**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS WESTERN DIVISION**

| | | |
|---|---|---|
| NICK GEORGEFF, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 3:20-cv-50313 |
| v. | ) | |
| | ) | |
| DON BORNEKE CONSTRUCTION, INC., | ) | |
| | ) | Judge: Honorable Judge John J. Tharp Jr. |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' AFFIRMATIVE DEFENSES II, III, IV, and V

Now comes the Plaintiff, NICK GEORGEFF, by his attorneys, ANESI, OZMON, LTD., and submits the following Motion to Strike Defendant, DON BORNEKE CONSTRUCTION, INC.'s ("Borneke"), Affirmative Defenses II - V pursuant to Fed. R.P.12(f). In support, Plaintiff states as follows:

## EXHIBITS

**Ex. A:** Plaintiff's Complaint
**Ex. B:** Deposition of Plaintiff
**Ex. C:** Construction Contract between Mortensen and Defendant
**Ex. D:** Deposition of Nicholas Borneke
**Ex. E:** Deposition of Andrew Black

**Ex. F:** Deposition of Joseph Barnes
**Ex. G:** Deposition of Leonard Breyne
**Ex. H:** Defendant's Affirmative Defenses
**Ex. I:** Deposition of Andrew Kruse
**Ex. J:** Deposition of Mark Sikel
**Ex. K:** Deposition of James Tinjum

## STATEMENT OF FACTS

This case involves a personal injury that occurred on November 15, 2018, at a construction project in Mendota Hills, Illinois. Ex. A, Compl. ¶¶ 6-13. Plaintiff was an ironworker employed by M.A. Mortensen Company ("Mortensen"). Ex. A, ¶ 6. The project was to build a windfarm in an area of farmland. There were 29 small areas designated as work sites

where wind turbines were to be erected by Mortensen. Ex. B, Dep. Nick Georgeff 22:7-20.

Defendant, Borneke Construction, was the professional excavation company hired for the

project. Pursuant to its contract with Mortensen, Borneke was responsible for grading,

compacting, and preparing the land at each work site so that workers could safely erect the

turbines. Ex. C, Cont.at 8-9; Ex. D, Dep. Nicholas Borneke 55:24-56:21. This meant "[b]umps

shall be **leveled and holes filled** to accommodate equipment travel," and that the cleared areas

"shall be **maintained, compacted and provide positive drainage** at all times." Ex. C, at 9.

(emphasis added). The purpose of grading and compacting the ground is to eliminate ruts and

depressed areas so that the ground can support the weight of delivery trucks, machinery, and

other materials that will be used during the turbine installation. Ex. E, Dep. Andrew Black 28:11-

15.  It is also important for the erection site to have proper drainage so that water cannot pool

creating a hazard for the workers. Ex. D, Dep. Borneke 43:9-24; Ex. F, Dep. Joseph Barnes

106:3-6; Ex. E, Dep. Black 36:12-37:17. If an area is properly graded with adequate drainage,

water will not pool and freeze into a sheet of ice. Ex. D, Dep. Borneke 69:4-22; Ex. F, Dep.

Barnes 120:18-23.

On the day in question, Mr. Georgeff arrived at the T-11 site (turbine 11). Ex. B, Dep.

Georgeff 44:6-12. The ground was covered in a thin blanket of snow. Ex. B, Dep. Georgeff 72:9-

16. As Mr. Georgeff walked toward his work area, he stepped on a sheet of ice concealed by the

snow. Ex. B, Dep. Georgeff 72:9-16. While attempting to exit the ice patch, he slipped and

sustained a serious ankle fracture. Ex. B, Dep. Georgeff 102:3-5;164:15-20.

## ARGUMENT

Plaintiff's complaint contains two counts—Direct Negligence and Premises Liability. Count I, Direct Negligence, alleges that Defendant had a duty to exercise reasonable care in performing its excavation work and Defendant breached its duty in failing to properly grade, compact, and maintain the land at the erection site. Ex. A, Compl. ¶¶11-12. Defendant's negligent work caused Plaintiff to be injured on the work site. Ex. A, ¶¶12-13. Count II, Premises Liability, alleges that Defendant controlled the premises and negligently caused and maintained a dangerous condition, namely ruts and unnatural accumulations of ice. Ex. A, ¶¶16-18. Count II further alleges that Defendant knew or could reasonably expect that persons on the property would not discover the danger or would fail to protect against the danger in performing their work. Ex. A, ¶ 19.

Defendant filed affirmative defenses on May 25, 2023. Affirmative defenses two through five <u>are defective in fact and in law and should be stricken</u>. An affirmative defense is a is "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's ... claim, even if all the allegations in the complaint are true." *Bell v. Taylor*, 827 F.3d 699, 704–05 (7th Cir. 2016). Because affirmative defenses are pleadings, they are subject to the pleading requirements of the Federal Rules of Civil Procedure. *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989). Accordingly, affirmative defenses must provide "a short plain statement" of the defense, including "all material elements of the claim asserted." Fed.R.Civ.P. 8(b)(A); *Renalds v. S.R.G. Rest. Group*,119 F. Supp. 2d 800, 802 (N.D. Ill. 2000). "Bare legal conclusions attached to narrated facts will not suffice*." Renalds v. S.R.G. Rest. Group*, 119 F. Supp. 2d 800, 802 (N.D. Ill. 2000).

3

The Court should strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" from pleadings.  Fed. R.P.12(f). When examining the sufficiency of an affirmative defense, courts employ a three-part test. *Sloan Valve Co. v. Zurn Industries, Inc.*, 712 F. Supp. 2d 743, 749 (N.D. Ill. 2010). First, the matter must be properly pleaded as an affirmative defense. *Id.* Second, the matter must meet the pleading requirements of Fed.R.Civ.P. 8 and 9. *Id.* And third, the matter must survive a Rule 12(b)(6) challenge—"in other words, if it is impossible for defendants to prove a set of facts in support of the affirmative defense that would defeat the complaint, the matter must be stricken as legally insufficient." *Id.*  For cases premised on diversity jurisdiction, "the legal and factual sufficiency of the affirmative defenses is examined with reference to state law." *LaSalle Bank Nat'l Assoc v. Paramont Properties*, 588 F. Supp. 2d 840, 860 (N.D. Ill. 2008)

## I.  Affirmative Defense II must be Stricken because the ice was not Open and Obvious and Defendant's active Negligence Caused Plaintiff's injury.

In a premises liability claim, the open and obvious doctrine is an exception to the general duty of care owed by a landowner. *Park v. N.E. Illinois Regl. Commuter R.R. Corp.*, 960 N.E.2d 764, 769 (Ill. App. 1st Dist. 2011). The doctrine provides that a "possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious." Restatement (Second) of Torts § 343A(1) (1965). A condition is open and obvious where "the condition and risk are apparent and would be recognized by a reasonable person exercising ordinary perception, intelligence, and judgment." *Crosson v. Ruzich*, 110 N.E.3d 355, 361 (Ill. App. 5th Dist. 2018); *see also Sandoval v. City of Chicago*, 830 N.E.2d 722, 727 (Ill. App. 1st Dist. 2005) (whether a condition is open and obvious depends on "the objective knowledge of a reasonable person confronted with the same condition").

Common examples of open and obvious conditions include fire, height, and bodies of water because these conditions, by nature, "carry their own warning of potential harm." *Bucheleres v. Chicago Park Dist.*, 665 N.E.2d 826, 832-37 (Ill. 1996). Similarly, sidewalk defects may constitute open and obvious conditions because they are common, "readily visible to a reasonably prudent pedestrian," and "can be easily anticipated by the average pedestrian." *Foy v. Village of La Grange*, 169 N.E.3d 1106, 1111 (Ill. App. 1st Dist. 2020); *see also Bruns v. City of Centralia*, 21 N.E.3d 684, 687 (Ill. 2014) (finding that the cracked uneven sidewalk was an open and obvious condition). If a condition is open and obvious, the law generally assumes that the likelihood of injury is slight because "people are expected to appreciate and avoid obvious risks." *Bucheleres*, 665 N.E.2d at 832. By contrast "if a danger is concealed or latent…the likelihood of injury increases because people will not be as readily aware of the latent danger." *Id*.

Here, the sheet of ice was <u>not</u> an open and obvious condition that alleviated the defendant's duty. It is undisputed that the ice was **concealed** by a thin blanket of snow on the day in question. Ex. B, Dep. Georgeff 72:9-16; Ex. G, Dep. Leonard Breyne 103:10-17. For a condition to be open and obvious, one needs to be able to appreciate both the condition and the risk. *See Crosson*,110 N.E.3d at 361. However, due to a layer of snow, Mr. Georgeff would have been unable to see the ice and it could not have been "open" or "obvious." Mr. Georgeff was unaware that the dangerous condition even existed. Ex. B, Dep. Georgeff 144:10-14. Since it is undisputed that the ice was concealed from his view, he had no opportunity to appreciate the risk, much less avoid it.

Moreover, even, *arguendo*, if the ice was "open and obvious," it would be irrelevant as the doctrine does not apply to Count I, the direct negligence claim, because the defendant's conduct

of negligently and improperly performing their work in excavating the land is what caused the plaintiff's injury. For the open and obvious doctrine to apply in ordinary negligence cases the alleged cause of the injury must be a condition of the land and **not the defendant's active negligence**. *Hutson v. Pate*, 2022 IL App (4th) 210696, ¶ 53.

This issue was addressed in *Hutson v. Pate* where the court held the open and obvious doctrine did not apply to the plaintiff's ordinary negligence claim because the defendant's **conduct** is what caused the plaintiff's injury, not some condition of the land. *Id.* ¶ 62. There, the defendant yanked a garden hose causing the plaintiff to trip and fall, fracturing her ankle. *Id.* ¶ 7. The plaintiff tripped because the defendant pulled the hose, not because of "some passive feature of the hose independent of [the defendant's] **dangerous conduct or active negligence**." *Id.* ¶ 55 (emphasis added).  The condition of the hose "was merely the instrumentality of [the plaintiff's] injury, not its cause." *Id.* ¶ 62.

Here, as in *Hutson*, the open and obvious doctrine does not apply to Mr. Georgeff's negligence claim (Count I) because the defendant's improper excavation work is what caused the injury at issue. The sheet of ice only existed because of the defendant's negligent **conduct** by improperly grading the ground and providing inadequate drainage. The testimony is clear that if Defendant did its job properly, in a non-negligent manner, there would not be large, depressed areas or standing water that could freeze over in the erection site. Ex. D, Dep. Borneke 83:5-24; 93:13-94:4; Ex. F, Dep. Barnes 120:18-23. In fact, the very reason Defendant was hired in the first place was to prevent these kinds of hazards. Ex. D, Dep. Borneke 72:7-11; Ex.E, Dep. Black 60: 1-24. Like the hose in *Hutson*, the ice was "merely the instrumentality" of Mr. Georgeff's injury, not its cause. *See* 2022 IL App (4th) 210696, ¶ 62. Thus, the open and obvious doctrine is

inapplicable to Mr.Georgeff's direct negligence claim (Count I) and Defendant's affirmative defense must be stricken.

## II. Affirmative Defense III must be stricken because it is not an Affirmative Defense at all; it is actually an Action for Contribution that Defendant failed to file.

When a defendant's negligence proximately causes a plaintiff's injury, "it is not a defense that [something] [or] [someone] else may also have been a cause of the injury." IPI. 15.01. The defendant's argument that Mortensen proximately caused Mr. Georgeff's injury is not an affirmative defense, rather, it is an action for contribution that the defendant failed to file. The Contribution Act provides when two or more people are liable in tort for the same injury to the same person, a right of contribution exists among them. 740 ILCS 100/2. Here, Defendant is attempting to blame Mortensen for Mr.Georgeff's injuries while at the same time refusing to bring a contribution action against the very party it argues is responsible. Defendant chose not to despite every opportunity to do so. As such, its affirmative defense must be stricken.

Additionally, in its prayer for relief, the defendant also stated that Mortensen was the "sole proximate cause" of Mr.Georgeff's injuries. Ex. H, Def.'s Affirm Def at 3. This similarly is not an affirmative defense. *See Allen v. Sarah Bush Lincoln Health Ctr.*, 185 N.E.3d 815, 830 (Ill. App. 4th Dist. 2021) (finding that "sole proximate cause. . .is not an affirmative defense" in a negligence action). Under federal law, "affirmative defenses generally admit matter in a complaint but nevertheless assert matters that would defeat recovery." *Amelio v. Yazoo Mfg. Co.*, 98 F.R.D. 691, 693 (N.D. Ill. 1983). Arguing that Mortensen is the sole proximate cause does not admit the allegations in Plaintiff's complaint. The court's analysis in *Amelio* is instructive in this regard.

In *Amelio*, the defendant's affirmative defense stated that "the plaintiff's own negligence was the sole and proximate cause of . . . his alleged injuries." *Id.* The court held that this was not a federal affirmative defense because, although it could be true, the defense did not admit the allegations of plaintiff's complaint. *Id.* If the jury found as the defendant claimed, the plaintiff "simply would have failed to prove necessary elements of his claim"—namely causation. *Id.*

Here, as in *Amelio*, the defendant's affirmative defense fails because it does not admit the allegations in Mr. Georgeff's complaint. Causation is a necessary element of Mr. Georgeff's prima facie case. Arguing that Mortensen is the sole proximate cause amounts to a denial and claim that a third party is responsible—not an affirmative defense.

Furthermore, the evidence already elicited in this case clearly establishes that Mortensen **could not** have been the sole proximate cause of Mr. Georgeff's injuries. The defendant, not Mortensen, was under a contractual obligation to grade and compact the ground, provide proper drainage, and maintain these conditions throughout the duration of the project. Ex. C, Cont. at 8-9; Ex. D, Dep. Borneke 55:24-56:21. It was the defendant's responsibility to not only prepare the ground right the first time, but to revisit the erection sites and provide periodic maintenance when necessary. Ex. D, Dep. Borneke 66:22-67:8. Based on the testimony and incident report, it appears that the defendant was called back to the site and shown the area where Mr. Georgeff fell, but negligently left the sheet of ice because it was in tight quarters. Ex. E, Dep. Black 79:2-10; Ex. I, Dep. Andrew Kruse 62:16-22.

For over 20 years, the defendant has worked on dozens of wind farm projects. Ex. D, Dep. Borneke 25:18-22. The defendant's employees testified that, as the expert in excavation, the manner in which Borneke performs its job is left to Borneke—not Mortensen. Ex. J, Dep. Mark

Sikel 81:10-20; Ex. D, Dep. Borneke 102:20-24. Even the defendant's own expert testified that Mortensen could not have been the sole proximate cause for the injury at issue. Ex. K, Dep. James Tinjum 174:2-13. Thus, the defendants affirmative defense must be stricken.

### III.     Affirmative Defenses IV must be Stricken because Lack of Notice does not Defeat an Ordinary Negligence Claim.

To prevail on a negligence claim, a plaintiff only needs to prove three elements:(1) the defendant owed plaintiff a duty, (2) the defendant breached its duty, and (3) this breach was the proximate cause of the plaintiff's injuries. *Williamson v. Evans Nails & Spa Corp.*, 2023 IL App (1st) 220084, ¶ 10. Establishing that the defendant had actual or constructive notice is not necessary when the evidence suggests that the defendant's active negligence caused the plaintiff's injury. *Wind v. Hy-Vee Food Stores, Inc.*, 650 N.E.2d 258, 264 (Ill. App. 3d Dist. 1995; *Piper v. Moran's Enterprises*, 459 N.E.2d 1382, 1389 (Ill. App. 5th Dist. 1984). For example, in *Wind*, the court held it was reversible error to require a plaintiff to prove actual or constructive notice when a defendant tripped over a floor mat in the defendant's store. 650 N.E.2d at 264. The defendant's employee placed a wrinkled mat in the doorway and failed to tape down its edges, which was customary practice during inclement weather. *Id.* at 259. Since the evidence suggested that the defendant negligently installed the mat, the plaintiff did not need to prove that the defendant had notice of the condition. *Id.*; *see also Piper*, 459 N.E.2d at 1389 (finding that a plaintiff who fell through a wooden pallet was not required to prove actual or constructive notice of because the defect was likely caused by Defendant's negligence).

Here, as in *Wind*, the evidence shows that Defendant's negligent conduct created the hazardous condition and caused Mr. Georgeff's injury. The defendant had a duty to exercise reasonable care in preparing the ground at the erection sites, which included grading and

compacting the land so that depressed areas did not form and providing positive drainage "at all times." Ex. C, Cont. at 9. Nick Borneke himself testified that if Borneke does its job properly there should not be standing water in the erection area. Ex. D, Dep. Borneke 69:18-22. Yet, at the T-11 turbine site where Mr. Georgeff fell, water was able to pool and freeze. The defendant's argument that it lacked notice fails because the defendant's negligence created the dangerous condition in the first place. Thus, with regard to Mr.Georgeff's direct negligence claim (Count I), affirmative defense IV must be stricken as it is inapplicable and does not bar Plaintiff's recovery.

### IV. Affirmative Defense V must be stricken because it does not Apply to Plaintiff's Direct Negligence Claim and Even in the Context of Premises Liability, the Accumulation of ice in this case was Unnatural.

The natural accumulation rule provides that "a landowner or possessor of real property has no duty to remove natural accumulations of ice, snow, or water from its property." *Beaumont v. J.P. Morgan Chase Bank, N.A.*, 782 F. Supp. 2d 656 (N.D. Ill. 2011). The flaw in the defendant's argument is that Mr. Georgeff's direct negligence claim is not premised upon the existence of ice on the land but upon the defendant's negligent performance of its excavation work. Not only did the defendant improperly grade and compact the ground—as evidenced by the large depression—but Defendant failed to provide adequate drainage. As a result, water was able to pool and freeze over. The testimony is clear that if an area is properly graded with proper drainage, water will not pool and freeze into a sheet of ice. Ex. D, Dep. Borneke 69:4-22; Ex. F, Dep. Barnes 120:18-23. Thus, it is not a defense to say the accumulation was natural because the defendant failed to use ordinary care in its excavation work causing Mr.Georgeff's injury. Accordingly, the defendant's affirmative defense must be stricken as it is inapplicable to the direct negligence claim.

Moreover, even in the context of the premises liability claim, Count II, the ice was an unnatural accumulation caused by defendant's conduct and failure to maintain the worksite. Owners or occupiers of land have a duty to prevent unnatural accumulations of ice on their property when it "is caused by design deficiencies that promote unnatural accumulations of ice and snow." *Webb v. Morgan*, 531 N.E.2d 36, 39 (Ill. App. 5th Dist. 1988). An unnatural accumulation can be caused by the design or maintenance of a premises, or if the owner caused the hazardous condition to develop in an artificial way. *Bloom v. Bistro Rest. Ltd. Partn*., 710 N.E.2d 121, 123 (Ill. App. 1st Dist. 1999). For example, in *Ide v. City of Evanston*, the court held that a sheet of ice on a sidewalk was an unnatural accumulation because it was caused by the defendant landlord's leaky pipes. 173 N.E.2d 534, 538 (Ill. App. 2d Dist. 1961). In *Lapidus v. Hahn* water dripped down from an apartment complex's roof onto the building's front porch. 450 N.E.2d 824, 828 (Ill. App. 1st Dist. 1983). The water collected in a depression on the porch and froze, later causing the plaintiff to slip and injure her arm. *Id.* Because a jury could reasonably conclude that the ice "was caused by the defective nature and construction of the roof and abetted by the depression in the platform," it was not a natural accumulation, and the defendant landlord was liable. *Id.*

Here, as in the examples above, the sheet of ice did not occur naturally. But for the defendant's negligence in failing to properly grade and maintain the land and provide adequate drainage, the large sheet of ice would not exist. As stated in the defendant's employee's testimony, if an area is properly graded with proper drainage, water will not pool and freeze into a sheet of ice. Ex. D, Dep. Borneke 69:4-22. The natural accumulation rule is not applicable where, as here, the owner or possessor of property "in some way caused an unnatural

11

accumulation or aggravated a natural condition." *Hahn*, 450 N.E.2d at 828. Because Defendant

caused the unnatural accumulation of ice, Defendant's affirmative defense must be stricken.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that this court

strike the defendants second (II) through fifth (V) affirmative defenses.

Respectfully Submitted

By:     /S/ Steven A. Berman
        One of the plaintiff's attorneys

Steve A. Berman (ARDC 6224469)
Charles A. Terry  (ARDC 6330705)
**ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.**
161 North Clark Street - 21st Floor
Chicago, IL  60601
312/372-3822

16546 MLT/ks
2/3/20

Attorney ID# 6216938

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| NICK GEORGEFF, | ) | |
| | ) | |
| Plaintiff, | ) | Case Number.: |
| v. | ) | |
| | ) | Judge: |
| DON BORNEKE CONSTRUCTION, INC., | ) | |
| | ) | Magistrate Judge: |
| Defendants. | ) | |

### COMPLAINT

Now comes the Plaintiff, NICK GEORGEFF, by his attorneys, ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., and complaining of the Defendant, DON BORNEKE CONSTRUCTION, INC., states as follows:

### JURISDICTION AND VENUE

1.     This is a personal injury action involving an individual plaintiff and a corporate defendant.

2.     The plaintiff is a citizen of the state of Illinois.

3.     The defendant is a citizen of the state of Minnesota.

4.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000.00 and is between citizens of different states.

5.     The events and omissions giving rise to this claim occurred in Lee County, Illinois, thus pursuant to 28 U.S.C. § 1391(b) this Court is the appropriate venue for this action.

EXHIBIT

A

## COUNT I – DIRECT NEGLIGENCE

6. On and before November 15, 2018, the plaintiff was employed by M. A. Mortenson Company and engaged in a construction project on a wind farm in or near the Village of Compton, Lee County, Illinois.

7. Prior to said date, M. A. Mortenson Company hired the defendant to grade, maintain, repair and remove snow and ice from the dirt roadways used by persons, vehicles, and equipment on the construction site.

8. On and before said date defendant was in charge of and responsible for grading, maintaining, repairing, and removing snow and ice from the dirt roadways used by persons, vehicles and equipment on the construction site.

9. On and before said date defendant operated vehicles and equipment on the dirt roadways.

10. On said date, the plaintiff was walking on a dirt roadway on the construction site in the performance of his work.

11. At all relevant times, the defendant had a duty to exercise reasonable care in the grading, maintaining, repairing and removal of snow and ice from said dirt roadway.

12. Notwithstanding and in violation of said duty, defendant, through its agents, servants, and employees, was then and there guilty of the following careless and negligent acts and/or omissions:

(a) Failed to properly grade, maintain and repair the dirt roadway;

(b) Failed to remove or to properly remove snow and ice from the dirt roadway;

2

     (c)     Failed to make a reasonable inspection of the dirt roadway when the defendant knew or should have known that such inspection was necessary to prevent injury to persons using the dirt roadway;

     (d)     Failed to use ordinary care to see that the dirt roadway was reasonably safe for the use of those lawfully on the property;

     (e)     Caused tracks and ruts to form on the dirt roadway creating a danger to persons using the dirt roadway;

     (f)     Allowed tracks and ruts to remain on the dirt roadway creating a danger to persons using the dirt roadway;

     (g)     Caused unnatural accumulations of ice to form in tracks and ruts on the dirt roadway creating a danger to persons using the dirt roadway;

     (h)     Allowed unnatural accumulations of ice to remain in tracks and ruts on the dirt roadway creating a danger to persons using the dirt roadway;

     (i)     Was otherwise careless and negligent.

13.     As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions, at said time and place plaintiff slipped and fell on an unnatural accumulation of ice, causing him to suffer severe bodily injury and to sustain damages of a personal and pecuniary nature, including but not limited to pain, suffering, disability, loss of a normal life, loss of earnings and loss of earning potential, expenses for medical care and services, and other damages, all of which are continuing and permanent in nature.

WHEREFORE, plaintiff respectfully requests judgment be entered in his favor and against the defendant in a dollar amount in excess of $75,000.00, plus costs of suit.

## COUNT II – PREMISES LIABILITY

14.     On and before November 15, 2018, the plaintiff was employed by M. A. Mortenson Company and engaged in a construction project on a wind farm in or near the Village of Compton, Lee County, Illinois.

15.     Prior to said date, M. A. Mortenson Company hired the defendant to grade, maintain, repair and remove snow and ice from the dirt roadways used by persons, vehicles, and equipment on the construction site.

16.     On and before said date defendant possessed, operated, managed, maintained, designed, inspected, planned and/or controlled the dirt roadways used by persons, vehicles, and equipment on the construction site.

17.     On said date, the plaintiff was walking on a dirt roadway on the construction site in the performance of his work.

18.     On said date the defendant, well knowing its duty in this regard, carelessly and negligently caused and permitted said dirt roadway to become and remain in a dangerous condition for persons walking on the dirt roadway, in that the dirt roadway was in a state of disrepair with tracks, ruts, and unnatural accumulations of ice present, although the defendant knew or in the exercise of ordinary and reasonable care should have known of the dangerous condition.

19.     At said time and place the defendant knew or could reasonably expect that persons on the property would not discover or realize the danger or would fail to protect against the danger in the performance of their work.

20.     As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions, at said time and place plaintiff slipped and fell on an unnatural accumulation of ice, causing him to suffer severe bodily injury and to sustain damages of a personal and pecuniary nature, including but not limited to pain, suffering, disability, loss of a normal life, loss of earnings and loss of earning potential, expenses for medical care and services, and other damages, all of which are continuing and permanent in nature.

4

WHEREFORE, plaintiff respectfully requests judgment be entered in his favor and against the defendant in a dollar amount in excess of $75,000.00, plus costs of suit.

**PLAINTIFF DEMANDS TRIAL BY JURY**

/s/ Michael L. Teich
Attorneys for Plaintiff

Michael L. Teich
Attorney ID# **6216938**
**ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.**
161 North Clark Street - 21st Floor
Chicago, IL 60601
312/372-3822 / mteich@anesilaw.com

**GEORGEFF, NICK**
01/04/2022

Pages 1–4

---

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHERN DISTRICT of ILLINOIS
3              WESTERN DIVISION
4  NICK GEORGEFF,              )
5              Plaintiff,      )
6      -vs-                    )  No. 3:20 CV 50313
7  DON BORNEKE CONSTRUCTION,   )
8  INC.,                       )
9              Defendant.      )
10
11     The videoconference deposition of NICK
12  GEORGEFF, called for examination, taken pursuant to
13  the Federal Rules of Civil Procedure of the United
14  States District Courts pertaining to the taking of
15  depositions, taken before CAROL RAYMOND, CSR No.
16  84-001077, a Notary Public within and for the
17  County of DuPage, State of Illinois, and a
18  Certified Shorthand Reporter of said state, at
19  Suite 2100, 161 North Clark Street, Chicago,
20  Illinois, on the 4th day of January, A.D. 2022,
21  commencing at 2:00 p.m.
22
23
24
```

Page 2

```
1  PRESENT:
2      ANESI, OZMON, RODIN, NOVAK & KOHEN,
3      (161 North Clark Street, Suite 2100,
4      Chicago, Illinois 60601,
5      (312) 372-3822), by:
6      MR. CHARLES A. TERRY,
7      cterry@anesilaw.com
8          appeared on behalf of the Plaintiff,
9
10      SWANSON, MARTIN & BELL,
11      (330 North Wabash, Suite 3300,
12      Chicago, Illinois 60611,
13      (312) 321-8448), by:
14      MR. CHRISTIAN A. SULLIVAN,
15      csullivan@smbtrials.com
16          appeared on behalf of the Defendant.
17
18
19
20
21
22
23  REPORTED BY:  CAROL RAYMOND, CSR,
24              CSR No. 04-001077
```

Page 3

```
1              (WHEREUPON, the witness was duly
2              sworn.)
3              (WHEREUPON, a certain document was
4              marked Georgeff Deposition Exhibit
5              No. 2, for identification, as of
6              1/4/22.)
7      THE COURT REPORTER:  My name is Carol
8  Raymond, a State notary public and certified
9  shorthand reporter.  This deposition is being held
10  via videoconferencing equipment.  The witness and
11  reporter are not in the same room.  The witness
12  will be sworn in remotely pursuant to agreement of
13  the parties.
14              NICK GEORGEFF,
15  called as a witness herein, having been first duly
16  sworn, was examined and testified as follows:
17              DIRECT EXAMINATION
18  BY MR. SULLIVAN:
19      Q.    Good afternoon, Mr. Georgeff.  My name
20  is Chris Sullivan and I represent the defendant in
21  this case, Borneke Construction Company.
22              Could you please state your name and
23  spell it for the court reporter.
24      A.    Yes, Nick Georgeff, N-i-c-k,
```

Page 4

```
1  G-e-o-r-g-e-f-f.
2      Q.    And could I call you Nick?
3      A.    Yes.  Sure.
4      Q.    Nick, do you still live at 7126 Townsend
5  Road in Plainfield?
6      A.    Yes, I do.
7      Q.    And have you ever given a deposition
8  before?
9      A.    No, I have not.
10      Q.    Okay.  Let me explain a little bit about
11  the process.  This is the opportunity that I have,
12  and the only opportunity to ask you questions about
13  your claim in this case against my client, Don
14  Borneke Construction.  The only thing that I ask
15  is, you listen carefully to my question, and let me
16  know if you have not understood something that I
17  have asked.  It will be more difficult with the
18  technology that we have to deal with, but be that
19  as it may, I will do my best to hear you and for
20  you to hear me.
21              If you answer a question without letting
22  me know you did not understand, then, I have to
23  assume that you understood it when you answered the
24  question, does that sound fair?
```

EXHIBIT

B

GEORGEFF, NICK
01/04/2022

**Page 5**

```
 1     A.    Yes, it does.
 2     Q.    And there's probably going to be more of
 3  a delay just because, you know, we're on the
 4  electrical communication here.  She cannot take
 5  down -- the court reporter cannot take two people
 6  speaking at once and so forth.  So, there may be
 7  plenty of times that you will anticipate my
 8  question before I am done, but I just ask that wait
 9  until I am done because she cannot take us both
10  down speaking at the same time and she cannot take
11  nonverbal responses either.  There will be a few
12  times when I may ask a follow up just be clear of
13  whether the answer is yes or no or what have you.
14  Other than that, if you need a break for any
15  reason, let me know.  Otherwise, it should be
16  fairly efficient.
17     A.    Okay.
18     Q.    How long have you lived at this address
19  in Plainfield, sir?
20     A.    21 years.
21     Q.    And you own the home there?
22     A.    My parents own the home.
23     Q.    And who are your parents?  What are
24  their names?
```

**Page 6**

```
 1     A.    James and Lucy Georgeff.
 2     Q.    Do they still live there?
 3     A.    No, they do not.
 4     Q.    Currently you live with your wife and
 5  two kids, is that correct?
 6     A.    That's correct.
 7     Q.    And how old are your children?
 8     A.    21 and 18.
 9     Q.    And your wife's name is what?
10     A.    Ana, A-n-a.
11     Q.    One N?
12     A.    One N.
13     Q.    And you said -- who owns the home now?
14     A.    My parents own it.
15     Q.    Okay.  They are still alive, though?
16     A.    Yes, they are.
17     Q.    Do you own any homes yourself in your
18  own name?
19     A.    No, I do not.
20     Q.    And what does your wife do for a living?
21     A.    Interior design.
22     Q.    Are you currently working anywhere?
23     A.    I am working at Home Depot now.
24     Q.    And since when?
```

**Page 7**

```
 1     A.    July of 2020.
 2     Q.    Okay.  And your salary there is what?
 3     A.    Right now it's $15 an hour.
 4     Q.    And are you scheduled for any raises in
 5  the future that you know of?
 6     A.    No.
 7     Q.    You work at one specific store?
 8     A.    Yes.
 9     Q.    Where is that?
10     A.    In Shorewood.
11     Q.    And describe your educational
12  background, please.
13     A.    High school, I finished.  I attended
14  Triton College for two years.  I have an
15  associate's in applied science.  I went there for
16  automotive.
17     Q.    And what high school, sir?
18     A.    Downers Grove South.
19     Q.    What years?
20     A.    I graduated in 1990.
21     Q.    1990?
22     A.    Yes.
23     Q.    And when did you complete your Triton
24  College work?
```

**Page 8**

```
 1     A.    I believe '93 I finished.
 2     Q.    Did you ever work as a mechanic?
 3     A.    Yes, I did.
 4     Q.    And where did you work?
 5     A.    I started out at Honda of Lisle.
 6     Q.    It is right next to my office.  I bought
 7  two cars there.  Were you an ASE certified
 8  technician?
 9     A.    No.
10     Q.    What was your position?
11     A.    I was a technician.
12     Q.    They call it a technician?
13     A.    Yes.
14     Q.    How many years did you work there?
15     A.    I worked there for three years.
16     Q.    And have ever been ASE certified?
17     A.    I was ASE certified in suspension.
18     Q.    And did you work anywhere else as a
19  mechanic?
20     A.    What is that?
21     Q.    Did you work anywhere else as a
22  mechanic?
23     A.    Yes, I worked at an independent shop in
24  Naperville called Sterling Automotive.
```

GEORGEFF, NICK
01/04/2022

Pages 9–12

Page 9

1    Q.    You said Sterling?
2    A.    Yes.
3    Q.    And what was your salary at those two
4    places, if you recall?
5    A.    I really don't remember.
6    Q.    Okay.  And just so I know, what were the
7    years that we are talking about?
8    A.    At Honda it was probably '91 through
9    about '94.  And then Sterling Automotive was like
10   '94 to about '99.
11   Q.    Is that place still in existence?
12   A.    The last I heard it was and the owner
13   had passed probably eight years ago.  I believe it
14   was still operational.
15   Q.    Okay.  And did you work anywhere else as
16   a mechanic after Sterling Automotive?
17   A.    No, I did not.
18   Q.    Why did you decide to change careers?
19   A.    Better benefits as an ironworker.  My
20   brother's father-in-law was an ironworker and he is
21   the one that kind of recruited.  He thought it
22   would be a good fit for me.
23   Q.    What does your dad do out of curiosity?
24   A.    He worked in a factory.  Rexnord, they

Page 10

1    made airplane parts.
2    Q.    Is that in Joliet somewhere?
3    A.    No, I believe it was Downers Grove.
4    Q.    And was there any specific reason why
5    you left Sterling in 1999 as opposed to any other
6    time?
7    A.    No specific reason.  I just wanted a
8    change.  Like I said, the benefits were better.
9    The complete package was a lot better being an
10   ironworker.
11   Q.    And how were you trained as an
12   ironworker?  Where and how?
13   A.    In Joliet I went trough an
14   apprenticeship for three years.
15   Q.    This is at Local 444?
16   A.    Yes.
17   Q.    You said your brother's father-in-law
18   got you into it?
19   A.    Yes.
20   Q.    And he's still a member of Local 444?
21   A.    He was.  He passed about five or six
22   years ago.
23   Q.    What do you have to do qualify as an
24   ironworker?

Page 11

1    A.    You have to take a test to get into the
2    apprenticeship.
3    Q.    Okay.  And this is testing through the
4    union itself, right?
5    A.    Right.
6    Q.    Now, is Local 444 the only union you
7    have been a member of?
8    A.    Yes, it is.
9    Q.    Okay.  Because there's also unions for
10   auto mechanics, right?
11   A.    Yes.
12   Q.    And you were never a member of those?
13   A.    No.
14   Q.    Okay.  Did you apply to any other union
15   aside from 444?
16   A.    No, I have not.
17   Q.    Okay.  And what is involved with the
18   apprenticeship program for the three years you
19   discussed?
20   A.    You basically go through, you know,
21   history of iron working, structural rebar
22   reinforcing, and you also have on-the-job training,
23   like welding.
24   Q.    Okay.  So, you would regularly perform

Page 12

1    welding tasks as part of the ironwork as well?
2    A.    Right.
3    Q.    Okay.  Before I forget, have you ever
4    had any felony convictions in your lifetime?
5    A.    No, I have not.
6    Q.    Have you ever had any misdemeanor
7    convictions involving dishonesty?
8    A.    Not that I am aware of, no.
9    Q.    And you have lived in Illinois your
10   whole life?
11   A.    Yes, I have.
12   Q.    You have been married once?
13   A.    I have been married twice.
14   Q.    No kids from your first marriage?
15   A.    No kids.
16   Q.    From when to when was your first
17   marriage?
18   A.    '91 to '94.
19   Q.    Okay.  The same time that you were at
20   Honda of Lisle?
21   A.    Yes.
22   Q.    Does that coincide with your work at
23   Honda of Lisle when you divorced, I guess?
24   A.    Not really.  It just ended up that way.

GEORGEFF, NICK
01/04/2022

Page 13

1    Q.    Okay.  And what's your date of birth,
2  sir?
3       A.    November 5, 1971.
4    Q.    So, from when to when did you do the
5  three-year apprenticeship?
6       A.    I started in 2001 and I finished in
7  2004.
8    Q.    And, I assume, part of it is on-the-job
9  training, right?
10      A.    Right.
11   Q.    And then is there testing throughout or
12 is there just a one-time test before and after?
13      A.    Just a one-time test and then you got to
14 pass your classes.
15   Q.    Okay.  And does the class involve some
16 onsite construction as well?
17      A.    Not so much on-site.  We would attend
18 class at the union hall twice a week where we would
19 have basic classes and a welding class.
20   Q.    So, everything was at the union hall,
21 then?
22      A.    Right.
23   Q.    And that's located where?
24      A.    In Joliet.

Page 14

1    Q.    So, at the end of the three years, then,
2  where did you go?  What did you do?
3       A.    What's that?
4    Q.    What happened at the end of the
5  three-year apprentice?
6       A.    I became a journeyman.
7    Q.    Okay.  And a journeyman was your title
8  at the time of this incident as well, right?
9       A.    Right.
10   Q.    Okay.  So, do you get a certificate or
11 something that says you are a journeyman?
12      A.    You get your union card, that's
13 typically the completion of it.
14   Q.    I see because you have to be a
15 journeyman to have your union card, right?
16      A.    Correct.
17   Q.    So, you got our union card when?
18      A.    2004.
19   Q.    Okay.  And where did you work after
20 that?
21      A.    I was allover.
22   Q.    So, how does it normally work, then?  I
23 am not that familiar with union assignments and so
24 forth.  You just -- tell me how it works when you

Page 15

1  get an assignment through the union and how long it
2  lasts and that sort of thing?
3       A.    I would show up at the union hall.  We
4  would get a call that they need somebody and I
5  would be dispatched to a certain location depending
6  on where it is and it can last anywhere from a day
7  to a year.
8    Q.    So all assignments ran through the union
9  hall?
10      A.    Right.
11   Q.    And they would tell you just where to
12 go?
13      A.    Yes.
14   Q.    I was looking at their website, it has a
15 pretty broad area of Northern Illinois that your
16 union covers, is that right?
17      A.    Yes, it is.
18   Q.    Okay.  So, the project at issue here is
19 one of these wind turbine sites, right?
20      A.    Right.
21   Q.    Of course -- it seems like they are
22 allover our state now.  How much experience did you
23 have with that type of job site before the incident
24 at issue in this case in 2018?

Page 16

1       A.    Quite a bit.  I worked on a wind farm, I
2  believe, it was in 2008, that was also Mortenson
3  the general contractor on that.  I was there --
4    Q.    I'm sorry.
5       A.    I was there close to a year and then
6  this job site.
7    Q.    Would that have been the second time on
8  a wind turbine project for you?
9       A.    Correct.
10   Q.    So, the 2008 project, how long did --
11 you said it was about a year?
12      A.    Roughly a year.
13   Q.    And where was that?
14      A.    I believe Dwight, Illinois.
15   Q.    Is that like Grundy County or something?
16      A.    I believe so.  I know it is in that same
17 general area.
18   Q.    So, from '04 to '08, what type of
19 projects were you doing?
20      A.    Mainly reinforcing projects.
21   Q.    Okay.  Is that for new building
22 construction, is that you mean?
23      A.    Yeah, new buildings.
24   Q.    Reinforced rebar, is that what you

GEORGEFF, NICK
01/04/2022

Page 17

1  saying?
2      A.    Correct.
3      Q.    And so that could be -- well, where was
4  the majority of your work in terms of location?
5      A.    Typically around the Joliet area.
6      Q.    Okay.  Mainly the Joliet area?
7      A.    Mainly the Joliet area.  Occasionally, I
8  would be going towards Kankakee or towards Aurora,
9  that area.
10     Q.    It would be like high-rise projects?
11     A.    In Joliet, no.
12     Q.    What kind of -- shopping malls?  I am
13  just trying to get a feel of what kind of projects?
14     A.    Warehouses.  Shopping malls.  The
15  biggest thing was probably warehouses.
16     Q.    Okay.  And so the length of the time of
17  any those projects could vary, I guess, right?
18     A.    Right.
19     Q.    And is that, generally speaking, the
20  type of work you did other than these two wind
21  turbine projects?
22     A.    Yes, it was mainly warehouses.  I did a
23  library in Elgin.
24     Q.    Okay.  And each of these were all

Page 18

1  reinforced rebar work?
2      A.    The Elgin Library was more like
3  Structural Steel.  That was setting columns and
4  beams.
5      Q.    Okay.  And what does an ironworker do on
6  a wind turbine site?
7      A.    Depending on what section you are on,
8  the base of wind turbines are reinforced steel, so
9  there's concrete, I did that before I came over to
10  the turbine crew.
11     Q.    Okay.  And what does that involve in
12  terms of is -- is it setting reinforced steel into
13  concrete, is that what it is?
14     A.    Yeah.
15     Q.    That's for the base of the turbine?
16     A.    Right, that's for the base of the
17  turbine?
18     Q.    All right.  Let's talk about the 2008
19  project.  What was your duty in that situation?
20     A.    Just ironworker.  I was doing the base
21  reinforcing, journeyman.
22     Q.    The same exact thing you just mentioned?
23     A.    Right.
24     Q.    And the design of the wind turbine was

Page 19

1  essentially the same as the one in this case?
2      A.    Correct.  They might not been as tall,
3  but, generally speaking, they were about the same.
4      Q.    And then you said you moved onto the
5  turbine itself?
6      A.    Yes, to the erection site.
7      Q.    Did you ever do the erection site work
8  in the 2008 project?
9      A.    No, I did not.
10     Q.    And what is involved for you as a
11  ironworker in the turbine erection base?
12     A.    I was the steward on the job.  So, I
13  would basically be going to the union hall and
14  doing union business, whatever needed to be done.
15  Getting permits for out-of-town workers and then
16  they would have me -- basically, I would unload the
17  trucks part of the day and then I would help the
18  erection side with what they needed.
19     Q.    So, part of your job was to actually get
20  the permits and so forth?
21     A.    Right.
22     Q.    Okay.  Now, what was the length of time
23  that this project took place and it's called The
24  Mendota Hills Project, right?

Page 20

1      A.    Yeah, I don't really remember what it
2  was called.
3      Q.    Okay.  What was the closest town to
4  where this was, do you know?
5      A.    Compton.
6      Q.    Now, we know from the documents that's
7  been referred to as the Mendota Hills site, but,
8  apparently -- I mean, you're not disputing that's
9  the name or anything, are you?
10     A.    No.
11     Q.    You are not aware of any other name for
12  the general project, are you?
13     A.    Not that I am aware of.
14     Q.    So, when did you first join this
15  project?
16     A.    I would say it started back in April or
17  May of 2018, because I was on the reinforcing site
18  until the beginning of October and then I went to
19  the erection site in the beginning of October.
20     Q.    Okay.  So, erection October-November.
21  And we know the incident took place on November
22  15th of '18.  And did you ever go back to work at
23  Mortenson's after that?
24     A.    Not Mortenson.  They gave me light duty

Page 21

1  for a little bit after my accident.  I think it was
2  three or four weeks.
3       Q.   So, then, when -- when was the last time
4  you worked for Mortenson that you recall?
5       A.   I want to say the beginning of May of
6  2019.
7       Q.   I'm skipping ahead a little bit and I
8  will get into that specifically.  How was your
9  salary determined working for Local 444?
10      A.   It's a base salary.  Everybody gets the
11  same.  Depending on the job, if you are foreman you
12  get paid a little more, but basically journeymen
13  are all the same.
14      Q.   And you have never been a foreman
15  before, have you?
16      A.   Not on this job.  I was a foreman at one
17  other job.
18      Q.   Just one time you've been a foreman?
19      A.   Yes, just the one time.
20      Q.   And your base salary was $41.75 an hour
21  in 2018, is that right?
22      A.   Correct.
23      Q.   And was that the same rate throughout
24  this project?

Page 22

1      A.   Yes.
2      Q.   What was the reason that you went to
3  erection duties in October of 2018, if you know?
4      A.   The reinforcing section was done and I
5  knew everybody already in the erection side, so I
6  just hopped over.
7      Q.   Okay.  What was Mortenson's role in the
8  project as a whole, do you know?
9      A.   General contractor.
10      Q.   And do you know what Mortenson's role
11  was?
12      A.   Excavating.
13      Q.   Did you ever have any interaction with
14  Don Borneke's employees?
15      A.   No.
16      Q.   Just in the order of things, there were
17  probably dozens.  Do you know how many turbines
18  were on this site as a whole?
19      A.   I believe there was 29.
20      Q.   So over two dozen?  29 turbines?
21      A.   Correct.
22      Q.   Each one has its own little site,
23  correct?
24      A.   Yes.

Page 23

1      Q.   It involves basically grading the
2  farmlands so you could set it up, is that fair to
3  say?
4      A.   Sure.
5      Q.   Because this was all in farmlands,
6  right?
7      A.   Yes.
8      Q.   Okay.  And just so I have the location,
9  it's essentially Interstate 39 and County Road 10,
10  does that sound right?
11      A.   That sounds right.
12      Q.   And it says Lee County Illinois, right?
13      A.   Yes.
14      Q.   In terms of the order of erecting a
15  turbine, there are areas where it's set up and it's
16  graded and there are also access roads to get to
17  that area, right?
18      A.   Yes.
19      Q.   So, is it graded and then the concrete
20  is poured and the base reinforcement project is
21  undertaken first, right?
22      A.   Right.
23      Q.   And by the way, do you know the diameter
24  of these turbines?

Page 24

1      A.   I know the base was about 75 feet
2  across.
3      Q.   And they are all the same size, right?
4      A.   Yeah.
5      Q.   Okay.
6      A.   The reinforcing base was about 75 feet.
7      Q.   How big would the concrete slab be?
8      A.   Those were about 75 feet.
9      Q.   Okay.
10      A.   Going in towards the bottom and they
11  cone up at the top and they probably about 25 feet.
12      Q.   At the top?
13      A.   At the top.
14      Q.   Of the turbine itself?
15      A.   Right.
16      Q.   So, was it designed so that the base of
17  the turbine covered the concrete completely?
18      A.   Not completely.
19      Q.   How much of a gap was there, if you
20  know?
21      A.   There was maybe a couple of inches on
22  each side once the base was set.
23      Q.   And was part of your job duties in
24  erecting the base to actually -- these are huge

GEORGEFF, NICK
01/04/2022

Page 25

1  screws in the concrete, right?
2  **A.  Correct.**
3  Q.   And it was part of your job to make sure
4  it was secured with the screws and so forth?
5  **A.  Yeah.**
6  Q.   How large are these screws?
7  **A.  They got to be inch-and-a-half, two**
8  **inches.**
9  Q.   There are 100 of them or how many?
10 There is maybe more?  Hundreds of screws?
11 **A.  Yes, probably.  I would say a 100 to be**
12 **safe.**
13 Q.   So, once that part is completed, then
14 the turbine is brought in in sections, right?
15 **A.  Right.**
16 Q.   And the access road is to get the
17 equipment to raise the turbines, is that right?
18 **A.  Right.**
19 Q.   Do you know how large the sections were?
20 **A.  I want to say the base was a little over**
21 **200 feet long.**
22 Q.   Okay.
23 **A.  Then in the mid was -- they were all**
24 **pretty much the same, but I know the base was**

Page 26

1  probably the largest section.
2  Q.   That's the base that anchors onto the
3  circular pad, right?
4  **A.  Right.**
5  Q.   Then there is a mid section before you
6  get to the fan section?
7  **A.  Correct.**
8  Q.   You never worked on erecting the fan
9  section, right?
10 **A.  No.**
11 Q.   And these way tons, I assume, correct?
12 **A.  Yes.**
13 Q.   And they are made out of reinforced
14 steel.  Do you know what these turbines are made
15 out of?
16 **A.  They are reinforced steel.**
17 Q.   Now, the access roads, were they all
18 essentially -- strike that.
19        Each little pad site, was it roughly the
20 same area?
21 **A.  Pretty much for the most part.**
22 Q.   Okay.
23 **A.  Some might have been a little bigger**
24 **than others, but essentially they are all roughly**

Page 27

1  the same.
2  Q.   The access roads were essentially
3  supposed to be temporary, weren't they?
4  **A.  I don't know about the access roads.**
5  Q.   Okay.  Is part of your job on the
6  turbine section, did you have to visit multiple
7  sites?
8  **A.  Yes.**
9  Q.   Okay.  Now, you said you were -- part
10 of your duty was to get permits.  What kind of
11 permits did you have to get?
12 **A.  Just permits for out-of-town workers,**
13 **working our local.**
14 Q.   That's for your union, essentially,
15 right?
16 **A.  That's for the union.  It's allover.**
17 **It's just not in Joliet.**
18 Q.   Now, is Lee County an area that your
19 union normally covers or is this some outside area?
20 **A.  No, it is our union.  Our local.**
21 Q.   Why would you have to get out of town, I
22 am just curious?
23 **A.  Some of the guys travel with Mortenson.**
24 **I know one of the guys was from Minnesota, so he**

Page 28

1  would have to pay for a permit to work in our
2  **local.**
3  Q.   I see.  And you were never directly a
4  Mortenson's employee, were you?
5  **A.  I worked for Mortenson.  I wasn't a**
6  **lifetime Mortenson employee.**
7  Q.   Right.  It was always through the union,
8  right?
9  **A.  Yes.**
10 Q.   Did Mortenson have its own ironworkers
11 that were not union workers?
12 MR. TERRY:  I'm going to object to foundation.
13 When you say nonunion workers, you mean not Local
14 444 or not union at all?
15 MR. SULLIVAN:  Not union at all.
16 MR. TERRY:  You can answer if you know.
17 BY THE WITNESS:
18 **A.  They were all union.  They just belonged**
19 **to different unions around the country.**
20 BY MR. SULLIVAN:
21 Q.   Okay.  Do you know where Mortenson is
22 based, do you know?
23 **A.  I believe they are out of Minnesota.**
24 Q.   Were there any of the Mortenson

GEORGEFF, NICK
01/04/2022                                                                    Pages 29–32

Page 29

1  employees that you worked with in 2008, that were
2  also on this project in 2018?
3       A.    I did recognize a couple of them.  I am
4  not really sure what their names are.  I did
5  recognize a few from that site.
6       Q.    Okay.  And when you switched from the
7  base reinforcement to turbine erection, did you
8  have a new supervisor at that point?
9       A.    Yes.
10      Q.    Okay.  Who was this -- this would be a
11 Mortenson employee who was your supervisor, I
12 assume, right?
13      A.    Right.
14      Q.    Who was your supervisor for the base
15 reinforcement part of the project?
16      A.    There were actually two.  There were
17 subcontractors.  They were not Mortenson's
18 employees.  They were a different company.  But
19 Joel McGrath was one of them.
20      Q.    And, then, who was your supervisor when
21 you were in turbine erection?
22      A.    Lonnie Anderson.
23      Q.    L-o-n-n-i-e?
24      A.    Yeah.

Page 30

1       Q.    So, it was a female?
2       A.    No, it was a male.
3       MR. TERRY:  And for the record Lonnie,
4  L-o-n-n-i-e, and the last name is Sears, like Sears
5  and Roebuck.
6  BY MR. SULLIVAN:
7       Q.    Had you ever worked with Lonnie Sears
8  before you were transferred to the turbine erection
9  section?
10      A.    No.
11      Q.    And how was it determined where you had
12 to go each day, when you were in that turbine
13 erection division, or whatever you call it.
14      A.    It would depend.  Certain trucks would
15 come in for certain units.  So, each site had its
16 own specific components.
17      Q.    When you say specific components, they
18 all have the same components, but different stages
19 of erection, is that what you're saying?
20      A.    They all have the same components, but
21 just certain ones were designated for certain
22 sites.
23      Q.    Okay.  Was your area limited to a
24 certain area of the whole project?

Page 31

1       A.    No.
2       Q.    Okay.  So, you could have been at any
3  one of the 29 turbine sites, is that what you're
4  saying?
5       A.    Correct.
6       Q.    And the whole space is hundreds of
7  acres, is that fair to say?
8       A.    That's correct.
9       Q.    Okay.  So, other than obtaining permits
10 and so forth, what was your actual duty in terms of
11 inspecting each site that you would have to visit?
12 What were you doing?
13      A.    Like I said, I was unloading components,
14 that was part of my duties in the morning, and then
15 in the afternoon I would go to wherever they needed
16 help.
17      Q.    And what kind -- what components were
18 you unloading?
19      A.    Like the base, the mid and the blades.
20      Q.    The huge sections themselves, right?
21      A.    Right.
22      Q.    So, they would come in on a crane,
23 right?
24      A.    They would come in on semis and then we

Page 32

1  would use a crane to unload them.
2       Q.    Now, you weren't -- obviously, you were
3  not a crane operator, correct?
4       A.    I am not.
5       Q.    You never drove the semi.  You weren't
6  involved in the actual removal components from the
7  truck to the ground?
8       A.    I was involved in hooking them up to the
9  crane to get them on the ground.
10      Q.    They use like a cable winch type of
11 systems?
12      A.    Right.
13      Q.    So, you would have to climb onto the
14 turbine to do that?
15      A.    We would use a JLG, an aerial lift.
16      Q.    I am familiar with a JLG lift, that's a
17 common four-wheeled lift that you see inside and
18 outside to raise -- it's a platform, right?
19      A.    Right.
20      Q.    It raises up various different heights
21 for workers and for maybe components, right?
22      A.    Correct.
23      Q.    So, you would have to stand on the JLG?
24      A.    Correct.

GEORGEFF, NICK
01/04/2022

Page 33

1     Q.    Then connects the hooks and then the
2  crane would take it and put it on the ground?
3     A.    Right.
4     Q.    These things, considered they weigh so
5  much, they were always put directly on the earth?
6     A.    No, we would put them on cribbing.  They
7  used to be railroad ties 10 x 12.
8     Q.    And who erected the cribbing?
9     A.    We technically would.
10    Q.    Even though you weren't personally
11  involved with the cribbing section, were you?
12    A.    I did do some of the cribbing, yes.
13    Q.    What does that involve in putting the
14  cribbing down?
15    A.    We basically have like a truckload of
16  cribbing and a little forklift truck would come in
17  and pick one out and set it down where we needed
18  it.  We wouldn't be moving them by hand.
19    Q.    Okay.  And, then, as long as you need it
20  for the turbines, so at least it wasn't sitting on
21  the bare ground?
22    A.    Correct.
23    Q.    And was the area where the cribbing
24  placed, was it graded at all before that?

Page 34

1     A.    Yes and no.  Yes it was, but once the
2  trucks would come in to unload it, depending on if
3  it had rained the night before or that day, it
4  would essentially become ungraded because there
5  would be ruts in the ground.
6     Q.    And, then, was the area regraded after
7  the components were placed on the cribbing, if you
8  know?
9     A.    Not to my knowledge.
10    Q.    Now, you don't claim to have the
11  expertise in grading, do you?
12    A.    Expertise, I would say, no.
13    Q.    You've never been involved in a grading
14  project like Borneke was doing in this case, were
15  you?
16    A.    No, I have not.
17    Q.    And you don't have any knowledge of what
18  the contract between Mortenson and Borneke required
19  Borneke to do, do you?
20    A.    No.  I know what typically is done on
21  job sites.
22    Q.    Okay.  And from your experience, what
23  are you saying is typically done?
24    A.    Typically if there's an excavator

Page 35

1  on-site, they will smooth out whatever you need
2  done.
3     Q.    Mortenson had to make sure that the area
4  where the cribbing was going to be placed was
5  graded before they put the cribbing down, right?
6     MR. TERRY:  I'll object to form.  You can
7  answer.
8  BY THE WITNESS:
9     A.    They would not come out and inspect it.
10  We would basically get the cribbing where it goes.
11  BY MR. SULLIVAN:
12    Q.    Okay.  I believe you said at one point
13  that some yes and some no were graded before the
14  cribbing went down, is that right?
15    A.    Right.
16    Q.    And do you know why some weren't and
17  some were?
18    A.    Because it had rained the morning of and
19  the trucks would come in and there would be such
20  big ruts in the ground and once we put the base
21  down, there's no way of getting under it.
22    Q.    Right.  Once the base is down, you can't
23  grade it because it's in the way, is that what
24  you're saying?

Page 36

1     A.    Yes.
2     Q.    But before the cribbing was put down,
3  the area was always graded first, right?
4     A.    Yes.
5     Q.    Are you aware that -- strike that.
6     Do you know if Borneke was the only
7  company providing grading for the project?
8     A.    Yes, they were.
9     Q.    Are you aware of any complaints about
10  the grading by anyone at Mortenson before your
11  accident?
12    A.    Oh, there were complaints all day long.
13    Q.    And how do you know this?  What is it
14  that you know of?
15    A.    Because every site we would have
16  problems.  As you could see in some of the
17  pictures where the crane was actually sinking in
18  the ground.
19    Q.    Did you ever make complaints about the
20  grading?
21    A.    I want to say everybody on the job site
22  did.
23    Q.    The project, as far as you know, you did
24  not call for any other material than cribbing to

GEORGEFF, NICK
01/04/2022

Page 37

1 protect the ground essentially, is that right?
2 **A. As far as I am aware of, that's correct.**
3 Q. When it comes to access roads, the crane
4 would have to come in on the access road, right?
5 **A. The cranes to unload would, but not the**
6 **crane for the erecting part.**
7 Q. There's two different ones?
8 **A. There were two different ones. The**
9 **erecting one was a giant crane.**
10 Q. Okay. And that's -- the erecting crane
11 is the one that might sink into the ground?
12 **A. Right.**
13 Q. Depending, obviously, how wet and how
14 soft it might be, right?
15 **A. Correct.**
16 Q. But once the crane is onsite, you cannot
17 regrade it because it's already in the way, is that
18 true?
19 **A. Not necessarily. The crane is on**
20 **wheels, so if you had to grade it, you can always**
21 **have them move.**
22 Q. Okay. Do you recall any instance where
23 that happened, where the crane was sinking and you
24 had it moved and Borneke came over regraded it so

Page 38

1 it would be more firm?
2 **A. Yes.**
3 Q. Was that a common occurrence, do you
4 know?
5 **A. When the ground was wet, quite a bit.**
6 Q. There was no design or plan for the
7 crane to sit on anything, other than graded earth,
8 was there?
9 **A. The erection crane was actually sitting**
10 **on cribbing.**
11 Q. Okay.
12 **A. But mainly the wheeled cranes that would**
13 **come in for unload, they were basically on the**
14 **ground lifted up on cribbing.**
15 Q. Okay. What I am getting at, there
16 was -- the access roads, none of this area where
17 the cranes were was intended to have anything other
18 than just dirt and cribbing? There was no asphalt
19 or any other material that would make a more
20 permanent road?
21 **A. No.**
22 Q. No one asked Don Borneke to put any more
23 permanent road on any of these areas, correct?
24 **A. Correct.**

Page 39

1 Q. So, obviously, if you had a week without
2 rain, the ground would be more firm and you would
3 have less issues with sinking, right?
4 **A. Yes.**
5 Q. And like you said, once the large
6 components were placed on the cribbing, there's no
7 way you could move them to regrade it, right?
8 **A. Correct. There would be enough room in**
9 **between them to get a small machine in there to**
10 **grade, but not directly under the component.**
11 Q. Right. And would you agree with me,
12 that Borneke would grade whenever someone from
13 Mortenson asked them to do it?
14 **A. Depending on what they had planned, they**
15 **would do it.**
16 Q. Okay. Did you keep any notes of where
17 you had to go each day when you were on the
18 project?
19 **A. No, it was different every day.**
20 Q. Okay. You said you never actually
21 talked to anyone from Borneke, did you?
22 **A. No.**
23 Q. You agree with me that -- well, strike
24 that.

Page 40

1 You are not aware of any specific change
2 orders that were implemented?
3 **A. No, I am not aware.**
4 Q. Now, you said October 15th is when you
5 switched over to the turbine erection?
6 **A. Yeah, the beginning of October.**
7 Q. The beginning of October?
8 **A. Beginning of it.**
9 Q. Is that only because the base erection
10 was already done?
11 **A. Correct.**
12 Q. Okay. Other than making sure the hooks
13 were on the cranes, is there anything else that you
14 would have to do when you would travel the site?
15 **A. Just make sure everything was there that**
16 **we needed. All of the nuts and washers were there**
17 **for erection.**
18 Q. These pieces are all held together by
19 nuts and washers, right?
20 **A. Yes.**
21 Q. Bolts, too?
22 **A. Yes.**
23 Q. There must have been a lot of bolts and
24 washers and nuts, right?

GEORGEFF, NICK
01/04/2022

Page 41

1    A.    Yeah.
2    Q.    They were all the same size?
3    A.    Yeah.
4    Q.    Would you routinely when you would
5  walk -- strike that.
6         You were driving a Mortenson company
7  truck or something?
8    A.    Right.
9    Q.    Just a regular pickup truck?
10   A.    Yes.
11   Q.    Was it the same truck that you had
12  throughout the project?
13   A.    Yes, it is.
14   Q.    And would you have to -- other than
15  carrying the bolts and washers and nuts, is there
16  anything else that you would have to carry while
17  you were walking around?
18   A.    Just whatever slings we needed for
19  lifting.
20   Q.    Slings to go around the turbines to lift
21  them up?
22   A.    Right.
23   Q.    And those are made of what?
24   A.    Nylon.

Page 42

1    Q.    These need to be really long?
2    A.    Yes.
3    Q.    You have to roll them up like a hose or
4  something?
5    A.    It's faster if you just pick them up and
6  throw them in the truck.  Essentially towards the
7  end of the day, we would roll them up so they don't
8  get ruined.
9    Q.    And do you know what the length is?
10   A.    I want to say 30 feet.
11   Q.    Okay.  Were there various lengths?
12   A.    Yes, they had some other size lengths,
13  too.
14   Q.    Who were you erecting with when you were
15  actually doing the erecting?
16   A.    Mainly the crane operator or the oiler.
17   Q.    Who is the oiler?  What is an oiler?
18   A.    An oiler, he just maintains the crane to
19  make sure it's working right.
20   Q.    That's a separate union from crane
21  operators, isn't it?
22   A.    Yes.
23   Q.    Do you know who the company was that did
24  the crane operation?

Page 43

1    A.    They were hired through Mortenson.
2  Cranes were rented, I believe, from Stevenson
3  possibly.
4    Q.    Okay.  All of the subcontractors were
5  hired through Mortenson, right?
6    A.    Right.
7    Q.    What did -- Lonnie Sears, what was that
8  person's role during this erection?
9    A.    He was a foreman.
10   Q.    What does a foreman do?
11   A.    He basically would tell each crew where
12  to go and what they needed to do.
13   Q.    For that day?
14   A.    For that day.
15   Q.    Okay.  For example, on November 15th,
16  you would have checked in with Lonnie Sears and he
17  would have told you, you need to go to this site
18  and this site and this site?
19   A.    Right.
20   Q.    Well, how long does it take to do the
21  erection?
22   A.    Usually in one day they would do one
23  tower.
24   Q.    Okay.

Page 44

1    A.    It would take them all day.
2    Q.    Okay.  Is it three pieces?  All three
3  pieces?
4    A.    Yes, three pieces, plus the wings and
5  the turbine itself on the top.
6    Q.    Do you know what the site number was
7  that you visited on November 18th?
8    A.    November 15th?
9    Q.    That's what I meant, 15th, yes.
10   A.    It was T-11.
11   Q.    You're sure it was T-11?
12   A.    Yes, I am positive.
13   Q.    I have some materials that say T-1.  If
14  it says T-1 that's wrong?
15   A.    Right.
16   Q.    On that day of November 15th, the tower
17  at that T-11 pad site, the whole thing went up?
18   A.    I don't how much of it went up after I
19  had fallen, but just the base was up prior to me
20  falling.
21   Q.    What is your recollection of the weather
22  in October-November of 2018 on this site?
23   A.    October it was nice.  November it
24  started getting a little shaky.  It was the first

GEORGEFF, NICK
01/04/2022

Pages 45–48

Page 45

1  snowfall on the 15th.
2      Q.    Okay.  When did you normally arrive in
3  the morning?
4      A.    7:00.
5      Q.    Okay.  Where would you show up at 7:00?
6      A.    The main laydown yard.
7      Q.    Where was that?
8      A.    I don't know the streets.  I know it's
9  in the -- I don't the name of the street.
10     MR. TERRY:  Chris, just to interrupt, we have
11 a copy of the site map here, is it okay if he
12 refers to that?
13     MR. SULLIVAN:  You know what, I marked it as
14 an exhibit.
15     MR. TERRY:  I will let him refer to it.
16 MR. SULLIVAN:
17     Q.    I actually already marked this as Group
18 1, can you see that?
19     A.    Yes.
20     Q.    Okay.  This is the map that you are
21 talking about, right?
22     A.    Yes.
23     Q.    And just -- so I just went ahead and
24 marked this Georgeff Exhibit 1.  It is 11 pages

Page 46

1  with different things in it that we will go
2  through.  The exhibit here, there is a map of the
3  whole project, right?
4      A.    Yes, it is.
5      Q.    So, you said T-11, you can -- T-11 here,
6  it looks like its covered up on Bingham Road, does
7  that sound right?
8      A.    Yes.
9      Q.    You are sure of where you were at that
10 day?
11     A.    Yes.
12     Q.    That was the only place that you were
13 scheduled to be that day?
14     A.    To my recollection yes.
15     Q.    Okay.  And looking on this map, you see
16 where the main yard is -- oh, the laydown yard, you
17 just referred to that?
18     A.    Yes.
19     Q.    That's what I am circling.
20     A.    Right by T-29.
21     Q.    And what is the miles from T-29 to T-11?
22     A.    It's about a mile-and-a-half.
23     Q.    Okay.  And is this a road here
24 (indicating)?

Page 47

1      A.    Yes.
2      Q.    Okay.  This is that County Road?
3      A.    Yes.
4      Q.    Is it gravel or something?
5      A.    Part of it was gravel and part of it was
6  paved.
7      Q.    So, from the County Road, Blue would be
8  the access road?
9      A.    Those were the old access roads.
10     Q.    What do you mean old access roads?
11     A.    From the previous wind farm that was
12 there.
13     Q.    I didn't realize this was a previous
14 wind farm?
15     A.    Yes, there were previous wind turbines
16 on that property.
17     Q.    So, there was a wind farm or wind
18 turbine in the Blue access road?
19     A.    I believe so.
20     Q.    And did you have anything to do with
21 taking those old ones down?
22     A.    No.
23     Q.    At some point you're saying the old
24 turbines were taken down and the new ones were

Page 48

1  erected?
2      A.    Right.
3      Q.    Was there like empty concrete pads from
4  the old ones?
5      A.    I think they were there and they covered
6  them up with dirt.
7      Q.    T-11 here, do you see where I am
8  circling?
9      A.    Yes.
10     Q.    This is the access road to T-11 that you
11 just talked about, right?
12     A.    Yes.
13     Q.    And this would be another county road
14 here (indicating)?
15     A.    No, I think that's just a border of the
16 property.
17     Q.    And so this is just a dirt road that was
18 created as an access road?
19     A.    Yes.
20     Q.    It was right off of this, wherever
21 County Road is?
22     A.    Yes, it's right off Bingham.
23     Q.    Okay.  And what was actually at the
24 laydown yard?

GEORGEFF, NICK
01/04/2022

Pages 49—52

Page 49

1    A.    All of the trucks.  All of the Mortenson
2    trucks.  And just equipment that you needed.
3    Bolts.
4    Q.    Okay.  If you needed to get another
5    supply of bolts, you would have to drive back to
6    the laydown yard and go to whatever site, right?
7    A.    Correct.
8    Q.    So, then, do you know what time you
9    arrived at T-11 if you were at the laydown site at
10   7:00?
11   A.    It was maybe ten minutes, tops.
12   MR. TERRY:  I'm sorry, did you say he arrived
13   at 7:00, Chris?
14   MR. SULLIVAN:  That's what he said.  7:00 a.m.
15   THE WITNESS:  That day I didn't show up until
16   about 11:00.
17   BY MR. SULLIVAN:
18   Q.    Okay.  And why was that?
19   A.    Because I was at the union hall doing --
20   getting the permits and stuff.
21   Q.    They didn't have to wait for you to
22   begin the erection or anything, did they?
23   A.    No, they did not have to wait.
24   Q.    And what were you required to do once

Page 50

1    you showed up around 11:00?
2    A.    Like I said, I took the permits to the
3    out-of-town workers that were at different sites
4    and then I went to T-11 to help them erect.
5    Q.    Okay.  And they had already started
6    earlier that day?
7    A.    Yes, they had.
8    Q.    Okay.  So, you were driving by yourself,
9    right?  You weren't driving with other people in
10   the crew, right?
11   A.    Right, I was by myself.
12   Q.    How many other journeyman were on that
13   particular site to do the erection, if you know?
14   A.    I believe there was me.  I believe there
15   were four other ironworker journeymen.
16   Q.    One was Corey Blair, right?
17   A.    Right, he was the operator.
18   Q.    The crane operator?
19   A.    Crane operator.
20   MR. TERRY:  Just so the record is clear, is
21   Corey an ironworker or operator?
22   BY THE WITNESS:
23   A.    No, Corey is an operator.
24   BY MR. SULLIVAN:

Page 51

1    Q.    He also worked for Mortenson through the
2    crane operator's union, whatever it was?
3    A.    Right.
4    Q.    Do you know when it started snowing that
5    day?
6    A.    It was early in the morning because it
7    was snowing when I got to the union hall.
8    Q.    So, 11/15, what day of the week was
9    that?
10   A.    I believe it was Wednesday.
11   Q.    You would have driven from your home in
12   Plainfield to Joliet and to the union to get the
13   permits?
14   A.    Correct.
15   Q.    And then how long is it from the union
16   hall in Joliet all the way up to the site?
17   A.    Hour-fifteen, hour and 20 minutes.
18   Q.    It's over 100 miles, isn't it?
19   A.    I want to say it was 60 or 65 miles.
20   Q.    And your recollection was that it was
21   already snowing before you got to the union hall?
22   A.    Right.
23   Q.    And it hadn't snowed the night before,
24   though?

Page 52

1    A.    No, not that I am aware of.
2    Q.    Of course it's north?  The site is north
3    of Joliet by 60 or 70 or whatever miles, right?
4    A.    Yes.
5    Q.    So, do you know what weather was at the
6    site the day before?
7    A.    I know it wasn't snowing because I was
8    working that day.
9    Q.    You are not aware of any snow the day
10   before anywhere from Joliet to the site?
11   A.    Right.
12   Q.    And the minute you woke you on the 15th,
13   was it already snowing?
14   A.    I believe it was already snowing.
15   Q.    As far as you know it was the first snow
16   of 2018, right?
17   A.    Right.
18   Q.    Now, was there any plan by Mortenson as
19   to how to handle the snow conditions?
20   A.    Not that I am aware.
21   Q.    Are you aware of whether or not anyone
22   had the responsibility to remove snow from the
23   project site?
24   A.    Not that I am aware of.

GEORGEFF, NICK
01/04/2022

Pages 53–56

Page 53

1    Q.    Had you ever looked to see how much it
2  snowed that day at the project area?
3    **A.**    **I never looked.**
4    Q.    You never looked at weather records or
5  anything like that?
6    **A.**    **No.**
7    Q.    And how heavy was it snowing?
8    **A.**    **Pardon me?**
9    Q.    How heavy was it snowing when you were
10  in Joliet?
11    **A.**    **It was snowing pretty good.**
12    Q.    Do you know what the temperature was?
13    **A.**    **I believe it was in the low 30s.**
14    Q.    Big flakes?  Wet snow?  Any
15  recollection?
16    **A.**    **It didn't seem wet.  It just seemed like**
17  **puffy snowflakes.**
18    Q.    You had to take I-39, right?
19    **A.**    **Correct.**
20    Q.    From Joliet you go 80 to 39 or
21  something?
22    **A.**    **Yeah.**
23    Q.    And were there salt trucks on the
24  interstate or anything?

Page 54

1    **A.**    **I don't remember.  I am sure there would**
2  **have to be.**
3    Q.    Okay.  What time did you arrive at the
4  union hall, if you recall?
5    **A.**    **It was probably about 7:00.**
6    Q.    That was your normal starting time,
7  right?
8    **A.**    **Right.**
9    Q.    If you didn't have to go to the union
10  hall, you would just go to the project site at
11  7:00?
12    **A.**    **Correct.**
13    Q.    If you had to go get permits or
14  something, you would show up at the union hall at
15  7:00?
16    **A.**    **Yes.**
17    Q.    You were there for about an hour or
18  something?
19    **A.**    **Yes, the secretary to get the permits**
20  **she usually didn't show up until 7:30.  So, I would**
21  **talk with the business manager or the president to**
22  **let them know how the job is going.**
23    Q.    Before this incident, was the project,
24  generally speaking, on track in terms of time?

Page 55

1    **A.**    **As far as I know, yeah.**
2    Q.    Now, it had frozen.  You had freezing
3  temperatures prior to this snow, then, right?
4    **A.**    **I don't know.**
5    Q.    Okay.  Prior to this incident, did you
6  ever see a situation in which, you know, there was
7  water that had frozen on any of these sites?
8    **A.**    **Not that I can remember.**
9    Q.    Do you have any recollection of whether
10  it rained on the night of the 14th or 15th?
11    **A.**    **I don't believe so, but I am not 100**
12  **percent sure.**
13    Q.    Okay.  So, just so I am clear, you don't
14  recall any incident in which there was rain that
15  had frozen at any time that you were on this
16  project in Mendota Hills?
17    **A.**    **Before the accident, no, not that I can**
18  **remember.**
19    Q.    Okay.  What were toolbox talks?
20    **A.**    **Basically going over safety.  The safety**
21  **topic of the day or the week.**
22    Q.    Who conducted those?
23    **A.**    **It was just usually somebody in our**
24  **little group.  One of the ironworkers, they**

Page 56

1  typically pass it around from one to the other.
2    Q.    Pass around the sign-in sheet?
3    **A.**    **Yes.**
4    Q.    And how often did it take place?
5    **A.**    **Once a week.**
6    Q.    Okay.  Different topics every week?
7    **A.**    **Yes.**
8    Q.    And they were conducted by the Mortenson
9  people, right?
10    **A.**    **When you say Mortensen people, one of**
11  **the ironworkers.**
12    Q.    It would be one of the ironworkers?
13    **A.**    **It would be one of the ironworkers.**
14    Q.    One of the ironworkers from your union,
15  then, right?
16    **A.**    **Right.**
17    Q.    Who was working for Mortenson at that
18  time?
19    **A.**    **Correct.**
20    Q.    Did you ever give a toolbox talk
21  yourself?
22    **A.**    **I want to say I did because, like I**
23  **said, it usually would rotate from one person to**
24  **the other.**

GEORGEFF, NICK
01/04/2022

Pages 57–60

Page 57

1    Q.    Who decided who gave the talk?
2    A.    It just would be whoever. Just hand it
3  off to somebody and we would have a little meeting
4  in the morning.
5    Q.    And they were always about safety?
6    A.    It was always safety.
7    Q.    Are you aware of anyone else getting
8  injured on this project other than yourself?
9    A.    I am not aware.
10    Q.    Who decided what topics and when?
11    A.    I really don't know. One of the
12  higher-ups in the office.
13    Q.    Okay. And in your union you mean,
14  right?
15    A.    No, in Mortenson. One of higher-ups in
16  Mortenson would decide that.
17    Q.    Mortenson decide what toolbox
18  topics would take place and when?
19    A.    Right.
20    Q.    And then they would have -- they would
21  tell the union and have one of the union workers do
22  it for your group?
23    A.    Yes.
24    Q.    And that's the way it worked every time,

Page 58

1  right?
2    A.    Yes, depending on the time of the year.
3  If it was summer, they would do something on
4  humidity and heat exhaustion. That way they know
5  to do the heat exhaustion in the middle of winter.
6    Q.    Right. Of course. Did Lonnie Sears
7  have anything to do with when you would give your
8  toolbox talk or what it would be about or anything?
9    A.    Not that I am aware of.
10    Q.    At the time you did it yourself, where
11  did you get it from?
12    A.    I would get it from either Lonnie or one
13  of the other higher-ups at Mortenson who was
14  onsite.
15    Q.    They would just hand it off to you and
16  say, this is your talk of the day and somebody
17  needs to conduct it?
18    A.    Right.
19    Q.    And it would be -- so, what you're
20  saying is, Lonnie may have already had it from
21  someone at Mortenson or a Mortenson employee would
22  show up and give it to you?
23    A.    Mainly it would come from Lonnie. He
24  would be the one that would get the toolbox talk.

Page 59

1    Q.    I get it now. Would these usually take
2  place at the laydown site?
3    A.    What is that?
4    Q.    Would this usually take place at the
5  laydown site? The laydown yard?
6    A.    Yes.
7    Q.    That's where you would meet in the
8  morning before each day?
9    A.    Yeah, we would meet there in the morning
10  and then go on from there.
11    Q.    And that's what you would have done if
12  you didn't have to go to Joliet first?
13    A.    Correct.
14    Q.    Do you have any idea how much snow was
15  on the ground before you showed up at the site on
16  the 15th?
17    A.    There was probably -- my guess would be
18  two inches. It was a light dusting.
19    Q.    Was it still coming down or was it
20  already completed?
21    A.    It was -- I believe when I showed up it
22  was just finishing up.
23    Q.    Did it look any different than it did in
24  Joliet in terms of the way it was coming down?

Page 60

1    A.    Not really.
2    Q.    About the same?
3    A.    Yeah.
4    Q.    Now, do you have any recollection of
5  ever being on the T-11 site before this incident?
6    A.    Yes.
7    Q.    Okay. And you didn't witness the
8  grading or anything there, did you?
9    A.    No.
10    Q.    Did you have any part in the base
11  erection at T-11?
12    A.    Yeah.
13    Q.    Okay. When did the base erection take
14  place, if you know?
15    A.    You're talking the reinforcing part?
16    Q.    That's what I meant, yeah.
17    A.    I want to say it had to be June or July.
18    Q.    Okay. So, did they complete all of the
19  masonry reenforcements before they did the turbine
20  erection?
21    A.    Yes.
22    Q.    So, had you been there at all since June
23  to T-11?
24    A.    Just possibly to unload the truck when

GEORGEFF, NICK
01/04/2022

Pages 61–64

Page 61

1  the components came in.
2      Q.    Do you have any recollection of how long
3  the components were sitting there at T-11 before
4  they were erected?
5      A.    No.
6      Q.    What was typical on one of these sites,
7  how long it would be sitting there, if you know?
8      A.    Typically, I would say, a week tops.
9      Q.    Obviously, the weather changes a lot in
10  a week, right?  It could be sitting there and it
11  could be raining and it could be dry again?
12      A.    Right.
13      Q.    Are you aware that anyone ever asked for
14  regrading or anything at T-11 after the components
15  were laid down?
16      A.    Not to my knowledge.
17      Q.    Are you aware of any cribbing issues
18  that took place at T-11?
19      A.    Cribbing issues, no.
20      Q.    These were just railroad ties?
21  Standard?
22      A.    Right.
23      Q.    It is like treated wood?  Petroleum
24  treated?

Page 62

1      A.    Right.
2      Q.    Let's see, I will go ahead and show
3  you -- I will go down a little bit.  The next page,
4  there is this -- I will ask you about the picture.
5  Is this a picture of the site where you fell?
6      A.    To my recollection, yes.
7      Q.    This would be T-11?
8      A.    Right.
9      Q.    And do you know who took it?
10  MR. TERRY:  If you know.
11  THE WITNESS:  What?
12  MR. TERRY:  Do you know who took the photo?
13  BY THE WITNESS:
14      A.    No, I do not.
15  BY MR. SULLIVAN:
16      Q.    Where did you get it from, if you know?
17      A.    I don't remember where I got it from.
18      Q.    You don't know when it was taken, do
19  you?
20      A.    From what I can remember, it was the day
21  after or two days after I fell.
22      Q.    And there's obviously no snow in this
23  picture?
24      A.    Right.

Page 63

1  MR. TERRY:  I will object.  It
2  mischaracterizes the evidence.  You can clearly see
3  snow by the end of the picture on the right side.
4  It's not a lot, but there's still some.
5  BY MR. SULLIVAN:
6      Q.    The ice doesn't have any snow on it,
7  right?
8      A.    Right.
9      Q.    And this area, can you see my little
10  pointer?
11      A.    Yes.
12      Q.    And this is the cribbing here
13  (indicating)?
14      A.    No, that's the actual dirt.
15      Q.    This is the cribbing (indicating)?
16      A.    That's cribbing there and cribbing right
17  there.
18      Q.    So, underneath -- this is the turbine
19  part right here (indicating), correct?
20      A.    Yes.
21      Q.    And underneath it is wood, right?
22  MR. TERRY:  Can you zoom in a little bit more.
23  THE WITNESS:  Yeah.
24  BY MR. SULLIVAN:

Page 64

1      Q.    Is this wood?
2      A.    Yeah, it looks like it.
3      Q.    Okay.  This doesn't -- these look like
4  railroad ties to me.  This looks like some kind of
5  flat panel.  Do you have any recollection of a flat
6  panel wood this was resting on?
7      A.    I know occasionally they would slip some
8  underneath there.  I don't remember in T-11 there
9  being any.
10      Q.    Now, I don't know how this works,
11  really.  I assume this huge area is basically a
12  divot.  Right here (indicating), right?  This whole
13  thing is a divot from when this was resting?  Is
14  that fair to say or not?
15  MR. TERRY:  I'm going to object to form.  If
16  you understand, you can answer.
17  BY THE WITNESS:
18      A.    I don't really get it.
19  BY MR. SULLIVAN:
20      Q.    You don't know how deep this ice was, do
21  you?
22      A.    No.
23      Q.    And what I am trying to get at is,
24  they're about to attach this -- this piece, the

GEORGEFF, NICK
01/04/2022

1  turbine attaches to this (indicating), right?
2      A.    No, that attaches to the base which is
3  not in the picture.
4      Q.    The base is back here to the right?
5      A.    No, to the left.
6      Q.    The base is over here (indicating)?
7      A.    Over more left.  It should be right
8  about there.
9      Q.    And my question is, where was this thing
10  sitting if it's sitting, you know, for a week or a
11  few days before it's erection, do you know?
12      A.    Where was it sitting?
13      Q.    Yes.
14      A.    It would be right there or on the truck.
15      Q.    Okay.  This doesn't get moved at all
16  once it is laid down?
17      A.    Once it's laid down, it does not move
18  until it gets erected.
19      Q.    When it gets erected, do they have to
20  carry it over to this side where the base is?
21      A.    Yep.
22      Q.    And, then, they have drive the crane
23  over this ice and stuff?
24      A.    No, the crane would sit on the pad.

1      Q.    Is this the pad (indicating)?
2      A.    It would sit on there until it's ready.
3  It would never move.
4      MR. TERRY:  Do you mind if I do a little
5  narrating for the record, we will never remember
6  this.
7      MR. SULLIVAN:  Go ahead.
8      MR. TERRY:  If you see on the photograph in
9  the far left about halfway down right there, do you
10  see what looks like logs, essentially, that's what
11  we've been referring to as the crane pad.  Then the
12  piece in background of the photograph, maybe a
13  third of the way down, if you go straight left to
14  that, that is where Nick was referring to the
15  actual erecting site being straight left out of the
16  crane, so we have a clear frame of reference of
17  what we're talking about later on.
18  BY MR. SULLIVAN:
19      Q.    Right.  Is it fair to say, you don't
20  know what caused this dip here that would then
21  collect with water and then freeze?
22      A.    I was not there when they did it, but I
23  believe that was graded after I had fallen.
24      Q.    Do you think this is the way it looked

1  after you fell?  After it was regarded or
2  something?
3      A.    A day or two after I fell is when this
4  picture was taken.
5      Q.    And do you know if this area where the
6  ice is, is any different than when you fell?
7      A.    I do not know that.
8      Q.    And before you fell, do you know if
9  there was any component that was sitting where the
10  ice is?
11      A.    No.
12      Q.    You don't know, correct?
13      A.    I don't know.
14      Q.    So, there could have been something
15  laying here and you have no idea, right?
16      A.    The only other thing that could have
17  been laying there would have been the base section
18  before it was installed.
19      Q.    Okay.  But the point is, you don't know
20  what was there and what created the ice, do you?
21      A.    Right.
22      Q.    Yes?
23      A.    Sure.
24      Q.    And were these cones there that day?

1      A.    No, they were not.
2      Q.    Did you take any pictures yourself?
3      A.    What is that?
4      Q.    Did you take any pictures yourself?
5      A.    No.
6      Q.    Did you ask anyone to take any pictures
7  to capture what it looked like on the day you fell?
8      A.    No, I don't not believe so.
9      Q.    Okay.  And you said no one actually saw
10  you fall, is that correct?
11      A.    The only one who could have possibly
12  seen me fall was Corey because he was the first one
13  on the radio to say, Help him out.  Help him out.
14      Q.    Did you ever talk to Corey?
15      A.    No.
16      Q.    Have you ever talked to Corey about this
17  incident?
18      A.    About this incident, no.
19      Q.    Did you talk to Corey before the
20  incident?
21      A.    Yes, just in passing.
22      Q.    You knew him, just that he was a crane
23  operator, and you were on the same project
24  together?

Page 69

1  A.  That's all I knew about him, he was the
2  operator on the same project.  Being cordial.
3  Q.  You never worked with him on another
4  project, have you?
5  A.  No.
6  Q.  You do not know where Corey was from or
7  anything?
8  A.  No.
9  Q.  Where would you usually have lunch when
10 you were onsite?
11 A.  What is that?
12 Q.  Where would you usually have lunch when
13 you were onsite?
14 A.  Wherever.  Usually I would bring my own
15 lunch and eat in my car.
16 Q.  In the truck that they provided you,
17 right?
18 A.  In my personal vehicle because we
19 usually would go back to the laydown yard for
20 lunch.  If you wanted to go get something, you can.
21 If not, you can skip lunch.
22 Q.  I see.  If you didn't have to go to the
23 union hall, would you just drive your own car to
24 the project site?

Page 70

1  A.  No, I would still park in the laydown
2  yard.
3  Q.  With your own car?
4  A.  With my other personal vehicle.
5  Q.  Because we talked about you had a truck
6  at the Mortenson site?
7  A.  Right.
8  Q.  And where did have that versus your own
9  car, that's what I don't understand.
10 A.  In the morning we would drive to the
11 laydown yard off Chicago and Bingham and that's
12 where we would park our personal vehicles and get
13 in the Mortenson trucks.
14 Q.  The Mortenson truck to drive around the
15 whole site?
16 A.  Right.
17 Q.  When you were driving from Joliet up to
18 the site on that morning, you were actually using
19 your own car?
20 A.  Right.
21 Q.  Well, let me ask you before I leave
22 this.  How do you know this is the area you fell?
23 A.  Because I know that's T-11 and I know
24 where the turbine was according to where I fell.

Page 71

1  Q.  And how do you know it was T-11?
2  A.  I am assuming it's T-11.
3  Q.  This is basically the picture from the
4  incident report, right?
5  A.  Right.
6  Q.  And you didn't have -- well, strike
7  that.
8  Mortenson did the incident report,
9  right?
10 A.  I would assume.
11 Q.  You didn't see this picture before you
12 saw the incident report, is that fair to say?
13 A.  That's completely fair to say.
14 Q.  When did you see the incident report
15 afterwards, do you know?
16 A.  I really don't recall.  It was some time
17 afterwards.
18 Q.  A few months?
19 A.  Months likely.
20 Q.  Could you look at this picture and see
21 where it was you were walking and where you fell?
22 A.  Well, I know I had parked in the back.
23 Q.  Over here (indicating)?
24 A.  A little bit more to the right.  Right

Page 72

1  in there.
2  Q.  All right.
3  A.  I know that's where I had been walking
4  through to get to where I was supposed to be to
5  work for the day, just right in there.
6  Q.  For what reason would you have to be in
7  this icy area as opposed to going around here
8  (indicating)?
9  A.  I didn't know it was an icy area.
10 Q.  It was covered with snow?
11 A.  It was covered with snow.
12 Q.  And you estimate how much?
13 A.  I would say probably two inches.
14 Q.  And the whole area was, of course,
15 covered with snow?
16 A.  Yes.
17 Q.  Did anyone from Mortenson alert you to
18 the fact that there might be a change of plans
19 because of the snow.  We should slow down until the
20 snow is cleared or anything?
21 A.  No.
22 Q.  Now, what was already happening when you
23 showed up around 11:00 a.m. on this site?
24 A.  We were getting the site ready to

GEORGEFF, NICK
01/04/2022

Page 73

1  install one of the midpieces.
2      Q.    Is this the midpiece right here
3  (indicating)?
4      A.    Yes.
5      Q.    And the crane you said was always on
6  this platform on the left?
7      A.    Yes.
8      Q.    And would any equipment have to be in
9  this area between them?
10     A.    At the time of installation, no.
11     Q.    And were you -- were you carrying
12  something?  What were you walking over here to do
13  at that point, if you recall?
14     A.    To go to the other end to hook up the
15  piece, so we can put it on the base.
16     Q.    You mean all the front end of this
17  turbine?
18     A.    Right.  That's where they would hook it
19  up to lift it.
20     Q.    You're talking about you were putting
21  the sleeve around it?
22     A.    Yes.  You hook it up with the cables and
23  the shackles and pick it up.
24     Q.    So, were you carrying something?

Page 74

1      A.    No.
2      Q.    Was the sleeve and shackle already over
3  there?
4      A.    They were already over there.
5      Q.    Did you see anyone else slip on this?
6      A.    I didn't see anybody, no.
7      Q.    Did you see any footprints on it?
8      A.    No, not that I am aware of.
9      Q.    What shoes were you wearing?
10     A.    What?
11     Q.    What shoes were you wearing?
12     A.    My work boots.
13     Q.    Which are what?
14     A.    Steel toe Timberlands.
15     Q.    Leather?
16     A.    Yes.
17     Q.    Rubber sole?
18     A.    Yep.
19     Q.    And did you ever wear ice cleats?
20     A.    No.
21     Q.    Have you heard of them?
22     A.    I have heard of them.
23     Q.    But you saw the incident report and it
24  talks about ice cleats?

Page 75

1      A.    No.
2      Q.    I will show you that in a minute.  Did
3  anyone from Mortenson's say that, or from your
4  union for that matter, say that there should be
5  different shoes worn when there's snow out?
6      A.    No.
7      Q.    Is it your testimony that when there was
8  snow here, you couldn't tell the difference between
9  this dry dirt and the ice?
10     A.    Right.
11     Q.    Who would have had the authority to stop
12  the erection and say that the snow should be
13  cleared off?
14     A.    Probably someone in the front office
15  when they were doing the morning meetings, whether
16  it was Borneke or Mortenson --
17     Q.    Borneke was nowhere around T-11 that
18  day, correct?
19     A.    I really don't know where they there.
20     Q.    You did not see them on T-11 that day,
21  right?
22     A.    Not to my knowledge, no.
23     Q.    You have no knowledge that they were
24  required to remove snow or ice, correct?

Page 76

1      A.    Not to my knowledge.
2      Q.    The point was, you were not aware that
3  anyone had said, snow and ice needed to be removed
4  before this work on that day was done?
5      A.    Right.
6      Q.    Well, who is Kevin Hogan?
7      A.    I really don't know.
8      Q.    Who was the head of your group, other
9  than Lonnie?
10     A.    I know Lonnie was there.  Leo.  I don't
11  know who else was there.  I saw them two and I
12  assume a couple of the other guys were there.
13     Q.    And what is Leo's last name?
14     A.    I can't think of his last name.
15     Q.    He's another ironworker?
16     A.    He's another Joliet ironworker.
17     Q.    Did you ever talk to any of these people
18  about the incident?
19     A.    No.
20     Q.    I can't remember if I even asked you
21  this at the beginning.  Have you ever been a party
22  to a lawsuit before this case?
23     A.    No.
24     Q.    Other than maybe your divorce case?

GEORGEFF, NICK
01/04/2022

Page 77

1    A.    No.
2    Q.    Was that an actual divorce lawsuit, do
3  you know?
4    A.    Yeah.
5    Q.    Well, other than that, this is the only
6  only lawsuit that you have been a part of?
7    A.    Correct.
8    Q.    About where was it here that you fell,
9  do you know?
10   A.    What?
11   Q.    Where was it on this picture that you
12 fell?  Let us know for the record so you can
13 explain it.
14   A.    It was just before the turbine,
15 somewhere in there.
16   Q.    Okay.  So, in this space in between,
17 what do you call this big white piece?
18   A.    Turbine.
19   Q.    And this piece is what?
20   A.    The base or midpiece.
21   Q.    So, in between the midpiece and the
22 turbine?
23   A.    Yes.
24   Q.    And this is all dirt, right?  There's

Page 78

1  nothing else here?
2    A.    Right.
3    Q.    The concrete base is not in the view at
4  all?
5    A.    No, it is not.
6    Q.    Do you have any idea how much distance
7  is between these two pieces?
8    A.    Between the two pieces, my best guess
9  would be probably 15 to 20 feet.
10   Q.    Were you wearing a hard hat by the way?
11   A.    Yes.
12   Q.    Is that required on all sites?
13   A.    Yes.
14   Q.    Was the crane overhead?
15   A.    I believe it was already toward the back
16 of the base to pick it up.
17   Q.    Okay.
18   A.    Swinging over that way.
19   Q.    Neither of theses pieces were in the
20 air, were they?
21   A.    Pardon?  What's that?
22   Q.    Neither of these pieces were in the air,
23 though, right?
24   A.    In the area?

Page 79

1    Q.    In the air?
2    A.    The air, no.
3    Q.    The point was to lift them and build
4  them, right?
5    A.    Right.
6    Q.    Did you have to walk under the crane
7  arm?
8    A.    No, no, we would never walk under the
9  crane.
10   Q.    It looks like this has not been erected
11 yet.  The whole project stopped when you fell or
12 something?
13   A.    Yes.
14   Q.    Do you know when eventually it was
15 erected?
16   A.    I want to say probably the next day or
17 later that day because they would have stopped work
18 and had a safety talk before anything got done.
19   Q.    Okay.  You don't know for sure when it
20 was erected, though?
21   A.    No.
22   Q.    And you left the scene by ambulance,
23 right?
24   A.    Correct.

Page 80

1    Q.    You don't know who conducted the safety
2  talk?
3    A.    I would assume it would be the safety
4  guy from Mortenson.
5    Q.    Okay.  Do you know what his name was?
6    A.    I don't remember.  I was trying to think
7  of it, but I couldn't remember his name.
8    Q.    Did you attend any other safety talks
9  that this guy had given?
10   A.    That he had given, yeah.  In the morning
11 he would give a safety talk for the whole work area
12 forever everybody.
13   Q.    You didn't attend one that day, though,
14 did you?
15   A.    That day I did not attend.
16   Q.    This is -- this whole thing is called
17 Group Exhibit 1 and this is Page 3, do you see
18 that?
19   A.    Right.
20   Q.    And then this is a toolbox talk sign-in
21 sheet, is that what this is?
22   A.    Yes.
23   Q.    Do you see the date November 14th, the
24 day before this incident, right?

1   A.   Yes.

2   Q.   And it says toolbox talk
3   walking/working, is that right?

4   A.   Yep.

5   Q.   Was this like a typical sign-in sheet?

6   A.   Yes, for the most part.

7   Q.   And let's see.  I want to make sure you
8   see your name here.  It looks like the very first
9   one, that's your name?

10  A.   Yes, it is.

11  Q.   Is this your signature next to it?

12  A.   Yes.

13  Q.   And who is Dave Osterman?

14  A.   He was the safety guy that I couldn't
15  think of his name.

16  Q.   So, he's a Mortenson employee?

17  A.   Right.

18  Q.   He wasn't your direct supervisor or
19  anything like that?

20  A.   No, he was just the site safety man.

21  Q.   He would have given -- did he give all
22  of these toolbox talks?

23  A.   On occasion he would give them or
24  someone else would give them.

1   Q.   Why does it say Operating Group Wind.
2   This whole thing was a wind project?

3   A.   Yeah.

4   Q.   And do you recall anything about this
5   particular toolbox meeting?

6   A.   Not off the top of my head, no.

7   Q.   How long did they take place usually?
8   How long are they?

9   A.   Maybe ten minutes.

10  Q.   Your whole group would have attended?

11  A.   Yes.

12  Q.   And who is Luis Fernandez or Hernandez?

13  A.   I am not sure who it is.

14  Q.   The foreman for your group was Lonnie,
15  correct?

16  A.   Correct.

17  Q.   So, other than what the title says, do
18  you have any recollection of what this toolbox talk
19  involved?

20  A.   No.

21  Q.   You will agree that it took place the
22  day before your accident?

23  A.   Yes.

24  Q.   You didn't have a toolbox talk the day

1   of your accident, did you?

2   A.   Not to my knowledge, no.

3   Q.   Because you had to go to Joliet, right?

4   A.   Right.

5   Q.   So, if Mortenson had one with Dave
6   Osterman, you wouldn't have known?

7   A.   Correct.

8   Q.   Do you recall any of these toolbox talks
9   discussing freezing weather and creating difficulty
10  walking and working around freezing ground?

11  A.   No, I wouldn't have expected it to be in
12  the middle of November having it.

13  Q.   Well, it's common for it to snow in
14  mid-November, right?

15  A.   Occasionally.

16  Q.   I mean, you have lived in Illinois your
17  whole life, correct?

18  A.   Yes, it didn't snow this year until
19  almost Christmas.

20  Q.   Do you recall as a child there was lots
21  of snow in November, right?

22       MR. TERRY:  I will object as argumentative.
23  He has given his answer.

24  BY MR. SULLIVAN:

1   Q.   Do you recall any discussion about ice
2   cleats or other shoes or footing was available to
3   you?

4   A.   Not at this time.

5   Q.   Did anyone on your crew walk the T-11
6   site prior to work that day, if you know?

7   A.   Not that I am aware of.

8   Q.   What was a Pre-Task Card?

9   A.   Basically to let people know what you
10  are doing, who is on-site at that particular
11  location, and what's going on for the day and any
12  hazards that would be presentable at the time.

13  Q.   Who created these Pre-Task Cards?

14  A.   Just someone in the group.

15  Q.   In your group from your union?

16  A.   From Mortenson.  From, whoever will be
17  working in that area.

18  Q.   Was there a Pre-Task Card for this event
19  on November 15th?

20  A.   I am sure there was.

21  Q.   Have you ever seen it?

22  A.   Pulling up I had seen it, but I never --
23  I haven't seen it since.

24  Q.   When you saying pulling up, is this

GEORGEFF, NICK
01/04/2022

Pages 85–88

Page 85

1  something that is publically displayed?
2  A.   Yes, it's displayed for everybody to
3  see.
4  Q.   And they would have what, do you recall,
5  as an example of things to look out for?
6  A.   If it was raining the ground was wet,
7  slippery, or if they were unloading a truck to
8  watch out for moving trucks coming in and out.
9  Q.   Okay.  And did they say Mortenson on
10 their cards?
11 A.   Yeah.
12 Q.   Do you recall actually seeing it when
13 you showed up at T-11 that day?
14 A.   Yes.
15 Q.   Do you know what it said?
16 A.   Just watch out for hazards like the
17 snow, the weather, lifting overhead.
18 Q.   Anything else that you can recall?
19 A.   No, not off the top of my head.
20 Q.   Do you have a habit of checking the
21 Pre-Task Card when you show up to the site?
22 A.   Most of the time, yes.
23 Q.   How are these posted?
24 A.   They're just hanging off to the side of

Page 86

1  the road when you pull in.
2  Q.   On the access road?
3  A.   Yeah.
4  Q.   Hanging on what?
5  A.   Usually a cone and it's hanging on the
6  cone.
7  Q.   Is it cardboard?  What is it made out
8  of?
9  A.   It's just paper inside a plastic sleeve.
10 Q.   You said you have not seen it since the
11 incident, though?
12 A.   Correct.
13 Q.   Is that part of your training through
14 your union that you're supposed to check the
15 Pre-Task Cards when you show up on the job site?
16 A.   Not through the union.  It's -- every
17 job site is different.
18 Q.   Okay.  I guess what I am getting at id,
19 whose idea was it that you were supposed to check
20 these Pre-Task Cards when you showed up?
21 A.   Just the job.
22 Q.   Okay.  It would have been Mortenson
23 since they were the general contractor?
24 A.   Most likely.

Page 87

1  Q.   Is it fair to say that everyone who was
2  working on the project knew they're supposed to
3  check the Pre-Task Cards when they showed up to
4  this particular site?
5  A.   Right.  Check it out or fill it out
6  before they get to the site.
7  Q.   Okay.  Did you have to fill in the
8  Pre-Task Cards yourself sometimes?
9  A.   Yes.
10 Q.   Who decided who had to fill them out?
11 A.   It depends on who's working there.  A
12 lot of times if I was to unload a truck, I would be
13 by myself and would I fill out the Pre-Task and
14 have the crane operator sign it and it would just
15 be the two of us on there.
16 Q.   It's signed by the crane operator?
17 A.   Yes, everybody signs it.
18 Q.   You didn't sign the Pre-Task Card at
19 T-11 that day?
20 A.   I believe I did.
21 Q.   When would you have signed it?  The day
22 before?
23 A.   No, when I got there.
24 Q.   Okay.  You have to sign to say that you

Page 88

1  saw it?
2  A.   Right.
3  MR. TERRY:  Hey, Chris, is this now a good
4  time to take a quick break?
5  MR. SULLIVAN:  Yes, I could use a break.
6  MR. TERRY:  So, let's just take five.
7  MR. SULLIVAN:  That sounds good, I appreciate
8  it.
9  MR. TERRY:  I appreciate it.
10     (WHEREUPON, a recess was had.)
11 BY MR. SULLIVAN:
12 Q.   Mr. Georgeff, before I want to get into
13 some of these other issues, I want to be clear in
14 this case you are claiming that you slipped on the
15 ice, right?
16 A.   Yes.
17 Q.   You're not claiming that you tripped or
18 fell because the ground was uneven, correct?
19 A.   Correct.
20 Q.   I will show you the -- you see what I am
21 sharing right now?
22 A.   Yep.
23 Q.   This is the Mortenson Construction
24 Incident Analysis, right?

GEORGEFF, NICK
01/04/2022

Pages 89–92

Page 89

1    A.    Yes.
2    Q.    Have you seen this before?
3    A.    No, not until today.
4    MR. TERRY:  Just for the record, I have a hard
5  copy in front of him, I will let him look at it if
6  that's okay.
7    MR. SULLIVAN:  That's fine.
8  BY MR. SULLIVAN:
9    Q.    Were you aware that there was this
10  Incident Analysis done before today?
11    A.    I would assume that one would have been
12  done because it was an accident.  I did not know
13  when or where it was done.
14    Q.    Okay.  You haven't actually seen this
15  document until today you said?
16    A.    Correct.
17    Q.    Did you review it prior to the
18  deposition today?
19    A.    No.
20    Q.    Okay.  Now, is the first time you're
21  actually looking at it?
22    A.    Yes.
23    Q.    You saw the picture separate from that
24  somehow?

Page 90

1    A.    Yes.
2    Q.    The picture we've been looking at is the
3  same one that is in this report, right?
4    A.    Yes.
5    Q.    And you could see that this was
6  something that was created by Mortenson
7  Construction, right?
8    A.    Yes.
9    Q.    And I think I already asked you this
10  before.  Who is Jamie Langston, do you know who
11  that is?
12    A.    I've met him.  He's a superintendent.
13    Q.    For the whole project essentially?
14    A.    As far as I know he was there the whole
15  time.
16    Q.    Kevin Hogan, do you know who that is?
17    A.    Not off the top of my head.  Either two
18  safety guys at one point, so that could be the
19  second one.
20    Q.    Okay.  These are both Mortenson
21  employees, correct?
22    A.    Yes, to my knowledge.
23    Q.    And were you ever interviewed by either
24  of these guys after this accident?

Page 91

1    A.    After, no.
2    Q.    Are you aware of any OSHA investigation
3  separate from this?
4    A.    No.
5    Q.    You do not know if one took place or
6  not?
7    A.    I have no idea.
8    Q.    Of course Lonnie Sears is the foreman
9  from your group who you worked with every day?
10    A.    Yes.
11    Q.    Are you still friends with Lonnie Sears?
12    A.    No.
13    Q.    Do you see him at all?  Have you seen
14  since this --
15    A.    I have not seen him outside of the job
16  ever.
17    Q.    Ever.  Have you seen him since this
18  accident at all?
19    A.    Just when I went back for light duty for
20  those couple of weeks, that was it.
21    Q.    Okay.  You never talked to him about
22  this accident on how it happened or anything like
23  that?
24    A.    No.

Page 92

1    Q.    And Lonnie Sears did not see it happen,
2  did he?
3    A.    Not that I am aware of.  I don't believe
4  he did.
5    Q.    Okay.  Just going through the report
6  here.  What is SWI trained?
7    A.    It is what Mortenson trains people in.
8    Q.    Do you know what it stands for?
9    A.    No.
10    Q.    Do you recall some kind of training that
11  said SWI training?
12    A.    Not that I can recall.
13    Q.    Okay.  So, looking at the investigation
14  findings here it says, T-1, but you are certain it
15  was actually T-11?
16    A.    Right.
17    Q.    Your recollection is that this picture
18  actually shows T-11 instead of T-1?
19    A.    They all look identical.  I would just
20  assume it was T-11.
21    Q.    Okay.  You can't be certain, though, is
22  that true?
23    A.    No.
24    Q.    I mean, is that correct?

GEORGEFF, NICK
01/04/2022

1    A.    That's correct.
2    Q.    Okay.  Where would he -- the author of
3 this report, where would he have gotten this
4 narrative information from, if he didn't ask you in
5 the interview?
6    A.    Just from -- after I got hurt talking to
7 the safety guy.
8    Q.    You did talk to one of the safety guys?
9    A.    I did talk to one of the safety guys,
10 yes.
11    Q.    It had to be one of these guys.  Either
12 probably Kevin Hogan or -- most likely Kevin,
13 right?
14    A.    It could have been.
15    Q.    But you don't November have a specific
16 recollection of that conversation?
17    A.    No, I mean it could have been while I
18 was laying on the ice or it could have been at the
19 emergency room when I was coming out.
20    Q.    Did someone come and visit you from
21 Mortenson?
22    A.    Yeah, they came to see me that day.
23    Q.    You don't know if it was Kevin or who?
24    A.    I know it was the superintendent, James,

1 and I don't remember the other guy's name.
2    Q.    Okay.
3    A.    The other safety guy.
4    Q.    It could have been Kevin, you don't
5 know?
6    A.    Right.
7    Q.    And do you remember any specific
8 conversations with James?
9    A.    No.
10    Q.    Okay.  This narrative section, does this
11 sound accurate in terms of what you're saying
12 happened?
13    A.    Yeah.
14    Q.    Okay.  Your foot slipped out and you
15 caught it on a dry patch of dirt, right?
16    A.    Right.
17    Q.    And prior to this, you had not seen ice
18 anywhere on the site, is that correct?
19    A.    Correct.
20    Q.    What happened when you slipped?  Did you
21 call out in pain?  What exactly happened?
22    A.    I just landed on my back and I sat up
23 and I yelled for Lonnie.
24    Q.    Okay.

1    A.    I can hear somebody's walkie-talkie
2 going off, He fell.  Go help him.  I believe that
3 was Corey saying that from the crane.
4    Q.    And you said if anyone saw it, it would
5 have been because he had the highest vantage point?
6    A.    Right.
7    Q.    You don't know for sure if he saw it or
8 not?
9    A.    How much he saw, I really don't know.
10    Q.    How long were you sitting on the ice
11 before someone came over?
12    A.    Not long.  Maybe a minute tops.  Maybe
13 30 seconds.
14    Q.    Was your ankle in pain or were you not
15 able to get up on your own?
16    A.    I was in a lot of pain and that's why I
17 yelled out.
18    Q.    Did you hear anything?
19    A.    Pardon me?
20    Q.    Did you hear a bone crack or anything
21 like that?
22    A.    I didn't hear nothing.  I just remember
23 falling and being in pain and sitting up and
24 yelling for Lonnie.

1    Q.    Okay.  How long were you walking on the
2 ice before you realized that you were walking on
3 ice?
4    A.    Maybe a second.  A split second.
5    Q.    How many steps?
6    A.    Maybe two.
7    Q.    So, both of your feet were on the ice?
8    A.    Right.
9    Q.    And how far was it from the edge of the
10 ice, if you know, before you got up?
11    A.    Maybe two feet.
12    Q.    Was one foot onto the dry area already
13 by the time you slipped?
14    A.    No, both were on ice when I fell.
15    Q.    Okay.  Your right foot is the one that
16 was injured, correct?
17    A.    Correct.
18    Q.    You never had an injury to your right
19 foot before this?
20    A.    No.
21    Q.    Any injury to your left foot before
22 this?
23    A.    No.
24    Q.    Any leg injuries whatsoever?

1    A.    I had a shoulder injury back in 2007, I
2    believe.
3    Q.    Any other injuries besides that?
4    A.    No.
5    Q.    And what caused the shoulder injury?
6    A.    Overexertion.
7    Q.    On the job site?
8    A.    Yeah.  I was on job site at the time.
9    Q.    And did you open up a workers'
10   compensation case for that?
11   MR. TERRY:  I'll object to relevance.  You can
12   answer.
13   BY THE WITNESS:
14   A.    Yeah.
15   BY MR. SULLIVAN:
16   Q.    But that did not end up in a lawsuit,
17   that case?
18   A.    No, it did not.
19   Q.    And you settled the workers'
20   compensation case for your shoulder?
21   MR. TERRY:  Same objection.
22   BY THE WITNESS:
23   A.    It wasn't a settlement.  I did not get
24   anything out of it.  They paid my weekly benefits

1    and that was it.
2    BY MR. SULLIVAN:
3    Q.    Is your shoulder 100 percent now or is
4    it less?
5    A.    Yes, it's 100 percent.
6    Q.    Did you have any difficulty walking,
7    otherwise, at the time this incident took place?
8    A.    Nope.
9    Q.    When this happened, how old were you?
10   A.    I was 47, 48.
11   MR. TERRY:  Don't look at me, I don't know.
12   BY THE WITNESS:
13   A.    47.
14   BY MR. SULLIVAN:
15   Q.    Three years ago.  Just over three years
16   ago, right?
17   A.    I was 47.
18   Q.    Okay.  How long before you were lifted
19   up?
20   A.    I would say five minutes.
21   Q.    And who helped you up?
22   A.    The paramedic onsite came and put my leg
23   in a little boot and that's when they helped me up.
24   Q.    Okay.  Were you walking faster than

1    normal because you were running late?
2    A.    No.
3    MR. TERRY:  I'm going to object, it
4    mischaracterizes his testimony.  No one said he was
5    running late.  He was performing his job since 7:00
6    that morning.
7    BY MR. SULLIVAN:
8    Q.    You were walking at a normal speed in
9    your estimation?
10   A.    Yes, my normal speed.
11   Q.    You saw on the Pre-Task Card that there
12   was snow to be aware of, right?
13   A.    I am assuming there was.  I don't know
14   if it actually said it or not.  I would think it
15   would say it.
16   Q.    Okay.
17   A.    Having filled them out myself.
18   Q.    And, of course, you saw the snow
19   allover the area before you got out of your truck?
20   A.    Right.
21   Q.    And so when you -- wouldn't you normally
22   want to walk slower when there's snow on the
23   ground?
24   A.    It depends.

1    Q.    I mean you can slip on snow, just like
2    you could slip on ice, wouldn't you agree?
3    A.    I agree.
4    Q.    You didn't slip at all before you got
5    onto the ice, is that what you're saying?
6    A.    No.
7    MR. TERRY:  Wait.  Is that what you're saying
8    or are you just --
9    BY THE WITNESS:
10   A.    No, I did not slip before I got on the
11   ice.
12   BY MR. SULLIVAN:
13   Q.    And do you know how far it was from when
14   you got out of the truck to where the ice was?  How
15   far you walked?
16   A.    Probably 30 feet.
17   Q.    That entire time you were walking on
18   snow, right?
19   A.    Yes, yes, it was snow.  It could have
20   been somewhat melted because it was on dirt rather
21   than on ice.  So, it could have been a fixture of
22   snow and earth before I got to the ice.
23   Q.    Were you looking down at your feet while
24   you were walking?

GEORGEFF, NICK
01/04/2022

Pages 101–104

Page 101

1    A.    No.

2    Q.    Do you remember where you were looking?

3    A.    Just in front of me.

4    Q.    Okay.  And is that true when you got on

5  the ice, too?

6    A.    When I got on the ice, I immediately

7  looked down and gingerly tried stepping off.

8    Q.    I guess the point is, how did you know

9  you were on ice?

10   A.    I could feel it when I stepped on it.

11   Q.    Did it crack?

12   A.    It didn't crack, but I could tell my

13 foot being a little shaky compared to normal

14 ground.

15   Q.    Okay.  You felt the slippage as soon as

16 you stepped on it?

17   A.    Right.

18   Q.    With the first step?

19   A.    Yeah.

20   Q.    And your first step was your right foot?

21   A.    Right.

22   Q.    Did it immediately slip out from under

23 you?

24   A.    No.

Page 102

1    Q.    You stepped on it with your left foot

2  and did it also slip?

3    A.    I stepped on it with my left foot and

4  realized I was on ice and as I was trying to get

5  off the ice and that's when I slipped.

6    Q.    So, that would be your third step?

7    MR. TERRY:  If he remembers specifically how

8  many steps he took.

9  BY THE WITNESS:

10   A.    It would probably be my second because

11 it was my left foot that slipped out from under me.

12 So, it couldn't be the third because that would be

13 my right foot.

14 BY MR. SULLIVAN:

15   Q.    Okay.  I see.  So, you tried to catch

16 yourself with the right foot after you slipped with

17 your left foot, is that what you're saying?

18   A.    Most likely, yeah.

19   Q.    You do not know exactly what area was

20 bulldozed at T-11 before this happened, do you?

21   A.    I don't know exactly.  I would think

22 that the whole area would be bulldozed.

23   Q.    But you don't know?

24   A.    No, no one knows.

Page 103

1    Q.    And you're not aware of any complaints

2  from anyone at Mortenson or from your union that

3  T-11 was incorrectly graded before this happened or

4  anything?

5    A.    Not to my knowledge, no.

6    Q.    You see this references to ice cleats?

7    A.    Yeah.

8    Q.    It says the project offers the use of

9  ice cleats.  Are you aware that Mortenson ever made

10 ice cleats available to you?

11   A.    Not before the incident, no.

12   Q.    Have you ever worn ice cleats in your

13 life?

14   A.    Maybe on one job, but I can't really say

15 for sure.

16   Q.    What are they?

17   A.    They basically just slip over your boot

18 with little spikes at the end so you could gain

19 traction.

20   Q.    So, you have at least worn them once?

21   A.    I believe once I have worn them.

22   Q.    You don't know recall whether or not

23 they were available, is that what you're saying?

24   A.    Not at the time of my fall because, like

Page 104

1  I said, there was no reason for ice cleats at the

2  time.

3    Q.    You see this hazard identification?

4    A.    Yes.

5    Q.    It says Pre-Task Card highlighted the

6  presence of icy conditions, but did not specify --

7  identify specific locations on the pad, do you see

8  that language?

9    A.    Yes.

10   Q.    Do you have any recollection of the

11 Pre-Task Card we've been talking actually

12 referencing icy conditions?

13   A.    Off the top of my head, no.  I would

14 assume that it would because, like I said, I would

15 put that on there if I was filling that out.

16   Q.    You don't have any reason to dispute

17 what this statement says, do you?

18   A.    No.

19   Q.    Okay.  Now, you see this section about

20 site preparation.  It says it is the foreman's

21 responsibility to ensure the crew walks the site

22 prior to commencing work, do you see that?

23   A.    Yep.

24   Q.    Does that mean the foreman for your

Page 105

1  crew, like Lonnie?
2      **A.    I believe so.  I cannot really say**
3  **because this was done after the fact.**
4      Q.    Okay.  And is that something that you
5  would typically do, your crew -- you said you had a
6  crew of four, right?
7      **A.    Typically, yes.**
8      Q.    And Lonnie was the foreman the whole
9  time you were there, right?
10     **A.    Right.**
11     Q.    If you were arriving on any site, let's
12 say T21, instead of T-11, when you got there, would
13 you -- typically all of you would walk around the
14 site, is that right?
15     **A.    We wouldn't walk around the site.  We**
16 **would survey the site and see if we can find any**
17 **hazards.**
18     Q.    Okay.  And do you know if that took
19 place before you got there that day?
20     **A.    I have no idea.**
21     Q.    Is that something that would have
22 typically been done had you been there at 7:00 a.m.
23 that day?
24     **A.    Had I been there at 7:00 a.m., I would**

Page 106

1  **have known if they did it or not.**
2      Q.    And it's something typically that you
3  had done on prior sites in terms of the actual, you
4  know, T-location, is that right?
5      **A.    Right.**
6      Q.    Okay.  Do you know in this Adverse
7  Ground Condition section, what the project team
8  means or refers to?
9      **A.    Probably just the supervisor, the safety**
10 **guy, and the foreman.**
11     Q.    So, like supervisor --
12     **A.    The superintendent.**
13     Q.    The superintendent, right.  And then the
14 safety guy listed on this document.  And the only
15 other foreman would have been Lonnie for your
16 group, right?
17     **A.    For my group it would have been Lonnie,**
18 **yes.  Whether he was part of that project team, I**
19 **really don't know.**
20     Q.    So, you have no idea if Lonnie ever met
21 with any safety guy at Mortenson?
22     **A.    Right.**
23     Q.    Jamie Langston was the superintendent,
24 right?

Page 107

1      **A.    Correct.**
2      Q.    You never interacted with him on this
3  project, did you?
4      **A.    Yes, I spoke with him on this project.**
5      Q.    And what would you talk to him about at
6  all?
7      **A.    Just the work that we're doing.  What**
8  **needed to be done.**
9      Q.    Would Jamie conduct safety meetings
10 sometimes?
11     **A.    Sometimes.**
12     Q.    Do you have any specific recollection of
13 anything that he did?
14     **A.    No, not off the top of my head.**
15     Q.    Would you recognize Jamie if you saw
16 him?
17     **A.    I think so.  It's been a while.**
18     Q.    Okay.  And do you recall any specific
19 safety meetings that Kevin Hogan may have
20 conducted?
21     **A.    Not off the top of my head.**
22     Q.    I showed you that one toolbox talk with
23 the other gentleman?
24     **A.    Yes.**

Page 108

1      Q.    You don't recall this specific one with
2  Kevin?
3      **A.    No.**
4      Q.    Maybe some or maybe not?  You don't
5  know?
6      **A.    Right.**
7      Q.    So, you were never given a copy of this
8  report after it was done, is that right?
9      **A.    No.**
10     Q.    Did you have ice melt salt as it is
11 referred to in Section 6?
12     **A.    Not in my truck, no.**
13     Q.    Of course, the icy area that was coned
14 off in the picture was not like that when you fell
15 is what you're saying?
16     **A.    Correct.**
17     Q.    And one of the recommended actions is to
18 provide each foreman with ice melt salt and cones
19 to address adverse conditions in frequently
20 traveled areas, right?
21     **A.    Yes.**
22     Q.    Do you have any idea whether or not your
23 foreman, Lonnie Sears, had any ice melt salt or
24 cones?

GEORGEFF, NICK
01/04/2022

Page 109

```
 1      MR. TERRY:  We're talking on the day of the
 2  incident or after?  This says 1/26/18.
 3  BY MR. SULLIVAN:
 4      Q.    On the day of the incident.
 5      A.    On the day of the incident, I would have
 6  to say no.  This wasn't made until after the
 7  accident.
 8      Q.    Do you know if Lonnie Sears was ever
 9  provided with ice melt, cones and salt afterwards?
10      A.    I have no idea.
11      Q.    11/26 is the day when the report was
12  done, right?
13      MR. TERRY:  If you know.
14  BY THE WITNESS:
15      A.    I have no idea.
16  BY MR. SULLIVAN:
17      Q.    All right.  The point is, you don't know
18  or you have no recollection that these things were
19  given to the foreman before this accident, correct?
20      A.    Right.
21      Q.    And have you ever been provided ice melt
22  salt on a project working in the wintertime?
23      A.    No.
24      Q.    Is it your recollection that you met
```

Page 110

```
 1  with Jamie Langston just the one time after your
 2  fall?
 3      A.    From what I remember, yes.
 4      Q.    And you were taken by ambulance to what
 5  hospital?
 6      A.    I believe the Mendota Hospital.
 7      Q.    And have you already testified as to
 8  everything that you can recall about your
 9  conversations with Jamie Langston?
10      A.    Yes.
11      Q.    And do you have any recollection of any
12  other conversations with Kevin Hogan that you can
13  think of?
14      A.    No.
15      Q.    Do you know how close to the turbine
16  piece you were when you fell?
17      A.    Not off the top of my head.
18      Q.    And the place where you fell was not the
19  actual road or access road at all, was it?
20      A.    Where I fell, no.
21      Q.    Okay.  And it wasn't the pad site
22  either, was it?
23      A.    No.
24      Q.    What would you call that area just
```

Page 111

```
 1  generally?
 2      A.    The site laydown area.
 3      Q.    You said the site, s-i-t-e, laydown
 4  area?
 5      A.    Yes.
 6      Q.    Which is -- laydown area, meaning where
 7  they laid down the components to be erected, right?
 8      A.    Right.
 9      Q.    You don't know how many days that it had
10  been there before those pieces were erected?
11      A.    No, not off the top of my head.
12      Q.    You don't know how many days those
13  pieces were there before you fell either?
14      A.    Right.
15      Q.    Has your union ever provided training to
16  you about walking in the snow and ice?
17      A.    No.  The union, no.
18      Q.    Do you recall Mortenson ever giving you
19  training about that?
20      A.    Not to my recollection.
21      Q.    In the 2008 project, was that in the
22  wintertime?
23      A.    Yes, it was.
24      Q.    Any training about snow or ice in that
```

Page 112

```
 1  project?
 2      A.    Not that I am aware of.
 3      Q.    I can't remember if I asked you this.
 4  You did not talk to anyone from Borneke at any time
 5  on this project?
 6      A.    No.
 7      Q.    That's correct?
 8      A.    That's correct.
 9      Q.    All right.  Did the crane operator get
10  out there to help you?
11      A.    No, he was still in the crane.
12      Q.    So, he's the only one that actually
13  helped you?
14      A.    He came out of the crane, but he didn't
15  come down because the crane was still running
16  overhead, he just could not walk away from it.
17      Q.    The only one that actually helped you up
18  was the paramedic?
19      A.    No, Lonnie came running over after I
20  called for him and Leo was close by, he had the
21  radio and he had heard Corey call for help.
22      Q.    How long was it before the ambulance
23  arrived?
24      A.    The ambulance?  Probably 20, 25 minutes.
```

GEORGEFF, NICK
01/04/2022

Page 113

1  Q.   So, were you sitting on the ice for 25
2  minutes?
3  **A.   No, they pulled me off the ice, so I**
4  **wouldn't be on ice.  And then after the paramedic**
5  **put the boot on my leg, the site paramedic, they**
6  **put me in the back of a pickup to take me to where**
7  **the ambulance was.**
8  Q.   Okay.  So, Lonnie and another guy in
9  your group helped you --
10  MR. TERRY:  Leo.
11  BY MR. SULLIVAN:
12  Q.   You don't remember his last name?
13  **A.   Leo.  I can't remember his last name.**
14  MR. TERRY:  Chris, I will search any documents
15  we may have had and if I find his last name, I will
16  let you know.
17  BY MR. SULLIVAN:
18  Q.   And so you were just sitting in the dirt
19  off to the side until the ambulance got there?
20  **A.   Yes.**
21  Q.   You didn't attempt to stand up at all?
22  **A.   I did not attempt.  I knew it wouldn't**
23  **be a good idea.**
24  Q.   Did it swell up or at all?

Page 114

1  **A.   It had swelled up quite a bit.**
2  Q.   Did you keep your shoe on?
3  **A.   I had to.**
4  Q.   And it was still snowing or had it
5  stopped by then?
6  **A.   I believe it stopped snowing by then.**
7  Q.   Did anyone attempt to give you ice or
8  anything?
9  **A.   Pardon me?**
10  Q.   Did either of your co-workers attempt to
11  give you ice or first aid?
12  **A.   They helped me sit up and helped me get**
13  **off the ice.  Slid me off the ice.**
14  Q.   And then you stayed in the same spot
15  sitting down?
16  **A.   Yes.**
17  Q.   For 20 minutes?
18  **A.   Until they put the boot on my leg.**
19  Q.   Which the paramedics did?
20  **A.   The site paramedics.**
21  Q.   Wasn't it only three weeks earlier that
22  you had a back injury?
23  **A.   No.**
24  Q.   Okay.  Had you ever injured your back?

Page 115

1  **A.   No.**
2  Q.   Now, you were transferred from Mendota
3  to where?
4  **A.   After Mendota I went home.  They set my**
5  **foot in Mendota, wrapped it up, and sent me home.**
6  Q.   You were not given a cast, I take it?
7  **A.   Not a cast, no.**
8  Q.   Okay.  Then when did you first see
9  Dr. Holly Brockman?
10  **A.   Two days later.**
11  MR. TERRY:  For the record, Holly and then
12  Brockman, B-r-o-c-k-m-a-n.
13  BY MR. SULLIVAN:
14  Q.   Is she an orthopedic surgeon?
15  **A.   Yes.**
16  Q.   And at what hospital?
17  **A.   At the time she was at the Ottawa**
18  **Hospital.**
19  Q.   Is she the only doctor that performed
20  the surgery on your ankle?
21  **A.   No.  Her colleague, Dr. Jensen, I**
22  **believe, took the screws out, but it was under**
23  **Dr. Brockman's watch.**
24  Q.   Do you know how old Dr. Brockman is?

Page 116

1  **A.   How old she is?**
2  Q.   Yes.
3  **A.   I don't know.  I would assume late 40s.**
4  Q.   Okay.  And is it correct, you've had
5  three total surgeries?
6  **A.   Yes.**
7  Q.   The first one on November 26, 2018, does
8  that sound right?
9  **A.   Yes.**
10  Q.   And all of these were done at the Ottawa
11  Hospital?
12  **A.   Correct.**
13  Q.   Any specific reason why you would go to
14  the Ottawa Hospital?
15  **A.   That was first doctor they had me go**
16  **see.  They recommended her from the emergency room,**
17  **so I made the appointment to go see her and she got**
18  **me in the quickest.**
19  Q.   How far is Ottawa from your house?
20  **A.   A good 30 miles.**
21  Q.   I mean, there's a closer hospital in
22  Joliet if you wanted to, right?
23  **A.   Yes.**
24  Q.   Silver Cross, I think?

GEORGEFF, NICK
01/04/2022

Pages 117–120

Page 117

1    A.    Yes, but I couldn't wait any longer to
2 get the operation.
3    Q.    You had not -- you had not treated with
4 Dr. Brockman before this incident?
5    A.    That's correct.
6    Q.    Why did she tell you that you needed
7 surgery, if recall?
8    A.    My ankle was broken and my foot was
9 dislocated and I had bones broken on both sides of
10 my ankle.
11    Q.    And what did she tell you what the
12 outcome of the surgery would be, if anything?
13    A.    She said it all depends on how I heal.
14    Q.    And is there a reason why you had to two
15 follow-up surgeries that you know of?
16    A.    Yeah, I had a screw going through my
17 whole ankle holding it together and she believed
18 that was hindering my movement.  So, she
19 recommended to get that removed and go through
20 therapy again to try and get movement.
21    Q.    Was the original plan just to have one
22 ankle surgery?
23    A.    My original plan was not to have any.
24    Q.    Right.

Page 118

1    A.    I wasn't planning on getting anything
2 removed unless I had to.
3    Q.    I mean, do you recall any conversation
4 in which Dr. Brockman said to you after the first
5 surgery that you should get a follow-up procedure
6 to get this removed for what reason?
7    A.    She never recommended it.  The only
8 reason why she recommend getting it removed is if
9 it was bothering me or, like I said, the one screw
10 was hindering my movement.
11    Q.    Okay.  So, that was the procedure in
12 April of 2019, is that right?
13    A.    Right.
14    Q.    And you said that was performed by
15 another doctor?
16    A.    Yeah.  It was one of Brockman's
17 colleagues.
18    Q.    Like a resident?
19    A.    Yes.
20    Q.    And do you know what that doctor's name
21 is?
22    A.    I don't remember off the top of my head,
23 but I believe the last name might have been Jensen,
24 if I am not mistaken.

Page 119

1    Q.    Okay.  Do you know what the name of her
2 group is?
3    A.    No, I just know Ottawa Hospital,
4 St. Mary's maybe.
5    MR. TERRY:  I think you did go to someone else
6 for the surgery.  Was it with Dr. Brockman?
7    THE WITNESS:  No, it was her team.
8 BY MR. SULLIVAN:
9    Q.    You don't know the name of her group,
10 though?
11    A.    OSF, St. Elizabeth's Medical Center.
12    Q.    And that is in Ottawa?
13    A.    Yes.
14    Q.    Sometimes these orthopedic surgeons are
15 in a separate group and they have a different name,
16 I just thought I would ask.  You don't know if she
17 is in a separate group?
18    A.    No, everything I have ever seen was OSF.
19    Q.    And you had a third procedure on
20 December 30, 2019, right?
21    A.    Yes.
22    Q.    And what was that?
23    A.    That was to remove the rest of the
24 hardware.

Page 120

1    Q.    So, was the original plan after the
2 first surgery to keep the hardware in permanently?
3    A.    If need be.  I wasn't planning on
4 getting the second or third surgery.
5    Q.    That's what I am trying to figure out,
6 did she tell you before the first procedure that
7 this was supposed to be permanent hardware?
8    A.    She said most people leave it in.
9    Q.    Okay.
10    A.    It all depends.
11    Q.    On what?  Depends on what?
12    A.    Just how your recovery is.  Whether it
13 bothers you or not.  A lot of people have different
14 effects from the metal in their body compared to
15 other people.
16    Q.    As you stand today, do you have any
17 hardware in your ankle?
18    A.    No.
19    Q.    Do you have any further procedures
20 scheduled for your ankle?
21    A.    No.
22    Q.    When was the last time you saw
23 Dr. Brockman?
24    A.    Probably after I had therapy.  After the

GEORGEFF, NICK
01/04/2022

Pages 121–124

Page 121

1  last -- after it was removed.  So, probably, I
2  would say, July of '20.
3      Q.     Okay.  After each of these procedures,
4  Dr. Brockman ordered physical therapy for you?
5      A.     It was recommended by the insurance
6  company.  By the workers' comp company.
7      Q.     And what company was that?
8      A.     Gallagher-Bassett.
9      Q.     And is that workers' comp case still
10 going on?
11     MR. TERRY:  I'll object as to relevance.  If
12 you know the status of it, you can answer.
13 BY THE WITNESS:
14     A.     Yes, I am not sure how far it is.
15 BY MR. SULLIVAN:
16     Q.     You have not been made aware of its
17 result yet?
18     A.     No.
19     Q.     Do you have any further treatment for
20 your ankle scheduled?
21     A.     No.
22     Q.     When was the last time you had physical
23 therapy?
24     A.     I believe July.

Page 122

1      Q.     2020?
2      A.     '20.
3      Q.     That was at Athletico?
4      A.     Yes.
5      Q.     What was the name of the physical
6  therapist that you worked with?
7      A.     I believe her name was Charlie.
8      Q.     You don't know her last name?
9      A.     No.
10     Q.     Did any doctor tell you that you reached
11 the maximum medical improvement of your ankle?
12     A.     Yeah.
13     Q.     Who said that and when?
14     A.     Dr. Brockman said that.  I want to say
15 towards the end of '19.
16     Q.     Okay.
17     A.     After I got the screw removed.
18     Q.     Is there any limitations of movement in
19 your ankle?
20     A.     Yes.
21     Q.     How do you measure that?
22     A.     They measured it at the therapist's
23 office and said it was limited.  I was not within
24 the specs and I couldn't even feel it when I moved

Page 123

1  my ankle up or down and side to side.
2      Q.     Do you have any idea how far your range
3  of motion is limited specifically?
4      A.     Not off the top of my head.
5      Q.     When you say it wasn't within specs, you
6  don't know what specs they were talking about?
7      A.     They had told me at one point what it
8  was, but I never remembered it.
9      Q.     Okay.  Did you have sort of home
10 exercise plan that Charlie had created for you?
11     A.     Yes.
12     Q.     And did you follow that?
13     A.     Yes, I still do it.
14     Q.     What does it consist of?
15     A.     I just have movement up and down, side
16 to side.  Standing on the wall.  Getting my ankle
17 to bend.  Just stuff like that.  Rubber bands to
18 strengthen it.
19     Q.     Is there any advice given by the
20 physical therapist that you did follow?
21     A.     No.
22     Q.     Do you have any follow-up treatment
23 scheduled with Charlie or any other physical
24 therapist?

Page 124

1      A.     No.
2      Q.     Do you walk with a cane?
3      A.     No.
4      Q.     Do you have to wear any different shoes
5  than you used to wear?
6      A.     I only wear gym shoes now.
7      Q.     Why is that?
8      A.     Because if I wear dress shoes my ankle
9  swells up even worse than it is now.
10     Q.     Did anyone in your union tell you, you
11 could not perform union ironwork?
12     A.     No.
13     Q.     Is there any notes that any doctor has
14 given you that says you cannot perform union work
15 anymore?
16     MR. TERRY:  Object.  It calls for a medical
17 conclusion.  If you know the answer of the
18 restrictions, you can answer.
19 BY THE WITNESS:
20     A.     I know the restrictions.  Yes, they said
21 I could not walk on uneven ground, therefore, I
22 would not be able to do construction.
23 BY MR. SULLIVAN:
24     Q.     What doctor said that?

GEORGEFF, NICK
01/04/2022

Pages 125–128

Page 125

1    A.    Brockman said it and the two therapists
2    said it also.
3         Q.    And is that what you understood, that
4    you can't walk on an uneven ground?
5         A.    I cannot walk on an uneven ground or
6    make any sudden movements, so, yeah.
7         MR. TERRY:  Just a standing objection to this.
8    It calls for a medical conclusion.  The records
9    speak for themselves.  There are more restrictions
10   listed in both the FCA and from Dr. Brockman which
11   limited his lifting as well.
12   BY MR. SULLIVAN:
13        Q.    As far as you can recall, the only
14   people who told you that you have restrictions
15   currently are Dr. Brockman and you said two
16   therapists, right?
17        A.    Yes.
18        Q.    And no one else?
19        A.    No.
20        Q.    These are both physical therapists,
21   right?
22        A.    Yes.
23        Q.    And who was the other person besides
24   Charlie?

Page 126

1         A.    It was Athletico and ATI.
2         Q.    Okay.  So somebody at ATI?
3         A.    Yep.
4         Q.    But you don't recall the name?
5         A.    I don't remember the name.  I would see
6    different therapist every time I went.
7         Q.    Charlie was at Athletico?
8         A.    Right.
9         Q.    And you went to the same location each
10   time?
11        A.    Yes.
12        Q.    Which was where?
13        A.    In Shorewood.
14        Q.    And where was that ATI?
15        A.    ATI was also Shorewood.
16        Q.    That's Will County, isn't it?
17        A.    I believe so.  I am not sure.  It's Will
18   or Kendall, one of the two.
19        Q.    As you sit here, do you know what the
20   amount of your medical bills have been?
21        MR. TERRY:  I'll object as to relevance and
22   the collateral source rule.  If you know, you can
23   answer.
24

Page 127

1    BY THE WITNESS:
2         A.    I have no idea.
3    BY MR. SULLIVAN:
4         Q.    When did you start working at Home
5    Depot?
6         A.    July of 2020.
7         Q.    So, the same time you stopped the
8    physical therapy?
9         A.    Right.
10        Q.    You don't have any restrictions on your
11   employment at Home Depot, do you?
12        A.    Just my lifting instructions.  Just
13   lifting and standing for consecutive hours at a
14   time.
15        Q.    How many hours can you stand
16   consecutively?
17        A.    I usually can go four before I take a
18   break.
19        MR. TERRY:  I'll state an objection.  The
20   records speak for themselves.
21   BY MR. SULLIVAN:
22        Q.    Do you work full time at Home Depot?
23        A.    Yes, I do.
24        Q.    Is that a 40-hour week?

Page 128

1         A.    Yes.
2         Q.    What department do you work in, first of
3    all?
4         A.    I do plumbing.
5         Q.    Is that basically selling plumbing
6    products?
7         A.    Yes.
8         Q.    Have you spoken to anyone at the union
9    since this accident?
10        A.    No.
11        Q.    And anyone at Mortenson?
12        A.    Nope.
13        Q.    How many years were you a journeyman for
14   the union, roughly?
15        A.    Roughly close to -- a journeyman,
16   probably 17.
17        Q.    And what was your salary?  How much did
18   your salary change in those 17 years, if you know?
19        A.    I believe when I started it was $34 and
20   it went up to $41 in '18.  And now, I believe, it
21   is more than that, but I am not too sure.
22        Q.    The union sets that rate, right?
23        A.    Right.
24        Q.    It doesn't matter what job you're on,

GEORGEFF, NICK
01/04/2022

Page 129

1  you have the same rate through the union?
2      A.     Right.
3      Q.     Did you have to wear crutches when your
4  ankle was being worked on?
5      A.     Yes.
6      Q.     How long were you using crutches?
7      A.     Six months, I believe.
8      Q.     What type of jobs did you look for?
9  First of all, let me go back.  When did you first
10 start looking for jobs after your treatment was
11 completed?
12     A.     Pretty much probably the end of June,
13 beginning of July.
14     Q.     Where did you apply besides Home Depot?
15     A.     Why did I?
16     Q.     No, where?
17     A.     I also applied at Lowe's, Menard's.
18 Anywhere close by that would accommodate my
19 restrictions.
20     Q.     I take it, you did not ask the union if
21 you could do something else for the union?
22     A.     There's no light duty in the union.
23 There was nothing that I could have did.
24     Q.     But you did not ask anyone in the union,

Page 130

1  is that correct?
2      MR. TERRY:  Asked and answered.  You can
3  answer.
4  BY THE WITNESS:
5      A.     I didn't because I knew everything --
6  nothing is light duty.
7  BY MR. SULLIVAN:
8      Q.     Has anyone told you that you have
9  permanent disability?
10     A.     Other than the doctor, no.
11     Q.     Has anyone told you that you have
12 permanent range of motion loss?
13     A.     Other than the doctor, no.
14     Q.     Has anyone told you that you can regain
15 your range of motion in the future if you do
16 certain things?
17     A.     At this point, nobody has mentioned
18 that.
19     Q.     As you sit here, do you have any idea if
20 your range of motion will get better if you
21 exercise and so forth?
22     MR. TERRY:  It calls for speculation and a
23 medical opinion.  If you know, you can answer.
24

Page 131

1  BY THE WITNESS:
2      A.     Basically they said if I haven't gotten
3  better now, nothing is going to help after three
4  years.
5  BY MR. SULLIVAN:
6      Q.     And Dr. Brockman said that?
7      A.     Yes.
8      Q.     The PT's.  Anyone else?
9      A.     Yeah.
10     Q.     Is that it, those three?
11     A.     Just those three.
12     Q.     What exercises do you do now to try and
13 help your range of motion?
14     A.     I move up and down, side to side as far
15 as I can go.  Use a rubber band.  Stand against the
16 wall to stretch my ankle out.
17     Q.     Do you have any plans to move?
18     A.     No.
19     Q.     You don't pay rent to your parents for
20 the home or anything?
21     A.     No.
22     MR. TERRY:  Object as to relevance.  I'm just
23 curious, what does it have to do with anything?
24     MR. SULLIVAN: Well, you're claiming various

Page 132

1  types of damages, so it relates to lots of things.
2  It could be lost wages that you need to pay rent.
3  Who knows what.
4      MR. TERRY:  You can answer the question.
5  Object to relevance.
6  BY THE WITNESS:
7      A.     No, I do not.
8  BY MR. SULLIVAN:
9      Q.     Is there anything -- what types of
10 things would you normally do with your family?
11     A.     My wife and I would go on walks all of
12 the time.  Vacations.
13     Q.     And how old are your kids?
14     A.     21 and 18.
15     Q.     And they were how old when this
16 happened?
17     A.     17 and 14.
18     Q.     One boy and one girl?
19     A.     One boy, one girl.
20     Q.     Were you ever like a coach or anything?
21     A.     I did coach my son's T-ball team.
22     Q.     That was completed before this accident,
23 correct?
24     A.     Right.

GEORGEFF, NICK
01/04/2022

Page 133

1    Q.    You're still able to walk if you want to
2  talk a walk in the woods or something of that
3  nature, is that right?
4    **A.    I have not tried.**
5    Q.    Do you have any plans to try or is there
6  any reason why you haven't tried?
7    **A.    I just know I cannot walk across my**
8  **grass, so there's no way I would go hiking.  I stay**
9  **on solid ground.**
10   Q.    When you say you can't walk across your
11 grass, do you mean you have too much pain to walk?
12   **A.    I have too much pain to walk.  I do not**
13 **cut my grass anymore because I can't walk behind a**
14 **mower.**
15   Q.    Have you ever tried like any other
16 therapies, other than the physical therapy?
17   **A.    No.**
18   Q.    You do walk at Home Depot, correct?
19   **A.    Yes.**
20   Q.    It's obviously a big store, you have to
21 walk around the store, right?
22   **A.    I usually stay in my department, so I do**
23 **not walk around the whole store.**
24   Q.    Do you walk from your car in the parking

Page 134

1  lot to wherever your section is?
2    **A.    Yep.**
3    Q.    And you do not have any problems
4  performing your duties at Home Depot since you had
5  that job, have you?
6    **A.    No, other than the pain, no.**
7    Q.    Are you on any pain medications
8  currently?
9    **A.    No.  If I do, I take Advil every once in**
10 **a while and that's about it.**
11   Q.    Did the doctor prescribe any pain
12 medications around the time of the surgeries?
13   **A.    Yes.**
14   Q.    Do you know what it was?
15   **A.    I know -- she said if it got really bad,**
16 **she prescribed me OxyContin, and I believe the**
17 **first one was just like a Codeine type pill.**
18   MR. TERRY:  Norco?
19 BY THE WITNESS:
20   **A.    Yes, like Norco.**
21 BY MR. SULLIVAN:
22   Q.    And did you ever take OxyContin?
23   **A.    Occasionally I would take it.**
24   Q.    When was the last time you did and for

Page 135

1  how long, if you recall?
2    **A.    It's been probably since the beginning**
3  **of 2019 after the surgery.**
4    Q.    You don't have any ongoing prescriptions
5  for any opiates or anything, do you?
6    **A.    No.**
7    Q.    Have you ever had any addictions to
8  drugs or alcohol in your life that you recall?
9    **A.    Never.**
10   Q.    You don't have any plans to leave Home
11 Depot currently, do you?
12   **A.    Not at this time, no.**
13   Q.    And you do get overtime there, right?
14   **A.    I would.  They usually don't give out**
15 **overtime very much.**
16   Q.    And can you estimate what your annual
17 salary has been in the last couple of years?
18   **A.    At Home Depot it has been 30.  Before my**
19 **accident it was probably upper 90s, 100,000.**
20   MR. TERRY:  Just for record, we will provide
21 tax documents.
22   MR. SULLIVAN:  Okay.
23 BY MR. SULLIVAN:
24   Q.    Mr. Georgeff, is there anything that you

Page 136

1  can't do now that you used to do on a regular basis
2  you can think of that you haven't talked about?
3    **A.    I cannot go on walks with my wife.  She**
4  **used to complain I walk too fast and now she**
5  **complains I walk too slow.  I have problems going**
6  **to the beach with her.**
7    Q.    What kind of walks would you do with
8  your wife that you can't do now?
9    **A.    Just walking the dogs in the**
10 **neighborhood.  Maybe going on an occasional run**
11 **every now and then.**
12   Q.    Have you attempted running at all?
13   **A.    I have not attempted.**
14   Q.    Do you still walk the dogs?
15   **A.    No.**
16   Q.    You don't walk them at all?
17   **A.    Nope.**
18   Q.    What kind of dogs do you have?
19   **A.    Maltese Shih Tzu.**
20   Q.    How big are those?
21   **A.    The biggest one is probably six pounds.**
22   Q.    They don't walk far, do they?
23   **A.    No, they do not.**
24   Q.    What does your wife do?

GEORGEFF, NICK
01/04/2022

1    **A.    She's an interior design and she's a**
2  **teacher at JJC.**
3    Q.    Joliet Junior college?
4    **A.    Joliet Junior College.**
5    Q.    When you were on this project at the
6  Mendota site, what was your average work per week?
7    **A.    Take home or gross?**
8    Q.    No, how many hours?
9    **A.    Oh, probably 65.**
10    Q.    It averaged more than 40 per week?
11    **A.    Oh, definitely.**
12    Q.    Now, these projects once they were done,
13  then your union would have to assign you a new
14  assignment, essentially?
15    **A.    Right.**
16    Q.    And were there periods of time when you
17  had a lapse in the work because there wasn't an
18  assignment available?
19    **A.    Yes.**
20    Q.    And in the course of your career, do you
21  know how much time you would have a lapse like
22  that?
23    **A.    Maybe two months a year at tops.**
24  **Usually January and February.**

1    Q.    And, of course, when you had a lapse
2  like that, you would not be earning any salary
3  during that time, correct?
4    **A.    Right.**
5    Q.    And union workers is always hourly work,
6  right?
7    **A.    Right.**
8    Q.    You don't have any friends that work at
9  Mortenson, do you?
10    **A.    No.**
11    Q.    Do you consider yourself friends with
12  any the Local 444 members that you used to work
13  with?
14    **A.    I considered myself friends.  I don't**
15  **see them very often.**
16    Q.    Who do you see on a social basis?
17    **A.    On a social basis, really nobody.**
18    Q.    You were --
19    MR. TERRY:  Just so we can be clear, in
20  general or from this site specifically?
21    MR. SULLIVAN:  In general from the union?
22    MR. TERRY:  Okay.
23  BY MR. SULLIVAN:
24    Q.    Is that how you answered that?

1    **A.    Yes.**
2    Q.    And weren't social friends with anyone
3  on the site anyway?
4    **A.    No.**
5    Q.    You wouldn't hang out with Lonnie after
6  work or anything?
7    **A.    No.**
8    Q.    Or the other guy, Leo?
9    **A.    No.**
10    MR. SULLIVAN:  I think that's all I have.  I
11  will look over my notes here, if Charlie has any
12  questions.
13    MR. TERRY:  I definitely have some questions.
14  I will take a quick break, two minutes, and we will
15  finish up.
16    MR. SULLIVAN:  That sounds good.
17        CROSS EXAMINATION
18  BY MR. TERRY:
19    Q.    Back on the record.
20    I just want to follow up on a few things
21  with you.  I will bounce around a little bit, but
22  just bear with me and we should get you out of here
23  shortly.
24    You were asked questions about the CIA,

1  the Construction Incident Analysis.  Just to be
2  clear, on the CIA lists the site where you were
3  injured as T-1.  You believe it's a typo and
4  believe the area where you fell is to be T-11, is
5  that correct?
6    **A.    That is correct.**
7    Q.    And how do you know this?  Just because
8  you know the timeline of where you were and also --
9  like how do you know that you were at T-11 and not
10  T-1?
11    **A.    Because I know where T-1 is and I know**
12  **where T-11 is.**
13    Q.    That's from looking at the site map, you
14  could see on the site map you were at T-11 and not
15  T-1?
16    **A.    Correct.**
17    Q.    And then the photograph on the first
18  page of that, you were asked some questions
19  generally about whether or not kind of all the
20  sites looked the same.  To your knowledge, were
21  there multiple sites like a big sheet of ice like
22  this?
23    **A.    No.**
24    Q.    To the best of your knowledge, this

GEORGEFF, NICK
01/04/2022

Page 141

1　picture on CIA is showing the area where you fell?
2　　　A.　Correct.
3　　　Q.　And you could see in the background by
4　the -- I believe you called that the generator
5　piece, is that correct?
6　　　A.　Yes.
7　　　Q.　And by the generator piece, as well as
8　by the mid section on the right there's some
9　remnants of the snow that was covering the snow and
10　ice?
11　　　A.　Yes.
12　　　Q.　And it is also roped off and it looks
13　like orange stanchions, so to speak, and kind of
14　spray painted off, is that correct?
15　　　A.　Yes.
16　　　Q.　Were any of those conditions or warning
17　signs there prior to your fall?
18　　　A.　No, not at all.
19　　　Q.　Had those warning signs been there prior
20　to your fall, you would have avoided it, correct?
21　　　A.　Correct.
22　　　Q.　And had the snow not been covering the
23　ice, you would have avoided it, is that correct?
24　　　A.　Correct.

Page 142

1　　　Q.　It's fair to say, the photograph does
2　accurately depict the scene where you fell, minus
3　the snow which was previously covering the ice
4　before it had melted?
5　　　A.　Yes.
6　　　Q.　You were asked questions about the
7　factors of cleats that were -- you were asked
8　questions about cleats on the outside.  At any
9　time, were you required to wear ice cleats on this
10　job?
11　　　A.　No.
12　　　Q.　You were following all necessary safety
13　precautions, is that correct?
14　　　A.　That is correct.
15　　　Q.　If we go Page 2 of CIA under proper PPE,
16　I will read it, and I want to make sure that I read
17　it correctly.  When proper PPE: Team member had
18　all the required PPE for site policies.  Did I read
19　that correctly?
20　　　A.　Yes.
21　　　Q.　Was that your understanding you had all
22　the proper PPE or personal protective equipment as
23　required on this job site?
24　　　A.　That is correct.

Page 143

1　　　Q.　There is always something more you could
2　do, but nothing else was required.  You were doing
3　everything that was required of you?
4　　　A.　Yes.
5　　　Q.　If you go down to the next bullet point
6　that was not read.  It was confirmed that the team
7　member was not running/rushing; rather casually
8　walking.  Did I read that correctly?
9　　　A.　Yes.
10　　　Q.　And the reason I am bringing that it up
11　is because you were asked questions about whether
12　or not you were rushing because you were late.
13　First of all, were you late or were working the
14　whole morning?
15　　　A.　I was working the whole morning.
16　　　Q.　Just because of your job
17　responsibilities, you got to the job site later
18　than 7:00?
19　　　A.　Right.
20　　　Q.　That doesn't' mean you were late, does
21　it?
22　　　A.　No.
23　　　Q.　And when you look at this incident
24　analysis, it actually says that you were not

Page 144

1　running or rushing, that you were casually walking,
2　is that correct?
3　　　A.　That's correct.
4　　　Q.　To your knowledge, were you following
5　all the necessary safety precautions?
6　　　A.　Yes.
7　　　Q.　Do you believe anything that you did
8　contributed to this accident?
9　　　A.　No.
10　　　Q.　Is it fair to say that you fell because
11　a large sheet of ice was covered by snow and you
12　encountered that because you did not know that due
13　to the snow covering?
14　　　A.　That's correct.
15　　　Q.　And this ice formed in a depressed area,
16　is that correct?
17　　　A.　Yes.
18　　　Q.　The depressed area which had it been
19　graded, the water wouldn't have pooled there, is
20　that correct?
21　　　A.　Yes.
22　　　Q.　If we look up at the top of this page,
23　this still Page 2 on the CIA, I will read it and I
24　will ask if I read it correctly.  It says, Site had

GEORGEFF, NICK
01/04/2022

Page 145

1  been previously addressed with a bulldozer to
2  mitigate walking/working hazards, however the ice
3  accumulation had occurred too close to the WTG
4  section for the dozer to operate safely, leaving
5  the ice unaddressed.  Did I read that correctly?
6      A.    Yes.
7      Q.    Is it fair to say that on a job site
8  like this, there are various pieces of equipment
9  ranging in size from small to large?
10     A.    Typically, yes.
11     Q.    And then while a bulldozer might not
12 have been able to mitigate the condition, is it
13 safe to say that a bobcat or skid steer could have?
14     A.    Definitely.
15     Q.    Or even people going around with shovels
16 if they needed to?
17     A.    If you had to, yes.
18     Q.    So, there were other ways to do it, just
19 a bulldozer couldn't address it?
20     A.    Yes.
21     Q.    And the people who were operating the
22 bulldozer, those were all Borneke employees,
23 correct?
24     A.    Yes.

Page 146

1      Q.    And it was Borneke's job to grade and
2  maintain the roadway and the ground on this
3  project?
4      A.    Correct.
5      Q.    Had Borneke had chosen to use a skid
6  steer or bobcat that could have been done, it just
7  wasn't it?
8      A.    Yes.
9      Q.    And had they done that and had they
10 addressed this area, is it your belief that the
11 water wouldn't have pooled because there wouldn't
12 have been a depressed area?
13     A.    That is correct.
14     Q.    If there wasn't a depress area and no
15 water pooling, the water wouldn't have frozen and
16 you wouldn't have fallen, correct?
17     A.    Yep.
18     Q.    You were asked questions of what type of
19 area you would describe where your accident
20 occurred.  Is it fair to say that this was close to
21 the erection area where the windmills were actually
22 going to be built?
23     A.    Yes.
24     Q.    Approximately, how far from the base was

Page 147

1  the erection area to your accident?
2      A.    From the base probably about 30 feet.
3      Q.    Okay.  So, it's fair to say that this is
4  kind of like a hybrid of an erection area and a
5  laydown area?
6      A.    Yes.
7      Q.    All right.  You were asked questions
8  about whether or not this area was previously
9  graded prior to the delivery of the various
10 components that needed to be installed.  I believe
11 you testified that you believe that on all of the
12 sites they were at least addressed in some regard
13 to make it safe for delivery, correct?
14     A.    Correct.
15     Q.    After Borneke addressed the various
16 sites, did they leave the project or do they
17 maintain a site presence on a daily basis?
18     A.    No, they were onsite the whole time
19 going from location to location.
20     Q.    It's fair to say, Borneke and their
21 employees were onsite on a daily basis going from
22 site to site and doing various tasks on the job
23 site as a whole?
24     A.    Yes.

Page 148

1      Q.    And while they might not have been at
2  T-11 specifically on this day, they were on the job
3  site this day?
4      A.    Yes.
5      Q.    And prior to this day?
6      A.    Yeah.
7      Q.    And the CIA says that this was an area
8  which a bulldozer could not have -- that had been
9  previously addressed.  You would agree, Borneke was
10 the company that previously addressed this fourth
11 delivery, correct?
12     A.    Yes.
13     Q.    After the delivery of the various
14 components, this became too tight for the bulldozer
15 to get back in there?
16     A.    Right.
17     Q.    Again, if Borneke chosen a smaller piece
18 of equipment they could use that to address it?
19     A.    Right.
20     Q.    I am not going to ask you about
21 contractual obligations because -- I don't mean
22 any disrespect to you, you were not the project
23 manager on this job site, were you?
24     A.    No.

GEORGEFF, NICK
01/04/2022

Page 149

1    Q.    And you never read the contract between
2  Borneke and Mortenson?
3    A.    No.
4    Q.    I will ask you some questions based on
5  your observation in your 20 years experience in the
6  construction industry, is that fair?
7    A.    Yes.
8    Q.    Is it your understanding, based on your
9  observations of the work being performed, that
10 Borneke was the excavation company on this job
11 site?
12   A.    Yes.
13   Q.    And part of their responsibilities,
14 including building, grading and maintaining
15 temporary access roads?
16   A.    Yes.
17       MR. SULLIVAN:  Object to foundation.
18 BY MR. TERRY:
19   Q.    When I ask you these questions, is it
20 fair to say, that you saw Borneke doing these
21 various tests from time to time?
22   A.    Yes.
23   Q.    You saw Borneke erecting and maintaining
24 access roads?

Page 150

1    A.    Yes.
2    Q.    And you saw them erecting and
3  maintaining various erection areas and delivery
4  locations?
5    A.    Right.
6    Q.    So, it's fair to say that based on your
7  observations, you understand that Borneke was, in
8  fact, maintaining and erecting or constructing
9  access roads, laydown areas and stuff like that?
10   A.    Yes.
11   Q.    Based on your observation on this
12 project, was it Mortenson's responsibility or was
13 Borneke's responsibility to grade and maintain the
14 roadways and ground conditions?
15       MR. SULLIVAN:  Objection to foundation and
16 speculation.
17 BY MR. TERRY:
18   Q.    Let me re-ask it.  Based on your
19 observations, who was the company that you saw
20 performing grading and maintaining of roadways and
21 ground conditions?
22   A.    I would say Borneke just because
23 Mortenson's employees would not be allowed to drive
24 bulldozers because those are pretty much operators

Page 151

1  and we usually stay within our own unions and not
2  do outside work.
3    Q.    Exactly.  Union sites, each various
4  union has their own tasks, correct?
5    A.    Yes.
6    Q.    The ironworkers do the ironwork,
7  correct?
8    A.    Correct.
9    Q.    And the excavators do the excavating
10 work?
11   A.    Correct.
12   Q.    And the operators do the operating?
13   A.    And the teamsters drive the trucks.
14   Q.    Exactly.  On this site, the excavating
15 company was Borneke?
16   A.    Correct.
17   Q.    While on the job site, it's fair to say
18 from time to time you saw Borneke performing tasks
19 such as grading, blading, b-l-a-d-i-n-g,
20 maintaining the various ground conditions of the
21 roadways?
22   A.    Yes.
23   Q.    They would create and maintain crane
24 pads as you saw them doing?

Page 152

1    A.    Yes.
2    Q.    And they would create and maintain
3  laydown areas?
4    A.    Yes.
5    Q.    Same thing with erection areas?
6    A.    Yes.
7    Q.    From time to time on this job site, is
8  it fair to say that there was a known condition of
9  poor road conditions or ground conditions as a
10 whole?
11   A.    Yes.
12   Q.    Is it safe to say from time to time,
13 semi-trucks would get stuck and the cranes would
14 get stuck and have to be pulled out by tractors or
15 bulldozers?
16   A.    Yes.
17   Q.    And that was a known problem on the job?
18   A.    Yes.
19       MR. TERRY:  Then you were asked questions
20 about whether or not there were cranes that sink on
21 the job site.  And then, Chris, just for the
22 record, I am showing him a photograph that I
23 provided to you earlier.  I will hold it up real
24 quick.  It's just the second page of the document

GEORGEFF, NICK
01/04/2022

Page 153

1  that I sent you with the blue, I believe.  I want
2  to show you this.  We will mark the five
3  photographs that I sent to opposing counsel as
4  Exhibit 2 to your deposition.
5              (WHEREUPON, a certain document was
6              marked Georgeff Deposition Exhibit
7              No. 2, for identification, as of
8              1/4/22.)
9  BY MR. TERRY:
10      Q.    The blue truck, I believe is the second
11  page of the photographs.  Is that one of the cranes
12  that were used to offload some of the equipment?
13      A.    Yes.
14      Q.    As you could see in this photograph, the
15  back tires of the crane are about halfway into the
16  ground, is that correct?
17      A.    Yes.
18      Q.    When you look at the guy standing by the
19  truck, is it safe to say that it looks like the
20  ruts are so deep they're almost waist deep in them?
21      A.    Yes.
22      Q.    Again, it's a known condition that
23  Borneke was addressing on the job site?
24      A.    Yeah.

Page 154

1      Q.    Although the CIA said this area could
2  not have been addressed with a bulldozer again.
3  You agree that a smaller piece of equipment, like
4  we discussed, could have been used, correct?
5      A.    Yes.
6      MR. SULLIVAN:  Objection.  Foundation.
7  Speculation?
8  BY MR. TERRY:
9      Q.    In your experience, or you've been on
10  various jobs sites for 20-plus years, correct?
11      A.    Yes.
12      Q.    In these 20-plus years, have you seen
13  various pieces of equipment being used from large,
14  medium, small and all of the above?
15      A.    Yes.
16      Q.    Based on your 20-plus years in the
17  construction industry, it's your understanding that
18  a bobcat or skid steer or something similar, could
19  have been used to address this area?
20      A.    Yes.
21      Q.    And is it your opinion this area should
22  have been addressed?
23      A.    Yes.
24      MR. SULLIVAN:  Objection.  Foundation.

Page 155

1  Speculation.
2  BY THE WITNESS:
3      A.    Yes.
4  BY MR. TERRY:
5      Q.    If there's a depressed area on a job
6  site, can that lead to an unsafe pooling of water?
7      A.    Very much so.
8      Q.    And in your 20-plus years of experience
9  on the job site, is it safe to say that the
10  excavation company on the job site do their best to
11  maintain and grade roadways so that drainage occurs
12  away from where people are working?
13      A.    For the most part, yes.
14      Q.    It's safe to say that on certain areas
15  of the job site, there's actually designated areas
16  for drainage and pooling of water?
17      A.    Yes.
18      Q.    And that's not where people are working,
19  is that correct?
20      A.    That's correct.
21      Q.    And if it pools where people are
22  working, it can freeze and cause unsafe conditions?
23      A.    Correct.
24      Q.    It can cause an unsafe condition even if

Page 156

1  it doesn't freeze?
2      A.    Right.
3      Q.    And that's why you typically drain away
4  from where people are working?
5      A.    That's correct.
6      Q.    And had this area been regraded with a
7  piece of equipment, and even manpower, is it your
8  opinion there would have been no depressed area for
9  the water to pool?
10      A.    That is correct.
11      Q.    And if there is no depressed areas for
12  the water to pool and freeze, your accident could
13  have potentially been avoided, correct?
14      A.    Yes.
15      Q.    You would agree that large ruts or
16  depressed areas on the job site are unsafe?
17      A.    Yes.
18      Q.    And this would be on any job site?
19      A.    Correct.
20      Q.    And the ruts that you saw on this job
21  site and the depressed areas, obviously are unsafe
22  because you were injured, correct?
23      A.    Yes.
24      Q.    Is it safe to say that not only did

Page 157

1 Borneke do their excavation and grading work at the
2 beginning of the project, they continued doing this
3 at various sites throughout the duration of the
4 project?
5    **A.    Yes.**
6    Q.    You saw them doing this?
7    **A.    Yes.**
8    Q.    Again, there's just certain areas like
9 we saw in the photograph of the blue crane or in
10 the area you were injured which the grading wasn't
11 properly done or redone?
12    **A.    That's correct.**
13    Q.    And these are conditions that could have
14 been avoided had Borneke properly graded or
15 maintained the property?
16    **A.    Yes.**
17    Q.    Did you ever overhear any conversations
18 that you were asked about -- I don't mean to re-ask
19 it, but did you hear about any conversations about
20 people complaining about the ruts and the ground
21 conditions on the job site?
22    **A.    Yes, I had overheard people complaining,**
23 **but I don't know what was done about it.**
24    Q.    Is it safe to say, you heard people

Page 158

1 complain about the ruts and the ground conditions
2 as a whole, you just don't know what was done about
3 it?
4    **A.    Right.**
5    Q.    And these complaints were about
6 Borneke's work and the lack of proper grading and
7 maintaining of the roadway, is that correct?
8    **A.    Yes.**
9    Q.    I believe you also said when you were
10 asked, did you complain you said, I think everybody
11 complained.  I just want to follow up on that.  Is
12 it safe to say you also did complain?
13    **A.    Yes.**
14    Q.    And, again, not asking for a contractual
15 interpretation, is it safe to say that Mortenson
16 was hired to erect the -- Mortenson was the general
17 contractor.  Their job was to erect the windmills,
18 correct?
19    **A.    Yes.**
20    Q.    Borneke's job was to grade and maintain
21 and excavate, correct?
22    **A.    Correct.**
23    Q.    It's safe to say that Mortenson
24 employees, like yourself, relayed on Borneke for

Page 159

1 things such as grading, maintaining, blading and
2 things of that nature?
3    **A.    Yes.**
4    Q.    Was there anything you could have done
5 to avoid this accident?
6    **A.    No.**
7    Q.    Again, I think I asked you this.  I am
8 just going through my outline.  I do not mean to
9 re-ask it.  The ice was covered by a layer of snow?
10    **A.    Yes.**
11    Q.    And you were unable to see this prior to
12 your fall?
13    **A.    Yes.**
14    Q.    You were asked questions where you were
15 looking prior to your fall.  Is it safe to say that
16 you were looking out in front of you as one would
17 as they are walking?
18    **A.    Yes.**
19    Q.    Is it also fair to say that when you're
20 walking, it's not common to look at your toes, you
21 have to keep a safe lookout in front of you?
22    **A.    That's correct.**
23    Q.    And that's what you were doing prior to
24 falling, correct?

Page 160

1    **A.    Yes.**
2    Q.    And had the ice not been covered by
3 snow, because you were looking ahead of you, you
4 would have seen it?
5    **A.    Correct.**
6    Q.    But it was covered by snow and that's
7 why you didn't?
8    **A.    Yes.**
9    Q.    You were asked questions about whether
10 or not you were provided salt to melt the ice on
11 prior projects, do you remember those questions?
12    **A.    Yes.**
13    Q.    And you answered no, is that correct?
14    **A.    That's correct.**
15    Q.    Is it that because on prior projects the
16 excavation company properly did their jobs to avoid
17 pooling and freezing of water?
18    **A.    Yes.**
19    Q.    You were asked questions about whether
20 or not you talked to the union hall about
21 light-duty work.  You've been an ironworker for 20
22 years, is that correct?
23    **A.    That's correct.**
24    Q.    At times you need to carry over 100

GEORGEFF, NICK
01/04/2022

Page 161

1    pounds?
2        A.    Yes.
3        Q.    You need to climb up and down things and
4    walk on beams, a whole plethora of
5    heavy-duty tasks?
6        A.    Yes.
7        Q.    Without getting into too many specifics,
8    because it is in the records, do you remember
9    Dr. Brockman restricting you from lifting more than
10   50 pounds?
11       A.    Yes.
12       Q.    Do you remember her restricting you from
13   lifting more than 40 pounds repetitively?
14       A.    Yes.
15       Q.    Do you remember her restricting you for
16   standing for more than three to four hours at a
17   time?
18       A.    Yes.
19       Q.    I will ask you in your general
20   construction knowledge, can you ironwork with those
21   restrictions?
22       A.    No.
23       Q.    Can you even be like a foreman and walk
24   on unsafe ground conditions?

Page 162

1        A.    No.
2        Q.    When you go on a job site, if you lie
3    about your restrictions or your abilities, are you
4    not only putting yourself at risk but possibly
5    other workers?
6        A.    That is correct.
7        Q.    And this is because if you are walking
8    with a piece of equipment or walking above
9    somebody, you could lose your balance, fall, drop
10   something, a whole plethora of things that you can
11   hurt yourself or others?
12       A.    Yes.
13       Q.    And that's because you can't work as an
14   ironworker with these restrictions?
15       A.    Yes.
16       Q.    You were asked questions about whether
17   or not you're an expert in the excavation field.
18   It's safe to say your area of expertise is
19   ironwork, correct?
20       A.    That's correct.
21       Q.    You know a million times more about that
22   than I will ever know.  Is it safe to say that
23   while working in the ironwork field for the past 20
24   years, you've gotten a general sense and

Page 163

1    understanding of what excavating companies do on
2    their various jobs sites?
3        A.    Yes.
4        Q.    In providing certain discussions and
5    testimony today, you are relying on the 20-plus
6    years in the construction industry, is that
7    correct?
8        A.    That is correct.
9        Q.    You were asked questions about your
10   injuries.  I just want to follow up on a few
11   things.  Is it safe to say that from looking at the
12   pictures and your ankle hanging off to the side,
13   you immediately knew you were injured after you
14   fell?
15       A.    Absolutely.
16       Q.    Were you in pain?
17       A.    I was in tremendous pain.
18       Q.    Can you describe the pain?  If you can't
19   give us a numeric scale, can you relate it to other
20   things in your life?  Was it medium?  Was it worse?
21   Was it mild?
22       A.    It's hard to describe.  It was a
23   constant poke of pain.
24       Q.    And your ankle was visibly displaced,

Page 164

1    correct?
2        A.    Yes, it is.
3        Q.    And, then, is it safe to say that after
4    you fell and you were lying on the ground, at some
5    point the site paramedic stabilized your ankle?
6        A.    Yes.
7        Q.    And, then, at some point your co-workers
8    put you in the back of the pickup truck to take you
9    to the ambulance?
10       A.    That's correct.
11       Q.    It's safe to say that the road
12   conditions were so bad that the ambulance could not
13   even traverse them?
14       A.    That is true.
15       Q.    And just to generally summarize your
16   treatment, you went to the hospital and you were
17   diagnosed with a fracture.  While you were there
18   initially they reset your ankle, stabilized it and
19   discharged you, correct?
20       A.    That is correct.
21       Q.    At some point, you had an open-reduction
22   surgery to what was supposed to be a permanent
23   stabilization?
24       A.    Yes.

GEORGEFF, NICK

01/04/2022

Pages 165–168

Page 165

1   Q.   And that was performed by Dr. Brockman?
2   A.   Yes.
3   Q.   Can you walk us through the pain and the
4   recovery that you had to undergo, especially with
5   like being non-weight bearing and things like that?
6   **A.   Recovering was tough.  I couldn't do**
7   **anything.  I couldn't drive since it was my right**
8   **ankle.  Luckily my daughter just got her permit, or**
9   **else I wouldn't have been able to get around.  From**
10  **the pain, I started smoking more because of the**
11  **pain, it was just kind of comforting.**
12  Q.   So, it's safe to say after the surgery,
13  you were -- your ankle was immobilized and you
14  relied on other people in your family for tasks,
15  such as driving or just helping with daily
16  activities?
17  **A.   Absolutely.**
18  Q.   And, then, you were asked questions
19  about undergoing physical therapy, is that correct?
20  **A.   Yes.**
21  Q.   And you completed the whole round of
22  physical therapy?
23  **A.   Yes.**
24  Q.   And, then, Dr. Brockman recommended to

Page 166

1   remove the syndesmosis screw that went across your
2   ankle because she thought it was limiting your
3   ankle motion, correct?
4   **A.   Correct.**
5   Q.   Would you have gotten the surgery that
6   your doctor didn't recommend?
7   **A.   No.**
8   Q.   Because you were kind of asked questions
9   about why you got the surgeries, the second and
10  third.  Is it fair to say, you got the surgeries
11  because your doctor recommended that to you?
12  **A.   Yes.**
13  Q.   You got them in the hopes that it would
14  fully help your recovery and return you to
15  ironwork?
16  **A.   Correct.**
17  Q.   However, that didn't happen, did it?
18  **A.   No.**
19  Q.   And we talked about Dr. Brockman placed
20  permanent restrictions on you, correct?
21  **A.   Yes.**
22  Q.   Those are the 50 pound to 40 pounds and
23  the no standing for no more than three to four
24  hours?

Page 167

1   **A.   Yes.**
2   Q.   Then you were asked questions about the
3   physical therapist placing restrictions on you and
4   conversations you had with them.  Is it safe to
5   say, these physical therapists provided you with
6   these restrictions, these weren't just
7   conversations over coffee, so to speak?  These were
8   given after you underwent a functional capacity
9   assessment?
10  **A.   Correct.**
11  Q.   And the whole point of that is to see
12  what you can or can't do, whether or not you could
13  do ironwork, correct?
14  **A.   Yes.**
15  Q.   And the records speak for themselves.
16  But is it safe to say that when you underwent the
17  physical therapy, I believe his name was Paul
18  Sullivan with Athletico, he let you know and he
19  wrote in his report, you were at an increased risk
20  for injuries returning to your old profession?
21  **A.   Yes.**
22  Q.   He also said that you only met 61.54
23  percent of your recorded job demands as an
24  ironworker, is that correct?

Page 168

1   **A.   Yes.**
2   Q.   Those weren't just random conversations
3   you were having with physical therapists and
4   physical therapist assistants, these are actual
5   diagnoses provided to you by your doctor and your
6   physical therapist?
7   **A.   Yes.**
8   Q.   With these restrictions it's safe to
9   say, you got a job within these restrictions?
10  **A.   For the most part.**
11  Q.   And Home Depot accommodated these
12  restrictions?
13  **A.   As best as they could, yes.**
14  Q.   At risk of asking obvious questions that
15  we talked about, you make significantly less at
16  Home Depot than you did in ironwork?
17  **A.   That's correct.**
18  Q.   Some years you made close to $100,000?
19  **A.   Yes.**
20  Q.   That doesn't include benefits, such as
21  pension, health, all of the additional fringe
22  benefits that ironworkers are entitled to?
23  **A.   That is correct.  That's just take home**
24  **on-the-job pay.**

GEORGEFF, NICK
01/04/2022

Pages 169–172

Page 169

1    Q.    Your actual lost wages, is it safe to
2  say, Nick, that your actual lost income does not
3  only reflect your discrepancy in wages, but also
4  includes all of the lost benefits, such as your
5  fringe benefits, your health care plan, your
6  pension and all of those things?
7    A.    Yes.
8    Q.    Do you miss iron working, Nick?
9    A.    Definitely.
10    Q.    Were you proud to be an ironworker?
11    A.    Yes, I was.
12    Q.    A lot of ironworkers they wear it on
13  their sleeve, so to speak, clearly or figuratively
14  patches, and things like that.  Were you union
15  proud so to speak?
16    A.    Yes.
17    Q.    Without this injury, did you have any
18  plans to leave the trade?
19    A.    Not at all.
20    Q.    Did you plan on working as an
21  ironworker until you retired?
22    A.    Yes.
23    Q.    Do you know of a forced age of
24  retirement in your field?

Page 170

1    A.    No.
2    Q.    You could have worked for as long as
3  your body allowed you to?
4    A.    Correct.
5    Q.    Is it safe to say this is not where you
6  saw your career headed?
7    A.    Most definitely.
8    Q.    Is it safe to say this has affected you
9  not only on a financial basis, but also on a
10  personal and emotional basis?
11    A.    That's correct.
12    Q.    And you talked about certain things,
13  about how it has affected your life, and you said
14  that you no longer go for hikes.  You haven't tried
15  it.  It's safe to say, you've tried walking.  You
16  walk on a daily basis, correct?
17    A.    Yes.
18    Q.    You just don't walk on uneven surfaces
19  that can cause you injury?
20    A.    That's correct.
21    Q.    It's not that you don't walk at all, you
22  clearly walk, it's just that you don't walk in
23  areas where you don't think your ankle can hold up?
24    A.    Right.

Page 171

1    Q.    Bear with me, I am checking on my notes.
2  You were also questions, Nick, about the CIA on
3  Page 2, Hazard Identification, and whether or not
4  the Pre-Task Card listed ice as a potential hazard,
5  do you remember those questions?
6    A.    Yes, I do.
7    Q.    As you sit here today, you have no
8  reason to dispute that the Pre-Task Card listed
9  these typical hazards, do you?
10    A.    No.
11    Q.    You're just stating that there was a
12  layer of snow covering the ice that you fell on,
13  correct?
14    A.    Yes.
15    Q.    You were taking all of the necessary
16  precautions, you just couldn't see it because of
17  the snow?
18    A.    Correct.
19    Q.    As you sit here today, do you have some
20  pain in your ankle?
21    A.    Constant.
22    Q.    Does it ever go away fully?
23    A.    No.
24    Q.    Is it safe to say, you have some good

Page 172

1  days and bad days?
2    A.    Yes.
3    Q.    On your bad days, are those the days
4  that you have those over-the-counter medications?
5    A.    Yes, or call off work.
6    Q.    Have you had to call off work because of
7  the pain?
8    A.    Yes, a couple of times.
9    Q.    On your good days, does your pain ever
10  fully go away or does it just get better?
11    A.    It just gets a little better.
12    MR. TERRY:  Those are all of the follow-up
13  questions I have.  Chris, I am sure you might have
14  a few follow-ups.
15    MR. SULLIVAN:  Yes.  Thank you.
16      REDIRECT EXAMINATION
17  BY MR. SULLIVAN:
18    Q.    Mr. Georgeff, you're not aware of any
19  complaints about this grading in the area where the
20  ice was prior to your accident, are you?
21    A.    Not officially, no.
22    Q.    You are not aware of any, right?
23    A.    I just heard people complaining, but
24  that's about it.

GEORGEFF, NICK
01/04/2022

Page 173

1    Q.    And not about the area where you fell?
2    A.    That specific area, no.
3    Q.    And you didn't make any specific
4  complaints yourself to Borneke at any time, did
5  you?
6    A.    Not to Borneke, but other supervisors
7  who report to Borneke.
8    Q.    What did you complain about?
9    A.    Just the grading.
10   Q.    Generally?
11   A.    Yeah.
12   Q.    No specific area that you can recall?
13   A.    No specific area because it was allover.
14  It just wasn't one spot.
15   Q.    You never worked for a grading
16  contractor, have you?
17   A.    No.
18   Q.    You're not aware if anyone ever asked or
19  anyone ever asked Borneke to regrade the area where
20  you fell prior to your accident, are you?
21   A.    The area where I fell, no.
22   Q.    Is that correct?
23   A.    That's correct.
24   Q.    Okay.

Page 174

1    A.    Other areas, yes, just not that specific
2  one.
3    Q.    Now, Borneke -- did you even see a skid
4  steer anywhere on the premises?
5    A.    At some point there was.
6    Q.    What is a skid steer?
7    A.    It's a just smaller bulldozer with a
8  blade that runs across the bottom.
9    Q.    And do you know who was operating the
10  skid steer?
11   A.    I know it's Borneke.  It would be an
12  operator from Borneke.
13   Q.    You would agree with me, you wouldn't be
14  qualified to give any opinions about whether an
15  area could be graded or not by testimony, correct?
16     MR. TERRY:  I'm going to object.  Withdrawn.
17  You can answer.
18  BY THE WITNESS:
19   A.    I know what is right and what's wrong,
20  but to answer your question, no.
21  BY MR. SULLIVAN:
22   Q.    Did you see any bobcats?
23   A.    Yes.
24   Q.    And did you see them being used for

Page 175

1  grading at all?
2    A.    No.
3    Q.    And where did you see the skid steers
4  being used?
5    A.    I want to say usually at one of the
6  entrances.
7    Q.    Okay.  Did you see the skid steers being
8  used in the laydown areas at all?
9    A.    Not that I can recall.
10   Q.    And do you know who was operating the
11  bobcat when you saw it?
12   A.    Most likely Borneke.
13   Q.    You don't know for sure?
14   A.    Most likely it was them being the
15  operator.
16   Q.    But you don't know specifically, true?
17   A.    No.
18   Q.    Meaning that's true?
19   A.    That's true.
20   Q.    You're not aware if Borneke ever failed
21  to regrade an area that Mortenson asked them to
22  redo, are you?
23   A.    I have no idea.
24   Q.    Do you know if this area was ever graded

Page 176

1  after you fell?
2    A.    After I fell, I have no clue.
3    Q.    You don't know if Mortenson even asked
4  this area where you fell to be regraded, do you?
5    A.    I have no idea.
6    Q.    You never consulted with a grading
7  expert, have you?
8    A.    No.
9    Q.    Would it be common if you arrive late to
10  a job site that if one of your teammates had seen
11  an unsafe condition before you got there, that they
12  would alert you to the unsafe condition?
13   A.    Most likely.
14   Q.    Have you ever seen any of your team
15  members write anything on the Pre-Task Card that
16  they found when they got there for the other people
17  who maybe arrived later to watch out for?
18   A.    Yeah, I am sure.
19   Q.    You didn't need anyone to tell you that
20  there was snow on the ground, did you?  You could
21  see that?
22   A.    Correct.
23   Q.    Do you get any healthcare coverage
24  through Home Depot?

GEORGEFF, NICK
01/04/2022

Page 177

1  **A.**  **Yes, I do.**

2  Q.  Is there any pension available?

3  **A.**  **If I put into it, yes.**

4  Q.  Have you chose to put into it?

5  **A.**  **Not right now at this time.**

6  Q.  You could choose to do that in the

7  future if you wanted to, right?

8  **A.**  **Correct.**

9  MR. SULLIVAN:  That's all I have.  Thank you

10 for your time.

11 MR. TERRY:  I don't have anything further.  We

12 will waive signature.

13 MR. SULLIVAN:  Thank you.  I appreciate your

14 time.  Ms. Court reporter, I know it was difficult,

15 I will need to order, please.

16 MR. TERRY:  Ms. Court Reporter, if he is

17 ordering the original, I will take a copy, e-tran,

18 please.  Could you give me your e-mail address so I

19 could send you Exhibit No. 2.

20 THE COURT REPORTER:  Are you sending me your

21 exhibits?

22 MR. SULLIVAN:  I'm going to.  Yes, I will send

23 you the exhibits.

24 MR. TERRY: He has one exhibit and I have one

Page 178

1  also.

2  (WHEREUPON, the deposition concluded

3  at 5:03 p.m.)

Page 179

1  STATE OF ILLINOIS   )

2                      )  SS:

3  COUNTY OF DU PAGE   )

4       I, CAROL RAYMOND, CSR No. 84-001077, a

5  Notary Public within and for the County of DuPage,

6  State of Illinois, and a Certified Shorthand

7  Reporter of said state, do hereby certify:

8       That previous to the commencement of the

9  examination of the witness, the witness was duly

10 sworn to testify the whole truth concerning the

11 matters herein;

12      That the foregoing deposition transcript

13 was reported stenographically by me, was thereafter

14 reduced to typewriting under my personal direction

15 and constitutes a true record of the testimony

16 given and the proceedings had;

17      That the said deposition was taken

18 before me at the time and place specified;

19      That I am not a relative or employee or

20 attorney or counsel, nor a relative or employee of

21 such attorney or counsel for any of the parties

22 hereto, nor interested directly or indirectly in

23 the outcome of this action.

24      IN WITNESS WHEREOF, I do hereunto set my

Page 180

1  hand of office at Chicago, Illinois, this 10th day

2  of January, 2022.

7  Notary Public, Cook County, Illinois.

8  My commission expires 6/9/2023.

10 CAROL RAYMOND, CSR No. 84-001077

CAROL RAYMOND
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires Jun 09, 2023

GEORGEFF, NICK
01/04/2022                                                                    Pages 181

```
                                                           Page 181
 1           I N D E X

 2   WITNESS                        EXAMINATION

 3      NICK GEORGEFF

 4   By Mr. Sullivan                3, 172

 5   By Mr. Terry                   139

 6           E X H I B I T S

 7   NUMBER                         PAGE/LINE

 8   Deposition Exhibit No. 1       3/3

 9   Deposition Exhibit No. 2       153/5

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```







**Westwood**

**Mortenson**
construction
700 Meadow Lane
Minneapolis, MN 55422

**Mendota Hills
Wind Farm
Repower**

Lee County, IL

MEN-CVL-1000-Overall
Site Plan-2- 20180717 -
Rev A

**ISSUED FOR
CONSTRUCTION**

Date: 07/17/18

Georgeff Group Exhibit 1   00001



Georgeff Group Exhibit 1   00002

***MORTENSON EMPLOYEES ONLY***

## Renewable Energy Groups Training Sign-In Sheet

| Operating Group (circle one) | Instructor (please print) | | Instructor (please sign) |
|---|---|---|---|
| Civil  Wind  HVT  CAN  Solar | Jake Osterman | | |

| Training Date: 11/19/18 | Course Title: Toolbox Walking Working | | Project: Mendota Hills (18141002) |
|---|---|---|---|

| # | Last Name (print) | First Name (print) | Signature | Project # | Company | Job Title |
|---|---|---|---|---|---|---|
| Ex | Hernandez | Luis | Luis Hernandez | 16141018 | Mortenson | Foreman/labor/operatror |
| 1 | Georgeff | Nick | | | Mortenson | IW |
| 2 | Harad | John | | | Mortenson | Laborer |
| 3 | Schilly | Tony | | | Mortenson | IW |
| 4 | Sims | Lewis | | | Mortenson | IW |
| 5 | Whaley | Steve | Steve Whaley | | Mortenson | OP |
| 6 | Bevne | Eu | | | Mortenson | Ironworker |
| 7 | McClearin | Joshua | John McClean | | Mortenson | J. Millwright |
| 8 | Essel | Cody | | | Mortenson | IW |
| 9 | Bams | Kevin | Kevin Bams | | Mortenson | IW |
| 10 | Dole | Michael | | | Mortenson | IW |
| 11 | Pistorius | Phillip | Phillip Pan | | Mortenson | Man |
| 12 | Williams | Craig | | | Mortenson | IW |
| 13 | McGinn | Kurt | | | Mortenson | IW |
| 14 | McIntire | Jay B | Jay B one | | Mortenson | Site |
| 15 | Russell | Matt | | | Mortenson | IL |
| 16 | Steis | James | | | Mortenson | IEW |
| 17 | | | | | Mortenson | |
| 18 | | | | | Mortenson | |
| 19 | | | | | Mortenson | |
| 20 | | | | | Mortenson | |

Please email completed sign-in sheets to :training@mortenson.com

Georgeff Group Exhibit 1   00003

MORTENSON EMPLOYEES ONLY

# Renewable Energy Groups Training Sign-In Sheet

| Operating Group (circle one )<br>Civil **Wind** HVT CAN Solar | | Instructor (please print )<br>Jake Osterman | | Instructor (please sign ) | |
| Training Date<br>11/14/18 | | Course Title<br>Toolbox Talk Walking/Working | | Project<br>Mendota Hills (18141002) | |

| # | Last Name<br>(print) | First Name<br>(print) | Signature | Project # | Company | Job Title |
|---|---|---|---|---|---|---|
| Ex | *Hernandez* | *Luis* | *Luis Hernandez* | *16141018* | *Mortenson* | *Foreman/labor/operatror* |
| 1 | Biddlecome | Dan | Dan Biddlecome | | Mortenson | cu w/e |
| 2 | Barnum | Ken | | | Mortenson | MW |
| 3 | | | B | | Mortenson | MW |
| 4 | Sharpe | Brett | | | Mortenson | MW |
| - | | | | | Mortenson | MW |
| 6 | | | | | Mortenson | MW |
| | | | | | Mortenson | Fu |
| 8 | | | | | Mortenson | LW |
| 9 | | | | | Mortenson | IW |
| 10 | | | | | Mortenson | IW |
| 11 | | | | | Mortenson | LW |
| 12 | Medlar | Eric | Eric Medlar | | Mortenson | MW |
| 13 | | | | | Mortenson | |
| 14 | | | | | Mortenson | |
| 15 | | | | | Mortenson | |
| 16 | | | | | Mortenson | |
| 17 | | | | | Mortenson | |
| 18 | | | | | Mortenson | |
| 19 | | | | | Mortenson | |
| 20 | | | | | Mortenson | |

Please email completed sign-in sheets to :training@mortenson.com



***MORTENSON EMPLOYEES ONLY***

## Renewable Energy Groups Training Sign-In Sheet

| Operating Group (circle one ) | Instructor (please print ) | Instructor (please sign ) |
|---|---|---|
| Civil (Wind) HVT CAN Solar | Jake Osterman | |

| Training Date | Course Title | Project |
|---|---|---|
| 11/14/18 | Toolbox Walking/Working | Mendota Hills (18141002) |

| # | Last Name (print) | First Name (print) | Signature | Project # | Company | Job Title |
|---|---|---|---|---|---|---|
| Ex | Hernandez | Luis | Luis Hernandez | 16141018 | Mortenson | Foreman/labor/operatror |
| 1 | Bahr | Andrew | Andy Bahr | | Mortenson | Carp fore. |
| 2 | Belancier | Justin | Justin Belch | | Mortenson | Labor |
| 3 | Hericon | Cook | cody Hones 2 | | Mortenson | LB |
| 4 | Rodriguez | Julian | | | Mortenson | Londer |
| 5 | Pumteel | Darrin | Darren Pumtey | | Mortenson | LB |
| 6 | Henson | Mark | Mark Henson | | Mortenson | LB |
| 7 | Shm3 | Matt | Matt Edan | | Mortenson | FB |
| 8 | McBride | Brian | BMB | | Mortenson | IWGF |
| 9 | Dolan | Tim | Tim | | Mortenson | MW |
| 10 | Brown | Jeret | Jerald Brc | | Mortenson | MW |
| 11 | Helzg | Brian | | | Mortenson | MWGF |
| 12 | Colegen | Mglo | Mott Colson | | Mortenson | MW |
| 13 | Clark | Aaron | A Sm | | Mortenson | Mw |
| 14 | Witteman | Cole | Cole | | Mortenson | MWGF |
| 15 | | | | | Mortenson | |
| 16 | | | | | Mortenson | |
| 17 | | | | | Mortenson | |
| 18 | | | | | Mortenson | |
| 19 | | | | | Mortenson | |
| 20 | | | | | Mortenson | |

Please email completed sign-in sheets to    :training@mortenson.com

Georgeff Group Exhibit 1   00005

***SUBCONTRACTOR/TRADE PARTNERS ONLY***

# Renewable Energy Groups Training Sign-In Sheet

| Operating Group (circle one) | | Instructor (please print) | | Instructor (please sign) | |
|---|---|---|---|---|---|
| Civil   ~~Wind~~   HVT   CAN   Solar | | Sean Penketheman | | _(signature)_ | |
| **Training Date** | | **Course Title** | | Mendota Hills Wind 18141002 | |
| 11/14/18 | | Toolbox Talk | | | |

| # | Last Name (print) | First Name (print) | Signature | Project # | Company | Job Title |
|---|---|---|---|---|---|---|
| Ex | *Doe* | *John* | *John Doe* | *18141002* | *Cumming* | *Foreman* |
| 1 | Bennett | Brad | | 18141002 | Boroska | |
| 2 | Snellgrove | Trevi | | 18141002 | '' '' | |
| 3 | Hansen | Charles | | 18141002 | '' | |
| 4 | Gunder | Steve | | 18141002 | '' '' | OP |
| 5 | Oppy | Denzel | | 18141002 | '' '' | Laborer |
| 6 | Ross | Jon | | 18141002 | '' | Oper |
| 7 | Leonard | Rich | Rich Leonard | 18141002 | '' | Oper |
| 8 | Jones | Bud | | 18141002 | '' | OPER |
| 9 | Lert | James | | 18141002 | '' | |
| 10 | Beaston | Don | Don Bean | 18141002 | '' | '' |
| 11 | Seaman | Dan | | 18141002 | '' | '' |
| 12 | Berrale | Nn | | 18141002 | '' | '' |
| 13 | Charlella | Nick | | 18141002 | | |
| 14 | | | | 18141002 | | |
| 15 | | | | 18141002 | | |
| 16 | | | | 18141002 | | |
| 17 | | | | 18141002 | | |
| 18 | | | | 18141002 | | |
| 19 | | | | 18141002 | | |
| 20 | | | | 18141002 | | |

Please save in your project folder

Georgeff Group Exhibit 1   00006

***SUBCONTRACTOR/TRADE PARTNERS ONLY***

## Renewable Energy Groups Training Sign-In Sheet

| Operating Group (circle one) | Instructor (please print) | Instructor (please sign) |
|---|---|---|
| Civil  (Wind)  HVT  CAN  Solar | JAMES EICKHOFF | [signature] |

| Training Date | Course Title | Mendota Hills Wind 18141002 |
|---|---|---|
| 11/14 | Tool Box Talk | |

| # | Last Name (print) | First Name (print) | Signature | Project # | Company | Job Title |
|---|---|---|---|---|---|---|
| Ex | Doe | John | John Doe | 18141002 | Cumming | Foreman |
| 1 | WALDRON | TIM | Tim Waldron | 18141002 | JJECC | OPERATOR |
| 2 | Van meter | Huck | | 18141002 | JFCC | |
| 3 | STAGG | JOHN | Jon H.S.H | 18141002 | JFECC | FOREMAN |
| 4 | Dobbels | James | | 18141002 | JFFCC | GPS Tech |
| 5 | Vincent | Chase | Chase Vincent | 18141002 | JFECC | groundman |
| 6 | Brooks | Aaron | | 18141002 | JFECC | Foreman |
| 7 | Bragg | Dale | Dale Bragg | 18141002 | JFECC | operator |
| 8 | Schneider | Darrick | D. Schn | 18141002 | JFELL | JW |
| 9 | GACEK | ED | ED Gacek | 18141002 | JFECC | GM |
| 10 | DE REU | DAN | D. Dr. | 18141002 | JFECC | FOREMAN |
| 11 | | | | 18141002 | | |
| 12 | | | | 18141002 | | |
| 13 | | | | 18141002 | | |
| 14 | | | | 18141002 | | |
| 15 | | | | 18141002 | | |
| 16 | | | | 18141002 | | |
| 17 | | | | 18141002 | | |
| 18 | | | | 18141002 | | |
| 19 | | | | 18141002 | | |
| 20 | | | | 18141002 | | |

Please save in your project folder

Georgeff Group Exhibit 1   00007




# Mortenson Construction
## Construction Incident Analysis (CIA)

*Mortenson Construction is committed to continuous learning from past incidents. The CIA will be utilized to help educate others on past issues/incidents. A CIA is to be completed for the following Safety/Quality events:*

| | |
|---|---|
| *1. An OSHA Recordable Injury (Mortenson or Subcontractor)* | *6. An Event that significantly affects customer relations* |
| *2. A Property Damage with overall cost in excess of $5,000* | *7. Event is a recurring problem* |
| *3. A Serious Near miss (with high severity potential)* | *8. Rework of quality issue that results in an Injury* |
| *4. Unplanned disruption that result in schedule disruption* | *9. Quality Event with overall cost in excess of $25,000* |
| *5. Diamond Event - Incident or Potential Incident that resulted/may have had a Significant Impact* | *10. Significant Environmental Event* |

| | | |
|---|---|---|
| Operating Group | Wind Energy | |
| Project | Mendota Hills Wind | |
| Contractor | Mortenson | |
| Investigation Team | James Langston-Supt.<br>Kevin Hogan- Safety<br>Lonnie Sears- Foreman |  |
| Incident Type | OSHA Recordable Injury | |
| Type of Work and Crew | Base Mid Erection | |
| Date of Incident | 11/15/18 | |
| Time of Incident | 12:13 PM | |
| SWI/IWP/Pre-Task Plan Card Completed (Y/N) | Yes | |
| List Applicable Inspections Completed | N/A | |
| Job Title of Workers Involved | Iron Worker | |
| Orientation 1, 2, 3 Completed | 1st, 2nd, and 3rd complete | |
| List Applicable Task Training Completed | SWI Trained | |
| Workers Time in Industry | 15 Years | |
| Workers Time in Position | 7 Months | |
| Worker's Time on Site | ~1 ½ Months | |
| Crew Size | 5 | |

## I. Description of Incident:

Team member slipped and fell on ice resulting in an injury to his right ankle.

## II. Investigation Findings:

a. Narrative/ Explanation

i. At the time of the incident the team member was checking on the base-mid/offload crew at site T-1. Upon exiting his vehicle, he began to walk towards the work area alongside a mid-section. While walking to the work area the team member stated that he had realized he was on a sheet of ice covered with a thin layer of snow. While attempting to exit the ice patch, his left foot slipped out from under him and his right foot caught a dry patch. This in turn caused his right ankle to twist and become injured.

Georgeff Group Exhibit 1  00008





The site had been previously addressed with a bulldozer to mitigate walking / working hazards, however the ice accumulation had occurred too close to the WTG section for the dozer to operate safely leaving the ice un-addressed. The existing hazard was not properly delineated nor was its location identified on the Pre-Task Plan Card. Additionally, snow had begun to fall that morning covering the ice with a layer of snow which made its identification difficult prior to stepping on the ice.

The CIA team investigated several factors which commonly lead to slips, trips, and falls. Below are the findings, and reasoning as to why the factor was not considered a contributing factor to this incident.

- Awareness of surroundings: Based on the statement from the injured team member, he became aware of the ground conditions he was on prior to the incident but still ended up slipping as he tried to leave the area.

- Proper PPE: Team member had all the required PPE, per site policies; however, was not wearing ice cleats. While, the project site does offer the use of ice cleats to further protect team members, it was not a policy.

- It was confirmed that the team member was not running/rushing; rather casually walking.

b. Contributing Factors (5 Whys)

   i. Site Preparation- Due to the location of the ice, a dozer could not refinish the area because it was too close to the tube section and crane pad.
  ii. Hazard Identification – The pre-task card for that site highlighted the presence of icy conditions, but did not identify specific locations on the pad.
 iii. Adverse ground conditions- The site received enough snow that morning to cover the ground with a few inches. This layer of snow concealed some hazards that existed on site, specifically the ice adjacent to the mid-section.

c. Root Cause(s) (5 Whys)

   i. Team member was not wearing traction devices for icy conditions
      1. Site was lacking policy on when ice cleats were mandated






## III. Lessons Learned:

i. **Site Preparation:** It is the foreman responsibility to ensure the crew walks the site prior to commencing work. Any area that cannot be refinished by a dozer and contains adverse ground conditions needs to be delineated by identification on the pre-task plan card and by standard cones.

ii. **Adverse ground conditions:** The project team needs to ensure that any potential for adverse ground conditions are discussed at the site wide level. In addition, foreman need to be trained on the proper process for pre-task planning to ensure all changed conditions are planned and the risk mitigated. Lastly, the project team is identifying select tasks that will require ice cleats for 100% of the crew when icy conditions are present.

## IV. Corrective Actions / Preventative Measures

| # | Action | Responsible Party(s) | Due By Date | Date Completed |
|---|---|---|---|---|
| 1 | Site wide safety stand down to discuss walking working surfaces. | Jamie Langston | 11/16/18 | 11/16/18 |
| 2 | Reinforce 360 walk around work area during PTPC, identifying path of travel and specific hazards present in work area. | Jamie Langston | 11/16/18 | 11/16/18 |
| 3 | Toolbox Talk focusing on slips, trips, and falls while working in icy conditions. | Joshua Maier/Kevin Hogan | 11/16/18 | 11/16/18 |
| 4 | Identify tasks where 100% traction control devices are to be required. | Jamie Langston | 11/20/18 | 11/26/18 |
| 5 | Identify tasks where traction control devices will be used intermittently and implement devices which can be donned / doffed quickly. | Jamie Langston | 11/20/18 | 11/20/18 |

Georgeff Group Exhibit 1   00010



| 6 | Provide each foreman with ice melt salt and cones to address adverse conditions in frequently traveled areas on site. | Jamie Langston | 11/26/18 | 11/26/18 |
|---|---|---|---|---|

Georgeff Group Exhibit 1   00011



Nick Georgeff - Exhibit 2









<u>Subcontract Number:18141002</u>
<u>Task/Cost Code:  502.0200000.00000 S</u>

# M. A. MORTENSON COMPANY
## SUBCONTRACT AGREEMENT

**THIS SUBCONTRACT AGREEMENT ("Agreement")** is entered into effective this 29th[th] day of December, 2017, by and between M. A. Mortenson Company ("**Mortenson**") and Don Borneke Construction, Inc., 41537 50th Street, Janesville, MN ("**Subcontractor**"). This Agreement includes the Subcontract Standard Terms and Conditions ("**Standard Terms and Conditions**"), the Indemnity Clause ("**Indemnity Clause**") and the Subcontract Supplementary Terms and Conditions ("**Supplementary Terms and Conditions**"), all attached hereto ("**Attachments**"), and the following Exhibits ("**Exhibits**"):

| | |
|---|---|
| Exhibit A - | **Scope of Work** |
| Exhibit B - | **Subcontract Price** |
| Exhibit C - | **Schedule** |
| Exhibit D - | **Contract Documents List** |
| Exhibit E - | **Safety Program Requirements** |
| Exhibit F - | **Quality Program Requirements** |
| Exhibit G - | **Insurance Requirements** |
| Exhibit H - | **Application for Payment** |
| Exhibit I - | **Lien Waivers** |

In consideration of their mutual promises herein, Subcontractor and Mortenson agree as follows:

1.      **PROJECT.**  Mortenson has entered into a contract dated [December 29, 2017] (the "**Contract**") with Mendota Hills, LLC ("**Owner**") to perform labor and furnish material for the construction of Mendota Hills Repowering, located at Lee County, IL ("**Project**"), pursuant to Drawings, Specifications, General Conditions, Supplementary General Conditions, Special Conditions, and Addenda prepared by Westwood Professional Services and Barr Engineering Co. ("**Engineer**"), and made a part of the Contract.  The Contract Documents ("**Contract Documents**") are this Agreement, the Contract and its exhibits, Drawings, Specifications, General Conditions, Supplementary General Conditions, Special Conditions, and Addenda, including the following:

[See EXHIBIT D - CONTRACT DOCUMENTS LIST]

2.      **SCOPE OF WORK.**   Subcontractor shall furnish and pay for all supervision, labor, materials, tools, equipment, services, scaffolds, appliances and all other items necessary to fully perform the Agreement, consistent with the provisions of the Contract Documents, including completion of all the following (the "Work"):

[See EXHIBIT A - SCOPE OF WORK]

3.      **SUBCONTRACT PRICE.  The Subcontract Price** is

[see EXHIBIT B - SUBCONTRACT PRICE]

4.      **TIME OF COMPLETION.**  Subcontractor shall prosecute and complete the Work in accordance with the following schedules and time limits:

[See EXHIBIT C - SCHEDULE]

Mortenson Subcontract Agreement
Revised November 3, 2015

EXHIBIT

C

5. **RETAINAGE.** Mortenson shall retain an amount from each application for payment such that __TEN__ percent (<u>10</u>%) of the total value of Work performed is withheld. Retainage shall be held by Mortenson until released as provided in this Agreement.


6. **SITE-SPECIFIC SAFETY PROGRAMS.** Subcontractor agrees to provide all documents and conduct or participate in all site-specific safety programs related to elimination of accidents and injuries at the site, including but not limited to the following:

[See EXHIBIT E - SAFETY PROGRAM REQUIREMENTS]

7. **PAYROLL MARKUPS.** For Work performed on the basis of actual field cost pursuant to Paragraph 12.4.1.(a) of the Standard Terms and Conditions, the maximum allowable payroll mark-ups shall be <u>10</u>% for field labor and 10% for fabrication shop labor.

8. **INSURANCE:**
   a. Commercial General Liability insurance limits shall be $5,000,000 unless otherwise indicated here _____$2,000,000

   b. Professional Liability/Errors & Omissions coverage
      _____Is required
      __X__Is not required

   c. Pollution Liability coverage
      _____Is required
      __X__Is not required

9. **PAYMENT AND PERFORMANCE BONDS.**

   _____ Performance and Payment Bonds are not required.

   __X__ Performance and Payment Bonds are required, in full conformance with the requirements of Article 18 of the Terms and Conditions.


10. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto and is effective on the date set forth above. No oral representations or other agreements have been made by Mortenson except as stated in this Agreement. This Agreement may not be changed in any way except as herein provided, and no provision hereof may be waived by Mortenson except in writing signed by a duly authorized officer or agent.

IN WITNESS WHEREOF, Subcontractor and Mortenson herein execute this Agreement as set forth above.

_____

Don Borneke Construction, Inc., LLC

By _____*Mark Sikel*_____

Printed Name __Mark Sikel__

Its _____Project Manager_____

Subcontractor License No._____105C_____

Subcontractor state tax ID number __3730-5727__

M. A. MORTENSON COMPANY

By _____

Printed Name Andy Black

Its Project Manager

for _____Illinois

# M. A. MORTENSON COMPANY
## SUBCONTRACT AGREEMENT
## STANDARD TERMS AND CONDITIONS

1.    **CONTRACT DOCUMENTS.**

1.1    The Contract Documents have been made available to Subcontractor for examination.

1.2    In the event of conflict between the Agreement and the other Contract Documents, the provisions of the Agreement shall govern.

1.3    Subcontractor binds itself to Mortenson under the Agreement with respect to its Work in the same manner as Mortenson is bound to Owner under the Contract Documents.

1.4    Subcontractor has carefully examined and understands the Contract Documents, has investigated the site of the Work and the conditions under which it is to be performed, and enters into the Agreement on the basis of its own examination, investigation and evaluation of such matters and not in reliance upon any opinions or representations of Mortenson, Owner, or any of their respective officers, agents, or employees.

2.    **SCOPE OF WORK.**  Subcontractor shall furnish and perform all of the Work required in the Agreement and the Contract Documents.

3.    **SUBCONTRACT PRICE.**  For the full and satisfactory performance of the Agreement, in compliance with the provisions of the Agreement, Mortenson shall pay Subcontractor the fixed Subcontract Price.  This sum may be changed only in accordance with the provisions of the Agreement.

4.    **TAXES AND CONTRIBUTIONS.**  The Subcontract Price includes, and Subcontractor hereby accepts exclusive liability for payment of, all federal, state, county, municipal and other taxes imposed by law or contract, and based upon labor, services, materials, equipment or other items acquired, performed, furnished or used in connection with the Work, including but not limited to (a) contributions, taxes or premiums (including interest and penalties) measured upon payroll or required to be withheld from employees; (b) sales, use, personal property and other taxes (including interest and penalties), whether stated separately, imposed by reason of performance of the Work, or any materials, equipment, labor, services or other items in connection with the Work; or (c) pension, welfare, vacation, annuity and other benefit contributions payable in connection with labor agreements or applicable law.

5.    **LAWS AND PERMITS.**  Unless otherwise required in the Agreement, Subcontractor shall not be required to obtain or pay for the primary building permit for the Project.  The Subcontract Price includes, and Subcontractor shall obtain and pay for all other permits, licenses, and fees necessary to complete the Work in accordance with the Contract Documents.  Subcontractor shall perform the Work in compliance with all applicable federal, state, municipal and local laws, codes, ordinances, rules, regulations, and requirements, including without limitation those relating to O.S.H.A., discrimination in employment, fair employment practices and equal employment opportunity, without additional expense to Mortenson, and shall correct, at its own cost and expense, any violations thereof.  Subcontractor shall furnish such proof as Mortenson may request showing compliance and correction of violations.

6.    **TIME OF COMPLETION.**

6.1    Time being of the essence of the Agreement, Subcontractor shall begin the Work as soon as the Project is ready for the Work or, within three (3) calendar days after being notified in writing by Mortenson, and shall prosecute and complete the Work in accordance with the construction schedule, as such may be from time to time revised, and within the time limits stated in the Agreement.

6.2    Subcontractor shall promptly furnish all data requested by Mortenson for preparation and revision of construction schedules.

6.3    Should Subcontractor be delayed in the commencement, prosecution or completion of the Work by any unforeseeable cause beyond Subcontractor's control and not due to any fault, neglect, act or omission on its part, then Subcontractor shall be entitled to an extension of time.  Such extension shall be for a period equivalent to that granted to Mortenson by Owner under the Contract Documents for the same cause of delay, and shall release and discharge Mortenson from any and all claims by Subcontractor on account of the delay.  Subcontractor shall not be entitled to any extension of time unless a claim therefore is presented in writing to Mortenson within five (5) calendar days of the commencement of such claimed delay, or within such shorter time as may be required for Mortenson to comply with the Contact Documents.  Notwithstanding the foregoing, Subcontractor shall be entitled to compensation for delay if, and to the extent that, Mortenson secures compensation from Owner or others for delay on behalf of Subcontractor.

7.    **PAYMENTS.**

7.1    No payment shall be due or made to Subcontractor until receipt by Mortenson of (a) a fully executed Agreement; (b) evidence of insurance in conformance with Article 16 hereof; and (c) Bonds required under Article 18 hereof, if any.

7.2    Prior to submitting its first application for payment, Subcontractor shall submit a schedule of values allocating the Subcontract Price to the full Scope of Work, prepared in such form and supported by such data to substantiate its accuracy as Mortenson may require, which schedule shall be used as a basis for reviewing Subcontractor's applications for payment.  The schedule of values will be used for payment purposes only and shall not relieve Subcontractor from its obligation to perform all of the Work and

provide all labor and material required by the Agreement. When approved by Mortenson, the schedule of values may be modified by Subcontractor to incorporate executed change orders.

7.3    Not later than the 25th day of each month, Subcontractor shall submit its application for payment on forms provided by Mortenson. Each application for payment shall be calculated as the sum of (a) the value of Subcontractor's labor and materials incorporated into the Project as computed on the basis of the schedule of values, prices and allowable quantities of the Work performed, all as determined by Mortenson and either Owner or Architect; and (b) to the extent allowable by the Contract Documents, the value of materials not incorporated into the Project but delivered and stored at the Project site, minus (c) retainage, calculated from the sum of the amounts determined in preceding (a) and (b) as multiplied by the retainage percentage stated in the Agreement, and also minus (d) amounts previously paid. The application for payment shall not request payment for any portion of the Work which Subcontractor does not intend to pay to any subcontractor or material supplier that performed such Work. Subcontractor shall certify each application for payment, stating in writing that it accurately represents the value of the Work performed. Subcontractor agrees that, upon request by Mortenson, it shall furnish such information, supporting documents and consents of surety (on a form acceptable to Mortenson) as Mortenson may require to verify the value of the Work performed and confirm Subcontractor's entitlement to payment. When payment is based upon quantities at applicable unit prices, Subcontractor shall substantiate the quantities, and Mortenson and Owner shall have the right to examine, copy and audit relevant books and records of Subcontractor or any of its subcontractors in order to verify accuracy and completeness of the quantities. As a prerequisite to payment, Subcontractor shall provide, in a form satisfactory to Mortenson, partial lien and claim waivers and affidavits from Subcontractor, and its subcontractors and material suppliers, for the Work performed and the labor and material provided. Such waivers may be made conditional upon payment.

7.4    Monthly progress payments (less retainage) shall be made to Subcontractor within seven (7) days after Mortenson's receipt of payment from Owner, so long as Subcontractor is not in default or breach of the Agreement and is not subject to other reasons for withholding. Final payment to Subcontractor shall be due after completion and acceptance of the Work by Mortenson and either Owner or Architect and within seven (7) days of Mortenson's receipt from Owner of final payment for the Work, provided that: (a) Subcontractor shall have furnished evidence satisfactory to Mortenson that there are no claims, obligations, or liens for labor, services, materials, equipment, taxes or other items performed, furnished or incurred in connection with the Work; (b) Subcontractor shall have executed and delivered in a form satisfactory to Mortenson a general release in favor of Mortenson, Mortenson's surety, if any, and Owner; and (c) Subcontractor shall have delivered to Mortenson written consent of its surety, if any, to final payment. Final payment to Subcontractor shall constitute a release and waiver of any past, present and future claims by Subcontractor against Mortenson, its surety, if any, and Owner arising out of the Agreement and the Project or arising out of payment for the Work under the Agreement. Subcontractor acknowledges by its receipt of final payment that any and all of such claims are thereby released, waived and discharged.

7.5    Mortenson and Subcontractor expressly agree that payment to Mortenson on Subcontractor's account by Owner is an absolute condition precedent to Mortenson's obligations to pay Subcontractor under the Agreement. Subcontractor expressly agrees that it relies on the credit of Owner, not Mortenson, for payment for the Work. If Mortenson, in its sole discretion, pursues Owner or others for costs otherwise payable to Subcontractor, Subcontractor agrees that payment from Mortenson for Work shall not be due until Mortenson has exhausted all legal proceedings to recover such costs.

7.6    Subcontractor shall not be entitled to any payment to the extent there is: (a) any indebtedness owed by Subcontractor to Mortenson including for any matters unrelated to the Agreement; (b) defective Work not remedied or defective materials not removed and replaced; (c) third party claims; (d) claimed failure of Subcontractor to make payments to its subcontractors, material suppliers or laborers; (e) reasonable doubt that the Work can be completed for the unpaid balance of the Subcontract Price; (f) damage to Mortenson, Owner or another contractor or subcontractor; (g) unsatisfactory or untimely prosecution of the Work by Subcontractor; or (h) failure of Subcontractor to comply with the Contract Documents.

7.7    Subcontractor warrants and guarantees that title to all Work, materials and equipment included in an application for payment, whether incorporated into the Project or not, will pass to Owner upon receipt of such payment by Subcontractor, free and clear of all liens, claims, security interests or encumbrances. Subcontractor shall pay promptly for all materials, skills, labor and equipment used in performance of the Agreement, as bills or claims become due. Subcontractor shall protect the Project and defend, indemnify and hold harmless Owner and Mortenson and Mortenson's surety, if any, from and against all claims, bond claims, stop notices, equitable liens, mechanics' liens, damages, losses and expenses on account thereof, including without limitation legal fees and disbursements paid or incurred by Owner or Mortenson in connection therewith. Mortenson shall have the right at all times to contact Subcontractor's subcontractors and material suppliers to ensure that the same are being paid by Subcontractor for labor or materials furnished for use in performing the Work. Should Subcontractor: (a) fail to make timely payment to its material suppliers, subcontractors, laborers and fringe benefit funds; (b) fail to compensate Mortenson or another contractor or subcontractor for damage caused by Subcontractor; or (c) fail to perform its clean up obligations pursuant to Paragraph 8.5 hereof, Mortenson, in its sole discretion, may, in the instance of subsection (a) or (b), make direct payment to such individuals or entities and reduce the Subcontract Price accordingly or, in the instance of subsection (c), perform itself or hire others to perform such clean-up obligations and reduce the Subcontract Price accordingly.

7.8    Progress or final payments shall not be acceptance of improper, faulty, defective or non-conforming Work or material, shall not release Subcontractor of any of its obligations under the Agreement and shall not constitute a waiver of any rights or provisions hereof by Mortenson. Beneficial use or occupancy is not acceptance of the Work.

8.    **PROSECUTION OF WORK.**

8.1    Subcontractor shall perform the Work in a diligent, efficient and skillful manner, and in conformance with the Contract Documents using personnel competent to perform the Work, as the Work or any portion thereof becomes available, to allow Mortenson to promote the general progress of the entire construction and so that the Work shall not interfere with, hinder or delay other work.

8.2     Should Subcontractor delay the progress of the Work or of the Project, Subcontractor shall take necessary action as required to meet and maintain job progress, without additional compensation, and shall be liable to and reimburse Mortenson for damages resulting from such delay.

8.3     Subcontractor shall promptly secure delivery commitments, place orders for materials, equipment and services required in connection with the Work to avoid delays, and shall furnish copies of procurement documents and purchase orders upon request. Subcontractor shall furnish goods, materials, equipment and services in compliance with all applicable safety, certification and testing codes and laws. Subcontractor shall ship all goods, materials and equipment to the Project site, and all transportation, freight or delivery charges shall be prepaid by Subcontractor. Subcontractor shall be solely responsible for receiving and unloading shipments.

8.4     Mortenson shall have sole authority with respect to access and usage of the Project site. Subcontractor shall notify Mortenson prior to each delivery of goods, materials and equipment, and Mortenson, in its sole discretion, shall determine times and location for all such deliveries. Subcontractor shall establish temporary offices, storage facilities or other temporary facilities at the Project site only upon approval by and in locations designated by Mortenson. Subcontractor shall not post or display signs, banners or other announcements or advertising at the Project site without the express prior written approval of Mortenson.

8.5     Subcontractor shall clean up and remove from the site all debris caused by its operations no less than once each workday. Should Subcontractor fail to provide such cleanup and debris removal, Mortenson, upon Notice to Subcontractor, may arrange to have such work performed for the account of Subcontractor.

8.6     Subcontractor shall be solely responsible for protection of the Work and for loss or damage to materials, tools, equipment, or other personal property, owned or rented or used by Subcontractor in performance of the Work.

8.7     When as-built drawings are required by the Contract Documents, Subcontractor shall record as-built conditions on the Drawings and Detail Drawings in a form acceptable to Mortenson, on a weekly basis, during performance of the Work.

8.8     Mortenson will establish a limited number of initial control points, grid lines, benchmarks or other datum points for the use and reference of Subcontractor. Subcontractor shall be responsible for all subsequent layout, surveying and dimensional control required to perform the Work, and shall preserve or restore any initial layout disturbed or removed by Subcontractor. Notwithstanding dimensions given in the Drawings, Specifications and other Contract Documents, Subcontractor shall take all measurements and establish all dimensional controls necessary to insure proper matching and fitting of the Work.

8.9     Subcontractor shall promptly prepare and submit to Mortenson such shop drawings, details, design calculations, product data, submittals, samples and mockups as required by the Contract Documents and as necessary to describe completely the details of the Work and to ensure timely fabrication, delivery and installation of the Work. Shop drawings, details, design calculations, product data and other submittals shall be provided in the form, format and quantity requested by Mortenson. Approval of such items by Mortenson shall mean only that the submission conforms to the general concept of the Project, and shall not relieve Subcontractor of its obligation to perform the Work in compliance with the Contract Documents.

8.10    Should performance of the Work hereunder depend upon performance of other work, Subcontractor shall carefully examine all contiguous or dependent work, determine whether it is suitable for performance of the Work hereunder, report immediately any unsuitable conditions to Mortenson in writing, and allow Mortenson reasonable time to have such unsuitable conditions remedied. Unless Subcontractor reports such unsuitable conditions, Subcontractor shall be deemed to have accepted contiguous or dependent work as adequate for completion of the Work.

8.11    Subcontractor is responsible for intermeshing of various parts of the Work so that no part shall be left unfinished or incomplete owing to any disagreement between Subcontractor and its subcontractors or other subcontractors. Subcontractor shall be solely responsible to furnish and install sleeves, block-outs, piping, conduit, hangers, inserts, anchors, grounds and supports in concrete, masonry, structural steel or other preceding work, to provide for installation of the Work. Subcontractor shall provide all cutting, drilling and patching required to complete the Work and shall repair all damage by Subcontractor to existing conditions or to the work of others, including without limitation restoration of all fire-rated construction and fire-resistant coatings.

8.12    No substitutions of similar supplies, materials or equipment for items called for by the Contract Documents shall be made unless approved in writing by Mortenson and Owner or Architect, which approval shall not relieve Subcontractor from satisfactory and timely completion of the Work, or from conformance of the Work to the Contract Documents.

8.13    Subcontractor shall appoint a superintendent, who shall be responsible for the Work and shall have full authority to represent Subcontractor at the site. Subcontractor shall appoint a project manager who shall have full authority to represent Subcontractor in all matters related to the Project and the Agreement. Subcontractor's project manager and superintendent shall attend all meetings held by Mortenson relating to the Work, including weekly coordination meetings, unless excused by Mortenson.

8.14    Subcontractor shall maintain accurate and timely records relating to performance of the Work and shall provide daily reports and other records to Mortenson as required by the Contract Documents and as provided herein. Not later than 24 hours after the end of each work shift at the Project site, Subcontractor shall deliver to Mortenson a daily report. The daily report shall fully describe and record Work performed, including a) number of workers in each craft or category, b) weather conditions, c) visitors at the site, d) Work performed, including quantities and locations where applicable, e) summary of events, circumstances or conditions that could delay the Work or give cause for additional cost or time, and f) other information required to fully describe Work accomplished or as requested by Mortenson. Submission of the daily report shall not relieve Subcontractor of, or act in substitution for, notice requirements contained in the Agreement or in the Contract Documents.

9.      **LABOR.** Subcontractor shall not employ personnel, means, materials or equipment which may cause strikes, work stoppages or labor interferences. Subcontractor agrees to be bound by any applicable Project Labor Agreement. Subcontractor agrees to comply with and assist Mortenson in its compliance with, and to comply with, any subcontracting clause requirements of collective

bargaining agreements to which Mortenson is signatory and which are applicable to the Project.

10.    **TOOLS AND EQUIPMENT.** Subcontractor shall provide all tools and equipment necessary to perform the Work, including but not limited to scaffolds, ladders, hoisting and specialty items. Mortenson's tools and equipment shall be available to Subcontractor only at Mortenson's discretion and on terms satisfactory to Mortenson. Subcontractor agrees to assume sole responsibility for all claims for loss or damage to all property, including its property, and Mortenson's property, arising out of Subcontractor's use of Mortenson's equipment, including without limitation hoisting of material. Subcontractor agrees that operators of Mortenson's equipment during the period of Subcontractor's use, either singly or with others, shall be deemed loaned servants of Subcontractor even though actually employed by Mortenson or others.

11.    **SAFETY.**

11.1    Subcontractor shall perform the Work in a safe manner, shall comply with all safety measures initiated by Mortenson or required by the Contract Documents, and shall comply with all applicable laws, codes, ordinances, rules, regulations and orders of any public authority for the safety of persons or property, including such provisions as are more strict or more expensive than the safety measures initiated by Mortenson or required by the Contract Documents. Subcontractor shall be solely responsible for protection and safety of its employees, including employees of its subcontractors and suppliers of every tier, for final selection of safety methods and means, for required safety reports and records, for daily inspection of the Work area and its employees' safety equipment, and for instruction of its employees on health and safety, including weekly safety meetings. Subcontractor agrees to establish a goal of zero accidents and injuries for the Project, and to implement, maintain and enforce a safety program consistent with such goal. Subcontractor agrees to comply with the Mortenson Zero Injury Safety Training Manual and, if requested in writing, to prepare a written site-specific safety plan for the Project prior to commencing the Work. Subcontractor shall comply with all safety program requirements, as enumerated in Exhibit E - Safety Program Requirements.

11.2    Subcontractor shall reimburse Mortenson for all costs, including reasonable attorney fees, incurred by Mortenson arising out of or connected with a failure or alleged failure of Subcontractor to comply with this Article, including costs of investigation and fines and penalties imposed upon Mortenson for alleged safety violations by, or unsafe Work of, Subcontractor, regardless of whether Mortenson has or has not assisted or advised Subcontractor in fulfilling such responsibilities.

11.3    Subcontractor shall stop any part of the Work which either Mortenson or Subcontractor determines to be unsafe until corrective measures have been taken. Failure on the part of Mortenson to stop any part of the Work shall in no way relieve Subcontractor of its responsibility hereunder.

12.    **CHANGES.**

12.1    Mortenson shall have the right by written directive to order changes, including additions and deletions to the Work and other revisions to the scope of the Work or the required time for completion of the Work, without notice to Subcontractor's surety, if any. Subcontractor shall promptly comply with all such written directives and shall diligently perform the changed Work in accordance with the Contract Documents. Should Subcontractor claim that the changes are of such a nature as to increase or decrease the cost of any part of the Work, then, unless such written directive includes an agreed upon adjustment in the Subcontract Price and/or time for completion of the Work, Subcontractor shall submit to Mortenson, in writing, within five (5) calendar days of receipt of the written directive, or within such shorter period as may be required for Mortenson to comply with the Contract Documents, all claims, if any, for adjustment of the Subcontract Price or of the time for the completion of the Work. Subcontractor shall not be entitled to a change in the Subcontract Price or in the time for completion of the Work unless so authorized by written change order by Mortenson and unless such notice of claims is provided by Subcontractor.

12.2    Should Mortenson issue a request for a proposal for a proposed change in the Work or in the time for completion of the Work, Subcontractor shall deliver to Mortenson a detailed and itemized proposal within twenty (20) calendar days of receipt of such request, or within such shorter period as may be required for Mortenson to comply with the Contract Documents, and prior to commencement of such change in the Work. The proposal shall contain quantities, rates, prices and other information as required or as requested by Mortenson, to fully describe the scope and price of the proposed change and scheduling detail and data to substantiate entitlement to any requested extension of time for completion of the Work. Subcontractor shall cooperate with Mortenson, and Owner and Architect at Mortenson's election, to review, modify the proposal if necessary, and negotiate in good faith to reach an agreement upon the terms of any change order. Subcontractor shall not be entitled to compensation for any costs and expenses relating to preparation of proposals for changes in the Work. Should the parties be unable to agree as to the value of the Work to be changed, Subcontractor shall promptly proceed with the changed Work upon written order of Mortenson and the value of the changed Work shall be determined and paid at actual field costs or other applicable method as determined by Mortenson.

12.3    Should Subcontractor claim that the issuance of any instruction, drawing or direction by Mortenson, Owner or Architect results in additional costs, Subcontractor shall immediately submit written notice of such claim to Mortenson and not later than five (5) calendar days after receipt thereof, or within such shorter period as may be required for Mortenson to comply with the Contract Documents, and in all events prior to commencing such Work. Subcontractor shall not be entitled to a change in the Subcontract Price resulting from such instructions, drawings or directions unless such written notice is provided by Subcontractor.

12.4    The total cost of any changes to the Work shall be determined by one or more of the following methods or combinations thereof as Mortenson may elect: (1) acceptance of a lump sum proposal with properly itemized costs; (2) unit prices stated in the Contract Documents, or in the Agreement, or subsequently agreed upon (unit prices shall be deemed to include an allowance for all of Subcontractor's direct and indirect costs, including, without limitation, office or shop expense, overhead, profit and bonds); or (3) actual field costs incurred in performance of the changed, added or deleted Work, plus allowance for overhead, supervision and profit, as provided in subparagraphs 12.4.1 and 12.4.2. No other costs arising out of or connected with the change to the Work or extra Work of any nature may be recovered by Subcontractor.

12.4.1    Actual field costs shall mean costs necessarily incurred in the proper performance of the changes to the Work or of

the extra Work, and paid by Subcontractor at rates not higher than the standard paid in the locality of the Project, except with the prior written consent of Mortenson for:

(a) Wages paid for labor in the direct employ of Subcontractor or any of its subcontractors, plus a payroll mark-up on field labor and fabrication shop labor in amounts provided for in the Agreement, to cover all overhead items applicable to payroll, such as insurance, taxes, F.I.C.A., workers' compensation, unemployment taxes, and fringe benefits.

(b) Net cost of all materials, supplies and equipment used in or incorporated in the changed or extra Work.

(c) Third party rental charges for necessary machinery and equipment, exclusive of hand tools, for the period of time used in performing the changed or extra Work, including installation, minor repairs and replacements, dismantling, removal, transportation and delivery costs thereof at rental charges consistent with those prevailing in the locality of the Project. Total third party rental charges on machinery or equipment rented under an agreement containing a purchase option clause shall not exceed 75% of the option purchase price. Rental rates for machinery and equipment owned by Subcontractor shall be not more than 75% of published rental rates for like equipment in the locality of the Project, and the aggregate amount of rent for any single item of machinery or equipment shall not exceed 75% of the current fair market value.

(d) The actual net increase in the cost to Subcontractor for performance and payment bonds resulting from the changed or extra Work.

12.4.2 The maximum percentage allowance added to itemized costs under a lump sum proposal or to actual field costs shall be 10% for changed or extra Work performed by Subcontractor's own forces and 5% for changed or extra Work performed by its subcontractors. Such allowance will be paid as full compensation to Subcontractor for profit, general superintendence, hand tools, capital and interest expense, insurance expense, field office expense, overhead, and all other elements of cost not defined herein as actual field costs. Notwithstanding the foregoing, the maximum aggregate allowance payable to Subcontractor and its subcontractors shall not exceed the lesser of (a) 15% or (b) the mark-up permitted in the Contract Documents for changed or extra Work less Mortenson's mark-up on such Work.

12.4.3 Mortenson shall have the right to inspect, copy and audit the books and records of Subcontractor and any of its subcontractors making claim for reimbursement for actual field costs and payment pursuant to allowances in order to verify the accuracy and allowability of all costs and allowances claimed. Subcontractor shall retain such books and records for a period not less than three years after final payment, or for such longer period as may be required by the Contract Documents.

12.5 Subcontractor shall not be entitled to a change in the Subcontract Price or the time for completion of the Work unless authorized in writing by Mortenson. Subcontractor shall have no right to maintain an action in court or, in the event arbitration is invoked by Mortenson, in arbitration to recover for changed or extra Work, unless Subcontractor has strictly complied with the requirements set forth herein.

12.6 All changes to the Work or extra Work ordered in writing by Mortenson shall be deemed to be a part of the Work hereunder and shall be performed in compliance with all provisions of the Contract Documents.

13. **INSPECTION.**

13.1 Mortenson, Architect, Owner and their authorized representatives shall have the right to inspect and test the Work and the components thereof at all times and places to verify compliance with the Contract Documents and standards of good workmanship.

13.2 Subcontractor shall provide safe facilities for inspection of the Work by Mortenson, Architect, Owner and their authorized representatives in the field, at shops, or at any other place where materials or equipment for the Work are in preparation, testing, manufacture, treatment or storage.

13.3 All inspections and tests are for the benefit of Mortenson and Owner and shall not relieve Subcontractor of responsibility for providing its own quality control measures to assure that the Work complies with the Contract Documents. Inspection or testing by Mortenson, Architect or Owner, or any of their authorized representatives, shall not be construed as constituting acceptance and shall not relieve Subcontractor of responsibility for any non-compliance, damage to or loss of the Work, or in any way affect the continuing rights of Mortenson or Owner regarding the completed Work.

13.4 Within twenty-four (24) hours after receiving Notice from Mortenson that any portion of the Work has been rejected by Mortenson as defective or in any way failing to conform to the Contract Documents, Subcontractor, at its own expense and without an extension of time to complete the Work, shall proceed to remove all such portions of the Work from the Project or, at Mortenson's discretion, submit a schedule acceptable to Mortenson for removal of all such portions of the Work from the Project, and, in either instance, shall diligently proceed to replace the same with conforming Work and make good all work of others damaged or destroyed by or as a result of such defective, or non-conforming Work or by removal or replacement thereof.

14. **TAKING OVER PERFORMANCE-TERMINATION FOR DEFAULT.**

14.1 An "Event of Default" shall mean any of the following: (a) failure to maintain the insurance coverages specified in Article 16 hereof; (b) failure to provide the Bonds required in Article 18 hereof; (c) failure to supply sufficient skilled workers, equipment or materials of proper quality and quantity; (d) failure to make timely payments including, without limitation, all payments required in Article 7.7; (e) failure to proceed with the Work within the time or in the sequence directed by Mortenson; (f) failure to prosecute the

Work with promptness and diligence; (g) causing stoppage, delay or interference to work of Mortenson or any other contractor or subcontractor; (h) failure to perform the Work in compliance with the Contract Documents; (i) failure to comply with any warranty applicable to the Work; (j) the filing by or against Subcontractor a petition in bankruptcy or for an arrangement or reorganization (Mortenson being unwilling to accept and hereby declines performance by any trustee in bankruptcy); (k) if Subcontractor becomes insolvent, goes into liquidation or dissolution, makes a general assignment for the benefit of creditors, consents to or appoints a receiver, custodian, trustee or liquidator or otherwise acknowledges insolvency; (l) if Subcontractor is dissolved, liquidated, wound up or fails to maintain existence as a going concern in good standing; or (m) any other material breach of the Agreement. An Event of Default is a material breach of the Agreement.

14.2    Upon an Event of Default, Mortenson shall have the right, to the extent permitted by law, and in addition to any other rights and remedies provided by the Contract Documents or by law, after seventy-two (72) hours Notice to Subcontractor (except in the instance of Subsection 14.1(j), (k) or (l) in which case no such 72-hour Notice is required) to (i) perform (through itself or through others) any or all of the uncompleted part of the Work, or (ii) terminate the Agreement in whole or in part, for all or any portion of the Work, and in either case to enter the Subcontractor's premises, including any trailers, storage units or facilities owned or leased by Subcontractor and take possession of materials, equipment, scaffolds, tools, and other items necessary for the purpose of completing the Work, all of which Subcontractor hereby transfers, assigns and sets over to Mortenson; to employ persons as necessary to complete the Work; and to provide all labor, services, materials, equipment and other items required to complete the Work; and to deduct all resulting costs from any monies due or to become due to Subcontractor under the Agreement or, in the event such cost exceeds such moneys, recover the excess cost from Subcontractor.

14.3    In the case of such performance by Mortenson, whether by itself or through others, or in the event of such termination, Subcontractor shall not be entitled to receive any further payment under the Agreement until the Work shall be wholly completed to the satisfaction of Mortenson, at which time, if the unpaid balance of the Subcontract Price shall exceed the costs incurred by Mortenson in performing or completing the Work, such excess shall be paid by Mortenson to Subcontractor, but if such costs shall exceed such unpaid balance, then Subcontractor shall pay the difference to Mortenson, or any third party to whom Mortenson assigns its right of recovery. Notwithstanding anything to the contrary contained herein, neither Mortenson nor its insurers waive any claims or rights of subrogation against Subcontractor relative to an Event of Default. Such costs shall include the cost of performing, correcting and completing the Work in conformance with the Contract Documents and of furnishing all labor, services, materials, equipment, and other items required therefore, and shall also include all losses, damages, costs and expense, including attorneys' fees, legal expenses, and other disbursements, incurred by reason of or resulting from Subcontractor's default.

15.    **CONVENIENCE TERMINATION OR SUSPENSION**.

15.1    Mortenson may terminate the Agreement, in whole or in part, at any time by Notice to Subcontractor, whether or not Subcontractor is in default, in the event and to the extent that Owner has exercised its right, if any, to a convenience termination of the Contract. Such termination shall be effective at the time and in the manner specified in said Notice and shall be without prejudice to any claims which Mortenson or Owner may have against Subcontractor. Upon receipt of any such Notice, Subcontractor shall, unless the Notice directs otherwise: (a) immediately discontinue the Work on the date and to the extent specified in the Notice; (b) place no further orders for materials, equipment or services, except as may be necessary for completion of such portion of the Work that is not terminated; (c) promptly make every reasonable effort to procure cancellations, upon terms satisfactory to Mortenson, of all material orders and subcontracts to the extent they relate to the performance of the Work terminated; and (d) thereafter execute only such portion of the Work that is not terminated, or in the event that all of the Work is terminated, execute only that portion of the Work as may be necessary to preserve and protect the Work already in progress and to protect materials and equipment at the Project site or in transit thereto.

15.2    Subcontractor waives any claims for damages, including loss of anticipated profits for uncompleted Work, on account of termination by Mortenson pursuant to Paragraph 15.1 and shall accept as its sole remedy payment of the amount recovered by Mortenson from Owner allocated as compensation for termination of the Work.

15.3    Mortenson may suspend the Agreement in whole or in part, at any time by Notice to Subcontractor whether or not Subcontractor is in default, in the event and to the extent that Owner has exercised its right, if any, to suspend the work required by the Contract. Such suspension shall be effective at the time and in the manner specified in said Notice and shall be without prejudice to any claims which Mortenson or Owner may have against Subcontractor. Upon receipt of any such Notice, Subcontractor shall, unless the Notice directs otherwise: (a) immediately suspend the Work on the date and to the extent specified in the Notice; (b) place no further orders for materials, equipment or services, except as may be necessary for completion of such portion of the Work as is not suspended; and (c) thereafter execute only such portion of the Work that is not suspended, or in the event that all of the Work is suspended, execute only that portion of the Work as may be necessary to preserve and protect the Work already in progress and to protect materials and equipment at the Project site or in transit thereto.

15.4    Subcontractor waives any claims for damages on account of suspension by Mortenson pursuant to Paragraph 15.3 and shall accept as its sole remedy payment of the amount recovered by Mortenson from Owner allocated as compensation for suspension of the Work.

16.    **INSURANCE**.

16.1    Prior to starting the Work, Subcontractor shall procure, maintain and pay for such insurance as will protect against claims for bodily injury or death, or for damage to property, including loss of use, which may arise out of operations by Subcontractor or by any of its subcontractors or by anyone employed by any of them, or by anyone for whose acts any of them may be liable. Such insurance shall not be less than the greater of coverages and limits of liability specified in the Agreement, any coverages or limits of liability specified in the Contract Documents, or coverages and limits required by law.

16.2    Subcontractor shall procure and maintain the following minimum insurance coverages and limits of liability:

| Workers' Compensation | Statutory Limits |
| --- | --- |
| Employer's Liability | $1,000,000 each accident<br>$1,000,000 disease policy limit<br>$1,000,000 disease each employee |
| Commercial General Liability | $5,000,000 each occurrence<br>$5,000,000 general aggregate applicable<br>on a per project basis<br>$5,000,000 products/completed operations aggregate<br>or such other limits specified in the Agreement |
| Automobile Liability | $2,000,000 each accident |
| Professional Liability/Errors and Omissions (if required by Paragraph 16.2.d or required per the Agreement) | $2,000,000 each claim<br>$2,000,000 annual aggregate |
| Pollution Liability (if required by Paragraph 16.2.e or required per the Agreement) | $2,000,000 each claim<br>$2,000,000 annual aggregate |
| Aircraft Liability (if required by Paragraph 16.2.f or required per the Agreement) | $5,000,000 per seat<br>$10,000,000 per occurrence |

a.    <u>Workers' Compensation and Employer's Liability</u> - For any employee, owner or principal of the Subcontractor who shall be at the Project site or at a specific off-site Project related location, workers' compensation coverage shall be provided whether or not required by statute. If the Project is located and/or Subcontractor's principal place of business is in the state of Illinois, coverage must be amended such that the Subcontractor and its insurer agree to waive any protection afforded under statute, law, ordinance or common law rights that cap the employer's liability to the amount of workers' compensation benefits it has paid or will pay on behalf of its employee.

b.    <u>Commercial General Liability</u> - Insurance required under this Paragraph shall provide coverage on an occurrence form no less broad than the ISO Form CG 00 01 2004 or 2007 edition and shall include coverage for Products/Completed Operations, all renewed and maintained for four (4) years after final acceptance of the Project by Owner or such longer period as the Contract Documents may require of Mortenson. The general aggregate limit shall be per project.

c.    <u>Automobile Liability</u> - Insurance required under this Paragraph shall include coverage for all owned, hired and non-owned automobiles.

d.    <u>Professional Liability/Errors & Omissions</u> - If designated in the Agreement or if the Work includes architecture, design or engineering services, including that required to meet a performance specification, or other professional services including but not limited to surveying, Subcontractor shall procure, maintain, and pay for Professional Liability/Errors and Omissions insurance with limits of not less than $2,000,000 each claim and $2,000,000 annual aggregate including coverage for economic loss. Subcontractor agrees to renew and maintain such coverage for four years after final acceptance of the Project by Owner or such longer period as the Contract Documents may require of Mortenson.

e.    <u>Pollution Liability</u> - If designated in the Agreement or if the Work includes any portion of i) building enclosure systems involving the watertight integrity of the building (including, without limitation, vapor or moisture barriers, roofing or flashing, exterior windows, curtainwall components or systems, plaster or stucco or exterior stone, masonry, waterproofing, or caulking), ii) plumbing, heating, fire suppression, ventilating or air conditioning systems, iii) drywall or insulation, or iv) building foundations, Subcontractor shall procure, maintain and pay for Pollution Liability insurance including contractual liability coverage. Such insurance shall have limits of not less than $2,000,000 each claim and $2,000,000 annual aggregate, and shall include coverage for Completed Operations extending or renewed for four (4) years after final acceptance of the Project by Owner or such longer period as the Contract Documents may require of Mortenson. The policy shall include coverage for bodily injury, property damage and clean-up costs. The definition of Pollutant and/or Pollution Condition shall include any form of fungus, including mold.

f.    <u>Aircraft Liability</u> - If the Work involves the operation, maintenance or use of any aircraft, Subcontractor shall procure and maintain or cause to be procured and maintained Aircraft Liability insurance for loss or damage arising out of or related to the use of any aircraft used in the performance of the Work. Such insurance shall have passenger liability limits of $5,000,000 per seat and provide coverage in a combined single limit of not less than $10,000,000 per occurrence, including bodily injury, property damage and passenger liability. Such Aircraft Liability coverage shall be endorsed to include Mortenson and Owner and all others required by the Agreement to be additional insureds.

g.    For Work in those states where Workers' Compensation insurance is provided through a state fund and Employer's Liability coverage is not available, "stop gap" coverage shall be provided through either the Commercial General Liability policy or another state's Workers' Compensation policy.

16.3     To the extent allowed by law, all policies referenced in Article 16.2 shall include a waiver of subrogation in favor of Mortenson and Owner and others as required by the Contract Documents.

16.4     If the Professional or Pollution Liability insurance policies are required and written on a claims made basis, any retroactive date shall be prior to the start of Work and maintained on any subsequent renewals.

16.5     Employer's Liability, Commercial General Liability and Automobile Liability insurance may be arranged under single policies for full minimum limits required, or by a combination of underlying policies with the balance provided by an Excess or Umbrella Liability policy that is as materially broad as the underlying policy.

16.6     To the greatest extent allowed by law, Subcontractor shall endorse its Commercial General Liability (including Products/Completed Operations coverage and utilizing ISO endorsements CG 20 10 07 04 and CG 20 37 07 04 or equivalent) , Automobile Liability, Umbrella/Excess Liability, Contractors Pollution Liability and Aircraft Liability policies (if required herein)), to add Mortenson, Owner and such other parties as Mortenson is required under the Contract Documents to name as additional insureds on Mortenson's insurance, as "additional insureds", with respect to but not limited to liability arising out of (a) operations performed for Mortenson or Owner by or for Subcontractor, (b) Subcontractor's completed Work, (c) acts or omissions of Mortenson or Owner in connection with their general supervision of operations by or for Subcontractor, (d) Subcontractor's use of Mortenson's tools and equipment, and (e) claims for bodily injury or death brought against any of the additional insureds by Subcontractor's employees, or the employees of its subcontractors of any tier related to the performance of operations under the Contract Documents.  Such insurance afforded to Mortenson, Owner and others as additional insureds under Subcontractor's policies shall be primary insurance and not excess over, or contributing with, any insurance purchased or maintained by Mortenson or Owner or others required to be included as additional insureds.

16.7     Subcontractor shall maintain insurance with carriers authorized to do business in the state in which the Project is located and having a current A.M. Best rating of not less than A minus (A-), unless a different A.M. Best rating is accepted by Mortenson in writing.  In the event Subcontractor fails to procure or maintain any insurance required by this Article, Mortenson may, at its option, purchase such coverage and deduct the cost thereof from any monies due to Subcontractor, withhold funds from Subcontractor in an amount sufficient to protect Mortenson and other insured parties, or terminate the Agreement pursuant to its terms.

16.8     Certificates of Insurance including copies of the general liability additional insured endorsements shall be filed with Mortenson prior to commencing any Work hereunder.  Renewal certificates and endorsements shall be provided to Mortenson not less than ten (10) days prior to the expiration date of any of the required policies.  Mortenson shall not be obligated to review certificates or other evidence of insurance, or to advise Subcontractor of any deficiencies in such documents, and receipt thereof shall not relieve Subcontractor from, nor be deemed a waiver of Mortenson's right to enforce, the terms of Subcontractor's obligations hereunder. All insurance policies shall contain a provision that coverages and limits afforded thereunder shall not be canceled, or non-renewed, without thirty (30) days prior written notice to Mortenson or ten (10) days' notice for non-payment.  Subcontractor shall provide Mortenson written notice of material change to the required insurance thirty (30) days in advance of such change.  Mortenson shall have the right to examine any policy required under the Agreement.

16.9     To the extent of coverage afforded by any Builder's Risk, auto physical damage, any other property or equipment floater insurance applicable to the Work, vehicles, Project or equipment used in performance of the Work or the Project, regardless of whether such insurance is owned by or for the benefit of Subcontractor, Mortenson, Owner, or their respective agents and subcontractors, Mortenson and Subcontractor waive all rights against each other and Owner, and subcontractors, agents and employees each of the other, for loss or damage to the extent that the interests of Mortenson and Subcontractor are covered by such insurance, except such rights as they may have to the proceeds of such insurance.  If policies of insurance provided by Mortenson or Subcontractor that are referred to in this Article require an endorsement to provide a waiver of subrogation, the owners of such policies will cause them to be so endorsed.

16.10     Mortenson and Owner neither represent nor assume responsibility for the adequacy of the Builder's Risk insurance to protect the interests of Subcontractor.  It shall be the obligation of Subcontractor to purchase and maintain any supplementary property insurance that it deems necessary to protect its interest in the Work.

16.11     Any deductible amount applied to any loss payable under the Builder's Risk insurance or any other project specific policy purchased by Mortenson or Owner and not reimbursable by Owner, shall be borne by the party or parties that are responsible for the resultant damage, as solely determined by Mortenson.  To the extent that no subcontractor or sub-subcontractor of a subcontractor is found responsible for such loss, the deductible amount shall be borne by Subcontractor, if the Subcontractor's Work is damaged, in direct proportion that its individual loss bears to the total loss.

17.     **INDEMNITY.**

See Indemnity Clause attached to the Agreement, which is incorporated herein.  In addition to the terms of the Indemnity Clause, Subcontractor binds itself to defend, indemnify, and hold harmless Mortenson in the same manner and to the same extent that Mortenson is bound to defend, indemnify, and hold harmless the Owner or any other party under the Contract Documents, and Subcontractor binds itself to defend, indemnify, and hold harmless the Owner and any other parties that Mortenson is obligated to defend, indemnify, or hold harmless under the Contract Documents in the same manner and to the same extent that Mortenson is obligated to defend, indemnify, and hold harmless the Owner or such other parties under the Contract Documents. Each obligation of Subcontractor to defend, indemnify, and hold harmless Mortenson or any other party is a separate and independent obligation, none of which shall in any way limit the scope or applicability of any other.

18.     **BONDS.**

18.1     If required in the Agreement, Subcontractor shall obtain and furnish to Mortenson performance and payment bonds (the "Bonds") covering the faithful performance of the Agreement and payment of all obligations arising thereunder.  The Bonds shall be

written on Mortenson's Subcontractor Performance Bond and Subcontractor Labor and Material Payment Bond forms, each in the full amount of the Subcontract Price. The penal sum of each of the Bonds, at all times, shall be equal to the Subcontract Price. For changes to the Subcontract Price that, in the aggregate, exceed twenty percent (20%) of the original Subcontract Price, Subcontractor shall obtain written consent of its surety for such changes on forms acceptable to Mortenson. The premium for such Bonds, including any additional premiums resulting from increases in the Subcontract Price, shall be included in the Subcontract Price and shall be paid by Subcontractor.

18.2     Subcontractor shall furnish all performance and payment Bonds required by the Agreement within ten (10) days of receipt of the Agreement, but in all events prior to commencement of the Work. Failure to furnish the required Bonds within the specified time is an Event of Default.

18.3     The surety or sureties executing the Bonds shall be authorized to conduct surety business in the state in which the Project is located and shall be listed in the current United States Department of the Treasury Circular No. 570, with an underwriting limitation equal to or greater than the penal sum of the Bonds to be furnished. The surety, or sureties, must have a current A.M. Best rating of A minus (A-) or higher. If the A.M. Best rating of the surety, or sureties, which execute(s) the Bonds subsequently falls below A minus (A-), then Subcontractor shall, within ten (10) days of such change in the published rating or upon receipt of Notice from Mortenson, and at Subcontractor's sole expense, obtain and furnish to Mortenson replacement Bonds executed by a surety, or sureties, in full compliance with the Agreement. The failure of Subcontractor to provide acceptable replacement Bonds within the referenced timeframe shall be a material breach and default of the Agreement.

19.     **INTELLECTUAL PROPERTY.** Subcontractor shall pay all royalties and license fees and shall defend, indemnify and hold harmless Mortenson and Owner, and their representatives, from all suits or claims and expenses, including attorneys' fees, arising from any claim that any concept, product, design, equipment, material, process, copyrighted material or confidential information furnished by Subcontractor constitutes an infringement of any patent rights or copyrighted material or is a theft of trade secrets or intellectual property, except to the extent such is expressly required by the Contract Documents.

20.     **WARRANTY.** Subcontractor warrants and guarantees that it shall perform all of the Work in a skillful manner, and shall furnish new materials and equipment of good quality, fit for the purpose intended and free from defects and in compliance with all requirements of the Contract Documents; that without cost to Mortenson or Owner it shall promptly correct improper or defective Work, materials or equipment and other work affected by such correction which may be discovered within one year from the date of final acceptance of the Project by Owner. Notwithstanding the foregoing, Subcontractor shall provide any broader guarantee or longer warranty period required by the Contract Documents. Required equipment and system warranty documents and as-built drawings shall be delivered to Mortenson within thirty (30) days of completion of the Work, or such earlier time as required by the Contract Documents. Nothing contained in this Article shall be construed to establish a period of limitation with respect to other obligations which Subcontractor has under the Contract Documents. Establishment of the one year time period herein (and any other period elsewhere in the Contract Documents) relates only to Subcontractor's specific obligations to correct the Work and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced.

21.     **DISPUTES.**

21.1     If arbitration of disputes is provided for in the Contract, and if Mortenson, in its sole discretion, elects to demand arbitration with Subcontractor as part of joint proceedings with Owner or others in accordance with the Contract, then any dispute between Mortenson and Subcontractor arising out of or relating to the Agreement or regarding any terms contained in the Agreement including, but not limited to, the arbitration provision, or the enforceability of the Agreement, shall be decided by arbitration in the manner provided for in the Contract. If Mortenson elects to so demand arbitration with Subcontractor, arbitration proceedings shall be held, at Mortenson's election, in Minneapolis, Minnesota, such place for arbitration as required by the Contract or as Mortenson may designate.

21.2     If the Contract does not provide for arbitration or if Mortenson elects to demand arbitration with Subcontractor individually, or as part of joint proceedings with others, then, at Mortenson's sole discretion, any dispute between Mortenson and Subcontractor arising out of or relating to the Agreement or any terms contained in the Agreement, including, but not limited to, the arbitration provision, or the enforceability of the Agreement, shall be decided by arbitration in accordance with the then current Construction Industry Arbitration Rules of the American Arbitration Association. Arbitration proceedings shall be held in Minneapolis, Minnesota, or such other place as Mortenson may designate, in its sole discretion.

21.3     Mortenson may enforce its rights to arbitration under Article 21 pursuant to the Federal Arbitration Act and shall be entitled to recover its costs and attorneys' fees incurred in enforcing its right to arbitrate or any other of its rights in Article 21.

21.4     If Mortenson demands arbitration against Subcontractor, Subcontractor agrees not to institute or assert (and to stay) any lawsuits against Mortenson arising out of or relating to the Project or the Agreement.

21.5     Mortenson shall not be required to arbitrate any dispute with Subcontractor unless and until Mortenson has consented and elected in writing to the arbitration of such dispute. The award rendered by the arbitrator(s) pursuant to Article 21 shall be final, and judgment may be entered upon it in accordance with the Federal Arbitration Act in any court having jurisdiction thereof.

21.6     If the Contract Documents provide administrative procedures for resolution of disputes (including, but not limited to, mediation or a meeting of executives), Subcontractor agrees to comply with such procedures and submit any claims or disputes to Mortenson in such manner and time as will permit Mortenson to comply with such administrative procedures. Subcontractor agrees not to institute or assert (and to stay) legal or other proceedings against Mortenson until such administrative procedures and remedies have been exhausted, and agrees to fully reimburse Mortenson for costs and expenses, including reasonable attorney's fees, incurred by Mortenson in the enforcement of this Paragraph.

21.7     Any claim by Subcontractor involving, in whole or in part, acts, errors or omissions of Owner or Architect, or other agents or representatives of Owner, as determined by Mortenson in its sole discretion, shall be subject to and governed by this

Paragraph. Such claim shall be submitted in writing to Mortenson in such time and manner as will permit Mortenson to comply with the Contract. Such claim shall contain a written entitlement narrative and an itemization of pricing for review and approval by Mortenson. If Mortenson, in its sole discretion, determines that the claim as submitted is inadequate or requires revision, Subcontractor shall revise and resubmit such claim. If Mortenson, in its sole discretion, decides not to proceed with such claim, Subcontractor, to the extent it determines to pursue such claim, shall be obligated to pursue such claim directly against Owner or others, and Subcontractor agrees not to institute or assert (and to stay) legal or other remedies against Mortenson until all legal proceedings against Owner or others with respect to such claim are final and complete. If Mortenson, in its sole discretion, decides to proceed with such claim, Subcontractor agrees not to institute or assert (and to stay) legal or other remedies against Mortenson until all legal proceedings against Owner with respect to such claim are final and complete. Subcontractor's right of recovery, arising from acts, errors or omissions of Owner or Architect, or other agents or representatives of Owner, shall be limited solely to that dollar amount and other relief, which is recovered from Owner and Mortenson shall not be liable to Subcontractor for any monies or other relief except those paid to Mortenson by Owner for the benefit of Subcontractor. Subcontractor hereby agrees to waive any right to further payment beyond the Subcontract Price arising out of the acts, errors, or omissions of Owner or Architect, or other agents or representatives of Owner, other than to the extent that Mortenson may receive funds from Owner on behalf of Subcontractor, which funds shall be paid by Mortenson to Subcontractor less costs and expenses incurred by Mortenson in prosecuting such claim.

21.8     Pending final resolution of any dispute or claim, and at all times, Subcontractor shall proceed diligently with performance of the Work.

22.     **ASSIGNMENT AND SUBLETTING.**

22.1     Neither the Agreement nor any monies due or to become due hereunder shall be assigned by Subcontractor without prior written consent of Mortenson. Any assignment without prior written consent of Mortenson shall be of no effect and shall vest no right in the assignee against Mortenson. Mortenson's consent to any assignment shall not relieve Subcontractor of any of its obligations under the Agreement and the Contract Documents, and Subcontractor shall remain as fully responsible for the defaults, acts and omissions of its assignee and all persons directly or indirectly employed by its assignee as it is for its own defaults, acts and omissions and those of its own officers, agents, and employees.

22.2     Subcontractor shall submit to Mortenson a listing of its subcontractors who will perform Work on the Project. Subcontractor shall bind each of its subcontractors to all of the provisions of the Agreement and the Contract Documents with respect to the Work. Mortenson's consent to any subcontracting shall not create any contractual relationship between Mortenson and any subcontractor of Subcontractor to whom the Work or any portion thereof is subcontracted and shall not relieve Subcontractor of its sole responsibility for the work of any such subcontractor.

23.     **EQUAL OPPORTUNITY; EMPLOYMENT AND SUBCONTRACTING.**

23.1     **Subcontractor shall abide by the requirements of 41 CFR 60-1.4(a). Subcontractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, age, national origin, sexual orientation, or gender identity, or any other reason prohibited by applicable law. Subcontractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin.**

23.2     **Mortenson and Subcontractor shall abide by the requirements of 41 CFR 60-300.5(a) and 41 CFR 60-741.5(a). These regulations prohibit discrimination against qualified protected veterans; and qualified individuals on the basis of disability. These regulations require affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans and qualified individuals with disabilities.**

23.3     Subcontractor shall comply with all applicable federal, state and local laws, ordinances, orders and regulations with respect to employment practices, including but not limited to requirements for: timekeeping and payment of wages (including overtime pay), meal and rest breaks, minimum and prevailing wages, restrictions on the employment of minors, classification of employees, and anti-harassment policies and training.

23.4     Subcontractor shall comply with any applicable subcontracting, targeted business (MBE, DBE, or WBE), or workforce requirements and goals specified in the Contract between Owner and Mortenson.

24.     **CONTINGENT ASSIGNMENT OF AGREEMENT.** Subcontractor hereby consents to assignment of the Agreement by Mortenson to Owner (or Owner's Lender) provided that such assignment is effective only after Owner's termination of the Contract between Owner and Mortenson pursuant to the terms thereof. In such event, Subcontractor agrees to complete the Work for the benefit of Owner (or Owner's Lender), conditioned upon Owner's (or Owner's lender's) written agreement (1) to pay for all labor, material, and services furnished at Owner's request and (2) to pay for all labor, material, and services previously rendered to the extent such amounts are due and payable to Subcontractor under the terms of the Agreement.

25.     **MISCELLANEOUS.**

25.1     Mortenson's waiver of a breach of the provisions of the Agreement must be specifically set forth in writing signed by Mortenson and shall not extend to any other or future breaches. Mortenson's remedies herein are cumulative and in addition to other remedies in law or equity.

25.2     Subcontractor shall perform the Agreement as an independent contractor and is not, and shall not be deemed, an agent or employee of Mortenson.

25.3     If any term or provision of the Agreement is finally determined to be superseded, invalid, illegal or otherwise unenforceable, such determination shall not impair or otherwise affect the validity, legality or enforceability of the remaining terms or

provisions or parts of the provision of the Agreement, which shall remain in full force and effect as if the unenforceable term or provision or part were deleted.

      25.4     The term "Notice" in the Agreement shall mean a communication from Mortenson emailed to Subcontractor's email address in the Agreement, delivered personally by hand (with written confirmation of receipt) or sent to Subcontractor's last known address.

      IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge these Standard Terms and Conditions of the Agreement as set forth above.

    __Don Borneke Construction, Inc__        M. A. MORTENSON COMPANY
Subcontractor

By    *Mark Sikel*             By _____

Printed Name  __Mark Sikel__        Printed Name _____

Title    __Project Manager__         Title _____

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## **Subcontract Supplementary Terms and Conditions**

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of December 29, 2017

1.  The Subcontract Standard Terms and Conditions are amended as follows:

    a.  These Supplementary Terms and Conditions further define or clarify Standard Terms and Conditions previously listed.

    b.  This agreement supersedes all other previous correspondence, but does not alter previously agreed to Supplementary Terms and Conditions.

    c.  Work shall conform to all applicable local, state or national codes and guidelines, whichever is more stringent.  Any and all costs associated with these requirements are included.

    d.  As applies to the Work, Subcontractor shall provide specified warranties and guarantees to commence on the Project Substantial Completion date.

    e.  As applies to the Work, Subcontractor shall review equipment and material delivery access.

    f.  Within seven (7) days after award of Subcontract Agreement, Subcontractor shall submit each of the following:

        I.  Contact person(s) assigned to the Project.

        II.  A complete Submittal Register listing submittal identification number, type of submittal, description of item(s) and projected submittal date.  The Submittal Register shall list each item for which the Subcontractor is responsible per the specifications, including shop drawings, descriptive data, test reports, samples, and warranties.

    g.  No work shall be commenced until Insurance forms, Bonds (if applicable), etc. have been executed and approved.

    h.  All Subcontractor warranties shall be assignable to the Owner upon Project Mechanical Completion.

    i.  Supplier shall be responsible for repairs of public roads damaged as a result of his operations.

    j.  Subcontractor acknowledges that they are required to assist in the design stages and ensure design documents support fixed lump sum price per Exhibit B without cost increase.  No increases to the contract price will be allowed that arise due to the failure of the Subcontractor to identify and communicate cost impacts resulting from design changes.  Subcontractor shall use all reasonable means to keep the civil

1

engineering consistent with their original pricing proposal and identify any changes not consistent with the original proposal within three days of receiving each set of design documents. Failure to comply with this notification requirement shall result in Subcontractor performing work at no additional cost to the contract.

k.  Subcontractor shall be responsible for coordinating, to the mutual satisfaction of both the Subcontractor and Mortenson, all work included in this Agreement with the designated Mortenson Superintendent. Subcontractor, its sub-subcontractors and trades shall be required to fully cooperate with Mortenson Superintendent and other Contractors on the project.

l.  It shall be the responsibility of the Subcontractor, working with the trade representatives, to determine which of the trades is to perform any particular part of the work included in this agreement. The inclusion of any scope of work item under any particular heading of this subcontract is not to be construed as assignment of jurisdictional boundaries. Subcontractor is required to perform a pre-job meeting with local trade unions and provide documentation.

m.  Subcontractor specifically agrees to pursue local participation (Lee County, IL)

n.  Subcontractor shall be responsible for those repairs and clean up of public roads damaged, arising from the sole negligence of the Subcontractor, during the performance of the work included in this agreement.

o.  Subcontractor's employees and any subcontracted employees or suppliers shall only use the allowable public roads for construction and deliveries as specified in the design documents. All roads that are not approved for construction traffic shall not be used. If roads are used the Counties and townships may impose a fee and a violation form. Subcontractor shall be responsible for any fees associated with violating the road use agreement/ designated allowable construction traffic roads and correcting/ repairing any roads if damaged at Subcontractor's expense.

p.  Subcontract includes all utility locates as identified by Joint Utility Locating Information for Excavators (JULIE, Inc.), Public Record, the Owner, Mortenson and any other reasonable identification source, and associated costs as required for this scope of work. Subcontractor acknowledges location of existing natural gas lines and overhead high voltage lines. Subcontractor shall be responsible for ascertaining the location of and avoiding damage to all underground installations of utilities existing at the time of this subcontract, including without limitation, power, gas, water, sewer, telephone, data transmission, cable television and other underground installations.

q.  Mendota Hills Repowering, LLC as Third-Party Beneficiary; The parties hereto agree and acknowledge that the services/work/equipment to be provided hereunder by Subcontractor will be incorporated into the wind-powered electric generation facilities being developed by Owner. As such, the parties expressly agree that Owner is a third-party beneficiary of this Agreement entitled, in its own name or in the name of Mortenson to enforce this Agreement against Subcontractor."

2.  Subcontractor agrees to comply with the following Project site work rules and working conditions:

Subcontract Supplementary Terms and Conditions
10-26-04

a.  Subcontractor shall not restrain access by adjoining property owners to any building or field.

b.  Subcontractor is aware of the sensitivity of the adjoining property owners and shall maintain all of its activities to within the project limits.  Subcontractor shall jointly review alleged property damage with Mortenson and the property owner.

c.  Subcontractor shall repair any damage to land owner property or facilities caused by his/her work, excluding crop damage within established easements.

d.  When traveling on the local road system, subcontractor shall always yield the right of way to area residents.

e.  Subcontractor shall be responsible for any damage including crop damage caused by his/her work outside the established easements.

f.  Mortenson onsite supervision is required to be present as long as Subcontractor is performing their work. Normal working hours shall be from 7:00 a.m. to 5:00 p.m., Monday through Friday unless otherwise directed by Mortenson. Subcontractor shall inform Mortenson within forty-eight (48) hours if Subcontractor will deviate from normal Project hours.

g.  Overtime Operations – Subcontractor has included overtime costs as required to meet schedule requirement as required for the Milestone dates as identified in Exhibit C.

h.  Subcontractor shall coordinate all deliveries with the Mortenson on site Superintendent.

i.  Subcontractor shall provide representation at weekly/daily subcontractor coordination meetings.

j.  Mortenson will oversee a Quality Management Program for this project under the direction of their Quality Manager.  Subcontractor compliance with this program is mandatory. Copies of the Quality Management Program are available for review at the project site office. Subcontractor is responsible for their own quality management program, and Mortenson's program is supplemental to and not a replacement for Subcontractor's program unless blended and approved by Mortenson.

k.  Subcontractor recognizes the goal of Zero Punchlists and will manage the work accordingly to achieve such goal.

l.  Subcontractor specifically agrees to provide transportation for Subcontractor's employees, subcontractors, suppliers, vendors, and agents at work areas, and to abide by all established work hour, delivery, traffic control, site utilization, and traffic routing requirements for its work or the work of its employees, subcontractors, suppliers, vendors, and agents. Parking provisions for field and office personnel will be provided by Mortenson at the project office and laydown area. Employee personal vehicles will not be allowed at other project work areas.

m.  Subcontractor acknowledges areas within or near the site where construction activity is not allowed.

n.  In the event that an employee of the Subcontractor incurs an injury while on the project, the employer will furnish Mortenson a copy of the "First Report of Injury Report" within twenty-four (24) hours after the occurrence.

o.  Subcontractor shall keep the Project Site, including storage areas used by this subcontract, free from accumulation of waste materials or rubbish arising out of the work, and prior to the completion of the work shall clean up, remove and properly dispose of any such waste materials or rubbish from and about the Project Site.

p.  Subcontractor shall not permit or allow the introduction of any firearm, illegal drugs, or intoxicating liquor upon the Project Site.

q.  Subcontractor recognizes smoking is prohibited on the Project except in designated areas. Designated areas would include onsite lay down area and inside closed cab vehicles/equipment.

r.  Subcontractor first day-first hour orientations will only be conducted in the morning following daily stretching on days designated by M. A. Mortenson Company.

s.  Subcontractor shall reduce emissions from construction vehicles and equipment exhaust by implementing the following mitigation measures:
    - Minimize idling time to five minutes when construction equipment is not in use, unless more time is required per engine manufacturer's specifications or for safety reasons;
    - Ensure equipment is maintained and properly tuned;

t.  On-site fueling activities will require a drip pan to catch any fuel overflows.

u.  Subcontractor will provide their own two-way communication radios

3.  The Subcontract Standard Terms and Conditions are further modified as follows:

None

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge these Supplementary Terms and Conditions as set forth above.

Don Borneke Construction, Inc.
Subcontractor

By _Mark Sikel_

Its _Project Manager_

M. A. MORTENSON COMPANY

By Andy Black

Its Project Manager

**M. A. MORTENSON COMPANY**
**SUBCONTRACT AGREEMENT**

**INDEMNITY - Article 17 of the Standard Terms and Conditions**

**<u>Illinois</u>**

The following Article 17 is attached to and forms a part of the Standard Terms and Conditions of the Agreement between Subcontractor and Mortenson.

17.1    To the fullest extent permitted by law, Subcontractor shall defend and indemnify Mortenson and all others whom Mortenson is obligated to defend and indemnify by the Contract Documents, (collectively "the indemnified parties") from and against any and all suits or claims alleging damages, losses and expenses, including attorneys' fees, attributable to injuries to persons or damage to property (including loss of use), arising out of or resulting from Subcontractor's Work, including all suits and claims for which any or all of the indemnified parties may be or may be claimed to be liable, and including all suits and claims that arise during and after construction of the Project, but only to the extent that such suits and claims also arise out of Subcontractor's negligence or other wrongful conduct. Subcontractor understands and agrees that this Paragraph obligates Subcontractor to defend the indemnified parties from all suits and claims that allege negligence or other wrongful conduct on the part of the indemnified parties, and to pay all costs of defense of the indemnified parties, including attorneys fees and ancillary costs and expenses incurred by the indemnified parties.  Subcontractor understands and agrees that this Paragraph also obligates Subcontractor to pay any and all attorneys fees and expenses incurred by any of the indemnified parties in connection with enforcing the obligations of this Article 17.

17.2    Subcontractor further agrees to obtain, maintain and pay for commercial general liability insurance which conforms to Article 16, including completed operations coverages, and such other insurance types and limits as are specifically required by Article 16, to secure the provisions of this Article 17.

17.3    Subcontractor understands and agrees to undertake these obligations regardless of whether the injured person asserting a suit or claim is an employee of Subcontractor, its subcontractors, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable. Subcontractor's indemnity obligation under this Article 17 shall not be limited in any way by the operation of a workers' or workmen's compensation act, any disability act, or any other employee benefit act.

17.4    Subcontractor and Mortenson agree that this Article 17 complies with the requirements of 740 ILL. COMP. STAT 35/1.

.IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Indemnity Clause as set forth above.

<u>    Don Borneke Construction, Inc    </u>
Subcontractor

By <u>    Mark Sikel    </u>


Its <u>    Project Manager    </u>

**M. A. MORTENSON COMPANY**

By <u>                              </u>


Its <u>                              </u>

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## Exhibit A - Scope of Work

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of December 29, 2017

The Scope of Work shall include the following, without limitation:

All Work required by the Contract Documents within the following specification sections:

1.1.  All Contract Documents listed in Exhibit D.  If the Scope of Work below contradicts any of the documents in Exhibit D, the more stringent requirement shall take precedence.

1.2.  Subcontractor is required to assist in the civil design stages up to the issuance of IFC drawings to maintain lump sum price per Exhibit B.  Civil IFC drawings will be amended to Exhibit D upon completion. Exhibit B quantities are based on documents listed in Exhibit D.

**The following material and other obligations are the responsibility of The Supplier and are Included in the Agreement:**

**2.1.  General**

a.  All equipment, materials, products, design and construction shall be new and in compliance with contract documents, design drawings and specifications and the requirements of this section.

b.  Subcontractor shall provide all necessary submittals as required by the documents listed in Exhibit D of this contract.

c.  Subcontractor has performed a detailed takeoff based on the drawings listed in Exhibit D of this contract, has visited the site and confirmed quantities and assumes all risk associated with potential quantity overruns.

d.  Subcontractor agrees to procure, provide and pay for all materials, equipment, tools, consumables, labor, transportation, supervision, temporary office requirements, administration and other costs required to complete the work.

e.  Subcontractor shall work within the project easements.  Subcontractor shall be responsible for all costs associated with damage to property outside the project easements.

f.  Subcontractor shall furnish loads to the project site in conformance with the contract documents listed in Exhibit D.

g.  Subcontractor shall provide the necessary signage and personnel to assure a safe and proper traffic control during the construction of the scope of work. Signage shall comply with MUTCD standards and be coordinated with the local Authority Having Jurisdiction.

h.  Subcontractor shall furnish and pay for all temporary water needs for the execution of this subcontract.  This will include drinking water for all tradesmen employed by the Subcontractor.  Subcontractor shall properly remove all bottles or cups used for drinking water.

i.  Subcontractor acknowledges that Mortenson expects a fully comprehensive Quality Control Program to be implemented and managed by Subcontractor.  Mortenson will support Subcontractor with review and

preparation of their plan, however, Subcontractor shall have a full time dedicated Quality Manager on site to monitor work and fill out, review and submit proper paper work to Mortenson on a daily basis. Documentation shall include the use of Procore for inspections.

## 2.2. Mobilization

a. Subcontractor shall include all necessary hauling permits, packing, transportation and setup of all required equipment, personnel and support services needed to successfully execute this Scope of Work.

## 2.3. Clear and Grubbing

a. Clear and grubbing shall include pushing of organic debris and all rocks to the side of the LOD (Limits of Disturbance) per Agreements and specifications.

b. Rocks shall be removed from the site or used as riprap around culverts.

c. Any soft organic debris such as grasses and or soft brush can remain onsite but any shrubs, trees or other debris shall be removed and disposed of if less than 6" in size with landowner instruction and local state regulations. Any shrubs, trees or other debris that exceeds 6" in size shall be piled at the perimeter of the LOD for landowner use. If landowner does not want material, upon written request by Mortenson, subcontractor shall remove all shrubs, trees, and debris for landowner.

d. Subcontractor shall remove only those trees which are designated for removal. Subcontractor shall use care around trees to be saved. Prior to the removal of trees, Subcontractor to coordinate with Mortenson site team to ensure compliance with environmental regulations.

e. Subcontractor shall be responsible for mowing of public road shoulders and ditches along the project routes as necessary to promote safe travel upon the public road system.

## 2.4. Construction Trailer, Laydown Yard

a. Subcontractor shall construct an 7 acre area for trailers, laydown and contractor parking.

b. Subcontractor shall strip and stockpile existing topsoil & organics. Stockpiled topsoil shall be stabilized in conformance with the project Storm Water Pollution Prevention Plan (SWPPP) for use at the end of the project for restoration.

c. Subcontractor shall compact sub-grade per design documents.

d. This area shall be sloped to drain and shall be maintained in a level state free of ruts and potholes throughout the duration of the project, inclusive of additional aggregate being placed as needed. Furnish and install required culverts to maintain drainage along adjacent public roadways and allow vehicle access to the area.

e. Subcontractor shall place and compact aggregate base per project specifications.

f. Construct two entrances connecting to the public road. The entrances shall be constructed 24' wide with two radius corners similar to the access road entrance inside radius to accommodate semi-truck traffic.

g. The aggregate base material shall become the property of the project.

## 2.5. Road Surveying

a. Subcontractor shall be responsible for all surveying in Subcontractor Scope of Work.

    b.   Roads shall be surveyed & staked for horizontal & vertical alignment.

    c.   Center line stakes shall be set at 100' intervals on tangent & 50' intervals on curves.

       i.   Subcontractor shall survey & stake offsets & limit to include but not limited to the following: main access roads, turbine string roads, foundations, spur roads, MET tower roads and substation road

## 2.6. Turbine Access Roads

a.   Subcontractor shall construct access roads to each individual wind turbine as detailed in the design documents.

b.   Subcontractor has included all surveying and staking required to construct the access roads.

c.   Subcontractor shall provide the independent testing agency with samples of materials to be used to satisfy the testing requirements.

d.   Anticipate installation of a minimum of 5,280 lf of turbine access road per day.

e.   The roads shall have a maximum deviation of 9" rise or fall within any 100' span and be level within 1% across the entire width including the shoulders or as specified in design documents.

f.   The roads shall not exceed a max gradient per design documents and subcontractor has included all necessary grading, including cuts and fills, to support this requirement.

g.   Access road installation within a public right of way (ROW), shall include, but is not limited to, stripping topsoil, preparation of subgrade, compaction of subgrade, placement and compaction of aggregate material.

h.   Subcontractor shall prepare 10' compacted shoulders on each side of all turbine access roads or as directed by Mortenson. Where road abuts fencing on one side, subcontractor shall provide compacted shoulder up to 20' on opposite side of road.

i.   At a minimum, subgrade shall be prepared in accordance with and meet the compaction requirements set forth in the design documents prior to installing aggregate material. Subcontractor is aware that some areas of the road subgrade may need to be addressed with additional aggregate material or corrected per the Design Documents. Subcontractor agrees that payment for this work shall be time and materials as approved by the Contractor. Subcontractor is not required to upgrade entire road sections.

j.   Subcontractor shall proof roll the entire length of roadway after completion of cement stabilization/aggregate placement per design documents, including: Main access roads, turbine string roads, including shoulders and radii.

k.   Subcontractor shall coordinate testing, as required by the contract documents, with the independent testing agency. Subcontractor responsible for determining the optimal moisture percentage that is required for complete and effective cement hydration. Subcontractor acknowledges that this percentage may change as environmental and soil conditions change throughout the site, and will perform proctors as necessary to avoid the placement of unacceptable road sections. These provisions should be addressed in the contractors quality control plans and documentation.

l.   Place & Compact aggregate base to a thickness per the contract documents over the prepared sub-grade.

m.   The aggregate base shall meet the specification described in the design documents.

n. Subcontractor shall construct temporary access roads / radii required to facilitate the delivery of turbines to each wind turbine foundation location on site. Temporary access roads / radii shall be aggregate base. Subcontractor shall construct an entrance where the main access or turbine string roads meet the public roads. The subcontractor shall install entrances per design documents

o. Installation of turbine access roads shall not inhibit natural drainage. Finished elevation of the access roads shall be level with existing site grades.

p. Subcontractor shall install culverts and drainage features for access roads, entrances, spur roads and stream crossings at the locations and sizes specified in the design documents or as natural conditions require.

　　i. Culvert inlets and outlets shall have aprons and be protected with riprap material if required by design document or by the County.

　　ii. Culverts shall be installed as required and at the proper elevation to facilitate existing site drainage conditions.

　　iii. Culverts shall be constructed with a temporary extension for the permanent section to the face of the temporary wide radius corner.

　　iv. Culverts shall be installed per Lee County requirements as well as design specifications.

　　v. Subcontractor acknowledges that certain drainage features including but not limited to: such as small check dams, v-notches and riprap may be required to address drainage and SWPPP requirements and has included costs for such work.

q. Subcontractor shall install a shallow swale crossing at locations where culvert installation is not practical. Subcontractor shall work with designer and Mortenson on per location basis to address this type of drainage design. Subcontractor included cost to address swale crossings, if required.

r. At project completion, scarify, spread topsoil, and remove any material installed for erosion control.

s. Subcontractor shall notify Mortenson in writing proposed deviations to the contract documents and is not authorized to proceed with any deviations until written approval is given by Mortenson.

**2.7. Turbine Spur Road**

a. Upon removal of the crane pad subcontractor shall build a spur road connecting the existing turbine access road to the gravel beauty ring around the pedestal of the turbine.

b. The turbine spur road shall be constructed per design documents with approved materials.

**2.8. 2" Road Cap at End of Project**

a. An additional 2" of Aggregate cap shall be placed after all turbines on a particular string have been turned over and accepted by the Owner upon written direction from Mortenson.

b. The aggregate base shall meet the specification described in the design documents.

*Project to receive spot repairs at project completion using suitable onsite material.*

**2.9 Entrances with Swing Gate & Removable**

a. Any existing fencing disturbed by the Subcontractor's activities shall be repaired & if necessary replaced.

b. Subcontractor shall install "H" frame bracing prior to cutting any existing fence, so existing fence does not lose its tension.
c. Subcontractor shall Cut any barbed wire line fence and remove the Section of fence within the LOD.
d. The existing fence shall be attached to "H" frame bracing and a temporary fence shall be installed closing the opened section of fence during construction. The temporary fence and gate shall be wide enough and positioned appropriately to allow for crane travel and support turbine delivery.
e. Temporary barbed wire fence shall be extended from the "H" frames to the corner post of the swing gate and or the removable panel.
f. Subcontractor shall Install one (1) 16' lockable swing gate and one (1) 20' removable 5-strand barbed wire panel allowing a 36' ROW opening for crane travel set back from the public road, and located to support radii installation and turbine delivery.
g. At project completion the entrance shall be prepared for final construction. The swing gate will be relocated to the existing fence line and a new 5-strand barbed wire fence shall be installed to connect the corner post of the swing gate and "H" frames.
h. Subcontractor acknowledges that certain fence lines along the road will need to be relocated to allow for radius installation and component delivery. Subcontractor shall install new fence as needed to maintain property boundaries, install gate as needed to facilitate construction, return fence to original location following radii removal, and install permanent gate in final location as designated in design documents or in accordance with local standards.

**2.10. Fence Line Gate with a Swing Gate & Removable**
a. Where roads and crane travel paths cross existing fence lines a 40' wide access will be cut in the existing line fence.
b. Within fence openings one (1) 16' lockable swing gate and one (1) 20' removable 5-strand barbed wire panel will be installed along the fence line. A removable center post shall be installed to provide means of locking the swing gage and removable panel together and allowing access. The center post shall be set into a sleeve embedded in concrete.
c. Subcontractor shall install 16' lockable swing gate and removable panel on all access road entrances.

**2.11. Erosion and Sedimentation Control**
a. Erosion and sedimentation control, both during & after construction, shall be provided as required to retain sediment onsite & to control erosion of embankments, temporary & final exposed slopes & temporary stockpiles in conformance with the Contract Documents and permit. Subcontractor acknowledges that the Project area is sensitive to rain events and that erosion and drainage control is of the highest importance.
b. Subcontractor shall supply, install & maintain erosion & sedimentation controls per the SWPPP & NPDES design and permit, and shall be subject to weekly QC inspections of the installations by Mortenson. Inspections should be performed by Subcontractor  Maintenance of sediment controls shall include the controls "installed by others" as part of the owner's decommissioning scope. Subcontractor acknowledges that any noted deficiency or failure of these installations shall be corrected within 24 hours of written notice, or sooner if a rain event is eminent, and that failure to

correct will lead to potential fines or back charges. Mortenson shall have the right to perform corrections, or have corrections performed, if such corrections are not made within 24 hours of notice, at the expense of the Subcontractor.

c. Excess sediment behind silt fences will be removed and properly disposed when sediments reach 1/3 height of the structure, tracked sediments shall be removed from paved surfaces at the end of each day and construction entrances shall be maintained daily.

d. If construction activities are discontinued in areas of soil disturbance before final grading is complete, temporary grading shall be seeded and mulched. The areas shall be seeded with an appropriate perennial grass seed mix and shall be mulched with hay, straw, or other appropriate BMP within 7 days of the time it was temporarily discontinued. Mulch shall be maintained until a suitable vegetative cover is established.

e. Subcontractor shall provide additional periodic inspections and upkeep of erosion measures. Periodic can be defined as two inspections per every seven calendar days or after ½" rainfall in a 24 hour period is accumulated on the Mortenson rain gauges located at the office complex. Subcontractor shall report findings and an appropriate action plan to correct deficiencies to Mortenson within 24 hours of event.

f. Subcontractor shall maintain erosion control measures until the site has undergone final stabilization. Final stabilization shall be considered as when all soil disturbing activities have been completed and a uniform perennial vegetation cover has been applied and accepted by Mortenson. This maintenance program may extend into the next growing season.

g. All remaining temporary BMP's and accumulated sediments from silt fences shall be removed in accordance with the SWPPP.

h. Should any conflict arise between this Scope of Work and the SWPPP or NPDES Documents then the more stringent requirement shall govern.

**2.12. Dust Control/Road Cleaning**

a. Subcontractor shall provide the Project with full-time dust control operations. Nuisance dust will not be tolerated and must be mitigated during work activities and working hours.

b. Subcontractor shall be responsible for providing adequate quantity of water truck(s) to mitigate nuisance dust in a timely manner.

c. Subcontractor shall be responsible for locating and securing an approved and adequate water supply and all costs associated with the water supply. If a surge or storage tank is located onsite during construction, any permits and regulatory compliance shall be the responsibility of the Subcontractor.

d. Subcontractor shall place a chemical dust suppression agent in areas deemed extremely sensitive to nuisance dust. Subcontractor shall notify County and Mortenson 48 hours in advance when and where chemical application will be applied.

  i. Subcontractor shall place 1,000 lf of CaCl (28-32%) or Lignin in front of residential areas,

  ii. Subcontractor shall place 100 lf each way of CaCl (28-32%) or Lignin at road intersections

  iii. Chemical Applications are subject to local government approval.

e. Subcontractor shall respond to localized requests within thirty (30) minutes of notification of request.

f. Dust Control shall be provided by Subcontractor from the time the first piece of Subcontractor equipment arrives to site through completion of substantial completion punch list items.

   g. Subcontractor shall supply a skid steer(s) or equivalent piece of equipment(s) with bucket, brush and scraper attachments to address tracking on the local roads. This equipment(s) shall be available from the time the first piece of Subcontractor equipment arrives to site through completion of substantial completion punch list items.

**2.13. Construction Water**
   a. Subcontractor to provide and pay for all construction water necessary for completing the work of this agreement as well as supply of water to Mortenson for pressure washers and water storage vessels. Water supply is assumed to be supplied by the same water truck that is used for dust control operations.
   b. No water withdrawals from streams or protected water reservoirs with respect to construction associated with the Project will be allowed. This includes water sources that may be on private land near the project site.

**2.14. Project Maintenance**
   a. Subcontractor shall be responsible for maintaining or cleaning project access roads, project office laydown yard and public roads within the project limits of construction for the entire project duration.
   b. Road maintenance shall include periodic blading to prevent potholes, ruts and washboard and the placement of additional aggregate as required to maintain road surface and crown. At no time will absence of a road crown be tolerated.
   c. The subcontractor will be required to keep full time blade(s) onsite for road maintenance and crowning, as well as provide rolling and compaction equipment as necessary to maintain public and access roads.

**2.15. MET Towers**
   a. Subcontractor shall install a MET tower roads the same as Access roads per design documents.
      i. MET tower roads will be 12' wide with minimal to no shoulders.
      ii. Aggregate base per design documents.
      iii. Prepare and compact the sub-grade as required by the contract documents.
      iv. Reseed the LOD & maintain the erosion control measures during the project duration.
   b. Subcontractor shall clear & grub a 100' radius around the center of the Met Tower to a slope of no more than 5%.
      i. All cleared & grubbed debris shall be pushed to the edges of the cleared area.
      ii. Bumps shall be leveled & holes filled to accommodate construction equipment travel.
   c. Subcontractor to provide excavation and backfill per Met Tower Design Documents.
   d. After Met tower construction, the area shall be restored in the same manner as turbine areas.
   e. Contract to provide fencing and met tower pad per design documents and specs

**2.16. Substation Pad Preparation and Entrance**

    a.   Subcontractor agrees to perform work at existing substation to correct drainage issues. This work shall be in compliance with the design documents.

### 2.17. Foundation Excavation and Backfill

a. Subcontractor shall strip & stockpile topsoil for later use in restoration work. Stockpiled topsoil shall be stabilized in conformance with the project Storm Water Pollution Prevention Plan (SWPPP) for use at the end of the project for restoration.

b. Subcontractor shall excavate & backfill foundations in accordance with the design documents.

c. Subcontractor shall excavate the foundation with a 4' extension on each side of the foundation.

d. Subcontractor shall provide an excavation bottom that is level within 1/10' from side to side and within 1/10 from front to back.

e. Subcontractor shall bench or slope excavation back to OSHA standards.

f. Subcontractor shall excavate two (2) pedestrian ramps 10' wide down to the bottom of the excavation.

g. Ramps shall have 30% maximum grade to allow for safe entry and exit for personnel.

h. Excavated material shall be neatly stockpiled separately from topsoil on only two sides of the foundation excavation at least 10' back from the edge of the excavation. Subcontractor shall be responsible to protect the stockpiled materials from excessive moisture. Subcontractor to provide and install barricade around excavation to allow for visual delineation of the open excavation. Excavation has warning barrier rope 6' away from the perimeter including ramps. Rope is held by T-posts with flags delineated and adhered every 6'.

i. Subcontractor shall dig 2 sump pits in the corners of the excavation to allow for dewatering.

j. Subcontractor shall excavate cut-off trenches around the perimeter of the foundation bottoms sloped to each sump to handle potential groundwater infiltration.

k. Stockpiled material shall not impede or restrict access to the foundation for concrete operations.

l. Backfill materials & compaction shall comply with design documents.

m. Subcontractor acknowledges that electrical conduits, vaults, grounding cables and rods, and electrical equipment are located in areas within their backfill operations. Subcontractor shall protect these items during backfill operations.

n. Subcontractor shall stop work and notify Mortenson supervision immediately if unsuitable material is encountered during foundation excavation. If it is determined that the unsuitable material must be removed, subcontractor will submit an estimate or work authorization prior to proceeding.

o. Backfill shall be graded away from the turbine to create adequate slope away from the turbine as detailed in design documents. Mortenson and subcontractor shall review each location prior to excavation to determine anticipated post foundation installation issues and any required adjustments necessary to support proper drainage at completion.

p. Topsoil shall be re-spread over the backfill material & blend to the existing grade.

q. Subcontractor shall use redundant off sets prior to removing center pin, and shall not remove this pin until an independent, third party, licensed surveyor, provided by subcontractor has verified that the pin is in the proper location. Subcontractor shall place intial center pin, establish offsets, and reestablish center pin after excavation is complete.

## 2.18. Dewatering

a. Subcontractor shall dewater each foundation as required to support foundation construction. Subcontractor is responsible for dewatering from the beginning of excavation through backfill.

## 2.19. Wetland Crossing

a. Subcontractor shall supply and install culverts at the wetland crossings per the design drawings. This shall include permanent and temporary installations.

## 2.20 Concrete Operations

a. Subcontractor shall construct concrete wash out pit at each foundation excavation, and dispose of waste material in excavation sump pit. Concrete must be processed in a way that complies with Construction Documents.

## 2.21. Turbine Erection Areas

a. Subcontractor shall clear, grub and provide all necessary grading for a 175' radius around the turbine inclusive of cut and fill necessary to achieve no more than a 5% grade across the area. Actual limits of clearing and required slopes will be as per the Contract Documents and coordination with Mortenson superintendents for component locations.
   i. All cleared & grubbed debris shall be pushed to the edges of the cleared area.
   ii. Bumps shall be leveled & holes filled to accommodate equipment travel.
   iii. Cleared area shall be maintained, compacted and provide positive drainage at all times to facilitate turnaround area for turbine delivery components through the duration of the project.
b. Topsoil shall be stripped & stockpiled prior to any cut/fill operation and re-spread around the erection area upon completion. Subcontractor agrees to coordinate with Mortenson superintendent on topsoil pile placement to avoid conflicts with other trades i.e. electrical collection, turbine offload, etc.
   i. De-compaction & restoration will be required at all erection areas.
c. Subcontractor acknowledges that turbine elevation is extremely sensitive for the Project and that this may cause the need for additional cut and fill at turbine locations to ensure tower heights do not exceed elevation limits.

## 2.22. Earthen Crane Hardstands

a. Subcontractor shall construct in conformance with the contract documents detailed in design documents and but not limited to the following:
   i. Subcontractor to construct all crane pads 60' x 80' built with earthen material. Subcontractor shall ensure proper sloping beyond this pad area to ensure no shifting or tilting of mats.
   ii. Crane Pads must be level within 1% from side to side & within 1% of level front to back.

  iii. Subcontractor to maintain crane pads for the duration of the erection schedule.

  iv. Crane pads will be tested to meet compaction requirements, and reworked as necessary shall tests reveal failing results.

 b. Topsoil shall be stripped & stockpiled prior to any cut/fill operation & re-spread around the crane pad and turbine upon completion.

 c. Crane pad locations shall be coordinated with Mortenson on-site personnel with respect to roadways and turbine locations.

 d. Any excavations that occur within crane pad area must be properly backfilled & compacted to meet load bearing & compaction requirements. Note that in some locations crane pad compaction will have a more stringent requirement than structural backfill.

 e. Crane pads shall be smooth drum rolled. No sheep's foot compaction will be allowed unless required to meet compaction, and then finished with a smooth drum roller to ensure no pockets are present.

**2.23.  Crushed Stone Around Turbines**

 a. Place a standard 6" thick x 15' wide compacted aggregate ring around each turbine pedestal and place additional material near the spur road in such a manner that a pickup truck can execute a 3-point turn without leaving the graveled surface. The aggregate base shall meet the specification described in the design documents.

**2.24.  Crane Travel Paths and Road Crossings**

 a. Subcontractor shall install culverts & fill drainage ditches as required for temporary crane path drainage ditch crossings

 b. Upon completion of the use of the road crossings they shall be removed, cleaned of debris, re-spread top soil & reseeded.

 c. Subcontractor shall clear and grub crane travel path LOD to a width of 36' and compact insitu soils. Unit price provided if 80' width is required.

 d. Compacted crane paths shall be de-compacted after the erection cranes finish traveling the compacted routes.

 e. Upon completion of the use of travel path the area shall be cleaned of debris and reseeded with native grasses.

 f. Removal of erection debris is not the responsibility of the Subcontractor.

 g. Subcontractor to notify Mortenson of identified areas of local failure within the crane path route.

**2.26.  Public Road Improvements**

 a. Subcontractor included all cost for public road maintenance and dust control for the entire duration of the project.

  I. Subcontractor shall comply with County requirements as it relates to maintenance and dust control on County roads.

 b. Subcontractor shall install public road radii upgrade to facilitate turbine delivery on-site per County requirements and design documents.

**2.27.  Demobilization**

 a. Subcontractor shall include all necessary hauling permits, packing, transportation, and removal of all required equipment, personnel, and support services needed to successfully execute the scope of work.

The following is not the responsibility of The Subcontractor and is excluded from the Agreement:

None

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit A as set forth above.

Don Borneke Construction, Inc
Subcontractor

By _____*Mark Sikel*_____

M. A. MORTENSON COMPANY

By _____
          Andy Black

Its ___Project Manager___

Its _____Project Manager___

Mendota Hills Repowering
Lee County, Illinois
MORTENSON PROJECT NO. 18141002

## Exhibit B – Purchase Price

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of December 29th, 2017.

The Subcontract Price is Three Million Two Hundred Thirteen Thousand and Seventy Seven ($3,213,077) subject to adjustment only as provided in the Agreement.

Bonds

The execution of this contract is contingent upon the approval of the supplier through Mortenson's Pre-Qualification process, supported by Textura.

Sales and Use Tax

The Subcontract Price excludes the cost for all State Sales and Use Tax for the Work provided under this Agreement as required in the state of the location of the Project. Subcontractor to complete Building Material Exemption Certificate to comply with state legislature.


MJS
7/12/18

| Project Office Complex Area | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Project Office Complex Area (6" of 3" Minus & 2" of CA6 Aggregate Base) | 7 | ACRE | $ 50,000 | $ 350,000 | |
| SUBTOTAL | | | | $ 350,000 | |
| Applicable Taxes | | | 6.25% | Exempt | |
| TOTAL | | | | $ 350,000 | |
| Comments | | | | | |

| Existing Project Removal | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Mobilization | 1 | LS | $ 50,000 | $ 50,000 | |
| Removal & Haul off of Existing Access Roads | 34,650 | LF | $ 4.50 | $ 155,925 | Suitable material can be reused for access roads |
| Removal & Haul of Existing Crane Pad and Foundations Only | 63 | EA | $ 2,000 | $ 126,000 | Includes crane pad removal adjacent to |
| Removal and Haul off of Existing Substation Foundations | | LS | $ 30,000 | $ - | By Others |
| Restoration of WTG Foundation and Erection Area | | LS | $ 126,000 | $ - | By Others |
| Restoration of Removed Access Road Areas | 1 | LS | $ 40,000 | $ 40,000 | Match surrounding grade and restore to |
| SUBTOTAL | | | | $ 371,925 | |
| Applicable Taxes | | | 6.25% | Exempt | |
| TOTAL | | | | $ 371,925 | |
| Comments | | | | | |

No import included MJS 7/12/18

| Public Road Improvements | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Asphalt Road Improvements (3" Asphalt Overlay w/ 3' Agg. Shoulders) | - | LF | $ - | $ - | Work to be performed on T&M |
| Gravel Road Improvements (2" Aggregate Base x 18' Road w/ 3' Agg. Shoulders) | - | LF | $ - | $ - | Work to be performed on T&M |
| SUBTOTAL | | | | $ - | |
| Applicable Taxes | | | 6.25% | Exempt | |
| TOTAL | | | | $ - | |
| Comments | | | | | |

1

**Roads**

| Roads | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Mobilization | 1 | LS | $ 150,000 | $ 150,000 | |
| Demobilization | 1 | LS | $ 50,000 | $ 50,000 | |
| Civil Surveying | 1 | LS | $ 40,000 | $ 40,000 | |
| Two (2) Year Warranty | 1 | LS | $ 35,000 | $ 35,000 | |
| Total Bradbrick 16' Gravel Undressed 2" CA6 grade w/geotex-compacted soil | 13,910 | LF | $ 13.85 | $ 377,343 | |
| Refurbish Turbine String Roads - For Construction | 18,207 | LF | $ - | $ - | Included in Maintenance Number |
| Refurbish Turbine String Roads - Post Construction | 18,207 | LF | $ 2.00 | $ 36,414 | 2" Aggregate Cap on existing roads |
| Turbine Spur Roads (5' CA6 x 16' Road no Shoulders) | 2,320 | LF | $ 18.75 | $ 43,500 | |
| Entrances of 15' r'sted, corrugated metal Culvert w/ Temp Radius | 17 | EA | $ 10,000 | $ 170,000 | 165' radii only -6" nofabric |
| Existing Entrances | 11 | EA | $ 7,500 | $ 82,500 | 165' radii only -6" nofabric |
| Low Water Crossings - Rip Rap on fabric w/ 6" Aggregate Cap | 4 | EA | $ 5,000 | $ 20,000 | Borneke to coordinate selection of LWC vs Culvert with Mortenson |
| Crane Travel Path | 41,750 | LF | $ 2.00 | $ 83,500 | |
| Crane Travel Path Ditch Crossing (1 EA = 1 Ditch) | 30 | EA | $ 2,500 | $ 75,000 | |
| Crane Travel Path Road Crossing (1' Sand Bedding) | 1 | EA | $ 5,000 | $ 5,000 | |
| Erosion & Sedimentation Control | 1 | LS | $ 50,000 | $ 50,000 | |
| Restoration and Reseeding | 1 | LS | $ 75,000 | $ 75,000 | |
| Dust Control - Water Trucks | 100 | DAYS | $ 1,250 | $ 125,000 | 1 water truck |
| Dust Control - Chemical Applications | 1 | LS | $ 20,000 | $ 20,000 | |
| Full Time Safety Professional | 1 | LS | NA | NA | NA |
| Project Maintenance | 1 | LS | $ 250,000 | $ 250,000 | Number includes turbine area area maintenance |
| SUBTOTAL | | | | $ 1,588,263 | |
| Applicable Taxes | | | 6.25% | $ | |
| TOTAL | | | | $ 1,588,263 | |
| Comments | | | | | |

**Crane Pads and Erection Areas**

| Crane Pads and Erection Areas | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Turbine Erection Areas | 23 | EA | $ 2,500 | $ 72,500 | |
| Earthen Crane Hardstands - 60' x 80' | 23 | EA | $ 2,500 | $ 72,500 | |
| Crushed Stone Around Turbine - 19' Wide, 6" Thick | 23 | EA | $ 1,750 | $ 50,750 | Recycled CA6 |
| SUBTOTAL | | | | $ 135,750 | |
| Applicable Taxes | | | 6.25% | Except | |
| TOTAL | | | | $ 135,750 | |
| Comments | | | | | |

**Foundation Excavation & Backfill**

| Foundation Excavation & Backfill | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Foundation Excavation & Backfill - 63.5' Octagon, 9' Deep | 23 | EA | $ 3,000 | $ 261,000 | |
| Foundation Subcut & Soil Correction - 2' Over Ex | - | EA | $ 22,000 | Unit Price | |
| Foundation Dewatering | 23 | EA | $ 2,500 | $ 72,500 | |
| SUBTOTAL | | | | $ 333,500 | |
| Applicable Taxes | | | 6.25% | Except | |
| TOTAL | | | | $ 333,500 | |
| Comments | | | | | |

**Concrete Batch Plant Area**

| Concrete Batch Plant Area | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Concrete Batch Plant Area (5' of 3" minus & 2" of CA6 Aggregate Base) | 2 | ACRE | $ 53,000 | Stationary | |
| SUBTOTAL | | | | $ | |
| Applicable Taxes | | | 6.25% | Except | |
| TOTAL | | | | | |
| Comments | | | | | |

**Substation**

| Substation | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Substation Drainage Corrections | 1 | ACRE | $ 13,500 | $ 13,500 | Per 90% Civil Drawings |
| SUBTOTAL | | | | 13,500 | |
| Applicable Taxes | | | 6.25% | Except | |
| TOTAL | | | | 13,500 | |
| Comments | | | | | |

**MET Tower Site Preparation**

| MET Tower Site Preparation | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Met Tower Roads (Per Drawings) | 500 | LF | $ 21.50 | $ 10,750 | |
| Met Tower Site Preparation | 1 | EA | $ 1,500 | $ 1,500 | |
| Met Tower Excavation and Backfill | 1 | EA | $ 4,320 | $ 4,320 | |
| Met Tower Aggregate Base | 1 | EA | $ 1,385 | $ 1,385 | |
| Met Tower Fencing | 1 | EA | $ 5,384 | $ 5,384 | |
| | | | | $ | |
| SUBTOTAL | | | | $ 23,339 | |
| Applicable Taxes | | | 6.25% | Except | |
| TOTAL | | | | $ 23,339 | |
| Comments | | | | | |

**Misc**

| Misc | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Concrete Washout Pits | Included | | | Included | Use washout pits also as trap loss in gray during backfill |
| Public Intersection Improvements | 11 | | $ 24,200 | $ 266,200 | Assumes Coal for Wisdom to add access roads during backfill |
| Applicable Taxes | | | | 266,200 | |
| TOTAL | | | | $ 266,200 | |
| Comments | | | | | |

## Unit Price Provisions

Unit prices stated herein shall be applicable and available at Mortenson's sole discretion until the date of final payment or until such later date as provided in the Contract Documents. Except as otherwise described in the Contract Documents, unit prices shall include all miscellaneous and incidental material, labor, equipment, compensation, delivery, general conditions, benefits, overhead, profit, bonds, permits, shop drawings, small tools and taxes.

2

## Alternates

| Unit Prices | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Fence modifications at public road radius improvements | - | EA | $ 3,000 | $ | Includes relocating fences to allow for radius installation, temporary gate, fence relocation and final gate at completion |
| Draintile Repair - 4" (Up To 20' Repair) | - | EA | $ 535 | $ | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 6" (Up To 20' Repair) | - | EA | $ 535 | $ | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 8" (Up To 20' Repair) | - | EA | $ 577 | $ | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 10" (Up To 20' Repair) | - | EA | $ 655 | $ | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 12" (Up To 20' Repair) | - | EA | $ 728 | $ | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 4" (Over 20') | - | EA | $3.61' premium from under 20' | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 6" (Over 20') | - | EA | $10.25' premium from under 20' | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 8" (Over 20') | - | EA | $11.97' premium from under 20' | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 10" (Over 20') | - | EA | $14.00' premium from under 20' | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 12" (Over 20') | - | EA | $16.00' premium from under 20' | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 4" (Up To 20' Repair) | - | EA | $ 4,464 | $ | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 6" (Up To 20' Repair) | - | EA | $ 4,464 | $ | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 8" (Up To 20' Repair) | - | EA | $ 4,585 | $ | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 10" (Up To 20' Repair) | - | EA | $ 4,714 | $ | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 12" (Up To 20' Repair) | - | EA | $ 4,839 | $ | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 4" (Over 20') | - | EA | $3.61' premium from under 20' | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 6" (Over 20') | - | EA | $10.25' premium from under 20' | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 8" (Over 20') | - | EA | $11.97' premium from under 20' | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 10" (Over 20') | - | EA | $14.00' premium from under 20' | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 12" (Over 20') | - | EA | $16.00' premium from under 20' | | AIMA drain tile repair, foundation drain tile repair |
| Crane Travel Path - 60' Width | - | EA | $44' | | Includes clearing, cut and fill for full 60' corridor |

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit B as set forth above.

Don Borneke Construction, Inc
Subcontractor

M. A. MORTENSON COMPANY

By _____*Mark Sikel*_____

By _____
       Andy Black

Its _____Project Manager_____

Its _____Project Manager_____

3

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## **Exhibit D - Contract Documents List**

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of this 29th day of December, 2017.

The Contract Documents includes but not limited to the following:

**Exhibits not limited to list below included in the BOP Agreement:**

| Civil | | | | |
|---|---|---|---|---|
| **Drawing/ Spec No.** | **Rev. No.** | **Title** | **Drawing Date** | **Comment** |
| | REV 1 | GAMESA, "REQUIREMENTS DOCUMENT WFL_LEEWARD-ENERGY-MENDOTA-HILLS". DOCUMENT CODE GD323608-EN | 09/13/17 | DESIGN REQUIREMENTS |
| | REV 1 | BARR ENGINEERING COMPANY, "GEOTECHINCAL REPORT, MENDOTA HILLS REPOWER PROJECT, LEE COUNTY, ILLINOIS, JANUARY 2017" | JAN 2017 | PRELIMINARY GEOTECH REPORT |
| Exhibit C-1 | | Schedule Mendota Hills Re-Power Schedule – 11-1-17 | | |
| | | Mortenson's Zero Injury Safety Program | | |
| Exhibit M | | Mortenson Wind Turbine Agreement WRW | 3/7/17 | |
| | | Mortenson Wind Turbine Agreement – Illinois Addendum | 3/7/17 | |
| Exhibit L | | Attachment 2 - New Project_AIMA 90816 Final | | |
| Exhibit L | | Attachment 3 Road Agreement_County FINAL_Redacted | | |
| | | Exhibit E-2 Meterological Tower Specifications | | |
| Exhibit A | | Scope of Work - BOP Agreement | | |
| | | | | |
| | | | | |
| | | | | |

Exhibit D Attachment I Civil Specifications
Exhibit F – Applicable Standards
Exhibit FF – Owner Furnished Equipment
Exhibit G – Project Site Description and Real Property Rights
Exhibit K – Contractor Provided Training
Exhibit L – Attachment 4 Interconnection Agreement Form
      -Attachment 5 Lee County SUP
Exhibit NN Geotechnical Studies Report
2018-05-25 Mendota Hills 90% Civil Plans
Exhibit E-2 Attachment 6 Met Tower Specifications
Mendota Hills Preliminary Foundation Design

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit D as set forth above.

 Don Borneke Construction, Inc.
Subcontractor

M. A. MORTENSON COMPANY

By ____*Mark Sikel*_____

By _____
              Andy Black

Its ____Project Manager_____

Its ____Project Manager_____

Supplier Exhibit D – Contract Documents List
10-28-04

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## Exhibit E – Safety Program Requirements

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of this 29th day of December, 2017.

At Subcontractor's cost, Subcontractor shall have a safety program for the Work that includes the safety requirements contained in the below published safety programs, all of which are incorporated herein by reference:

- Mortenson Zero Injury Training Program Manual (hereinafter the "Zero Injury Manual")
- Mortenson Mobile Crane Training Manual
- Mortenson Forklift Training Program Manual
- Mortenson Disruption Avoidance Training Manual

Subcontractor agrees to perform the safety obligations in the above referenced manuals and agrees to perform such obligations with respect to its Work in the same manner that the manual references safety steps to be taken by, or the safety obligations of, Mortenson. In addition, Subcontractor agrees to abide by any additional safety programs at the Project which are made available to Subcontractor. Subcontractor agrees that is shall obligate its subcontractors and suppliers to adhere to the requirements of Article 11 of the Subcontract Agreement Standard Terms and Conditions and this Exhibit E.

# I. Requirements On All Mortenson Projects

### A. Zero Injury Manual

To the extent the Zero Injury Manual imposes requirements and policies applicable to Mortenson employees, then Subcontractor agrees to require its employees to adhere the same requirements of such policies. Subcontractor's attention is drawn to the below listed requirements detailed in the Zero Injury Manual. Identification by Mortenson of these requirements shall in no way diminish or otherwise limit application of the above listed manuals to Subcontractor's Work or Article 1.3 of the Subcontract Agreement Standard Terms and Conditions.

- Subcontractor shall provide a written site-specific safety program related to the Work, as detailed in Section 1 of the Zero Injury Manual, before the start of Work which shall address each item contained in Section 1 of the Zero Injury Manual.

- Subcontractor shall provide a written job hazard analysis ("JHA"), as detailed in Section 12 of the Zero Injury Manual, for each portion of the Work.

- Subcontractor shall adhere to the Hazard Communication program at the Project, the requirements for which are detailed in Section 25 of the Zero Injury Manual.

- Subcontractor shall complete daily written pre-task plans for each item of Work, or more frequently as conditions at the Project change or require. The pre-task planning process is detailed in Section 12 of the Zero Injury Manual.

1

- Subcontractor shall ensure its employees adhere to the hand protection requirements detailed in Section 27B of the Zero Injury Manual while performing work at the Project.

- Subcontractor shall promptly conduct post-accident investigations for any accidents that occur during completion of the Work and investigations of near-miss incidents related to the Work. In this provision, an accident is any incident that results in any injury to an employee of Subcontractor or any property damage caused by actions performed during completion of the Work. A near-miss is any incident that has all the attributes of an accident but, by mere chance, injury to a Subcontractor employee or property damage was avoided. Subcontractor's investigations shall be consistent with the requirements of Section 4 of the Zero Injury Manual.

- All Subcontractor employees are required to wear eye protection, a high-visibility vest, long pants, a sturdy working boot and a hard hat at all times while at the Project. Section 27A and 27B of the Zero Injury Manual addresses additional requirements for Subcontractor's employees regarding personal protective equipment.

- Subcontractor acknowledges the requirement for positive fall restraint and fall protection for all fall hazards over six feet. Subcontractor acknowledges the requirement for positive fall restraint for its personnel in aerial lifts. Further details on fall protection that govern the Work are contained in Sections 10 and 11 of the Zero Injury Manual.

**B. Subcontractor On-Site Safety Professionals**

- Subcontractor shall provide on-site safety professionals at the Project if required pursuant to Section 3 of the Zero Injury Manual.

- Unless a more stringent requirement for use of an on-site safety professional is listed below in Section II (if applicable), Section 3 of the Zero Injury Manual requires that if Subcontractor, at any time, has 50 craft workers or more on the project site (including the craft workers of any of its subcontractors and suppliers of any tier), then Subcontractor must have a project-specific safety professional on site part-time when the workforce is below 50 craft workers and full-time when the workforce reaches or exceeds 50 workers. Additional Subcontractor safety personnel are also required on a proportional basis if the number of craft workers reaches or exceeds 60 craft workers.

- Refer to Section 3 of the Zero Injury Manual for additional details.

**C. Return to Work/Injury Case Management Plan**

- Subcontractor shall submit to Mortenson a written site-specific return to work/injury case management plan which shall detail Subcontractor's goals and policies on returning employees to work following an injury. Subcontractor's policy may include offering light duty or transitional work following an injury (if such work or duty is possible given the nature of the injury). Mortenson may object to the plan if, in its reasonable opinion, the plan does not establish reasonable actions or goals on returning employees to work or light duty following an injury. Submission of the plan to Mortenson by Subcontractor shall not be deemed to be agreement or assent by Mortenson to any portion or part of the plan.

2

D.  **Written Silica Protection Policy**

- Subcontractor shall implement a silica protection plan for the Work which shall meet or exceed all laws and regulations (including applicable OSHA regulations) related to the protection of its employees against exposure to silica levels in excess of levels permitted by laws and regulations (including applicable OSHA regulations).

E.  **Substance Abuse Screening**

- Definitions.  In this Section E:

  - Drug means: A controlled substance, as defined in Schedules I through V of Section 202 of the Controlled Substances Act, 21 U.S.C. § 812, including cocaine, opiates, marijuana, amphetamines, phencyclidine (PCP), barbiturates, benzodiazepines, propoxyphene, methadone and methaqualone.

  - Intoxicating substance means: Drug(s) or alcohol or any substance, the use of which, impairs work behavior or performance of work obligations at the Project in a manner to be unsafe.

  - Under the influence of alcohol or an intoxicating substance means: (1) the presence of alcohol in the individual's system that equals or exceeds a blood alcohol content of .04 percent; (2) the presence of any drug in the individual's system; or (3) the presence of an intoxicating substance in the individual's system.

  - Accident means: An incident at the Project that involves: 1) personal injury which necessitates treatment by a medical professional or that is reasonably expected to result in lost work time; or 2) damage to property at the Project.

  - Reasonably significant near miss means: An incident that has all the attributes of an accident but, by mere chance, significant injury or death did not occur or significant property damage was avoided.

  - Reasonable cause means: A basis for forming a belief based on specific facts and rational inferences drawn from those facts that lead a Subcontractor supervisor or manager, or a Mortenson employee, to reasonably suspect that a Subcontractor employee is under the influence of drugs, alcohol or an intoxicating substance while at the Project or while performing the Work.  Such specific facts or rational inferences may be drawn from an employee's behavior, performance, appearance, speech, or bodily odors while at the Project or while performing the Work.

- Drug and alcohol-free workplace.  In order to achieve a drug- and alcohol-free workplace, Subcontractor's employees shall not perform the Work or be present at the Project-site while under the influence of drugs, alcohol or an intoxicating substance. Subcontractor's employees shall not bring to the Project any drugs or alcohol.

3

- <u>Pre-Placement at Project.</u>  By assigning employees to work at the Project, Subcontractor represents that it has conducted substance abuse screening of such employees to screen for the presence of drugs or alcohol.

- <u>Post-Accident Testing.</u>  Subcontractor shall immediately (or as soon as reasonably practicable) perform a drug and alcohol screen on all of its employees who caused or contributed to an accident or a reasonably significant near-miss at the Project.

- <u>Reasonable Suspicion Testing.</u>  Subcontractor shall perform drug and alcohol screening on its employees upon reasonable cause.

- Subcontractor shall not permit any Subcontractor employee that tests positive following any of the above screening procedures to perform any portion of the Work or be present at the Project at any time through final completion of the Project.

- If the Project institutes a Project specific drug and alcohol screening plan, Mortenson shall inform Subcontractor of the project specific screening plan and Subcontractor agrees to follow such project specific screening plan.

## F.  <u>Training</u>

- Subcontractor agrees that each of its employees at the Project or completing the Work shall attend three orientation training sessions provided by Mortenson (Orientation 1 [also known as first-day, first-hour which shall be completed before performing any work at the Project], Orientation 2 and Orientation 3).  Orientation 2 and Orientation 3 shall be completed as soon as reasonably practicable after Orientation 1 and as detailed in the Zero Injury Manual.

- Additionally, Subcontractor agrees that all its superintendents, foremen and Project supervisors, including members of its leadership that are overseeing any part of the Work, shall attend Mortenson's "Committed At The Top Zero Injury Program" training sessions.

- Subcontractor shall conduct daily safety meetings or daily toolbox safety talks at the Project for all Subcontractor's employees at the Project to discuss safely performing any specific items of Work anticipated during the day of the meeting and reminding employees to perform all Work in a safe manner.

## G.  <u>Safety Teams</u>

- Subcontractor acknowledges that a project safety committee will be created at the Project.  Subcontractor's highest-level employee who regularly works at the Project-site shall be a member of the committee and attend committee meetings.

## H.  <u>Safety Audits</u>

- Subcontractor shall conduct daily safety inspections and audits to determine if the Work is being performed in a safe manner and document, in writing, the results of such inspections and audits.

### I. **Stretch-and-Bend**

- Subcontractor agrees and acknowledges that each of its employees at the Project (regardless as to position) shall participate in the daily Mortenson-led morning stretching program at the time established by Mortenson.

### J. **Housekeeping**

- Subcontractor shall create and submit to Mortenson a housekeeping management plan that addresses adequate and sufficient daily clean-up, material storage and electrical cord management.

### K. **Use of Equipment**

- Subcontractor shall permit only those of its employees qualified by training or experience to operate equipment and machinery. Subcontractor must train each of its affected employees in the manner required by applicable law and regulation.

## II. Additional Project Requirements

- Notwithstanding Section I(B) above, if Subcontractor, at any time, has **25** craft workers or more on the project site (including the craft workers of any of its subcontractors and suppliers of any tier), then Subcontractor must have a project-specific safety professional on site full-time. When the workforce exceeds **25** craft workers additional safety personnel are required on a proportional basis (25:1) ratio of craft to safety professionals. The subcontractor safety professional must coordinate the subcontractor's safety activities with Mortenson to ensure that the collective safety management resources are coordinated and utilized to the greatest extent for the benefit of the entire project. All other provisions of Section 3 of the Zero Injury Manual shall remain applicable.

  - The list below details the requirements on the number of onsite safety professionals needed based on the number of subcontractor's craft workers (including the craft workers of any of the subcontractor's subcontractors and suppliers, of any tier.

| Number of Workers Present | Subcontractor Safety Professional On site Presence |
|---|---|
| 1-9 | Equivalent of one work shift during the work week. |
| 10-24 | Equivalent of two work shifts during the work week. |
| 25-49 | One subcontractor Safety Professional On site full time. |

| 50-74 | Two subcontractor Safety Professionals On site full time. |
| 75-99 | Three subcontractor Safety Professional On site full time. |
| 100 or more workers | Four subcontractor Safety Professionals on site full time plus any additional safety supervision as agreed upon between Mortenson and Subcontractor. |

Mortenson may adjust the ratio in a more demanding manner as deemed necessary by Mortenson to adequately mitigate risks.

- Random Drug and Alcohol Testing.  If permitted by the law of the location of the Project and in compliance with such law, Subcontractor shall subject its employees at the Project to unannounced drug and alcohol screening on a random selection basis.  Such random testing shall be performed at intervals selected by Subcontractor to ensure that its employees are not using drugs or under the influence of alcohol or an intoxicating substance while at the Project or while performing the Work.  Random selection basis means a mechanism for selection of employees that: 1) results in an equal probability that any employee at the Project will be selected, and 2) does not give Subcontractor discretion to waive the selection of any Subcontractor employee selected under the mechanism.

- Safety Incentive Program.  Subcontractor shall create a written recognition and reward program which shall encourage reporting of safety issues and near misses. The program shall not be implemented in a manner to discourage any Subcontractor employee from reporting any injury.

- Infection Control Requirements.  If requested by Mortenson, Subcontractor shall adhere to the infection control procedures established for the Project by Mortenson or Owner as detailed in writing to the Subcontractor prior to the start of Work.

- Safety Toe Boots.  Subcontractor shall require employees to wear lace up, safety-toe boots that extend above the ankle.

- Reports.  Upon the start of each work week no later than 9 am, subcontractor shall submit a weekly report of all hazard recognitions, near misses, first aides, injuries, unplanned disruptions, environmental incidents, total craft workers on site including the craft workers of any of the subcontractor's subcontractors and suppliers, of any tier and total hours worked from the previous week to Mortenson.  On the 1st working day of each month no later than 9 am subcontractors shall submit a monthly report with the total hazard recognitions, near misses, first aides, injuries, unplanned disruptions, environmental incidents, total craft workers on site including the craft workers of any of the subcontractor's subcontractors and suppliers, of any tier and total hours worked from the previous month to Mortenson.

Exhibit E – Safety Program Requirements
6/21/2011

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit E as set forth above.

Don Borneke Construction, Inc.
Subcontractor                                    M. A. MORTENSON COMPANY

By    *Mark Sikel*                               By _____
                                                              Andy Black

Its    Project Manager                           Its            Project Manager

Exhibit E – Safety Program Requirements
6/21/2011

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## **Exhibit F – Quality Program Requirements**

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of December 29, 2017

The Quality Program Requirements set forth in this Exhibit F are designed to further the goals of performing the Work correctly the first time, planning and coordinating the Work, eliminating errors, eliminating rework, maintaining efficient trade flow, and avoiding unnecessary delays. Accordingly, the Quality Program Requirements necessarily require close coordination with Mortenson.

1) Subcontractor shall designate a quality representative (the "Quality Representative") with responsibility to manage on behalf of Subcontractor all aspects of the quality process described in this Exhibit F.

2) Subcontractor shall participate in a preconstruction meeting with Mortenson at a time scheduled by Mortenson. The Quality Representative, among other Subcontractor personnel, shall attend the preconstruction meeting, as one of the purposes of the meeting will be to review the quality requirements for the Work under the Contract Documents.

3) A Definable Feature of the Work (sometimes referred to as a DFW) is defined as a task which is separate and distinct from other tasks, and has the same control requirements and work crews. For purposes of this Exhibit F, the Definable Features of the Work are:

| All Civil Infrastructure Work |
| --- |

4) Subcontractor shall, within 5 calendar days of execution of the Agreement (unless required earlier by the construction schedule), submit to Mortenson a site-specific Quality Management Plan covering all of the Work, including Work to be performed by subcontractors and suppliers at any tier to Subcontractor. The plan shall include the following:

   a) An organizational chart of Subcontractor personnel assigned to the Project with roles and responsibilities, including the identity of the Quality Representative.
   b) Identification of individuals responsible for performance of inspection of various aspects of the Work.
   c) The name, qualifications, duties and responsibilities of each person assigned to a quality control function.
   d) A description of subcontractor's procedure for ensuring that the most current drawing updates, specification updates, requests for information, changes to the Contract Documents, and requirements of approved shop drawings will be processed, tracked and communicated to both office and field team members and will be incorporated into the as-built documents.
   e) A log to identify and track all testing required by the Contract Documents and applicable codes.
   f) A complete list of closeout deliverables required under the Contract Documents, including operation and maintenance manuals, warranties, guarantees, and extra stock materials.

g) Checklists for all inspections required by the Quality Management Plan. Checklists will be created by Mortenson in Procore and completed by Subcontractor in the field and submitted to Mortenson at the end of each working day.

If Mortenson provides comments on the Quality Management Plan, Subcontractor shall address Mortenson's comment and resubmit the Quality Management Plan to Mortenson.

5) Subcontractor shall participate in a phase planning meeting with Mortenson and other subcontractors for the purpose of determining appropriate trade flow and further development of schedule details.

6) In collaboration with Mortenson, Subcontractor shall develop an integrated work plan for each Definable Feature of the Work describing how the Work (including Work performed by its subcontractors and suppliers at any tier to Subcontractor) will be installed. The integrated work plan shall outline requirements for the following:

a) Safety
b) Quality
c) Site utilization and access
d) Schedule and work sequences (including where the work will start and what direction the work will proceed)
e) Manpower and other resources
f) Utilities needed for performance of the Work
g) Equipment needed for performance of the Work
h) Establishing conformity of materials with the Contract Documents and approved shop drawings
i) Material handling
j) Industry standards, references and best practices
k) Installation processes.

The integrated work plan for each Definable Feature of the Work shall be submitted to Mortenson at least one week prior to the Preparatory Meeting. If Mortenson provides comments on the integrated work plan, Subcontractor shall address Mortenson's comments and resubmit the integrated work plan to Mortenson. Subcontractor shall train its installation crews on the content of the IWP and perform the Work in accordance with the IWP. If any modifications to the IWP are required as a result of changed or unforeseen conditions, a revised IWP shall be submitted to and reviewed with Mortenson prior to commencement of the Work affected by the changed or unforeseen conditions, unless otherwise directed by Mortenson in writing.

For each Definable Feature of the Work, Subcontractor shall participate in a preparatory meeting (the "Preparatory Meeting") to be scheduled by Mortenson prior to commencement of the applicable Work. The Quality Representative and the foreman or superintendent directly responsible for the installation of the applicable Work shall participate in the Preparatory Meeting. The purpose of the Preparatory Meeting will be to review the following in order to determine whether the installation is ready to proceed:

a) requirements of the drawings and specifications;
b) verification that all submittals have been submitted and approved;
c) required inspections and testing;
d) the Integrated Work Plan;
e) status of completion of predecessor activities;
f) Delivery status of required materials and availability of required labor; and
g) other matters related to the installation of the Work.

7) Subcontractor shall schedule the preparation and submission of all submittals related to each Definable Feature of the Work to allow approval of such submittals prior to the Preparatory Meeting.

8) If during the Preparatory Meeting it is determined that Subcontractor is not ready to proceed with the installation of the DFW, Subcontractor shall participate in additional Preparatory Meetings until it is determined that Subcontractor is adequately prepared to commence with the applicable Work.

9) Subcontractor shall participate in and/or perform the following quality inspections of the Work (which may be at the Project site or at another location), at a minimum:

a) An inspection of each mock up that may be required by the Subcontract or Contract Documents.

b) For each Definable Feature of the Work, an initial inspection (the "Initial Inspection") shall be conducted jointly by Mortenson and Subcontractor upon the completion of the installation of the first portion of the Work. The purpose of the Initial Inspection is to verify that the installation process is consistent with the requirements of the integrated work plan and that the Work conforms to the Contract Documents. If the installation process is not consistent with the integrated work plan, Subcontractor shall modify its installation process to conform to the integrated work plan or appropriately modify its integrated work plan. If the Work does not conform to the requirements of the Contract Documents, Subcontractor shall correct the Work immediately and in all cases before performing any additional Work.

c) If any modifications are required to be made to the to the IWP as a result of the Initial Inspection, Subcontractor shall submit the modified plan to Mortenson for Mortenson's review and comment prior to continuing with the installation.

d) Follow up inspections, to be performed by Subcontractor for each Definable Feature of Work as follows:
   i) An inspection upon receipt of each delivery of equipment or materials that will be incorporated into the Work to ensure that the equipment or materials conform to the requirements of the Contract Documents.
   ii) On-going inspections shall be performed periodically as the Work progresses, at least in definable areas determined by Mortenson (for example, by room, area, elevation, or other) or at a frequency determined by Mortenson.
   iii) Cover-up inspections, before any work is covered up and made inaccessible by the successor trades. Cover-up Inspections shall be conducted and all work identified as deficient shall be corrected before the Work is made inaccessible.
   iv) A pre-final inspection, when Subcontractor believes that all Work is complete.

Exhibit F -- Quality Program Requirements
8-30-12

v) A final inspection, after all non-conforming work previously identified has been corrected and Subcontractor believes the Work is complete, in order to verify that the Work is complete and acceptable.

e) For each inspection described above, Subcontractor shall use checklists and other quality control documents that may be required in the integrated work plan or the Contract Documents or that are jointly developed by Subcontractor and Mortenson.

10) Nothing in this Exhibit F shall be deemed to diminish in any way Subcontractor's responsibility for its means and methods, the quality and safety of the Work, performance of the Work as required by the construction schedule, or Subcontractor's compliance in all respects with the Contract Documents.   Subcontractor retains sole responsibility for all such matters.

11) Subcontractor shall maintain at the Project site and make available to Mortenson upon request any industry references, standards, best practices, or installation guidelines that are referenced by the Contract Documents or that directly pertain to the installation or acceptance of the Work.

12) Subcontractor shall ensure that all tools and devices used for measuring installed Work are in good and operable condition and are precise enough to accurately measure the Work within specified tolerances.  Measuring devices that are required to be calibrated shall be properly marked and the date of their calibration shall be displayed.  Upon request by Mortenson, Subcontractor shall furnish documentation of calibration.

13) Subcontractor shall maintain current as-built drawings (and building information models if such models are used by Subcontractor) as the Work progresses, and shall, at any time upon request, make them available for review by Mortenson or submit them to Mortenson.

14) In addition to the activities required above, the Quality Representative shall also:

**Report quality defects discovered and actions taken to mitigate issues to the Project Engineer on a weekly basis**

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this **Exhibit F** as set forth above.

 Don Borneke Construction, Inc.
Subcontractor                                      M. A. MORTENSON COMPANY

By _*Mark Sikel*_____          By <u>Andy Black</u>

Its ___Project Manager_____          Its <u>Project Manager</u>

4

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## **Exhibit G – Insurance Requirements**

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of this 29th day of December, 2017.

Subcontractor shall follow the attached insurance requirements form.

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit G as set forth above.

Don Borneke Construction, Inc
Subcontractor                                    M. A. MORTENSON COMPANY

By _____*Mark Sikel*_____           By _____
                                                              Andy Black

Its ___Project Manager_____          Its ___Project Manager_____

Subcontractor:

Your firm has been issued a Notice to Proceed/issued a Letter of Intent/awarded a Subcontract for the above project.  Your insurance must comply with the terms and conditions of such Notice to Proceed/Letter of Intent/Subcontract. Please carefully follow the procedures outlined below in issuing the required Certificate of Insurance.

1.    Direct your insurance company or agent to use the ACORD Certificate of Insurance Form, or a form acceptable to Mortenson.

2.    The certificate holder shall read:
      M.A. Mortenson Company
      Attn:Andy Black
      700 Meadow Lane North
      Minneapolis, MN 55422

3.    The description of operations shall indicate the project name as follows:

      Project Name:   Mendota Hills Repowering
      Project No.:    18141002

4.    The attached Sample ACORD Certificate of Insurance form shows the MINIMUM coverages and limits to be certified as required by your subcontract agreement or the project specifications.  MINIMUM limit requirements may be satisfied by any combination of limits shown for primary liability coverages (i.e. General Liability, Automobile Liability, Employers' Liability) and Excess Liability, provided the sum of each combined limit equals or exceeds the MINIMUM limit shown on the attached Sample Certificate of Insurance form.

5.    The certificate must clearly state "Walnut Ridge Wind, LLC and M. A. Mortenson Company are named as "Additional Insureds" to the General Liability, Automobile Liability, and Excess Liability Policies.  Additional insureds have been named on the General Liability policy per the attached endorsements (CG 20 10 10 01 **and** CG 20 37 10 01 or equivalent). Workers Compensation coverage includes a waiver of subrogation against M. A. Mortenson Company and the Owner."

6.    Return your completed Certificate of Insurance to the certificate holder above along with the **required General Liability Additional Insured Endorsements issued by your insurance carrier.**

No work will be authorized to proceed on the project until a Certificate of Insurance and copies of the required General Liability Additional Insured Endorsements (CG 20 10 10 01 and CG 20 37 10 01 or equivalent), properly completed by your insurance carrier, are received.

Thank you for your cooperation.

M. A. MORTENSON COMPANY

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 6/20/2018 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: | Trent Nyhammer | | |
|---|---|---|---|---|---|
| The MacKenzie Agency<br>P.O. Box 120<br>St. Peter MN 56082 | | PHONE (A/C, No, Ext): | 507-931-4482 | FAX (A/C, No): | 507-931-4544 |
| | | E-MAIL ADDRESS: | tnyhammer@mackenzieagency.net | | |
| | | INSURER(S) AFFORDING COVERAGE | | | NAIC # |
| | | INSURER A : | QBE North America | | 24414 |
| INSURED | BORNEKE | INSURER B : | | | |
| Don Borneke Construction Inc.<br>41537 50th St.<br>Janesville MN 56048 | | INSURER C : | | | |
| | | INSURER D : | | | |
| | | INSURER E : | | | |
| | | INSURER F : | | | |

## COVERAGES CERTIFICATE NUMBER: 1583205006 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>CLAIMS-MADE X OCCUR<br><br><br>GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY X PRO-JECT LOC | Y | Y | CCI0169885 | 10/14/2017 | 10/14/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY**<br>X ANY AUTO<br>ALL OWNED AUTOS / SCHEDULED AUTOS<br>X HIRED AUTOS X NON-OWNED AUTOS | Y | Y | CBA0169885 | 10/14/2017 | 10/14/2018 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR<br>EXCESS LIAB CLAIMS-MADE<br>DED X RETENTION $ 10,000 | | Y | CCU0169885 | 10/14/2017 | 10/14/2018 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? N / A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | Y | CWC1328078 | 10/14/2017 | 10/14/2018 | X WC STATU-TORY LIMITS OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Equipment Leased or Rented | | | CCI0169885 | 10/14/2017 | 10/14/2018 | Limit<br>Ded | 1,000,000<br>$1,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
MAM# 18141002    Project: Mendota Hills Repowering
As respects the named insured subcontractor's operations on this project, Mendota Hills Repowering and M.A.Mortenson Company are included as Additional Insureds under the General Liability, Automobile Liability and Umbrella Liability policies. Additional Insureds have been named on the General Liability policy per the attached endorsements (CG 20 10 10 01 and CG 20 37 10 01 or equivalent). Workers Compensation coverage includes a waiver of subrogation against M.A. Mortenson Company and the Owner.   Umbrella is follow form.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| M.A. Mortenson Company<br>Attn: Risk Management<br>700 Meadow Lane North<br>Minneapolis MN 55422 | AUTHORIZED REPRESENTATIVE |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)         The ACORD name and logo are registered marks of ACORD

POLICY NUMBER: CCI0169885

**COMMERCIAL GENERAL LIABILITY**
**CG 20 10 10 01**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name of Person or Organization: |
| --- |
| Mendota Hills Repowering<br>M.A. Mortenson Company |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** **Section II – Who Is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of your ongoing operations performed for that insured.

**B.** With respect to the insurance afforded to these additional insureds, the following exclusion is added:

**2. Exclusions**

This insurance does not apply to "bodily injury" or "property damage" occurring after:

**(1)** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed; or

**(2)** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

POLICY NUMBER: | CCI0169885

COMMERCIAL GENERAL LIABILITY
CG 20 37 10 01

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| **Name of Person or Organization:** |
| Mendota Hills Repowering<br>M.A. Mortenson Company |
| **Location And Description of Completed Operations:**<br>Project #18141002<br>Project: Mendota Hills Repowering |
| **Additional Premium:**<br>Included |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**Section II – Who Is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" at the location designated and described in the schedule of this endorsement performed for that insured and included in the "products-completed operations hazard".

© ISO Properties, Inc.,  2000 □

Mendota Hills Repowering
Lee County, Illinois
MORTENSON PROJECT NO. 18141002

## **Exhibit H – Lien Waivers**

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of December 29, 2017.

With each request for payment the Subcontractor shall provide the applicable lien waiver enclosed within Exhibit H.  Upon receipt of final payment, the Subcontractor shall provide a completed final lien waiver.

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit I as set forth above.

 Don Borneke Construction, Inc
Subcontractor

M. A. MORTENSON COMPANY

By ___*Mark Sikel*_____

By _____
Andy Black

Its ___Project Manager_____

Its _____Project Manager_____

| Exhibit AA-2 |
|:---:|

### Subcontractor's Partial Lien Waiver and Release

THIS SUBCONTRACTOR CERTIFICATE FOR PARTIAL WAIVER OF LIENS is made this _____ of _____, 20__, by _____, a _____, having a business address at _____ (the "Releasor"), subcontractor to [Contractor's Name]. a [State] corporation, having a business address at [Contractor's Corporate Office address] ("Contractor"), for the performance or furnishing of certain Work in connection with the Mendota Hills Repowering project located in Lee County, Illinois (the "Project") owned by Mendota Hills, LLC, a Minnesota limited liability company ("Owner"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the BOP Contract.

Releasor, on behalf of itself and all Persons claiming any interest in or through Releasor and for Releasor's and their successors and assigns, and those acting by or through any of the foregoing, for and in consideration of the sum of _____No/100 U.S. DOLLARS (U.S. $_____) (the "Partial Payment") does hereby unconditionally and irrevocably waive, release, remise, relinquish and quit-claim any lien or other security interest, of any kind whatsoever, by or through the Releasor to the Contractor for the Project, which the Releasor ever had, or now has, against the Project, the property on which the Project is located, or against Owner, Contractor, their partners, parents, subsidiaries and affiliates, at all tiers, and their insurers, sureties, officers, directors, representatives, shareholders, agents, and all parties acting for any of them (collectively the "Releasee Entities"). This waiver and release shall only be effective as of the date the Partial Payment is made by Owner to Contractor, and only to the extent of the monies so paid on such date.

Releasor hereby certifies, represents and warrants that, to the extent of the Partial Payment: (a) the Releasor has not assigned or pledged any rights or claims in any amount due or to become due from the Contractor; (b) no claims from sub-subcontractors, vendors, mechanics or materialmen have been submitted to Releasor with respect to the Project or remain unsatisfied as of the date of this Subcontractor Certificate for Partial Waiver of Liens; (c) no mechanics or material or materialmen's liens have been filed with respect to the Project; and (d) payment has been made to all subcontractors, laborers and material suppliers, at all tiers, and all other entities, for all labor, services, materials and equipment furnished by or through the Releasor for the Project, including, without limitation, all payroll taxes and contributions required to be made and all wages, overtime pay, premium pay, holiday pay, sick pay, personal leave pay, severance pay, fees, fringe benefits, commissions and reimbursable expenses required to be paid and all deductions for dues, fees or contributions required to be made in connection with all collective bargaining agreements in existence, if any, which affect any worker(s) providing services for the Project.

95761011.1 0057445-00005

Releasor will defend and indemnify the Owner of the Project, its lenders and title company, and Contractor and its sureties for all costs and expenses, including attorneys' fees, incurred as a result of claims that any of Releasor's subcontractors, suppliers or employees have not been paid or relating to the enforcement of this Partial Waiver of Liens.

The Releasor acknowledges and agrees that: (a) the Contractor and the Owner are relying upon the representations and warranties made herein as a material inducement for the Contractor to make payment to the Releasor; (b) this Subcontractor Certificate for Partial Waiver of Liens is freely and voluntarily given by the Releasor with full knowledge of its rights under the law and the Releasor has voluntarily accepted the terms of this Subcontractor Certificate for Partial Waiver of Liens for the Partial Payment recited above; and (c) the tendering of the Partial Payment by the Contractor and the receipt of the Partial Payment and the execution of this Subcontractor Certificate for Partial Waiver of Liens by the Releasor shall not, in any manner whatsoever, release the Releasor from: (i) its continuing obligations with respect to the completion of any work at the Project that remains incomplete, including, punch list work, warranty work or guaranty work, or the correction of defective or non-conforming work; (ii) any contractual, statutory or common law obligations of the Releasor with respect to any of the Releasee Entities; or (iii) any other obligations of the Releasor with respect to any of the Releasee Entities.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURES APPEAR ON FOLLOWING PAGE.]**

95761011.1 0057445-00005

Releasor hereby certifies, represents and warrants that the undersigned individual ("Signatory") is duly authorized, and the Signatory hereby represents that he/she has been duly authorized by and on behalf of the Releasor to execute this Subcontractor Certificate for Partial Waiver of Liens as of the date first above written.

[_____]

By:_____
Name:
Title:

STATE OF _____ )
                            )
COUNTY OF _____ )

This instrument was acknowledged before me on this _____ day of _____, by _____, _____ of _____, a _____, on behalf of said _____.

_____

[Notary Seal]                    Notary Public in and for the State of _____

_____

Printed Name of Notary Public

My Commission Expires:

Page 3 of 3

| Exhibit BB-2 |
|---|

## Subcontractor's Final Lien Waiver and Release

THIS SUBCONTRACTOR CERTIFICATE FOR FINAL WAIVER OF LIENS is made this _____ of _____, 20__, by _____, a _____, having a business address at _____ (the "Releasor"), subcontractor to [Contractor's Name], a [State] corporation, having a business address at [Corporate Office Address] ("Contractor"), for the performance or furnishing of certain Work in connection with the Mendota Repowering project located in Lee County, Illinois (the "Project") owned by Mendota Hills, LLC, a Minnesota limited liability company("Owner"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the BOP Contract.

Releasor, on behalf of itself and all Persons claiming any interest in or through Releasor and for Releasor's and their successors and assigns, and those acting by or through any of the foregoing, for and in consideration of the sum of _____ and No/100 U.S. DOLLARS (U.S. ) (the "Final Payment") and other good and valuable consideration, in hand paid, the receipt and sufficiency of which are hereby acknowledged, as full and final payment on account of all labor, services, materials and equipment, furnished to Contractor for the Project, does hereby unconditionally and irrevocably waive, release, remise, relinquish and quit-claim any lien or other security interest, of any kind whatsoever, which the Releasor ever had, now has, or may have in the future, known or unknown, against the Project, the property on which the Project is located, or against Owner, Contractor, their partners, parents, subsidiaries and affiliates, at all tiers, and their insurers, sureties, officers, directors, representatives, shareholders, agents, and all parties acting for any of them (collectively the "Releasee Entities"). This Final Waiver of Liens shall be effective as of the date Final Payment referenced herein is paid by Owner to Contractor.

Releasor hereby certifies, represents and warrants that: (a) the Releasor has not assigned or pledged any rights or claims in any amount due or to become due from the Contractor; (b) no claims from sub-subcontractors, vendors, mechanics or materialmen have been submitted to Releasor with respect to the Project or remain unsatisfied as of the date of this Subcontractor Certificate for Final Waiver of Liens; (c) no mechanics or material or materialmen's liens have been filed with respect to the Project; and (d) payment has been made to all subcontractors, laborers and material suppliers, at all tiers, and all other entities, for all labor, services, materials and equipment furnished by or through the Releasor for the Project, including, without limitation, all payroll taxes and contributions required to be made and all wages, overtime pay, premium pay, holiday pay, sick pay, personal leave pay, severance pay, fees, fringe benefits, commissions and reimbursable expenses required to be paid and all deductions for dues, fees or contributions required to be made in connection with all collective bargaining agreements in existence, if any, which affect any worker(s) providing services for the Project.

Releasor will defend and indemnify the Owner of the Project, its lenders and title company, and Contractor and its sureties for all costs and expenses, including attorneys' fees, incurred as a result of claims that any of Releasor's subcontractors, suppliers or employees have not been paid or relating to the enforcement of this Final Waiver of Liens.The Releasor acknowledges and agrees that: (a) the Contractor and the Owner are relying upon the representations and warranties made herein as a material inducement for the Contractor to make payment to the Releasor; (b) this Subcontractor Certificate for Final Waiver of Liens is freely and voluntarily given by the Releasor with full knowledge of its rights under the law  and the Releasor has voluntarily accepted the terms of this Subcontractor Certificate for Final Waiver of Liens for the consideration recited above; and (c) the tendering of the Final Payment by the Contractor and the receipt of the Final Payment and the execution of this Subcontractor Certificate for Final Waiver of Liens by the Releasor shall not, in any manner whatsoever, release the Releasor from: (i) its continuing obligations with respect to warranty work or guaranty work, or the correction of defective or non-conforming work; (ii) any contractual, statutory or common law obligations of the Releasor with respect to any of the Releasee Entities; or (iii) any other obligations of the Releasor with respect to any of the Releasee Entities.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURES APPEAR ON FOLLOWING PAGE.]**

Releasor hereby certifies, represents and warrants to Releasee that the undersigned individual ("Signatory") is duly authorized, and the Signatory hereby represents that he/she has been duly authorized by and on behalf of the Releasor to execute this Subcontractor Certificate for Final Waiver of Liens as of the date first above written.

[_____]

By:_____
Name:
Title:

STATE OF _____ )
                          )
COUNTY OF _____ )

This instrument was acknowledged before me on this _____ day of _____, by _____, _____ of _____, a _____, on behalf of said _____.

_____
[Notary Seal]          Notary Public in and for the State of _____

_____
Printed Name of Notary Public

My Commission Expires:

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## **Exhibit H - Application For Payment**

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of this 29th day of December, 2017.

Subcontractor shall use the attached application for payment form.

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit H as set forth above.

Don Borneke Construction, Inc.
Subcontractor.                                      M. A. MORTENSON COMPANY

By _____*Mark Sikel*_____                           By _____
                                                              Andy Black

Its _____Project Manager_____                       Its _____Project Manager_____

1

Exhibit C – Schedule
10-29-04

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF ILLINOIS
 3                 WESTERN DIVISION
 4
 5   NICK GEORGEFF,          )
 6        Plaintiff,         )
 7   vs.                     )  No. 3:20-cv-50313
 8   DON BORNEKE             )
 9   CONSTRUCTION, INC.,     )
10        Defendant.         )
11        The deposition of NICHOLAS BORNEKE,
12   called for examination pursuant to the Federal
13   Rules of Civil Procedure for the United States
14   District Courts pertaining to the taking of
15   depositions via Zoom videoconference, on the
16   9th day of March, 2022, at the hour of 1:01 p.m.
17
18
19
20
21
22
23   Reported by: Vicki L. D'Antonio, CSR, RPR
24   License No. 084-004344
```

**Page 2**

```
 1   REMOTE APPEARANCES:
 2
 3        ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., by
 4        MR. CHARLES A. TERRY,
 5        161 North Clark Street
 6        21st Floor
 7        Chicago, Illinois  60601
 8        (312) 372-3822
 9        cterry@anesilaw.com
10            Representing the Plaintiff;
11
12        SWANSON, MARTIN & BELL, LLP, by
13        MR. CHRISTIAN A. SULLIVAN,
14        2525 Cabot Drive
15        Suite 204
16        Lisle, Illinois  60532
17        (630) 799-6900
18        csullivan@smbtrials.com
19            Representing the Defendant.
20
21
22
23
24
```

**Page 3**

```
 1                  I N D E X
 2   WITNESS                              PAGE
 3   NICHOLAS BORNEKE
 4       Examination by Mr. Terry...............  5
         Examination by Mr. Sullivan............ 97
 5       Further Examination by Mr. Terry....... 102
 6
 7
 8                 E X H I B I T S
 8
 9
10        (NO EXHIBITS MARKED)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1            (Whereupon, the witness was duly
 2             sworn.)
 3        THE COURT REPORTER:  The attorneys
 4   participating in this deposition acknowledge
 5   that I am not physically present in the
 6   deposition room and that I will be reporting
 7   this deposition remotely.  They further
 8   acknowledge that, in lieu of an oath
 9   administered in person, the witness will
10   verbally declare his testimony in this matter is
11   under penalty of perjury.  The parties and their
12   counsel consent to this arrangement and waive
13   any objections to this manner of reporting.
14        Please indicate your agreement by
15   stating your name and your agreement on the
16   record.
17        MR. TERRY:  Charles Terry for the
18   plaintiff; we agree.
19        MR. SULLIVAN:  Chris Sullivan for
20   defendant; we also agree.
21        THE WITNESS:  Nicholas Borneke,
22   witness; I agree.
23            (Whereupon, the witness was duly
24             sworn.)
```

EXHIBIT
D

1          NICHOLAS BORNEKE,
2     having been first duly sworn, was examined and
3     testified as follows:
4                 EXAMINATION
5     BY MR. TERRY:
6          Q.   Sir, would you mind stating your name
7     and spelling your last name for the record?
8          A.   Nicholas Borneke, B-O-R-N-E-K-E.
9          Q.   Perfect.
10          MR. TERRY:  Let the record reflect this
11     is the deposition of Nicholas Borneke, taken
12     pursuant to notice and agreement of the parties,
13     and let the record also reflect this deposition
14     is being taken via Zoom.  It's still pursuant to
15     all applicable rules.
16     BY MR. TERRY:
17          Q.   Sir, have you given a deposition
18     before?
19          A.   I have not.
20          Q.   Well, two things, then.  One, this is
21     out of order, but do you mind if I call you
22     Nick, Nicholas, Mr. Borneke?  What do you prefer
23     for today?
24          A.   Nick.

5

1          Q.   Okay.  Perfect.
2          Since you haven't given a dep before,
3     Nick, I'm going to go over a few ground rules
4     with you, and when I say ground rules, if you
5     break them, the world's not going to implode,
6     nothing bad is going to happen, but following
7     them makes this court reporter's job a lot
8     easier and she won't be yelling at us if we try
9     to follow them.  Also, it makes the transcript a
10     lot easier to read later on, so I'm just going
11     to go over a few of those, okay?
12          A.   Okay.
13          Q.   The first one, and so far you're doing
14     a good job, try not to interrupt anyone who's
15     speaking, whether they're asking a question or
16     otherwise.  It makes it hard to type down what
17     two people are saying if they're talking over
18     each other, so just do your best, even though
19     attorneys are long-winded and boring and you may
20     know where we're going, to wait for the full
21     question prior to answering.  Does that make
22     sense?
23          A.   Yes.
24          Q.   Another one, again, you're doing a good

6

1     job so far, keep all your answers out loud,
2     meaning yes, no, or otherwise.  Nuh-uhs and
3     uh-huhs, while we know what you mean in the
4     moment, usually, they don't come over well in
5     the transcript, and if we need to use this for
6     whatever purpose later on, it likely won't be
7     helpful if it's a nuh-uh or uh-huh, so we'll try
8     to remind you of that, but just do your best to
9     keep it yes, no, or otherwise.
10          Just a couple more.  If you need a
11     break at any time, by all means, please let me
12     know.  I don't expect this to be awfully long,
13     but there still might be a good point to take a
14     break, and if you need one, just let me know,
15     and the only thing I ask is that if there's a
16     question pending, you answer the question, and
17     then after that, we can take a break.
18          Then the last one, the big one, any
19     question I ask you today, if you answer it, we
20     are going to assume you understood what it
21     meant.  So if you don't understand a question,
22     nine times out of ten, it's probably my fault,
23     so please just say so.  I'm happy to rephrase,
24     repeat, or have the court reporter read it back.

7

1     But, again, if you answer it, we will assume you
2     know what it meant, and the answer will stand.
3     Does that make sense?
4          A.   Yes.
5          Q.   Would you mind stating your date of
6     birth?
7          A.   April 14, 1992.
8          Q.   Perfect.
9          And what is your current address?
10          A.   13011 County Road 24, New Ulm,
11     Minnesota 56073.
12          Q.   And could you spell the --
13          A.   I apologize.  I just moved, so...
14          Q.   That's okay.
15          Would you mind spelling the city for
16     us?
17          A.   N-E-W, U-L-M.
18          Q.   U-L-M?
19          A.   Yes.
20          Q.   Perfect.  Thank you.
21          And how long have you lived at this
22     address?
23          A.   Four months.
24          Q.   Where'd you live prior to this?

8

1    A.   Pemberton, Minnesota.
2    Q.   At this new address in New Ulm, who do
3  you live there with?
4    A.   My girlfriend.
5    Q.   Does anyone else live at the -- is it a
6  house or an apartment?
7    A.   It's a house.
8    Q.   Does anyone else live there with you
9  two?
10   A.   No.
11   Q.   And I know you just moved a few months
12 ago, but are there any plans to move in the near
13 future?
14   A.   No.
15   Q.   One other piece of information I should
16 have told you.  I think your attorney probably
17 went over this, but the whole point of this
18 deposition is to find out what you would be
19 testifying to if this matter goes to trial and
20 find out a little bit about yourself, so I will
21 ask you some background questions.  I promise
22 I'll try to make those brief, okay?
23   A.   Okay.
24   Q.   What's your highest level of education?

9

1    A.   Bachelor's degree.
2    Q.   Where is that from and in what?
3    A.   Minnesota State University, Mankato,
4  construction management.
5    Q.   When did you receive that degree?
6    A.   2014.
7    Q.   Did you complete any other type of
8  technical or trade school other than your degree
9  in construction management?
10   A.   No.
11   Q.   Are you a member of a union?
12   A.   I am not.
13   Q.   Have you ever served in the military?
14   A.   No, I have not.
15   Q.   Have you ever served in any civil
16 service capacity, like police, firefighter, or
17 otherwise?
18   A.   No.
19   Q.   And then don't take offense to this.
20 We ask this question in every deposition.
21        Have you ever been convicted of a
22 felony or a crime involving fraud or dishonesty?
23   A.   No.
24   Q.   Have you ever declared bankruptcy?

10

1    A.   No.
2    Q.   After you graduated from Minnesota
3  State, who did you -- what did you do after you
4  started [sic] graduating?
5    A.   I went and worked for a company out of
6  Northern Minnesota, and I worked for them in
7  Baltimore for about two years.
8    Q.   What was the name of that company?
9    A.   S.J. Louis.
10   Q.   Did you start working with them in
11 2014?
12   A.   Yes, it would have been July of '14.
13   Q.   What were you doing for S.J. Louis?
14   A.   Project engineer.
15   Q.   What type of work did S.J. Louis
16 perform?
17   A.   Underground utilities.
18   Q.   Did this have anything to do with,
19 like, excavation or was that some other company
20 altogether?
21   A.   They put in water and sewer lines, so,
22 yes, they excavated to put all that stuff in.
23   Q.   So S.J. Louis did both, like, the
24 excavation as well as, like, the actual

11

1  placement of the utilities?
2    A.   Yes.
3    Q.   How long did you work for S.J. Louis
4  for?
5    A.   About two years.
6    Q.   As a project engineer, what were some
7  of your roles, duties, responsibilities, things
8  like that?
9    A.   I found all our subcontractors, helped
10 my project manager write their contracts, just
11 coordinated deliveries, kind of did quality
12 control.  Yeah, that's about it.
13   Q.   Did this work also have an on-the-job
14 presence, like meaning you would be on the
15 field -- or in the field looking at the work
16 being performed, or was it mainly more of a kind
17 of behind the scenes coordination of work?
18   A.   About 50/50.  I was there.  Our project
19 was in Baltimore, and, yeah, I spent half the
20 day in the office, then half the day out in the
21 field.
22   Q.   And when you were on-site, would this
23 be more of your quality control role?
24   A.   Yes.  It's taking pictures of stuff,

12

1  documenting, making sure the pipe was installed
2  right.
3      Q.   Did your quality control with S.J.
4  mainly pertain to the actual, like, placing of
5  the utilities or did it also entail quality
6  control of the excavation work as well?
7      A.   Both, because -- I don't know really
8  how to explain this. We were working in a major
9  city. It'd be no different than working
10  downtown Chicago where it's -- everything's
11  compacted, so, yes, we had to dig the smallest
12  trench possible, and me and this -- one of our
13  superintendents and project manager, we
14  basically engineered how we were going to shore
15  everything just so people would be safe down
16  there.
17      Q.   Okay. And I appreciate that.
18           Was this the main project you worked on
19  for S.J. Louis in those two years?
20      A.   Yes. And before I left, I started
21  working on a project just outside of D.C.
22      Q.   And was that a similar type of project?
23      A.   Yes.
24      Q.   So is it fair to summarize that at the

13

1  time you were with S.J. Louis, you worked on two
2  main projects, one of which lasted the majority
3  of your time, and then you switched to another
4  one in D.C.?
5      A.   Yes. Yeah, the way it works is while
6  you're cleaning up one project, you kind of get
7  rolling on the next one.
8      Q.   And then so that takes us to about, you
9  know, July mid 2016. What did you do from then
10  on, like after you left S.J. Louis?
11      A.   I came back to work at Borneke's. I
12  think I was driving back towards Minnesota and I
13  think my brother called me and asked if I want
14  to go help out in Nebraska, so I basically
15  stopped at home for a couple days, then drove to
16  Nebraska.
17      Q.   And have you been working for Borneke
18  ever since?
19      A.   Yes.
20      Q.   Between 2016 and present, have you had
21  any other employers or have you been with
22  Borneke full time?
23      A.   Borneke's full time.
24      Q.   When you started in 2016, what was your

14

1  title?
2      A.   I think project coordinator.
3      Q.   What would this entail?
4      A.   I pretty much kept track of all our
5  change orders.
6      Q.   Was this an on-site or off-site
7  position?
8      A.   On-site.
9      Q.   Would this role have any -- like a
10  quality control aspect to it or would it mainly
11  be just keeping track of the change orders and
12  making sure the work is being done?
13      A.   Yeah, I was going to get there. I
14  also -- there was quality control on that
15  project. There may -- everything we did, we had
16  to fill out these forms, and then they'd get
17  sent off and the general contractor would
18  approve them, then they would send them to the
19  owner and they would get approved there.
20      Q.   And before I forget -- I think I know
21  the answer to this because you said both of the
22  projects with S.J. Louis were in urban areas --
23  were either of them wind farm projects or no?
24      A.   No.

15

1      Q.   What about when you came back to
2  Borneke, have all the projects been wind farm
3  projects or has it been a variety of different
4  projects?
5      A.   I would say 95 percent wind farms.
6      Q.   And since 2016, how many various wind
7  farm projects have you been a part of? Best
8  estimate.
9      A.   Six.
10      Q.   Has your role always been something
11  along the lines of project coordinator and
12  quality control?
13      A.   Now I do more of a superintendent-type
14  role.
15      Q.   When did that switch happen?
16      A.   About two, three years ago. We just
17  got really busy and we didn't have enough
18  supervisors, and I'd been around it enough where
19  I kind of just got put in charge.
20      Q.   And on the -- well, let me ask you this
21  way -- this is why I need to turn off e-mail
22  notifications. I lose my train of thought.
23           On this subject wind farm we're here to
24  talk about, the Mendota Hills project, I've seen

16



1  your title listed as, you know, quality control
2  on site, something along those lines.  Does that
3  sound accurate to you for the subject project or
4  what would you describe your role as?
5      A.    I would say more of a foreman.  I took
6  care of all the quality control, but then I also
7  was in charge of half a dozen people.
8      Q.    As a foreman, what were you -- why
9  would you characterize yourself as a foreman?
10  What were you doing that you think that would be
11  characterized as a foreman on the project?
12      A.    Because these projects are -- they're
13  so big, so I'm sure you already talked to Brad
14  Bennett.  He would go off one way with half the
15  crew, three-quarters of the crew and take care
16  of certain items, and then I would take the
17  other four or five guys and do other activities.
18      Q.    As a foreman on this project, did you
19  undergo any specialized, like, OSHA training or
20  union training, or were you just relying on your
21  years in the industry?
22      A.    Well, I do have an OSHA 30.
23      Q.    Okay.  But are you or were you at that
24  time a part of the union or anything like that?

17

1      A.    No.
2      Q.    So you have your OSHA 30, but other
3  than that, you were just relying on your general
4  knowledge and training in the field to act as a
5  foreman on that project?
6      A.    Correct.
7      Q.    Let's talk about the quality control
8  aspect of it.
9            What was your role in terms of quality
10  control on this project?
11      A.    So when we dug the foundations, for
12  example, I'd have to go make sure the bottom's
13  level, that we dug it at the right elevation,
14  and I took pictures of everything.  And then it
15  was similar to Nebraska where I filled out one
16  of Mortenson's form, and then they would
17  basically check, saying they accepted it or
18  rejected it.
19      Q.    Then you talked about the foundation
20  and the quality control for that.
21            In terms of other job duties on this
22  project, like grading or compacting of the
23  ground, were you also doing quality control on
24  that or was it more so just from the foundation

18

1  aspect?
2      A.    Foundations and crane pads where the
3  big cranes actually sit.
4      Q.    What about like things such as grading
5  or blading or compacting of various roadways, is
6  that something that is just left to the
7  individual workers?
8      A.    The roads, I figure out how much rock
9  needs to go on the road, and then we put down X
10  amount of loads, and then that's basically we're
11  saying the math works out that there's enough
12  rock on the road.  Mortenson, if you want to
13  double-check it, you can go out there and dig
14  holes in the road.  The compaction, that's --
15  like when we backfill the foundations, that's
16  tested by a third-party tester.
17      Q.    What about in terms of like laid out
18  areas or like -- let's stick with erection area,
19  like where the actual work is going to be
20  performed, what about like the grading of the
21  land in those areas?  Who was doing quality
22  control for that?
23      A.    Really, no one, because it -- that
24  area -- because I believe -- we have to have it

19

1  within a 2 percent grade, and out where we were
2  at, it was so flat that you know from the center
3  of that tower to your outside of your area is
4  going to be less than 2 percent, and then that's
5  doubled-checked.  If anyone has an issue with
6  it, which most of the time, it is the turbine
7  delivery drivers and the people offloading the
8  parts, they will say something, and then it will
9  get fixed is generally how it works.
10      Q.    I know you said the ground is, like,
11  generally pretty flat, so in these areas, was
12  Borneke going out and, like, grading and
13  compacting the erection areas, or was it already
14  pretty level so that that wasn't needed to be
15  done?
16      A.    No, it doesn't ever matter if it's
17  level.  We still will take a road grader and
18  blade around the whole site, and then we'll run
19  a smooth drum roller around it, and that's about
20  it.  But, I mean, there -- I think there were
21  probably two sites on that project where we had
22  to take the top soil off and do like a mass
23  grading activity.
24      Q.    And why was that?

20

Nicholas Borneke 03/09/2022

1    A.   Because they were on hills and just --
2  we basically had to flatten a hill out.
3    Q.   So when you were saying that no one
4  really does quality control for like the grading
5  unless there's some type of complaint, Borneke
6  would still go and do like a once-over with the
7  blader and the other machine you mentioned to
8  make sure it's flat, but you're not necessarily
9  doing like a quality control like you would on a
10 crane pad; is that fair?
11   A.   That's fair.
12   Q.   I just want to ask you a few more
13 questions about your role as the PM, you know,
14 the quality control for the project and then
15 also as the foreman.
16        Would you say that on a project in
17 those roles, it's important for you to know what
18 Borneke is responsible for and what they're not
19 responsible for?
20   A.   Yes.
21   Q.   In doing this, do you become familiar
22 with contracts and scope of works and documents
23 like that?
24   A.   Yes.

21

1    Q.   Just from a general standpoint, I mean,
2  you've been working with Borneke for the last
3  six years and you have about eight years in the
4  construction field, plus four years of undergrad
5  in construction management, so based on that, is
6  it fair to say that you're generally familiar
7  with how things are run on a construction site?
8    A.   Yes.
9    Q.   And, you know, you're familiar with the
10 hierarchy or chain of command and how the
11 various contractors interact with each other?
12   A.   Yes.
13   Q.   Just from a general standpoint, you
14 understand what Borneke is hired to do, like
15 you're the excavators on projects, right?
16   A.   Yes.
17   Q.   And you understand the different
18 responsibilities that go into that and what's
19 included and what's excluded, right?
20   A.   Correct.
21   Q.   Like, for example, you understand from
22 a general standpoint that, you know, ironworkers
23 do the ironwork and excavators do the excavating
24 work, right?

23

1    Q.   Are you also somewhat trained in this,
2  not only from your experience, but also your
3  construction management background?
4    A.   Yes.
5    Q.   So as the quality control manager as
6  well as the foreman, you'd say it's important
7  for you to look at the contract and the scope of
8  work and understand it from a general sense,
9  right?
10   A.   Yes.
11   Q.   So maybe not from like a contract
12 interpretation standpoint, but at least from a
13 perspective of knowing what your
14 responsibilities are on the project, right?
15   A.   Correct.
16   Q.   What about communications with clients
17 or negotiations, things like that?
18   A.   I don't get into the negotiations.
19   Q.   Who would that be?  Would that be Mark
20 Sikel?
21   A.   Yes.
22   Q.   Anybody else that would be really
23 intimately involved in that?
24   A.   Not on the Mendota Hills project.

22

1    A.   Yes.
2    Q.   I just want to show you a few things
3  that I actually marked during Mr. Bennett's
4  deposition.
5        Before I get into that, I know you said
6  that you know I spoke with Mr. Bennett.  Did you
7  speak with him after his deposition?
8    A.   He just called me and asked if I had to
9  do one, too, and at the time, I didn't, and he's
10 like -- he said -- basically told me to wait.
11   Q.   What do you mean he said to wait?
12   A.   Well, because he probably -- he knew
13 that I was going to get requested to do one of
14 these as well.
15   Q.   Did you and him talk about any
16 specifics or what was discussed or anything like
17 that?
18   A.   No.
19   Q.   Okay.  I want to show you what was
20 marked as Exhibit 1 for Brad Bennett's
21 deposition.
22        Can you see my screen?
23   A.   Yes.
24   Q.   Given that this is a family company,

24



1  maybe you will have seen this, because Brad
2  Bennett never saw the website before.  I just
3  want to ask you a few questions.
4          Have you seen the Don Borneke website
5  before?
6      A.   Yeah, once, years ago, and I told them
7  to change it because it doesn't look very good.
8      Q.   It's very simple, right?
9      A.   Yes.
10     Q.   So this is just on the main page.  I
11 just want to go through a few things with you,
12 but just generally, you'd agree that it says
13 Borneke completed their first wind project in
14 2000, right?
15     A.   Yeah, that sounds about right.
16     Q.   And then I'll zoom in for you so it's a
17 little bit easier.
18         And then it also says that they have
19 completed over 60 projects and 3200 turbines,
20 right?
21     A.   Yes, and probably since this was made,
22 probably a lot more projects.
23     Q.   Yeah, so -- exactly.
24         And in addition to just Borneke, the

25

1  construction company as a whole, you also have
2  experience on these various wind farm projects,
3  right?
4      A.   Yes.
5      Q.   Don Borneke Construction is hired as
6  the excavators because they have this experience
7  in wind farm construction, right?
8      A.   Correct.
9      Q.   You guys know what's safe and what is
10 dangerous on these sites?
11     A.   Yes.
12     Q.   We'll get into more specifics later,
13 but just from the website, and I know I stopped
14 sharing my screen, but some of the things you
15 are -- when I say "you," the construction
16 company as a whole is responsible for is things
17 like clearing, creating laydown yards, creating
18 access roads, excavating, dewatering,
19 backfilling, compaction, and a whole plethora of
20 other things.  Does that sound about right?
21     A.   Yes.
22     Q.   And when working on these wind farms,
23 Don Borneke Construction as a whole understands
24 the importance of its work and what it's being

26

1  contracted to perform, right?
2      A.   Yes.
3      Q.   You understand that your company is
4  taking essentially untouched or unsafe farmland
5  and converting it into areas where wind farm
6  work can be performed, right?
7      A.   Yes.
8      Q.   Like, for example, Borneke is hired to
9  convert whatever type of crop is growing in
10 these farms' various areas into things like
11 access roads and erection areas and foundations,
12 right?
13     A.   Yes.
14     Q.   And at these various sites, various
15 tasks are required, such as grading,
16 maintaining, providing adequate drainage, all of
17 these things, right?
18     A.   Yes.
19     Q.   In these areas where Don Borneke is
20 performing its work, it's on very large farmland
21 where the vast majority of it is never going to
22 be touched by you guys, right?
23     A.   Right, yes.
24     Q.   Yeah, and then you guys have very

27

1  specific areas, like laydown yards or access
2  roads or erection areas, where you guys are
3  going to be working, right?
4      A.   Yes.
5      Q.   This is, you know, a small percentage
6  of the actual whole farm, but the small
7  percentage is where your work, you know, is --
8  matters the most, right?
9      A.   Yeah.
10     Q.   And let's talk about -- because we're
11 here to talk about something that happened at an
12 erection area, for the sake of efficiency, let's
13 just, you know, focus on those, okay?
14     A.   Okay.
15     Q.   You understand that at the erection
16 area, this is literally where the turbine is
17 going to be erected, right?
18     A.   Yes.
19     Q.   In this area for a radius going out in
20 each direction from the turbine, certain work
21 needs to be performed, right?
22     A.   Yes.
23     Q.   Like in the erection area as a whole,
24 the ground needs to first be graded and provide

28



Nicholas Borneke 03/09/2022

1 proper drainage for the site, right?
2   A.   Yes, and -- yes.
3   Q.   One of the ideas is that so the
4 erection areas are not going to be covered in,
5 like, standing water or large ruts, right?
6   A.   Yes.
7   Q.   And the idea behind it is after Borneke
8 comes in, other contractors, whether it be
9 delivery companies or ironworkers, are going to
10 come in, and the site needs to be ready for the
11 deliveries as well as the work that's going to
12 be performed, right?
13   A.   Yes.
14   Q.   You agree from a general standpoint if
15 the erection areas are properly graded, one of
16 the ideas is that so water does not pool near
17 the turbine or in the erection area, right?
18   A.   Yes.
19   Q.   You'd agree that if there's large areas
20 of standing water in the erection site, this can
21 damage equipment, it can cause tripping hazards,
22 it can freeze over and create more tripping
23 hazards, right?
24   A.   Yes, it could.

29

1   Q.   So you'd agree that just ensuring
2 proper drainage and grading of ground conditions
3 is one of the important tasks Borneke is hired
4 to perform on these projects?
5   A.   I would say it's important, but
6 probably not the top of the importance list.
7   Q.   No, but it's one of the important tasks
8 you're hired to perform?
9   A.   Yes.
10   Q.   And as the excavating company, it's
11 important to make sure the ground conditions are
12 properly prepared and safe for workers who are
13 going to be coming later, right?
14   A.   Yes.
15   Q.   As we talked about, the excavating
16 company prepares these areas for semi trucks to
17 later come, as well as other contractors who
18 have to perform work, right?
19   A.   Correct.
20   Q.   On these sites, it is common for
21 Borneke to walk around the site and keep an eye
22 on things that were done to make sure they were
23 done properly, right?
24   A.   Yes.

30

1   Q.   That's part of your job, actually, as
2 the quality control person on site, right?
3   A.   Right.
4   Q.   In addition to providing proper
5 drainage, would you agree that it's also
6 important to provide adequate grading and
7 compaction so that the ground is prepared for
8 deliveries and work that's coming later?
9   A.   Yes.
10   Q.   I just want to show you Exhibit 2 for
11 Brad Bennett's deposition, and we can just refer
12 to these.  I don't know if we have to mark them,
13 but can you see my screen, sir?
14   A.   Yeah.
15   Q.   On this, you'd agree that it talks
16 about Don Borneke being committed to providing a
17 safe workplace, right?
18   A.   Yep.
19   Q.   The expectations of this commitment
20 includes, as it says, "proper training,
21 appropriate personal protective equipment,
22 engineering out safety hazards when possible,
23 holding all employees accountable for safety,
24 and planning safety into each project and task."

31

1        Did I read that correctly?
2   A.   Yeah, yes.
3   Q.   So you'd agree that Borneke prides
4 itself on safety and even tries to engineer out
5 safety hazards when possible, right?
6   A.   Yes.
7   Q.   And then in the next paragraph, it
8 discusses how a lot of employees have been with
9 Borneke for decades and they rely on that
10 experience to help Borneke run efficiently and
11 timely and safely, right?
12   A.   Yes.
13   Q.   Then it says superintendents and field
14 supervisors also get additional training like
15 first aid, CPR, hazard communication, and PPE
16 assessment, right?
17   A.   Yes.
18   Q.   Were you -- do foremen get included in
19 that field supervisor category?  Like, who would
20 be subject to this additional training is kind
21 of what I'm trying to figure out.
22   A.   Yeah, like foremen, other project
23 coordinators.  Basically, if anyone wants to get
24 first aid, CPR certified, they can.

32

1    Q.   When you talk about those other
2 trainings like hazard communication and stuff
3 like that, is this just in the OSHA classes that
4 you discussed or is this additional training
5 that Borneke provides on site?
6    A.   Not on site.  We do a yearly -- well,
7 we used to do a yearly safety meeting, but the
8 last two years have kind of screwed that up, and
9 I just actually got an e-mail this morning about
10 this year's.
11    Q.   Yeah, COVID's kind of screwed
12 everything up, but other than that, the idea is
13 like yearly classroom training for various
14 workers, whoever wants to be part of it?
15    A.   Yes.  Like, a lot of our guys, since
16 they're in the union, they have to do so many
17 hours a year and stuff like that, and then as a
18 company, we do like a yearly safety presentation
19 which goes over driving regulations, confined
20 spaces, just what has changed over the last year
21 because safety's always changing.
22    Q.   Of course.
23        So then for the various people who are
24 in the union and that need to undergo this
                                                    33

1 training, does Borneke provide the required
2 training or is it all, like, additional elective
3 training, or is it kind of a combination of
4 both?
5    A.   A lot of it's elective.  Yeah, I would
6 say a majority of it's elective, but then at the
7 same time, it's -- if you're going to deal with
8 hazard materials, you have to go do a certified
9 hazmat class.
10    Q.   Okay.  Got it.
11        You know, I just want to switch gears a
12 little bit and actually talk about the subject
13 project specifically and why we're here, okay?
14    A.   Okay.
15    Q.   When I say the subject project and
16 Mendota Hills Wind Farm, you understand what I'm
17 talking about when I use those words
18 interchangeably, right?
19    A.   Yeah.
20    Q.   Okay.  And on this project, I know I
21 have to ask a few obvious questions, but Borneke
22 was the excavating company for this project,
23 right?
24    A.   Correct.
                                                    34

1    Q.   And we've already established you were
2 the foreman and quality control project manager
3 on this project, correct?
4    A.   Correct.
5    Q.   On this project, can you
6 specifically -- we kind of already talked
7 about -- actually, I don't know if we did.
8        Walk me through the various roles.  As
9 a foreman, what were you doing, what were you
10 overseeing, things like that on this project?
11    A.   That project -- so you dig the
12 foundations, and then crane pads, and then Brad
13 left and I was responsible for doing the final
14 restoration.
15    Q.   Who would have been, like, overseeing
16 things like grading and providing drainage for
17 the erection areas?
18    A.   That would be Brad's area of expertise.
19    Q.   And so anything that Brad testified to
20 in his deposition, would you have any reason to
21 dispute what he said or how things were run from
22 his area?
23    A.   No, absolutely not.
24    Q.   And in your opinion, is Brad qualified
                                                    35

1 both to give opinions about like the
2 construction field in his work, but also his
3 work generally?
4    A.   Yes.
5    Q.   So then for the foreman aspect of it,
6 you were mainly overseeing the digging of
7 foundation and the building of crane pads,
8 right?
9    A.   Yes.
10    Q.   What about the quality control aspect?
11 Was this -- and I'm not trying to trick you.  I
12 honestly just want to make sure I understand
13 your role on this project.  Were you mainly
14 overseeing quality control for where the
15 foundations and the crane pads were?  Is that
16 what you said?
17    A.   Yes, because those are -- those, along
18 with building the actual roads, are three main
19 activities.
20    Q.   Yeah, and, you know, for obvious
21 reasons, you know, the foundation needs to be
22 able support the weight of this turbine, right?
23    A.   Yes.
24    Q.   And then, like, the crane pads need to
                                                    36



1  be able to support the weight of a crane as well
2  as all the equipment it's holding, so that's why
3  these are two of the more important areas, in
4  your opinion, right?
5      A.   Yes.
6      Q.   How often were you on site on this
7  project?
8      A.   Every day besides about two weeks.
9      Q.   Do you happen to remember when, give or
10 take, those two weeks were, like in the scheme
11 of the year?
12     A.   September.
13     Q.   But other than that, you had an on-site
14 presence every day?
15     A.   Yes.
16     Q.   And I know we spoke from a general
17 standpoint about contracts and scopes of work.
18          Have you seen, maybe not in some time,
19 but the contract for this specific project?
20     A.   Yes.
21     Q.   Same thing for the scope of work?
22     A.   Yes.
23     Q.   So you understand what Borneke was
24 contracted to do and what work they were going

37

1  to be performing, right?
2      A.   Yes.
3      Q.   As the quality control guy as well as,
4  like, the foreman, wearing both hats, it's very
5  important for you to know the contracted
6  responsibilities of Borneke so that you can
7  ensure the work is being done and that it's
8  being done right?
9      A.   That's correct.
10     Q.   Then one thing I should have asked you
11 in the beginning.  This is obviously a family
12 company, given the last name, right?
13     A.   Yes.
14     Q.   How many of you are there from the
15 family perspective in the company?  I know you
16 talked about your brother.  Would you mind just
17 kind of giving me a makeup the company?
18     A.   Yeah.  So my uncle owns it.  A couple
19 of my other uncles now still work there, but
20 they're to retirement age pretty much, so
21 they're -- we'll just call them part-timers.
22 And then we got four, I think -- yeah, four or
23 five project managers in the office and five or
24 six superintendents and a handful of guys like

38

1  me that -- we help out the superintendents, but
2  if we have to, we'll lead projects, and then
3  there's, yeah, 40 other people.
4      Q.   And the 40 other people, would those be
5  like the --
6      A.   Operators, laborers.
7      Q.   Yeah.
8      A.   And 40 is a rough estimate.  I would
9  say there's 40 main people that travel all over
10 with us, and then we sign local union deals, so
11 like when we were in Illinois, we had to hire
12 like 90 percent of the guys out of the local
13 Illinois hall.
14     Q.   No, that makes sense.
15          When you say the numbers like four to
16 five project managers, five to six
17 superintendents, are these all family members or
18 are these just like a mixture of people?
19     A.   Mostly now not really family members.
20 I got a couple uncles that they just work as
21 operators.  One of my uncles is the vice
22 president now of the whole company.  But, yeah,
23 most of my uncles, they drive semis or operate
24 equipment, really whenever we need help or just

39

1  around our local area.
2      Q.   Okay.  Then we talked about, you know,
3  Borneke's work from a general standpoint.
4          Would you agree that on this project as
5  well, some of the tasks included things like
6  clearing and grubbing, grading various areas of
7  the project, things like that?
8      A.   Yes, not really clearing and grubbing
9  because clearing and grubbing, to me, is when
10 we're down in Texas where it's mesquite brushes
11 and mesquite trees.  That's clearing and
12 grubbing to me.  I think on this project, we had
13 to trim a couple trees just so the turbine parts
14 didn't get scratched up, but it wasn't so much
15 clearing and grubbing.
16     Q.   What about things like creating and
17 maintaining a general laydown yard?
18     A.   Yes.
19     Q.   And same thing with creating and
20 maintaining various access and spur roads,
21 right?
22     A.   Yes.
23     Q.   And then also creating and maintaining
24 the ground at foundation areas as well as in

40



Nicholas Borneke 03/09/2022

1  erection areas, right?
2      A.   Yes.
3      Q.   As the quality control guy/foreman, you
4  would walk around to make sure the workers were
5  actually performing these tasks?
6      A.   Correct.
7      Q.   Would you actually be -- I don't mean
8  to use this term, like, unartfully -- but
9  getting your hands dirty with them as well doing
10  some of the tasks, or were you more overseeing
11  the work?
12     A.   Both.  I like getting my hands dirty,
13  and a lot of places, I can, but dealing with the
14  local Illinois unions, you can't, really.  You
15  have to play by their rules, so it's more
16  babysitting and making sure they're doing what
17  they need to be doing.
18     Q.   Got it.  Okay.
19         So on this project, due to, like, local
20  union rules and stuff, you were more so in the
21  supervisory position, but when you can on
22  various projects, you do try to hop in and help
23  where you can?
24     A.   Yes.

41

1      Q.   I want to, you know, talk about
2  erection areas.  The erection area, if we talk
3  about the site, this is literally -- like on
4  this project, I think there were 29 sites or
5  something like that.  Each T, like T1 through
6  T29, would be an erection area, right?
7      A.   Correct.
8      Q.   And to ask an obvious question, the T
9  stands for turbine, and then the number is the
10  turbine or site number?
11     A.   Yeah, it's turbine number, site number,
12  yeah, yes.
13     Q.   While these turbines were going up,
14  this area surrounding these, like that radius we
15  talked about, that same thing applied for this
16  project, and that area is called the erection
17  area, right?
18     A.   Yes.
19     Q.   On this project, part of Borneke's job
20  was to prepare the erection areas, right?
21     A.   Yes.
22     Q.   And then in these erection areas, I
23  know you said that there wasn't much clearing
24  and grubbing, but some of the main tasks would

42

1  be grading the land, providing drainage, making
2  sure the ground is as smooth as possible, things
3  like that, right?
4      A.   Yes.
5      Q.   You'd agree that it's important to do
6  these tasks in the erection areas, the grading
7  and the providing drainage, right?
8      A.   Yes.
9      Q.   And one of the reasons -- let's start
10  with drainage.  Providing drainage where
11  designated is important because you don't want
12  water pooling where people are going to be
13  working, correct?
14     A.   Correct.
15     Q.   And you'd also agree that if water
16  pools in the wintertime, this can be dangerous
17  because it can freeze and then lead to a
18  slipping or tripping hazard, right?
19     A.   Yes.
20     Q.   And then as we talked about before, on
21  this project too, if there's standing water, it
22  can damage equipment, it can lead to ruts being
23  formed more easily and cause more potential
24  tripping hazards.  It can cause a whole plethora

43

1  of problems, right?
2      A.   Yes, it could.
3      Q.   All of this, including the potential to
4  freeze, would be potentially dangerous things
5  that Borneke was hired to try and minimize,
6  right?
7      A.   Yes.
8      Q.   In addition to all these tasks we
9  talked about, the grading, drainage, things like
10  that, Borneke was also responsible for periodic
11  maintenance and inspection of the area it had
12  worked to make sure that it was still adequate,
13  right?
14     A.   Yes.
15     Q.   This is one of your roles as the
16  quality control guy on this project, to make
17  sure that the work was, no pun intended, but
18  quality work, right?
19     A.   Yes.
20     Q.   And what were you doing to ensure this?
21  Were you going around the various sites with a
22  pickup truck, you know, making sure everything
23  still looked okay, or were you just kind of
24  waiting to see if there were complaints?  Like,

44

Nicholas Borneke 03/09/2022

1  what was your role in that regard for quality
2  control on this project?
3      A.   I would say all.  Every week I had to
4  drive around to every site for -- to go over
5  erosion stuff, so I went to every site every
6  week.
7      Q.   So part of your tasks would be, to say
8  it another way, weekly going to each site and
9  discussing erosion and things of that nature?
10     A.   Yes.
11     Q.   What else would you discuss while you
12  were at these various sites?
13     A.   If something got messed up, we would
14  see if it was our fault, if it was something
15  natural, or if another contractor came in and
16  messed the site up, then we figure out who has
17  to fix it.
18     Q.   Would this include things like possibly
19  if the ground was no longer graded or if there's
20  like large ruts at various sites, things like
21  that?
22     A.   Yes.
23     Q.   On this project, was that a common
24  occurrence where you'd have to go to various

45

1  on-site superintendent on this project, knowing
2  the various tasks and making sure that they were
3  not only being performed, but also that they
4  were being performed well?
5      A.   Yes, absolutely.
6      Q.   And to make sure that the various sites
7  were being maintained to the best of the
8  abilities, right?
9      A.   Yes.
10     Q.   On this site, this was Brad Bennett,
11  correct?
12     A.   Correct.
13     Q.   During his deposition, he did testify
14  that he would, you know, in his role have to be
15  knowledgeable about inclusions and exclusions so
16  that he knows what Borneke was going to perform
17  and what they were not going to perform.  You
18  would agree with this that that's an important
19  responsibility for him to have and know, right?
20     A.   Yes.
21     Q.   Okay.  And then I just want to show you
22  a few more things.
23          Can you see my screen again?
24     A.   Yes.

47

1  sites and address various problems?
2      A.   On this site, no.
3      Q.   When you say you would go weekly to
4  each site, what were some of the things that on
5  this site you were specifically addressing other
6  than erosion?
7      A.   Just to make sure everything was still
8  put together right and make sure the roads
9  aren't falling apart, make sure no one drove
10  their pickup trucks across the crane pads, you
11  know.
12     Q.   Yeah.  So weekly, you would do your own
13  inspection, go to each various site, and just
14  make sure things still looked as good as they
15  could, given the circumstances, right?
16     A.   Yes, yeah.
17     Q.   If you saw something that was
18  potentially unsafe or bad ground conditions,
19  this is something that you would address with
20  the general contractor and see if it's something
21  that you need to readdress, things like that,
22  right?
23     A.   Correct.
24     Q.   Would you also expect the same of your

46

1      Q.   This is Brad Bennett's Exhibit No. 3.
2          Are you familiar with what it is we're
3  looking at here?
4      A.   Yes, it's a site map.
5      Q.   This site map is for the project we're
6  here to talk about, right?
7      A.   Yes.
8      Q.   And then at the top, we have T1, and it
9  goes, you know, kind of weaving around, but
10  various numbers all the way down to the bottom
11  at T29, right?
12     A.   Yes, yeah.
13     Q.   And then all these various T sites are
14  what we were talking about, the -- where the
15  turbine is and where the erection area actually
16  is, right?
17     A.   Yes.
18     Q.   I never actually realized this before,
19  so I'm just going to ask you, what does M1 stand
20  for, M as in Michael?
21     A.   It's MET tower.  They work as weather
22  towers and other communication towers.  I'm not
23  exactly sure what they do, but they look like
24  radio towers.

48



1    Q.   Got it.  And we've had some testimony
2  about that.  They essentially, like, measure the
3  weather at these sites, right?
4    A.   Yeah.
5    Q.   And then I want to show you, just
6  generally, Exhibit 4 for Brad Bennett's
7  deposition.
8        Again, can you see my screen?
9    A.   Yes.
10   Q.   This, again, is Beemerville Road, we
11  have Bingham Road, and Fisk Road.
12       Does it appear to be just the general
13  location of where this Mendota Hills project
14  was?
15   A.   Yes.
16   Q.   And then off of these roads, you can
17  see these various turbines and, like, the
18  shadows of them and these roads that lead up to
19  them.  These would be, like, the access roads,
20  right?
21   A.   Correct.
22   Q.   If we go on to Page 2, we see a
23  zoomed-in site.  What site this is, I don't
24  know, but, again, this curved road, this would

49

1  be, like, the access road, right?
2    A.   Yes.
3    Q.   And then this area that's cleared out
4  near the turbine, that would be, like, the
5  erection area, right?
6    A.   Yes.  During construction, the cleared
7  area is about 2 acres.  When it's all said and
8  done, you got the whole 20-foot circle of
9  concrete, and on this -- it was an existing wind
10  farm, so they left some old crane pads in, which
11  looks like a parking lot here.
12   Q.   Okay.  But again, so just from a
13  general standpoint, at least, this curved thing
14  would be, like, the access road, and then the
15  cleared out area near the turbine, that would
16  be, like, an example of an erection area, right?
17   A.   Yes.
18   Q.   And then, you know, we can see the
19  different colorations.  The dark green in this
20  is literally like 99 percent of the land like we
21  talked about earlier that you're never even
22  going to be touching, right?
23   A.   Yes.
24   Q.   And then it's only like the areas such

50

1  as the access roads and the erection areas that
2  actually matter.  Everything else, who cares
3  about, essentially, right?
4    A.   Yes.
5    Q.   In this erection area, you'd agree that
6  Borneke knows things are going to be delivered
7  here and workers are going to be coming in
8  later, right?
9    A.   Yes.
10   Q.   This is an important area to keep
11  maintained and safe for those various tasks and
12  workers, right?
13   A.   Yes.
14   Q.   This would include grading as well as
15  possible, as well as providing adequate
16  drainage, right?
17   A.   Yes.
18   Q.   I want to move in to the contract for
19  this project.  Again, this was marked as
20  Exhibit 5 for Brad Bennett's deposition.
21       And you can see my screen?
22   A.   Yes.
23   Q.   When we were talking about, like, the
24  contracts and the scope of work, this is an

51

1  11-page scope of work document.  Can you see
2  that?
3    A.   Yes.
4    Q.   At the top, it says "Mendota Hills
5  Repowering Project," so you'd agree this is for
6  the specific project we're here to talk about,
7  right?
8    A.   Yes.
9    Q.   And this would have been something that
10  you read prior to Borneke starting its work on
11  this project and at least be somewhat familiar
12  with so you know what Borneke had to do and what
13  they didn't have to do on this project, right?
14   A.   Yes.
15   Q.   Again, I'm not going to ask you to
16  interpret the contract from a legal standpoint,
17  but just from your time in the construction
18  field, your training in college, and everything
19  in between, you feel comfortable looking at
20  these documents and talking about what Borneke
21  was contracted to do and what they weren't
22  contracted to do, right?
23   A.   Yes.
24   Q.   So if we go on the first page under

52



1  2.1 General, Section D, it says, "Subcontractor
2  agrees to procure, provide, and pay for all
3  materials, equipment, tools, consumables, labor,
4  transportation, supervision, temporary office
5  requirements, administration, and other costs
6  required to complete the work," right?
7      A.  Yes.
8      Q.  So essentially, to say it simply,
9  Borneke has a job and they are responsible for
10  completing it, right?
11      A.  Yes.
12      Q.  If we go on to Page 2 under
13  Section 2.4, this is something we've talked
14  about before, and one of the areas Borneke was
15  responsible for was the construction trailer and
16  the laydown yard, right?
17      A.  Yes.
18      Q.  When we looked at the site map, that
19  was the overall laydown area down at the bottom
20  by like site T29 or something like that, right?
21      A.  Yeah, that sounds right.
22      Q.  And then if we go on to Page 3, under
23  Section 2.6, again, one of the things we talked
24  about, turbine access roads, part of Borneke's

53

1  documents, right?
2      A.  Yes.
3      Q.  Then part of the idea behind this is,
4  again, as we talked about, if the area's graded
5  away from where the turbine is and where the
6  work is being performed, there won't be standing
7  water that pools in the work area or near the
8  turbine.  That's part of the idea behind it,
9  right?
10      A.  Yes.
11      Q.  If we go to Page 9, Turbine Erection
12  Areas, if we go under Subsection A of 2.21,
13  Turbine Erection Areas, it says that "Borneke
14  has to clear, grub, and provide all necessary
15  grading for a 175-foot radius around the
16  turbine, inclusive of cut and fill, necessary to
17  achieve no more than a 5 percent grade across
18  the area."
19          Did I read that correctly?
20      A.  Yes.
21      Q.  Then there's subsections to this part
22  as well, like 1, 2, and 3, right?
23      A.  Yes.
24      Q.  For example, it says that "All cleared

55

1  responsibility was to create and maintain these
2  turbine access roads, right?
3      A.  Yes.
4      Q.  And then we can skip ahead a little bit
5  to Page 8 of this document.  Again, one of the
6  ideas -- or one of the responsibilities of
7  Borneke under 2.17 was foundation, excavation,
8  and backfill, right?
9      A.  Yes.
10      Q.  And Borneke was responsible for
11  creating and maintaining the various foundation
12  areas?
13      A.  Yes.
14      Q.  Under Section C, it says, you know,
15  like, excavate and backfill foundations in
16  accordance with the design documents, right?
17      A.  Yes.
18      Q.  And then I can skip some of this
19  because it's -- you know, after talking with
20  Brad, we've realized that it's not really
21  relevant, but some of it is.  Like, for example,
22  backfill, it says that it should be graded away
23  from the turbine to create adequate slope away
24  from the turbine as detailed in the design

54

1  and grubbed debris shall be pushed to the edges
2  of the cleared area."  That's 1.
3          And then 2 says, "Bumps shall be
4  leveled and holes filled to accommodate
5  equipment travel."
6          Did I read that correctly?
7      A.  Yes.
8      Q.  And then the last subsection of 2.21A,
9  No. 3 says, "Cleared area shall be maintained,
10  compacted, and provide positive drainage at all
11  times to facilitate turnaround area for turbine
12  delivery components through the duration of the
13  project," right?
14      A.  Yes.
15      Q.  And this is in that 175-foot radius
16  that we talked about, right?
17      A.  Yes.
18      Q.  So throughout this whole erection area,
19  these are some of the responsibilities of
20  Borneke, right?
21      A.  Yes.
22      Q.  So let's just break down Subsection 3.
23  It says it "shall be maintained and compacted,"
24  right?

56



1    A.    Yes.
2    Q.    Then another one says "provide positive
3 drainage," right?
4    A.    Yes.
5    Q.    One of the reasons for this is that the
6 turbine is in the center of this erection area?
7    A.    Yes.
8    Q.    And in addition to that, there's going
9 to be various cranes, trucks, workers coming in
10 this erection area, and you want the water going
11 away from this area, right?
12    A.    Yes.
13    Q.    From a common sense perspective, you
14 know, this is where workers are going to be
15 actually working, and you don't want people
16 wading around in water, right?
17    A.    Yes.
18    Q.    Additionally, standing water, as we
19 talked about on these projects, it can pool, and
20 then it can freeze, depending on the
21 temperature, right?
22    A.    Yes.
23    Q.    This is another reason why these tasks
24 are included in the scope of work because it's

57

1    A.    Right.
2    Q.    So there's different grades, like
3 90 percent would essentially be off a cliff,
4 right?
5    A.    Yes.
6    Q.    And then 5 percent would be a very
7 minimal grade, so the idea is keep the ground
8 mostly level but somewhat of a grade away from
9 these areas, right?
10    A.    Yes.
11    Q.    And, again, one of the reasons for this
12 is at these various areas, large pieces of
13 equipment are going to be coming in, right?
14    A.    Yes.
15    Q.    You want the semi trucks to be able to
16 come in and deliver these pieces of equipment,
17 right?
18    A.    Yes.
19    Q.    And you want the -- for example, the
20 rough terrain crane, you want that to be able to
21 come in, take the pieces of equipment off the
22 truck and place them in the staging areas,
23 right?
24    A.    Yes.

59

1 important to provide proper drainage on this job
2 site, right?
3    A.    Yes.
4    Q.    And then if we go on, it says that it
5 shall be compacted and maintained, but also in
6 the last subsection, bumps shall be leveled and
7 filled, so Borneke has to keep the ground as
8 level as possible in these areas, right?
9    A.    Yes.
10    Q.    And one of the reasons, like if we take
11 the crane pad, for example, you want the ground
12 to stay level so for things like the crane
13 doesn't tip over, right?
14    A.    Crane doesn't tip over.  You want
15 it -- that's why it's -- it's tricky, because,
16 yes, you want the water to drain, but you want
17 it as flat as possible.  Otherwise, yeah, they'd
18 put them all on hills.  Well, you can't work on
19 a hill, either, so you want it as flat as -- you
20 want it as flat as possible but still to have
21 drainage.
22    Q.    Yeah, no, and that's why there's
23 various degrees.  Like, for example, this says
24 no more than a 5 percent grade, right?

58

1    Q.    And if the ground is properly compacted
2 and leveled, one of the ideas is, like,
3 equipment doesn't roll away and it stays where
4 it should, right?
5    A.    Yes.
6    Q.    I want to break this down a little
7 further.  You'd agree that these requirements
8 for this erection area are for the full 175-foot
9 radius around the turbine, right?
10    A.    Yes.
11    Q.    Then again, like we said, this also
12 includes the maintaining of this area throughout
13 the duration of the project, as it says right
14 here, correct?
15    A.    Yes.
16    Q.    So is this part of your responsibility
17 as you talked about, on a weekly basis, going to
18 these various sites and making sure that they're
19 still graded, there's no large ruts, there's no
20 standing water, things like this?
21    A.    Yes, to a point, because if you also
22 read the whole thing, it's to facilitate an
23 area, a turnaround area for turbine delivery
24 components.

60



Nicholas Borneke 03/09/2022

1    Q.   Yeah.
2    A.   So, yes, once those components get
3  there, then we step back because they got to put
4  up that tower.  We can't be in there because
5  that's an even bigger safety risk.  So once
6  those turbine parts are in there, we're not even
7  supposed to really go into that site until
8  they're done putting the tower up.
9    Q.   Okay.  And, again, if you read the --
10 that is the last part, the Subsection 3, but it
11 also says things like "bumps shall be leveled
12 and holes filled to accommodate equipment
13 travel."
14       So you'd agree that Borneke, while
15 they're not going to be in there while a crane
16 is picking up a piece of equipment, they still
17 have a responsibility to make sure that these
18 various pieces of equipment and the workers can
19 do their job properly, right?
20   A.   Yes.  And the way I look at that
21 section, that's -- okay.  There's a cornfield
22 and it's plowed up, so we go and level it off so
23 it's not a plowed-up cornfield.
24   Q.   Exactly, but the idea is you can't just

61

1  go there, give it a once-over, and if something
2  happened where there's large ruts or standing
3  water, you can't just wipe your hands and say,
4  well, we've already been there.  Borneke has a
5  responsibility to maintain these areas as well
6  to the best of their abilities, right?
7    A.   Yes.
8    Q.   But to your point as well, the main
9  thing, like you said, is going in there and
10 doing it right the first time, preparing the
11 ground properly, right?
12   A.   Yes.
13   Q.   And this includes grading, drainage,
14 compaction, all those things?  Do it right the
15 first time, right?
16   A.   Yes.
17   Q.   And the idea is if you grade and
18 compact the land properly, it'll be able to
19 support the weight of the various pieces of
20 equipment that are coming on later, right?
21   A.   Not -- that's how it used to be, not so
22 much -- the equipment and everything's getting
23 so big and weighs so much that natural ground
24 can't support it.  That's why they use wooden

62

1  mats to put under stuff.  It's just -- no,
2  everywhere now, they put mats under everything
3  because the natural ground cannot support the
4  weight of the equipment and the parts.
5    Q.   Well, then, you know, to that point, if
6  the ground couldn't support it anyway, Borneke's
7  role is irrelevant, so that's kind of true, but
8  it's kind of not.  Borneke still has a
9  responsibility to prepare the ground properly,
10 right?
11   A.   Yes.
12   Q.   And part of that responsibility is to
13 ensure that the ground, to the best of its
14 natural abilities, can support the weight of
15 these various trucks and equipment, right?
16   A.   Correct.
17   Q.   Because if you just said, well, the
18 ground can't support it, we're not going to do
19 anything, you're not doing your job, right?
20   A.   Right, so we will do it the best of our
21 abilities, but then you bring in a million-pound
22 crane or 2-million-pound crane, it's just the
23 science of the dirt says you need to add
24 something else to it.

63

1    Q.   Of course.
2    A.   So, yes, to the best of our abilities,
3  yes, we compact it.
4    Q.   Okay.  Give me one second.
5        And like you said, to the best of your
6  abilities, you grade and compact the land,
7  right?
8    A.   Yes.
9    Q.   And the idea behind that is you want to
10 be able to make sure that the ground can, to the
11 best of its ability, support the weight under
12 these pieces of equipment, right?
13   A.   Correct.
14   Q.   And you want to make sure that -- you
15 know that this ground is going to have semi
16 trucks coming in, cranes, workers.  You want it
17 to be prepared properly so that the work goes
18 smoothly, right?
19   A.   Yes.
20   Q.   Not only smoothly, but safely, right?
21   A.   Yes.
22   Q.   What were you doing as a Borneke
23 quality control worker and foreman to ensure
24 that the area was properly maintained?

64

Nicholas Borneke 03/09/2022

1    A.   Just every week when I did my
2  erosion -- I can't even -- I can't think of the
3  term for it -- where I had to check all the
4  erosion stuff, so, yeah, I'd drive around to
5  every site, and if something was messed up, I'd
6  bring it up and we would -- if someone messed it
7  up, we'd fine -- they'd be responsible for
8  fixing it.  If it was something we did, we would
9  have to fix it.
10   Q.   Now, like, for example, if it's a --
11 well, let me break that down.
12        Are you stating that if another
13 contractor messed up excavating work, you'd make
14 ironworkers do excavating work?
15   A.   No, no, no.  So say, after we go
16 through and we do the concrete backfill, the
17 electricians come in and have to trench all
18 their electrical lines, so we're not going to go
19 and mess with their work.  If they're in there
20 working and it's -- if they leave a 4-foot hole
21 where they splice together wires, that's not our
22 responsibility to maintain their work as well.
23   Q.   No, and I see what you're saying, but
24 from a general perspective, if it's something

65

1  that just deteriorates because of, you know,
2  natural ground conditions or just how the site
3  is, you know, going, but if it was an excavating
4  task, these are things that Borneke would be
5  responsible for maintaining and fixing
6  periodically, right?
7    A.   Yes.
8    Q.   So what you're stating is you're just
9  not going to go back and fix someone else's
10 work, but if some of your work gets messed up,
11 that is something you would be responsible for
12 going back and addressing?
13   A.   Yes.
14   Q.   And then you would agree that if
15 Borneke is not maintaining these erection areas
16 and not ensuring that the ground is still up to
17 standards, by not doing this, they are not
18 performing the tasks they were contracted to do,
19 right?
20   A.   Can you repeat that?  You cut out a
21 little.
22   Q.   Yeah, sure.  You'd agree that Borneke,
23 in addition to preparing the ground right the
24 first time, had a responsibility to maintain the

66

1  various areas as well, right?
2    A.   Yes.
3    Q.   And if Borneke is, in fact, not going
4  around and maintaining areas that need to be
5  maintained or readdressed, hypothetically
6  speaking, this would mean they were not
7  fulfilling their contractual obligations, right?
8    A.   Correct.
9    Q.   On these job sites, and this one in
10 particular, you agree that Borneke had necessary
11 equipment to grade and maintain the roadways,
12 right?
13   A.   Yes.
14   Q.   They had bulldozers, Bobcats, bladers.
15 They had equipment big and small, right?
16   A.   Yes.
17   Q.   And if an area was potentially too
18 tight for a bulldozer to get to, something like
19 a smaller piece of equipment like a Bobcat could
20 have potentially been used, right?
21   A.   Yes.
22   Q.   This is out of place in my outline, but
23 before I forget to ask you this, retention of
24 documents, you know like how Borneke has various

67

1  documents for various projects, whether it be
2  change orders, contracts, safety documents,
3  whatever it may be, Brad testified that his
4  understanding is, after the project is done,
5  Borneke sends everything to the general
6  contractor or the owner, and then they don't
7  really keep a copy of it.  Does this sound
8  accurate to you?
9    A.   Yes.
10   Q.   Do you know why that is, just why it's
11 kind of we'll send everything out, and then we
12 don't retain a copy ourselves?
13   A.   I don't -- honestly, I don't know why
14 that is, either.  I don't know.
15   Q.   Okay.  Got it.
16        MR. TERRY:  Hey, Chris, do you think
17 now is an okay time to take a quick break?
18        MR. SULLIVAN:  Yeah, that's fine.
19        MR. TERRY:  Perfect.
20        Nick, we're just going to take a few
21 minutes.
22        Ms. Court Reporter, let's just take
23 like five and come back at about like 2:20 or
24 so.

68



1         (Whereupon, a short break was
2              taken.)
3    BY MR. TERRY:
4         Q.   So then, sir, I just want to ask you a
5    few general questions.  Just to be clear, you
6    agree that if an area is properly graded, one of
7    the benefits is that standing water will not
8    pool, right?
9         A.   Yes.
10        Q.   And if the grading and the draining is
11   done properly, this prevents standing water,
12   right?
13        A.   Yes.
14        Q.   And if the water does not stand or
15   pool, so to speak, then it cannot freeze.
16   That's one of the ideas behind it?
17        A.   Yes.
18        Q.   You'd agree that if an area that
19   Borneke is responsible for grading and providing
20   drainage, if they do this properly, there should
21   not be standing water in these areas, right?
22        A.   Correct.
23        Q.   You agree that large areas of standing
24   water can later turn into sheets of ice

69

1    that's the delivering and the erecting of wind
2    turbines, right?
3         A.   Yes.
4              MR. TERRY:  And, Ms. Court Reporter,
5    Mortenson is M-O-R-T-E-N-S-O-N, just for the
6    record.
7    BY MR. TERRY:
8         Q.   And then Borneke knows that in order to
9    effectuate, like, delivery, they have to, for
10   example, prepare the access roads so that they
11   don't simply sink underneath the weight of the
12   pickup trucks, right -- or the semi trucks?
13        A.   Yes.
14        Q.   And Borneke also knows the same thing.
15   Obviously, there are limits with natural land,
16   but to the best of the ability, Borneke has to
17   prepare the erection areas so that they, for
18   example, can support the weight of the crane on
19   the crane pad, right?
20        A.   Yes.
21        Q.   And this crane pad not only has to be
22   able to support the weight of the crane, but
23   also be able to support the weight of the
24   various pieces of equipment being delivered,

71

1    possibly, correct?
2         A.   Yes.
3         Q.   On this project, the vast majority of
4    it is farmland that Borneke never touches
5    because it would be next to impossible to touch
6    every square inch, right?
7         A.   Yes.
8         Q.   But there are designated areas, such as
9    erection areas, for example, where it's
10   important to make sure the grading, the
11   drainage, and the compaction is done properly,
12   right?
13        A.   Yes.
14        Q.   And to ensure that this work is
15   maintained in these areas, right?
16        A.   Yes.
17        Q.   And to ensure that potholes or ruts are
18   filled as needed, right?
19        A.   Yes.
20        Q.   You would further agree that given
21   Borneke's decades of experience in the wind farm
22   industry as well as working with Mortenson on
23   prior projects, Borneke is well aware of what is
24   going to be performed on this project, and

70

1    right?
2         A.   Correct.
3         Q.   And you'd agree that part of Borneke's
4    responsibilities is to grade and compact the
5    land to prepare for these tasks, right?
6         A.   Yes.
7         Q.   And you'd agree that part of the
8    responsibilities is to prevent the ground from
9    simply caving in or sinking underneath the
10   weight of these various pieces, right?
11        A.   Yes.
12        Q.   And you'd agree that these pieces, like
13   the bases, the mid, the top sections of these
14   turbines, I mean, they weigh tens of thousands
15   of pounds, right?
16        A.   Yes.
17        Q.   And if the ground is -- let's just say
18   hypothetically, if the ground is not compacted,
19   if it's not prepared properly, catastrophic
20   things can happen where the ground caves in and
21   these pieces of equipment roll or fall and
22   really bad things can happen, right?
23        A.   Yes.
24        Q.   That's why it's really important to

72

1  prepare the ground properly so that the ground
2  can support the weights of these pieces of
3  equipment, right?
4      A.   Yes.
5      Q.   And in preparing the ground, not only
6  does Borneke grade it, but they compact it to
7  try and help prepare it for the various
8  components that are going to be there, right?
9      A.   Yes.
10     Q.   And you'd agree that one of the reasons
11 you compact the ground in these erection areas
12 is that so it does not sink underneath the
13 pieces of equipment, right?
14     A.   Yes.
15     Q.   And another reason is, is that so the
16 ground does not sink in and cause a depressed
17 area to form where water could later pool and
18 freeze because that would be a potentially
19 unsafe condition, right?
20     A.   Correct.
21     Q.   Like, for example, you'd agree that
22 Borneke is able to create crane pads that do not
23 sink in underneath the weight of the crane,
24 right?

73

1  underneath these various pieces of equipment,
2  right?
3      A.   Yes.
4      Q.   I want to show you what was marked as
5  Exhibit 8 for Mr. Bennett's deposition.
6          Have you seen this document before,
7  sir?  It's an incident analysis created by
8  Mortenson.
9      A.   Yes, I've seen this one.
10     Q.   I don't want to know about what you
11 spoke with Mr. Sullivan about or anyone from his
12 office, but when did you see this document?
13     A.   I don't know, a month ago.
14     Q.   Was that the first time that you saw
15 it?
16     A.   Yeah, yes.
17     Q.   Were you involved in any investigation
18 or conversations after the subject incident that
19 we're here to talk about today?
20     A.   No.
21     Q.   Let me just ask you some questions
22 about this document.
23          You'd agree that in this document, we
24 see what appears on the right side of this

75

1      A.   Yes -- yes, and that stuff's always
2  changing, but yes.
3      Q.   Yeah.  But generally speaking, you'd
4  agree that to be true.  Otherwise, there would
5  be no need for excavators.  Borneke is able to
6  prepare the land so that the crane pad could
7  adequately support the weight of the crane and
8  the crane holding the various pieces of
9  equipment, right?
10     A.   Yes.
11     Q.   And then the same thing, Borneke is
12 also able to prepare the various erection areas
13 so that it can adequately support the weight of
14 semis traveling, as well as the staging of
15 equipment, right?
16     A.   Yes.
17     Q.   And you'd agree that Borneke knows that
18 these various tasks are going to be performed,
19 like semi trucks delivering equipment and
20 equipment being staged in these areas, right?
21     A.   Yes.
22     Q.   And you would expect that if Borneke
23 properly grades and compacts the erection area,
24 the ground would not sink in or cave in

74

1  picture to be an erection area, right?
2      A.   Yes.
3      Q.   To the left, it's a little hard to see,
4  but we can see the crane pad to the left, right?
5      A.   Yes.
6      Q.   And then, you know, we can see
7  literally where I think the farmland again
8  starts, because you see this area behind the hub
9  in the background.  That's a little elevated,
10 but then the area around the crane pad and the
11 erection area as a whole is more level, right?
12     A.   Yes.
13     Q.   And then so this whole area where this
14 big midsection to the right is being staged, as
15 well as the hub, as well as where the crane pad
16 is, this is all part of the erection area,
17 right?
18     A.   Yes.
19     Q.   Do you have any understanding of how my
20 client's incident happened other than from
21 conversations with your attorney?
22     A.   No.
23     Q.   I want to go on to Page 2 of this
24 document.  It says that, and I quote:  The site

76



Nicholas Borneke 03/09/2022

1  had been previously addressed with a bulldozer
2  to mitigate walking/working hazards. However,
3  the ice accumulation had occurred too close to
4  the WTG section for the dozer to operate safely,
5  leaving the ice unaddressed.
6        You agree that Borneke -- and Brad
7  agreed with this as well -- that Borneke was the
8  entity running the bulldozers and grading and
9  maintaining the land, right?
10     A.   Possibly.  I also do know Mortenson
11 also had their own bulldozer on-site as well.
12     Q.   Do you happen to know if anyone from
13 Mortenson asked or addressed this ice
14 accumulation with people from Borneke?
15     A.   No, they did not at all.
16     Q.   But as it pertains to what's in this
17 document, do you have any knowledge one way or
18 another about the information in this document
19 or any of the findings?
20     A.   Can you repeat that one more time?
21     Q.   Sure.  I guess that was a bad way to
22 ask the question, like I said in the beginning.
23        You said the first time you saw this
24 document was about a month ago, right?

77

1      A.   Yes.
2      Q.   You had no -- did you have any part in
3  an investigation into this accident or how it
4  happened on this job site?
5      A.   No.
6      Q.   And do you have any opinions one way or
7  another about the information contained in this
8  document, considering you were not part of
9  creating it or anything like that?
10     A.   No.  The document seems -- it's just
11 like all the other ones Mortenson does, so I --
12     Q.   So you've seen these documents in the
13 past on various Mortenson projects?
14     A.   Yes.
15     Q.   And it's just, like it says, an
16 incident analysis for how the incident occurred
17 and what could have been done, stuff like that?
18     A.   Yes.
19     Q.   But, again, based on the photograph
20 that I showed you in that document, you agree
21 that this an erection area that Borneke was
22 responsible for grading and maintaining
23 throughout the project, right?
24     A.   Yes.

78

1      Q.   And in this responsibility, this area
2  included the responsibility to properly prepare
3  the land for both the crane pad as well as the
4  various pieces of equipment and the trucks that
5  are going to be coming later in, right?
6      A.   Yes.
7      Q.   We've already established Borneke is
8  responsible for providing proper drainage and
9  grading so that water doesn't pool and freeze in
10 these areas, right?
11     A.   Correct.
12     Q.   And if water does not pool, if there's
13 proper drainage, the idea is water won't be able
14 to pool and freeze, right?
15     A.   Yes.
16     Q.   Like we've established, Borneke has
17 been on these wind farm projects for the last
18 20-plus years, right?
19     A.   Yes.
20     Q.   They know what's going to be delivered
21 and what's going to be expected, right?
22     A.   Yes.
23     Q.   And they are responsible for grading
24 and compacting these areas that we saw in the

79

1  photograph?
2      A.   Yes.
3      Q.   I think I've already asked you this,
4  but just to get the proper foundation, what's
5  your opinion of Brad Bennett as a site
6  superintendent, just a worker as a whole?
7      A.   He's an expert.  I love working with
8  Brad.  I actually -- yeah, I've been working
9  with Brad since I was in high school during the
10 summers.  Yeah, he's awesome.
11     Q.   And, you know, from taking his
12 deposition, I can tell you that he seems very
13 knowledgeable, but the point of my question is,
14 you don't have any qualms with his
15 qualifications or ability to perform his work,
16 do you?
17     A.   No.
18     Q.   And the same thing, do you have any
19 reason to have qualms with his knowledge of what
20 work was supposed to be performed or how it was
21 supposed to be performed?
22     A.   No.
23     Q.   And during his deposition, as you and I
24 have talked about, he testified consistently,

80



1 and there's just a few things I want to ask you
2 about that.
3          You agree that -- well, let me ask you
4 this: He testified that, you know, Borneke
5 knows what's going to be delivered to the
6 various sites and that they prepare the sites so
7 that they do not get depressed areas formed
8 either by the trucks or the equipment, to the
9 best of Borneke's abilities. Would you agree
10 with this?
11     A.  Yes, to the best of our abilities, yes.
12     Q.  Yeah. And he also testified that if
13 the ground is not properly prepared, depressed
14 areas and large ruts could form, and this could
15 lead to areas where water can pool and possibly
16 freeze, right?
17     A.  Correct.
18     Q.  And he also testified that Borneke is
19 responsible for grading, compacting, and
20 providing proper drainage, like you testified,
21 but he said if these tasks are done properly,
22 the idea is there won't be large areas of
23 standing water that could freeze over. You'd
24 agree with this as well, right?

81

1     A.  Yes.
2     Q.  And then he further testified that
3 Borneke knows what is going to be delivered to
4 the various sites, and that is why these
5 erection areas are created so that part of the
6 land can accommodate what's going to be
7 delivered and the work that's going to be
8 performed there. You would agree with this,
9 right?
10     A.  Yes.
11     Q.  And part of the being able to
12 accommodate the delivery is making sure that the
13 ground does not simply cave in underneath the
14 weight of these trucks and equipment, right?
15     A.  Correct.
16     Q.  You agree that if there are large ruts
17 or depressed areas existing in areas where
18 Borneke was responsible for grading, compacting,
19 and maintaining, you know, this is evidence that
20 certain areas may not have been properly graded
21 or compacted, right?
22          MR. SULLIVAN:  Objection, legal
23 conclusion.
24          You can answer.

82

1          THE WITNESS:  What's that?
2          MR. SULLIVAN:  Go ahead. Rephrase,
3 please.
4 BY MR. TERRY:
5     Q.  Yeah, sure. You would agree that if
6 there are large ruts or depressed areas on
7 various parts of the project, like erection
8 areas, for example, where Borneke is responsible
9 for grading, compacting, and drainage, if
10 there's these large ruts in depressed areas in
11 these various erection areas, this is evidence
12 that certain areas were not properly graded or
13 prepared, right?
14          MR. SULLIVAN:  Same objection.
15          Go ahead.
16          THE WITNESS:  Me?
17 BY MR. TERRY:
18     Q.  Yes.
19     A.  Yes. If our job was done correctly,
20 yes.
21     Q.  If your job is done correctly, the idea
22 is to prevent those large ruts and depressed
23 areas in these erection sites, right?
24     A.  Yes.

83

1     Q.  And then Brad also testified that
2 Borneke has access to the plans of the day on
3 this project, right?
4     A.  Yes.
5     Q.  And so they know what is going to be
6 performed on the various days and when things
7 are going to be delivered, stuff like that,
8 right?
9     A.  Yes.
10     Q.  And Brad testified that something that
11 was feasible was looking at the plans of the
12 days, seeing when various pieces of equipment
13 were being delivered, and just making sure that
14 after that, the various erection areas are still
15 properly graded and maintained. You would agree
16 with this, right?
17     A.  Yes.
18     Q.  And this is part of what you were
19 actually doing, going to these various areas
20 and, you know, seeing if the areas were still
21 properly graded and compacted after various
22 deliveries were made, right?
23     A.  Before deliveries.
24     Q.  Why not after?

84



Nicholas Borneke 03/09/2022

1      A.   After is when they're supposed to be
2  putting their tower up and we're not supposed to
3  be in there.
4      Q.   Well, on these projects, there's
5  sometimes weeks or, you know, months of delays
6  after the equipment is delivered before it's
7  actually put up, right?
8      A.   Yes.
9      Q.   So in those two weeks that, for
10 example, the equipment is sitting at one site
11 and not being erected, it's possible for Borneke
12 to go there and make sure the ground is still
13 properly graded and drainage is still adequate
14 at these sites, right?
15     A.   Yes, but that's also to the best of our
16 abilities because the more equipment, the more
17 people you bring into one of those sites, the
18 greater the risk is to running into one of the
19 towers, so you want to minimize as much as you
20 can going in and out of these sites because if
21 you run a bulldozer or road grader into one of
22 those turbines, then it's a really big problem.
23     Q.   And, again, that's why it's so
24 important to prepare these roadways and erection

85

1  areas right the first time so you don't need to
2  go back and address them?
3      A.   Yes.
4      Q.   So that way, the erection area does not
5  simply sink in or cave in underneath the various
6  mid pieces or the crane.  Prepare it right the
7  first time and these things shouldn't happen,
8  right?
9      A.   Yes.
10     Q.   And, you know, showing you what was
11 marked as Exhibit 9 for Mr. Bennett's
12 deposition, these are just some photographs of
13 the --
14          THE WITNESS:  Can I go yell at my dog
15 for a second?
16          MR. TERRY:  It's not bothering me, but
17 if you need to, yeah, you can.  I have a German
18 Shepherd at home, so I get it.
19          THE WITNESS:  Yeah, I'm just going to
20 go put him in my garage.
21          MR. TERRY:  Yeah, of course.  Yeah, go
22 ahead.  Take your time.
23          (Whereupon, a short break was
24            taken.)

86

1          MR. TERRY:  Back on the record.
2  BY MR. TERRY:
3      Q.   Sir, I'm showing you what's been marked
4  as Bennett Exhibit 9.
5          Can you see my screen?
6      A.   Yes.
7      Q.   And this is just a -- you can tell that
8  this is just a photograph that was contained in
9  the incident report that I showed you, right?
10     A.   Yes.
11     Q.   Then if we go on to Page 2, it's
12 another photograph that shows like a rough
13 terrain crane having to be towed out of ruts by
14 one or two tractors, right?
15     A.   Yes.
16     Q.   Was this a common occurrence on this
17 job site, you know, like, large pieces of
18 equipment or trucks getting stuck and having to
19 be towed out?
20     A.   Not to my knowledge.  This might have
21 been the only one.
22     Q.   But overall, you'd agree that, you
23 know, the site as a whole before Borneke gets
24 there, you know, rough, bad farmland, right?

87

1      A.   Yes.
2      Q.   And in the areas where Borneke is
3  working, it's important to take the proper
4  precautions so that the land is prepared for
5  what is going to be coming next, right?
6      A.   Yes.
7      Q.   And, like, this land is easily
8  problematic to begin with, given that it's
9  untouched farmland, right?
10     A.   Yes.
11     Q.   This is more reason to ensure that the
12 areas Borneke works on are properly prepared and
13 maintained, right?
14     A.   Yes.
15     Q.   And as the quality control person as
16 well as the foreman on this project, you had the
17 responsibility to ensure the work was being
18 performed properly, right?
19     A.   Yes.
20     Q.   And this included areas such as access
21 roads, laydown areas, and erection areas, right?
22     A.   Yes.
23     Q.   And, again, prior to this incident,
24 there's been testimony that Borneke was not

88

Nicholas Borneke 03/09/2022

1  responsible for snow and ice removal prior to
2  this incident.  You'd agree with that
3  explicitly, right?
4      A.   Yes.
5      Q.   But prior to this incident, Borneke was
6  responsible for grading, compacting, and
7  maintaining various erection areas, right?
8      A.   Yes.
9      Q.   One of the tasks they were responsible
10 for was providing drainage at these erection
11 areas?
12     A.   Yes.
13     Q.   And you'd agree that these tasks, the
14 compaction and the drainage, are important
15 because if the land is not even per
16 specifications in the contract or not properly
17 drained, this can lead to a lot of problems both
18 for equipment and workers, right?
19     A.   Yes.
20     Q.   Have you ever spoken to my client, Nick
21 Georgeff?
22     A.   No.
23     Q.   Do you know anything about his
24 accident, his injuries, or his recovery?

89

1  BY MR. TERRY:
2      Q.   Yeah.  And Borneke, to the best of your
3  abilities -- we'll say that to the best of your
4  abilities, Borneke is required to prepare the
5  ground so that it does not sink in underneath
6  these pieces of equipment, right?
7      A.   Correct.
8      Q.   And Borneke knows that various semi
9  trucks need to drive up to these erection areas
10 and put down these pieces of equipment, right?
11     A.   Yes.
12     Q.   And Borneke knows that these delivery
13 sites to the erection areas need to be compacted
14 and stable, right?
15     A.   Yes.
16     Q.   You'd agree that if a piece -- if a
17 ground caves in underneath these pieces of
18 equipment, it can roll off the cribbing and
19 possibly damage equipment or even hit and kill
20 somebody, right?
21     A.   Yes.
22     Q.   From a further standpoint, not only
23 could the equipment roll and damage something,
24 but if the equipment just sinks into the ground

91

1      A.   Just from reading that.
2      Q.   So is the extent of your knowledge that
3  he slipped on ice on this project and injured
4  his ankle?
5      A.   Yes.
6      Q.   So did you see, like, him fall or the
7  aftermath or anything like that?
8      A.   No.
9      Q.   So you'd agree that if this goes to
10 trial, you will not come in and testify that you
11 have any observations or knowledge of his pain
12 or anything like that, right?
13     A.   Correct.
14     Q.   So overall, just from a general
15 standpoint, you'd agree that if Borneke is doing
16 their job properly, the ground will not sink in
17 underneath pieces of equipment that are
18 delivered to erection sites, right?
19         MR. SULLIVAN:  Objection, calls for a
20 legal conclusion.
21         But go ahead if you understood.
22         THE WITNESS:  To the best of our
23 abilities, yes.
24

90

1  on top of the cribbing, this could lead to a
2  depressed area forming, right?
3      A.   Yes.
4      Q.   And in these depressed areas, water can
5  form, pool, and freeze, right?
6      A.   Correct.
7      Q.   To the best of Borneke's abilities,
8  they're contracted to prepare the ground so that
9  it does not sink in underneath these pieces of
10 equipment, right?
11     A.   Yes.
12     Q.   If Borneke is doing their job properly,
13 in a perfect world, things like this don't
14 happen, right?
15     A.   Correct.
16     Q.   And Borneke has worked on a whole
17 plethora of various projects, including some
18 where there's a lot of rain and some where
19 there's no rain, right?
20     A.   Yes.
21     Q.   Borneke has worked on projects with
22 everything in between those scenarios as well,
23 right?
24     A.   Yes.

92

1    Q.   So the idea is they've worked on
2  projects where there's a whole variety of
3  conditions and they know how to prepare for
4  whatever conditions the job site brings, right?
5    A.   Yes.
6    Q.   You'd agree that if Borneke, and,
7  again, to the best of their abilities and in a
8  perfect world, is doing this grading --
9              (Whereupon, the proceedings were
10             interrupted due to technical
11             difficulties.)
12 BY MR. TERRY:
13   Q.   -- doing their grading and this
14 compaction in these erection areas, the idea is
15 there won't be standing water in these areas
16 that can freeze over?
17       MR. TERRY:  And I believe Mr. Sullivan
18 had an objection and the witness answered
19 "correct," but nonetheless, we can --
20 Mr. Sullivan, if you want to remake your
21 objection.
22       MR. SULLIVAN:  I objected to it calls
23 for a legal conclusion.
24

93

1  BY MR. TERRY:
2    Q.   Sir, would you mind regiving your
3  answer, just for the record?
4    A.   Yes.
5    Q.   Your answer was "correct," right?
6    A.   Correct.
7    Q.   And, again, the 99 percent of this
8  farmland Borneke is never going to touch, but
9  the various erection sites where Borneke is
10 responsible for, this is where they are
11 responsible for, to the best of their abilities,
12 preventing depressed areas and standing water
13 that forms as a result of ground sinking
14 underneath delivered pieces of equipment, right?
15   A.   Yes.
16   Q.   And the sheet of ice that we saw in
17 that picture that formed looks to be in a
18 depressed area that formed underneath the piece
19 of equipment.  Would you agree with that?
20   A.   Yeah, I got one or -- two things could
21 have happened.  When they brought that in, they
22 had mats down there before -- so I'll back up.
23       It's November.  Everything's frozen in
24 the morning, thaws out in the afternoon, so

94

1  Mortenson could have came in, scraped some mud
2  off, you know, just so their trucks could get
3  some traction, put mats down, and dug a little
4  bit of a hole to create that area where the ice
5  was sitting.  Then on top of that, you got mats
6  on the backside creating a dam, so that would
7  block water off from draining out the back side.
8    Q.   And let me -- you have no idea if
9  that's what happened or not.  This is just your
10 best guess and speculation, right?
11   A.   Yes, but looking at the picture, there
12 were mats down before.
13   Q.   Well, in that picture, there's no mats
14 down, and I can tell you that one of the
15 ironworkers testified he does not believe mats
16 were used in this area.  He said that this is an
17 area where the base was previously staged.  So
18 do you have any reason to disagree with that?
19   A.   No, but the base would have been on
20 mats.
21   Q.   He said he doesn't believe so.  He
22 believes it was just on cribbing.
23   A.   Then why is the other part on
24 100 percent mats?

95

1    Q.   Well, I'm just going to tell you that
2  I'm going to be the one asking the questions,
3  and I don't mean that disrespectfully, but your
4  attorney can ask you any follow-ups he wants,
5  but even if the other one is on mats, you'd
6  agree that mats have been used on numerous
7  projects, right?
8    A.   Correct.
9    Q.   This is not uncommon for mats to be
10 used to help stage equipment, right?
11   A.   Correct.
12   Q.   And Borneke knows that sometimes
13 cribbing is used and sometimes mats are used to
14 help stage equipment, right?
15   A.   Yes.
16   Q.   And underneath these mats is ground
17 that Borneke prepares, right?
18   A.   Yes.
19   Q.   And the ground is supposed to be
20 prepared to effectuate delivery, staging, and
21 eventual erection, right?
22   A.   Yes.
23   Q.   And if the ground sinks in underneath
24 these mats or underneath this equipment such

96



1  that a depressed area is formed, you'd agree
2  that the ground might not be properly prepared
3  because the ground's supposed to be prepared so
4  that this doesn't happen, right?
5      A.  To the best of our abilities.
6      Q.  So the answer is correct, to the best
7  of your abilities?
8      A.  Yes.
9      Q.  To the best of your abilities,
10 hypothetically, if Borneke does these things
11 properly, the ground will be prepared so that
12 these conditions don't happen underneath these
13 pieces of equipment, right?
14     A.  Yes.
15         MR. TERRY:  That's all I have right
16 now.  Chris, I appreciate your time.
17         And, Nick, I appreciate your time as
18 well today, sir.
19         THE WITNESS:  Thank you.
20         MR. SULLIVAN:  Nick, I have a few
21 follow-up questions for you.  Almost done here.
22              EXAMINATION
23 BY MR. SULLIVAN:
24     Q.  I wanted to ask you some questions

97

1  about the picture, but before I do that, Nick,
2  would you agree with me that Borneke complied
3  with its contractual requirements in this
4  contract with Mortenson on this project?
5         MR. TERRY:  Objection, legal
6  conclusion, contract interpretation.
7  BY MR. SULLIVAN:
8      Q.  Go ahead.
9      A.  Yes.
10     Q.  Did Mortenson pay you for the project?
11     A.  Yes.
12         MR. TERRY:  Relevance.
13 BY MR. SULLIVAN:
14     Q.  Did Mortenson ever tell you, you did
15 not comply with any aspect of the scope of work?
16     A.  No.
17     Q.  Did Borneke's work comply with the
18 standard of care of a reasonably competent
19 grading contractor?
20     A.  Yes.
21     Q.  When you were done on each of these
22 turbine erection sites with your grading work,
23 did the areas drain properly?
24     A.  Yes.

98

1      Q.  Were they graded properly?
2      A.  Yes.
3      Q.  Did any of the areas have depressed
4  sections that would collect water like you saw
5  in the picture?
6      A.  No.
7      Q.  Let me pull up this.
8          Can you see the picture?
9      A.  Yes.
10     Q.  It's the same picture we've been
11 looking at, right?
12     A.  Yes.
13     Q.  Now, there's no snow in this picture,
14 but there was snow that day, right?
15     A.  Yes.
16         MR. TERRY:  I'm just going to object to
17 mischaracterizing the photograph.  There is snow
18 in that picture by the base and in other areas,
19 just not on the sheet of ice.  If you want to
20 zoom in, you can, but there's clearly snow in
21 that picture.
22 BY MR. SULLIVAN:
23     Q.  I don't know, is that snow?  I don't
24 know.

99

1          There's no snow on the ice that you
2  see, is there?
3      A.  No.
4      Q.  But that day, it didn't look anything
5  like this, right?  Because it was snowing at the
6  time, wasn't it?
7      A.  Correct.
8      Q.  And you mentioned mats earlier, right?
9      A.  Yes.
10     Q.  Do you see mats in this picture
11 underneath the piece that's still there?
12     A.  Yes.
13     Q.  What was your experience with the way
14 Mortenson used mats?
15     A.  They put mats under everything they do
16 pretty much to help with their working surface
17 to support the items so they don't roll off,
18 roll away.
19     Q.  Would you have ever left an area with
20 this type of condition that you see in this
21 picture when you were done with your work on the
22 erection site?
23     A.  No.
24     Q.  Did you ever have notice that this

100

1  condition in this picture ever existed?
2      A.  No.
3      Q.  Did Mortenson ever contact anyone from
4  Borneke and say please come out to site T11.
5  There's ice that has formed.  Please address it?
6      A.  No.
7      Q.  Isn't it true that based on the sheer
8  weight of these components, you can properly
9  grade and compact the area, and they can still
10 sink into the ground because of the sheer
11 weight; isn't that right?
12     A.  That is correct.
13     Q.  By the way, Borneke had nothing to do
14 with using pads under any pieces of equipment,
15 correct?
16     A.  Correct.
17     Q.  And the contract did not require
18 anything like pad usage, certainly by Borneke,
19 correct?
20     A.  Correct.
21         MR. SULLIVAN:  I think that's all I
22 have.  Thank you, Nick.
23         MR. TERRY:  And, you know, Nick, I just
24 have a few follow-ups.  I'll have you out of

101

1  here by 3:00 o'clock.  It's 2:58.  Just a few
2  follow-ups.
3            FURTHER EXAMINATION
4  BY MR. TERRY:
5      Q.  You were asked questions about whether
6  or not there was depressed area when you left
7  and if Mortenson ever complained to you that you
8  were not performing the work properly.  Do you
9  remember those questions?
10     A.  Yes.
11     Q.  You agree that Borneke is hired on
12 these projects because they are the experts in
13 the excavating field, correct?
14     A.  Correct.
15     Q.  Borneke is not going to Mortenson and
16 asking Mortenson how Borneke should do their
17 job.  That's left up to Borneke to figure out,
18 right?
19     A.  Can you rephrase that?
20     Q.  Sure.  The point of my question is,
21 Borneke is the experts in their field and how
22 Borneke does its job is left up to Borneke,
23 right?
24     A.  Yes.

102

1      Q.  And there's an expectation that as long
2  as Borneke is complying with the contractual
3  responsibilities, they are going to be
4  performing their tasks properly and as experts
5  in the field of excavation, right?
6      A.  Yes.
7      Q.  And you've worked on projects with
8  Mortenson in the past, right?
9      A.  Yes.
10     Q.  And you said that they put mats under
11 everything, right?
12     A.  Yes.
13     Q.  So you've seen this -- these types of
14 mats being used for staging in the past?
15     A.  Yes.
16     Q.  And you agree that in addition to -- so
17 you agree that you have seen these mats be used
18 on other projects and knew that this was a
19 possibility for how equipment was going to be
20 staged, right?
21     A.  Yes.
22     Q.  And you agree that the ground needs to
23 be prepared for not only delivery, but also
24 staging so that it does not sink in underneath

103

1  the cribbing or the mats, right?
2      A.  Yes.
3          MR. TERRY:  I believe that's all I
4  have.  Thank you.
5          MR. SULLIVAN:  Thanks.  We'll waive
6  signature.
7              (whereupon, the deposition
8               concluded at 3:01 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

104

Nicholas Borneke 03/09/2022

```
 1          C E R T I F I C A T E
 2
 3      I, Vicki L. D'Antonio, a Notary Public
 4  within and for the County of Cook and State of
 5  Illinois, do hereby certify that heretofore,
 6  to-wit, on the 9th day of March 2022, personally
 7  appeared before me NICHOLAS BORNEKE, a witness
 8  in a certain cause now pending and undetermined
 9  in the United States District Court, Northern
10  District of Illinois, Western Division, wherein
11  NICK GEORGEFF is the Plaintiff and DON BORNEKE
12  CONSTRUCTION, INC., is the Defendant.
13      I further certify that the said NICHOLAS
14  BORNEKE was by me first duly sworn to testify
15  the truth, the whole truth, and nothing but the
16  truth in the cause aforesaid; that the testimony
17  then given by said witness was reported
18  stenographically by me in the presence of said
19  witness and afterwards reduced to typewriting by
20  Computer-Aided Transcription, and the foregoing
21  is a true and correct transcript of the
22  testimony so given by said witness as aforesaid.
23      I further certify that the signature to
24  the foregoing deposition was waived by counsel
```

105

```
 1  for the respective parties.
 2      I further certify that the taking of this
 3  deposition was pursuant to notice and that there
 4  were present at the deposition the attorneys
 5  hereinbefore mentioned.
 6      I further certify that I am not counsel
 7  for nor in any way related to the parties to
 8  this suit, nor am I in any way interested in the
 9  outcome thereof.
10      IN TESTIMONY WHEREOF:  I have hereunto
11  set my verified digital signature this 16th day
12  of March, 2022.
13
14
15
16  NOTARY PUBLIC, COOK COUNTY, ILLINOIS
    CSR LIC. NO. 84-004344
17
18
19
20
21
22
23
24
```

106



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

105..106

Andrew Black 03/14/2022

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF ILLINOIS
 3                 EASTERN DIVISION
 4   NICK GEORGEFF,              )
 5        Plaintiff,             )
 6   vs.                         ) Civil Action
 7   DON BORNEKE CONSTRUCTION, )   No. 3:20-CV-50313
 8   INC.,                       )
 9        Defendant.             )
10
11        The deposition of ANDREW BLACK, called
12   for examination pursuant to the Rules of Civil
13   Procedure for the United States District Courts
14   pertaining to the taking of depositions, before
15   Michelle L. Barta, a certified shorthand
16   reporter in the State of Illinois, on the
17   14th day of March 2022, at 1:01 p.m.,
18   via videoconference per Executive Order 2020-14
19   pursuant to subpoena.
20
21
22   Reported by:  Michelle L. Barta, C.S.R., R.P.R.
23   License No:   084-004033
24
                                                    1
```

```
 1                 I N D E X
 2   WITNESS                            PAGE
 3   ANDREW BLACK
 4    EXAMINATION BY MR. TERRY            8
 5    EXAMINATION BY MR. SULLIVAN        80
 6    FURTHER EXAMINATION BY MR. TERRY  106
 7
 8
 9
10             E X H I B I T S
11   NUMBER                             PAGE
12
13        (No exhibits were marked)
14
15
16
17
18
19
20
21
22
23
24
                                                    3
```

```
 1   REMOTE APPEARANCES:
 2
 3        ANESI, OZMON, RODIN, NOVAK & KOHEN, by
         MR. CHARLES TERRY
 4        161 North Clark Street, 21st Floor
         Chicago, Illinois  60601
 5        (312) 372-3822
         Cterry@anesilaw.com
 6
              Representing the Plaintiff;
 7
 8        SWANSON, MARTIN and BELL, by
         MR. CHRISTIAN A. SULLIVAN
 9        2525 Cabot Drive, Suite 204
         Lisle, Illinois  60532
10        (630) 799-6900
         csullivan@smbtrials.com
11
              Representing the Defendant;
12
13        FAEGRE DRINKER BIDDLE & REATH, LLP, by
         MS. CYRI A. VAN HECKE
14        90 South Seventh Street
         Minneapolis, Minnesota  55402
15        (612) 766-7000
         cyri.vanhecke@faegredrinker.com
16
              Representing the Deponent.
17
18
19
20
21
22
23
24
                                                    2
```

```
 1            (Whereupon, the witness was
 2            excused.)
 3        THE COURT REPORTER:  This deposition
 4   is being taken by means of Zoom videoconference.
 5   The attorneys participating in this deposition
 6   acknowledge that I am not physically present
 7   with the witness.  The parties and their counsel
 8   consent to the oath being administered remotely
 9   and waive any objections to this manner of
10   reporting.
11        will all counsel present please state
12   your name and indicate your agreement on the
13   record beginning with plaintiff's counsel?
14        MR. TERRY:  Charles Terry for the
15   plaintiff, we agree.
16        MR. SULLIVAN:  Chris Sullivan for
17   defendant, I agree as well.
18        MS. VAN HECKE:  Cyri Van Hecke and
19   I am representing Andy Black as counsel for
20   M.A. Mortenson Construction Company, I agree as
21   well.
22        MR. TERRY:  Mr. Black, would you mind
23   stating and spelling your first and last name
24   for the record?
                                                    4
```

EXHIBIT

E

1    THE WITNESS: Yes. It's Andrew Black,
2 A-n-d-r-e-w, Black, B-l-a-c-k.
3    MR. TERRY: Let the record reflect this
4 is the deposition of Andrew Black taken pursuant
5 to notice and agreement of the parties. Let the
6 record also reflect this deposition is being
7 taken via Zoom but still pursuant to all
8 applicable rules.
9    Sir, first of all, do you mind if I
10 call you Andy, Andrew, Mr. Black? What do you
11 prefer?
12    THE WITNESS: Andy would be great.
13    MR. TERRY: Okay. Andy, have you ever
14 given a deposition before?
15    THE WITNESS: I have not.
16    MR. TERRY: All right. I am sure your
17 counsel has gone over a few of the ground rules
18 with you, but I am just going to remind you of a
19 few of them. When I say rules, the world is not
20 going to implode, nothing bad is going to
21 happen, but it just helps the process go
22 smoother. So try to keep them in mind as you're
23 giving your testimony. Okay?
24    THE WITNESS: Yes.

                                                    5

1    MR. TERRY: The first one, and so far
2 we are doing a pretty good job it seems like it,
3 try to wait for the full question to come out
4 before answering. If we are talking over each
5 other it makes Ms. Barta's job very hard and it
6 also just makes the transcript messy at the end
7 of the day.
8    So do your best to allow us to finish
9 our questions and I can promise you we will give
10 you the same courtesy when you are answering.
11 Does that sound okay?
12    THE WITNESS: Absolutely.
13    MR. TERRY: Perfect. Try to keep all
14 your answers out loud and by that I mean yes, no
15 or otherwise. Nah-uhs and uh-huhs don't come
16 over well in the transcript and while we may
17 know what you mean in the moment, it won't be
18 clear on the transcript later on. So if you do
19 give an uh-huh or an um-hum or something like
20 that, we will probably remind you and ask you if
21 that was a yes or a no. Again we are not trying
22 to be difficult. We are just trying to have a
23 clear transcript. Okay?
24    THE WITNESS: Yes.

                                                    6

1    MR. TERRY: For any breaks you may
2 need, by all means just let me know. I am
3 apparently losing my voice again so I am going
4 to try to do this as fast as possible. I don't
5 expect this to be awfully long, but if for
6 whatever reason you need a break, that is
7 perfectly fine. Just answer any question I have
8 pending and then we can take a break.
9    All right. Then just two more. If you
10 do not understand a question, please ask. A lot
11 of times attorneys are longwinded and boring and
12 we think it makes sense in our head, the
13 question, but it may not when we actually spit
14 it out. So if you answer a question we are
15 going to assume you understood what it meant.
16 So if you have a misunderstanding or you're
17 unclear, just ask us to repeat or rephrase.
18 Does all that make sense?
19    THE WITNESS: Yes, it does.
20    MR. TERRY: Perfect. And then the last
21 one, during the deposition there may be some
22 objections made by myself or Mr. Sullivan,
23 possibly by your counsel. At the end of the
24 day, 99 percent of the time objections are what

                                                    7

1 I call legalese. They are for the attorneys and
2 the Court later on. You can usually answer the
3 question, but at the end of the day you're
4 represented by counsel today and just listen to
5 her. She has your best interest at heart.
6 Okay?
7    THE WITNESS: Okay. Perfect.
8    ANDREW BLACK,
9 having been first duly sworn, was examined and
10 testified via Zoom videoconference as follows:
11    EXAMINATION
12 BY MR. TERRY:
13    Q. Sir, would you mind giving me your date
14 of birth please?
15    A. May 8, '89.
16    Q. And then one last thing actually.
17 During these deps we -- the point of it is if it
18 goes -- if this goes to trial, we just want to
19 know what you're going to testify to, kind of
20 who you are, what you know. So we ask a little
21 bit of background information. I promise I will
22 keep that as brief as possible because you don't
23 really have too much to do with this matter; but
24 nonetheless, that's why we ask some of the

                                                    8

1  background. Okay?
2     A.   Okay.
3     Q.   What is your current address, sir?
4     A.   My current address is
5  3070 South Plateau Drive in Salt Lake City,
6  Utah, 84109.
7     Q.   And is that a permanent address or is
8  that an address like a job site you're on?
9     A.   That is a personal permanent.
10    Q.   And how long have you lived there?
11    A.   Three months.
12    Q.   All right. Congratulations on the new
13 place.
14    A.   Thank you.
15    Q.   Who do you live there with?
16    A.   My wife and our newborn daughter.
17    Q.   Oh, congratulations.
18         And then do you have any plans to move
19 in, let's just say, next year or so?
20    A.   I do not.
21    Q.   What is your highest level of
22 education?
23    A.   Bachelor's degree in architectural
24 engineering.

9

1     Q.   And where was that from and when?
2     A.   The University of Colorado in Boulder
3  from 2007 to 2011.
4     Q.   You said '7 to '11?
5     A.   Correct.
6     Q.   And a bachelor's degree in
7  architectural engineering just to make sure I
8  heard correctly, right?
9     A.   Correct.
10    Q.   Do you have any other degrees or
11 certifications or anything like that?
12    A.   I do not.
13    Q.   And have you ever been a member of a
14 union?
15    A.   I have not.
16    Q.   Have you ever gotten any specialized
17 like OSHA training or anything like that for
18 your career?
19    A.   I have gone through OSHA 10 and
20 OSHA 30.
21    Q.   And do you know approximately when
22 those are? I know -- This is not a memory test
23 today, so best estimates are okay.
24    A.   I would say OSHA 30 was probably

10

1  seven years ago, OSHA 10 call it nine.
2     Q.   And don't take offense to these next
3  couple questions. We ask them in every
4  deposition.
5         Have you ever been convicted of a
6  felony or a crime involving fraud or dishonesty?
7     A.   I have not.
8     Q.   Have you ever filed for bankruptcy?
9     A.   I have not.
10    Q.   I always say don't take offense to that
11 and the depositions go a lot faster when the
12 answers are no, but they are a lot more fun when
13 they are yes. So again, we ask them of
14 everybody.
15         Have you ever served in the military,
16 sir?
17    A.   I have not.
18    Q.   After you graduated from college, what
19 did you end up doing?
20    A.   After college I hired on with a
21 general contractor in the Boulder, Colorado,
22 area for a few years. After about
23 two-and-a-half years of employment there I
24 hired on with Mortenson Construction out of

11

1  their Denver office. After working in Denver
2  for a few years I started traveling with the
3  organization building wind farms, did that for
4  three to four years before moving into what I am
5  currently doing in the data center market. So
6  that's what brought me to Salt Lake.
7     Q.   Perfect. And then we don't have to
8  talk too much about what you're doing now, but
9  just you said data?
10    A.   Yes. Building data centers for some
11 social media companies.
12    Q.   So is it still in the construction
13 field?
14    A.   It is, yes.
15    Q.   Got it. Okay.
16    A.   Just a different market sector.
17    Q.   I want to break down your experience
18 with the prior two contractors, Mortenson
19 obviously, but the one before that as well.
20 What was the name of the contractor you worked
21 with in Boulder?
22    A.   It was Deneuve Construction,
23 D-e-n-e-u-v-e, and that was -- I was an
24 estimator with them.

12



1    Q.   Were you an estimator for the whole
2  two-and-a-half years you were there?
3    A.   Yes.
4    Q.   Did you ever work as a project manager
5  while you were -- maybe like a dual role so to
6  speak or no?
7    A.   I did not.
8    Q.   So that was, just to be sure I
9  understand, between 2011 and middle of 2013 give
10  or take?
11    A.   Yes.
12    Q.   And then during that time as an
13  estimator, correct me if I am wrong, but that's
14  essentially going in on behalf of the contractor
15  you're working for and literally estimating the
16  cost of the various tasks you are bidding for?
17    A.   Yes, that's correct.
18    Q.   So while you're not a project manager,
19  you're still involved in like the bidding and
20  the contract process as well as determining what
21  like tasks should be included and what should be
22  excluded, is that fair?
23    A.   Yes, that's fair.
24    Q.   And while you were with -- How do you

13

1    A.   I am currently employed by them.
2    Q.   I am sorry.  You're currently employed
3  by them?
4    A.   Just in a different -- They have
5  several different market sectors, so just kind
6  of in a different role.
7    Q.   Got it, okay.  See, that's why you
8  should not assume anything because I assumed you
9  started with someone else.
10        When did you start in the new role?
11    A.   New role being data centers?
12    Q.   Yes.
13    A.   That would have been March 2019.
14    Q.   And I am going to jump ahead a little
15  bit and then come back, but so if we are here to
16  talk about an incident that occurred in November
17  of 2018.  You still would have been working with
18  Mortenson in kind of like the wind farm
19  department so to speak?
20    A.   That is correct.
21    Q.   So back to your experience with
22  Mortenson and we will focus on the wind farms,
23  when you started in 2013, is that when you were
24  traveling for the various wind farms or did that

15

1  pronounce it?
2    A.   Den-euve.
3    Q.   Deneuve, okay.
4        While you were with Deneuve, did you
5  work on any wind farms?
6    A.   I did not.
7    Q.   What type of work were you doing --
8  obviously estimating, but like the type of
9  construction with Deneuve?
10    A.   It was primarily multi-family,
11  specifically affordable housing.
12    Q.   Okay.  And then what made you
13  ultimately switch from Deneuve to Mortenson in
14  2013?
15    A.   Just I was looking to transition from
16  more of the pre-con estimating side out into
17  some more of the field operations roles, plus
18  Mortenson was just a bigger general contractor
19  with more opportunity.
20    Q.   And do you happen to remember
21  approximately -- I know 2013, but when you
22  started with Mortenson?
23    A.   It was early September 2013.
24    Q.   When did you work with them until?

14

1  start a little bit later?
2    A.   That started later.  I believe that
3  started end of 2015.
4    Q.   Okay.
5    A.   In 2013 that was localized to Denver.
6    Q.   While you were in Denver, what were you
7  doing for Mortenson?
8    A.   I was a project engineer working on
9  like hospitality projects.
10    Q.   And when you say project engineer, can
11  you just walk me through what you would do in a
12  given day, project, however you want to break it
13  down?  Like what was your responsibility?
14    A.   Primarily quality focused.  So it's
15  kind of you're in a support role supporting the
16  different subcontractors with your -- you know,
17  the main focus being on ensuring that the work
18  going in place is consistent with project
19  drawings and specs.
20    Q.   So was this more of an on-site
21  position?
22    A.   It was, yes.
23    Q.   And you did that until approximately
24  2015.  Then when you said you traveled for three

16



Andrew Black 03/14/2022

1  to four years, is that approximately from the
2  2015 time frame until March of '19 that you were
3  building wind farms?
4      A.  Yes.
5      Q.  If you have to guesstimate, how many
6  different wind farm projects were you a part of?
7      A.  Say six.  Six or seven.
8      Q.  On these wind farm projects were you
9  typically serving as the project manager or what
10 role were you serving?
11     A.  Starting as a project engineer and then
12 kind of moving through -- As your career
13 advances the progression is generally project
14 engineer and then there is a couple sub-tiers
15 within that into assistant project manager and
16 eventually to project manager.
17     Q.  And at the -- For the sake of ease, can
18 you kind of walk me through a general time frame
19 of those various title sub-tiers to like when
20 eventually you became a project manager?
21     A.  Yes.  I think Project Engineer II is
22 probably right when I was joining wind, so in
23 the 2015 time frame, and then I will say
24 approximately a year-and-a-half later moving

17

1  managers.  You know, kind of just supporting a
2  team there.
3      Then when you move into the project
4  management position you're partnered with a
5  superintendent, and the superintendent is more
6  responsible for schedule and some of the safety
7  items.  Then the project manager still is in the
8  financial, the quality side, but functioning as
9  the two leads on that project.
10     Q.  Okay.  I appreciate that.
11     Would both the assistant project
12 manager and the project manager have an on-site
13 presence?
14     A.  Yes.
15     Q.  Does one have more of an on-site
16 presence than the other or are they pretty
17 consistently on site?
18     A.  Yeah, they are full time on site.
19     Q.  Okay, got it.  And then just because at
20 the time of the Mendota Hills project you were a
21 project manager I want to talk about that, okay?
22     A.  Yep.
23     Q.  Is it --
24     A.  Yes.

19

1  into that assistant project manager capacity, so
2  saying mid 2017, and then mid 2018 into that
3  project manager role.
4      Q.  Okay.  When I talk about the
5  Mendota Hills Repowering Project, are you
6  familiar with what I am talking about?
7      A.  Yes, I am.
8      Q.  Was that your first project as a
9  project manager or no?
10     A.  That was the first project as a
11 project -- not an assistant project manager.
12     Q.  Okay, got it.  And can you kind of walk
13 me through what the -- You walked me through
14 what a project engineer does.  What about an
15 assistant project manager and a project manager,
16 can you kind of just walk me through the various
17 duties and responsibilities for those tasks?
18     A.  Yeah.  The assistant project manager I
19 would say your primary function is more on the
20 financial side in supporting project manager,
21 senior project manager, just making sure that
22 the cost forecasting and tracking is done
23 appropriately while still kind of acting as that
24 in-between between engineers and the project

18

1      Q.  Is it safe to say that as a project
2  manager it's important for you to look at and
3  understand the contracts between Mortenson and
4  the various subcontractors?
5      A.  Yes, that's accurate.
6      Q.  And you understand the various tasks
7  each contractor and subcontractor are contracted
8  to perform?
9      A.  Yes.
10     Q.  I don't think I could have said
11 contract more in that sentence.
12     Then from a general standpoint in terms
13 of the contractual duties and responsibilities
14 of each contractor and subcontractor, this is
15 something that you as the project manager for
16 Mortenson would have to be familiar with so it
17 can be implemented in the field?
18     A.  That is correct.
19     Q.  Would you also take part in some of the
20 negotiation process like the inclusions and
21 exclusions with the various subcontractors?
22     A.  Yes.
23     Q.  Had you worked with Don Borneke
24 Construction prior to this incident or prior to

20



1  this project?
2      A.   I had.  I had worked with them on a
3  wind farm in Nebraska previously.
4      Q.   Was this still while you were with
5  Mortenson though?
6      A.   Yes.
7      Q.   And so just from a general standpoint,
8  is it safe to say that from past work as well as
9  the work on this project you knew that
10  Don Borneke was an excavating company and that's
11  what they were hired to perform?
12      A.   Yes.
13      Q.   Is it also safe to say that Mortenson
14  hires various subcontractors for the expertise
15  they bring in their own fields?
16      A.   Yes, that's correct.
17      Q.   Meaning like Don Borneke is hired and
18  contracted with because they are the experts in
19  excavation, correct?
20      A.   Correct.
21      Q.   And Mortenson relies on this expertise
22  and expects the work to be performed safely and
23  reasonably?
24      A.   Yes.

21

1      Q.   And Mortenson also expects the
2  subcontractor, Don Borneke in this case for
3  example, to fulfill the contracted to
4  obligations and responsibilities?
5      A.   Yes.
6      Q.   Okay.  And would you agree that if a
7  subcontractor is not performing all of the tasks
8  in their scope of work or the contracted to
9  duties and responsibilities, that would mean
10  that subcontractor is not fulfilling their
11  obligations?
12      A.   Yes.
13      Q.   So just from a general standpoint, and
14  I know a lot of these questions are elementary
15  in a way but we have to ask them to lay the
16  foundation, is it safe to say that based on your
17  experience with Mortenson you are very familiar
18  with how things are ran in terms of interactions
19  between Mortenson and the various
20  subcontractors?
21      A.   Yes, I would say that's correct.
22      Q.   And you generally know what all the
23  subcontractors as well as Mortenson, for
24  example, are going to do on the project?

22

1      A.   Correct.
2      Q.   And you understand that like -- I have
3  a lot of friends in the trades and they are
4  proud people.  They each stay in their lane so
5  to speak.  Like ironworkers do the ironwork and
6  excavators do the excavating work.  You would
7  agree with that for the most part, correct?
8      A.   Correct.
9      Q.   And then just from a general
10  standpoint, when working on these wind farms is
11  it safe to say that Mortenson understands the
12  importance of having the ground properly
13  prepared and that's why it hires excavating
14  companies?
15      A.   Yes.  For -- Yes.
16      Q.   Like meaning these wind farms are built
17  on massive farms and only a small portion of the
18  farms are actually going to be worked on, right?
19      A.   Correct.
20      Q.   And Mortenson hired an excavating
21  company to in part turn farmland into workable
22  land, right?
23      A.   Correct.
24      Q.   Like on this project, for example, the

23

1  Mendota Hills project, Mortenson hired Borneke
2  to turn various areas of the project, either
3  refurbish them or just convert them into
4  workable areas for the erection of turbines;
5  right?
6      A.   Yes.
7      Q.   And we will get into the contract scope
8  of work in a little bit, but essentially Borneke
9  was hired to take unsafe farmland in the various
10  areas and convert it into workable land; right?
11      A.   Yes.
12      Q.   And some of these tasks would include
13  things like grading, maintaining, compacting the
14  land, things like that?
15      A.   Correct.
16      Q.   As well as providing proper drainage at
17  various areas?
18      A.   Yes.
19      Q.   And these are all things that Mortenson
20  and Borneke know going into their negotiations
21  and that's why these various tasks are
22  negotiated and contracted for, right?
23      A.   Correct.
24      Q.   Let's just talk about a few of the

24



1  tasks of Borneke in general.  You would agree
2  that Mortenson relies on Borneke to prepare
3  access and spur roads?
4      A.  Yes.
5      Q.  And you would expect that these roads
6  would be able to support the weight of the
7  various trucks and equipment that would be
8  traveling on them, right?
9      A.  Yes.
10      Q.  And Mortenson would expect that based
11  on Borneke's preparation these roads wouldn't
12  simply sink in underneath the pieces of
13  equipment or the trucks that come on it, right?
14      A.  Yes.
15      Q.  And same thing for the erection areas,
16  as Mortenson's project manager you would expect
17  that the excavating company, Don Borneke in this
18  case, would properly grade and compact erection
19  areas; right?
20      A.  Yes.
21      Q.  And you would expect them to provide
22  proper drainage in these areas as well?
23      A.  Yes.
24      Q.  And typically the drainage in these

25

1  cause these depressed areas; that's the idea
2  behind it, right?
3      A.  Correct.
4      Q.  And one of the reasons are these
5  depressed areas can cause tripping hazards for
6  the various workers, right?
7      A.  Yes.  The primary function -- So there
8  is -- Those are -- The drive lanes and the paths
9  themselves, right, are per the design documents
10  which are, you know, the worst case scenario for
11  those is the -- specifically for component
12  delivery and to support the crane that is
13  bearing on top of it.
14      Q.  Exactly.  So these erection areas to
15  use an obvious word is literally where the
16  erection is going to take place, right?
17      A.  Correct.
18      Q.  There is going to be a very heavy crane
19  on the crane pad?
20      A.  Correct, and that often has a separate
21  design associated with it.
22      Q.  Of course.  So the crane pad inside the
23  erection area has its own design component and
24  specifications, right?

27

1  areas is done away from the erection and the
2  turbine areas so that water doesn't pool where
3  workers are or where the turbine is going to be,
4  right?
5      A.  Yes.
6      Q.  And if these erection areas are
7  properly graded and compacted, same thing like
8  with the spur roads, you would expect the ground
9  to be able to support the weight of the various
10  pieces of equipment and the delivery trucks;
11  right?
12      A.  Yes.
13      Q.  And you would expect that the ground in
14  these erection areas would not simply sink in or
15  cave in underneath the weights of these pieces,
16  right?
17      A.  Yes.
18      Q.  Because if the ground is not properly
19  prepared or compacted it's a lot easier for the
20  ground to simply get depressed and cause ruts or
21  various depressed areas, right?
22      A.  Correct.
23      Q.  And if the ground is properly prepared,
24  the idea is the trucks and the equipment won't

26

1      A.  Yep.  Yes.
2      Q.  But then the erection area itself also
3  has specific requirements for compaction,
4  grading and drainage; right?
5      A.  Yes.
6      Q.  Okay.  And part of the reason for that
7  is it is known that various semi trucks are
8  going to come in, deliver and stage these pieces
9  of equipment; right?
10      A.  Correct.
11      Q.  And the erection area needs to be able
12  to support the weight of these semi trucks as
13  well as the pieces of equipment while they are
14  staged for erection, right?
15      A.  Correct.
16      Q.  And if the ground simply sinks in
17  underneath a semi-truck or a piece of equipment
18  such that there is depressed areas or ruts, this
19  would show that possibly the ground was not
20  prepared properly; right?
21      A.  Correct.
22      Q.  Okay.  And for example, if the ground
23  sinks in underneath a staged piece of equipment
24  or where a semi-truck delivered pieces of

28



1 equipment, this can cause large depressed areas
2 and water can eventually pool in these areas
3 hypothetically; right?
4    A.  Correct.
5    Q.  And this water could cause slipping or
6 tripping hazards and it could potentially
7 freeze, too; right?
8    A.  Correct.
9    Q.  Not only that though, even if water
10 doesn't pool these depressed areas can cause bad
11 problems such as just simply tripping hazards;
12 right?
13    A.  Yes.
14    Q.  Or in the worst case scenario if the
15 ground caves in underneath a piece of equipment
16 it can cause it to roll off its cribbing and
17 possibly kill somebody?
18    A.  Correct.
19    Q.  Okay.  So Mortenson understands the
20 importance of these erection areas and to have
21 them properly prepared and that's why they hire
22 an excavating company, right?
23    A.  Yes.
24    Q.  And Mortenson relies on the excavating

29

1 company to properly prepare these areas?
2    A.  Yes.
3    Q.  Okay.  And Mortenson understands that
4 these erection areas are not only where the
5 turbines are going to be erected but also where
6 various tradesmen and women are going to be
7 coming later on to perform construction work,
8 right?
9    A.  Yes.
10    Q.  So would you agree that grading,
11 draining, and proper compaction of the ground in
12 erection areas are hugely important components
13 for erection areas?
14    A.  Yes.
15    Q.  And would you also agree that it's no
16 surprise on these projects to any of the
17 contractors present what work is going to be
18 performed, meaning like erection of turbines?
19    A.  Correct.
20    Q.  So it's understood in the bid process
21 between Mortenson and Don Borneke, for example,
22 what is going to be coming later and how the
23 ground needs to be prepared to effectuate what's
24 coming later; right?

30

1    A.  Correct.
2    Q.  And we have already established that,
3 but for sake of completeness we are going to
4 switch gears to the subject project.
5         Borneke on this project, what was their
6 role based on your understanding?
7    A.  They were the earthwork contractor.
8 They're responsible for putting in the access
9 roads in order to support the delivery of the
10 components, and then prior to that they are
11 excavating for the foundations, they are
12 performing the backfill operations and they are
13 doing the crane pad prep.
14    Q.  And would you also agree that they were
15 performing the preparation work for the various
16 erection areas?
17    A.  Yeah.  So the design for that is kind
18 of a -- it's the radius to support the -- it's
19 essentially designed to support the trucks that
20 need to turn around with their extending turning
21 radius -- radii.
22    Q.  And we will get to the contract in a
23 second, but when you say like the radii, you
24 mean like to state it simply when we are reading

31

1 this later in each direction coming off of the
2 turbine for I think on this project it's 175 or
3 185 feet.  That area would make up the erection
4 area, correct?
5    A.  That would, yes.
6    Q.  Yeah.  And this is the area that needs
7 to be properly graded, compacted and with proper
8 drainage; right?
9    A.  Correct.
10    Q.  And then on this project I think we
11 have already established this, too, but were you
12 the project manager at the start of this project
13 or the assistant project manager or did you only
14 have one role in this project?
15    A.  Singular role as the project manager.
16    Q.  Got it, okay.
17         And how often were you on site?  I know
18 you said full time on site.  Does that mean
19 every day work is being performed you were on
20 site?
21    A.  Correct.
22    Q.  And while you were on site, do you --
23 for this project specifically, walk me through
24 some of the tasks that you were performing with

32



1  your responsibilities, duties, things like that.
2      A.   Yeah.  So early on would have been
3  working with the preconstruction team and the
4  project executives to establish the estimates
5  and then taking it from there to buying out the
6  subcontracts, writing the contracts, helping to
7  track productivity and, you know, man hours
8  associated with each task, helping to track the
9  equipment that was on site, supporting the team
10  of project engineers and superintendents in
11  their functions, then project financials.
12      Q.   Okay.  Got it.  And I appreciate you
13  walking through that.
14      On this site -- and I can show you the
15  site map if needed, but would you agree that
16  there were various the letter T sites like T1
17  through 29 and each of those delineated where a
18  turbine would be?
19      A.   Correct.
20      Q.   And at the center of these T sites 1
21  through 29, literally where the site is is part
22  of the erection area; right?
23      A.   Yes.
24      Q.   Then the foundation that you talked

33

1  about, is that kind of the dead center of the
2  erection area and then for a radius in each
3  direction out from that would make up the
4  erection area?
5      A.   Yes.
6      Q.   And then on this project, as the
7  excavating company would part of Borneke's job
8  be to grade that surrounding area where the
9  turbine was ultimately going to be delivered and
10  placed prior to erection?
11      A.   Yeah.  They need to provide basically a
12  surface so that the components can be stored
13  there temporarily until the erection takes
14  place.
15      Q.   And this process includes the need to
16  compact the ground so that it can support the
17  weight, right?
18      A.   Yeah, and I can't -- I will be -- To be
19  honest, I can't remember if there is a specific
20  spec for areas outside of the crane pad having
21  been out of the industry for a couple years.
22      Q.   Yeah.
23      A.   The crane pad is very specific.  The
24  surrounding areas, I don't know if there was

34

1  a -- if it's more of -- more broadly described
2  instead of truly based on like a compaction
3  requirement that a testing agency would perform.
4      Q.   Of course.  So the crane pad as we have
5  established, that's like to some very high
6  standard so that the crane does not sink or tip
7  over; right?
8      A.   Correct.
9      Q.   But then the surrounding area is still
10  an area that needs to be compacted, graded and
11  maintained so that various pieces of equipment
12  can be delivered and staged, but that's left
13  more so up to the excavating company to
14  determine what is proper for each site; right?
15      A.   Yeah.  My memory is telling me that was
16  a little more subjective than the very clearly
17  defined other areas.
18      Q.   But nonetheless, the subjective
19  requirement still required these areas to be
20  able to support the weight of the various trucks
21  and the pieces of equipment; right?
22      A.   Correct.
23      Q.   So while it's more subjective, it's
24  subjective in the sense of do what needs to be

35

1  done so that the work can be performed and be
2  performed safely; right?
3      A.   Correct.
4      Q.   And some of these tasks, just because I
5  have looked at the contract too many times to
6  count now, included things such as clearing and
7  grubbing of the land if necessary?
8      A.   Yes.
9      Q.   Also things such as grading or in
10  another words making it smooth?
11      A.   Yes.
12      Q.   And things such as providing adequate
13  drainage away from the erection area so that
14  it does -- so that water does not pool in the
15  erection area, right?
16      A.   Correct.
17      Q.   All right.  And would you agree that if
18  water pooled in the erection area this could
19  provide a dangerous condition especially in the
20  winter when it can freeze?
21      A.   Yes.
22      Q.   And if water is pooling in the erection
23  area due to either bad drainage, bad grading or
24  bad compaction, this would be an indication the

36

1  excavating wasn't done properly?
2      MR. SULLIVAN:  Objection, foundation.
3  Go ahead.
4  BY MR. TERRY:
5      Q.  You can answer.
6      A.  For me to answer?
7      Q.  Yes.
8      A.  Yes.
9      Q.  Okay.  And if there is large areas of
10  standing water -- and I know some of these may
11  seem like duplicate questions from before, but
12  this is just in a general sense in the erection
13  area.
14      If on this project if there is water
15  standing in these areas it can damage equipment
16  or cause potential hazards for workers?
17      A.  Yes, and I -- So a lot of that work
18  that's being described is done up front and with
19  there being many sites, you were referencing the
20  T -- I think there was 29 turbines on that job,
21  so the sites are a little bit fluid in nature
22  just as the environmental conditions change and
23  the equipment move through this.
24      So what you were describing is kind of

37

1  the initial product that is -- that is
2  delivered.
3      Q.  Okay.  And then one other thing I
4  wanted to ask about is in addition to doing
5  these things on the project like the clearing,
6  grubbing, grading, compacting of the land, was
7  Borneke on site on a daily basis?
8      A.  They are.  They're are in kind of in
9  reference to the fluid nature, so they are
10  probably -- There is a couple sites that are
11  being worked on at a time based on what crew is
12  there, and so they are providing kind of support
13  as needed kind of as crews evaluate the sites
14  and determine what they think could support
15  their operations.  They are providing -- you
16  know, they have got a roller, they have got a
17  grader, they have got a blade.  So if things are
18  requested by the crews that are working on those
19  sites, they kind of support on an as-needed
20  basis.
21      Q.  And just to be clear, are you saying
22  that Borneke would do their initial tasks on
23  each site as needed and then kind of come back
24  to the various sites to perform touch-ups or

38

1  maintenance as needed as well?
2      A.  Yeah, and that -- It's -- That would be
3  kind of something that would be talked about
4  each morning in that daily -- So we have morning
5  safety discussions, and during those discussions
6  that's kind of -- on a wind farm that is a topic
7  of conversation because they are fluid in nature
8  and they do change, and so it's -- the
9  communication is kind of evaluate the site, we
10  have got the equipment on standby should there
11  be some additional support needed.
12      Q.  Okay.  And this additional support in
13  terms of like excavating work, all the
14  excavating work on this project would have been
15  done by Don Borneke Construction; correct?
16      A.  Correct.
17      Q.  And then while it's fluid in nature so
18  to speak because certain ground conditions can
19  change, you agree that part of the
20  responsibilities of Don Borneke would be to
21  prepare the ground adequately so that it can
22  accommodate the various pieces of equipment and
23  possible weather conditions to the best of their
24  ability in the first place; right?

39

1      A.  Correct.  Kind of in a temporary
2  function though because those areas eventually
3  get restored back to native -- native condition.
4      Q.  Yeah, of course.  So while the work is
5  being performed on the project it is expected
6  that the ground will be cleared, compacted,
7  graded and prepared for delivery and erection;
8  right?
9      A.  Correct, yes, and then as people -- The
10  second part of that is kind of on that as-needed
11  basis.  There is the initial preparation and
12  then the having them return to site when risks
13  are identified.
14      Q.  Got it.  Okay.
15      I want to just talk specifically now.
16  I am going to share my screen with you and let
17  me know if you can see it.  Okay?
18      A.  Yes.
19      Q.  You can see it?
20      A.  I can.
21      Q.  Okay, perfect.  This is a 59-page
22  document which was previously marked at
23  Mark Sikel's deposition.  I am just going to
24  scroll through it very quickly and we will go in

40

1    more detail, but does this 59-page document at
2    least appear to be a true and accurate copy of
3    the contract with Don Borneke for the subject
4    Mendota Hills Repowering Project?
5        A.  Yes, it does.
6        Q.  All right.  I don't know if I said true
7    and accurate.  Does it appear to be a true and
8    accurate copy as well?
9        A.  Yeah.  To the best that I can tell this
10   is the contract -- the subcontract agreement for
11   Don Borneke.
12       Q.  And at the risk of asking an obvious
13   question, if we zoom in on Page 1 it shows the
14   subcontract agreement between M.A. Mortenson
15   Company and Don Borneke Construction, Inc.;
16   right?
17       A.  Yes, it does.
18       Q.  All right.  And then under one it shows
19   the project as being the Mendota Hills
20   Repowering Project, correct?
21       A.  Yes.
22       Q.  All right.  And then if we go down to
23   Part 2 on Page 1, the scope of work, it
24   essentially says that subcontractor will furnish

41

1    and pay for all the material, labor, et cetera,
2    to fully perform their tasks; right?
3        A.  Yes.
4        Q.  And then their specific tasks for this
5    project would be contained within the scope of
6    work attachment, right?
7        A.  Correct.
8        Q.  If we go on to Page 3 of this document,
9    is this your electronic signature on this
10   document?
11       A.  Yes, it is.
12       Q.  And then are you familiar with
13   Mark Sikel?
14       A.  Yes.
15       Q.  Was he the project manager for
16   Don Borneke that you were working with on this
17   project?
18       A.  Yes, he was.
19       Q.  Okay.  And is this the person that you
20   would have been negotiating with and contracting
21   with on behalf of the various companies to
22   figure out which task each contractor will be
23   performing?
24       A.  Correct.

42

1        Q.  All right.  Before we get into the
2    actual scope of work, I just want to go on to
3    Page 17.  Do you see Subsection H?
4        A.  I do.
5        Q.  I will read it, and if you need me to
6    zoom in -- I will just do it to be safe.
7            It says subcontractor shall coordinate
8    all deliveries with the Mortenson on-site
9    superintendent.  Did I read that correctly?
10       A.  Yes, you did.
11       Q.  Why is this required on various job
12   sites that the excavating company coordinates
13   with the Mortenson superintendent?
14       A.  This specific excerpt would probably be
15   referencing the delivery of materials to support
16   road construction and that would be needed just
17   to kind of have an awareness of what is going on
18   should there be conflicts between say you have a
19   concrete pour going on at the same time as a --
20   as road base material is getting delivered.  You
21   can just kind of have some congested travel
22   paths.  So it's just kind of bringing the
23   Mortenson superintendent back into the fold so
24   they can have a holistic look on what's going on

43

1    on the project.
2        Q.  Okay.  Would it also have anything to
3    do with Borneke's work essentially effectuating
4    the delivery and the staging of equipment so to
5    make sure that the various roadways and erection
6    areas are still performing as they should?
7        A.  Loosely.  I mean, this -- that
8    Subsection H would be in every single trade
9    partner agreement, I believe, from
10   Mendota Hills.  So for an electrical contractor
11   it's when are you bringing in cable reels.  It's
12   really more of a coordination-related item for
13   that holistic oversight.
14       Q.  So it's more of a coordination; but
15   nonetheless, this requirement was in fact
16   required and enforced on this project?
17       A.  Yes.  There would have been daily
18   communication on deliveries that were taking
19   place.
20       Q.  So it's safe to say each subcontractor
21   including Don Borneke was informed of when
22   various deliveries were being made and what was
23   going on on a daily basis at the various sites?
24       A.  Yes.  There would be a morning meeting

44



1  where that would be discussed every day.
2      Q.  If we go on to Page 20, this is an
3  11-page document as you can see at the bottom.
4  It says Exhibit A, scope of work.  Again, I will
5  briefly scroll through this and then ask you
6  specific questions.
7          Does this 11-page document appear to be
8  a true and accurate copy of the scope of work
9  that is attached to the contract?
10     A.  From what I can tell, yes.
11     Q.  Okay.  And then to ask an obvious
12 question, this was the contractually required
13 tasks for Don Borneke on this project; right?
14     A.  Yes.
15     Q.  And by negotiating back and forth
16 with you, these are tasks they assumed the
17 responsibility for and were ultimately paid to
18 complete?
19     A.  Yes.
20     Q.  If we go to Page 1 of 11, just general
21 requirements, under 2.1D as in dog, similar to
22 the general on the first page of the contract,
23 subcontractor agrees to procure, provide and pay
24 for all materials, equipment, tools,

45

1  consumables, labor, et cetera, et cetera, and
2  other costs required to complete the work.
3          So generally Don Borneke had a task and
4  they are responsible for completing it, right?
5      A.  Correct.
6      Q.  And if we go on to Page 2 of 11, we see
7  some of the tasks that we were talking about
8  earlier like the clearing and the grubbing and
9  the construction trailer and laydown yard,
10 right?
11     A.  Yes.
12     Q.  All right.  And then under -- On Page 3
13 of 11 or 2.6, the turbine access roads, these
14 access roads, are these the roads that literally
15 branch off from the main road that would give
16 access to the turbine sites?
17     A.  Yes.
18     Q.  And at these roads like other parts
19 of the project, for example under E they have
20 various grading and height and degree
21 specifications for each of them, meaning like
22 they can't deviate by more than a certain number
23 of inches or degrees and these specifications
24 are spelled out in the contract; right?

46

1      A.  They are, and that one in particular is
2  looking at -- That's kind of based on the trucks
3  that are used to deliver the equipment.  That's
4  the max allowable grade.
5      Q.  Yeah, exactly.  So the point is, like
6  for example, at these access roads, for example,
7  it is known what needs to be done and there is
8  specific specifications for this work so that
9  the various trucks can get in and out with this
10 equipment; right?
11     A.  Correct.
12     Q.  All right.  And then again like under G
13 for example, some of these things we talked
14 about, stripping top soil, preparation of
15 subgrade, compaction and placement of compaction
16 of aggregate material.  These are all some of
17 the tasks that Don Borneke was contracted to
18 perform on this project?
19     A.  Yeah, and there is kind of some
20 different details for different locations
21 associated with that.
22     Q.  Of course.  And then under N for
23 example, subcontractor shall construct temporary
24 access roads/radii required to facilitate the

47

1  delivery of turbines to each wind turbine
2  foundation location on site.  Temporary access
3  roads/radii shall be aggregate base.  Did I read
4  that correctly?
5      A.  Yes, you did.
6      Q.  Okay.  So again, is this kind of what
7  we were talking about earlier, these access
8  roads also need to have this radii required to
9  facilitate delivery and turnaround of the
10 trucks?
11     A.  Correct.
12     Q.  And this radii would kind of go hand
13 and hand with the erection areas that we are
14 going to talk about as well, right?
15     A.  Yes.  And it's the -- A lot of times
16 the radii are for -- more specifically for what
17 you're building so they can turn into those
18 sites or off of county roads --
19     Q.  Okay.
20     A.  -- less so the specific pad site
21 because a lot of times at the pad site it's --
22 they are not doing a full turnaround around the
23 foundation.  It's kind of -- They are usually
24 designed pretty uniquely and they -- they work

48



1  with the trucking operation to see exactly what
2  they would need for the turnaround.
3      Q.  So these subcontracts like Don Borneke
4  actually worked with the trucking companies to
5  know what type of trucks are going to be used,
6  how much it's going to weigh and make sure the
7  ground is properly prepared for the trucks and
8  the equipment on it; right?
9      A.  Correct.
10     Q.  Okay.  And these turnaround areas need
11 to be able to support the weight of not only the
12 trucks but also the pieces of equipment on them
13 and when the pieces of equipment are later
14 staged, right?
15     A.  Correct.
16     Q.  And by not properly preparing the
17 ground or by just allowing the ground to cave in
18 underneath trucks for delivered pieces of
19 equipment that are staged for erection, this
20 would mean that Don Borneke is not fulfilling
21 its contractual requirements; right?
22         MR. SULLIVAN:  Objection, foundation,
23 legal conclusion.
24         Go ahead.

49

1  BY MR. TERRY:
2      Q.  You can answer, sir.
3      A.  Sorry.  Could you guys -- For me to
4  answer?
5      Q.  Yes.
6          MS. VAN HECKE:  Andy, just so you know,
7  if there is anything that you shouldn't answer,
8  I will tell you not to answer.
9          THE WITNESS:  Okay.
10         MS. VAN HECKE:  Okay.
11         THE WITNESS:  Yes, and just, Charlie,
12 just kind of to what I was saying previously
13 that that can be in kind of isolated strips
14 within that pad.  It's not necessarily saying a
15 whole 150-foot radius is going to withstand the
16 weight of that truck.  It's kind of in order to
17 support the most demanding elements which would
18 be the trucks that are delivering the components
19 and the cranes that need to bear on that soil.
20 BY MR. TERRY:
21     Q.  So while there is a 175-foot radius or
22 whatever it is, it's mainly the areas where the
23 equipment is going to be delivered and staged
24 that need to be able to support the weight, not

50

1  the full 180 feet, is that what you're saying?
2      A.  Yes.
3      Q.  So in the area where the equipment is
4  going to be staged and delivered what I said is
5  true then, right?
6      A.  It needs to have an adequate compaction
7  to withstand the weight of whatever the imposed
8  load is.
9      Q.  And the idea behind it is trucks are
10 going to come in and you don't want the trucks
11 getting stuck or sinking into the ground, right?
12     A.  Correct.
13     Q.  And also after the trucks deliver the
14 pieces of equipment in the areas where it's
15 actually staged, you expect the ground to be
16 properly prepared so that depressed areas don't
17 form due to the equipment sinking into the
18 ground; right?
19     A.  Correct.
20     Q.  Okay.  And then if we go on to Page --
21 of the contract just to keep going a little bit.
22 We will skip forward to Page 8.  This section
23 talks about the foundation excavation and the
24 backfilling like we talked about earlier, right?

51

1      A.  Correct.
2      Q.  All right.  And I skipped a page, but
3  on Page 7 under maintenance, although this
4  section is discussing roads and the laydown
5  yard, this shows that Borneke under C will be
6  required to keep full-time blades on site for
7  road maintenance and crowning as well as provide
8  rolling and compaction equipment as necessary to
9  maintain public and access roads; right?
10     A.  Correct, and I think that that alludes
11 a little bit to kind of that fluid nature of
12 those sites and definitely as-needed work.
13     Q.  And these -- Based on this, these
14 access roads, would it also include if we go to
15 the next section that we just talked about the
16 radii for delivery and turnaround; right?
17     A.  Correct.
18     Q.  So the need to maintain these areas
19 also include the delivery and staging area,
20 right?
21     A.  Yeah, specifically to where that travel
22 path would be and where the component would be
23 placed.
24     Q.  So it's not just the access roads.

52



1  It's literally the access road up until where
2  it's going to be delivered, staging and turning
3  around, all of that needs to be prepared and
4  maintained; right?
5      A.  Yes.  As I read that, it's -- that is
6  full-time maintenance for public and access
7  roads versus some of the as-needed stuff.
8      Q.  Yeah.  And so this access road part,
9  the point I am getting at is it also includes --
10 and I think I asked this, and if I did I
11 apologize, but it also includes that turnaround
12 area for the semi trucks as well as where the
13 trucks are going to deliver and stage the actual
14 equipment; right?
15     A.  Correct.
16     Q.  And if we go on to Page 9 of 11,
17 Section 2.21, you would agree that this section
18 discusses the turbine erection areas; right?
19     A.  I would.
20     Q.  Did you say you would?
21     A.  I would, yes.
22     Q.  Okay.  Got it.  And under Subsection A,
23 I am going to read it and then ask you some
24 questions.  It says subcontractor shall clear,

53

1  grub and provide all necessary grading for a
2  175-foot radius around the turbine inclusive of
3  cut and fill necessary to achieve no more than
4  5 percent grade across the area.  Did I read
5  that correctly?
6      A.  Yes.
7      Q.  Okay.  So the specifications for this
8  project are 175-foot radius around the turbine,
9  right?
10     A.  Yes.
11     Q.  And then the grade is 5 percent?
12     A.  Correct.
13     Q.  And for this 175-foot area, maybe at
14 the very outer edge the compaction standards can
15 get a little less, but closer to the center
16 where the trucks are going to be and where the
17 delivery components are going to be staged this
18 is -- as well as the crane, this is where the
19 compaction standards are more important?
20     A.  In kind of specific to the limits as it
21 references the coordination with Mortenson's
22 superintendent for component location.  So
23 it's -- They are most stringent in those
24 coordinated locations that they are talking

54

1  through kind of on a daily basis.
2      Q.  And so on a daily basis Mortenson is
3  telling Don Borneke hey, in this 30-foot square
4  or however you want to phrase it, this is where
5  the truck is going to be coming in and this is
6  where the components are going to be delivered;
7  right?
8      A.  Yes, Mortenson being referenced pretty
9  broadly there.  So sometimes that direction
10 comes from the crews that -- So a lot of the
11 labor associated with these sites is contracted
12 through the union directly to Mortenson and so
13 the superintendents would be working with their
14 foremen on those crews to kind of look at
15 their -- their functions for the day and kind of
16 coordinating a couple days in advance based on
17 what they are seeing and what the right way to
18 go about that work is.
19     Q.  Okay.  Got it.  So nonetheless though,
20 somebody on the project is communicating to
21 Don Borneke the various, to use the exact words,
22 component locations in these erection areas;
23 right?
24     A.  Correct, and especially in that -- kind

55

1  of in the micro time frame of work coming up
2  within the next week.  Because of how you move
3  around these sites certain areas get more
4  attention throughout, right?  Where there is
5  active work going on, those are the ones that
6  are generally talked about in those morning
7  discussions.
8      Q.  And in these more stringent areas where
9  the work is going to be performed, where the
10 equipment is going to be staged, this is where
11 the compaction and the grading and the drainage
12 really all matters; right?
13     A.  Specific to the -- to the compaction,
14 yes, especially for those initial activities at
15 those sites when you're bringing the truck in
16 and off-loading them, and that's kind of the --
17 the first product that is delivered, and then
18 beyond that you revisit on that as-needed basis.
19     Q.  And let's just break that down a little
20 bit.  So this area where it's going to be
21 delivered is literally told to Don Borneke so
22 they know which areas are more important than
23 others, right?
24     A.  Yes.  They will approach a site and

56

1  work with the trade partners and the trucking
2  companies to kind of identify exactly where
3  things are going to go.
4      Q.   And these areas where -- that are being
5  identified to Don Borneke are the areas
6  that need to be really well compacted so that
7  the ground does not sink in underneath staged
8  equipment or various trucks that are delivering
9  the equipment, right?
10     A.   Correct, and there is generally --
11 Given the nature of the work there is kind of --
12 there is an assumed deflection.  Things are --
13 You know that it's never going to be a
14 perfectly -- it's not going to be working on
15 concrete, but it's going to be -- it's
16 sufficient to support the operation and that
17 primary operation is off -- getting the truck
18 in, off-loading the component, staging it and
19 backing the truck out.
20     Q.   Exactly.  So we are not working in a
21 warehouse with concrete floors; but nonetheless,
22 Don Borneke is expected to prepare the ground in
23 these areas so that it doesn't sink in
24 underneath trucks or even just the staged

                                                57

1  equipment while it's waiting to be erected,
2  right?
3      A.   Correct.
4      Q.   And then if we go into the subsections
5  of Part A on this contract, some of the things
6  we talked about are again listed here.  These
7  erection areas need to be cleared and grubbed,
8  right?
9      A.   Yes.
10     Q.   But then also under II, bumps shall be
11 leveled and holes filled to accommodate
12 equipment travel, did I read that correctly?
13     A.   You did, and that would generally be
14 during the initial build of the turbine erection
15 areas, you're in a farm field.  There is going
16 to be -- within that 175-foot radius there could
17 be low points in the natural topography and so
18 eliminating those holes and making it that --
19 the smooth pad.
20     Q.   And so these depressed areas or just
21 the ruts, they all need to be leveled and filled
22 so that equipment and various trucks can
23 properly deliver the equipment and the equipment
24 can be staged; right?

                                                58

1      A.   Yes, to provide the -- to meet the
2  specs that's identified in A.  That's kind of
3  part of the work that needs to be take place in
4  order to do that.
5      Q.   And then if we go under Subsection III,
6  it also says that cleared area shall be
7  maintained, compacted and provide positive
8  drainage at all times to facilitate turnaround
9  area for turbine delivery components through the
10 duration of the project, right?
11     A.   Correct.
12     Q.   So this is like what we were talking
13 about earlier.  Maybe not the whole 175-foot
14 radius, but in this smaller, more stringent area
15 where the pieces are going to be delivered and
16 staged this needs to be maintained, compacted
17 and positive drainage provided at all times
18 throughout the duration of the projects; right?
19     A.   Yeah.  So just given the nature of the
20 work, that's usually on kind of that -- The few
21 sites that you're looking at, as those crews are
22 evaluating their work they are the ones that are
23 kind of communicating where the maintenance is
24 specifically required.

                                                59

1      Q.   But all of these tasks that we just
2  talked about, this grading, the maintaining, the
3  compacting, the drainage, all of this among
4  other things helps prevent large ruts or
5  depressed areas from forming in these erection
6  areas; right?
7      A.   Yes.  This is a step that helps prevent
8  that.
9      Q.   Yeah.  And in this step that helps
10 prevent it, one of the ideas is if these things
11 are prevented water won't pool near the turbine
12 or where workers are working; right?
13     A.   Correct.
14     Q.   And if water does not pool, you know,
15 ruts and depressed areas don't form, then there
16 is not these areas where little lakes of water
17 can pool and freeze; right?
18     A.   Correct.
19     Q.   And all of these things that we just
20 talked about, these are all tasks that Borneke
21 is contracted to prevent by providing the
22 necessary preparation work for these sites?
23     A.   Yes.  It's assumed that they are --
24 Yes, they are maintaining these sites.

                                                60



Andrew Black 03/14/2022

1  Specifically they are re-focussing on those
2  areas and there's crews present and they are
3  requested to be there.
4      Q.   Okay.  So in these various sites, not
5  only do they prepare them for all these things
6  that we just talked about, but it's also
7  expected that they will also maintain them as an
8  on -- on an as-needed basis?
9      A.   Correct.
10     Q.   And this could be a combination of
11  things.  This could be Borneke being told hey,
12  come to a site or just Borneke seeing something
13  is wrong with the site and taking it upon
14  themselves to remedy it; right?
15     A.   Yes.  More of the former than the
16  latter, but both could be the case.
17     Q.   And then on this project I want to ask
18  you a question about the various deliveries.
19  The various -- I will get to that in a second
20  actually.  I don't want to lose my train of
21  thought on this.  I will go back to the scope of
22  work because we are kind of in the middle of
23  that.
24          I am still here.  I am just trying to

61

1  find my place.  Give me one second.
2          And so again in these cleared areas,
3  this maintenance for the compaction and the
4  drainage for whatever the purpose is, these are
5  tasks that are required to be maintained
6  throughout the duration of the project; right?
7      A.   It's primarily kind of referencing
8  getting it to that final product to support the
9  deliveries and then the subsequent erection
10  operations, but it -- it is a -- it's a product
11  that they deliver once and then they maintain on
12  that as-needed basis.
13     Q.   And then, you know, Borneke is
14  contracted to maintain and prepare these areas
15  because they know what is going to be performed
16  at these sites and that's deliveries on large
17  semis carrying pieces of equipment that weigh
18  tens of thousands of pounds; right?
19     A.   Yes.  That's the original design that
20  they are trying to provide.
21     Q.   In these areas if a large rut or
22  depressed area forms where Borneke prepared the
23  ground for delivery, these are things that they
24  would have to maintain or try to remedy if

62

1  possible; right?
2      A.   Yeah.  If they were requested to go out
3  there and level that out, they certainly would.
4      Q.   And then we talked a lot about the
5  grading and the drainage, but also the
6  compacting.  You agree by compacting the land
7  Borneke is helping to ensure the land is able to
8  support the weights of these various pieces of
9  equipment, right?
10     A.   Yes.
11     Q.   Not only that, but by compacting the
12  land Borneke is helping to ensure that the land
13  in these tight stringent areas is able to
14  support the weight of the trucks delivering the
15  equipment; right?
16     A.   Yes.
17     Q.   And same question for while the
18  equipment is off-loaded and staged prior to
19  going up, right?
20     A.   Correct, yes.  There is some assumed
21  deflection there, right?  If they need to have
22  the compaction in order to meet those minimum
23  requirements with the understanding that in an
24  Illinois farm field where the soil can be very

63

1  wet there is some deflection that may occur, you
2  just got to be able to get the trucks in and
3  out.
4      Q.   Okay.  But nonetheless, you also have
5  to provide proper drainage so that if there is a
6  depressed area or a rut or something forms,
7  water does not pool in these areas; right?
8      A.   Correct.  Yeah, kind of especially for
9  the long-term maintenance of -- during the
10  construction process.
11     Q.   Exactly.  So the idea behind it is
12  prepare the ground to effectuate the delivery
13  and the staging but also provide drainage so
14  that if a rut or depressed area forms water
15  won't just simply pool in the erection area,
16  right?
17     A.   Yes.
18     Q.   So it's kind of a combination of both.
19  So not only do they have to prepare and compact
20  the land, but they also have to provide the
21  drainage so that if the land does sink in a
22  little bit large areas of water don't pool and
23  possibly freeze; right?
24     A.   Correct.

64

Andrew Black 03/14/2022

1    Q.   So again using a hypothetical, if there
2  is an area where a piece of equipment is staged
3  and it sinks into the ground, if there is proper
4  drainage at this site even if the piece of
5  equipment somewhat sinks into the ground the
6  idea is with proper drainage water still won't
7  pool because the ground is graded away from the
8  turbine; right?
9    A.   Correct.
10   Q.   Okay.  And if this is done properly by
11 the excavating company, Borneke in this case,
12 then there shouldn't be large areas of standing
13 water that can pool and freeze; right?
14   A.   Correct.  It's just sometimes during
15 the off-loading of that equipment, right, that's
16 when it takes place.  That's when that -- the
17 reference rutting would be taking place, and so
18 there -- I would say reference and somewhat
19 assumed rutting, and some of that rutting might
20 take place directly adjacent to components where
21 the -- fixing those puts more things at risk --
22 The kind of the risk/reward analysis would be
23 you're introducing more risk by driving heavy
24 equipment next to expensive components, and so

65

1  are ten feet apart, that five percent grade
2  can't overcome that rut.
3    Q.   Okay, got it.  But that's why all these
4  compaction tasks so that the ground can support
5  the various pieces of equipment and trucks are
6  so important that it's done right the first time
7  so that these things don't form or they form
8  less, right?
9    A.   That is again the goal in an ideal
10 scenario.  It's just within the nature of the
11 wind industry and where you're constructing
12 these it's hard to guarantee that a thousand
13 percent.
14   Q.   In this -- I want to ask you a couple
15 questions before we get back into more
16 specifics.  Have you -- When I say the subject
17 incident and the wind farm, you're obviously
18 familiar with the wind farm.  Are you familiar
19 with my client Nick Georgeff?
20   A.   I am.
21   Q.   And are you familiar with the incident
22 that we are here to talk about?
23   A.   I am.
24   Q.   Okay.  I want to show you the -- excuse

67

1  in those cases the crews assess those
2  challenging -- those challenges that are present
3  at the site and they -- they plan as part of
4  their pre-task planning process appropriately.
5    Q.   So you've got to kind of look at it in
6  like if it occurs too close for a bulldozer to
7  operate safely, you have got to weigh the cost
8  benefit and see what can be done, if anything,
9  type of thing?
10   A.   Correct.
11   Q.   But nonetheless, the fact still remains
12 in a perfect world the idea is this ground would
13 be prepared so that depressed areas don't form;
14 right?
15   A.   In an ideal scenario, yes.
16   Q.   And in an ideal scenario even if these
17 depressed areas form, hopefully the water won't
18 pool there because of the fact that there is
19 proper drainage; right?
20   A.   Yes, but that drainage is kind of --
21 It's for the -- It's for the pad as a whole.  So
22 if there is a rut there will be localized
23 drainage challenges.  It can overcome -- within
24 a five percent grade if you have two ruts that

66

1  me.  I apologize -- the construction incident
2  analysis.  Have you seen this document before?
3    A.   I have.
4    Q.   This is a document stated simply
5  prepared by Mortenson and it's basically like an
6  incident report, right?
7    A.   Correct.
8    Q.   And this incident report shows the
9  sheet of ice that my client slipped on, right?
10   A.   Correct.
11   Q.   But on the day of the occurrence, and
12 it says this here, the ice was covered with a
13 thin layer of snow so it couldn't be seen;
14 right?
15   A.   Yeah.  I mean, that is what is
16 referenced.  I mean, I -- I can't remember
17 specifically.
18   Q.   Okay.  But you have no reason to
19 disagree with that, right?
20   A.   No reason to disagree.
21   Q.   Okay.  And then if you look
22 specifically in this area this is an erection
23 area and you can see the crane pad maybe ten
24 feet away from where the sheet of ice is, right?

68

1    A.   I can't necessarily tell there.  So
2  timbers like that would be used.  Whether or not
3  those are just staged in the area versus like
4  the actual pad to support the foundation -- or
5  adjacent to the foundation to support the main
6  crane's erection I can't tell.
7    Q.   Do you have any reason to disagree with
8  prior testimony of ironworkers at this site who
9  state that that was the crane pad?
10    A.   I don't, no.  I mean, where that hub is
11  located -- The hub is that triangular piece
12  right there.
13    Q.   Yeah.
14    A.   That seems a little close, but I don't
15  know.  No, I have no reason to disagree with
16  that.
17    Q.   Okay.  But nonetheless, this is an area
18  where this ice has accumulated, that's part of
19  the area we were talking about that there is
20  supposed to be these stringent requirements for
21  delivery and stagging of equipment; right?
22    A.   Yes.
23    Q.   I want to ask you some questions about
24  this.  It says that the site had previously been

69

1  addressed with a bulldozer to mitigate
2  walking/working hazards; however, the ice
3  accumulation had occurred too close to the WTG
4  section for the dozer to operate safely leaving
5  the ice unaddressed.  Did I read that correctly?
6    A.   You did.
7    Q.   So this is an area that Don Borneke
8  would have previously addressed with a
9  bulldozer, right?
10    A.   Yeah.  Based on what the report is
11  saying, yeah.  You can infer that they would
12  have addressed that because someone had
13  requested a dozer to visit that site.
14    Q.   So this is something that based on this
15  document somebody would have called Don Borneke
16  and said hey, come check this out, but the ice
17  occurred too close for the dozer to operate
18  here; right?
19    A.   Yeah.  That's how it reads.
20    Q.   So basically this is stating -- to
21  state it another way, Don Borneke was called to
22  the site to look at this, saw it and then said
23  this is too close to the WTG section for the
24  dozer to operate safely so it was left

70

1  unaddressed, that's what this document is
2  stating in your opinion?
3    A.   That is how it reads to me.
4    Q.   Okay.  Got it.
5         And then under adverse ground
6  conditions it does say the site received enough
7  snow that morning to cover the ground with a few
8  inches.  This layer of snow concealed some
9  hazards that existed on site, specifically the
10  ice adjacent to the mid-section.  Did I read
11  that correctly?
12    A.   You did.
13    Q.   So again, this is just what I was
14  talking about earlier at least based on the
15  document.  While the photograph doesn't show it,
16  it is documented that there was a thin layer of
17  snow covering the ice on this project; right?
18    A.   Yeah.  I mean, that's how it reads.
19    Q.   Okay.
20    A.   Documented, I don't know; but if there
21  was, that would have been addressed that morning
22  when they talked through safety items.
23    Q.   Okay.  Got it.  And bear with me.  I
24  just want to ask you a few more questions.

71

1         Do you -- Actually I am trying to think
2  of the way to ask this.  Did you talk with my
3  client after this accident?
4    A.   I know I talked to his wife.
5    Q.   Okay.
6    A.   So following the incident the emergency
7  response plan was enacted --
8    Q.   Sure.
9    A.   -- and I went -- I followed the
10  ambulance to the clinic where they were at and
11  just kind of stayed there until his family was
12  there to support -- just to support the injured
13  worker.
14    Q.   And again to make sure I heard you
15  properly, you would have went to the clinic and
16  waited for his family to arrive?
17    A.   Yeah, just to kind of express support
18  for an injured worker.
19    Q.   Oh, of course.  No, I am not
20  questioning the decision.  I just want to make
21  sure I heard you correctly.
22         So while you were at the clinic, did
23  you actually go into my -- I am just trying to
24  see whether you saw him, if you observed him, if

72

1   you -- if he said anything.  That's all I am
2   trying to get at, like what you observed, what
3   you saw, maybe you actually went to the site
4   while he was still on the ground, any of that
5   stuff.
6       A.   I -- I remember the emergency response
7   going into action which for us means there is a
8   call over the radio back to the main office.
9   The main office dispatches -- and we do have EMT
10  on site full time, so they would be part of that
11  original response.  If they deemed --
12  collectively it's deemed that additional support
13  is needed, you would call the emergency
14  response, bring an ambulance to the site.
15          So I was on the office side and then if
16  I recall correctly, I think I was approaching
17  the site as the ambulance was -- or as they were
18  loading him up and removing him from site, so
19  then followed shortly thereafter.  After finding
20  out where they were sent, went to the clinic and
21  my time, as I recall, was just spent in the
22  waiting room.  Then as she arrived we -- we
23  exchanged some words.  I mean, basically just
24  talked through sorry, let us know if we can help

73

1   Q.   Well, if I relate to you that there is
2   a change order dated after this accident that
3   says, you know, snow and ice will be assumed by
4   Don Borneke, would you have been part in those
5   communications or that process or do you not
6   remember at this point?
7       A.   Oh, I am sure I would have been.  I
8   don't remember the specific change order.  I
9   would assume that it was based on work that they
10  had performed, not necessarily an
11  all-encompassing scope moving forward.
12      Q.   Okay.  Got it.  Is this something that
13  there is like an unwritten rule on these
14  projects that it's assumed the excavating
15  company will take care of these responsibilities
16  prior or is this just something that came to be
17  due to the nature of the project itself?
18      A.   They're -- They're the best equipped to
19  provide those services along the way because
20  they have the equipment and so then they would
21  perform those on a T&M basis I am assuming is
22  what the change order was associated with it.
23          So if the superintendent determined
24  that additional work is required, they will sign

75

1   with anything, and then went from there.
2       Q.   Okay.  Got it.  And so again, the
3   reason I am asking is if this goes to trial,
4   this matter, we just need to know what you would
5   talk about, what you wouldn't.
6           Is it safe to say that you did not
7   actually see my client, like you did not observe
8   him in pain, he did not tell you about his pain
9   level, things like that?  You just kind of went
10  to the site, you missed him, and then you waited
11  at the hospital for his wife to arrive, but you
12  never actually saw or spoke with my client about
13  the injury or the pain?
14      A.   I don't believe I did.
15      Q.   Got it.  No, no, that's fine.  Like I
16  said, this is not a memory test.  This is just
17  to find out what you know and what you don't
18  know.  That makes sense.
19          After the fact, you know, after this
20  accident at some point there was a change order
21  for ice removal to become the explicit
22  responsibility of Don Borneke.  You agree,
23  right?
24      A.   I don't recall.

74

1   a ticket documenting that so many hours of work
2   were performed.
3       Q.   So this is likely something that was
4   just kind of assumed would be done in the
5   forefront and then once it actually started to
6   get done, a change order was put in place so
7   that additional compensation could be paid?
8       A.   It would be done so -- I don't know if
9   I would say it's assumed that that would take
10  that course.  That's kind of back to the fluid
11  nature of these sites --
12      Q.   Sure.
13      A.   -- that if that work is needed they are
14  going to be compensated, especially if our
15  superintendents agree that the work was in fact
16  performed and required.
17      Q.   Got it.  And I am about wrapping up.  I
18  just have maybe five more minutes of questions.
19  I just wanted to let you know there is a light
20  at the end of the tunnel.
21          I am going to ask you basic, you know,
22  overall questions and then I am going to turn it
23  over to Mr. Sullivan.
24          So just generally, sir, you would agree

76

1  that in these areas for the 175 feet around the
2  turbine, that radius, but mainly in the areas
3  where the turbine is going to be delivered and
4  staged, these are the areas that need to be
5  properly compacted so that it can effectuate the
6  delivery and the staging of these pieces of
7  equipment; right?
8       A.  Yeah.  It needs to be able to support
9  the weight of the delivery truck.
10      Q.  And by being able to support the
11 weight, the idea is this ground in this tight
12 radius won't sink in underneath the trucks or
13 the equipment while it's staged; right?
14      A.  That would be the goal.
15      Q.  And then an additional goal would be to
16 provide proper drainage in these areas as well?
17      A.  Yes.
18      Q.  Okay.  And in these areas Don Borneke
19 as we saw in the contract from the access road
20 and its play with the erection area based on the
21 radii, they had an ongoing obligation to
22 maintain these areas?
23      A.  The -- The way the contract referenced
24 that would be ongoing access -- ongoing

77

1       A.  Correct.
2       Q.  And ultimately based on your reading of
3  the construction incident analysis, your reading
4  of that says that Borneke was called to the
5  site, shown the area, but due to location they
6  couldn't address it again with a bulldozer due
7  to tight quarters?
8       A.  Yeah.  The way it reads is that they
9  would be concerned for damage to the turbine
10 component.
11      MR. TERRY:  Okay.  I believe that's all
12 I have right now.  I appreciate your time today.
13 I am sure Mr. Sullivan will have some
14 follow-ups.
15      If anyone wants to take a break, now
16 might be a good time or we can probably keep
17 going.
18      MR. SULLIVAN:  Do you mind if we take a
19 couple minutes?
20      MR. TERRY:  Sure, not a problem.  Is
21 that okay by everyone else?  Just maybe less
22 than five minutes?
23      MS. VAN HECKE:  Yeah.
24      MR. TERRY:  Thank you.

79

1  maintenance for public roads and then
2  maintenance on the delivery road and then kind
3  of the as needed within the 175.
4       Q.  Okay.  Got it.  But ultimately
5  Don Borneke on this project had a responsibility
6  to ensure the land was properly prepared so that
7  it did not sink in underneath the weight of the
8  materials or the trucks, right?
9       A.  They did.
10      Q.  And part of this goal would be so that
11 there is not a depressed area where water could
12 pool and eventually freeze, right?
13      A.  Yeah.  And the drainage is referencing
14 because if there is low spots water will sit
15 there and over time and it will do -- it will
16 have a detrimental impact.  So that's kind of
17 the goal of that 5 percent drainage spec.
18      Q.  And all of these things are things that
19 Mortenson contracted Borneke to perform because
20 Borneke is the expert in excavation, right?
21      A.  Yes.
22      Q.  And Mortenson relied on Borneke's
23 expertise to -- and expected that these tasks
24 were performed properly and reasonably, right?

78

1             (whereupon, a short break was
2             taken.)
3       MR. SULLIVAN:  Mr. Black, I have a few
4  questions for you.
5             EXAMINATION
6  BY MR. SULLIVAN:
7       Q.  With regard to this project, you
8  were the senior project manager and the
9  superintendent was James Langston, is that
10 right?
11      A.  I was the project manager at that time.
12 It was a different position or different title,
13 and James -- Jaime Langston would have been the
14 erection superintendent.
15      Q.  So when you have been referring to
16 superintendent throughout this deposition, are
17 you referring to Jaime Langston?
18      A.  It would -- Andrew Kruse was also part
19 of that.  He was a superintendent on the project
20 and then Jaime Langston at that time, I believe,
21 was the lead superintendent.
22      Q.  At time of the incident you mean?
23      A.  I believe so, yes.
24      Q.  Okay.  So for example, in the safety

80

1  report that you were reviewing earlier it does
2  identify James Langston is the superintendent.
3  So he would have been the superintendent on the
4  day of the incident as far as you know?
5      A.   Yeah.  That would probably be the most
6  accurate to represent.
7      Q.   And he is a Mortenson employee, right?
8      A.   He is.
9      Q.   Do you know if James Langston is still
10 employed at Mortenson or not?
11     A.   I believe he is, but I can't confirm
12 100 percent.
13     Q.   Have you ever spoken to him about this
14 case or the incident?
15     A.   We would have spoken on it at the time,
16 but I don't recall the nature of any of those
17 conversations.
18     Q.   You haven't -- When was the last time
19 you saw James Langston if you know?
20     A.   Probably March 2019, maybe February of
21 2019.
22     Q.   Which is when you said you stopped
23 doing the windmill work, right?
24     A.   Correct, at the completion of that

81

1  project.
2      Q.   This would have been the last project,
3  the Mendota project?
4      A.   Correct.
5      Q.   Now, the order of the way it worked on
6  this project was for each windmill erection site
7  the erection areas were prepared before the
8  equipment was delivered, right?
9      A.   Correct.
10     Q.   And when the grading and compaction
11 work was done, it was reviewed by Mortenson when
12 Borneke was done with that work; is that right?
13     A.   For grading and compaction -- So for
14 compaction there would have been soil testing
15 done for the backfill material.  We would have
16 done our own -- so with quality control there is
17 quality control and quality assurance, right?
18     Q.   Um-hum.
19     A.   So it's likely there would have been
20 some quality assurance done.  Ultimately the --
21 the kind of decider of what is acceptable and
22 I -- I referenced this previously.  I can't
23 recall specifically if there is actually a soil
24 testing requirement for the turbine component

82

1  deliveries; so if there was not, then it would
2  have been accepted with a proof roll in some
3  capacity by the component delivery company.  So
4  they have to look at the site and determine if
5  they feel comfortable driving on them.
6      Q.   You said proof roll, r-o-l-l?
7      A.   Yes, and sometimes that is -- On some
8  sites that's done on every single site prior to
9  getting out there.  On others it's kind of on an
10 as-needed basis.  So they have a loaded truck of
11 X pounds that they feel simulates that -- the
12 future delivery.
13     Q.   Okay.  Is it safe to say that --
14 Mortenson obviously was the general contractor
15 on the project, right?
16     A.   Correct.
17     Q.   And in terms of the scheduling of tasks
18 primarily with delivery and then also with later
19 erection, that was done by Mortenson?
20     A.   It would have been an agreed upon
21 schedule between Mortenson, the owner, and the
22 turbine supplier which would have identified the
23 scheduled deliveries up front and then as you
24 get closer it starts to be a little bit --

83

1  you're scheduling deliveries out within a week.
2      Q.   The soil inspectors were a third-party
3  company, is that right?
4      A.   Yes.  I believe it was Element on that
5  project.
6      Q.   Okay.  And do you remember who the
7  delivery company was?
8      A.   I don't.  Someone contracted through
9  Siemens Gamesa.
10     Q.   And that's basically just a truck
11 company?
12     A.   Yes.  They are pretty specialized just
13 because of the nature of the components they are
14 handling, but the trucking contract goes through
15 the turbine supplier and up to the owner.
16     Q.   Okay.  You don't -- As you sit here, do
17 you recall what specific site is at issue in
18 this case with regard to the injury that
19 Mr. Georgeff is alleging?
20     A.   I remember it being east of the
21 laydown yard and the office, but I couldn't tell
22 you which site it was.
23     Q.   You didn't take any pictures at the
24 time of what that site looked like, did you, on

84



Andrew Black 03/14/2022

1 that day?
2    A.   I didn't.
3    Q.   Did you actually see the site after
4 Georgeff fell?
5    A.   I know I approached it as that
6 ambulance was -- I have a memory of an ambulance
7 at that site, so I would have visited -- visited
8 it that day.  I can also say that seeing that my
9 name wasn't on that construction analysis
10 incident I think I left for vacation either the
11 next day or the following day which was why I
12 was not a part of it.  So I didn't do a detailed
13 look at that site.
14    Q.   I see.  Did you observe the snow or the
15 area where he actually fell?  What do you
16 recall, if anything?
17    A.   I don't recall.
18    Q.   Okay.  Did you have any input at all
19 then in the creation of this incident analysis?
20    A.   No.  I think I was copied on it and
21 returned from vacation to see it.
22    Q.   And do you remember how long you were
23 gone?
24    A.   A week.

85

1    Q.   Have you ever spoken to Kevin Hogan
2 about this report?
3    A.   We would have talked about it at the
4 time just to understand what they determined was
5 the root cause and just to kind of understand,
6 you know, mitigation moving forward.
7    Q.   Do you have any specific recollection
8 of any conversation with Kevin about the
9 incident or this case or anything?
10    A.   Nothing specific, no.
11    Q.   And then what about Lonnie Sears, did
12 you ever speak to him about this case?
13    A.   Not after the fact.  I don't really
14 remember any specific conversations on the
15 incident.
16    Q.   Okay.  Lonnie Sears was Georgeff's
17 direct foreman, is that right?
18    A.   That sounds right.  He was the -- one
19 of the general foremen, so I believe that.
20    Q.   Now, so he would have been a union
21 employee that was contracted by Mortenson but
22 still a Mortenson employee, is that fair to say?
23    A.   He would have been on Mortenson
24 payroll, yes.

86

1    Q.   When it comes to the actual crane
2 erection, who decides when and what exactly
3 takes place?  On any given site that is.
4    A.   It would be defined in a construction
5 schedule that would be part of the contract
6 documents and then that would kind of be
7 coordinated as you're approaching some of those
8 because given the nature of the work and where
9 it's done you don't want to be too far in
10 advance because that gives -- gives the
11 opportunity for the sites to, you know, suffer,
12 I guess, from the weather, from the elements.
13    Q.   Right.  Would you agree with me that --
14 Huh?
15    A.   I said to the grade.  I am sorry.  The
16 grade was the word I was looking for.
17    Q.   Right, right.
18         You would agree with me that one of
19 these erection areas could be graded to the
20 specifications of the contract and a weather
21 event can come up with rain and so forth and a
22 week could pass and it would no longer be within
23 the specification potentially; right?
24    A.   Yeah, I agree with that.

87

1         MR. TERRY:  Objection, hypothetical.
2 Sorry.
3 BY MR. SULLIVAN:
4    Q.   Now, with respect to each one of these
5 29 sites, we are talking about, you know, crane
6 pad sites at each one plus this 175-foot
7 erection area around that; right?
8    A.   Yes.
9    Q.   Each one would have been -- There is
10 some background noise and I am not sure what
11 that is.  Maybe it's me but --
12    A.   Is that on my side?
13    Q.   I don't know.  I just want to make sure
14 that you can hear me.  It's definitely not me
15 but --
16    A.   I can hear you fine.
17         MR. TERRY:  Yeah, Chris, we can also
18 hear -- I can still hear you, too.  I don't know
19 what it is though.
20         MR. SULLIVAN:  Oh, you can hear it,
21 too?  It's almost like someone talking on a
22 phone.
23         MR. TERRY:  I don't know, but, you
24 know, we can still hear you though.

88

1     MR. SULLIVAN:  Okay.
2     THE WITNESS:  Is that better when I
3 mute?
4     MR. SULLIVAN:  It's good now, yeah.  It
5 seemed like when you were giving answers is when
6 I was hearing background.  That's what made it
7 hard for me to hear, that's all.  I am good now.
8 Thank you.
9     THE WITNESS:  Okay.
10 BY MR. SULLIVAN:
11     Q.  With regard to each one of these sites,
12 before the components were delivered Borneke
13 would have done its grading, excavating work and
14 then it would have been reviewed either by the
15 soil tester or someone from Mortenson, is that
16 fair to say?
17     A.  Before the components arrived that
18 would be fair to say, yes.
19     Q.  Right.
20     A.  Yeah, maybe not right at the end of
21 their work, but at some point before the
22 components arrived, that is correct.
23     Q.  Okay.  And then while the components
24 were actually being -- There is a span of time.
                                              89

1 I am sure it probably varied in terms of how
2 long it took from when the components were
3 delivered before they were erected, right?
4     A.  Yes.
5     Q.  Do you know what that typically was,
6 that time?
7     A.  Gosh, it could be a week to several
8 weeks.
9     Q.  Okay.  And in terms of the schedule,
10 once the components had been delivered is it up
11 to Mortenson to put together the construction
12 schedule for the actual erection and where to go
13 in order and so forth?
14     A.  Yes, and that's all known up front.
15 It's kind of -- Once you get going it's kind of
16 dictated by progress which is a lot of times
17 limited by the environmental factors.  So if a
18 crane can't move from Site A to B, you know, B
19 it's going to sit a little bit longer.
20     Q.  Right.  And did you have any
21 involvement in that or was that someone else at
22 Mortenson in terms of what order of things?
23     A.  We would have looked at it up front
24 with -- It was probably Andrew and James that
                                              90

1 put that together with the support of the
2 general foreman just because they know the crane
3 travel paths best.
4     Q.  You said the general foreman in this
5 case was Lonnie Sears.
6     A.  Lonnie Sears and Brian McBride.
7     Q.  Okay.  I don't see that Brian McBride
8 was involved with the construction incident
9 report.  Do you have any idea if he was there
10 that day working on site?
11     A.  I don't.  I know he was part of the
12 up-front planning efforts.
13     Q.  Okay.  And then I missed -- You said
14 Andrew was another superintendent.  What is his
15 last name?
16     A.  Kruse, K-r-u-s-e.
17     Q.  Okay.
18     MR. TERRY:  And, Chris, that's the
19 person we are deposing tomorrow.
20     MR. SULLIVAN:  Perfect.
21 BY MR. SULLIVAN:
22     Q.  Andy Black, did you have any role
23 yourself in reviewing any of the work by
24 Borneke?
                                              91

1     A.  Not more than in passing.
2     Q.  Okay.  Do you have any knowledge that
3 any of the excavation or grading or compaction
4 work that Borneke did on this project was
5 inadequate or insufficient in some way?
6     A.  No.  I mean, I remember there being wet
7 sites that were, I would say, not super atypical
8 given the conditions that were present.  I don't
9 remember repeated failures of test reports.
10     Q.  And let's say if the initial grading
11 work was done and there was a rain event, what
12 would happen?  Was it Mortenson that would call
13 out Borneke to repair something or fix, you
14 know, damage that had been caused by weather?
15 Is that what happened?
16     A.  It would be collaborative.  The
17 superintendents, Borneke and Mortenson, would
18 evaluate those together looking at that
19 short-term schedule and determine with the
20 support of the general foreman what needs to be
21 done.
22     Q.  And do you have any information that
23 Borneke had refused to do any work that
24 Mortenson had called them back out to perform if
                                              92

1  something had happened in the interim weather
2  related or otherwise?
3      A.  No.  If the crews and the
4  superintendent determined something needed to be
5  done, they would comply.
6      Q.  Okay.  The morning meetings were
7  conducted by Mortenson, right?
8      A.  It would be a plan-of-the-day meeting
9  and it would be -- Every primary group on site
10  would have a role in it walking through what
11  their plans were for the day and coordinating in
12  general.
13      Q.  And who would then conduct those
14  meetings or does it vary?
15      A.  Yeah.  I mean, it -- It's in the
16  Mortenson office, so I guess by default
17  Mortenson.  So it would be the superintendent
18  and then each of the foremen for the specific
19  crews, then Borneke and then the other trade
20  partners on site.
21      Q.  You don't have any recollection of the
22  plan-of-the-day meeting for the day of this
23  incident in November, do you?
24      A.  I do not.

93

1      Q.  And did you attend those usually or
2  not?
3      A.  Yep.
4      Q.  Did you always attend them?
5      A.  90 percent attended.
6      Q.  Okay.  And what is the pre-task plan
7  card?
8      A.  That would be -- So the pre-task
9  planning is a form that each crew is expected to
10  do once each day that assesses their work area,
11  goes through the common hazards associated with
12  their tasks and anything that's specific to
13  that day.  They mark it down.  It's basically a
14  communication tool for the foremen to walk
15  through with their crew of this is what we
16  should be looking out for today, so please be
17  aware of it.
18      Q.  Okay.
19      A.  And then as conditions change they
20  revisit.
21      Q.  And pre-task plan cards do include
22  things like weather conditions, right?
23      A.  Correct.
24      Q.  So it is something that's created by a

94

1  Mortenson employee, isn't it, the pre-task plan
2  card?
3      A.  So every -- The expectation is that
4  every crew on site does it.  So like for a
5  Mortenson employee they would have a Mortenson
6  pre-task card.  Borneke would have their own job
7  hazard analysis or JJ is another word for it,
8  but the expectation is that everyone is using
9  Mortenson's or their own internal form.
10      Q.  And the pre-task plan card is actually
11  posted on the site, isn't it?
12      A.  Yes.
13      Q.  Okay.  And do you -- You don't have any
14  recollection or do you have a recollection of
15  what that pre-task plan card was, what it said
16  for the day in question?
17      A.  I don't.
18      Q.  Do you recall any discussion -- or
19  strike that.
20          Other than what you have already talked
21  about, do you remember November 15, 2018, the
22  weather conditions, what you actually were doing
23  before you heard about this incident, anything
24  like that?

95

1      A.  I don't.
2      Q.  Okay.  Do you remember the snow event
3  at all?
4      A.  I remember it being -- It was a snowy
5  cold winter.  The specific event I don't recall.
6      Q.  Obviously it can snow in winter, it's
7  not a surprise.
8      MR. TERRY:  At least in the Chicago
9  area, yeah.
10  BY MR. SULLIVAN:
11      Q.  So you don't have any idea one way or
12  the other whether the plaintiff in this case,
13  Georgeff, would have seen the pre-task planning
14  card when he showed up at the site that day, do
15  you?
16      A.  Do I know if he would have seen it?
17      Q.  Yeah.
18      A.  I would assume so and I -- the
19  expectation is that folks assess each site as
20  they -- So if they are not -- If they don't walk
21  on to a site and see one that's already
22  completed, they perform their own.  The nature
23  of finding one that's existing is that someone
24  has already kind of talked through it and then

96



Andrew Black 03/14/2022

1  you're also aware of the hazards of their
2  operations, especially if you're not a part of
3  their crew.  It kind of helps bring you up to
4  speed of what is going on.  So that's why you
5  would sign on to one of theirs.  If one is not
6  completed the expectation is you're evaluating
7  it on your own.
8      Q.    And are they supposed to be signed by
9  the crew members that arrive at the site?
10     A.    Yes.
11     Q.    And it is something that would have
12 weather conditions, like whether or not there is
13 snow and ice that has been identified and to be
14 aware of it; right?
15     A.    Yes.  That's something that I would
16 expect to be a part of that conversation.
17     Q.    And something that would be on the
18 pre-task plan card, right?
19     A.    Yes.  There is a place for you to --
20 You know, it asks you all the probing questions
21 and then there is even a little sketch area for
22 you to visually identify where the hazards are.
23     Q.    Okay.  Do you have any recollection of
24 ever reviewing the site, I think it's T11,

97

1      A.    So it's -- There is several different
2  erection crews.  There is a crew that's
3  associated with the lower and the middle
4  component of the tower and then there is a
5  separate one that completes the remainder of
6  them, so they put the top and then they assemble
7  the blade.
8          So it would be different crews for
9  different days.  Within that crew would be a
10 general foreman, a foreman and then the rest of
11 the labor force, and then there would be some
12 transient people that are in and out throughout
13 the day being safety, superintendents, quality.
14 You know, they each have their part, but they
15 are not there for the duration of it.
16     Q.    Now, on this project you would not
17 expect the excavating contractor to be present
18 on the site when the erection was actually
19 taking place, would you?
20     A.    I would not unless they were called out
21 for something specific.
22     Q.    Okay.  Called out by someone at
23 Mortenson, right?
24     A.    Yeah.  Likely a general foreman.

99

1  before this incident?
2      A.    No.  I would have been there at some
3  point over the course of construction; but
4  within a reasonable proximity to the actual
5  event, unlikely.
6      Q.    And the picture that you have been
7  shown on the incident report is basically the
8  only picture we have.  Do you know when that was
9  taken and who took it or any of that stuff?
10     A.    No.  I would assume it was completed
11 during the -- during the incident analysis which
12 would have been within a day or several days
13 later.
14     Q.    You never talked to anyone at Borneke
15 about this incident after it took place, did
16 you?
17     A.    Not that I recall.
18     Q.    With regard to the actual erection when
19 it's actually taking place, who was on site to
20 make sure that happens?
21     A.    who is actually doing the erection --
22     Q.    That's correct.
23     A.    -- or in general?
24     Q.    Actually doing it.

98

1      Q.    And the crane operator, was that a
2  Mortenson employee or someone else?
3      A.    On that project that would have been a
4  Mortenson employee.
5      Q.    Okay.  Is it also a union position do
6  you know?
7      A.    Yeah, that would be an operator from
8  the Local 150 union.
9      Q.    And in terms of trying to figure out,
10 you know, which people made which decisions, you
11 know, looking at this particular day we know
12 that they had already begun erecting one of the
13 mid-sections and then there was another piece
14 yet to go.
15          You know, who would have been on that
16 site T11 who would have made the decision to go
17 ahead and erect the first, you know, piece onto
18 the base?
19     A.    Yeah, I mean, it's kind of the crew --
20 that would have been scheduled for the day's
21 activities, right, and then each crew goes out
22 and visits their site and determines if it's
23 suitable for work that day.
24     Q.    For example, do you know if

100



1  James Langston would have been on site at T11
2  along with Lonnie Sears while that was taking
3  place?
4      A.  He could have been.  That decision kind
5  of does come down to, you know, you're
6  empowering the folks that are actually doing the
7  work to make those decisions.  So it would
8  have -- Lonnie Sears absolutely would have been.
9  Jaime may have stopped by if there was a reason
10 for him to visit.
11     Q.  But it was not your job to be on each
12 pad site when the actual erection was going on,
13 was it?
14     A.  Mine personally?
15     Q.  Correct.
16     A.  No.
17     Q.  Okay.  So when you were on site -- when
18 I say on site, the whole project was over
19 100 acres, wasn't it?
20     A.  Yes.
21     Q.  There was a headquarters-type trailer
22 or something like you were in normally?
23     A.  Yes.  There is a -- Yeah.  We call it
24 the laydown yard and that housed a bunch of

101

1  trailers.
2      Q.  Which is also the same place that would
3  have had these morning meetings, right?
4      A.  Yes.
5      Q.  Did you have any involvement in the
6  determination of what PPE is required by the
7  employees?
8      A.  There is like a minimum required from
9  Mortenson which is the steel-toed boots, vests
10 gloves, hard hat, glasses, and then there is
11 some other like as-needed PPE that is available
12 if crews determine it's needed.
13     Q.  Okay.  There was a mention in the
14 report about ice cleats.  Do you recall anything
15 about whether ice cleats were discussed as being
16 necessary equipment?
17     A.  On that specific day, no; but, I mean,
18 I remember them being talked about a lot on that
19 project.  There was enough for every -- you
20 know, everyone on site, a couple different
21 varieties, and so that would have been
22 anticipated to be part of the morning discussion
23 of does this site require ice cleats or not.
24     Q.  I assume you have no recollection of

102

1  the actual morning meeting of November 15,
2  2018 --
3      A.  I do not.
4      Q.  -- correct?
5          And do you know if you were even there?
6      A.  I do not.
7      Q.  Do you know if Nick Georgeff had ice
8  cleats that were available to him if he wanted
9  to use them on that day?
10     A.  I think we -- I think we ordered a
11 whole bunch of ice cleats of different sizes for
12 available -- They were available if folks
13 determined they needed them.
14     Q.  And they were already on site before
15 this incident, right?  You didn't order them
16 after the fact, did you?
17     A.  I believe they were, yeah.
18     Q.  Was Brian McBride and Jaime Langston
19 basically same position, different scheduling?
20 What was the difference in their position, do
21 you know?
22     A.  Brian McBride would have been the
23 general foreman, so he would have been from the
24 local union --

103

1      Q.  Okay.
2      A.  -- or -- He would have been a union
3  member that was brought into the local for that
4  project to act as a supervisory position.
5      Q.  Would he be considered below
6  Jaime Langston?
7      A.  Yes.
8      Q.  Okay.  And you would have been
9  considered above Jaime Langston in hierarchy,
10 right?
11     A.  Parallel.  Different functions.
12     Q.  With regard to the picture that you
13 reviewed -- I could put it up again if you would
14 like, but just a couple general questions about
15 that.  You can see obviously the ice in the
16 picture, right?
17     A.  Yes.
18     Q.  And you don't recall seeing the ice
19 that day particularly yourself?
20     A.  I don't recall.
21     Q.  Do you know how long that ice had been
22 there?
23     A.  I do not.
24     Q.  Do you know the specific cause for it?

104



1    A.   I do not.
2    Q.   Do you know how long the piece that had
3 been laying on top of that ice had been removed
4 from it to expose the ice?
5         MR. TERRY:  Objection to relevance.
6         MS. VAN HECKE:  You can go ahead and
7 answer.
8         THE WITNESS:  I do not.
9 BY MR. SULLIVAN:
10   Q.   Are you aware that anyone on the day of
11 the incident had noticed ice as a hazard and
12 then contacted Borneke to do anything about it?
13   A.   I don't know.
14   Q.   Borneke was paid for this project,
15 right?
16        MR. TERRY:  Object to relevance.
17        You can answer obviously, sir.
18        THE WITNESS:  Yes, they were.
19 BY MR. SULLIVAN:
20   Q.   Are you aware that Mortenson alleged
21 that Borneke failed to do something such that
22 they shouldn't get paid or they were alleged to
23 have breached the contract in any way on this
24 project?

105

1    A.   I am not aware of that happening.
2    Q.   Do you know if Ice Melt salt was
3 available to any of the Mortenson employees?
4    A.   Yeah.  It was generally available on --
5 at sites.  Yeah, it would have been.
6    Q.   You have never worked for a grading
7 company yourself, have you, or excavation
8 company?
9    A.   I have not.
10   Q.   And since you moved to your new role at
11 Mortenson you don't interact with Borneke
12 anymore, is that fair to say?
13   A.   That's correct.
14   Q.   And so this would have been the last
15 project in which you interacted with Borneke,
16 right?
17   A.   Yes.
18        MR. SULLIVAN:  I think that's all I
19 have, sir.  I appreciate your time.  Thank you.
20        MR. TERRY:  Mr. Black, I do have one
21 follow-up and I actually mean that.
22             FURTHER EXAMINATION
23 BY MR. TERRY:
24   Q.   You were asked about ice cleats.  I am

106

1 going to show you the CIA.  Under proper PPE I
2 am going to read it and then ask you a question.
3 Team member had all the required PPE per site
4 policies, however, was not wearing ice cleats.
5 While the project site does offer the use of ice
6 cleats to further protect team members, it was
7 not a policy.  Did I read that correctly?
8    A.   You did, yes.
9    Q.   So when you were asked questions about
10 ice cleats, you would agree that the document,
11 the incident analysis, states that my client had
12 all the required PPE and that that ice cleats
13 were not required on the site; right?
14   A.   Yes.  They would have been available,
15 but not required.
16        MR. TERRY:  Okay.  That's all I have.
17        Ms. Van Hecke, would you like to
18 explain signature or would you like me to or do
19 you just want to waive?
20        MS. VAN HECKE:  What was the question?
21        MR. TERRY:  I said do you want me to
22 explain signature to the witness or do you just
23 want to waive on his behalf or do you want to
24 reserve?

107

1         MS. VAN HECKE:  Yes, we would like to
2 read and sign.
3         MR. TERRY:  I am sorry?
4         MS. VAN HECKE:  Yes, we would like to
5 read and sign.
6         MR. TERRY:  You would like to reserve,
7 okay.
8         MS. VAN HECKE:  Yes.
9         (FURTHER DEPONENT SAITH NOT.)
10             (whereupon, the proceedings
11             adjourned at 3:04 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

108



1  STATE OF ILLINOIS     )
2                         )   SS:
3  COUNTY OF C O O K      )
4          I, MICHELLE L. BARTA, a certified
5  shorthand reporter for the State of Illinois,
6  do hereby certify that heretofore, to-wit,
7  on the 14th day of March 2022, personally
8  appeared before me via Zoom videoconference,
9  ANDREW BLACK, in a cause now pending and
10 undetermined in the United States District Court
11 for the Northern District of Illinois, wherein
12 NICK GEORGEFF is the Plaintiff, and DON BORNEKE
13 CONSTRUCTION, INC., is the Defendant.
14         I further certify that the said
15 ANDREW BLACK was first duly sworn to testify the
16 truth, the whole truth and nothing but the truth
17 in the cause aforesaid; that the testimony then
18 given by said witness was reported
19 stenographically by me and afterwards reduced to
20 typewriting by Computer-Aided Transcription, and
21 the foregoing is a true and correct transcript
22 of the testimony so given by said witness as
23 aforesaid.
24         I further certify that the signature to

                                        109

1  the foregoing deposition was waived by the
2  counsel for the witness.
3          I further certify that I am not counsel
4  for nor in any way related to the parties to
5  this suit, nor am I in any way interested in the
6  outcome thereof.
7          IN TESTIMONY WHEREOF:  I have hereunto
8  set my verified digital signature this 29th day
9  of March, 2022.
10
11
12
13
14         _Michelech. Barta_
15         MICHELLE L. BARTA, C.S.R., R.P.R.
16         LIC. NO. 084-004033
17
18
19
20
21
22
23
24
                                        110



Joseph Barnes                                          October 13, 2022

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      WESTERN DIVISION

 3   NICK GEORGEFF,                )
          Plaintiff,              )
 4                                )
     vs.                          )   Case No. 3:20-cv-50313
 5                                )
     DON BORNEKE CONSTRUCTION, INC., )
 6        Defendant.              )
     *************************************************************
 7                       ORAL DEPOSITION OF

 8                        JOSEPH BARNES

 9                      (Reported Remotely)

10                      October 13, 2022

11   *************************************************************

12              ORAL DEPOSITION of JOSEPH BARNES, produced as a

13   witness at the instance of the Defendant, and duly sworn, was

14   taken in the above-styled and numbered cause on the 13TH day of

15   October, 2022, from 1:00 P.M. to 3:58 P.M., before Christy

16   Nowotny, CSR, CVR-CM in and for the State of Texas, reported by

17   stenographic means, remotely via Zoom video teleconference,

18   pursuant to the Texas Rules of Civil Procedure and the

19   provisions stated on the record or attached hereto.

20

21

22

23

24

25
```



EXHIBIT

F

Joseph Barnes

October 13, 2022
Pages 2 to 5

---

**Page 2**

```
1              A P P E A R A N C E S
2   FOR PLAINTIFF:
3        MR. CHARLES A. TERRY
4        ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.
5        161 North Clark Street, 21st Floor
6        Chicago, Illinois 60601
7        (312)779-6610
8        E-mail: cterry@anesilaw.com
9
10  FOR DEFENDANT:
11       MR. CHRISTIAN SULLIVAN
12       SWANSON, MARTIN & BELL, LLP
13       2525 Cabot Drive, Suite 204
14       Lisle, Illinois 60532
15       (630)799-6970
16       E-mail: csulliva@smbtrials.com
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1                     INDEX
2                                              Page
3   Appearances................................    2
4   Exhibits...................................    4
5   JOSEPH BARNES
6   EXAMINATION BY MR. SULLIVAN................    6
7   EXAMINATION BY MR. TERRY...................  101
8   FURTHER EXAMINATION BY MR. SULLIVAN........  122
9   FURTHER EXAMINATION BY MR. TERRY...........  124
10  Reporter's Certificate.....................  126
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1                    EXHIBITS
2   EXHIBIT        DESCRIPTION               PAGE
3   Exhibit 1    Photo                        51
4   Exhibit 2    Incident Report              58
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 5**

```
1              P R O C E E D I N G S
2        THE REPORTER:  All right.  Wee are on the
3   record.  Today's date is October 13, 2022.  The time is
4   1:00 p.m. Central Standard Time.  This is the oral deposition
5   of Joe Barnes, and it is being conducted remotely by agreement
6   of the parties.  The witness is appearing via Zoom video
7   teleconference and is located in Conroe, Texas.  This is in the
8   matter of Nick Georgeff versus Don Borneke Construction, Inc.
9   in the United States District Court of the Northern District of
10  Illinois, Western Division, Case No. 3:20-cv-50313.
11       My name is Christy Nowotny, Texas CSR No. 11536,
12  with Magna Legal Services.  I'm administering the oath and
13  reporting the deposition remotely by stenographic means from my
14  residence within the state of Texas.
15       Mr. Barnes, can I get you to raise your right
16  hand for me?  You do affirm and declare under penalty of
17  perjury that the testimony you give in the cause now pending
18  will be the truth, the whole truth, and nothing but the truth.
19       THE WITNESS:  I do.
20       THE REPORTER:  Thank you.  Would counsel please
21  state their appearances for the record?
22       MR. TERRY:  Sure.  Charles Terry for the
23  plaintiff.
24       MR. SULLIVAN:  Chris Sullivan for the defendant.
25       THE REPORTER:  All right.  The witness has been
```



Joseph Barnes

October 13, 2022
Pages 6 to 9

Page 6

1 sworn. Please proceed.
2          JOSEPH BARNES
3      having been duly sworn, testified as follows:
4          EXAMINATION BY MR. SULLIVAN
5      Q.  (By Mr. Sullivan) Thank you. Good afternoon,
6 Mr. Barnes. My name is Chris Sullivan. I represent Don
7 Borneke Construction. Could you please state your full name
8 and spell it for the court reporter please?
9      A.  Joseph Barnes, J-O-S-E-P-H, B-A-R-N-E-S.
10     Q.  I'm glad to see you're feeling better. I understand
11 you were sick the other day. So I'm glad you're doing well.
12     A.  Well, I -- I thank you for being so -- so nice for
13 this. I'm still -- still very ill. I have a fever of about
14 103 right now, so if I sound foggy, I apologize.
15     Q.  Yeah. I'm sorry to hear that. If you need to take a
16 break, let me know.
17     A.  Thank you. You're very kind. Thank you.
18     Q.  You have been deposed before in a lawsuit I assume;
19 correct?
20     A.  Yes, sir.
21     Q.  Okay. The only thing I ask is you listen carefully
22 to what I'm asking you, and let me know if you don't understand
23 the question. I'm in Illinois. You are in Texas. There could
24 be issues with the connection or so forth. So let me know if
25 you don't understand something, and I'll repeat or rephrase it.

Page 7

1 If you answer a question, I have to assume you understood the
2 question when you answered it unless you tell me otherwise; is
3 that okay?
4      A.  Yes, sir.
5      Q.  Let's see. How do you spell Conroe, Texas?
6      A.  C-O-N-R-O-E.
7      Q.  And where is that?
8      A.  It's north of Houston -- north of Houston about
9 20 miles.
10     Q.  Okay. Okay. And would it be considered a suburb of
11 Houston?
12     A.  Yes, sir.
13     Q.  Okay. How old are you, sir?
14     A.  51.
15     Q.  And what's your address?
16     A.  811 Highway 45 South, No. 272, Conroe, Texas 77301.
17     Q.  Okay. Do you have any plans to move in the next
18 year?
19     A.  No. I hope not.
20     Q.  Okay. And are you married? Do you have any
21 children? Who else lives with you?
22     A.  I -- I'm married, and I have nine children.
23     Q.  Wow. Congrats.
24     A.  Well, my wife and I, we -- we had our older group,
25 and then we became foster parents and adoptive parents five

Page 8

1 years ago, and have adopted four children out of child
2 protective services.
3      Q.  Hey, that's commendable.
4      A.  They're our babies. We love them. They're awesome.
5      Q.  I thought three was hard.
6      A.  That's a good start, my friend. We should have a
7 coffee one day. I'll get you going.
8      Q.  What did you reviewed to prepare for today's
9 deposition?
10     A.  It's in the front of my report. There's a -- there's
11 a -- quite a list, a lot of documents. The depositions --
12 would you like me to go over each one of them, or do you want
13 to take it from the report?
14     Q.  No. I'm going to take it from the report. It -- on
15 page 6 of your report --
16     A.  Yes.
17     Q.  -- it includes documents reviewed; right?
18     A.  Correct.
19     Q.  And is that a complete list?
20     A.  Yes, sir.
21     Q.  And to prepare for this deposition today is there
22 anything else you reviewed?
23     A.  No.
24     Q.  Okay. Where do you currently work?
25     A.  I am the safety director for Mesa Southern Well

Page 9

1 Servicing, and then up until this week I had a second director
2 position at Third Coast Services.
3      Q.  Okay. I missed what -- safety director, what was the
4 first job at Mason something?
5      A.  Mesa, M-E-S-A, Mesa Southern Well Servicing.
6      Q.  Okay. what is Barco Services?
7      A.  That's Barnes Company. That's -- that's me.
8      Q.  Okay. Is that your own independent business?
9      A.  Yes, sir.
10     Q.  Okay. Let me back up a little bit. Did you grow up
11 in Texas?
12     A.  No, Missouri.
13     Q.  Okay. What town in Missouri?
14     A.  Neosho, N-E-O-S-H-O.
15     Q.  And where is that?
16     A.  Do you remember hearing about the -- the big tornado
17 in Joplin, Missouri a few years back that wiped out --
18     Q.  Yeah. I lived in Tulsa, so I know where Joplin is.
19     A.  Oh, okay. So like 15 minutes south of Joplin.
20     Q.  Okay. Got it. And you went to high school there?
21     A.  Yes, sir. Are you from Tulsa originally?
22     Q.  No. Illinois, and then I moved to Tulsa for --
23     A.  My uncle went to law school in Tulsa.
24     Q.  Yeah. I lived until freshman year of high school. I
25 thought it was a nice town. It's --



Joseph Barnes

October 13, 2022
Pages 10 to 13

Page 10

1    A.  It's great, Casa Bonita.
2    Q.  Yeah.  It's getting bigger.  I haven't been there
3  since 1990, so it's a long time ago.
4    A.  Yeah.
5    Q.  What post high school education do you have?
6    A.  I have a Bachelor's in Healthcare Administration.  I
7  have an MBA.  I have a Master of Science in Occupational Safety
8  and Health.
9    Q.  Okay.  Let me back up.  Where did you get the
10  Bachelor of Arts in Healthcare?
11   A.  American Intercontinental.
12   Q.  And what is -- where is that school?
13   A.  Hoffman Estates, Illinois.
14   Q.  Okay.  I know where that is.
15   A.  Oh, yeah.
16   Q.  And Master of Science in what?
17   A.  Occupational Safety and Health.
18   Q.  And when did you receive that degree and where?
19   A.  2015 at Columbia Southern.
20   Q.  And where is Columbia Southern located?
21   A.  Alabama.
22   Q.  Okay.
23   A.  And I'm currently at the University of Alabama
24  Birmingham doing my Masters in Engineering.
25   Q.  You said -- what type of engineering?

Page 11

1    A.  Advanced Safety by Design.
2    Q.  There was one other degree you mentioned.  What was
3  that?
4    A.  I have an MBA as well.
5    Q.  Okay.  And when and where was that?
6    A.  That was at Columbia Southern.  I graduated that in
7  '16.
8    Q.  What is safety by design?
9    A.  Forgive me.  Safety by design deals with the
10  processes of planning before you actually start construction.
11   Q.  Okay.
12   A.  Implementing safety features in as you go.
13   Q.  Is that considered engineering in terms of, you know,
14  like we -- I would normally think of electrical engineering,
15  chemical engineering?
16   A.  Yes.  It's a -- it's an actual engineering degree,
17  yes.
18   Q.  What are your job duties for Mesa Southern Well
19  Servicing?
20   A.  I lead a safety staff in two states.  I authored
21  their entire safety program.  I administrate their safety
22  program.  I do inspections of their sites as well as coordinate
23  the training for other people.
24   Q.  How long have you had that job?
25   A.  Since 2014, I think.

Page 12

1    Q.  Okay.  And your other current position other than
2  your independent company is what again?
3    A.  Director of safety at Third Coast Services.
4    Q.  And what is Third Coast Services?
5    A.  They're -- they do heavy civil construction and
6  electrical construction for highway stuff and intersections.
7    Q.  And what is considered heavy construction?
8    A.  Like big equipment, large equipment, like a -- big
9  tractors and equipment, bucket trucks they can stand up poles
10  and that kind of thing.
11   Q.  Are they for road projects?
12   A.  Yes.
13   Q.  Usually or always?
14   A.  Well, they -- they do both, but primarily they work
15  for the state of Texas for the Department of Transportation.
16   Q.  Okay.  And where is Third Coast Services located?
17   A.  It's in Magnolia, Texas.
18   Q.  Okay.  How long have you worked there?
19   A.  I started there in February of 2020.
20   Q.  Are those your only two current jobs other than Barco
21  Services?
22   A.  I -- I'm a paramedic, and every now and then I'll go
23  work a shift at the emergency room or jump on an ambulance once
24  in a while, but primarily yes.
25   Q.  Have you ever -- are you a member of any unions,

Page 13

1  first of all?
2    A.  No, sir.
3    Q.  Have you ever been a union member?
4    A.  No, sir.
5    Q.  Have you ever worked for an excavation company?
6    A.  That does exclusively excavation, nothing else?
7    Q.  Yes.
8    A.  No.  Oh, wait.  You asked me if I had another job.
9  I'm -- I'm sorry.  I left one out.  I work at Texas A&M
10  University engineering extension teaching certification towards
11  excavation and safety professionals, that kind of thing.
12   Q.  Certification for what?
13   A.  Certified safety and health official, we actually
14  teach -- some of the members of OSHA come to our courses.
15   Q.  And this is all OSHA related standards that you're
16  teaching?
17   A.  OSHA and ANSI as well.
18   Q.  Okay.  But you've never worked for an excavation
19  company you said; right?
20   A.  That does exclusively excavation?
21   Q.  Yes.
22   A.  No.  Every company I work with does excavation, but
23  it's not their exclusive position.
24   Q.  Have you ever done any hands-on work in the field as
25  an excavator?



Joseph Barnes

October 13, 2022
Pages 14 to 17

Page 14

1   A.   Yes.
2   Q.   Describe that for me.
3   A.   My grandfather's construction company, I grew up --
4   his construction company is called Verlona Construction.
5   Q.   How do you spell that?
6   A.   V-E-R-L-O-N-A, when he left the FBI, he opened up his
7   own property company as well as doing remodeling, that kind of
8   thing, and he would buy homes that were going to be torn down,
9   and then we'd buy -- he would buy streets, and we would prepare
10  the entire street and move the homes to them.
11  Q.   This is a business that your father had when you were
12  a child?
13  A.   Grandfather.
14  Q.   And what did you do for them exactly?
15  A.   Everything, we did everything.  My brothers and my
16  uncles, we did everything.
17  Q.   What type of projects are you talking about?
18  A.   So as I said, he would buy a neighborhood that was
19  dilapidated.  He'd knock down all the properties.  We would go
20  in and -- and build curb sites, foundations, and then he'd buy
21  houses and have them moved in, and we'd plant the houses on the
22  new foundations and the new parking areas.
23  Q.   Okay.  Any other experience doing excavation work
24  yourself?
25  A.   In -- in all my jobs as a safety director we do

Page 15

1   excavations virtually every day, and so -- so yes.  Are you
2   talking about sitting on the tractor digging or supervising?
3   Q.   Both.
4   A.   I haven't sat on the tractor digging in some years.
5   But as far as, you know, being there for the excavations, yeah,
6   it's very often.
7   Q.   When was the last time you sat on a tractor digging
8   if you know, estimate?
9   A.   Give me -- yeah.  It's probably been maybe about
10  2016.
11  Q.   And what company would that have been for?
12  A.   Mesa Southern, one of the components of Mesa Southern
13  is plugging and abandoning for the state of Texas.  So we have
14  to expose underground facilities, cap them off, and then build
15  foundations over the top of them.
16  Q.   Plugging and abandoning?
17  A.   Yes, sir.
18  Q.   Is that for like closed mines or something?
19  A.   No, sir.  If somebody drilled a well back in the
20  50s, and now it's -- it's either leaking, or it's just
21  unsafe, we have to excavated it, and then you -- you cap it
22  off.  You cover it with foundation and cement and then put dirt
23  back over the top of it.
24  Q.   Okay.  Have you ever performed work on a wind farm
25  like the one at issue in this case?

Page 16

1   A.   Not on a wind farm, no.
2   Q.   Okay.  Are there any wind farms in Texas?
3   A.   Yes.  There's a lot of wind farms in Texas.
4   Q.   Okay.
5   A.   I'm scared of heights, so I stay away from them.
6   Q.   What is the -- your job duty as safety director, what
7   does that involve?
8   A.   I'm in charge of all things safety, as well as
9   regulatory liaison between any OSHA official or EPA official or
10  TCEQ official.  I write the policies for the safety program
11  related to the organization, do audits, inspections, and advise
12  senior leadership on any changes that need to be made.
13  Q.   Any plans to leave this career once you get this new
14  degree?
15  A.   Oh, no.  No.
16  Q.   What's the reason for the extra degree?
17  A.   Well, there's a couple reasons.  Number -- number
18  one, I invented a couple of things for the oil field and then
19  couldn't sell them because I didn't have an engineer to stamp
20  them.  So I didn't like that, so that was one of the reasons
21  for getting a degree.  But it was just the next logical step
22  for what I do.  You know, a greater education for what I do.
23  Q.   You're not studying theology; are you?
24  A.   Yes.
25  Q.   Okay.  I saw that somewhere.

Page 17

1   A.   Ohio Christian, yes.
2   Q.   So you're attending two universities at once then?
3   A.   I -- I take one class one semester and do the other
4   class.  And so I go back and forth, yes.
5   Q.   So currently you're going to -- what is it Ohio
6   Christian you said?
7   A.   I'm on -- I'm on leave from Ohio Christian while I'm
8   working on University of Alabama.
9   Q.   Okay.  And what do you plan to do with a Master of
10  Arts in Practical Theology?
11  A.   Be a better father.
12  Q.   Well, that's always good.
13  A.   Yeah.
14  Q.   I could use a -- some help with that myself.
15  A.   Well, yeah.  We all could; right?
16  Q.   But it has no application to your other work?
17  A.   The only application would be that, you know, as a
18  safety professional, we're everything from the janitor to -- to
19  the -- you know, the liaison.  That means guys come to us
20  with their personal problems, and I've been there when
21  somebody's been killed and not known what to say, and so that
22  was one of the reasons for doing this.
23  Q.   Okay.  How big of a company is, first of all, Mesa
24  Southern Well Servicing?
25  A.   It's almost the largest workover company in the -- in



Joseph Barnes

October 13, 2022
Pages 18 to 21

Page 18

1  the United States. It's becoming that way. We have rigs in
2  Texas, New Mexico, and Utah, and we're owned by Finley
3  Resources, and I -- I think Mr. Finley owns 900 wells, I think.
4      Q.  And this is oil wells? What kind of wells are these?
5      A.  Well, that's -- those are his -- those are his
6  personal wells, but production wells, and then we do workover
7  and facility maintenance and repair.
8      Q.  And workover is what? I don't know what that means.
9      A.  So if you have a -- a well that's not functioning
10 well, it's not producing anymore, we go in there, and we pull
11 the pipe out of the ground and replace it, or we would clean it
12 out so to speak and make repairs.
13     Q.  Okay. But these are all oil wells, though; right?
14     A.  Oil or gas, yes.
15     Q.  Okay. You're not in the shale industry; are you?
16     A.  The shale, yeah, we're there, the Eagle Ford Shale,
17 and the Permian Basin, and I forget the name of the one in
18 Utah.
19     Q.  But they -- they have a -- is that a different type
20 of well for that?
21     A.  No. It's the same types of well.
22     Q.  Okay. What about Third Coast Services?
23     A.  What was the question, sir?
24     Q.  How big of a company is that?
25     A.  Oh, it -- it's a smaller company. It's -- I think

Page 19

1  there's 130 people. There's about 30 crews.
2      Q.  And I don't know if you told me, how long have you
3  been at each one of these companies?
4      A.  I went at Mesa Southern I think September of '14,
5  and, again, I've been at Third Coast, February of '20.
6      Q.  Okay. And do you have a separate business then as --
7  as an expert witness in lawsuits?
8      A.  Yes. Yes.
9      Q.  Is that what Barco Services is?
10     A.  Well, Barco Services does safety in general as well
11 as -- that's one aspect of what we do. We also do training.
12 When I say we, I mean me, by the way, so.
13     Q.  Right. That was my next question.
14     A.  Uh-huh.
15     Q.  Is it a corporation? What is Barco Services?
16     A.  It's a d/b/a.
17     Q.  Okay. And then you're the only employee?
18     A.  Other than my wife, yes.
19     Q.  Okay. What does your wife do for the -- Barco
20 Services?
21     A.  Administrative, she has a -- she's bilingual, and she
22 has a Master's degree in Human Resources. So she helps us with
23 those kind of questions.
24     Q.  The -- Spanish is the other language?
25     A.  Yes.

Page 20

1      Q.  Is that what you mean by bilingual?
2      A.  Yes, sir.
3      Q.  And your wife's name is what?
4      A.  Esmerelda, same last name.
5      Q.  And you said Barnes Company; does that just mean the
6  same thing?
7      A.  Yeah. Barco, Barnes company, yeah.
8      Q.  Okay. I thought I saw Barco Services?
9      A.  It is Barco Services EMS, and it's environmental,
10 medical, and safety.
11     Q.  Okay. How long have you had that business?
12     A.  Oh, my, in one form or the other since '06.
13     Q.  Okay.
14         MR. TERRY: I'm -- I'm sorry. What was the last
15     question and answer? I heard something about '06, and then it
16     broke up a little bit, Chris -- you can just verify if you
17     want, Chris. That's fine.
18         MR. SULLIVAN: Yeah. I just asked him when he
19     -- how long Barco Services had been around. He said since
20     2006.
21         MR. TERRY: Since 20 -- okay. Got it. Yeah. I
22     misheard. Thank you.
23     Q.  (By Mr. Sullivan) Uh-huh. It's always just been
24 you; is that right, Mr. Barnes?
25     A.  Unless I've needed some help. I -- I contract some

Page 21

1  people to help me.
2      Q.  Okay. What kind of safety training do you do and for
3  whom?
4      A.  So at Texas A&M I teach all the collegiate courses
5  toward the professional certifications. It's on the -- the
6  resume. And then -- well, that's not -- that's for Texas A&M.
7  For me personally, I teach OSHA 10 and OSHA 30 for construction
8  and general industry, HAZWOPER, CPR and first aid, rescue and
9  escape. I think -- I think that's about everything I teach. I
10 also teach EMT.
11     Q.  Okay. How long have you been an EMT?
12     A.  1991, maybe.
13     Q.  Did you ever work as part of an emergency response
14 crew in an ambulance or anything?
15     A.  Oh, yes. I've -- I've always maintained some kind of
16 affiliation with somebody.
17     Q.  Okay. And who are you affiliated with currently?
18     A.  Right now, ShurMedical Training Institute.
19     Q.  S-U-R-E?
20     A.  S-H-U-R and medical. That's one word,
21 S-H-U-R-M-E-D-I-C-A-L, ShurMedical Training Institute.
22     Q.  What do you have to do to become OSHA certified in
23 order to teach classes?
24     A.  So -- so there's no such thing as an OSHA
25 certification. There's OSHA -- OSHA authorization.



Joseph Barnes

October 13, 2022
Pages 22 to 25

Page 22

1    Q.   Okay.
2    A.   And, by example, for construction if you want to
3  teach OSHA 10 and 30 for construction, you have to take the
4  OSHA 510 course at a -- at a -- one of the OTIs, one of the
5  college programs, and then you have to take -- take the OSHA
6  500 course at one of the college programs.  To be general
7  industry you have to take the 501 and the 511 to get authorized
8  to teach and then sign a contract with the training center.
9    Q.   What do you mean by training center?  What is --
10   A.   So there's 27 OTIs, 27 approved university programs
11 throughout the nation from OSHA.  OSHA has selected 27
12 programs.  For example, in my area there's Texas A&M and the
13 University of Texas Arlington.  So the program has to come
14 through one of the OTIs.
15   Q.   Looking at your report, you do include a case
16 history.  It goes back to -- it looks like 2009; is that right?
17   A.   I believe so, yes, sir.
18   Q.   And did you testify in court anywhere before 2009?
19   A.   No, sir.
20   Q.   Okay.  So that's when you started testifying in court
21 in lawsuits, 2009?
22   A.   Yes, sir.
23   Q.   And is this a comprehensive list?
24   A.   I looked at it this morning, and now this is my 20th
25 deposition.

Page 23

1    Q.   Okay.
2    A.   And there's a -- I've been given a few more cases,
3  but I can give you an updated through Mr. Terry.
4    Q.   Do you have any other cases with Terry's firm, Anesi
5  Ozmon?
6    A.   No, sir.
7    Q.   Most of these are obviously here in Texas; right?
8    A.   Yes, sir.  Yeah.  A lot of them are in Texas.  I like
9  the Chicago, though.  Just remember me.
10   Q.   And the estimate here that you put down was
11 90 percent on behalf of the plaintiff in terms of your
12 testimony; correct?
13   A.   That's correct.
14   Q.   It looks like only one other Illinois case; right?
15   A.   I'd have to look real fast.
16   Q.   Maybe two?
17   A.   Two, three, four, I see four.
18   Q.   Any current cases other than this case?
19   A.   In Illinois?
20   Q.   Yes.
21   A.   No.  These three cases are over.
22   Q.   And -- and these don't have the dates; do they?
23   A.   No, sir.  I -- I can get those if you need them.
24 Hampton versus UPS is -- is current.  That's in Illinois, and
25 they're alphabetical by the way.

Page 24

1    Q.   Okay.  Okay.  Where is that case pending?
2    A.   Just not Chicago, I'd have to look it up.  I
3  apologize.  I don't have it on there.
4    Q.   Okay.
5    A.   Then --
6    Q.   Yeah, I missed that, it says Jackson versus Reliable
7  Carriers, Inc.  That's Illinois as well?
8    A.   Yeah.  That one's -- that one's long gone.
9    Q.   Okay.  Do you know where that was pending?
10   A.   No, sir.  I'm not sure where that -- I think that was
11 Chicago, but it was like 2018 I believe.
12   Q.   Okay.
13   A.   And then the Ronaldo Ramirez versus Serac, that
14 closed in '20 I believe.
15   Q.   And you don't recall where the one was pending?
16   A.   No, sir.
17   Q.   How many of these cases -- well, do any of these
18 cases involve a wind farm like we have here?
19   A.   No, sir.
20   Q.   Do you know, from your recollection of these cases on
21 your list, how many involved excavation as the issue in the
22 case?
23   A.   You have to give me just one minute, sir.
24   Q.   Sure.
25   A.   They're -- they're actually listed on the -- on --

Page 25

1  under the -- the styling.
2    Q.   Right.  Yeah, I did see that.  I didn't really see
3  anything that said excavation directly, so I just want you
4  to -- maybe I misread it.  I don't know.
5    A.   No.  Yeah.  No questioning.  I just wanted to
6  look and see.  Cosse versus LaFarge in Louisiana, that was an
7  excavation case.
8    Q.   Do you know what the issue was?
9    A.   Yes.  The -- a dump truck driver was driving on a
10 temporary road, and the road gave way underneath him, and he
11 rolled into a ditch full of water.
12   Q.   Okay.  I take it you were critical of the excavator
13 in that case?
14   A.   Yes.
15   Q.   And that case is no longer pending?
16   A.   No, sir.
17   Q.   Okay.  Are there any others?
18        MR. TERRY:  I'm just going to objection to the
19 relevance.  You can answer obviously, Joe.
20        THE WITNESS:  Yes?
21   A.   We have -- we have a new case, Kelly Wright versus
22 Webber Construction.  That's an excavation safety case that's
23 ongoing.
24   Q.   (By Mr. Sullivan) And where's that pending?
25   A.   That's in Houston.



Joseph Barnes

October 13, 2022
Pages 26 to 29

Page 26

1    Q.   Okay.  Harris County?
2    A.   Yes, sir.
3    Q.   And what's the issue in that case in terms of the
4  excavation?
5    A.   Unprotected open excavation.
6    Q.   What does that mean?
7    A.   If you have an excavation that has any -- any kind of
8  opportunity for somebody to fall into, you have to protect it
9  under OSHA regs.
10    Q.   You mean cover it up -- up the hole?  Is that what
11  you mean, like an hole in the ground?
12    A.   Yeah.  You have to have some kind of control, warning
13  device.  Either under the hierarchy you have to control the
14  site, or you have to put up some kind of barricade system to
15  make sure that it's, you know, visible all the time and people
16  are well warned.
17    Q.   Okay.  So this is your first wind farm case, though;
18  is that true?
19    A.   Yes, sir.  Did -- did you want me to go through the
20  rest of these, or -- or no?
21    Q.   Do you see any others that involve excavation?
22    A.   I'm -- I'm only -- I'm only a few pages in.  I'm
23  sorry.  Oh, that's you.  Reed versus Wise Construction, it's in
24  Virginia.  That one is closed.
25    Q.   Okay.  And what did that involve briefly?

Page 27

1    A.   Again, unprotected open excavation that people
2  walking -- a guy fell into it and it got hurt real bad.
3    Q.   Okay.
4    A.   It was a -- it was more of a -- not an excavation as
5  in a ditch, but they excavated the area to put in a sidewalk
6  and parking lot.
7    Q.   Okay.  And that's it; right?
8    A.   Let me -- just one second.  Yes, sir.  I believe so.
9    Q.   Okay.  Did you interview anyone as part of your
10  investigation to prepare this report?
11    A.   No, sir.
12    Q.   Okay.  Your report is complete; right?
13    A.   I'm sorry.  I'm sorry.
14    Q.   Let me just say if you need to take a break, just let
15  me know.  I have no problem with that.
16    A.   If you see my face getting red, I should probably
17  take a break.
18    Q.   Well, it's -- you know, the video is not the best, so
19  it's hard to tell.
20    A.   Yeah.  I'm not supposed to be red, but --
21    Q.   If you feel bad, just let me know.
22    A.   Thank you, sir.
23    Q.   I forgot what I just asked.
24    A.   The report.
25    Q.   Yeah.

Page 28

1         MR. TERRY:  You asked him if his report is
2  complete, I think.
3         MR. SULLIVAN:  Yes.
4         MR. TERRY:  I shouldn't be helping you, Chris,
5  but I like you, so.
6         MR. SULLIVAN:  Oh, yeah.  I appreciate that.
7  Well, you can help me a lot of different ways too, you know.
8         THE WITNESS:  Y'all need -- y'all need some time
9  alone?
10    Q.   (By Mr. Sullivan) Is your report complete, sir?
11    A.   Yes, sir.
12    Q.   Does it contain all your opinions in this case?
13    A.   Yes, sir.
14    Q.   You don't anticipate amending it or anything; do you?
15    A.   Not at this time, no.
16    Q.   And I can't remember -- you said you did not
17  interview anyone for this report; did you?
18    A.   No, sir.
19    Q.   Did you rely on any written materials, like textbooks
20  or periodicals?
21    A.   What kind of books, sir?
22    A.   Anything related -- well, is there anything that you
23  can think of that you relied on for this report?
24    A.   I think I have all the -- everything listed, the OSHA
25  standard, the 1926 and the 1910 standards.

Page 29

1    Q.   Okay.
2    A.   There's one letter of interpretation from the OSHA --
3  attorney for OSHA, and I'm trying to think if there's anything
4  else.  That -- I think that's everything.
5    Q.   Okay.  What is the 1926 standard?
6    A.   The construction standard for OSHA.
7    Q.   That's the general construction standard; right?
8    A.   No, sir.  That's the construction standard.
9    Q.   Applicable to what trades?
10    A.   Anything that's construction beyond the -- the point
11  of -- of remodeling.
12    Q.   Okay.  And what's the 1910 standard?
13    A.   General industry.
14    Q.   Okay.  And besides the construction industry, 1910
15  would apply to what?
16    A.   Excuse me.  Anything that's not marine or like
17  farming, agricultural.
18    Q.   Okay.  Does OSHA have any standards specific to
19  excavation?
20    A.   Yes.  Yes.
21    Q.   What standard -- what are those?
22    A.   It's in the 1910 standard as well as the 1926 subpart
23  P.
24    Q.   Okay.  Let's see.  I'll get to that in a minute.  I
25  think you put in your report you were paid $3800 so far; is



Joseph Barnes

October 13, 2022
Pages 30 to 33

Page 30

1   that right?
2       A.   Yes, sir.
3       Q.   And for future work, what is your structure and so
4   forth?
5       A.   Oh, I -- I get paid 175 an hour for review and case
6   report production.  I think that's in there.  It should be in
7   there.
8       Q.   So the $3800 covers what?
9       A.   It's a retainer to work against as I'm working
10  through the -- through the case.
11      Q.   Okay.  So everything is billed hourly then?
12      A.   Correct.
13      Q.   Okay.  And other than testifying here today and at
14  trial, do you anticipate any other work?
15      A.   On this case?
16      Q.   Yes.
17      A.   No, sir.
18      Q.   And it's the same rate regardless of it's a report or
19  a deposition or trial?
20      A.   It's a different price for deposition and trial, and
21  I apologize.  It's -- the service that has us has changed the
22  rates.  I don't have it at the top of my mind, but it's in the
23  report at the end.  I can find it for you.  I just don't have
24  that -- I don't have that page with me.  I just have the
25  report.

Page 31

1       Q.   Okay.  So it's not 175 anymore?
2       A.   Oh, it was 135.  The service raised it.
3       Q.   Oh, I see, and what is the service that you're
4   talking about?
5       A.   The Expert Institute.
6       Q.   What is the Expert Institute?
7       A.   It's a service that provides links between attorneys
8   and special experts, those kind of things.
9       Q.   Okay.  Have you ever testified in court on behalf of
10  or in support of an excavation company?
11      A.   No, sir.  Let me -- let me rephrase that -- respond
12  to that.  Do you mean exclusively an excavation company?
13      Q.   Yes.
14      A.   Yes.  No, sir.
15      Q.   Have you ever been found unqualified to testify as an
16  expert by any court?
17      A.   No, sir.
18      Q.   You obviously did not travel to the wind farm site at
19  issue in this case; correct?
20      A.   Correct, sir.
21      Q.   Did you -- you said you have not interviewed any
22  witnesses, so I -- does that mean that you have not spoken to
23  the plaintiff in this case either?
24      A.   No, sir.
25      Q.   I mean, that's correct you have not spoken to him?

Page 32

1       A.   That's correct.
2       Q.   Have you ever been convicted of a felony crime?
3       A.   No, sir.
4       Q.   Have you ever been convicted of a misdemeanor crime
5   involving dishonesty?
6       A.   No, sir.
7       Q.   Are you aware of any certifications for an excavation
8   company?
9       A.   Specifically what -- what are you referring to?
10      Q.   For example, do -- are you aware of any states that
11  require that excavation workers be certified?
12      A.   Not -- not aware of any -- I'm sorry.  I didn't mean
13  to cut -- cut you off.  I'm not aware of that in Texas, no.
14      Q.   Okay.  Are you aware of that in any other state?
15      A.   No, sir.
16      Q.   Did you do any review of note -- I'm sorry -- weather
17  records in -- as part of your preparation for the report?
18      A.   Yes, sir.
19      Q.   And what was that?  What did that involved?
20      A.   Online search for the area, I forget the -- the
21  actual service that was online that -- that gave me the weather
22  reports for that area for the timeline.
23      Q.   Okay.  And, of course, you reviewed the plaintiff's
24  deposition testimony; right?
25      A.   Correct.

Page 33

1       Q.   And you saw that he testified it was snowing the date
2   he was injured; correct?
3       A.   I believe he said there was a -- a light snow that
4   morning if I remember correctly, but, yes.
5       Q.   Did you see any of the weather records to corroborate
6   that?
7       A.   I don't recall, but I don't doubt his testimony.
8       Q.   In the cases that you've been involved with before up
9   to the present, has Mortenson Construction had anything to do
10  with any of them?
11      A.   No, sir.
12      Q.   And before this case had you ever heard of my client,
13  Borneke Construction?
14      A.   No, sir.
15      Q.   Have you ever testified in Minnesota?
16      A.   No, sir.
17      Q.   You reviewed the contract and the scope of work;
18  correct?
19      A.   Briefly, yes, sir.
20      Q.   As part of your job do you ever write scope of work
21  contract documents for your businesses?
22      A.   No, sir.  No.  I don't write the scope.
23      Q.   Okay.  What was your understanding of Georgeff's role
24  on this project?
25      A.   Of -- of Georgeff's role?



Joseph Barnes

October 13, 2022
Pages 34 to 37

Page 34

1   Q.   Yes.
2   A.   He was an employee of Mortenson, of the guys who were
3   building the turbine.
4   Q.   Did you see the testimony about him being a walking
5   steward?
6   A.   I believe so, sir.
7        MR. TERRY:   I'm going to object to relevance.
8   Q.   (By Mr. Sullivan) It wasn't your understanding that
9   he was on a -- an erection crew; was it?
10  A.   I -- I don't recall that he was on an erection crew,
11  no.  And -- and, again, forgive me if I seem foggy.  I -- I
12  apologize.
13  Q.   Sure.  Let's see here.  You, of course, have your
14  report in front of you; right?
15  A.   Yes, sir.
16  Q.   Can we turn to page 8 please?  What is the reason for
17  citing each of these standards?
18  A.   Say that one more time.
19  Q.   What's the reason that you cited each of these
20  standards?
21  A.   I believe they're meant to be relevant in this
22  situation.
23  Q.   All right.  What is ANSI A10.33.2?
24  A.   It is the ANSI guideline on how to put together your
25  safety program as it relates to your own organization and other

Page 35

1   organizations that you'll be working around.
2   Q.   Now, Mortenson had a safety program; didn't it?
3   A.   Yes, sir.  They did.
4   Q.   Are you critical of Mortenson's safety program at
5   all?
6   A.   No, sir.
7   Q.   Did you see any safety program that Borneke had?
8   A.   I -- I don't recall.  I can look on the list and see
9   if I looked -- I don't recall specifically if they had -- if
10  they had -- if -- well, go ahead with your question.
11  Q.   Sure.  How is ANSI A10 applicable to my client?
12  A.   To your client as in Borneke?
13  Q.   Yes.
14  A.   Yes, sir.  Whenever they are going to do work in
15  their specialty around other organizations, they have to have a
16  plan.
17  Q.   And are you critical of them for not having a plan?
18  A.   I have not seen any plan that's been produced
19  specific to other contractors working within their -- their
20  zone of what they were doing.
21  Q.   But are you testifying that they should have had some
22  sort of plan?
23  A.   Absolutely.
24  Q.   And what is the plan should have said in your view?
25  A.   How they were going to roll out their services while

Page 36

1   protecting those that could enter their site, be it another
2   contractor or the general public.
3   Q.   And ANSI A10.33.2 applies to what industries?
4   A.   All industries.
5   Q.   So basically in construction, for example, all
6   subcontractors should have an ANSI A10 plan?
7   A.   Yes.  And to extend that, A -- A10.34 actually is
8   whenever they're doing work where somebody could be adjacent to
9   construction, then they have to have a specific program lined
10  out, and they actually give you a reference template in A.34,
11  which is the follow-up to A.33.
12  Q.   Okay.  I forgot to ask you earlier, how many times
13  have you actually testified at trial, if you know?
14  A.   I -- I think it's five.
15  Q.   Okay.  And that is between when and when?
16  A.   2009 and currently.
17  Q.   And the last time was when?
18  A.   This year -- well, I -- I had a sworn testimony in
19  front of a judge this year sometime around March maybe.
20  Q.   Okay.
21  A.   And then a trial last year I believe.
22  Q.   And where was that?
23  A.   Before COVID -- forgive me.  Before COVID.  COVID's
24  got everything kind of out of whack.
25  Q.   Sure.

Page 37

1   A.   Yeah, but before COVID.
2   Q.   Was it like 20 -- do you know what year?
3   A.   When did COVID kick up?  Was it March of 2020?
4   Q.   2020, yeah.
5   A.   So '19, yeah.
6   Q.   '19, okay.  And have you ever testified at trial in
7   Illinois before in Illinois court?
8   A.   No, sir.
9   Q.   And if you recall, where were these cases -- the five
10  that you testified at trial?
11  A.   In '09 it was in Huntsville, Texas.
12  Q.   Okay.
13  A.   One was in Bexar County, Texas.  I don't remember the
14  county, but it was in Dallas, Texas, another one.  One was
15  Zoom; two were Zoom.
16  Q.   Okay.  And where were those at; do you know?
17  A.   I think they were in Dallas as well.
18  Q.   Okay.  So pretty much everything has been in Texas?
19  A.   All the testimony, yes, sir.
20  Q.   Okay.  And what is the hierarchy of safety controls?
21  A.   So that -- this hierarchy of safety controls was
22  developed by the National Safety Council in the 1950s, and
23  it's the basis for every safety program throughout the United
24  States.  If elimination is available, elimination is the only
25  safety control that's proper.  And then there's a step down



Joseph Barnes

October 13, 2022
Pages 38 to 41

Page 38

1 from elimination being the most proper, all the way down to we
2 can't do anything else, so we'll just put people in PPE.
3    Q.   And that's the pyramid chart you have on page 11;
4 right?
5    A.   Yes, sir.
6    Q.   Is that just a general principle, OSHA principal?
7    A.   Well, it was developed by the National Safety
8 Council, and has been adopt -- adopted by not only OSHA, but
9 the EPA, and you -- you name the organization -- the United
10 States Military.  We all follow the same hierarchy.
11    Q.   Okay.  Have you ever served in the military yourself,
12 sir?
13    A.   Yes, sir.
14    Q.   And where and when?
15    A.   From '91 to '99, I was in the Army Reserves as a
16 medic.
17    Q.   As a medic?
18    A.   Yes, sir.
19    Q.   Is there any other employment that you've had that
20 you have not told me about?
21    A.   Just I've always maintained some kind of medical
22 ambulance something my whole life -- adult life.
23    Q.   Okay.  Do you have any businesses other than Barco
24 that are just your own business?
25    A.   My wife and I own real estate.

Page 39

1    Q.   What kind of real estate?
2    A.   Rental properties.
3    Q.   Okay.
4    A.   Yeah.  We -- we do small, boutique remodeling work
5 for ourselves as well as other small business real estate
6 owners.
7    Q.   Is that all in Texas?
8    A.   Yes.
9    Q.   Can you explain, going back to page 8 of your report,
10 how 29 CFR 1910 is applicable to my client?
11    A.   So we're dealing with walking/working surfaces.  They
12 created the walking/working surface.
13    Q.   So are you saying they had a duty to provide a
14 written certification?
15    A.   Well, are -- are you talking about 1910?  I went to
16 the bottom.  I'm sorry.  I went to 1910.22.  You're talking
17 about 132?
18    Q.   Yes, sir.  Yes, sir.
19    A.   Okay.
20    Q.   I'm sorry.  What are you opining that they should
21 have done in regard to that standard?
22    A.   So in the 1910.132 standard whenever you have a
23 project you have to do a hazard assessment of what could be the
24 forecastable hazards of that location, and you identify, based
25 again on the hierarchy of safety control, how you will control

Page 40

1 those hazards, and then if you require PPE, you have to have a
2 written certification.
3    Q.   So is it your testimony that Borneke should have had
4 a separate certification in that regard from Mortenson?
5    A.   From themselves, they do their own hazard assessment.
6 You're required as an organization to do your own hazard
7 assessment for the area for which you're working.
8    Q.   Require by whom?
9    A.   By OSHA under 1910.132(d)(2).
10    Q.   You don't take part in OSHA investigations; do you?
11    A.   I have in the past, yes.
12    Q.   And is it on behalf of OSHA?
13    A.   Yes.
14    Q.   Okay.  Have you ever actually been an employee of
15 OSHA?
16    A.   No, sir.  I've taught their -- I've taught the OSHA
17 inspectors and the OSHA officers before.
18    Q.   What have you done for OSHA investigations in terms
19 of --
20    A.   There was a fatality -- I'm sorry.  I didn't mean to
21 talk over you.  There was fatality -- a double fatality in
22 south Texas of -- of two brothers in a confined space.
23    Q.   And what did you do for them to help them -- to help
24 OSHA?
25    A.   I -- I did the inspection and wrote a report.

Page 41

1    Q.   So you were retained by OSHA?
2    A.   No.  I was asked -- because I was -- I was working
3 with A&M, I was asked, you know, if I could look into it, and I
4 did.
5    Q.   Okay.  How are you paid by Texas A&M?
6    A.   As an -- as an instructor.  I'm -- I'm adjunct
7 faculty.  They pay me by the hour.
8    Q.   You agree with me that Nick Georgeff was not
9 Borneke's employee; right?
10    A.   That's correct.
11    Q.   Did you do a search to see if there were any OSHA
12 investigations related to this incident in this case?
13    A.   I believe so, but I don't think I ever found any.
14    Q.   And you know that my client has never been cited by
15 OSHA related to this case; right?
16    A.   OSHA --
17        MR. TERRY:  I'm going to object to relevance.
18    Q.   (By Mr. Sullivan) Was Mortenson required to report
19 the incident to OSHA?
20        MR. TERRY:  Same objection.
21    A.   Under the 1904 standard, was Mortenson required to
22 report the incident?
23    Q.   (By Mr. Sullivan) Yes.
24    A.   Only -- only to the point to see if Borneke had
25 reported it themselves.



Joseph Barnes

October 13, 2022
Pages 42 to 45

Page 42

1   Q.  Why do you say that?
2   A.  Because it happened on their location.  They were in
3   control of the site, and they should have reported it.  So
4   Borneke and Mortenson would have both reported, and OSHA would
5   have done investigation, and under the CPL 02-124, determined
6   who was controlling and who had the responsibility.  But I
7   don't think that it was reported by -- by Borneke or Mortenson,
8   either one.
9   Q.  Why do you say that Borneke had control of the site?
10  A.  So they -- they had -- they had general authority
11  over the site to make corrections.  They had Mr. Borneke doing
12  I believe weekly inspections of the site.  So they had general
13  supervisory authority over the site to make corrections, and
14  they had the authority and the ability to make safety changes
15  if they needed to.
16  Q.  Did you see the testimony from the foreman for
17  Mortenson in which he said that once Borneke's work was
18  complete, and they had started the erection phase, they did not
19  want Borneke on-site?
20  A.  Yes, sir.  Yes, sir, I did that.
21  Q.  And did you see the testimony that in this case on
22  the day it took place, it was only Mortenson employees that
23  were working; correct?
24  A.  Yes.
25      MR. TERRY:  Hold on.  I'm going to object to

Page 43

1   mischaracterizes testimony.  You mean on the site as a whole or
2   this specific site, Chris?
3       MR. SULLIVAN:  The site where this incident took
4   place.
5   Q.  (By Mr. Sullivan) What is a multi-employer work-site
6   policy?  Can you explain that for me?
7   A.  Yes, sir.  Under OSHA when you have multiple
8   employers working on -- on one general location, they have a
9   CPL set up to determine one of four classes of -- of employer,
10  controlling, creating, exposing, and correcting, and under
11  their CPL, they determine how they mesh together.
12  Q.  How do you determine if it's -- if it's really a
13  multi-employer site?
14  A.  More than one employer.
15  Q.  So any employer, does that mean any construction site
16  that involves more than one employer can -- is a
17  multi-employer?
18  A.  Absolutely, yes.
19  Q.  You agree with me that OSHA standards are not
20  required by the law; right?
21  A.  I'm sorry?
22  Q.  OSHA standards are not required by a court of law;
23  correct?
24      MR. TERRY:  I'm going to object to legal
25  opinion.

Page 44

1   A.  I -- I believe that's outside of my scope to make
2   that -- that call.  OSHA does regulate; OSHA does fine, and
3   OSHA does take people to court based on the regulations.
4   Q.  (By Mr. Sullivan) You're not offering any opinions
5   in this case about what the legal standard of care was for my
6   client; are you?
7   A.  The legal standard of care, only as it relates to the
8   OSHA regulations.
9   Q.  Do you have an opinion that OSHA should have fined or
10  cited Borneke in this case?
11  A.  Yes.
12  Q.  But not Mortenson?
13  A.  No, not Mortenson.
14  Q.  Why not Mortenson?
15  A.  It was the Borneke excavation that was left open and
16  that had sagging and substandard construction areas that caused
17  the event.  Under the CPL they would have been the creating
18  employer.
19  Q.  Was Mortenson the exposing employer?
20  A.  Was Mortenson the exposing -- yes, Mortenson would
21  have been the exposing employer.
22      MR. TERRY:  Okay.  I'm going to object to
23  relevance because, Chris, you had your opportunity to
24  third-party Mortenson.  So I'm just going to have a standing
25  objection to that.

Page 45

1       MR. SULLIVAN:  Okay.
2   Q.  (By Mr. Sullivan) What are the duties of an exposing
3   employer?
4   A.  The duties of an exposing employer, if they --
5   forgive me.  Give me just a second.  The exposing employer has
6   to make sure that their -- just give me -- let me -- let me
7   rethink.  Sorry.  Getting kind of fuzzy.  The exposing employer
8   works their own hierarchy of safety controls to make sure that
9   they're following through the appropriate controls for their
10  locations.
11  Q.  Okay.  It -- well, let me back up.  You agree with me
12  that -- I understand you're alleging that my client created the
13  hazard, and I'll -- and I'll ask you some questions about that.
14  But would you agree with me that Mortenson first identified the
15  hazard that caused plaintiff's injury?
16      MR. TERRY:  Going to object to relevance, and
17  object to the form.
18  A.  If you have some -- I'm sorry.  If you have something
19  for me look at, I'd be glad to look at that.
20  Q.  (By Mr. Sullivan) Well, do you know who first
21  noticed the ice that was at issue in this case that led to
22  plaintiff's fall?
23  A.  I -- I don't recall who first noticed the ice.  The
24  situation that -- the formation of the sag was from the
25  construction.  So everything started with -- with faulty



Joseph Barnes

October 13, 2022
Pages 46 to 49

Page 46

1  construction.
2      Q.  Is it your opinion that -- well, strike that.
3          You -- you know that the contract required
4  excavation within 175-foot radius of the tower; right?
5      A.  That's correct.
6      Q.  And so is it your opinion that any ice within that
7  175-foot radius would be my client's fault?
8      A.  We're not -- we're not specifically dealing with ice.
9  We're specifically dealing with a project that was built to
10 last the duration and -- and the lifetime of what they needed
11 to do, and it only lasted -- I forget the timeline -- but a few
12 weeks versus the lifetime of the project.
13     Q.  Do you agree with me that -- well, strike that.
14         You know that when the excavation work was done
15 on each pad site it was approved by Mortenson before the -- the
16 components were delivered; right?
17     A.  That -- that is true, but Mr. Borneke took it upon
18 himself to keep coming back and checking.  So I think he was
19 fully aware that there was going to be issues.
20     Q.  You agree with me that an area can be perfectly
21 excavated, and then conditions will change if it becomes
22 saturated with rain; correct?
23     A.  Yes.  That's one of the -- that's one of the things
24 that an excavator would plan for as far as the -- the drainage
25 to keep the water off the site, and I haven't seen anything

Page 47

1  that would show me that a swale was cut or how the drainage was
2  supposed to be taken from the location.
3      Q.  You don't know the weight of any of these components;
4  do you?
5      A.  Not off the top of my head, no.
6      Q.  Do you place any blame on Mortenson in this case at
7  all?
8          MR. TERRY:  Relevance.  You can answer,
9  obviously.
10     A.  No.  Under -- under the OSHA regs, they have the
11 right to rely on the specialist that they hired to do the --
12 the project, and then that reliance then sets with Borneke.
13     Q.  (By Mr. Sullivan) But if -- as the exposing
14 employer, if they know of a hazardous condition, don't they
15 have a duty to create reasonable measures so that there own
16 employees don't become injured by this condition?
17     A.  The reasonable measure would be to have Borneke
18 repair or correct whatever was not done right in the first
19 place.
20     Q.  And did you see any evidence that once -- well,
21 strike that.
22         You agree with me that this -- the ice that was
23 underneath this midsection piece was not discovered until the
24 component was lifted off the ground?
25     A.  I -- again, I don't know how that's possible with

Page 48

1  Mr. Borneke doing weekly checks.  I don't see how that's
2  possible from an experienced and highly qualified excavator.
3      Q.  Well, you saw that when each of these components were
4  laid down, there was wood cribbing underneath -- that covered
5  up the area where it was actually sitting, so it was not just
6  sitting on the bare ground; correct?
7      A.  That's true, which makes -- which makes me even more
8  concerned, because if you're sitting on the cribbing, it's not
9  sitting on the ground crunching and -- and moving pore space.
10 So it's substandard excavation beneath the whole piece of
11 equipment allow for pooling and -- and sinkage.  So that's
12 really even more concerning that it was on cribbing and not
13 specifically on the ground.
14     Q.  Do you know how deep the rut or depressed area that's
15 at issue in this case was?
16     A.  I do not.  I know that when they -- they initiated
17 the construction, because there is the knowledge that this was
18 farm area, and I think it was corn farm, you know, there's so
19 much tilling that's happened over the years, and -- and the
20 ground has been churned up so much, their original grubbing
21 should've probably been in the neighborhood of 3 feet just to
22 get to something before they started coming back and
23 compacting.  So if the rut was less than 2 or 3 feet then it
24 was never brought down to -- to the proper length to begin
25 with.

Page 49

1      Q.  You don't know if the ice was visible at all when the
2  component piece was actually laying down before they erected
3  it; do you?
4      A.  If you have a picture -- there's a picture in my --
5  in my report.  Can we look at that picture?
6      Q.  Well, for -- yes but --
7      A.  Do you have that picture?
8      Q.  Yes.  Just -- let me just ask you a follow-up
9  question.  Is that the only picture you've seen?
10     A.  No.  I believe I've seen others.  I think there were
11 a couple of others.  I just don't have them with me.
12     Q.  And tell me what picture you're looking at?
13         MR. TERRY:  Form.  Go ahead.
14     Q.  (By Mr. Sullivan) Just to be clear, this is one from
15 the Morten -- Mortenson Construction incident analysis report;
16 correct?
17     A.  My report.
18     Q.  Oh, maybe you put -- you put the same picture in your
19 report; right?
20     A.  I believe so, yes, sir.
21     Q.  Go ahead.  What were you going to say about the
22 picture please?
23     A.  So if you -- if you look at the -- at the picture --
24 we're looking at the one with the -- the piece of the turbine's
25 tower?



Joseph Barnes

October 13, 2022
Pages 50 to 53

Page 50

1    Q.   Yes.  It's page 17 of your report; right?
2    A.   Correct.  Correct.  Yes.  There's a couple things.
3  Number -- number one, external to the area that looks like the
4  shape of the tower section, that soil is -- is seeping.  So
5  it's clearly Class C soil, and the -- and the greater concern,
6  that should've been picked up right away whether or not there's
7  a piece of equipment laying over it, that saturation of the
8  soil was happening external to where the piece of equipment was
9  cribbed.  But to the far end of that picture, we see the spoil
10 pile, which my -- all intents and purposes, made that area a
11 bowl.
12   Q.   And what is the spoil pile?
13   A.   The -- the stacked dirt that you can see in the -- in
14 the distance.
15   Q.   Okay.  And so it's your opinion that my client put
16 that there as part of the excavation process?
17   A.   I would expect that more likely than not they did it
18 as part of the tuneups.
19   Q.   But you don't know if my client was ever actually
20 asked to do a tuneup on this particular site; do you?
21   A.   No.  That was speculation on my part completely.
22   Q.   And do you know -- well, strike that.
23        You don't know if this ice was actually visible
24 when the component was resting on it; do you?
25   A.   I don't know if the ice was visible, but I have no

Page 51

1  doubt that the -- this seepage in the soil was visible.  If the
2  cribbing is the same as what's next to it, then, yes, it should
3  have been visible.  And you can see under the -- the other
4  component that's sitting there, there's already a pool starting
5  under that one as well, right in the middle.
6    Q.   All right.  I'll share my screen with you for a
7  second.  All right.  Can you see this picture?
8    (EXHIBIT 1 WAS MARKED FOR IDENTIFICATION.)
9    A.   Yes, sir.  I believe that's the same picture.
10   Q.   All right.  And let me go over there.  Do you see
11 that better?
12   A.   Yes.
13   Q.   Now, you don't know exactly when this was taken;
14 correct?
15   A.   No, sir.  I -- I don't.
16   Q.   And, of course, we already -- at the time of the
17 incident, there was snow covering the ice.  You saw that in the
18 testimony; correct?
19   A.   That's correct.
20   Q.   You said you can all -- you can already start to see
21 ice on the other component.  Where -- what are you -- if you
22 could point it out, I'm not sure I understand that.
23   A.   So on the laydown plates on the right-hand side,
24 right in the middle of it, right -- stop right there, you see
25 the water on top of the laydown plate, and then if you'll look

Page 52

1  at the top left corner of that plate, it's already sunken --
2  sunk below the plate next to it right there.
3    Q.   And -- and what does that show?
4    A.   That the ground underneath it is sagging.
5    Q.   So you would expect to see ice underneath that as
6  well?
7    A.   There should -- it should be marshy, wet, Class C
8  soil saturated right there.  In fact, if you look past the
9  cribbing towards the end, you can already see that past the
10 cribbing there's already more sinkholes happening on that
11 specific side as well as to the one to the left.
12   Q.   And what do you contend my client should've done to
13 fix that?
14   A.   The -- at the very least, they should have barricaded
15 if they couldn't affect some kind of move to eradicate it and
16 eliminate it.  Under the hierarchy, they should have controlled
17 the site.  Now, I don't know when these barricades -- these
18 rope barricades were put up, but something like that to the
19 very minimal standards, should've been appropriate for this
20 site.
21   Q.   Right.  And wouldn't that be Mortenson's job, since
22 they were the one controlling the work at the time of the
23 incident?
24   A.   Actually Borneke was the one -- the contractor that
25 created it.  So they would be the ones that would actually

Page 53

1  eradicate it and take it down to elimination.  So if the
2  planning was to actually do what they were hired to do and --
3  and removed the actual hazard, then they should have barricaded
4  off what they were doing.
5    Q.   But they would've had to have notice of the condition
6  in order to do that; right?
7    A.   It's impossible, in my opinion, for you not to have
8  noticed when you see just sagging and standing and potholes
9  right next to equipment.  I don't see how they could say they
10 didn't have notice in my opinion.
11   Q.   Okay.  Do you know how long the ice had been exposed
12 on the day of the incident before the injury?
13   A.   Forgive me.  I -- I -- I'm kind of fuzzy on when this
14 happened, but I think there was a light snow that morning,
15 and -- and I think it was gone by the end of the day or the
16 next day.
17   Q.   Right.  But I -- my question is in this specific
18 area -- the testimony as I understand it is that Georgeff fell
19 on this sheet of ice that's in this picture?
20   A.   Yes.
21   Q.   And it was covered with snow at the time, but do you
22 know how long it had been exposed -- the ice had been exposed
23 from lifting the component piece before the injury?
24   A.   As in relation to Mr. -- when Mr. Georgeff walked
25 across it?



Joseph Barnes

October 13, 2022
Pages 54 to 57

Page 54

1  Q.  Yes.
2  A.  No, sir.
3  Q.  And you agree with me that Mortenson had the ability
4  to stop work if it believed this ice was too dangerous to
5  continue working?
6  A.  I believe that they had the ability to rely on their
7  specialist that they had hired. I don't know that specifically
8  Mr. Georgeff would have seen that as a deep puddle of water
9  with ice in it or just a mere, you know, shallow spot that he
10 could have stepped on. I can remember growing up as a -- as a
11 boy in Missouri the little shallow spots of ice you just step
12 on and crunch under your feet versus an actual small --
13 small -- I won't call it a lake, but a small depression
14 that's -- that's sunk.
15 Q.  Yeah. And we don't know how deep this was; do we?
16 A.  We don't know how deep it was. We can see to the
17 right.
18      MR. TERRY:  Hold on. I just want -- I just want
19 to object, Chris. I think you're mischaracterizing the
20 evidence. There was clear testimony this was covered with snow
21 on the day of the occurrence.
22      MR. SULLIVAN:  Okay. Sure.
23      MR. TERRY:  So is this a hypothetical, or is
24 this an actual question?
25      MR. SULLIVAN:  It's an actual question. Looking

Page 55

1  at this picture, we don't know how deep this depression was; do
2  we?
3      MR. TERRY:  This was taken after the fact when
4  the snow already melted, though.
5      MR. SULLIVAN:  Okay.
6      MR. TERRY:  Anyway, I made my objection. I
7  think it's misrepresenting the evidence, but that's -- that's
8  okay.
9  A.  Would -- would you like me to answer, sir?
10 Q.  (By Mr. Sullivan) Please.
11 A.  So if you'll look at the -- the plates underneath the
12 existing tower section, the one right next to the one that's
13 sagging, that looks to be a -- good hand size above the
14 actual water line of that ice, and -- and I'm sure if you took
15 it straight across it would be pretty level to the other side
16 that's all chunked out with the Class C soil. So my estimation
17 is at the very minimum it's at least as deep as that space
18 between the plate to the top of the water line.
19 Q.  Did you see in your review of any of the testimony of
20 the records in this case that anyone called out my client to
21 try to rectify this condition after it was noticed by Mortenson
22 and before Georgeff showed up on the site?
23      MR. TERRY:  Relevance. You can answer.
24 A.  I remember testimony that Mr. Borneke took it upon
25 himself weekly to make sure he was following up and making sure

Page 56

1  the area was safe.
2  Q.  (By Mr. Sullivan) Okay. But that wasn't the
3  question. Did you see any testimony that Mortenson had called
4  Borneke out to address this that day before the incident?
5  A.  Not that I recall. I think it happened early, early
6  morning. It may have been even dark, and there was a light
7  dusting of snow.
8  Q.  This is the only picture you -- you viewed of the
9  actual area where he fell; correct?
10 A.  I don't recall. There -- there wasn't many pictures.
11 I don't recall.
12 Q.  You don't recall any other ones besides this one,
13 though; do you?
14 A.  Of the area that he fell?
15 Q.  Yeah.
16 A.  There may have been one or two more, but I -- I just
17 don't recall. I'm sorry.
18      MR. TERRY:  And, Chris -- Chris, just for the
19 record, we sent him any that were from the depo, like the ones
20 that showed the trucks that we used in the deposition. Like I
21 don't have any other photos that weren't marked in the
22 depositions. Also the ones that sent you are the ones that he
23 reviewed, so.
24      MR. SULLIVAN:  Right. Right. I think we both
25 know this is the only one that shows the area where he fell.

Page 57

1  Q.  (By Mr. Sullivan) You agree with me that Borneke did
2  not have the ability to tell Mortenson to stop working; did it?
3  A.  Of course they did.
4  Q.  And what do you say that?
5  A.  Any -- any specialist that you bring out, you hire
6  them for their specialty. If -- if you're not going to listen
7  to their advice when they tell you, hey, this is an unsafe
8  condition, why would you bring them out to begin with. So they
9  most definitely had the ability to tell Mortenson you need to
10 stop, or you need to fire us.
11 Q.  Do you have a copy of the Mortenson Construction
12 incident analysis report in front of you?
13 A.  Not in front of me, sir. And I'm not in my office,
14 if you could put it up, I'd -- I'd be glad to read it with you.
15      MR. TERRY:  Chris, do you want me to share my
16 screen?
17      MR. SULLIVAN:  Yeah. Sure. Why not if you've
18 got it.
19      MR. TERRY:  All right. Let me pull it up. Hold
20 on.
21      MR. SULLIVAN:  You might as well do something
22 while you're doing nothing. That's a line from a movie I
23 think.
24      MR. TERRY:  I like it. I'm going to have to use
25 that.



MAGNA
LEGAL SERVICES

Joseph Barnes

October 13, 2022
Pages 58 to 61

Page 58

1    THE WITNESS: I missed it. I missed it.
2    MR. TERRY: He said I'm going to have to do
3 something while I'm doing nothing.
4    THE WITNESS: Oh, there you go. It sounds like
5 my -- my wife talking.
6    MR. TERRY: There you go. It should be on the
7 screen. Can you guys see that?
8    THE WITNESS: Yes, sir.
9    MR. TERRY: Chris, where do you want me to go?
10    MR. SULLIVAN: Let's see. Well, actually just
11 the top part.
12    MR. TERRY: All right.
13    (EXHIBIT 2 WAS MARKED FOR IDENTIFICATION.)
14    Q.   (By Mr. Sullivan) Okay. You did review this as part
15 of your report; right, sir?
16    A.  Yes, sir.
17    Q.  And do you know why this was created?
18    A.  The -- the employee was injured.
19    Q.  And this report should have gone to OSHA; right?
20    MR. TERRY: I'm going to object to relevance.
21 You can obviously answer.
22    A.  It depends. Under OSHA's catastrophic --
23 catastrophic injury law, if Mr. Georgeff was admitted into the
24 hospital past the emergency room and initial analysis, there
25 should've been a report.

Page 59

1    Q.   (By Mr. Sullivan) But he wasn't admitted to the
2 hospital was he? He went to the ER?
3    A.  Immediately admitted and did -- never left or came
4 back, then there was required to be a report.
5    Q.  Does -- this report says it's an OSHA reportable
6 injury?
7    A.  Correct. An OSHA recordable injury could be a
8 chipped tooth.
9    Q.  Okay. And what's OSHA form 301?
10    A.  The -- the incident -- like this is their version of
11 the 301.
12    Q.  And what is a 301?
13    A.  It's an accident injury report template that OSHA put
14 out -- provides that an employer can use.
15    Q.  And you saw what the pre-task plan cards are; right?
16    A.  Yes. I've seen pre-task plan cards, yes.
17    Q.  And did you see that in this case the testimony of
18 the foreman was that it would've said that there was icy
19 conditions?
20    A.  I'm sorry. Did you want me to read this section?
21    Q.  No. Did you -- do you recall any of the testimony
22 that the pre-task plan cards warned Mortenson employees of icy
23 conditions?
24    MR. TERRY: I'm going to object to speculation.
25 I think the superintendent or foreman said that they should

Page 60

1 have, not that he remembered they actually did. Subject to
2 that, you can obviously answer.
3    A.  I don't recall the specifics of it, but I remember
4 the phrase icy conditions.
5    Q.   (By Mr. Sullivan) And my question is, you blame
6 Borneke for the icy conditions; right?
7    A.  Not for the icy conditions, for the substandard
8 condition of the lot.
9    Q.  But if it did its job, there wouldn't be ice; is that
10 what you're saying?
11    A.  No. If they would -- if it did its job, there'd be
12 runoff, there'd be proper drainage, there'd be some swale cuts
13 somewhere that the water would've left the location.
14    Q.  Did you see any -- anywhere in the record that
15 Mortenson had any criticisms of Borneke's work?
16    MR. TERRY: Relevance?
17    A.  Again, I -- I don't recall that they had criticism of
18 their work, but, again, they're hiring a specialist. If I
19 hired a surgeon to operate on the inside of me, I don't know
20 that I'd have criticism of it as long as he got it done.
21    Q.   (By Mr. Sullivan) Can you -- you know what --
22    MR. TERRY: Chris, do you want me to keep
23 sharing my screen?
24    MR. SULLIVAN: No. Just stop, it's easier for
25 me to do it. Sorry.

Page 61

1    MR. TERRY: Okay.
2    Q.   (By Mr. Sullivan) Do you agree with me that this
3 injury would not have happened if Georgeff was wearing ice
4 cleats?
5    MR. TERRY: Objection; relevance. They were not
6 required on this job.
7    A.  I'm sorry. No. I don't agree with that.
8    Q.   (By Mr. Sullivan) And why is that?
9    A.  I've actually worn ice cleats and still fallen in --
10 in the ice and snow.
11    Q.  The point of them is to reduce the risk of injury
12 like this, though; right?
13    A.  Correct. And, again, the -- that would be at the
14 very bottom of the hierarchy of safety controls. That would
15 say, as the contractor, the excavator, I couldn't eliminate the
16 hazard, I couldn't substitute, I couldn't engineer any controls
17 out, and the last thing we can do to protect people is make
18 them wear PPE. That is the lowest form of safety, and it only
19 says everything else is not possible, and that's not the case
20 in this situation.
21    Q.  So does that mean that you don't think Mortenson
22 should have mandated ice cleats?
23    MR. TERRY: Same objection; relevance.
24 Mortenson -- Mortenson's not a party to the case.
25    A.  Go ahead? I've not seen their hazard assessment



Joseph Barnes

October 13, 2022
Pages 62 to 65

Page 62

1   either, whether they required PPE.  If I was doing Mortenson's
2   hazard assessment, I don't think that I would've required the
3   ice cleats if I relied on the contractor to excavate and
4   properly maintain the site.
5            MR. TERRY:  Chris, you were moving real slow for
6   a second.  I thought you were frozen.
7            MR. SULLIVAN:  No.  No.  I'm just going to show
8   you this myself I.  Believe it's easier.
9       Q.   (By Mr. Sullivan) I'm putting the incident report
10  back up.  You see that; right?
11      A.   Yes, sir.  You went fast.
12      Q.   And this is a report created by Mortenson's safety --
13  I forgot what his name is -- safety --
14      A.   Hogan, I forget -- I don't remember his name.
15      Q.   That's right.  Kevin Hogan; right?
16      A.   Yes.
17      Q.   Let me show you -- this is their view of what the
18  cause was and contributing factors; right?
19      A.   Yes.  They've done a five whys, an Ishikawa if you
20  will.
21      Q.   What is Ishikawa?
22      A.   A five whys representation that turns into a
23  fishbone, which they have I think on the next page.
24      Q.   Is that part of a standard OSHA investigation?
25      A.   No.  It's one of the -- one of the -- the

Page 63

1   investigative tools you could use to do an investigation.
2       Q.   Okay.  Now, when it says hazard identification, it
3   says the pre-task card for the site highlighted the presence of
4   icy conditions but did not specify locations on the pad.
5       A.   I'm sorry.  You want me to read -- can you read that
6   one more time?
7       Q.   Do you see this line right here?
8       A.   Yes.  Yes.
9       Q.   It says it highlighted the presence of icy
10  conditions; do you see that?
11      A.   Yes.
12      Q.   And you know that this job site required Mortenson
13  employees to actually sign the pre-task plan cards at the
14  individual sites before they actually walked onto the site;
15  right?
16      A.   That's common practice, yes.
17      Q.   And we also know from plaintiff's testimony that it
18  was snowing when he arrived; correct?
19      A.   I -- I believe so.  I -- I don't doubt you.  I don't
20  doubt you.
21      Q.   Okay.  And so I guess what I'm getting at, do you
22  have any view of that -- strike that.
23           Wouldn't you agree with me that Georgeff was on
24  notice of potential for snow and ice to walk on?
25           MR. TERRY:  Objection; form.  Speculation.

Page 64

1       A.   Sure -- sorry.  I -- I would -- I would agree to that
2   with -- with some caveat.  Number one, and with you -- when
3   you're walking on ice cleats on the muddy dirt, your ice cleats
4   become ineffective after a few steps because they're caked up.
5   Anybody who has played football has kind of -- kind of lived
6   that lifestyle.
7            But also in your second bullet point on the same
8   document it says, while the project site does offer the use of
9   ice cleats to further protect team, it's not a policy.  So it's
10  been my experience that the ice cleats make your feet heavier,
11  put more stress on your knees, and get caked up real quick if
12  you're in -- in muddy, soggy soils.
13      Q.   Well, my question wasn't about ice cleats because, in
14  fact, he wasn't wearing any ice cleats?
15      A.   That's correct.  I apologize if I misunderstood you.
16      Q.   (By Mr. Sullivan) So he's on notice when he shows up
17  and reads the pre-task plan card and sees the snow that there
18  may be ice around?
19           MR. TERRY:  Same objections.
20      A.   Yes, sir.  He's -- I -- I fully believe he would have
21  seen the snow, yes.
22      Q.   (By Mr. Sullivan) And anyone who has seen snow
23  recognizes there could also be ice; correct?
24           MR. TERRY:  I'm going to object to form.
25  Speculation.

Page 65

1       A.   If the expectation was for him to be on a -- on a
2   flat surface, no.  If the expectation was for him to be on a
3   surface that had a lot of bad areas then maybe.
4       Q.   (By Mr. Sullivan) Are you critical of the foreman at
5   all for not stopping his work so that the plaintiff would not
6   have been exposed to this ice?
7            MR. TERRY:  Same objection.  He's not a party to
8   the case.
9       A.   No.  I believe that the -- the foreman also as a --
10  as a member of the Mortenson team relied on the specialist to
11  make the site safe.
12      Q.   (By Mr. Sullivan) You agree with me the foreman
13  could have stopped the work, though, and coned off the area
14  once he found ice?
15           MR. TERRY:  Same objection.
16      A.   Yeah.  Any -- anybody can have stop-work authority.
17  That's true.
18      Q.   (By Mr. Sullivan) And -- and the report actually
19  talks about it's the foreman's responsibility to ensure that
20  the crew walks the site prior to commencing work and that any
21  adverse ground conditions must be identified in the pre-task
22  plan card and marked off by cones; right?
23           MR. TERRY:  Same objection.
24      A.   If -- if I'm putting an analysis together, the
25  foreman was -- they were required to walk the site to look for



Joseph Barnes

October 13, 2022
Pages 66 to 69

Page 66

1  hazards, but then again we go back to the site was covered with
2  a light dusting of snow.  Walking the site, unless they were
3  specifically walking where he fell, wouldn't have mattered.
4      Q.   (By Mr. Sullivan) Right.  But once they identify the
5  hazard, they need to put cones there; isn't that true?
6           MR. TERRY:  Same objections.  Not a party to the
7  case.
8      A.   The -- yes.  They -- they could have a situation
9  where they could have put cones there if they understood that
10  that was a deep hole and not just a light covering of ice over
11  a rough area of the terrain.
12     Q.   (By Mr. Sullivan) And your testimony is that even if
13  a Borneke employee had reviewed this site while the basement
14  piece was still laying there, and on top of the cribbing, and
15  the ice was not exposed, they should have known that there was
16  a danger underneath the basement piece; is that right?
17     A.   Can you rephrase your question please?
18     Q.   We know that before they lifted up the piece and took
19  off the cribbing, the ice was not exposed.  So if Mortenson had
20  -- I'm sorry.  Borneke, one of my client's employees, had
21  reviewed this site while the pieces were laid there, and you
22  can't see the ice, your testimony is that it should have
23  recognized there was a depressed area and ice underneath there?
24     A.   I may be able to answer that question a little bit
25  better if you bring the picture backup.

Page 67

1      Q.   Sure.  Do you see it?
2      A.   Yes.  Can you make it bigger?
3      Q.   Is that big enough?
4      A.   A little bit bigger, please.  Okay.  Good.  Do you
5  see the cribbing stacked at the top of that section?
6      Q.   Over here?
7      A.   Yes.
8      Q.   Yes.
9      A.   Do you see just past that, immediately in front of
10  the cribbing and to the left.
11     Q.   You mean like right there?
12     A.   Yeah.  You just went over it.  That whole ground
13  is -- is wrong.  It's bad.  It's -- it's not right.  And any
14  excavator whose looking at that site each day, whether there
15  was a piece of section laying on the dirt right where the ice
16  was or not, should have seen that and said, wait a minute,
17  we've got some stuff we've got to go back and redo and make it
18  right.
19     Q.   What is it that's wrong with this?
20     A.   You've got standing water right there, next to that
21  one tank.  That's actually the -- the section that holds the --
22  the arms.  And then right above the cribbing you've also got
23  standing water.  And immediately past the cribbing you have the
24  spoil pile which pushes the water back towards the sections of
25  the turbine, which I just can't get past why that would be

Page 68

1  there.  I mean, again, that makes it a bowl right
2  adjacent to where these pieces of heavy equipment are sitting.
3      Q.   Okay.  You don't know if standing water was ever
4  noticed on this pad site before they began the erection work
5  that day; do you?
6      A.   Noticed by whom, sir?
7      Q.   Anyone.
8      A.   I -- I don't know.  I just can't rectify in my mind
9  how a professional like Mr. Borneke would not have caught that,
10  though.
11     Q.   And you don't know how long this area was in this
12  condition either; do you?
13     A.   I do not.  I know that the ground around it in those
14  darker areas is saturated.  So it's Class C soil again, so it
15  should have been immediately caught by an excavator.
16     Q.   Even while the ice was covered up; correct?
17     A.   Well, I mean, if -- if ice covered the whole ground,
18  I -- I wouldn't -- wouldn't dare say that, you know, they could
19  see under the ice, no.
20     Q.   What I'm saying is while the piece that had covered
21  this ice was still there, what should my client have done?  Was
22  it too late at that point?  That's what I'm trying to figure
23  out.
24     A.   Oh, no.  They -- it's not too late.  He could have
25  barricaded it off, had them move that -- at least one thing,

Page 69

1  move that smaller section, which is I -- I think the motor part
2  of the -- the turbine; I'm not professing to be turbine expert
3  at all, but scrapped that down to good soil, retightened it,
4  re-compacted it, and reset it.  And if he couldn't get around
5  because the piece of equipment was there, if they didn't want
6  him to, then he should have barricaded it off and communicated
7  a new plan with Mortenson.  He's the expertise.  He's the
8  specialist.
9      Q.   Okay.  So my question is he should have recognized
10  there's a piece that was like this right next to this, and
11  that's what had covered up this ice?
12     A.   Correct.
13     Q.   If he -- if he had gone to the site before they
14  decided -- before the erection phase and recognize there was
15  ice under there, he should have asked them to lift up the piece
16  so he could address the land; is that what you're saying?
17           MR. TERRY:  No, and that -- that
18  mischaracterizes the testimony.  Objection; mischaracterizes
19  testimony.  You can answer, Joe.
20     A.   He could, at the very minimum, barricaded it off and
21  brought them in for a meeting to say what plan can we do to
22  make sure that this is going to be doing safely.  As an expert
23  with excavation, I mean, he could clearly see -- I mean, look
24  at the dirt to the left of this.  This is saturated dirt.
25  That's why it's dark.  That's why it's clumpy.  It's Class C



Page 70

1  dirt.  He could have said, guys, it's not going to be safe to
2  have your people here; what are you willing to pay for; what
3  can we get done, but I can't have your guys coming up on that.
4      Q.   (By Mr. Sullivan) And in your mind it makes no
5  difference if Mortenson had told Borneke we don't want you to
6  come back unless you're asked to come back?
7      A.   Then Borneke should've walked off the job and
8  reported them.
9          MR. TERRY:  And I'm going to object to
10  mischaracterizes the testimony.  No one ever said that.
11      Q.   (By Mr. Sullivan) You agree with me that Borneke at
12  the time of this incident did not have an obligation to remove
13  snow and ice generally; did it?
14      A.   I believe they had an obligation for maintenance,
15  which would have included the removal of snow and ice.
16      Q.   Why do you say would have included the snow and ice
17  removal?
18      A.   So they -- they built the walking/working surface for
19  that pad, and under the standard that we read earlier,
20  1910.22.(a)(3), walking/working surfaces are maintained free of
21  hazards to include snow and ice.  It's on page 8, last
22  sentence.
23      Q.   So there was no need for them, in your opinion, to
24  have a separate contract for snow and ice removal; huh?
25      A.   Not under the standard, no.

Page 71

1      Q.   Was Borneke correcting employer?
2      A.   They should have been.
3      Q.   You don't have any information or opinion about
4  whether Georgeff was looking at where he was walking at the
5  time --
6          MR. TERRY:  I'm going to -- speculation.  It's
7  clear in his testimony.  The plaintiff can speak for himself.
8  You can answer, Joe.
9      A.   That -- that's what I was going to say.  I couldn't
10  speculate what was going through his mind at the time.  He
11  could've been thinking about groceries.  I don't know.  Excuse
12  me.
13      Q.   (By Mr. Sullivan) You say in your report on page 23
14  that this accident occurred because of the complacent attitude
15  of Don Borneke Construction.  What was complacent about Don
16  Borneke Construction?
17      A.   So Mr. Borneke was -- was for all intents and
18  purposes, auditing the site at least once a week.  And, again,
19  I can't rectify in my mind how a professional with that much
20  experience could not see areas that were sagging, areas that
21  eventually held water, and marshy land, as well as having the
22  spoil piles moving around the site creating a bowl.
23      Q.   Have you ever physically inspected any wind farm site
24  for excavation analysis purposes?
25      A.   Not a wind farm, but several lay down pipe yards.

Page 72

1      Q.   You agree with me that there's nothing in the
2  contract that guarantees the soil is going to be able to
3  actually support changing weather conditions and the weight of
4  these turbine components?
5      A.   I -- I think that's an excellent point.  That's why
6  you hire a specialist because they're the guys that would tell
7  you whether or not they could make it support the weight of
8  this equipment.
9      Q.   Okay.
10      A.   I'm sorry.  Excuse me.
11      Q.   You saw the testimony of the foreman from Mortenson;
12  right?
13      A.   Can you remind me of his name?
14      A.   Sears.
15      A.   Sears, yes.  Okay.  Go ahead.
16      Q.   And he said he had no problem doing the work under
17  the conditions that were there.  Do you remember that
18  testimony?
19          MR. TERRY:  Relevance.
20      A.   Well, I -- I remember the -- I remember him
21  testifying.  I don't remember specifically from that testimony,
22  but, again, I'd go back to the fact that he's not the
23  specialist, and he could have been relying on what the
24  specialist did.
25      Q.   (By Mr. Sullivan) What do you contend that Borneke

Page 73

1  should've done to make sure that this depressed area did not
2  form specifically?
3      A.   So -- I'm sorry.  So they should have, at the very
4  minimum, because we know what this property was, when they did
5  their grubbing knowing that there's going to be vegetation and
6  root systems and all that kind of stuff and that the soil has
7  been churned many, many times, they should've excavated deep to
8  make sure they got down to solid soil, and then come back and
9  reset and recompacted and recompacted, and then got their grade
10  so that they could have good runoff.  And then for sure not
11  pile -- put your spoil pile right around the edge of the site
12  to turn the water back into the site itself.
13      Q.   And where should the spoil pile have been put in your
14  opinion?
15      A.   Well, they should've easily put the spoil pile --
16  number one, if -- if it was our construction site, we would put
17  the spoil pile in a single pile, and we would put it
18  significantly away from the site in a lower area.
19      Q.   This assumes that you had authority to actually use
20  other land to do that; right?
21      A.   Well, they could have put it in an area that they had
22  the drainage going to instead of the area around the entire
23  site or around the edge of that site where the water was
24  pooling.
25      Q.   Are you critical of Mortenson for approving the



Joseph Barnes

October 13, 2022
Pages 74 to 77

Page 74

1 excavation work that Borneke performed?
2          MR. TERRY:  Relevance.
3     A.  Well -- I'm sorry.
4          MR. TERRY:  Go ahead.  I'm sorry, Joe.
5     A.  No.  It was my fault.  I'm sorry.  No.  Again, they
6 -- you know, they -- they had the -- the ability to rely on
7 their specialist, and for them approving the site, I'm sure it
8 was more than anything else, you know you're a highly reputable
9 organization, and we approve it because we rely on you to be a
10 good specialist.
11     Q.  (By Mr. Sullivan) If -- hypothetical -- I'm asking a
12 hypothetical -- hypothetical here.  If general contractor
13 prevents the excavation specialist -- specialists from coming
14 back and performing something he thinks is necessary, you think
15 they should walk off the job; is that right?
16          MR. TERRY:  Assumes facts not in evidence.
17 Incomplete hypothetical.  Lacks the foundation for that
18 hypothetical.  You can answer, Joe.
19     A.  So if I understand right if a -- general contractor
20 hires a specialist, and then the specialist tells them you have
21 to do some -- something, part a, and they refuse, should they
22 walk off the job, absolutely.
23          MR. TERRY:  Hey, Chris, do you mind if we take a
24 quick restroom break.
25          MR. SULLIVAN:  Sure.  That's fine.

Page 75

1          MR. TERRY:  All right.  Perfect.  I just need a
2 couple minutes.
3          MR. SULLIVAN:  Yeah.
4          THE REPORTER:  We are off the record at 2:41
5 p.m.
6     (The deposition was in recess from 2:41 to 2:47.)
7          THE REPORTER:  All right.  We are back on the
8 record at 2:47 p.m.
9     Q.  (By Mr. Sullivan) Mr. Barnes, I wanted to ask you a
10 bit about Mortenson here.  Do you -- I can't remember if you
11 specifically said this.  Do you have an opinion on whether
12 Mortenson committed any safety violation?
13          MR. TERRY:  Relevance.
14     A.  If they committed any safety violation, I want -- I
15 want to think through it thoroughly.  I -- I just don't think
16 they did as far as their role in -- in -- in building a wind
17 turbine, obviously I don't have the information on that.  They
18 did an appropriate investigation.  They did an acknowledgment
19 that there could have been some PPE, but it was not required.
20 I -- I don't at this point, no.
21     Q.  (By Mr. Sullivan) Okay.  Did Mortenson have a duty
22 to correct the hazard itself when it identified it?
23     A.  Well, they -- they couldn't correct because they
24 weren't the specialists.  They wouldn't have the ability to --
25 to do the correction themselves at the level of what a

Page 76

1 specialist could've done, so, no.
2     Q.  Well, they could have stopped and got rid of the ice,
3 though; right?  The hazard itself was the ice?
4     A.  The testimony that I recall was that they weren't
5 allowed to get close to the heavy, expensive components of the
6 turbine, which is why they had the specialists there to begin
7 with.
8     Q.  Well, no one was allowed to get close to the heavy,
9 expensive equipments of the turbine?
10     A.  Correct.  So the -- the excavator, the specialist
11 involved, should at that point have said, we have to strategize
12 with you to make a new plan to make our work -- you know, now
13 that we've got to go back and redo something, make it
14 appropriate.
15     Q.  And that assumes that they were made aware of it
16 after it was exposed in this incident?
17     A.  In -- in my mind, there's no way that an expert like
18 Mr. Borneke could've not been aware of it.
19     Q.  Okay.
20          THE WITNESS:  I apologize.  I don't mean to keep
21 coughing in your ear, Christy.  I apologize.
22     Q.  (By Mr. Sullivan) And should -- should Mortenson
23 have put ice melt salt on the ice once it identified the ice?
24          MR. TERRY:  Relevance.
25     A.  I can't speak to that.  I don't know.

Page 77

1     Q.  (By Mr. Sullivan) I mean should Mortenson at least
2 have told Borneke to come look at this icy area and stopped
3 work?
4          MR. TERRY:  Same objection.  Not a party to the
5 case.
6     A.  I believe they trusted that Mr. Borneke doing the
7 drive-bys once a week with having them look at those sites.
8     Q.  (By Mr. Sullivan) But doesn't -- don't -- don't they
9 have a duty once they identify a hazard to stop work before the
10 hazard is -- I mean, until the hazard is corrected?
11          MR. TERRY:  Same objection.
12     A.  That makes me -- I'm sorry.  That makes me speculate
13 on what they knew and how much they knew based on their
14 ability.
15     Q.  (By Mr. Sullivan) Well, you saw testimony Leonard
16 Brayne.
17     A.  Remind me of Mr. Brayne.
18          MR. TERRY:  I think it was Leonard Brayne.
19          MR. SULLIVAN:  Well, however you say it, Brayne,
20 B-R-A-Y-N-E.
21     Q.  (By Mr. Sullivan) He's one of the people whose
22 depositions you read; right?
23     A.  Correct.
24     Q.  He said that the ice was there exposed to the crew
25 for 30 minutes, maybe an hour.  Before that no one had seen the



Joseph Barnes

October 13, 2022
Pages 78 to 81

Page 78

1  ice. So --
2      A. Correct.
3      Q. And what -- and the only people on the site at that
4  time were Mortenson employees. So didn't Mortenson at least
5  have a duty to stop work and call Borneke and discuss how to
6  rectify this hazard?
7      A. So we're putting the heart -- the cart before the
8  horse. There would've been this sagging place for ice to be
9  had this site been prepared properly. So if they had not seen
10  the site with the sagging and recognize that was an issue of
11  unstable sub-foundation then, no. The people who would
12  recognize that would've been specialist who knows what to look
13  at when they see a site that's got substandard foundation
14  underneath the top that's sagging. So, no, Mr. Borneke would
15  have caught that. The guys from Mortenson would have said,
16  hey, the excavator has been out here. We're good to go.
17          Now, if it pooled and leveled off because there
18  was water and ice, who is to say they didn't think that Borneke
19  had already been out there and made some repairs. I mean,
20  we're -- we're speculating on what the specialist did from what
21  the guys who hired the specialist knew, and I just don't really
22  think I can comment on that very well.
23      Q. But anyone would see a sheet of ice and recognize
24  that as a hazard; right?
25      A. I -- I wouldn't argue with you. I'm a Texas boy. I

Page 79

1  see ice, I'm going to think it's a hazard. When I was a kid in
2  Missouri, I'd have probably slid across it.
3      Q. So if we agree that the ice itself -- the sheet of
4  ice is a hazard, shouldn't Mortenson have done something rather
5  than just keep working?
6          MR. TERRY: Relevance. Same objections.
7      A. I believe they did something. I believe they
8  relied -- relied on their specialist to make it right since
9  they were in charge of maintenance.
10      Q. (By Mr. Sullivan) But they didn't do anything once
11  they noticed -- noticed the ice. They just kept working. And
12  then Borneke showed up to inspect or check people's cards or
13  whatever he was doing, and he slipped?
14          MR. TERRY: Same objection. Asked and answered.
15      A. I -- I believe we're trying to make a speculation
16  that they were working on top of the ice right there at that
17  one spot. I think they were working on the site. I don't know
18  that I have any information that they were all traversing
19  across this ice, doing their job every day. All that we do
20  know is that Mr. Georgeff went across the ice that was covered
21  in snow that morning.
22      Q. (By Mr. Sullivan) Right. But the foreman, if you
23  look at his testimony, he said he was walking on that ice that
24  whole morning. His whole crew was. They didn't have a
25  problem. They were continuing with their work.

Page 80

1          MR. TERRY: I'll object to mischaracterizes the
2  evidence. He said they realized the ice -- they slipped on it,
3  and it was covered with a thin layer of snow before Nick came.
4  Come on, Chris. You can answer if you remember that made up
5  testimony.
6      A. I -- I don't -- I don't recall specifically, if you
7  could rephrase your question. I apologize.
8      Q. (By Mr. Sullivan) The foreman testified he had
9  walked on that ice himself before Georgeff showed up and --
10          MR. TERRY: Same objection.
11      Q. (By Mr. Sullivan) -- the crew did. He testified to
12  that.
13          MR. TERRY: Same objection.
14      Q. (By Mr. Sullivan) So shouldn't he have stopped work
15  before Georgeff showed up knowing that?
16          MR. TERRY: Same objection.
17      Q. (By Mr. Sullivan) Knowing that?
18      A. So this is probably outside of my zone of specialty,
19  but I have an opinion I will give you. I believe that
20  Mr. Georgeff was there early in the morning, and there was some
21  dusting of snow. The foreman was there when there was light,
22  and it was probably solid. So I'm -- I'm going to speculate
23  that he walked across it because it was solid, and he saw it,
24  as I would've as a kid in Missouri, and then, again,
25  Mr. Georgeff came there and slid on what was covered with snow.

Page 81

1  We're -- we're trying to compare two guys, with two different
2  views, from two different vantage points, at two different
3  times of the day. So it's hard to put them together and say,
4  yeah, one is right and one is wrong.
5      Q. And you saw Georgeff's testimony that it had been
6  snowing all morning; right?
7      A. Yes, sir. I don't remember specifically exactly what
8  he said, but that sounds familiar.
9      Q. So in the hierarchy of controls it doesn't mean
10  that -- elimination is the best, but these other areas,
11  substitution, engineering controls, and PPE, all of those have
12  to work together to prevent injury; don't they?
13      A. No, sir. That's not how the hierarchy works. It's a
14  top-down system. If you can't eliminate the problem, then you
15  move down the ladder, till you get to -- PPE is the -- the last
16  option that you have. And if we're saying that this foreman
17  was okay with this ice, he walked on it, even though I guess
18  there's distribution -- you guys are disputing between
19  yourselves, we're trying to assume that this was the only spot
20  on location that had ice, and that's not true. We looked at
21  your picture a couple of times, and we see standing water that
22  I have no doubt was frozen above the cribbing and next to the
23  other components and off to the side, and it looks like the
24  spoil pile is only about a truck and a half to two trucks away
25  from the -- the tops of these pieces of equipment. So it's



Joseph Barnes

October 13, 2022
Pages 82 to 85

Page 82

1  hard to come back and say that -- that the hierarchy was all of
2  these things when elimination was appropriate.
3      Q.   So the way it works in your -- your opinion is that
4  since elimination was possible by not creating the condition in
5  the first place; right?
6      A.   That's -- that's one option.  It was also possible by
7  remediating the condition to elimination.  Eradication to
8  elimination was possible as well as doing it right the first
9  time.
10     Q.   So because it could have either been eliminated or
11 remediated, there was no need to even consider PPE; is that
12 right?
13           MR. TERRY:  Argumentative.
14     A.   I don't know that there's -- forgive me.  I don't
15 know that there's any PPE that would have protected this type
16 of fall.  In fact, if I remember correctly the testimony of
17 Mr. Georgeff, he stopped walking when he was realizing he was
18 slipping, and when he turned to take a step, one foot stayed
19 planted.  So if he had been wearing cleats, that might have
20 made the injury even worse.  And that's just me speaking as a
21 paramedic.  I -- I'm not speaking as a safety person.
22     Q.   (By Mr. Sullivan) But is your opinion that PPE
23 wasn't necessary because, in your view, there should have been
24 elimination?
25     A.   Yeah.  If they -- if they didn't have the issue to

Page 83

1  start with, they would've never have even been considering a
2  sag, full of ice and full of water, or any -- you know, any
3  discussion about ice cleats.
4      Q.   You agree with me that Borneke had no control over
5  the work Mortenson did?
6      A.   I -- I think Mortenson was erecting the tower, and
7  Borneke had nothing to do with that, if that's what you're
8  asking.
9      Q.   Do you recall seeing any evidence that Mortenson had
10 asked Borneke to address this specific ice?
11           MR. TERRY:  Same objection.
12     A.   The specific one spot of ice or the total --
13     Q.   (By Mr. Sullivan) The one spot where the injury
14 occurred.
15     A.   Okay.  No.  No.  I don't.  I -- I think if they had,
16 they'd have probably talked to them about the other areas as
17 well.
18     Q.   So do you disagree with the conclusion in the
19 Mortenson Construction incident analysis that says the
20 Mortenson foreman should have coned off the area that he
21 identifies as a hazard?
22           MR. TERRY:  Same objection.
23     A.   That's a rearview mirror view, and, yes, I disagree
24 with that.
25     Q.   (By Mr. Sullivan) Because of what, just so I'm

Page 84

1  clear?
2      A.   He -- I'm sorry.  He had a specialist that should've
3  been there to take care of the job, and he had already been
4  there.  So if I understand correctly, when Mr. Georgeff fell,
5  not only did he fall, he was there for some time before he was
6  actually rescued off that ice.  So cordoning off the area would
7  have probably involved cordoning off the entire section, which,
8  again, would've required Borneke to get it right because they
9  didn't do it right the first time.
10     Q.   And in your view, it was possible to excavate this
11 with drainage such that water never would've pooled in this
12 area where he fell; is that right?
13     A.   Well, I -- I never use the word never, but, yeah,
14 they could've adequately provide the right kind of swale across
15 the sides and well-positioned their spoil piles as well as got
16 their grade and compaction right.
17     Q.   Did you see anything specifically in the contract
18 that they breached in your opinion?  Are you offering any
19 opinions about breach of contract, first of all?
20     A.   The contract is outside of my scope, sir.
21     Q.   So you're not offering opinions about breach of
22 contract; correct?
23     A.   No.  I'm -- I'm not an attorney.
24     Q.   And so on -- as a result of this incident, you
25 believe Borneke should've been cited by OSHA?

Page 85

1      A.   I believe that they're open to citation by OSHA, yes.
2      Q.   And specifically what section should they be cited
3  with?
4      A.   Failure of the excavation contractor, so they would
5  have been cited under subpart P.
6      Q.   And explain that please.  Subpart P of what, just so
7  I have it?  And point that --
8      A.   19 -- 29 CFR 1926 subpart P, the excavation standard.
9           MR. TERRY:  And I'm sorry.  Just to be clear, I
10 think, Chris, you said B.  Joe, you said be P.
11           THE WITNESS:  P as in Paul.
12           MR. TERRY:  P as in Paul, okay.
13     Q.   (By Mr. Sullivan) Is that on page 8 of your report?
14     A.   I don't believe so.
15     Q.   Where do you see that in your report, that specific
16 section?
17     A.   Well, the actual standard for -- for excavation is
18 subpart P.
19     Q.   Did you --
20     A.   If you want to go just off the report, 1926.651(h)(3)
21 is on page 8.
22     Q.   Uh-huh.
23     A.   And it deals with the appropriate drainage.  If
24 excavation work interrupts the natural drainage of surface
25 water, diversion ditches, dikes, or other suitable means shall



Joseph Barnes

October 13, 2022
Pages 86 to 89

Page 86

1 be used to prevent water -- surface water from entering the
2 excavation and to provide adequate drainage of the area
3 adjacent to the excavations. So we know at the top of that
4 section there's standing water, and there's no way for it to
5 escape past the spoil pile, so they would've been cited for
6 improper excavation.
7    Q.   This is 1926.651(h)(3) that you just read?
8    A.   Correct.
9    Q.   And how would -- what does -- what does subpart P
10 say, or is this part of subpart P?
11   A.   That is part of subpart P, Sir.
12   Q.   And what is the citation for subpart P? Is it --
13   A.   They would have used the drainage. They would have
14 used 65 -- and you're reading me speak for OSHA at this point.
15 Among other things, they would've cited 651(h)(3) because the
16 drainage was to the front of a spoil pile right back into the
17 section of the excavation. In fact, if I could read from --
18 from subpart P, that if there was a --
19   Q.   Where are you reading from?
20   A.   I -- I'm reading from 1926 subpart P excavations that
21 I'm reading from.
22   Q.   Is that in your report?
23   A.   No. This is the whole standard for -- for
24 excavations.
25   Q.   Okay. And what exactly --

Page 87

1    A.   Subpart P.
2    Q.   What's -- is this part of the CFR?
3    A.   Yes. Yes. Definitely.
4    Q.   And what is the full cite?
5    A.   1926, subpart P, subpart title: Excavations.
6    Q.   Why didn't you put that in your report?
7         MR. TERRY: Argumentative. Mischaracterizes the
8 report. He put the general quote so to speak, and then not the
9 subchapter.
10   Q.   (By Mr. Sullivan) Go ahead, sir.
11   A.   Yes. So under C, requirements, there's two parts,
12 number 4 and number 5. Number 4, in a layered system that's
13 where you have different stratas of dirt and then that kind of
14 thing. The system --
15        MR. TERRY: Hold on. Hold on, Joe. Joe, his
16 question was why wasn't this specific thing cited in your
17 report.
18   A.   Oh, I'm sorry. As you said, this is more of a book,
19 and what's in the report is more just the section, the one
20 standard that would -- that would be appropriate for this
21 citation.
22   Q.   (By Mr. Sullivan) And, of course, you know Borneke
23 was never cited by OSHA; correct?
24   A.   Yes, sir.
25        MR. TERRY: Relevance. Inadmissible.

Page 88

1    A.   I -- I haven't seen any documentation that they
2 actually made a formal report to OSHA either.
3    Q.   (By Mr. Sullivan) And you don't know if Mortenson
4 made a report to OSHA either; do you?
5         MR. TERRY: Asked and answered. Relevance.
6    A.   I -- I don't recall.
7    Q.   (By Mr. Sullivan) And what is it you contend that
8 Borneke should've done to mitigate if it was called back once
9 the ice was observed?
10        MR. TERRY: Incomplete hypothetical. You can
11 answer.
12   A.   They should have had a strategy meeting after the
13 area was controlled.
14   Q.   (By Mr. Sullivan) Controlled meaning work stopped
15 and coned off.
16   A.   However -- however, they determined was the best way
17 to control the area. I don't think it was specific to just the
18 fall. I think they had more than just that to be concerned
19 with, that one area of the fall. We can see in your picture
20 that above the fall in the spoil pile there was all -- all
21 other kinds of symptoms of a bad underlay.
22   Q.   So in your view, there should have been more injuries
23 because the -- the whole area was unsafe; is that right?
24        MR. TERRY: Objection; argumentative.
25 Mischaracterizes his report and testimony.

Page 89

1    A.   There would be no way for me to answer that.
2    Q.   (By Mr. Sullivan) You agree with me that Georgeff
3 has a duty to watch out for ice and watch where he's going to
4 make sure he doesn't slip; right?
5    A.   Are you asking me if I believe this gentleman should
6 have walked safely across the yard?
7    Q.   No. I -- I'm asking the question I asked.
8    A.   I'm sorry. I don't understand your question.
9         MR. SULLIVAN: Could you read it back? I don't
10 remember the exact wording. Could you please read it back?
11        (Requested portion of the record read back.)
12        THE REPORTER: Did you -- did you guys hear me?
13        MR. SULLIVAN: Yes.
14        MR. TERRY: We did, yeah. Thank you.
15   A.   I would -- I would agree that he has an -- an
16 obligation -- I don't know if I would call it a duty. I think
17 he has a -- a duty to himself to -- to walk safely.
18   Q.   (By Mr. Sullivan) Okay. But just so we're clear,
19 you place 100 percent of the blame on Borneke for the injury in
20 this case, and 0 percent on any other party; is that true?
21   A.   I believe that if they had done it right the first
22 time, we wouldn't be here for the injury at all.
23   Q.   So what does that mean in relation to my question?
24 100 percent of the blame on Borneke; right?
25   A.   Yes. And I don't fault Mr. Georgeff for walking



Joseph Barnes

October 13, 2022
Pages 90 to 93

Page 90

1 across the yard and falling. I fault the specialist who had
2 the ability to build it right the first time and to catch any
3 issues as symptoms and make corrections before somebody fell.
4    Q. And you don't believe Mortenson has any
5 responsibility whatsoever?
6    A. Mortenson wasn't the specialist hired to design --
7 put this together. It was Borneke.
8    Q. A -- an exposing employer cannot just rely on the
9 employer that's allegedly created the hazard and continue to
10 expose its own employees to the hazard; can it?
11       MR. TERRY: Form. Same objections.
12 Argumentative.
13    A. Were that true any employee in the history of OSHA
14 that ever got electrocuted because they -- they believed that
15 the piece of equipment they were getting ready to touch was
16 safe would have been their own fault.
17    Q. (By Mr. Sullivan) Well, but Mortenson was the
18 exposing employer in this situation; right?
19       MR. TERRY: Same objections.
20    A. Any employer -- I'm sorry. Any employer when there's
21 a hazardous condition will be called the exposing employer.
22 That doesn't mean that they're at fault. That means that their
23 employees were there.
24    Q. (By Mr. Sullivan) And any exposing employer has a
25 duty to eliminate the hazard; right?

Page 91

1       MR. TERRY: Same objection.
2    A. If they recognize -- I'm sorry. I'm sorry, Charles.
3 If they recognize it as a true hazard and -- and not a
4 condition that they trusted that was safe, then I would agree
5 that the exposing employer could say something.
6    Q. (By Mr. Sullivan) And not just say something, but
7 eliminate the hazard; right?
8       MR. TERRY: Same objection.
9    A. No. You -- you're mischaracterizing the four jobs.
10 That would be the correct employer that would eliminate the
11 hazard.
12    Q. (By Mr. Sullivan) Would you agree that if the
13 exposing employer has authority to correct the hazard it must
14 do so?
15       MR. TERRY: Same objection.
16    A. I would agree if they have the special --
17 specialization and skill that they could recognize it to -- as
18 the same degree as the specialist who was hired to -- to put it
19 together, then yes. But I don't agree that the average worker
20 and even the foreman out there on that location has the special
21 skills that Mr. Borneke has.
22    Q. (By Mr. Sullivan) But they would have enough to
23 recognize that ice should be eliminated before they keep
24 working, though; don't thing?
25       MR. TERRY: Same objection.

Page 92

1    A. Well, you're asking me -- I'm sorry. You're asking
2 me to speculate what these guys were thinking, and I can't do
3 that.
4    Q. (By Mr. Sullivan) Well, but you're the expert on
5 safety, though, and so if the foreman sees ice and recognizes
6 that ice is a hazard, he should eliminate it before work
7 continues?
8       MR. TERRY: Asked and answered multiple times.
9    A. Then again, we're putting two different times of day
10 together with two different situations. I believe Mr. Georgeff
11 was there as it -- the light -- before the light was coming up
12 with a dusting of snow. So his vantage point of the ice
13 would've been different than the foreman who is working during
14 the day with crews and solid ice.
15    Q. (By Mr. Sullivan) You agree with me that Borneke did
16 not have the authority to move any pieces around to correct any
17 conditions underneath them; right?
18    A. I would agree that they could not move the sections.
19 I mean, not that I'm aware of.
20    Q. And would you consider Mortenson to be an entity that
21 created the condition by placing the components on the ground?
22       MR. TERRY: Same objections.
23    A. Oh, absolutely not. They -- they didn't build the
24 site. They didn't prep the site to hold the weight. They told
25 the excavation expert, the specialist in excavation, this is

Page 93

1 what we're doing. Prepare the site so it's going to hold this.
2 So to say that they were the creating employer implies that
3 they built the location, and they didn't. They put the
4 components on it after it was built in my understanding.
5    Q. You wrote in your report that based on my research
6 and experience, the weather conditions for the area at the time
7 of the work were mild. Where -- where do you derive that from?
8    A. Yes, sir. You asked me that a little earlier. We
9 did -- or I did research to see what the rain was like in that
10 area, and it wasn't anything like a deluge had happened. It
11 wasn't a typhoon coming through there. It was -- it was more
12 or less what was expected for the time of year that they were
13 doing this project.
14    Q. What do you mean by mild, though? I mean, I'd
15 consider mild to be warm such that ice wouldn't form. What do
16 you mean by mild?
17    A. I'm sorry.
18       MR. TERRY: Asked and answered. Asked and
19 answered.
20    A. By -- I mean by -- by mild is there was no excessive
21 rainfall to the degree that the area would have been so
22 situated that they couldn't do their work. The expert in
23 excavation would definitely take into consideration when
24 they're putting their project together if there is going to be
25 excessive amounts of water or rain that they make corrections



Joseph Barnes

October 13, 2022
Pages 94 to 97

Page 94

1 towards the area so that they don't have these issues.
2    Q.    (By Mr. Sullivan) You've not inspected the soil
3 obviously at the area; correct?
4    A.    No, sir.  That wouldn't be possible.
5    Q.    When's the last time you were in Illinois?
6    A.    This is -- this is what?  This is October?
7         MR. TERRY:  Objection.
8    A.    I'm sorry.  I was there in September.
9    Q.    (By Mr. Sullivan) What were you here for in
10 September?
11    A.    I was the guest speaker at a risk management
12 conference for Zurich North American.
13    Q.    Is that in Schaumburg at Zurich headquarters?
14    A.    Yes, sir.
15    Q.    Have you ever been employed by Zurich?
16    A.    No, sir.
17         MR. TERRY:  Chris, I think that's a better
18 question for you.  Bad joke.
19         MR. SULLIVAN:  That was a bad joke.  I'm going
20 to pretend I didn't hear it.
21    Q.    (By Mr. Sullivan) You write that Don Borneke's
22 conduct was inexcusable; right?
23    A.    What page are you on, sir?
24    Q.    Page 12.
25    A.    I wrote what?

Page 95

1    Q.    You write, the claim of Don Borneke Construction that
2 a bulldozer would not fit close enough to the section was an
3 excuse.  An excuse thus inexcusable.  What do you mean by that?
4    A.    I'm still trying find you, sir.  Where -- exactly
5 where are you?  Page 12, what part?
6    Q.    The bottom, the end of the paragraph, it should be
7 noted --
8    A.    What page?
9         MR. TERRY:  Five -- five or six lines up from
10 the bottom of page 12.
11    A.    Okay.  Oh, it should be noted that -- oh, no.  That's
12 his website.
13         MR. TERRY:  No, Joe, you were in the right spot.
14 The bottom of that paragraph, the sentence starts the claim of
15 DBC.
16    A.    Oh, the claim of DBC was an excuse.  An excuse thus
17 inexcusable in that DBC is an excavation contractor with access
18 to smaller skid steers and the like readily available, no
19 doubt, on the very location.  I think it answers the question
20 in the last part of the sentence in that they had smaller
21 pieces of equipment that they could've used to make the area
22 more safe in the space that they had, a situation that they
23 created.
24    Q.    (By Mr. Sullivan) Was there anything inexcusable
25 about their conduct?  Is that -- that's what I'm wondering.  Is

Page 96

1 that what you mean by that?
2    A.    So you had the head of the company looking at his own
3 excavation, undoubtedly, in my mind, saw that there were
4 situations that were improper, had smaller equipment because
5 nobody was supposed to get the big equipment next to those
6 heave, expensive components.  But no one said anything about
7 the smaller skid steer style pieces of equipment that could
8 have, if nothing else, put a load of -- of gravel or something
9 right there to -- to try to mitigate that hole that was forming
10 until they could get that piece moved and -- and redo that
11 whole site down to the -- to the proper soil.
12    Q.    Well, you saw in the report created by Mortenson that
13 the area was too close to the pieces; right?
14    A.    For the large pieces of equipment to get to I believe
15 it said.
16    Q.    And so it's not an excuse that Borneke created?
17    A.    No.  He's the specialties.  He's the one that
18 should've recommend -- made that recommendation.  I know we
19 can't take the bulldozer up there, but I've got a skid steer
20 and a dump truck full of dirt.  I can saturate that, you know,
21 area with good dirt or soil and then compact it down to remove
22 the water from the pore spaces.  He had that option available
23 to him with a small piece of equipment, and he had the
24 equipment, and he had the skill, yet it wasn't done.  So that's
25 an excuse that's inexcusable for his specialty.

Page 97

1    Q.    And so if Borneke says when we reviewed the site, it
2 looked fine, it's your testimony that they must've seen
3 situations that were improper, and if they say it was not then
4 they were incompetent or -- or what?
5    A.    They would be inept or dishonest, yes.
6    Q.    Have you ever heard of Borneke before this case?
7    A.    No, sir.  I'm -- I'm not up north.
8    Q.    Every employer has a duty of safety to its own
9 employees; right?
10    A.    You're -- you're referring to USC 654.581, the
11 general duty clause?
12         MR. TERRY:  Form.
13    Q.    (By Mr. Sullivan) Correct.
14    A.    And when you tie that to CPL 02-124, and OSHA
15 identifies what employers are what identification, then that
16 crosses the lines of who is called employee and who they have
17 to protect.
18    Q.    So in your scenario then, Georgeff was Borneke's
19 employee?
20    A.    No, but they were required to protect him with their
21 own work.
22    Q.    And just so I'm clear about notice, if Borneke
23 testifies they didn't have notice of this condition, you say
24 that's impossible?
25    A.    No.  I say in my mind I don't see how that's possible


MAGNA
LEGAL SERVICES

Joseph Barnes

October 13, 2022
Pages 98 to 101

Page 98

1  with the expertise of Mr. Borneke.
2      Q.  What courses do you teach at Texas A&M specifically?
3      A.  They're on the -- the resume.  I teach OSHA 500 and
4  501 that we talked about earlier to become an OSHA outreach
5  instructor for construction.  I teach the recertification class
6  for those who have been teaching OSHA themselves.  I teach the
7  general industry train the trainer courses, accident
8  investigation, machine guarding, permit required, confined
9  space, fall protection, H2S development, and then I teach
10  excavation -- is that on there?  I teach excavation, safety
11  management systems, accident investigation, OSHA recordkeeping.
12      Q.  Okay.  What is the excavation that you teach in your
13  course?
14      A.  I teach the course for excavation.  How to look at
15  the soil samples.  How to look at the site and see if it's
16  going to have problems that you can forecast, sagging,
17  fissures, pooling, pregnant sides, pregnant walls, bubbling up
18  and seeping, all the -- all the things that are symptoms of
19  a -- of an excavation that could be a dangerous area or was
20  improperly prepared.
21      Q.  And what should Borneke have done to compact it so
22  that I could handle the changing weather conditions and the
23  weight of these turbines?
24      A.  So we know that compaction is merely moving whatever
25  is sitting in the poor spaces.  It would be that water.  It

Page 99

1  would be that air.  So if we know that there's water coming, or
2  we know we're having water, then compaction -- and -- and,
3  again, we're -- we're saying that -- that it was put together
4  appropriately to begin -- then we know that more water requires
5  more compaction, more regular being on the site to move the
6  water in the pore spaces to maintain the integrity of the
7  location, and he would know that as a specialist.
8      Q.  So you're critical of compaction and drainage and
9  where they put the waste pile?
10      A.  Well, they -- they -- improper placement of the spoil
11  pile.  Their compaction, unless they did their grubbing
12  appropriately, would've never -- they -- they could have -- they
13  could've driven it every day, and if they had not grubbed it
14  appropriately and got down below the vegetation levels of this
15  farmland, there's nothing they could have done.  It was
16  definitely going to fail, and it proved it failed because it
17  only lasted, you know, a short portion of the project and not
18  the entire project.
19      Q.  But you can't expect excavation to hold up throughout
20  changing weather conditions and different large equipment
21  driving on it; right?
22      A.  No.  I expect a specialist to anticipate what's going
23  to happen based on what he's going to use it for and what the
24  environment's going to be moving forward for the project.  I
25  have no doubt that Mr. Borneke is -- is very adept at building

Page 100

1  these -- these locations.  However, in this situation it looks
2  to me that they didn't put the grubbing correctly.  They didn't
3  anticipate the water.  And I don't see that the water was that
4  excessive for the area.  My research shows it was -- it was
5  kind of normal for the area.  So that points back to they
6  didn't get it right to start with.
7      Q.  What weather records did you look at specifically to
8  find that it was mild and normal for the area?
9      A.  I -- I think we may have talked about that.  I did
10  research.  I searched the area.  And, again, I forget the
11  website that I used, but I searched the area online to find out
12  what the weather was like for that timeline.
13      Q.  And so if a Borneke employee or any witness says
14  there was a deluge in the week beforehand, you would disagree
15  with that?
16      A.  So that -- I wouldn't challenge his integrity, but I
17  would say that if there was a proper grade and drainage, a
18  deluge in itself, unless it was massive, would've drained off
19  appropriately.  But with the spoil pile right there at the head
20  of the -- of the system, it wasn't going anywhere.  It was
21  going to sit there and make a bowl.
22      Q.  Any other criticisms that you haven't already
23  mentioned?
24      A.  I don't believe so, sir.
25          MR. TERRY:  Other than what's in his report

Page 101

1  obviously too; right?
2      A.  That's correct.  Whatever the -- the opinions are in
3  the report.
4      Q.  (By Mr. Sullivan) And all your opinions are in the
5  report?
6      A.  Yes, sir.
7          MR. SULLIVAN:  All right.  Go ahead, Charlie.
8              EXAMINATION BY MR. TERRY
9          MR. TERRY:  All right.  Is it all right if we
10  keep going, Ms. Court Reporter?  All right.  Perfect.  I
11  shouldn't be long.
12      Q.  (By Mr. Terry) Joe, first and foremost, is
13  excavation one of the areas that's at the forefront of almost
14  everything you do in your career, both from an educational
15  standpoint but also a professional standpoint?
16      A.  Every company I've ever worked with, we did
17  excavation, and I teach it at the school.
18      Q.  Okay.  So when you were asked questions about whether
19  you had ever specifically worked for an excavation company, is
20  it fair to say that that is a misleading question because you
21  have worked for companies that specialize in excavation, but
22  not only excavation?
23      A.  That's correct.  I never did work for a company that
24  only did excavation.
25      Q.  But you have worked for companies that have



Joseph Barnes

October 13, 2022
Pages 102 to 105

Page 102

1 specialized in excavation among other things; right?
2   A.  That's correct.
3   Q.  And you yourself have worked in the excavation field
4 in the past; right?
5   A.  Yes.  I -- I've made many -- many a parking lot.
6   Q.  Okay.  And you are a -- a trained professional who,
7 in fact, teaches OSHA as well as other safety courses at Texas
8 A&M and lecture nationwide on construction safety and OSHA;
9 right?
10   A.  That's correct.  Next week I'll be in Nashville,
11 Tennessee doing the exact same thing.
12   Q.  Okay.  And although you've never worked on a wind
13 farm, have you, in fact, worked on private projects in which
14 you or your company had to perform tasks similar to that of
15 Borneke in this case?
16   A.  Yes.
17   Q.  Okay.  So not only have you taught on these topics,
18 you've, in fact, been down and dirty, so to speak, doing the
19 same tasks and know what's required of an excavating company
20 doing these tasks?
21   A.  Yes, sir.
22   Q.  All right.  I'm not going to go over all of your
23 opinions because the report is voluminous.  I think it pretty
24 much speaks for itself, but I just want to go over the
25 highlights pretty much that are on pages 2 and 3.  And No. 1 --

Page 103

1 well, first, correct me if I'm wrong.  Is it pretty much your
2 opinion in this case that both the work performed by DBC, Don
3 Borneke Construction, I use DBC, precipitated the dangerous
4 conditions that caused this incident?
5   A.  That's true.  Had it been done right the first time,
6 we wouldn't be here.
7   Q.  Okay.  And this can further be broken down into how
8 the work should have been performed to begin with, and how it
9 should have been remedied had they seen these conditions;
10 right?
11   A.  That's correct.
12   Q.  Okay.  So, first, on No. 1 you talk about DBC's
13 expertise, how this was foreseeable, and then at the end of the
14 paragraph you state, the deteriorating condition of the pad
15 site that sunk and allowed water to accumulate in it and ice to
16 form was an expectation that could have been controlled and
17 prevented at the initial construction.  That's one of your
18 opinions in this case; right?
19   A.  That's correct.  That goes back to -- to the
20 grubbing.  If they get -- get down to the appropriate level and
21 get rid of all this old Class C soil and got to something
22 strong and hard then we wouldn't be here.
23   Q.  Okay.  So to break it down just in layman's terms
24 essentially, what you're saying is instead of just stripping
25 down the topsoil and compacting, as a trained excavation

Page 104

1 company, Borneke should've really looked at where the soil was
2 starting to become sufficient for what they needed to do, get
3 down to that level, and then start compacting?
4   A.  That's correct.  This isn't a typical piece of land
5 we're just stripping off.  This is farmland that's been churned
6 and churned and churned who knows how many times.  It would've
7 been a deeper excavation.
8   Q.  All right.  And could this have been done --
9 hypothetically, there's the argument by Borneke that they
10 couldn't have done this because they had to allow the land to
11 be able to be reclaimed by the farm.  Could this have been done
12 in such way that after their work was performed, the soil could
13 have been returned and farming could've resumed?
14   A.  That's very common.  Take the topsoil off, and
15 whatever you need, move it away, and bring it back when it's
16 done.
17   Q.  Okay.  And so is this why you believe that this was a
18 foreseeable condition that could have been prevented at the
19 initial construction had they actually not just compacted the
20 ground, but dug up what they needed to, and then compacted?
21 This, in and of itself, shouldn't have happened?
22   A.  That's correct.
23   Q.  All right.  And then second, you discussed the site
24 tuneups and inspections, and this would be the second main
25 point of your opinions I believe; right?

Page 105

1   A.  Yes.
2   Q.  Okay.  And when you discuss the inspections and the
3 tuneups, is this something that you were referring to solely at
4 the time when the ice was exposed, you know, about 30 minutes
5 before this accident, or is this something that you believe
6 should have been being performed on a frequent basis by the
7 quality control manager, Nick Borneke?
8   A.  Well, I would call him the competent person, but,
9 yes, when you do tuneups it's like going to the doctor, and
10 getting your blood pressure checked, and find out, oh, my blood
11 pressure's high; now, I need medication.  These are symptoms
12 that the expert should have caught, and they could have, you
13 know, made the remediations before there was a problem.
14   Q.  Okay.  So you were asked questions about whether
15 Borneke actually knew about this ice, whether they were called
16 back to the site to address the ice.  In your opinion is that
17 irrelevant because the site, in and of itself, when you look at
18 the photographs were giving indications that the ground was
19 sinking under the weight of the equipment?
20   A.  Yeah.  There were symptoms that it was sinking under
21 the weight of the equipment and just sinking in general.
22   Q.  Okay.  So whether or not they saw the ice, they had
23 all of the evidence there, as a qualified excavator, to know
24 that the ground was failing underneath this and causing a
25 depressed area?



Joseph Barnes

October 13, 2022
Pages 106 to 109

Page 106

1    A.  I can't imagine that they didn't recognize it, no.
2  Not as a -- not as a trained specialty group like that, no.
3    Q.  Okay.  And is it a well-known hazard by excavators
4  that when depressed areas form on job sites water can pool and
5  potentially freeze underneath them?
6    A.  That's correct.
7    Q.  All right.  So is this also why you believe, going
8  back to your first point, this was a foreseeable and
9  preventable condition?
10   A.  That's right.
11   Q.  Okay.  And even if they do not have notice of the
12  ice, in your opinion being a trained excavator on the site
13  every day, they should've at least seen that the conditions
14  were failing underneath the equipment; correct?
15       MR. SULLIVAN:  Objection.
16   A.  Yes.  I'm sorry.  I apologize.  Yes.  Yes, I agree.
17   Q.  (By Mr. Terry)  Okay.  And you, in fact, in your
18  review of the testimony saw that Nick Borneke was, in fact, as
19  the competent person and the quality control manager, doing
20  these routine inspections on the -- this specific site and the
21  jobs site as a whole; is that fair?
22   A.  That's my understanding.  He was going out there
23  to -- too look at the site, and I just can't imagine him not
24  seeing these symptoms.
25   Q.  Okay.  And in your field, you've seen jobs where

Page 107

1  excavators have remained on site for the duration of the
2  project and jobs where excavators leave the day the work is
3  done; right?
4    A.  That's correct.
5    Q.  On this job, Borneke remained on site throughout the
6  duration of the project and at least through the duration of
7  this incident; is that fair?
8    A.  Yes.
9    Q.  Okay.  And as a trained excavation professional,
10  would you expect they would have, in fact -- take the testimony
11  out of it.  Just from your expertise, would you expect the
12  excavation company on site responsible for maintenance to be
13  doing routine inspections looking for these signs and symptoms?
14   A.  Absolutely.
15   Q.  All right.  And by not recognizing them, would they
16  deviate from the proper standard of care for an excavation
17  subcontractor in their field?
18       MR. SULLIVAN:  Objection; calls for a legal
19  conclusion, and object to the foundation grounds.
20   A.  Can you repeat your question, sir?
21   Q.  (By Mr. Terry)  Sure.  Subject to Chris's objections,
22  would you agree that a trained excavation contractor who is
23  performing these inspections but fails to realize the signs and
24  symptoms of a failing excavation would be deviating from what a
25  properly trained and safe excavating company would do on a

Page 108

1  normal job site?
2    A.  Yes.
3    Q.  All right.  And then going on to your third opinion,
4  I think this is your overall opinion in which you discuss the
5  175-foot radius, and how this is important to you because this
6  was contractually referred to as the erection area where the
7  work was being performed; right?
8    A.  Yes.
9    Q.  All right.  And then you say that the sagging area
10  filled with water and later froze does not correlate with known
11  construction requirement of the design.  Can you please -- and
12  -- and, again, taking notice completely out of the equation,
13  can you just elaborate what you mean by this in terms of the
14  design and construction of the work?
15   A.  Sure.  These -- these are the areas that they were --
16  the expectation of the most heavy work with the most vibration
17  and traffic.  So with that knowledge they should have been
18  built so that they would not fail for the entire duration of
19  the project and then some.
20   Q.  Okay.  And have you worked on projects in which
21  excavation had to be performed where top levels of soil had to
22  be removed, such that what you're talking about today, you get
23  down to a level where it is sufficient to compact, it's
24  compacted, weather conditions change such as heavy rain, and
25  heavy equipment comes in, but the ground still holds up?

Page 109

1    A.  I don't think I understood your question.  Can you
2  rephrase it one more time?  It was pretty long.
3    Q.  What I'm trying to just get like if you've worked
4  on -- I think you've already talked about this, but you've
5  worked on jobs in which -- and you've, in fact, participated in
6  jobs in which your company that you were working for had to
7  perform very similar tasks to that of Borneke in this case;
8  right?
9    A.  Correct.
10   Q.  Okay.  And had they done their job such that they
11  stripped away the topsoil, they got down to a level where they
12  believed the soil was good enough to compact, even if there was
13  a large amount of rain, would you expect -- or, you know,
14  changing weather conditions, would you expect that because they
15  prepared the ground properly, the conditions would be able to
16  support the weight of not only the trucks delivering the
17  equipment but also the equipment being staged on the site?
18   A.  Yes.  That's why we hire the specialist.
19   Q.  And is this how you've seen it happen in your
20  experience?
21   A.  That's correct.  Yes.
22   Q.  And have you been on jobs involving this type of work
23  in both good and poor weather conditions?
24   A.  Yes.
25   Q.  And in both those conditions, both good and poor



Joseph Barnes

October 13, 2022
Pages 110 to 113

Page 110

1 weather, has the ground held up because the work was performed
2 properly?
3    A.  Yes.
4    Q.  All right.  And then you continue in this same area
5 that it says, there is no reason short of failed processes by
6 DBC as to why the area should not have maintained its integrity
7 during construction activity.  And, again, in your opinion, is
8 the failing of the ground condition combined with the pooling
9 and freezing of water, something that should never have
10 occurred if a qualified contractor properly prepares the
11 ground?
12    A.  Yeah.  If he -- if they'd have grubbed down far
13 enough to get the right soil and started working their way back
14 up, we wouldn't have this issue.
15    Q.  Okay.  And even hypothetically speaking, if the
16 compaction fails or the grade fails, would you expect that the
17 other requirements, such as the drainage, hold up such that
18 even if there is a depressed area, the 5 percent grade will
19 allow the water to pool away as opposed to in the work area?
20    A.  Yeah.  That's a secondary safety -- you know, to
21 control the integrity of the site to keep the water off of it
22 because, you know, water is the enemy of excavation just like
23 vibration is.  So, you know, we control the vibration by
24 getting down to solid soil and building back up.  We control
25 the water through proper drainage.

Page 111

1    Q.  Was there anything that you saw in the record that
2 suggests -- because your next point goes on to that Borneke had
3 the foreknowledge of the activities of the nature expected, and
4 this would allow for forecastable planning.  And that nothing
5 short of disaster and full site deluge should there be this
6 condition.  So my question for you is, is there anything in the
7 record or your investigation that shows you that there was this
8 full-fledged disaster or deluge or hurricane or anything that
9 should have led to this condition on this job site but for poor
10 planning?
11    A.  No.  I haven't -- I haven't seen any flooding or
12 deluge of rain or anything like that.
13    Q.  And even taking your separate investigation out of
14 it, did you see anything in the testimony of any of the workers
15 that there was a monsoon the night before this?
16    A.  Not that I recall, no.
17    Q.  Okay.  And even if, hypothetically, Mortenson was
18 hosing off their equipment on the construction site, is this a
19 well-known task on a construction site that certain pieces of
20 equipment are going to be cleaned off before they're installed?
21    A.  Absolutely, and that wouldn't be anywhere near enough
22 water to cause an issue.
23    Q.  So even -- so even if they were doing this, would you
24 agree that the conditions, if prepared properly by Borneke,
25 should not have given way, and the drainage should have been

Page 112

1 adequate to get rid of the water?
2        MR. SULLIVAN:  Objection; foundation.  Calls for
3 speculation.
4    A.  The drain -- sorry, sir.  The drainage should have
5 handled the water.
6    Q.  (By Mr. Terry) All right.  And then real -- well,
7 hold on.  I'm trying not to touch on things that we've already
8 touched on, so just bear with me a second.
9        I want to direct your attention to the
10 photograph that Mr. Sullivan has been showing you.  It's on
11 page 17 of your report.  Based on your review of this
12 photograph and being a expert in excavation and construction
13 safety, do you believe that by looking at -- well, first of
14 all, can you tell by looking at this photograph whether or not
15 the ground was, in fact, stripped down to the proper level and
16 then compacted?
17    A.  No.
18    Q.  Is it -- I -- I think I asked that poorly.  Is your
19 answer -- and it's a two-part question.  One, can you, in fact,
20 tell if that was done in this photograph?
21    A.  I wouldn't think so, no.  You've got too many sagging
22 areas, and you've got saturated Class C soil right at the edge.
23    Q.  Okay.  So your opinion is that based on looking at
24 this photograph you can tell that the topsoil was not properly
25 stripped away, down to a level that was sufficient to be

Page 113

1 compacted, and based on that, that's how you're coming to the
2 opinion -- well, that's a poor question.  Let me just ask this.
3        By looking at this photograph, how can you tell
4 that the ground was not properly stripped away and compacted
5 such that it would be able to support the activities that were
6 going to be performed on this project and the weather
7 conditions expected for the Midwest?
8    A.  There's sagging and pooling in -- in more than one
9 area on this picture.
10    Q.  Okay.  And would that typically happen if the ground
11 is stripped away down to a adequate sublevel and then
12 compacted?
13    A.  No.  If you get down to the right cohesive soil and
14 build back up, you shouldn't have these issues.
15    Q.  And then going back to the pages 2 and 3, No. 4, you
16 talk about expertise.  Why is Borneke's expertise in this field
17 something that is of such importance to you in terms of the
18 excavation work?
19    A.  They're trained on what to look for.  They're trained
20 to identify symptoms.  They're also trained to know how to get
21 down to the proper soil and then work their way back up.
22 That's what they were hired to do.
23    Q.  Okay.  And then No. 5, you talk about the interplay
24 between the plans and DBC's work.  Can you please elaborate on
25 this, and like what you mean here?  What I mean is, is it your



Joseph Barnes

October 13, 2022
Pages 114 to 117

Page 114

1 opinion that the plans were wrong, or is it your opinion that
2 DBC just didn't do their job properly and kind of did a surface
3 level excavation?
4    A.   Well, I -- I don't agree that the plans were wrong.
5 I think they probably more likely than not just did a surface
6 excavation and didn't get down as deep as they needed to to a
7 cohesive level.
8    Q.   And I think your last sentence of this opinion clears
9 up what you mean.  You said that DBC was the professional who
10 was an expert on building wind farms, but more important, DBC
11 bore the responsibility to construct ground conditions at the
12 location capable of sustaining the expected activities in
13 conjunction with known environmental challenges; right?
14    A.   Correct.  They -- they weren't hidden from the fact
15 of what was going to be done there, and they had the
16 opportunity to know the weather conditions they were going to
17 be facing.
18    Q.   Okay.  So basically plans are important, but DBC is
19 the expert in this field, and as conditions change or as
20 different things rise, DBC needs to properly work based on the
21 various problems that arise?
22    A.   Yes.  As -- as things change, they -- they're
23 required to reclassify if they needed to.
24    Q.   Okay.  And then can you talk about the creating and
25 correcting employer?  You were asked a lot about this, and

Page 115

1 whether or not Mortenson would have been an exposing employer.
2 What do you mean just in 30 second elevator pitch language
3 about DBC being the creating and the correcting employer on
4 this location?
5    A.   So DBC created the excavation that led to the sagging
6 site, which created the problem that we had the accident and
7 the fall.  The correcting employer, they were the ones who
8 would've come back and dug it back down to the appropriate
9 level of cohesive soil and rebuilt it back.  They would be the
10 correcting employer again.
11    Q.   Okay.  And then No. 7, and, again, not only with your
12 research, but based on the testimony that you saw that
13 corroborated this, why is this important?
14    A.   This is -- discusses the weather conditions.  I
15 didn't find anything in just a -- a general search for Lee
16 County that showed that there was a massive amount of -- of
17 rain over the night before or the week before such that the
18 conditions would have deteriorated to where they couldn't use
19 the site.
20    Q.   Okay.  Just a few more questions.  On page 11 of your
21 report you give this chart that says hierarchy of controls, and
22 I just want to make sure we're talking about the same thing.
23 Elimination, when I think of elimination I think of something
24 that's already happened and you fix it.  Are you using
25 elimination to mean that the hazard can be eliminated even

Page 116

1 before it rises?
2    A.   Absolutely.  If -- if I had a pitbull inside of a
3 fenced yard and told you to go in there and paint a house, you
4 could either wear a dog body suit, and you'd still get hurt, or
5 you could just remove the pitbull.  That's our situation here.
6 They could have just removed the hazard.  Elimination was a
7 proper control, and it wasn't done.
8    Q.   All right.  And then continuing on to page 12, you
9 say that drainage, trenching, erosion control, and grade was
10 available.  It seems like this is to eliminate the hazard
11 before if it even becomes one, so to speak; right?
12    A.   That's correct.
13    Q.   All right.  And is that what you mean by elimination?
14 They could have used any of these methods that a proper and
15 safe excavation company would have used, and then you eliminate
16 the hazard before it even arises?
17    A.   They'd have used all those methods.
18    Q.   All right.  And then can you further elaborate on how
19 an excavating contractor, knowing what's coming in terms of
20 equipment, vehicles, materials, work to be performed, should be
21 able to foresee what is coming and use this to their benefit in
22 terms of preparing the ground?
23    A.   Yeah.  So -- so they knew the region.  They knew
24 what -- the pieces of equipment that were going to be brought
25 in.  They no doubt understood the weight.  That's why they were

Page 117

1 brought in as a specialist.  And if there's any foreseeable
2 issues, they had two options.  Say nothing about it and just
3 compact ground with a -- with a little bit of topsoil moved, or
4 go to the client that hired them and say maybe we should
5 consider another strategy.
6    Q.   And then just to wrap up a little bit too -- well,
7 before we get there, in terms of the contractor knowing what
8 was coming in that same question, would you expect that given
9 the conditions you saw in that photograph, had they did what
10 you suggested, stripped down the soil down to a good level, and
11 then compacted, then prepared, then provide the adequate
12 5 percent grade and drainage, that this depressed area would
13 never have formed to begin with?
14    A.   No, it wouldn't.  I don't expect it to have formed at
15 all.
16    Q.   All right.  And then just to wrap up, I wanted to
17 direct your attention to your first sentence of your
18 conclusion, and I believe that's on page 21 where you say
19 Occam's razor would suggest there was nothing mystical about
20 the deteriorating site Borneke built.  It was merely improperly
21 prepared.  And I think we talked about this, but is this your
22 general opinion in this case, and if so, can you elaborate on
23 it?
24    A.   Yeah.  I -- I believe there's no fantastic sequence
25 of events that created this site to deteriorate overnight or --



Joseph Barnes

October 13, 2022
Pages 118 to 121

Page 118

1  or have issues that nobody could find or see.  There were
2  symptoms that were happening.  The site was deteriorating.  It
3  was deteriorating way before it was supposed to have issues.
4  And the simplest explanation is usually the best explanation,
5  and it's usually the truth.  This thing wasn't prepared right
6  to begin with.  Had it been, we wouldn't be here.
7      Q.  Okay.  And ultimately, is it your opinion that the
8  condition which caused Mr. Georgeff to slip and fall, all be it
9  the ice sheet, was preventable had Borneke performed its
10 excavation work to begin with on this project?
11     A.  Yeah.  No sagging site, no pooling water, no frozen
12 ice, no slip and fall.
13     Q.  And they could have done this with both proper
14 drainage, compaction, trenching, and whole bunch of other
15 things that we talked about; is that fair?
16     A.  That's fair.
17     Q.  Okay.  So take notice out of it.  Is this a condition
18 that they caused by their improper excavation work in your
19 opinion?
20     A.  Fair.
21     Q.  All right.  It is also your opinion that had the
22 ground simply became a little bit depressed, if there was that
23 adequate grade and drainage, the water wouldn't have pooled
24 even with the depressed area?
25     A.  Yeah.  That's the secondary control to get the water

Page 119

1  off of there.
2      Q.  Okay.  So is it further your opinion that not only
3  did Borneke not adequately perform its tasks in terms of
4  compaction and grade, but also in drainage and multiple other
5  aspects?
6      A.  Yeah.  I've -- I've not seen any pictures of any
7  swale cuts or anything where they could have either directed
8  the water off the site or controlled it in a better way.
9      Q.  Okay.  And then further, is it your opinion that had
10 Borneke been properly inspecting and maintaining its work, even
11 without seeing ice, they should have seen depressed areas and
12 improper conditions for work that was going to be performed on
13 this project?
14     A.  I -- I can't imagine not being able to see it as a
15 specialist.
16     Q.  Okay.  So when you were talking earlier about they
17 would've known about this, you didn't even mean ice.  You just
18 meant the dangerous conditions which could lead to ice, albeit
19 depressed areas under equipment?
20     A.  Yeah.  I think the secondary situation of the ice
21 is -- is just that.  It's secondary.  There was already
22 problems forming.
23     Q.  Okay.  I mean, this is something that as a trained
24 excavation expert, you would expect them to be able to
25 recognize the signs and symptoms and fix it before the ice is

Page 120

1  even exposed?
2      A.  Yeah.  An excavator is an expert in dirt work.  They
3  should be looking at the dirt.
4      Q.  Okay.  And overall, just about you a little bit, you
5  are a construction safety expert, and you have taught OSHA
6  classes on safety nationwide; right?
7      A.  That's correct.
8      Q.  All right.  And your work in the construction field,
9  and you've, in fact, worked on excavation projects?
10     A.  That's correct.
11     Q.  Okay.  And based on your experience, would you expect
12 ground conditions which were prepared properly by excavation
13 experts, such as DBC holds itself out to be, would you expect
14 that ground to depress under staged equipment such that there
15 are areas where water can pool and freeze?
16     A.  You -- you broke up the last bit of that.  Can you --
17 can you say that one more time?
18     Q.  Sure.  Based on your experience, would you expect
19 that ground conditions, which were prepared by an excavation
20 expert such as DBC, would you expect this ground condition to
21 become depressed under staged equipment such that there was an
22 area where water could pool and freeze?
23     A.  No.  That should have held up.
24     Q.  Okay.  And would you expect that drainage and grade
25 of an area where a qualified excavation contractor performed

Page 121

1  their work was sufficient to remediate any water that came,
2  whether it be from cleaning equipment or natural elements?
3      A.  Yeah.  The grade was appropriate.
4      Q.  Okay.  And have all your opinions today been given to
5  a reasonable degree of certainty in your field as both a
6  construction safety expert as well as an excavation expert?
7      A.  Correct.  Yes.
8      Q.  All right.  And based on all of that, do you have an
9  opinion as to whether this incident can occur but for Borneke
10 improperly doing its tasks?
11     A.  No.  Not without a -- a force of nature just
12 destroying the site from above, no.
13     Q.  All right.  Would you agree that just because OSHA
14 did not cite somebody does not mean they were not unsafe?
15     A.  Not at all.
16     Q.  All right.  Would you agree that there's plenty of
17 times there's a horrible accident where people were very
18 unsafe, and OSHA doesn't issue a citation?
19     A.  Yes.  There's very few OSHA inspectors.
20     Q.  All right.  Would you agree that just because this
21 was approved by Mortenson -- well, scratch that.
22         Is it common in the construction industry for
23 the general contractor to rely on the work of the
24 subcontractor?
25     A.  Absolutely.  They -- they hire them for that reason.



Joseph Barnes

October 13, 2022
Pages 122 to 125

Page 122

1    Q.   And when general contractors go in and, quote,
2  unquote, approve the work of a subcontractor, are the actually
3  going in with the same knowledge and expertise as the
4  subcontractor, or are they giving it a once over to say, yeah,
5  I assume you did your work properly because you're the
6  excavation expert?
7    A.   I would say in general, they're giving it the once
8  over because they're not specialist themselves.
9    Q.   And is that, based on your review of the testimony,
10 what you believe happened here?
11   A.   I do.
12        MR. TERRY:  Okay.  I believe those are all the
13 follow-ups I have.  I'm sure Mr. Sullivan may have a few
14 follow-ups.
15        THE WITNESS:  Yes, sir.
16        FURTHER EXAMINATION BY MR. SULLIVAN
17   Q.   (By Mr. Sullivan) I just had a couple questions,
18 Mr. Barnes.  Did you see the testimony that Mortenson actually
19 hired a soil analysis expert?
20   A.   I -- I recall that, but I don't remember exactly what
21 the testimony was.
22   Q.   And this soil analysis expert actually made the call
23 that the Borneke excavation work was sufficient for them to
24 even begin delivery of the components?
25   A.   So he tested the soil on the -- on the top of the --

Page 123

1  of the -- the layout of the site; is that correct?
2    Q.   Yes.
3    A.   So he wasn't able to see what they did when they
4  excavated the site down to the grubbing of the appropriate
5  area?  I -- I say that because I do soil sampling, and when I
6  take a soil sample, I go out there with a little shovel and
7  take a little bit of dirt out and do soil sampling.  So he
8  wasn't there when -- that -- if I understand what you're
9  saying, he wasn't there when they stripped it down to the
10 appropriate cohesive level and then built back up.  He tested
11 the soil after it was done to see what class it was.
12   Q.   No.  My understanding from the testimony is Mortenson
13 actually hired a soil expert after the excavation work was done
14 to make sure the ground could actually hold the weight of the
15 components before they were delivered.
16   A.   So he did a compaction test and a soil test.  I think
17 your picture would show that somebody probably needs to talk to
18 him because that was saturated Class C soil which allowed for
19 this sagging and pooling.
20   Q.   So you would be critical of the expert if the expert
21 would have approved it after the initial work?
22   A.   Well, that's hard to say because I don't know what he
23 did other than just scooping up a little bit of soil from the
24 top and saying, yes, to this Class B.  You're good to go.
25   Q.   You would agree with me that you have not seen any

Page 124

1  pictures and there's no evidence of what that excavation work
2  looked like before the components were delivered?
3    A.   No.  My understanding was it was a corn farm.
4    Q.   No.  I mean after -- after the excavation work and
5  before the delivery of the components?
6    A.   No.  I haven't seen that at all.
7    Q.   And you don't know exactly how long that was in this
8  case and what weather took place in between that time?
9    A.   No.
10   Q.   And you agree with me that Borneke could not have
11 lifted the component itself to correct anything underneath?
12        MR. TERRY:  Asked and answered.  Relevance.  You
13 can answer.
14   A.   I don't know that they had the authority to move the
15 equipment.  I would think not.
16        MR. SULLIVAN:  That's all I have.  Thank you.
17        FURTHER EXAMINATION BY MR. TERRY
18   Q.   (By Mr. Terry) One -- one follow-up -- follow-up
19 question, and for once an attorney actually means that.  Did
20 any of Mr. Sullivan's questions today or his follow-ups change
21 any of your opinions that you've either put in your report or
22 given today in your deposition?
23   A.   No, sir.
24        MR. TERRY:  Okay.  I believe that's everything.
25 We don't need to worry about signature because it's Federal

Page 125

1  Court right, or do we still need to?
2        MR. SULLIVAN:  I don't think so.
3        MR. TERRY:  I don't think so.  Mr. Barnes, you
4  are finished today.  Thank you for taking the time, and we'll
5  be in touch.
6        THE WITNESS:  Thank you.  Nice to meet you, Mr.
7  Sullivan.
8        MR. SULLIVAN:  Thank you.
9        MR. TERRY:  Oh, wait.  Christy, I can't hear
10 you.
11        THE REPORTER:  Can you hear me now?  Do you want
12 to order a copy of this transcript, Mr. Terry?
13        MR. TERRY:  Well, I -- I believe Mr. Sullivan is
14 -- if he's ordering the original, I'll take a copy.
15        THE REPORTER:  Okay.  And we are off the record
16 at 3:58 p.m.
17        (Proceedings ended at 3:58 P.M.)
18
19
20
21
22
23
24
25



Joseph Barnes

October 13, 2022
Page 126

Page 126

```
1                    REPORTER'S CERTIFICATION
                    DEPOSITION OF JOSEPH BARNES
2                       October 13, 2022
3         I, Christy Nowotny, Certified Shorthand Reporter
    in and for the State of Texas, hereby certify to the following:
4
          That the witness, JOSEPH BARNES, was duly sworn
5   by the officer and that the transcript of the oral deposition
    is a true record of the testimony given by the witness's;
6
          I further certify that pursuant to FRCP Rule 30
7   (f) (1) that the signature of the deponent:
8   ____ was requested by the deponent or a party before the
    completion of the deposition and that the signature is to be
9   before any notary public and returned within 30 days from the
    date of receipt of the transcript.  If returned, the attached
10  Changes and Signature Page contains any changes and the reasons
    therefor;
11
    __x__ was not requested by the deponent or a party before the
12  completion of the deposition.
13        I further certify that I am neither counsel for,
    related to, nor employed by any of the parties or attorney in
14  the action in which this proceeding was taken, and further that
    I am not financially or otherwise interested in the outcome of
15  the action.
16        Certified to by me this 13TH day of October,
17  2022.
18
19  _____
    Christy Nowotny, Texas CSR (11536), CVR-CM
20  Expiration Date: 03-31-24
    Magna Legal Services
21  Firm Registration No. 633
    1635 Market Street, Suite 800
22  Philadelphia, Pennsylvania 19103
23
24
25
```









## Mortenson Construction
## Construction Incident Analysis (CIA)

*Mortenson Construction is committed to continuous learning from past incidents. The CIA will be utilized to help educate others on past issues/incidents. A CIA is to be completed for the following Safety/Quality events:*

| | |
|---|---|
| 1. An OSHA Recordable Injury (Mortenson or Subcontractor) | 6. An Event that significantly affects customer relations |
| 2. A Property Damage with overall cost in excess of $5,000 | 7. Event is a recurring problem |
| 3. A Serious Near miss (with high severity potential) | 8. Rework of quality issue that results in an Injury |
| 4. Unplanned disruption that result in schedule disruption | 9. Quality Event with overall cost in excess of $25,000 |
| 5. Diamond Event - Incident or Potential Incident that resulted/may have had a Significant Impact | 10. Significant Environmental Event |

| | |
|---|---|
| Operating Group | Wind Energy |
| Project | Mendota Hills Wind |
| Contractor | Mortenson |
| Investigation Team | James Langston-Supt.<br>Kevin Hogan- Safety<br>Lonnie Sears- Foreman |
| Incident Type | OSHA Recordable Injury |
| Type of Work and Crew | Base Mid Erection |
| Date of Incident | 11/15/18 |
| Time of Incident | 12:13 PM |
| SWI/IWP/Pre-Task Plan Card Completed (Y/N) | Yes |
| List Applicable Inspections Completed | N/A |
| Job Title of Workers Involved | Iron Worker |
| Orientation 1, 2, 3 Completed | 1st, 2nd, and 3rd complete |
| List Applicable Task Training Completed | SWI Trained |
| Workers Time in Industry | 15 Years |
| Workers Time in Position | 7 Months |
| Worker's Time on Site | ~1 ½ Months |
| Crew Size | 5 |

![Photo of wind turbine base section on a muddy construction site with ice/water on the ground]

## I. Description of Incident:

Team member slipped and fell on ice resulting in an injury to his right ankle.

## II. Investigation Findings:





a. Narrative/ Explanation

    i. At the time of the incident the team member was checking on the base-mid/offload crew at site T-1. Upon exiting his vehicle, he began to walk towards the work area alongside a mid-section. While walking to the work area the team member stated that he had realized he was on a sheet of ice covered with a thin layer of snow. While attempting to exit the ice patch, his left foot slipped out from under him and his right foot caught a dry patch. This in turn caused his right ankle to twist and become injured.

The site had been previously addressed with a bulldozer to mitigate walking / working hazards, however the ice accumulation had occurred too close to the WTG section for the dozer to operate safely leaving the ice un-addressed. The existing hazard was not properly delineated nor was its location identified on the Pre-Task Plan Card. Additionally, snow had begun to fall that morning covering the ice with a layer of snow which made its identification difficult prior to stepping on the ice.

The CIA team investigated several factors which commonly lead to slips, trips, and falls. Below are the findings, and reasoning as to why the factor was not considered a contributing factor to this incident.

- Awareness of surroundings: Based on the statement from the injured team member, he became aware of the ground conditions he was on prior to the incident but still ended up slipping as he tried to leave the area.

- Proper PPE: Team member had all the required PPE, per site policies; however, was not wearing ice cleats. While, the project site does offer the use of ice cleats to further protect team members, it was not a policy.

- It was confirmed that the team member was not running/rushing; rather casually walking.

b. Contributing Factors (5 Whys)

    i. <u>Site Preparation-</u> Due to the location of the ice, a dozer could not refinish the area because it was too close to the tube section and crane pad.

    ii. <u>Hazard Identification –</u> The pre-task card for that site highlighted the presence of icy conditions, but did not identify specific locations on the pad.

    iii. <u>Adverse ground conditions-</u> The site received enough snow that morning to cover the ground with a few inches. This layer of snow concealed some hazards that existed on site, specifically the ice adjacent to the mid-section.

c. Root Cause(s) (5 Whys)

    i. Team member was not wearing traction devices for icy conditions





1. Site was lacking policy on when ice cleats were mandated



**III.** **Lessons Learned:**

i. **Site Preparation:** It is the foreman responsibility to ensure the crew walks the site prior to commencing work. Any area that cannot be refinished by a dozer and contains adverse ground conditions needs to be delineated by identification on the pre-task plan card and by standard cones.

ii. **Adverse ground conditions:** The project team needs to ensure that any potential for adverse ground conditions are discussed at the site wide level. In addition, foreman need to be trained on the proper process for pre-task planning to ensure all changed conditions are planned and the risk mitigated. Lastly, the project team is identifying select tasks that will require ice cleats for 100% of the crew when icy conditions are present.

**IV.** **Corrective Actions / Preventative Measures**

| # | Action | Responsible Party(s) | Due By Date | Date Completed |
|---|--------|----------------------|-------------|----------------|
| 1 | Site wide safety stand down to discuss walking working surfaces. | Jamie Langston | 11/16/18 | 11/16/18 |



| 2 | Reinforce 360 walk around work area during PTPC, identifying path of travel and specific hazards present in work area. | Jamie Langston | 11/16/18 | 11/16/18 |
|---|---|---|---|---|
| 3 | Toolbox Talk focusing on slips, trips, and falls while working in icy conditions. | Joshua Maier/Kevin Hogan | 11/16/18 | 11/16/18 |
| 4 | Identify tasks where 100% traction control devices are to be required. | Jamie Langston | 11/20/18 | 11/26/18 |
| 5 | Identify tasks where traction control devices will be used intermittently and implement devices which can be donned / doffed quickly. | Jamie Langston | 11/20/18 | 11/20/18 |
| 6 | Provide each foreman with ice melt salt and cones to address adverse conditions in frequently traveled areas on site. | Jamie Langston | 11/26/18 | 11/26/18 |

| | |
|---|---|
| 1       IN THE UNITED STATES DISTRICT COURT | 1           I N D E X |

**Column 1 (page 1):**

1       IN THE UNITED STATES DISTRICT COURT
2       NORTHERN DISTRICT OF ILLINOIS
3         EASTERN DIVISION
4 NICK GEORGEFF,       )
5     Plaintiff,   )
6  vs.        ) Civil Action
7 DON BORNEKE CONSTRUCTION, ) No. 3:20-CV-50313
8 INC.,         )
9     Defendant.   )
10
11    The deposition of LEONARD BREYNE, called
12 for examination pursuant to the Rules of Civil
13 Procedure for the United States District Courts
14 pertaining to the taking of depositions, before
15 Michelle L. Barta, a certified shorthand
16 reporter in the State of Illinois, on the
17 23rd day of February 2022, at 1:03 p.m.,
18 via videoconference per Executive Order 2020-14
19 pursuant to subpoena.
20
21
22 Reported by: Michelle L. Barta, C.S.R., R.P.R.
23 License No: 084-004033
24

1

**Column 2 (page 3):**

1           I N D E X
2 WITNESS             PAGE
3 LEONARD BREYNE
4  EXAMINATION BY MR. TERRY     8
5  EXAMINATION BY MR. SULLIVAN   109
6  FURTHER EXAMINATION BY MR. TERRY  132
7
8
9
10          E X H I B I T S
11 NUMBER             PAGE
12
13    (No exhibits were marked)
14
15
16
17
18
19
20
21
22
23
24

3

**Column 1 (page 2):**

1 REMOTE APPEARANCES:
2
3    ANESI, OZMON, RODIN, NOVAK & KOHEN, by
4    MR. CHARLES TERRY
5    161 North Clark Street, 21st Floor
6    Chicago, Illinois  60601
7    (312) 372-3822
8    Cterry@anesilaw.com
9      Representing the Plaintiff;
10
11    SWANSON, MARTIN and BELL, by
12    MR. CHRISTIAN A. SULLIVAN
13    2525 Cabot Drive, Suite 204
14    Lisle, Illinois  60532
15    (630) 799-6900
16    csullivan@smbtrials.com
17      Representing the Defendant.
18
19
20
21
22
23
24

2

**Column 2 (page 4):**

1    THE COURT REPORTER:  This deposition
2 is being taken by means of Zoom videoconference.
3 The attorneys participating in this deposition
4 acknowledge that I am not physically present
5 with the witness.  The parties and their counsel
6 consent to the oath being administered remotely
7 and waive any objections to this manner of
8 reporting.
9    Will all counsel present please state
10 your name and indicate your agreement on the
11 record beginning with plaintiff's counsel?
12    MR. TERRY:  Charles Terry, so
13 stipulated.  And for the record, I don't want to
14 hear that I talk too fast.  You have me beat I
15 think.
16    MR. SULLIVAN:  Chris Sullivan, I will
17 agree to that, too.  Thank you.
18       (Whereupon, the witness was duly
19       sworn.)
20    MR. TERRY:  Sir, can you please state
21 and spell your first and last name for the
22 record?
23    THE WITNESS:  Leonard Breyne,
24 L-e-o-n-a-r-d, B-r-e-y-n-e.

4

EXHIBIT
G

1    MR. TERRY:  And you pronounce your last
2  name Breyne?
3    THE WITNESS:  Breyne, yeah, like the
4  first.
5    MR. TERRY:  Let the record reflect this
6  is the discovery deposition of Leonard Breyne
7  taken pursuant to subpoena and agreement of the
8  parties.
9    Let the record also reflect this
10  deposition is being taken via Zoom but still
11  pursuant to all applicable local rules.
12    Sir, have you ever given a deposition
13  before?
14    THE WITNESS:  No, sir.
15    MR. TERRY:  All right.  I am going to
16  go over a few ground rules with you.  I call
17  them rules.  If you break them the world is not
18  going to end, we are not going to yell at you.
19  We might just remind you of them from time to
20  time.  Okay?
21    THE WITNESS:  Okay.
22    MR. TERRY:  The first one, in a normal
23  setting when we are not in Zoom it's hard enough
24  for this court reporter, Ms. Barta, to do her

                                                    5

1  job when we are talking over each other.  It's
2  even more important when we are via Zoom to try
3  not to talk over each other; meaning if a
4  question is still being asked, do your best to
5  let the full question come out before you
6  answer.  Okay?
7    THE WITNESS:  Okay.
8    MR. TERRY:  And we will try to give you
9  the same courtesy.  Inevitably there will be
10  times when we talk over each other.  Let's just
11  try to limit that.  Okay?
12    THE WITNESS:  Okay.
13    MR. TERRY:  Try to keep all your
14  answers out loud and by that I mean yes, no or
15  otherwise.  Nah-uhs and un-uhns don't come over
16  well on the transcript, so just if that happens
17  we might remind you, but try to keep that in
18  mind you have to give a verbal yes, no or
19  otherwise answer.  Okay?
20    THE WITNESS:  Okay.
21    MR. TERRY:  If at any point you need a
22  break, please let me or Mr. Sullivan know.  This
23  is not an endurance test.  This is just a --
24  trying to find out what you know.  So if at any

                                                    6

1  point you need a break, let us know.  We are
2  happy to take as many as you need.  The only
3  caveat to that is if a question is pending,
4  meaning we have asked a question and you have
5  not yet answered it, you have to answer the
6  question before we take a break.  Okay?
7    THE WITNESS:  Yes.
8    MR. TERRY:  Just two more.  If you
9  answer a question we are going to assume you
10  understood what it meant.  So if you don't
11  understand a question, please ask.  Does that
12  make sense?
13    THE WITNESS:  Yes.
14    MR. TERRY:  Okay.  And then the last
15  one, the point of today because you have never
16  given a deposition before is if this matter goes
17  to trial we would like to know what you know and
18  what you would testify to.  So if you don't know
19  the answer to a question or if you don't
20  remember, that's fine, you can just say so; but
21  we would ask you to do your best to answer all
22  the questions because the purpose is just to
23  find out what you know and what you don't know.
24  Okay?

                                                    7

1    THE WITNESS:  Yes.
2    MR. TERRY:  Perfect.
3    LEONARD BREYNE,
4  having been first duly sworn, was examined and
5  testified via Zoom videoconference as follows:
6                EXAMINATION
7  BY MR. TERRY:
8    Q.   Sir, what is your date of birth?
9    A.   January 20, 1962.
10    Q.   I am the 21st.
11    A.   Oh, really?
12    Q.   Yeah.
13         Sir, what is your current address?
14    A.   481 State Route 251, Rutland, Illinois,
15  61358.
16    Q.   And how long have you lived at this
17  address?
18    A.   Approximately 12 years.
19    Q.   Do you have any plans to move in the
20  next year or so?
21    A.   No.
22    Q.   Okay.  Who do you live at this address
23  with?
24    A.   My wife and my son.

                                                    8

1    Q.   We don't have to get into specifics
2  about them, but what is your wife's name?
3    A.   Juanita.
4    Q.   Does anyone else live at that address
5  with you?
6    A.   My son.  He is 22 years old.
7    Q.   Is your son, the 22 year old, is he
8  your only child?
9    A.   No.
10   Q.   How many other children do you have?
11   A.   Seven.
12   Q.   Congratulations.  Big family.
13   A.   Yeah.
14   Q.   Let me ask -- And again, I apologize.
15  One other thing.  These are a little bit of an
16  intrusive question, some of them.  Again, we are
17  just trying to find out who you are, what you
18  know and what you'll testify to.  So I will try
19  to keep the background to a minimum.  Just a few
20  more.
21        What is your highest level of
22  education?
23   A.   High school.
24   Q.   And where did you go to high school?

                                                  9

1    A.   Wenona High School in Wenona, Illinois.
2    Q.   And when did you graduate from there?
3    A.   1980.
4    Q.   And after high school did you join the
5  union or what did you do after high school?
6    A.   I worked in the construction business
7  and then I didn't join the union until I was
8  about 36.
9    Q.   And when you were working in the
10  construction field after high school, was it
11  nonunion work?
12   A.   Yes.
13   Q.   And what were you doing?
14   A.   About everything.  I did construction,
15  framing, plumbing, concrete work, roofing.  Just
16  a plethora of different jobs.
17   Q.   Was this for one company or a multitude
18  of companies?  How did it work?
19   A.   Multitude of companies.
20   Q.   All right.  So this would be -- You
21  said you graduated high school in 1980.  When
22  did you join the union?
23   A.   1998.
24   Q.   So from approximately 1980 to 1998, is

                                                  10

1  it safe to say you were doing various
2  construction work for various companies?
3    A.   Yes.
4    Q.   Okay.  Do you remember what the last
5  company was that you worked for prior to joining
6  the union?
7    A.   I do not recall that.
8    Q.   Do you remember like any of the
9  companies that stick out to you, the ones that
10  you were with the longest or the ones that you
11  did the most important work in your mind,
12  anything like that?  I know it's a long time ago
13  but...
14   A.   Not really.  I just can't remember
15  besides Carney Plumbing Company.  I worked for
16  a plumbing company and that was --
17  B&B Construction for a little while.  That's
18  about it, out in Nebraska.
19   Q.   So it's safe to say though that in
20  those 18 years before you joined the union you
21  were doing general construction work and you
22  have been doing that ever since you joined the
23  union as well?
24   A.   Yes, sir.

                                                  11

1    Q.   When you joined the union in 1998, what
2  union did you join?
3    A.   I joined Iron Workers Local 380 out of
4  Champaign, Illinois.
5    Q.   And are you still a member of that
6  union?
7    A.   No.  I was transferred to Joliet
8  Local 444.
9    Q.   Are you still a member of Local 444?
10   A.   Yes, sir.
11   Q.   When did you get transferred from 380
12  to 444 approximately?
13   A.   I believe 2006.
14   Q.   Are those the only two locals that you
15  have ever been a part of?
16   A.   Yes.  As a member, yes.
17   Q.   Possibly as maybe like a traveling
18  worker somewhere else, is that what you're
19  referring to?
20   A.   Yes.  I have worked all over the
21  country.
22   Q.   And so just for sake of time, you're
23  basically describing where various union members
24  can travel to different states and work on

                                                  12

1  projects and you're like a temporary member of
2  that local then; right?
3      A.  Yes.
4      Q.  When you joined the union in 1998, did
5  you have to undergo an apprenticeship?
6      A.  No, I did not because I worked for a
7  company and I worked beyond the allowed time for
8  what we call a permit hand to work and I was
9  waived into the union.
10     Q.  So another way to ask that is based on
11 your experience and based on the amount of work
12 you performed in the construction field the
13 union felt comfortable in giving you full
14 journeyman status in 1998, right?
15     A.  Yes, sir.
16     Q.  And have you been a journeyman
17 ironworker ever since?
18     A.  Yes, sir.
19     Q.  All right.  When you started working --
20 Well, you know, that's a long time ago.  Let's
21 just go from 2006 to present since you have been
22 with Local 444.  Can you describe is there a
23 type of work that you get more of than others,
24 like some people are always on wind farms, some

13

1  people are always on buildings or is it kind of
2  just the whole plethora of things that you do?
3      A.  There was a plethora of things, but
4  when I traveled I worked for a wind farm company
5  as a general foreman, and that was
6  Gemma Renewable Power.  Then I -- Other than
7  working out of my hall, I worked for
8  Lilja Corporation out of California that worked
9  on glass furnaces.  They made glass bottles and
10 glass products or they rebuilt the furnaces that
11 made glass bottles and products.
12     Q.  Got it, okay.
13         Because you said something that's
14 pertinent to this case, you said that you
15 traveled as a foreman for wind farm companies.
16 When was this?
17     A.  So 2000 and -- Let me think.  2012, I
18 believe, was the last time I worked with
19 Gemma Renewable Power.
20     Q.  I am sorry.  Can you spell the first
21 name of the company?
22     A.  Gemma, G-e-m-m-a.
23     Q.  Gemma Renewable?
24     A.  Yes.

14

1      Q.  And was this through your local that
2  you got this position or how did that work
3  because I know it was a traveling position?
4      A.  I was sent out through the local to
5  work for them as just a local hand and through
6  my performance and stuff they offered me a
7  position.
8      Q.  And approximately what years did you
9  work for them?
10     A.  I believe it would be 2008 to 2012.
11     Q.  And obviously a lot of different tasks
12 go into building a wind farm.  What was
13 Gemma Renewable's task?  Were they a GC?  Were
14 they an ironworking company?  Were they an
15 excavator?  What was Gemma's tasks on these
16 projects?
17     A.  They were in charge of the erection of
18 the wind towers and -- and the civil work.  They
19 are like the general of the project.
20     Q.  Would they also employ ironworkers who
21 would be actually installing and erecting these
22 wind towers?
23     A.  Yes.
24     Q.  So Gemma in your work with them not

15

1  only were you a foreman so a supervisory
2  position, but you also had your own workers
3  hands on doing these same tasks that you were
4  doing at the subject project we are here to talk
5  about; right?
6      A.  Yes.
7      Q.  How many projects would you say that
8  you worked on with Gemma in some type of wind
9  farm capacity?
10     A.  Four.
11     Q.  And on all of these were you a foreman?
12     A.  Either a foreman or a general foreman,
13 yes.
14     Q.  And how many wind farm projects would
15 you say you have worked on in total in your
16 career?  A best estimate is fine.
17     A.  Basically over -- over a dozen.
18 Approximately 15 or better.  I have done five in
19 the last three years.
20     Q.  So it's safe to say that you have
21 worked in both supervisory positions as well as
22 non-supervisory positions as an ironworker on
23 over 15 or so wind farm projects over the years,
24 correct?

16

1  A.  That's correct.
2  Q.  And in this time you have become
3  familiar with what is required of various
4  subcontractors on these projects?
5  A.  Yes, basically.
6  Q.  You know what the ironworkers are hired
7  to do so to speak and you know what other people
8  are hired to do like the excavators, right?
9  A.  Yes.
10  Q.  And we will get a little bit more into
11  that in a little bit, but just to get a little
12  bit more of information about your background,
13  sir, have you ever served in the military?
14  A.  No, sir.
15  Q.  Have you ever served in any civil
16  service capacity like police or firefighter?
17  A.  No, sir.
18  Q.  All right.  And please don't be
19  offended.  We ask this question of everybody in
20  every deposition.  Have you ever been convicted
21  of a felony or a crime involving fraud or
22  dishonesty?
23  A.  Of fraud and dishonesty?  No, sir.
24  Q.  Okay.  And have you ever filed for

17

1  bankruptcy?
2  A.  No, sir.
3  Q.  Who is your current employer?
4  A.  I am working for White Construction.
5  Q.  I am sorry, did you say White?
6  A.  Yes, White Construction.
7  Q.  And how long have you been working with
8  them?
9  A.  Approximately eight months straight
10  right now.
11  Q.  And is this on a wind farm project?
12  A.  Yeah.  I just finished up one last
13  Friday and I was transferred to another one
14  Monday.
15  Q.  And the new one that you're transferred
16  to, I think I understood your answer but I just
17  want to be clear, this is another wind farm
18  you're talking about; right?
19  A.  Yes.
20  Q.  And is this still with
21  White Construction?
22  A.  Yes.
23  Q.  And what was your position with White?
24  Was it just an ironworker or was it any

18

1  supervisory personnel?
2  A.  I was a foreman on the last project.
3  This project I am just a worker.
4  Q.  Okay.  Prior to working with
5  White Construction, who was your employer before
6  that?
7  A.  Basically -- Let's see.  Last year --
8  I have done, let me think, three other jobs with
9  White Construction in the last -- since 2000
10  and -- last year, year before -- 2019 I believe.
11  Q.  And were all of these wind farm
12  projects?
13  A.  Yes.
14  Q.  So between 2019 and present, is it safe
15  to say that White Construction was your main
16  employer out of the hall?
17  A.  Yes.  Yes.  I have had some small
18  miscellaneous projects, but yeah, White has been
19  my main employer.
20  Q.  What about between, let's just say,
21  2012 and 2019?  I know you worked for Mortenson
22  for a period of time, right?
23  A.  Yeah.  I did a couple of wind farms
24  with them and --

19

1  Q.  I apologize.  What was the time frame
2  you worked with Mortenson give or take?
3  A.  Oh, man.  Let me think.  Project -- The
4  project before the one we are discussing today
5  is when I started with Mortenson, so I worked
6  two projects with them.
7  Q.  And then this accident happened in
8  October of -- or November of 2018.  So would you
9  have worked on a project sometime in 2017 or
10  2018 prior to this one with Mortenson?
11  A.  I believe I was hired in the springtime
12  of -- or the summertime of 2018 for Mortenson,
13  and when we finished that project I transferred
14  over to the other project in Paw Paw.
15  Q.  Okay.  And when you say the Paw Paw
16  project, that's the one where -- It's safe to
17  say you're familiar with why we are here and the
18  incident we are here to talk about with my
19  client Nick Georgeff; right?
20  A.  Yes.
21  Q.  And that's the subject project that
22  you're talking about at Paw Paw, right?
23  A.  Yes.
24  Q.  Okay.  So before we get into that, I

20



1 just want a little bit more of a background
2 about your work history.
3         Can you give me a general rundown what
4 you were doing between your time with Gemma that
5 ended in approximately 2012 through when you
6 started with Mortenson in 2018 or so?
7     A.   I went and traveled on the road with
8 Lilja Corporation and worked on furnaces, the
9 blast furnaces, as a night general foreman and a
10 foreman.
11     Q.   And was this the majority of your work
12 between those years?
13     A.   Yes, and other than that I ran a
14 project at Pilkington Glass Company in Naplate,
15 Illinois, as a general foreman for ISI,
16 Illinois Services.
17     Q.   And the company you worked for between
18 2012 and 2018 when you were traveling, can you
19 spell that name for us?
20     A.   L-i-j-i-a, I believe.
21     Q.   All right.  Perfect.  Thank you.
22         So we have gone over, you know, a good
23 background and just from generally speaking we
24 have already established on these wind farms you

21

1 worked in both what I call the actual
2 non-supervisory like the work positions as well
3 as supervisory positions even though sometimes
4 the supervisory positions still require you to
5 get your hands dirty, right?
6     A.   Correct.
7     Q.   So you're familiar with what your
8 responsibilities are as an ironworking company
9 on these job sites, right?
10     A.   Correct.
11     Q.   And you have had numerous interactions
12 with various subcontractors in which you discuss
13 who is responsible for what, right?
14     A.   Yes, correct.
15     Q.   And you're generally familiar with how
16 things are run in a construction site?
17     A.   Yes, generally pretty much familiar.
18 Yes.
19     Q.   And what I am getting at is, you know,
20 the ironworkers, they are hired to do the
21 ironworking; right?
22     A.   Yes.
23     Q.   And then the excavating company is
24 hired to do the excavating work, right?

22

1     A.   Yes.
2     Q.   So the idea is each union stays in
3 their own lane so to speak, like the excavators
4 wouldn't step on the ironworkers' toes and the
5 same is true for the reverse; right?
6     A.   Yeah.  I mean, operators that work for
7 the excavating company wouldn't step on the
8 ironworkers' toes and vice-versa.
9     Q.   So from a general standpoint though
10 what I said about the ironworkers doing the iron
11 work and the excavators doing the excavating
12 work and them staying in their own lanes for the
13 most part is generally true, right?
14     A.   Yes.
15     Q.   And I am going to use Mortenson as an
16 example because that is who you were working for
17 on this project, is that okay?
18     A.   Yes.
19     Q.   When an excavating company is hired for
20 these wind farm projects -- Well, first of all,
21 these wind farms projects are built in the
22 middle of nowhere on farmland, right?
23     A.   That's correct.
24     Q.   And before the excavating company gets

23

1 out there it's rough farmland that's actually
2 areas of it are converted into workable land,
3 right?
4     A.   Yes.
5     Q.   So the excavating company is hired to
6 essentially prepare the ground for what is going
7 to be coming?
8     A.   Yeah.  Prepare the site, yes.
9     Q.   Yeah.  They grade the land to make it
10 level, right?
11     A.   Yes.  They will put access roads in,
12 grade -- grade, excavate for the bolt cages and
13 stuff like that and backfill.
14     Q.   Yeah.  Additionally they do things like
15 compacting the land in various areas to make
16 sure --
17     A.   Yes.
18     Q.   -- it's properly prepared for the
19 equipment that's coming?
20     A.   Yes.
21     Q.   Okay.  And then in addition to things
22 like access roads and things like you just
23 talked about, they also prepare erection areas,
24 like where the actual building of the turbine is

24



1  going to be; right?
2      A.  Yes.  That's what we call a tower site,
3  yes.
4      Q.  Yeah.  So the tower site, the tower is
5  kind of in the center of the erection site;
6  right?
7      A.  Yes.
8      Q.  And then on a radius going out in each
9  direction for however many feet the project
10  specifies, that is the erection area that's
11  going to be built so that the ironworkers and
12  all the different trades can come in and do what
13  needs to be done; right?
14      A.  Yes.  They will lay out an area so we
15  can lay components down and start erecting the
16  towers.
17      Q.  And from a general standpoint, prior to
18  the excavating company coming in and creating
19  these erection areas like we have talked about,
20  this is rough farmland prior to them coming out
21  there; right?
22      A.  Yeah.  It's just a farm.  Yes.
23      Q.  Yeah.  And the excavating company is
24  hired to convert this unsafe farmland into safe

25

1  work area for the turbines and all the workers,
2  right?
3      A.  Yes.
4      Q.  And on this specific project the
5  excavating company was Borneke, right?
6      A.  Yes.  I do remember it was Borneke,
7  yes.
8      Q.  And so the same tasks that we just
9  talked about, the grading, the compacting, the
10  preparing of erection areas, this was all
11  Borneke who was performing this work on this
12  project?
13      A.  Yes.
14      Q.  And again, a vast majority of the area
15  where these turbines are going to be erected in
16  like the site as a whole are never going to be
17  touched by the excavating company, like a vast
18  majority of the land, it's just very specific
19  areas that are actually converted into workable
20  land; right?
21      A.  Yeah.  The access lane and
22  approximately 300 feet around the tower is
23  converted into the construction site and then
24  when it's done it's all reclaimed back into the

26

1  farmland except for approximately maybe 20 feet
2  around the tower itself and the access lane.
3      Q.  Okay.  So again though, like the
4  whole -- Let's just say the whole project is a
5  big square.  There is going to be various little
6  circles inside that square and access roads that
7  are converted from farmland into the working
8  area and then the rest of that square is never
9  even touched because who cares about the
10  farmland so long as it's not where people are
11  going to be working; right?
12      A.  Exactly.  Yes.  We do -- They do
13  trenching.  Electricians have to trench
14  underground cables between towers and towers and
15  they build a crane for us to move our cranes
16  from site to site.
17      Q.  Okay.
18      A.  But other than that, the rest of the
19  farmland is never touched.
20      Q.  Got it.
21      So then let's just talk about briefly
22  access roads.  So the access roads are at the risk
23  of asking an obvious question because it's in
24  the name, these access roads are roads that

27

1  provide access to the turbine site off the main
2  road; right?
3      A.  That is correct.
4      Q.  And these access roads are cleared,
5  graded, compacted and prepared by the excavating
6  company so that semi trucks and various trades
7  can get to and from the turbine; right?
8      A.  That is correct.
9      Q.  And then at the actual turbine, like
10  you just said the radius around it, that is the
11  whole erection area that the access road leads
12  up to; right?
13      A.  Yes.
14      Q.  And the erection area is actually where
15  the ironworkers and all the other trades are
16  going to be erecting these turbines, hence the
17  name erection area?
18      A.  Yes.
19      Q.  And these areas are very important in
20  terms of needing to be properly graded and
21  prepared, right?
22      A.  Yeah.  They need to be compacted and
23  graded, yeah, so we have areas to move.  It's in
24  their contract with the farmers to have excess

28

1  amount where we do not disturb their fields.
2     Q.   Exactly.  There is areas that you are
3  not allowed to touch, but then the areas like
4  the erection sites are the areas where it needs
5  to be graded, compacted, maintained, things like
6  that; right?
7     A.   That is correct.
8     Q.   And additionally, the excavating
9  company is required to provide proper drainage
10 at these erection sites; right?
11       MR. SULLIVAN:  Objection to foundation.
12       Go ahead though.
13       THE WITNESS:  Around the -- yes.
14 Around the foundation, yeah.
15 BY MR. TERRY:
16    Q.   Yeah.  The idea is -- and you have seen
17 this on other projects; right?
18    A.   Yes.
19    Q.   The idea behind it is you don't want
20 water pooling near the erection area or near the
21 turbine sites, right?
22    A.   It usually is pretty much graded away
23 to drain away from the tower itself and the
24 crane pad.

29

1     Q.   Let's talk about the compacting that
2  you have seen being performed and the compacting
3  that needs to be performed at these erection
4  sites.
5         You would agree that compacting of
6  ground is really important because it helps
7  prepare the ground for what is going to be
8  coming later, right?
9     A.   Yes.  We bring in some pretty heavy
10 pieces and equipment so it does -- it needs to
11 be compacted so it does not sink.
12    Q.   Exactly.  You can't just clear
13 farmland, not compact it and expect the ground
14 not to sink in; right?
15    A.   Yes, pretty much.
16    Q.   The idea is you want to compact the
17 ground so that the ground can support the weight
18 of the crane, the semi trucks and all the
19 equipment that's going to be coming late; right?
20    A.   Yes.
21    Q.   And the whole idea behind this, the
22 compacting, the grading, the drainage is so that
23 the erection areas and the turbine sites aren't
24 covered in standing water or poor ground

30

1  conditions like large ruts; right?
2     A.   Yeah.  The compaction is to maintain
3  the weight around the tower area to support,
4  yeah, the heavy pieces that come in, the heavy
5  trucks and the cranes and everything else.
6     Q.   And part of the idea behind the
7  compaction is because it is known that heavy
8  pieces of equipment and large trucks, large
9  cranes, all these things are going to be coming
10 and if the ground is compacted properly the idea
11 is that the ground won't sink underneath this
12 stuff; right?
13    A.   Yes.  Yes.  Can you hear me?
14    Q.   No, I can.  I apologize.  I just -- We
15 also sometimes check our notes as we go, so
16 unless we --
17    A.   Okay.
18    Q.   Unless we completely freeze, we are
19 still here.
20    A.   Okay.
21    Q.   All right.  So you would agree though
22 that providing proper drainage, grading and
23 compacting of land are all very important tasks
24 that need to be performed prior to the work

31

1  commencing in these erection sites; right?
2     A.   Yes.
3     Q.   The excavating company comes in first
4  and they prepare the ground for trades like the
5  ironworkers or the truck drivers to later come
6  in and do the work they need to do?
7     A.   Yes.
8     Q.   And it's important for the excavating
9  company to do their work right the first time so
10 that the ground is properly prepared for
11 whatever is coming, right?
12    A.   Yes.  There -- After we build the
13 foundation they dig a pretty large hole to put
14 the tower foundations down and they have to make
15 sure that that is compacted because that's in
16 with the area of the cranes and the trucks will
17 drive in so that they don't sink back in when
18 they backfill that tower foundation.
19    Q.   And the same thing would be true for
20 where the various pieces of equipment like the
21 base sections or the midsections or the blades,
22 that needs to be compacted properly, too,
23 because you don't want the ground sinking in
24 underneath these and allowing these pieces of

32



1  equipment to roll around; right?
2      A.   Yes.
3      Q.   You would agree that if the ground
4  sinks in underneath a base or a midsection and
5  it rolls it can possibly kill somebody?
6      A.   Yes.  They usually just sink, but yes.
7  Yeah, if it does -- Being on a hillside or
8  something and rolls away, yes, there has been
9  accidents.
10      Q.   Okay.  And if the ground is not
11  properly prepared, like you just said things can
12  happen where the equipment sinks into the ground
13  partially; right?
14      A.   Yes.
15      Q.   And this would cause a depressed area
16  in the ground that water can pool in for
17  example?
18      A.   Yes.
19      Q.   Or someone can just simply trip in it,
20  it can create -- The idea is if the ground is
21  not properly prepared and the equipment sinks
22  into the ground it creates a potentially
23  dangerous situation later on; right?
24      A.   Yeah.  If there is trenches and stuff

33

1  like that, yes, it's hazardous walking and
2  working conditions, yes.
3      Q.   Just generally speaking from your
4  experience on 15-plus different wind farm
5  projects both as a foreman and as a non-foreman,
6  you would agree that large areas of depressed
7  land that was formed by equipment sinking into
8  the ground this could be unsafe; right?
9      A.   Yeah.  It will create tripping hazards
10  for the workers around the area.
11      Q.   Yeah.  And like we said, it can also
12  create areas for large pools of water to
13  accumulate and form; right?
14      A.   Yes.
15      Q.   And these depressed areas are things
16  that can be possibly prevented with proper
17  ground preparation, right?
18          MR. SULLIVAN:  Objection to foundation.
19          Go ahead.
20          THE WITNESS:  Yeah, but, you know,
21  it's -- I can't really -- It's -- I don't know
22  how to say this, but it's like farm ground.
23  You're out in a -- out there.  You can't do
24  every secure inch, but you do around the

34

1  foundation area that it has been disturbed.
2  BY MR. TERRY:
3      Q.   Exactly.  And that's the idea.  The
4  whole project itself where it's located is on
5  farm ground, but these areas near the erection
6  site and the foundation, these are the areas
7  that need to be properly prepared for the
8  delivery of the various equipment; right?
9      A.   Yes.
10      Q.   And there are certain things that you
11  have seen grading and excavating companies do in
12  the past to properly prepare the ground such as
13  compacting, putting down gravel, various other
14  things that need to be done from time to time to
15  prepare the ground properly; right?
16      A.   Yes.
17      Q.   And these are all things that can be
18  done and with proper preparation can prevent
19  certain dangerous conditions like large holes or
20  depressed areas, right?
21      A.   Yes, it can.
22      Q.   You would agree that on a wind farm
23  project -- again, I am not talking about the
24  project as a whole.  I am talking about where

35

1  people are going to be staging equipment, where
2  the foundation is going to be.  Those specific
3  areas you would agree that if the ground is
4  properly prepared for these pieces of equipment
5  to come in and for -- and to the compaction
6  requirements, large depressed areas and sheets
7  of ice do not generally occur; right?
8      A.   They should -- should not, yes.
9      Q.   Exactly.  And that's the idea behind
10  it.  The general contractor hires an excavating
11  company to prepare the land so that large
12  depressed areas and sheets of ice don't form,
13  right?
14      A.   Yeah.  There is an access to water
15  runoff, drainage, to keep it away from the tower
16  itself to drain away from the components, yes.
17      Q.   All right.  So you would agree that if
18  there are large sheets of ice or large depressed
19  areas on a job site, this is not a normal or
20  safe condition that should be allowed?
21      A.   No.  Somebody should have been informed
22  and had some equipment out there to clean it up.
23      Q.   And just from a general standpoint, not
24  this specific area, but on other projects if

36



1 there was a large depressed area or large sheets
2 of ice this is something that on prior projects
3 you would expect to be addressed immediately;
4 right?
5     A.    Yeah.  I would expect whoever was on
6 that site to call the excavating company or
7 their boss and have them bring some equipment
8 out to clean up that area so -- to relieve the
9 presence of a hazard.
10     Q.    Exactly.  And this can be done by
11 direct snow and ice removal or it can done by
12 simply regrading and re-preparing the land,
13 right?
14     A.    Yeah.
15          MR. SULLIVAN:  Objection, foundation.
16     Go ahead.
17          THE WITNESS:  I am sorry.
18          MR. SULLIVAN:  Your answer, it will
19 stand.  You already gave your answer.  Thank
20 you.
21 BY MR. TERRY:
22     Q.    And again, by preparing the ground
23 properly on these projects this is how these
24 dangerous conditions are avoided?

37

1 it up and straighten it out for further work.
2     Q.    Okay.  Of course, but on this project
3 Don Borneke was on site every day.  You would
4 agree with that, right?
5     A.    Yeah, he was on the project site.  He
6 just was not on every site every day.  There
7 is -- You know, they were working other areas at
8 the time probably.  I mean, an excavating
9 company doesn't just leave their equipment
10 sitting on one site that you're working on.
11 They have got other things that they have got to
12 do, but somebody you know -- but if there is a
13 potential hazard and there is bad conditions
14 they need to be informed and then they need to
15 bring in equipment and straighten it out.
16     Q.    Fair.  So exactly.  If there is a
17 hazard that's noticed, they can either notice it
18 themselves or fix it or they can be notified of
19 it and fix it; right?
20     A.    Yes, that's correct.
21     Q.    Okay.  Not only that though, but on the
22 project their job is to prepare the ground so
23 that these large pieces of equipment don't sink
24 into the ground; right?

39

1     A.    Yeah, but they always need to be
2 maintained after a certain amount of time just
3 to relieve some of the hazards that develop
4 during the excavation -- or not the excavation,
5 but the erection of the towers.
6     Q.    Exactly.  So the ground is prepared and
7 then the excavating company needs to maintain
8 the land from time to time to remedy potential
9 hazards that have arose after the fact, right?
10     A.    Yes.
11     Q.    Okay.  So it's kind of twofold.  One,
12 prepare the ground properly so that hazards
13 don't form; and two, if they do form, come back
14 and fix it?
15     A.    Yes, but they -- they need to be
16 notified if there is a hazard that -- so they
17 can bring their equipment back in and take care
18 of the problem.
19     Q.    Of course.
20     A.    You understand what I am saying?
21     Q.    Yes, of course.
22     A.    I mean, they are not on the site 24/7
23 with us, but they should be informed and have
24 some equipment available to come back and clean

38

1     A.    Yes.
2     Q.    Okay.
3     A.    They are hired to prepare the site,
4 yes.
5     Q.    And you have seen various ways for this
6 to be performed on projects.  On some projects
7 gravel is used and put down so that it can help
8 the ground in anticipation for these pieces of
9 equipment and stuff like that?
10     A.    Usually that's where we put the
11 equipment.  The gravel is just used for the
12 crane pads themselves and the access roads.  The
13 area is just usually graded off and compacted
14 to -- to support the weight of the equipment
15 coming in and out.
16     Q.    So then for the actual area where the
17 equipment is going to go, it's about compaction.
18 You compact the ground properly so that the
19 equipment does not just sink into the ground and
20 cause a large depressed area, right?
21     A.    Yes, and then we are not sinking trucks
22 and pulling trucks apart and stuff like that
23 trying to get them out of the hole.
24     Q.    Let's go to the subject project itself,

40

Leonard Breyne 02/23/2022

1  Mendota Hills Wind Farm.  What was Mortenson's
2  role in this project in your own words?
3      A.   Basically the general erection foreman.
4  They erect the towers and they should have been
5  liable doing -- contacting the civil work and
6  electrical work and stuff like that.
7      Q.   Okay.  So Mortenson --
8      A.   All the contractors would be like a
9  subcontractor under them.
10     Q.   Got it.  So Mortenson was the entity
11 that was actually responsible for erecting the
12 various turbines, right?
13     A.   Yeah, and preparing the sites.  Having
14 the sites prepared properly, too, yeah.
15     Q.   Yeah.  And then Borneke -- Well,
16 Borneke was the excavating company on this
17 project; right?
18     A.   Yes.  They would have been like a
19 subcontractor hired by Mortenson to perform the
20 work that needed to be done.
21     Q.   Yeah.  And some of this work that
22 needed to be done was like what we have talked
23 about before on this project, the creating of
24 access roads; right?

41

1      A.   Yes.
2      Q.   As well as the creating of erection
3  areas?
4      A.   Yes.
5      Q.   Okay.  And in addition to creating the
6  erection areas, the things we talked about rang
7  true for this project as well.  They needed to
8  properly compact the land so that it was
9  prepared for the deliveries that were going to
10 be coming, right?
11     A.   Yes.
12     Q.   On this project there was no controlled
13 access zones where people could not go, right?
14     A.   No.
15     Q.   Yeah.  So meaning there is various
16 sites.  There were 29 sites for this project,
17 right?
18     A.   Yes.
19     Q.   So at the different 29 sites we have
20 already established there were not controlled
21 access areas, so while different contractors may
22 be working in different areas, nothing was
23 preventing them from having somebody drive
24 around and make sure the work they have already

42

1  performed was still adequate; right?
2      A.   Unless work was being performed on
3  the -- Like unless the ironworkers or something
4  we were -- we were erecting and picking up
5  components, they usually have to sign a job
6  safety analysis sheet and get permission from
7  the foreman to enter the job site so they are
8  not interfering or in a hazardous position when
9  they come into the site.
10     Q.   Okay.  So yeah.  Again, the idea is you
11 don't want people walking underneath cranes when
12 things are going to be picked up; right?
13     A.   Exactly.  Don't want them driving into
14 the components or anything like that.
15     Q.   So other than when a crane is being
16 used or some type of very what I like to use the
17 word heavy, you know, work is being performed,
18 there aren't controlled access sites, meaning
19 subcontractors like Borneke can go around and
20 make sure areas they have previously addressed
21 were still good.  If they wanted to, that was an
22 option to them; right?
23     A.   Yeah.  Yes.  All they had to do is,
24 like I said, we -- When the ironworkers get

43

1  there and we start off-loading and erecting and
2  doing stuff like that and we are performing work
3  in the area, we are made to fill out a job
4  safety analysis sheet and it tells us the steps
5  that we are doing.  I don't know if you're
6  familiar with anything like that.  For anybody
7  to come across -- We put a barrier up and for
8  anybody to come across that barrier they have to
9  read the job safety analysis sheet, sign it, and
10 there is usually a phone number on there to
11 contact the foreman that's on that site to get
12 permission to come into the site --
13     Q.   Okay.
14     A.   -- so we know who is there, who comes
15 in instead of, you know, something -- they park
16 in the wrong place and we swing something and it
17 hits their vehicle.  Do you understand what I am
18 saying?  Or they get in a position where they
19 are in a hazard, but they usually got to notify
20 the foreman on the site.
21     Q.   Okay.  So again though, for example,
22 let's take the access roads.  The various
23 subcontractors can take the access roads up to
24 the site, up to the actual turbine site so long

44

Leonard Breyne 02/23/2022

1  as they don't go in the controlled area so to
2  speak and they can look at what is going on and
3  turn around and go to another site if they
4  needed to?
5      A.  Yes.  That's usually approximately like
6  300 feet away behind the crane pad that we
7  usually zone off.
8      Q.  And so this area outside of that is an
9  area that people can go to look at the work they
10 have already performed and make sure it's still
11 good, right?
12     A.  Yes.
13     Q.  Not only that, as long as the crane is
14 not at the site, like let's say the crane is at
15 some other site, let's say the crane is at T1,
16 nothing was preventing the excavating company
17 from going on T11 or T12 and making sure the
18 work previously performed was still good;
19 right?
20     A.  Yes.  There is no -- no reason why
21 they -- Yeah, they can have access to that.
22 It's just going to have to be an arrangement.
23 If there is no other work being performed on,
24 yeah, you can have full access to that T12 or

45

1  so the components and equipment can sit there
2  because you cannot put any components and
3  equipment on that site until the foundation is
4  poured, passes the test, passes the strength
5  test and it is backfilled.
6      Q.  And then the same thing is true that we
7  talked about just from a general standpoint, the
8  vast majority of the actual farmland will never
9  be touched, but the erection site itself is
10 where all the work that's going to be performed
11 and this is the area that needs to be graded and
12 compacted; right?
13     A.  Yeah.  Most of the compaction happens
14 basically around where the foundation is dug up.
15 The rest of the 300 foot radius that we use is
16 just graded to level or graded to have runoff
17 and it's -- you know, just graded and smooth it
18 out so we can bring equipment in and out of
19 there.
20     Q.  Okay.
21     A.  But most of the compaction and
22 everything is done over the foundation area that
23 has been dug up and disturbed.
24     Q.  You would agree that the ground at

47

1  T11 tower.
2      Q.  So we have talked about, you know, like
3  the erection sites from a general standpoint on
4  your previous projects.  Is the same kind of
5  thing that you have been describing for these
6  erection sites true for this project as well,
7  it's where the erection is going to be taking
8  place, where the equipment is going to be staged
9  and it's for an area in each direction out of
10 the turbine?
11     A.  Yes.
12     Q.  And in the middle of the erection area
13 is where the foundation actually goes, right?
14     A.  Yes.
15     Q.  Can you describe what the foundation
16 is?
17     A.  The foundation is a concrete
18 foundation.  It's usually -- You have to dig a
19 hole maybe 100 feet in diameter so we can put
20 the rebar and the bolt cage and the concrete,
21 and then that's backfilled and compacted.  Then
22 they -- After that then they will perform --
23 compact a crane pad so the crane can sit on
24 there and areas around it need to be compacted

46

1  least has to be compacted and prepared enough so
2  that the various pieces of equipment and the --
3  like the cranes and the trucks as well as the
4  pieces of equipment that are going to be
5  delivered don't sink into the ground, right?
6      A.  Yes.  I mean, we are bringing in stuff
7  that's weighing 160,000 pounds on a truck and,
8  you know, you're looking at 200,000 pounds and
9  you bring that in on a non-compacted area and
10 it's going to sink and it's going to get stuck.
11 Then we are not going to be able to get the
12 component off and stuff like that.
13     Q.  Yeah, and so that's the idea.  There is
14 certain areas that are compacted more than
15 others like the crane pad or the foundation
16 itself, right?
17     A.  Yeah.  Yeah.  That's the major
18 compaction area that needs to be compacted.
19     Q.  But then there's other areas like the
20 erection site as a whole that also needs to be
21 compacted because like you said 200,000 pounds
22 of equipment is coming in and the ground needs
23 to be ready for this, right?
24     A.  Yes.  That's usually -- It doesn't take

48



1 up the whole erection site. Usually the heavier
2 stuff is within 65 feet of the center pin of the
3 crane on the crane pad. So say 65 feet from the
4 center of the crane pad to the tower will be
5 your heaviest equipment and off -- Let me think.
6 90 feet so we can pick the heavy components with
7 the crane.
8    Q.   Okay. So within this let's just -- So
9 within this let's say 90 feet, this is the area
10 that really needs to be compacted because this
11 is where the heaviest equipment is going to be,
12 right?
13    A.   Yeah. What really needs to be
14 compacted is the foundation area -- the ground
15 that has been disturbed by being dug up.
16    Q.   And then the same thing with the areas
17 where the equipment is going delivered or no?
18    A.   Yeah.
19    Q.   Like the heavy equipment.
20    A.   Some of the components usually end up
21 in the area of the -- on the foundation area the
22 same as the crane because the foundation is
23 usually 70 or 80 feet wide at the base.
24    Q.   So what you're saying is -- and I just

49

1 want to make sure I understand correctly -- the
2 crane and the equipment that's coming in to
3 build the turbine all go close enough to the
4 actual foundation so that the ground around it
5 is compacted enough to support it?
6    A.   Yes.
7    Q.   So the ground is prepared for these
8 things, but they are just placed close enough in
9 the compaction area so that the standards meet
10 what it needs to meet; right?
11    A.   Yeah.
12    Q.   So the crane is put on the crane pad
13 which is close to the foundation, right?
14    A.   Um-hum.
15    Q.   Is that a yes?
16    A.   Yes. I am sorry.
17    Q.   No, it's okay.
18        And then the same thing with the pieces
19 like the base or the mid or the blades, all of
20 these are put close enough so that they are also
21 in the compacted area, too; right?
22    A.   Yeah. They are put within the radius
23 of the crane to pick them up so we can erect it.
24    Q.   Exactly. So maybe not the whole

50

1 300 foot radius, but where the crane is and
2 where this equipment is being dropped, this is
3 all area that needs to be properly prepared so
4 the ground does not sink in underneath it;
5 right?
6    A.   That is correct.
7    Q.   And if the ground does sink in let's
8 say underneath the crane for example, that means
9 the ground wasn't properly prepared, right?
10        MR. SULLIVAN: Objection to foundation.
11        Go ahead.
12 BY MR. TERRY:
13    Q.   You can answer.
14    A.   Yeah. I mean, there is other -- Yeah.
15 I mean, if the crane -- Well, you know, the
16 crane pad and the crane sinks, yeah, the
17 foundation is -- the crane pad is not prepared
18 properly.
19    Q.   And you know this just from your
20 15 years of experience in the construction
21 field, you have seen things done right and you
22 have seen things done poorly; right?
23    A.   Yeah. You don't want to drop over a
24 300-foot tall crane and, you know, tens of

51

1 millions of dollars and flip it over and kill
2 somebody. That thing has to be pretty much hard
3 compacted to whatever specifications that were
4 allotted in the contract.
5    Q.   Exactly. And then the same thing for
6 where -- again, it's right by the foundation
7 where these large pieces of equipment are, same
8 thing there, like the base or the midsection,
9 this area also needs to be properly graded and
10 compacted so that the ground doesn't sink in
11 underneath those pieces?
12    A.   Yes.
13    Q.   And if the ground does sink in
14 underneath the base or the mid so that there
15 is large ruts and depressed areas, the
16 compaction wasn't done to the proper
17 specifications because it's --
18        MR. SULLIVAN: Objection.
19 BY MR. TERRY:
20    Q.   Let me finish -- because it's so close
21 to the foundation area?
22        MR. SULLIVAN: Foundation objection.
23        Go ahead.
24        THE WITNESS: Yes, I believe.

52



Leonard Breyne 02/23/2022

BY MR. TERRY:

Q.   And again, this is also from -- It's just common sense in your field.  The area where this large equipment is going to be coming in needs to be properly compacted so that it doesn't -- the ground doesn't sink in underneath, it's just common sense from your 15 years in the industry; right?

A.   Yes.  It needs to be solid to support the weight.

Q.   You said it needs to be able to support the weight?

A.   Yeah.  It needs to be solid enough to support the weight.

Q.   Exactly.  And you have seen other projects where the area around the foundation is properly compacted and the base and the mid-sections don't sink into the ground, right?

A.   Yeah.  It could be the next site down the road.  I mean, farm grounds are -- are peculiar places to be working; but yeah, I mean, one site could be totally different from another site and it can only be, you know, just down the road.  One site can be more clay, one site can

53

have more sand, you know what I mean.

Q.   Yeah, of course.  And this is why it's so important like you said to properly prepare and compact the ground so that to use your own words it can support the weight, right?

A.   Yes.

Q.   And in your experience -- Let's just talk about this area that we are talking about now where the crane goes, where the equipment is staged, where the foundation is.  If the compacting is done properly the idea is that large ruts and depressed areas won't form, right?

A.   Well, you're always going to have a rut, but if -- you're always going to end up with a -- Most of the time you're going to end up with a rut unless it's dry, dry dirt.  You know, when it gets wet and rainy you're going to end up with a rut and it needs to be graded away so that the rain -- the water does not pool up and stand underneath the components.

Q.   Okay.  So the idea is essentially what you're saying, the ground needs to be prepared, but when the trucks come in there is going to be

54

some amount of ruts that form and these need to be re-addressed?

A.   Yes, but once -- They are not -- Yeah, but you cannot re-address it until that piece is picked up and moved.  Then you can bring some equipment in to clear out the ruts that were underneath that piece of equipment or piece of tower section as I call it.

Q.   Okay.  So we are talking about two different things.  Let's just talk about the ground preparation first.  So what you have stated and I think is accurate, correct me if I am wrong, the ground around the foundation where the crane is, where the deliveries are being made, that needs to be compacted so that things like the crane and the base and the mid don't sink into the ground; right?

A.   Yes.

Q.   The ground needs to be compacted so much that like you said it can support the weight, right?

A.   Yes.

Q.   And then in your experience proper compacting of the ground in these areas prevent

55

these pieces of equipment from sinking into the ground?

A.   Yes.

Q.   And it also -- The idea behind it is if you compact it so that the pieces don't sink into the ground, there is not going to be these depressed areas when you move the pieces of equipment; right?

A.   Yes.

Q.   And on this project the preparing of the ground the compacting of it, this was Borneke's responsibility?

A.   I believe -- Yes.  They were the subcontractors that did the excavating, yes.

Q.   And in addition to this, and we've talked about the compaction for a while now, but also you said that the land needs to be graded away from the foundation so that water doesn't pool by the foundation where people are working; right?

A.   Yes.  They usually are graded away from it to -- when it rains so the runoff can get away from the towers and the foundation and everything and the crane pad.

56



1   Q.   And you would agree that water pooling
2   near a foundation or where people are working
3   can be a dangerous condition, right?
4       A.   Yes.
5       Q.   It can cause damage to equipment or it
6   can cause a slipping or tripping hazard, right?
7       A.   Yes.
8       Q.   It can also lead to areas where ruts
9   form more easily, right?
10      A.   Yes.
11      Q.   And that's why the grading and the
12  drainage is so important so that this water
13  doesn't pool in areas where work is going to be
14  performed?
15      A.   Yes.
16      Q.   And not only do these excavating
17  companies like Borneke come in and prepare the
18  ground, but they come back as needed to maintain
19  the area as well; right?
20      A.   Yes.  Usually they are informed and
21  they will come back and -- to maintain that
22  properly.
23      Q.   Yeah.  Whether it's that they are
24  informed of a condition or they just see it

57

1   themselves, if there is something unsafe like a
2   large rut or depressed area, this is something
3   that the excavating company would come back and
4   try to remedy; right?
5       MR. SULLIVAN:   Objection, foundation
6   and misstates prior testimony.
7       Go ahead.
8   BY MR. TERRY:
9       Q.   You can answer.
10      A.   Yeah, but usually like I said before,
11  it's -- if you're working on a project in the
12  area and you got ruts and stuff and usually the
13  foreman of that project -- or that's running
14  that should call up because -- and have them
15  come in and grade it back out for the -- you
16  know, get rid of the hazards that have
17  developed.
18      Q.   Okay.  But the idea is near the
19  foundation site and where the turbine is
20  actually going to be staged and erected, these
21  are the areas that you talked about it's so
22  important to compact it so much that the ground
23  doesn't sink underneath it; right?
24      A.   Yes.  Especially around the foundation,

58

1   yes.
2       Q.   I am going to show you what was marked
3   as Exhibit 3B during another deposition for
4   Brad Bennett's deposition.  I will zoom in for
5   you because I know it's a little small on the
6   screen, but have you seen this document before?
7   It's a site map for the Mendota Hills Wind Farm.
8       A.   Okay.
9       Q.   Have you seen this before?
10      A.   Yeah.  I had a site map in my hand
11  before years ago, yes.
12      Q.   Okay.  You know, this site map, this
13  shows the project we are here to talk about
14  today; right?
15      A.   Um-hum, yes.
16      Q.   And it shows what appears to be
17  29 various turbine sites, right?
18      A.   Yes.
19      Q.   And then the area surrounding each
20  turbine site would be erection area, right?
21      A.   Yeah, in the green dots.
22      Q.   Yeah, okay.  And then I want to ask
23  you a question.  There was a little bit of a
24  discrepancy between the incident report and what

59

1   has been testified to so far and I just want to
2   see if you remember.  There is testimony by my
3   client that he believes he fell at Site T11
4   which would be by Bingham Road and Butler Road
5   as it came across.
6       Do you happen to remember if this
7   sounds accurate based on where you were that
8   day?
9       A.   Yes.  I -- That sounds like it's pretty
10  accurate right there.  I believe that is T11,
11  yeah.
12      Q.   Okay.  Because there was a note made of
13  T1, but Nick thinks that was a typo and he
14  remembers the area being the T11.
15      A.   It's T11, not T1.
16      Q.   Okay.  So you do remember that it was
17  T11, not T1?
18      A.   Yeah.  I remember the site.
19      Q.   Okay, perfect.
20      So I am going to take that off the
21  screen and then I am going to show you another
22  exhibit that was marked at Mr. Bennett's
23  deposition which is Exhibit No. 4.  This is just
24  a zoomed out Google Earth image, okay?

60

1    A.   Okay.
2    Q.   And then you can see down at the bottom
3  of Page 1 we have Beemerville Road and in the
4  middle we have Bingham Road, right?
5    A.   Yes.
6    Q.   So this would be a zoomed out area of
7  the project that we are here to talk about,
8  right?
9    A.   Yes.  I believe so, yes.
10    Q.   Okay.  And then these roads that break
11  off of Bingham and Beemerville that go up to the
12  wind turbines, these would be like the access
13  roads we talked about; right?
14    A.   Yes.
15    Q.   Okay, got it.
16         And then if we go on to Page 2 of this
17  exhibit, you see Bingham Road on the side right
18  here; right?
19    A.   Yes.
20    Q.   And then we see -- and I don't know
21  what site this.  This is just for general
22  testifying purposes.  This curved road that
23  leads up to the turbine, this would be the
24  access road; right?

61

1    A.   Yes.
2    Q.   And then this area by the actual
3  turbine, this is what we have been talking
4  about.  In the direct center where the turbine
5  sits on, that's the foundation; right?
6    A.   Yes.
7    Q.   And then the area surrounding that
8  would be like the erection area, right?
9    A.   Yes.
10    Q.   And then if we look out all around
11  this, all this green area like the really dark
12  green, this is just the general farmland that
13  will never even be touched by any -- any company
14  for that matter; right?
15    A.   Yes.
16    Q.   So if the ground is uneven way over
17  here to the left or way over here to the right
18  or if water is pooling, one, who cares and two,
19  people will probably never even know because
20  work is not being performed there; right?
21    A.   That's right.
22    Q.   But in this area by the turbine near
23  the foundation in the erection site, this is
24  where it needs to be compacted and properly

62

1  graded, this little area out of the whole
2  project; right?
3    A.   Yeah.
4    Q.   Okay.
5    A.   I mean, roughly -- Like I say, I think
6  it's -- Depending what the contract says, I
7  think it's around 300 feet around the turbine
8  that needs to be cleared and compacted and
9  graded.  Compaction is really just around the
10  foundation area.  The rest needs to be cleared
11  out and graded.
12    Q.   And I believe the contract for this
13  site either called for 175 or 185 feet.  Does
14  that sound about right to you?
15    A.   Pardon me?
16    Q.   I said I believe the contract for this
17  site calls for either 175 or 185 feet as opposed
18  to 300.  Could that be accurate based on your --
19    A.   Yeah, from the -- Yeah.
20    Q.   Okay.
21    A.   Whatever the contract was agreed upon,
22  yeah.
23    Q.   So you're just using 300 as a base
24  point --

63

1    A.   Yes.
2    Q.   -- but it could be a little more, it
3  could be a little less?
4    A.   Yeah.
5    Q.   And then in this erection area you said
6  for maybe like -- I think you said 60, maybe
7  80 feet around the foundation that's the whole
8  area that you think really needs to be
9  compacted, and then the further area outside
10  just needs to be kind of graded and drained away
11  from the foundation; right?
12    A.   Exactly.
13    Q.   But then the area near the foundation,
14  where the crane is going to go, where the
15  equipment is going to be staged, this is the
16  really important area that needs to be compacted
17  and the ground needs to be prepared for the
18  equipment; right?
19    A.   Yeah.  Usually it's -- If it's not
20  disturbed by digging from the foundation and
21  stuff which I said, you know, usually I think
22  it's a 70 -- 80-foot hole across and, you know,
23  that stuff -- the outer part -- if it's not
24  disturbed, it just needs to be graded and more

64



1  of the compaction is right around that
2  foundation hole.
3      Q.   And the compaction area is where the
4  crane is going to be and where the equipment is
5  going to be staged, right?
6      A.   If it falls within that 70 feet or
7  whatever of the -- yeah --
8      Q.   Okay.
9      A.   -- of the foundation, however big the
10  foundation was -- hole was when they built it.
11      Q.   And then like we have talked about
12  generally, prior to Borneke coming in at this
13  site or at the various sites, the sites
14  generally look like the rest of the farm area
15  and then Borneke, the excavating company, comes
16  in, clears it, grades it and maintains it;
17  right?
18      A.   Yes.
19      Q.   So in this situation Borneke is
20  literally creating an access road for trucks to
21  drive on, right?
22      A.   Yeah, radiuses for the longer trucks so
23  they can make it around the corners and stuff
24  without going in the pit.

65

1      Q.   Like the turnaround area, right?
2      A.   Yeah, radius.  The turning area, yeah.
3      Q.   Got it.  And then in addition to
4  creating these access roads they are literally
5  creating the areas where the turbine is going to
6  go and where the work is going to be performed,
7  right?
8      A.   Yeah.
9      Q.   And if they don't compact the ground
10  properly near the foundation the ground can sink
11  in and it can cause catastrophic events, right?
12      A.   Yeah.
13      Q.   Let's keep talking about these erection
14  areas for a second.  It's known what is going to
15  be done at these areas.  Like it's no surprise
16  that turbines are going to be erected at a
17  turbine site, right?
18      A.   That's correct.
19      Q.   And it's no surprise that cranes are
20  going to be placed near the erection site?
21      A.   That's correct.
22      Q.   And again, I am asking you very obvious
23  questions, but they are important.  It's no
24  surprise that workers are going to be working

66

1  there or large pieces of equipment weighing tens
2  of thousands of pounds are going to be staged
3  prior to erection.  This is no secret.  It's
4  like this on every project, right?
5      A.   That's correct.
6      Q.   All right.  And more importantly, on
7  this project and I am sure on most projects
8  there is certain documents that tells the
9  various contractors what tasks are going to be
10  performed on each day, right?
11      A.   Yes.
12      Q.   And on this project they were called
13  the plans of the day, right?
14      A.   I believe so.  I wasn't involved in any
15  of that.  I don't know how -- Different
16  companies call it different things, but yes,
17  they usually have a meeting every morning.
18      Q.   And would this meeting include all the
19  contractors or would it include one of the
20  contractors?  How did that work or would it vary
21  from day to day?
22      A.   It would probably vary day to day.
23      Q.   Okay.  I am still here.  I am just
24  looking over.

67

1      I want to show you what was marked as
2  Exhibit 9 for Mr. Bennett's deposition.  Can you
3  see my screen here?
4      A.   Yes.
5      Q.   So this is a two-page document.  Let's
6  start with Page 2.  This shows what looks to be
7  like a rough terrain crane being stuck in the
8  ground and having to be pulled out by a tractor,
9  right?
10      A.   Yes.
11      Q.   And you see the large ruts that are
12  formed by the truck and kind of how the tire's a
13  third or halfway down into the ground?
14      A.   Yes.
15      Q.   Was this a common occurrence on this
16  project, ruts being bad and ground conditions
17  being so bad that cranes or trucks got stuck?
18      A.   Yes.  That crane got stuck quite a bit,
19  a few times.
20      Q.   And this was not just on one area, this
21  was on multiple areas of the project?
22      A.   Yeah, I believe so.  Yeah.
23      Q.   Okay.  And after this happened, would
24  the excavating company then go to where it was

68



Leonard Breyne 02/23/2022

1  stuck and regrade the land or try to compact it
2  down a little bit?
3      A.   I have no idea on that, what the
4  purpose would be for that.
5      Q.   But you do know that this happened at
6  numerous sites on this project as a whole,
7  right?
8      A.   Yeah.  That crane got stuck quite a few
9  times on that site.
10     Q.   So the idea is the ground conditions
11 being poor on this site, this was no secret to
12 anybody; right?
13     A.   No.  It's farm ground.
14     Q.   So then we spoke in double negatives.
15 So the answer to my question is yes, it wasn't a
16 surprise that the cranes were getting stuck and
17 semis were getting stuck, this was a common
18 occurrence on this project?
19     A.   Yes.
20     Q.   Did you hear complaints being made
21 about the ground conditions on this project
22 prior to this accident?
23     A.   No.
24     Q.   Let's go to Page 1 of this.  This is a

69

1  photograph that shows the area that Nick fell in
2  at least as he relates.  Is this -- Obviously
3  there was snow covering it on the day of the
4  accident, but does this appear to be the area
5  where Nick fell?
6          MR. SULLIVAN:  I am just going to
7  object to the foundation.  You haven't
8  established he was even there that day and what
9  his role was and so forth.
10         MR. TERRY:  I thought we established on
11 a prior deposition that he's the one who
12 literally drove Nick to the hospital, but I
13 guess I can ask ABC questions.
14 BY MR. TERRY:
15     Q.   Sir, do you happen to remember an
16 incident where my client fell at a job site?
17     A.   Yes.
18     Q.   Were you there on the project that day?
19     A.   Yes.
20     Q.   Did you end up driving Nick to the
21 hospital after he fell?
22     A.   I didn't drive him to the hospital.  I
23 followed the ambulance to the hospital with him.
24     Q.   Okay.  You put him in your pickup truck

70

1  and drove him to the ambulance though, right?
2      A.   No.  Safety man put -- Mortenson's
3  safety personnel put him in a pickup truck and
4  drove him to the end of the access road so the
5  ambulance from Paw Paw could pick him up and
6  take him to Mendota Hospital.
7      Q.   Were you at the actual site where Nick
8  fell?
9      A.   Yeah.  I was on a trailer behind that
10 hub sitting there.
11     Q.   When you say the hub, you mean this big
12 kind of --
13     A.   Yeah.
14     Q.   -- triangular piece in the background,
15 right?
16     A.   Yes.
17     Q.   So you were within earshot, so to
18 speak, of where Nick fell; right?
19     A.   Yes.
20     Q.   So now I am going to ask you some basic
21 questions about this photograph then.  On the
22 day of the accident, was there snow on the
23 ground?
24     A.   Yeah.  It covered that -- all that ice

71

1  up.
2      Q.   So that's the idea behind my question.
3  On the day of the accident this ice was here but
4  it was covered by a thin layer of snow, right?
5      A.   Yes.
6      Q.   Do you happen to know who took this
7  picture?
8      A.   I have no idea.
9      Q.   On the day of the accident is it safe
10 to say that these orange cones and the tape and
11 the spray paint were not there?
12     A.   Yeah.  None of that stuff was there.
13     Q.   This was all put there after the fact,
14 right?
15     A.   Yes.  I was probably at the hospital
16 with Nick when they did all that.
17     Q.   So in other words of stating it, there
18 was a large sheet of ice covered by snow with no
19 blatant warnings about it prior to him falling;
20 right?
21     A.   Yeah.
22     Q.   In the middle of this picture we see
23 the large sheet of ice here, right?
24     A.   Yes.

72

1    Q.   To the right we see what has been -- Do
2  you know what this piece of equipment is?  Other
3  people have said it was a midsection.  Do you
4  know what this is?
5    A.   That's a midsection.
6    Q.   And underneath it it looks like there
7  might be some type of staging.  Is that what
8  that is?
9    A.   Yeah.  We had cribbing to hold it up
10 off the ground.
11   Q.   And then on the left over here, do you
12 see these --
13   A.   That's the start of the crane pad.
14   Q.   So all of this area, this is close
15 enough to the crane pad where you would expect
16 the compaction to be done to a higher standard
17 to prepare the ground for delivery and
18 everything; right?
19   A.   Yeah.
20   Q.   This is well within the 60 or 80 or
21 100 feet, whatever specification you said
22 before.  This looks to be just a few feet away
23 from the crane pad; right?
24   A.   Yes.

73

1  ground?
2    A.   No.  The cribbing wasn't sunk like --
3  You know, you put a -- You put cribbing on each
4  end of the tube so the tube would just -- It's
5  like that midsection underneath.  It wasn't
6  touching the ground.  So like the whole thing
7  didn't sink in.
8    Q.   No, of course.  The whole base didn't
9  sink into the ground, but the ground sunk
10 underneath it a little bit to allow this
11 depressed area to form; right?
12   A.   Yeah.  It just looks like it was just a
13 low spot that filled up with ice and water --
14   Q.   Okay.
15   A.   -- water and then ice.
16   Q.   Yeah.  And you believe this low spot
17 was caused by the base that was there prior to
18 it being stood up and erected, right?
19   A.   Ask me that again.  What do you mean?
20   Q.   Sure.  That was a poor way to ask it.
21       I just want to make sure you think that
22 in this area prior to there being snow and ice
23 here this is where the base was staged, right?
24   A.   Yes.

75

1    Q.   Okay.  How big was -- You were on the
2  project.  How big would you estimate this sheet
3  of ice was?
4    A.   Probably 10, 12 foot wide.  I couldn't
5  tell you how long.  Probably about 30 foot long
6  maybe.  You said it was covered with snow.
7    Q.   Do you know what would have been here
8  prior to being just an open area with ice there?
9  Would another piece of equipment have been
10 staged there?
11   A.   The base section was sitting at that
12 part -- at that spot and it was already up, set
13 on the foundation so that exposed all that ice
14 and that -- and that ruts and stuff and that
15 depression.
16   Q.   So what do you believe caused this
17 depression?  Is it the base sinking into the
18 ground?
19   A.   No.  The base didn't -- The base did
20 not sink into the ground.  It's just -- It just
21 pooled underneath there.  The base was sitting
22 on cribbing and the cribbing was into the ground
23 when we picked that base.
24   Q.   You said the cribbing went into the

74

1    Q.   And this is an area -- While looking at
2  the photograph, this is an area that needed to
3  be properly compacted before the delivery of
4  these components were made; right?
5    A.   Well, obviously it should have been
6  graded better so that water didn't pool up
7  underneath there.
8    Q.   Okay.  But you think this is an area
9  that just from the get-go should have been
10 graded area?
11   A.   Yeah.  Just by looking at it the
12 water -- I mean, you don't see the ice
13 underneath the other piece.  You don't see the
14 ice anywhere else.  You just see the ice right
15 underneath that base.
16   Q.   Exactly.  So you think that if you look
17 to the right you see the cribbing underneath the
18 midsection, right?
19   A.   Um-hum.
20   Q.   And if we -- Is that a yes?
21   A.   Yes.
22   Q.   Trust me.  We are both going to do
23 that.  I did it at one point today, so don't
24 apologize.

76



1      If we zoom in way in the back of this
2  photograph it's a little blurry, but behind this
3  midsection that's what you're talking about, in
4  the background you don't see ice and water
5  pooling; right?
6      A.  No.
7      Q.  And then over to the left -- well, you
8  said no.  You would agree with my question,
9  right?
10     A.  Yes.  There is probably some down
11 around that berm back.  There might be some
12 water and ice buildup in the far background, but
13 nothing that close.
14     Q.  Yeah.  And then if we look over between
15 this sheet of ice and the crane pad, again we
16 don't see water and ice pooling and forming
17 here; right?
18     A.  No.  It looks like it's at a higher
19 elevation.
20     Q.  And then the same thing underneath this
21 midsection, if we look through and underneath
22 it, we don't see water and ice forming
23 underneath this; in fact, we can literally see
24 where the depression starts next to the cribbing
77

1  for this midsection, right?
2      A.  Basically.
3      Q.  So you would agree that this area where
4  this depression formed is -- in your opinion is
5  just an area that wasn't properly graded?
6          MR. SULLIVAN:  Objection to foundation.
7  He is not qualified to give opinions, but go
8  ahead.
9          THE WITNESS:  It's just it pooled up
10 there.
11 BY MR. TERRY:
12     Q.  And how do you think that could have
13 been prevented?
14         MR. SULLIVAN:  Objection, foundation.
15         Go ahead.
16         THE WITNESS:  If it was graded away so
17 the water ran off someplace else besides pooling
18 up there.
19 BY MR. TERRY:
20     Q.  And these are all things that you as
21 the ironworking company being a foreman on
22 numerous jobs, working on 15 other wind farm
23 projects, you would expect this to be done prior
24 to the delivery of these pieces of equipment
78

1  because once it comes in it's very hard to fix
2  these problems after the fact; right?
3      A.  Well, yeah, but if there is a condition
4  like this that -- being a foreman on that
5  project I probably would have called somebody up
6  to have the excavator come in here or some kind
7  of bobcat, something, to clean that out before
8  we proceeded any farther than what we did.
9      Q.  Okay.  So this is a condition --
10     A.  Get rid of the hazard.
11     Q.  So this is a condition, this depressed
12 area, that you think is a hazard even without
13 the ice?
14     A.  Well, it just makes a sloppy mess to
15 walk around in.  I mean, you wouldn't want to
16 walk through mud and water up to your knees.  I
17 don't appreciate doing it when I am on the
18 projects.
19     Q.  So this is part of the area that was
20 prepared by Borneke prior to the equipment being
21 delivered, right?
22     A.  Yes.
23     Q.  And we see various areas on this site,
24 T11, that was in fact done properly like near
79

1  the crane pad, near the mid; right?
2      A.  Yeah.
3      Q.  And then it's just -- Is it your
4  opinion that this area where we see the
5  depression just wasn't properly graded with the
6  adequate drainage away from the area and that's
7  why this water pooled?
8          MR. SULLIVAN:  Objection, foundation,
9  speculation.
10         Go ahead.
11         THE WITNESS:  Yes.  For some reason
12 there is a rut there.  There is a depression in
13 that area that made the water pool up.  If it
14 was -- Obviously if it was graded in a different
15 direction or something it wouldn't have pooled
16 up there and had a place to run off instead of
17 into a puddle.
18 BY MR. TERRY:
19     Q.  Exactly.  And these are things that you
20 as the ironworker and the foreman on numerous
21 job sites would expect the excavating company to
22 do before you even start your work there?
23     A.  Well, yeah, or clean it up after we
24 move that piece.
80



1    Q.   Yeah.  So you can either -- So you can
2    either prepare the ground properly the first
3    time so that this doesn't happen or you can come
4    in after the fact when you realize there is a
5    problem and fix it after the fact, right?
6    A.   Yeah.  Usually, you know, if we put
7    something down when it's dry and the ground is
8    dry and then we have the weather, you're going
9    to end up with some conditions that weren't seen
10   before and -- and yeah, then when it rains and
11   stuff there is conditions that come up so that
12   that's when the excavating company needs to be
13   informed by somebody and you bring some
14   equipment out or have some equipment there and
15   clean that up.
16   Q.   Not only that though, let's take away
17   that for a second.  What you talked about before
18   is important.  You agree that for some reason
19   there is a rut here that should have been graded
20   away or that should have been provided with
21   adequate drainage prior to the water even
22   forming, right?
23   A.   Yes.
24   Q.   So when you're stating that they should

81

1    have been notified, that's after the fact,
2    that's if it even gets to this point; right?
3    A.   Yeah, because if -- if it was just from
4    the truck sinking when we brought that piece in
5    it would just be in ruts.  It wouldn't be like a
6    big pool like that.
7    Q.   Yeah.  If it was just a large rut, that
8    would be like what we see in Photograph 2 where
9    the tires of -- where the tires of the crane are
10   stuck, right?
11   A.   Yes.
12   Q.   If we go back to Photograph 1 which
13   shows the area that my client fell, this is
14   literally just an area that is depressed that
15   allowed water and ice to accumulate; right?
16   A.   That's what it looks like to me, yes.
17   Q.   And this is something that from the
18   get-go before the equipment is even being
19   delivered should have been graded and drained,
20   right?
21   A.   Yes.
22   Q.   And had this been graded and drained
23   from the beginning, this water wouldn't be able
24   to pool because there is drainage away from this

82

1    area then; right?
2    A.   Yes.  By physics, yes, you know.
3    Q.   Well, just from common sense
4    perspective on these projects, you would agree
5    that drainage and grading is provided so that
6    things like this do not happen; right?
7    A.   Yes.
8    Q.   And if it was properly graded and
9    drained prior to this water pooling and then
10   freezing this big sheet of ice here wouldn't
11   have formed to begin with?
12   A.   It should --
13        MR. SULLIVAN:  Objection, foundation.
14   BY MR. TERRY:
15   Q.   I am sorry.  What did you say?
16   A.   I said it shouldn't have.
17   Q.   Should not have, right?
18   A.   Yeah.
19   Q.   And if it should not have formed to
20   begin with, then we wouldn't even have to get to
21   the point of telling Borneke to come back.  If
22   they graded and drained properly to begin with
23   this doesn't happen, right?
24        MR. SULLIVAN:  Objection, foundation,

83

1    speculation.
2        Go ahead.
3        THE WITNESS:  Yeah.  If it was pushed a
4    higher elevation or something, yeah, that water
5    would have pushed out of there and we wouldn't
6    have had that pool of water -- pool of ice.
7    BY MR. TERRY:
8    Q.   And the company that was responsible
9    for grading and draining on this project in this
10   area particularly before this even happened was
11   Borneke, right?
12   A.   Yes.
13   Q.   So had Borneke done their job properly
14   the first time, provided the draining, provided
15   the grading, that wouldn't have happened?
16        MR. SULLIVAN:  Objection, foundation,
17   speculation.
18   BY MR. TERRY:
19   Q.   You can answer.
20   A.   I mean, like I said before, when you do
21   it and it's dry and then when you get the
22   weather, a lot of conditions change.  Yeah.  If
23   it -- I don't know.  If it was grading and it
24   pushed away and it pushed itself away, yeah, it

84



1  wouldn't have happened.
2      Q.  Well, and the idea is when we look at
3  the photograph, in that photograph --
4          MR. SULLIVAN:  Can you hold on for a
5  second?  My computer is frozen up here.  I can't
6  see anything anymore.
7          MR. TERRY:  Chris, do you just want to
8  take a two-minute break?
9          MR. SULLIVAN:  Yeah.  I may have to
10 disconnect and reconnect because my computer
11 froze up and I can't do anything.  The mouse is
12 not working.
13         MR. TERRY:  Okay.  Chris, let's take
14 like a -- Mr. Breyne, let's just take like a
15 five-minute break and we will come back in a
16 little bit.
17         THE WITNESS:  Okay.  How long is this
18 going to take?  I have got to be somewhere at
19 3:00 o'clock.
20         MR. TERRY:  Okay.  I will do my best to
21 get through this in the next 15, 20 minutes.  I
22 will push you through and then, Chris, how long
23 would you say approximately?
24         MR. SULLIVAN:  Oh, hard to say.  Maybe

                                                    85

1  15, 20 minutes.
2          MR. TERRY:  Okay.  So --
3          THE WITNESS:  I am going to have -- I
4  am going to text my wife and tell her that she
5  is going to have to wait.  I am going to have to
6  pick her up from work.  I will tell her to hang
7  tight.
8          MR. TERRY:  Okay.  We will just do our
9  best to plow through this and get you out of
10 here, but it might be a little bit after 3:00,
11 but we will do our best.  We will just take a
12 like a two-minute break and come back then,
13 okay?
14         THE WITNESS:  Okay.  Thank you.
15         MR. TERRY:  Thank you.
16             (Whereupon, a short break was
17              taken.)
18 BY MR. TERRY:
19     Q.  Sir, I just want to ask you a couple
20 more questions about the area that we were just
21 talking about and then I will move on and try to
22 finish up here really quickly.
23         You would agree that the area that we
24 see here with the sheet of ice is lower or more

                                                    86

1  depressed than the area surrounding it, right?
2      A.  Yes.
3      Q.  And you said, you know, something along
4  the lines of if it rains or if it's -- you know,
5  weather conditions change after the fact that
6  that can change the makeup of the ground; right?
7      A.  Yes.
8      Q.  So you would agree that even if it did
9  rain prior to this, which it did, the area
10 surrounding this sheet of ice are not depressed
11 like the area where the ice is; right?
12     A.  Yes.
13     Q.  So the area that's supporting the
14 midsection over here, this is okay; right?
15     A.  Yeah.  It looks like it's higher ground
16 than what that depressed area is.
17     Q.  Yeah, and the same thing on the area to
18 the left of the sheet of ice in the photo near
19 the crane pad, right?
20     A.  Yes.
21     Q.  So that just further shows that what
22 you said is true, had this area been properly
23 graded to begin with or had it provided the
24 proper drainage to begin with this sheet of ice

                                                    87

1  wouldn't have formed because the water wouldn't
2  have been there; right?
3          MR. SULLIVAN:  Objection, foundation.
4          THE WITNESS:  Yeah, but --
5          MR. SULLIVAN:  Go ahead.
6          THE WITNESS:  -- it wouldn't have
7  formed.  No.  I mean, you can see behind, you
8  know, in the background there is not standing
9  water back there or standing ice.
10 BY MR. TERRY:
11     Q.  Exactly.  And that just shows that
12 certain areas were prepared properly and certain
13 areas weren't, right?
14         MR. SULLIVAN:  Foundation.
15         Go ahead.
16         THE WITNESS:  I believe -- Yeah.  I
17 mean, I -- It was -- Obviously it was prepared
18 enough for us to take that mid in there.  As far
19 as I know about after we put that mid up because
20 I remember slipping on that ice when I hooked
21 that mid up, you know, the rest of the area was
22 not -- that I recall was not iced up like that
23 area was when we took that base -- put that base
24 up, I am sorry.

                                                    88

BY MR. TERRY:

1 Q. Yeah. So this, whatever you said it
2 was, about 12 foot by 30 foot sheet of ice, had
3 this area been properly graded and the drainage
4 provided from day one it wouldn't have formed,
5 right --
6 MR. SULLIVAN: Foundation.
7 THE WITNESS: Yes.
8 BY MR. TERRY:
9 Q. -- in your opinion?
10 A. Yes.
11 Q. And these tasks are the responsibility
12 of Borneke based on what you saw in this job
13 site, right?
14 A. Yes.
15 Q. Okay. And this proper grading and
16 drainage in these erection sites where this
17 sheet of ice formed, these are all tasks that
18 are common and expected of the excavating
19 company on these projects; right?
20 A. Yes.
21 Q. And if the excavating company does
22 their job properly from day one, the idea is
23 things like this don't happen; right?

89

1 A. Well, it's got to be maintained. I
2 mean, they just can't go in there and do it and
3 then not sit there and maintain after the
4 weather conditions change.
5 Q. Okay. So let's break that down. First
6 of all, you would expect them to do it right,
7 grade and provide drainage from the get-go;
8 right?
9 A. Yes.
10 Q. But also you would expect them just to
11 come back from time to time if needed and
12 maintain the area as well, right?
13 A. Yes.
14 Q. Okay. And if they don't do either of
15 these things, if they don't properly prepare the
16 ground or if they don't come back and properly
17 maintain the areas then they are not doing their
18 job; right?
19 A. Well, I -- You know, like in that
20 situation once we picked that base up they
21 should have been informed that they needed to
22 bring some kind of equipment in there to
23 straighten that out. They are -- There is no
24 access to take care of that until that base was

90

1 set. Somebody should have informed them, and I
2 know they weren't -- I know they weren't on the
3 site at the time. I remember they weren't on
4 the site with any equipment, but somebody should
5 have gotten a hold of them and told them hey, we
6 need to get this taken care of, get this ice out
7 of here to make it safer.
8 Q. Okay. But nonetheless, this is
9 something that they could have done, too, they
10 could have driven around the site and used their
11 eyes and saw a large sheet of ice and realize
12 it's something that they need to fix; right?
13 A. Well, yeah, but that thing was
14 probably -- wasn't even exposed a half hour or
15 so prior to the accident, maybe an hour.
16 Q. Okay. But nonetheless, you would agree
17 that in the areas surrounding this ice the land
18 surrounding it is not depressed, it is just this
19 one area; right?
20 A. Yes. Exactly. I agree with that.
21 Q. So then the area surrounding it where
22 there is no ice and no depressed area, this area
23 was properly prepared; right?
24 A. If there was no ice there, yeah, it

91

1 was -- it was graded away.
2 Q. Okay. But then the area, just that one
3 spot where the ice is forming, this is an
4 example of an area that wasn't properly graded
5 and drained to begin with; right?
6 MR. SULLIVAN: Foundation objection.
7 Go ahead.
8 THE WITNESS: To me, yeah. It
9 didn't -- It didn't drain away, so obviously it
10 wasn't -- wasn't done properly or some other
11 circumstances made that depression; but like I
12 said, when we picked that base up the base was
13 not sitting on the ground to make that
14 depression.
15 BY MR. TERRY:
16 Q. But again, before we even get to
17 somebody telling Borneke hey, come over here and
18 fix this, this should have been graded and
19 maintained and drained from day one, and if that
20 was done we wouldn't even be in a situation
21 where they need to be notified; right?
22 MR. SULLIVAN: Objection to the --
23 THE WITNESS: Yes.
24 MR. SULLIVAN: -- foundation. Go

92

1  ahead.
2  BY MR. TERRY:
3      Q.   You can answer.  You said yes, right?
4      A.   Yes.  Graded to the point where the
5  water would have ran away from that area where
6  we have the equipment and the components placed,
7  yeah, that never would have happened.
8      Q.   Yeah.  And you can tell that that's
9  true because the area surrounding this area was
10 properly graded because water is not pooling
11 there, right?
12     A.   Yes.
13     Q.   It's just in this area one that wasn't
14 properly graded from day one and had it been
15 graded right from day one we wouldn't be here,
16 right?
17          MR. SULLIVAN:  Objection, foundation,
18 calls for speculation.
19 BY MR. TERRY:
20     Q.   You can answer.
21     A.   Probably not.
22     Q.   Okay.
23     A.   Did you hear me?
24     Q.   Yes, I did.

93

1          And this is why this is an example of
2  something that's preventable.  This is why
3  grading and the drainage are done from day one
4  because things like this are preventable in most
5  circumstances, right?
6          MR. SULLIVAN:  Objection, foundation,
7  calls for speculation.
8          THE WITNESS:  Yeah.  The -- Yeah, it
9  could have been preventable if it was graded
10 away and that water had a chance to go
11 someplace else.
12 BY MR. TERRY:
13     Q.   And that's why grading and drainage are
14 so important on these projects?
15     A.   Exactly.
16     Q.   Okay.
17     A.   Not only for personal health reasons --
18 I mean, more for personnel reasons, but for
19 equipment and stuff like that.
20     Q.   Let's talk about the accident itself.
21 You said you were behind this hub in the
22 background where my client fell, right?
23     A.   Yes.
24     Q.   Okay.  Did you see him fall or no?

94

1      A.   No.  I was -- I was out of the trailer
2  and we were -- I was -- We were bringing stuff
3  out of the base and I was landing it on the
4  trailer, our tooling, and -- I had a radio and I
5  heard a crane operator say somebody needs to
6  help him.  I did see Nick over there and I did
7  see him turn to walk away, but I -- my focus was
8  on doing my task and I was like one of the first
9  guys over to get to Nick to help him when he was
10 laying on the ground.
11     Q.   And when you helped him, was he still
12 on the sheet of ice or he crawled off at that
13 point?
14     A.   No, no.  We were -- We were on the
15 sheet of ice.
16     Q.   Okay.
17     A.   I didn't let him move.
18     Q.   You didn't what?
19     A.   I did not let him move.  I went and had
20 another co-worker go get my jacket and we tried
21 to get him to sit on the jacket to get him up
22 under the ice and I kind of held him until we
23 got safety personnel there.
24     Q.   What did you see?  Like could you

95

1  visually see that something was wrong with his
2  ankle?
3      A.   Oh, yeah.
4      Q.   Can you describe what you saw?
5      A.   I would say his right ankle was at a --
6  What do I -- How do I want to say it?  I have
7  got to picture it.  At a distinctive angle that
8  wasn't right.  You know what I mean?  It was --
9  definitely had -- I knew right away that it
10 definitely was a serious injury.
11     Q.   So this is something that you could not
12 only hear him telling you, but you could
13 actually see his ankle visibly out of place?
14     A.   Yeah.  Nick didn't even know what went
15 on.  He just didn't even know his ankle was
16 messed up and I just -- Yeah.  Once I got to him
17 and I looked down and his leg was twisted and I
18 knew that he had broken something.
19     Q.   Was he telling you he was in pain?  Was
20 he telling you -- Was he screaming, anything
21 like that or did it just kind of appear he was
22 in shock?  Like what did you see that he was
23 doing?  What did you observe?
24     A.   As a matter of fact, he was pretty

96



Leonard Breyne 02/23/2022

1 calm. He was like kind of in shock. He was
2 like what happened and I just kept telling him
3 not to look at his leg and -- You know, I was
4 just trying to keep him comfortable, keep my
5 eyes on him, like I said, put a jacket on him,
6 keep him warm until we had personnel get there
7 that are more trained to -- I didn't let him
8 move. I didn't want him to move anywhere. I
9 didn't want him to try anything until we had
10 somebody there to get a splint on him. We
11 called the ambulance and called the first aid
12 personnel.
13     Q.    So can you kind of walk me through that
14 a little bit? You said like a splint, the
15 ambulance. Walk me through what happened, you
16 know, after you were there with him up until the
17 point you got him in the ambulance.
18     A.    Well, I sat there with him. Like I
19 said, I had some other guys went and grab -- I
20 had an extra jacket and stuff in my truck and I
21 had them grab my jacket to cover him up. I just
22 kind of held him, tried to keep him off the ice
23 so he wouldn't get cold. Once the personnel
24 came, office personnel, everybody, everybody

97

1 come running down that crane path on that high
2 spot that you saw there and they started to come
3 out to where I was at. I told them don't come
4 out here, this is a sheet of ice. Everybody
5 that stepped on that sheet of ice danced around
6 and almost fell themselves until they got to us.
7         They told me the ambulance was coming.
8 The safety man came and proceeded to put some
9 kind of a splint on his leg and then we had to
10 pick him up. They pulled a pickup truck by that
11 midsection and we picked him up and they carried
12 him and put him in the back of the pickup truck, a
13 four-door pickup truck. They drove him to the
14 access road for the ambulance to transfer him to
15 the ambulance -- the gurney and the ambulance.
16 I argued with them about moving him because I
17 knew the ambulance was going to come and they
18 were going to have the gurney, but they said
19 they needed to move him. So they put him in a
20 pickup truck and transferred him up the access
21 road to the main road so he can meet the
22 ambulance.
23     Q.    Do you know whose truck it was that you
24 put him in?

98

1     A.    The safety personnel's truck.
2     Q.    Was that Hogan?
3     A.    I can't remember the man's name.
4     Q.    That's okay. But overall you were
5 helping Nick -- Just to summarize, you were
6 helping Nick. Somebody from the site came over,
7 put a splint on him and you actually helped Nick
8 get in the back of the pickup truck and you
9 waited with him until the ambulance came?
10     A.    Yeah. Pretty much, yes. My
11 superintendent came on the job, and since Nick
12 was the union steward and as the union -- rules
13 are that nobody goes to the hospital. You're
14 hurt, you got to go to the hospital, the steward
15 has to go with you. Well, I was appointed the
16 steward at the moment and I went to the hospital
17 so he didn't have to go by himself and stayed in
18 the emergency room with him.
19     Q.    How long were you in the emergency room
20 with Nick for? Were you there until he was
21 discharged or how did that work?
22     A.    Yes, I was there until he was
23 discharged. His wife came to pick him up when
24 he got discharged and then I left.

99

1     Q.    You said his wife came and picked him
2 up?
3     A.    Yes.
4     Q.    So you were with Nick in the hospital
5 from the time he was injured until he was
6 discharged to his wife?
7     A.    Yeah. Basically by the time we got to
8 the hospital because I had to follow the
9 ambulance in a pickup truck until we got to the
10 hospital. The time he got in there until the
11 time he was discharged and his wife and helped
12 him walk out so he can get into his car.
13     Q.    Got it. Okay.
14         But overall, the ground conditions at
15 this area you said it was so bad that an
16 ambulance couldn't get to where he was?
17     A.    No, no. The ambulance could have
18 pulled right down in there and got where the
19 pickup truck was. I don't know why the safety
20 personnel needed to get him in the pickup truck.
21 I argued with him and I told him that the
22 ambulance was coming, they can drive down here,
23 get the gurney over here, we can get him on the
24 gurney and get him in the ambulance instead of

100



1  just picking him up and, you know -- and putting
2  him in anymore pain than he already was in, but
3  they -- that's what the safety personnel and
4  superintendent said and so everybody grabbed a
5  hand on him to help him to get in the back of a
6  pickup truck which I thought was stupid.
7      Q.  Okay.
8      A.  I thought.
9      Q.  Okay.  But nonetheless, I am just going
10  to -- I asked you about that, so I am going to
11  move on to -- Out of the sake of time for you, I
12  know you have other obligations, so I am going
13  to move on.
14          Have you ever seen the incident report
15  that was filled out as it relates to this
16  accident?
17      A.  No.
18      Q.  Were you involved in any investigation
19  or anything like that?
20      A.  No.
21      Q.  If I told you the names James Langston,
22  Kevin Hogan, do any of them sound familiar as to
23  whose pickup truck it was that you put Nick
24  into?

101

1      A.  No.
2      Q.  What about Lonnie Sears?
3      A.  Lonnie Sears was ironworker foreman on
4  the site.
5      Q.  I am just going to summarize what the
6  incident report said and I want to make sure
7  it's kind of clear that it's the same thing that
8  you understand happened.  It basically says that
9  Nick was checking on the base/mid offload crew
10  at site T1 and upon exiting he began walking
11  towards the midsection and that's when he
12  realized he was on a sheet of ice covered by a
13  thin layer of snow and he fell as he tried to
14  get off of it.  Does that sound accurate to you?
15      A.  All I did is seen him turn and walk
16  away and I think he was heading down the other
17  end to help Lonnie Sears hook up the midsection.
18      Q.  Okay.
19      A.  And he walked like -- He didn't like
20  walk across the ice, he walked long ways on that
21  ice.  Like he was going from one end of that
22  midsection that you saw in the picture to the
23  other end, and that's -- All I heard was the
24  call on the radio.  I looked over.  I jumped off

102

1  the trailer and I ran over there to help him.
2      Q.  So he was kind of walking in that area
3  between the hub and the midsection along the
4  long portion of the ice, right?
5      A.  Yeah.  He was like, yeah, about end of
6  that -- end of the midsection that you have in
7  the photo there and he was walking to the other
8  end of it which would be approximately, I don't
9  know, 70, 75 feet away.
10      Q.  And you remember the sheet of ice being
11  covered by a thin layer of snow on this day even
12  though the photo doesn't show it, right?
13      A.  Yeah, because when I hooked up that
14  base and we hooked up and did some work on the
15  bottom of the mid that me and my partner in my
16  truck, we both slipped and skidded around on
17  that ice as soon as --
18      Q.  Did you hook up the mid -- or the base
19  that morning?
20      A.  Yes.
21      Q.  And then the idea was --
22      A.  We were just --
23      Q.  Go ahead.
24      A.  We were just finishing parking it.  We

103

1  were just finishing anchoring it down when Nick
2  came out.
3      Q.  So you just got done with the base and
4  you were about to hook up to the midsection,
5  right?
6      A.  Yes.
7      Q.  But ultimately you said that you didn't
8  even see the sheet of ice because it was covered
9  by a thin layer of snow.  So that part is
10  accurate, right?
11      A.  Yes.  Yeah, like we didn't know that
12  ice was there when we first started.
13      Q.  There was a comment made about the
14  possibility of using ice cleats.  Were ice
15  cleats required on this project that you know
16  of?
17      A.  I never seen no ice cleats.
18      Q.  So it's safe to say that those were not
19  a requirement for this project, right?
20      A.  No.  I mean, they had them out.  Safety
21  usually has them out, but I never did see
22  anybody with them or anything like that.
23      Q.  There was comments made in the incident
24  report that this area had previously been

104



1 addressed with a bulldozer but ice had
2 accumulated too close to the WTG section for the
3 dozer to operate safely.
4      You would agree that in that picture I
5 showed you hypothetically a smaller piece of
6 equipment could have been used to fix this area,
7 right?
8      A.   Yeah.  They would could have brought in
9 a small bobcat or something if, you know, they
10 would been informed by the foreman on that
11 project, they noticed it was a hazard, we could
12 have called in and I am sure somebody would have
13 brought a piece of smaller equipment, maybe some
14 sand, something to throw down on that.
15      Q.   But ultimately you said that the area
16 where this happened was exposed shortly before
17 Nick fell and that's where the base was that you
18 just hooked up, right?
19      A.   Yes.
20      Q.   So ultimately this area where the ice
21 formed, there was a deposition that proceeded
22 and somebody said that it might have been formed
23 by the use of crane mats or something like that.
24 Is it your understanding that this ice formed

105

1 underneath a base section?
2      A.   Yeah.  That's where the base section
3 sat.
4      Q.   So this area, this depressed area,
5 wasn't formed by the use of crane mats or
6 anything like that, it was formed underneath a
7 base that was previously staged there; right?
8      A.   Yeah, but I don't remember -- Like we
9 off-loaded that area, but I don't remember using
10 crane mats to off-load it right there.  I just
11 don't remember.
12      Q.   Let me ask you a couple more questions.
13 Have you ever spoken with Nick since the
14 accident after the hospital or anything like
15 that?
16      A.   No.
17      Q.   Do you happen to know like how he is
18 doing today?  Like do you grab drinks with him
19 or catch up or anything like that?
20      A.   No.  Just word of mouth through other
21 guys that know him; but no, he lives probably
22 almost an hour and a half, two hours from me.
23      Q.   Just overall from a general standpoint,
24 Borneke was the excavating company hired on this

106

1 project; right?
2      A.   Yes.
3      Q.   They were the company that was
4 responsible for grading, blading, and providing
5 adequate drainage in areas that we saw in that
6 photograph; right?
7      A.   Yes.
8      Q.   They were the ones that were operating
9 the bulldozers, creating the access roads and
10 creating and maintaining the lay down areas;
11 right?
12      A.   Yes.
13      Q.   And the same thing with the erection
14 areas and the foundation areas, right?
15      A.   Yes.
16      Q.   And they were -- and as you see in the
17 picture provided drainage and grading for areas
18 in this erection area, just not the depressed
19 that.  That's a poor way to ask that question.
20      You would agree that when you look at
21 the picture there is plenty of areas in that
22 erection site that aren't depressed and don't
23 have water and ice accumulated, right?
24      A.   Yes.

107

1      Q.   So those are areas in which it looks
2 like the grading and the drainage were formed --
3 were properly, right?
4      A.   Yes.  I would imagine, yeah.  If there
5 is no water standing there, everything ran off,
6 yeah.
7      Q.   And taking aside someone coming out
8 after the fact and fixing it, is it your opinion
9 that this is an area that should have been
10 graded and drained properly from day one so that
11 this can never form to begin with?
12      MR. SULLIVAN:  Objection, foundation,
13 asked and answered already.
14      THE WITNESS:  Yeah.
15 BY MR. TERRY:
16      Q.   And had this been properly graded and
17 drained like the areas surrounding it, this ice
18 would never have formed to begin with and we
19 wouldn't be here likely; right?
20      MR. SULLIVAN:  Foundation, asked and
21 answered.
22 BY MR. TERRY:
23      Q.   You can answer.
24      A.   Yes.

108



1    MR. TERRY:  I believe those are all the
2  questions I have for you at this time.  I am
3  sure Mr. Sullivan does have a few follow-ups.
4  Thank you, sir.
5    THE WITNESS:  Yes.
6    MR. SULLIVAN:  I realize you have a
7  time crunch.  It wasn't my doing.
8    MR. TERRY:  I didn't know that either,
9  Chris.  I am not trying to obviously leave you
10  with no time.  If we need to reconvene, we can
11  but --
12    MR. SULLIVAN:  No, understood.
13            EXAMINATION
14  BY MR. SULLIVAN:
15    Q.  Mr. Breyne --
16    A.  Breyne.
17    Q.  -- Breyne, you were not the foreman,
18  right?  You were a journeyman?
19    A.  No.  I was just a worker.
20    Q.  And so you were in the same position as
21  Nick Borneke, right?  I mean, Nick Georgeff,
22  Nick Georgeff?
23    A.  Yes.
24    Q.  Did you know him at all prior to this
                                              109

1  project?
2    A.  No.
3    Q.  You don't have any experience working
4  for an excavating company, do you?
5    A.  No.
6    Q.  And you don't hold yourself out as an
7  expert in excavation, do you?
8    A.  No.
9    Q.  You have not seen the contract between
10  the Mendota Hills owner of the project and
11  Mortenson, have you?
12    A.  No.  No, sir.
13    Q.  And you haven't seen the contract
14  between Mortenson and Borneke, have you?
15    A.  No, sir.
16    Q.  How long had you worked with Nick
17  before this took place?
18    A.  Just on that project.
19    Q.  So it had been, what, a month,
20  something like that?  How long?
21    A.  We were probably a couple months in.
22    Q.  Now, Borneke was not on that site.  You
23  said it was T11 on that day, correct?
24    A.  I do not believe I remember seeing them
                                              110

1  anywhere on that site.
2    Q.  Did you ever interact with anyone from
3  Borneke?
4    A.  No.
5    Q.  Did you ever complain to anyone at --
6  Well, strike that.
7        Your direct boss was who?
8    A.  Lonnie Sears.
9    Q.  Okay.  And that also would have been
10  Nick's boss, right?
11    A.  Yeah.  He was -- Lonnie Sears was the
12  foreman of the base -- off-load base mid
13  erection.
14    Q.  And you were considered what?
15    A.  A worker.
16    Q.  For the base mid erection?
17    A.  Off-load base mid erection, yeah.
18    Q.  In Lonnie Sears' team, right?
19    A.  Yes, yes, yes.
20    Q.  And you and nick and Lonnie were all
21  employees of Mortenson, right?
22    A.  Yes.
23    Q.  Mortenson was required to identify
24  hazards, weren't they?
                                              111

1    A.  I would believe so, yes.  That occurred
2  that -- Yeah, that occurred.  When things don't
3  happen I brought that up before.  Like the
4  foreman or whatever on the site should have
5  been -- informed somebody to come in and clean
6  that up.
7    Q.  Right.
8    A.  Clean up after ruts are made and stuff
9  like that -- when Borneke is out doing something
10  else at a different site.
11    Q.  Right.  You're not aware that anyone
12  ever notified Borneke of this ice patch, are
13  you?
14    A.  No.
15    Q.  And you don't have any reason to
16  believe that Borneke would not have come out to
17  fix it if they were notified of this, do you?
18    A.  I have no reason to recollect they
19  wouldn't if -- You know, that's usually --
20  That's their job.  If they were informed, they
21  probably would have came out.
22    Q.  Right.  Now, you were asked about the
23  pieces in the creation of ruts and depressed
24  areas and so forth.  The weather changed on this
                                              112

1  worksite often, right?
2      A.   Yeah.
3      Q.   I mean, you had rainy days, you had
4  colder days.  In this particular case you had
5  rain that was followed by colder weather that
6  turned into snow, right?
7      A.   Yeah.
8      Q.   Would you agree with me that just
9  because one of these pieces sinks into the
10  ground it doesn't mean it was not excavated
11  properly at the beginning before the stuff was
12  laid down?
13      A.   Well, yeah, I would agree to that
14  point, but the water needs to get pushed out
15  someplace.  Most of them crane pads on that site
16  were just -- they weren't elevated what I want
17  to say.  They weren't elevated.  They were just
18  right there on the dirt and then they just --
19  and they just put crane mats down and brought
20  the cranes on it.
21          A lot of those sites that I work on
22  they are usually a little elevated and they are
23  packed with gravel and stuff and then they put
24  your crane pads down to bring your crane on.

113

1  These were basically just on the dirt.
2      Q.   Right, but you don't know if the
3  contract said they needed to use gravel or
4  anything; right?
5      A.   No.  I have no idea.  That was the
6  first one I have ever really been on that never
7  had like gravel put on the crane pad.
8      Q.   Let me ask you about the base section.
9  You said earlier that the base section wasn't
10  just laying on the dirt, right?
11      A.   No.  It was on that cribbing.
12      Q.   And the cribbing is what?
13      A.   What holds it up.  It's like 8 by 8
14  mats and some 4 by 6 oak that we make into like
15  a V and put them on each end of the tube and the
16  tube suspends itself over those mats.
17      Q.   Okay.  And what are the mats made of?
18      A.   Oak.
19      Q.   And is it -- In looking at that
20  picture, is it the same stuff that's underneath
21  the other piece?
22      A.   Yeah, yeah.
23      Q.   Okay.  And it's laid down the whole
24  length of the piece then, right?

114

1      A.   No, just put on each end and then the
2  piece is suspected.  It's not covered -- You
3  just put cribbing on one end of the tube and
4  then cribbing on the other end of the tube and
5  you lay the tube down on top of it and then it
6  sits there and it's suspended.
7      Q.   Let me just pull up --
8      A.   There is no -- There is nothing in
9  between the middle or anything like that in
10  between that.
11      Q.   Okay.
12          MR. TERRY:  Chris, do you want me to
13  pull up the photo?
14          MR. SULLIVAN:  That would be nice.
15  Actually it will make it easier.  I have a
16  different copy of it.
17  BY MR. SULLIVAN:
18      Q.   Okay.  You see that, sir?
19      A.   Yeah.
20      Q.   You see that?
21      A.   So that piece right there --
22      Q.   Um-hum.
23      A.   Okay.  That's your cribbing.
24      Q.   Right.  This stack that's at the end,

115

1  right?
2      A.   Yes.
3      Q.   But what's this other stuff that goes
4  under the whole length of the tube?
5      A.   Nothing.
6      Q.   Well, if you zoom in it's --
7      A.   You put a stack on one end and you put
8  a stack on the other end.  The tube is heavy
9  enough and good enough it will support itself.
10      Q.   Can you see the picture?
11      A.   Yeah.
12      Q.   You see where the arrow is now?  That's
13  not just dirt, right?  There is some kind of
14  pads.
15      A.   That might be waffle mats.  Yeah, swamp
16  mat.
17      Q.   What are those?
18      A.   Those are just some swamp mats on that
19  piece.
20      Q.   What is a swamp mat?
21      A.   It looked like dirt before now that you
22  pointed it out.  Sorry.  It's a waffle mat.
23  It's a thin mat that are about -- What are them?
24  12 feet wide.

116



1    Q.   Right.  Okay.  And what is it made of?
2    A.   Wood.
3    Q.   And were these the same mats that were
4  underneath the other base piece where the ice
5  is?
6    A.   No, because -- No.  I don't remember
7  them being underneath there because if they were
8  that ice would have been all broke up when we
9  pulled them up to get to the other piece.
10   Q.   You said it was only half an hour to an
11 hour that you had lifted up the base piece and
12 moved it out of the way?
13   A.   An hour or so.
14   Q.   And were you involved in that?  Did you
15 watch that happen?
16   A.   Yes.
17   Q.   And was there anything underneath the
18 base pad other than the cribbing that you
19 recall?
20   A.   I don't recall.  I remember we threw
21 some mat -- some of those mats at the end to
22 cover up that ice in the end, but in the middle
23 I don't believe -- I can't remember if there was
24 any there or not; but if there was, then we

117

1  would have had to pull them up or they would be
2  in that picture, and if I would have pulled them
3  up, that ice would have been all broke up.  It
4  wouldn't have been a sheet of ice.  Do you
5  understand what I am saying?
6    Q.   Right.  But you had just -- You don't
7  recall if there were any mats down there or not,
8  is that right?
9         MR. TERRY:  Objection, he just
10 answered.
11        THE WITNESS:  I don't recall seeing
12 mats there.  I don't recall at the time.
13 BY MR. SULLIVAN:
14   Q.   And you don't know how long after this
15 incident that the picture was taken, whether it
16 was that day or the day after?  You don't know,
17 right?
18   A.   No.  I have no idea.
19   Q.   And by the way, the cones that are here
20 now to mark it off as a hazardous area, that was
21 done by Mortenson; right?
22   A.   I believe so.  I never went back to
23 that site after the accident.
24   Q.   Okay.  Did you ever --

118

1    A.   They finished the project what they
2  were doing I think -- No.  I don't think I ever
3  went back to that because I had to take over
4  Nick's job.
5    Q.   Did you ever speak to the safety person
6  from Mortenson about this case?
7    A.   No.  No.  Nobody talked to me about the
8  accident or nothing.
9    Q.   In the way that this project was set
10 up, the area is graded first before the
11 equipment ever comes in; right?
12   A.   Yes.
13   Q.   And Borneke, the excavator, is required
14 to be out of the area by the time the equipment
15 is actually set up; right?
16   A.   Yeah.  They are supposed to be out --
17 Yeah.  You can't -- Yeah.  They need to have
18 their equipment out of there before we start
19 bringing the big trucks in, yeah.
20   Q.   I mean, there is not enough room for
21 them to even be there when the pieces are being
22 erected using the cranes; is that true?
23   A.   Well, there is -- I mean, they park up
24 off the access road and stuff; but yeah, for to

119

1  be in on -- in the middle of the site, no, they
2  are -- and like I said before, for them to come
3  into the site with a piece of equipment or
4  anything they usually have to be informed,
5  inform the foreman of the site or ask to come in
6  from the foreman of the site --
7    Q.   Right.
8    A.   -- which would have been Lonnie Sears.
9    Q.   That would have to take place for them
10 to even show up on the path site, the erection
11 site; correct?
12   A.   Yeah.  Probably would have had a
13 foreman to come or something like that.
14   Q.   And you're not aware that anyone ever
15 called Borneke out to Site T11 that day, are
16 you?
17   A.   I am not aware at all.
18   Q.   Was there any -- Do you recall any
19 discussion from anyone at Mortenson about the
20 incoming snow or that it was going to get cold
21 or anything like that?
22   A.   No.
23   Q.   Was there a -- I forgot what it's
24 called -- like a warning sign about weather when

120



1  you arrive at the T11 site?
2      A.   No.
3      Q.   You're not aware of that?
4      A.   No, no.
5      Q.   Obviously you knew it was snowing that
6  day, correct?
7      A.   Oh, yeah.  I work outside all the time.
8  Yeah, we deal with it all the time.
9      Q.   And if there is snow, there is also a
10 possibility for ice; right?
11     A.   Yes.
12     Q.   And of course it's -- Anyone should be
13 more careful walking on snow and ice --
14     A.   Yeah.
15     Q.   -- if they are aware that there is snow
16 and ice coming down, right?
17     A.   Frozen ground, whatever.
18     Q.   You don't know how long that ice had
19 been there, do you, by the way?
20     A.   No.  I have no idea, bud.  We just
21 pulled up at the site and started putting pieces
22 up.
23     Q.   And you're not aware that anyone
24 informed Nick when he arrived look out for snow

121

1  and ice or anything of that nature?
2      A.   No.
3      Q.   You didn't talk to Nick before he fell,
4  did you?
5      A.   No.  No.  I was -- I was doing my job.
6      Q.   By the way, what was your job at that
7  moment?
8      A.   Well, like I said, I was landing our
9  tooling.  It was coming out of the base because
10 it was done on to a trailer that was parked
11 behind -- kind of behind the hub and -- kind of
12 in between the hub and the base itself.  I was
13 just landing stuff on the -- that we were done
14 with, cords and stuff and tooling on to the
15 trailer.
16     Q.   Okay.  Did anyone -- After picking up
17 the base section it was actually put in an
18 upright position and bolted done, was it?
19     A.   Yeah.
20     Q.   And that had already taken place before
21 Nick arrived?
22     A.   Yes.
23     Q.   And did you hear anyone from Mortenson
24 observe after the base section was lifted up

122

1  that there was ice underneath and they should
2  halt the project, mark it off and call someone
3  to get it corrected?
4      A.   I never heard anyone from Mortenson say
5  any of that.
6      Q.   Did you hear anyone -- Well, strike
7  that.
8          Was there anyone other than Mortenson
9  employees at that time at that site?
10     A.   No.
11     Q.   Okay.  Did you after the base -- Strike
12 that.
13         Let me go back.  Did you have anything
14 to do with hooking up equipment to pick up the
15 base piece?
16     A.   Yes.  We put the stripping shoe on the
17 end of it and then hooked it up to lift it.
18     Q.   And it is your job to hook the
19 equipment up so it could pick it up?
20     A.   Yes.
21     Q.   Did you walk on the ice at any point
22 before it was lifted up?
23     A.   Yeah.  It was icy at the end of the
24 base.  We slipped on it.  I think it was the

123

1  base or to hook up the mid.  We slipped on it.
2  Me and my partner slipped on it.
3      Q.   You can't remember if it's the base or
4  the mid?
5      A.   I think we threw some mats down because
6  it was icy out at the base and then we went over
7  to do the mid.  That's when we slipped if I
8  recall right.
9      Q.   Is that before Nick fell?
10     A.   Yes.
11     Q.   Did you or anyone else say that you
12 should stop and address the ice before you guys
13 continued?
14     A.   No.  Nobody -- We just -- No.  We just
15 went on to -- After we did that, we went back to
16 working on the base.
17     Q.   Okay.  Was Lonnie -- What was
18 Lonnie Sears doing when the base was being
19 lifted?
20     A.   He was directing the crane.
21     Q.   Okay.  Is that part of the job as the
22 foreman?
23     A.   Yeah.
24     Q.   And in terms of the responsibility, you

124

1  know, who had the responsibility to halt it if
2  there was a dangerous condition that needed to
3  be done? Was that Lonnie?
4      A.  Well, they say anybody on the job site,
5  but yeah, Lonnie would have been the foreman of
6  the site.
7      Q.  Okay. You didn't hear Lonnie say oh,
8  there is ice here, we should stop and get this
9  addressed, nothing like that?
10     A.  No. Not that I recall.
11     Q.  And you don't recall anyone else
12 suggesting to Lonnie or anyone else wait a
13 minute, there is ice here, we need to stop and
14 get this addressed?
15         MR. TERRY: Objection, asked and
16 answered 42 times.
17         THE WITNESS: No, I don't recall.
18 BY MR. SULLIVAN:
19     Q.  You agree with me that -- Well, you
20 said that these pieces weigh what, hundreds of
21 thousand of pounds; right?
22     A.  Yeah.
23     Q.  And if they are already put down
24 sometimes they are sitting there for over a day,
125

1  was suspended over it.
2      Q.  Right. And looking at the picture, not
3  that it's up anymore, but looking at that, first
4  of all, you don't know how deep the depression
5  was where the ice had formed over, do you?
6      A.  No.
7      Q.  You don't know if it's two inches or a
8  foot --
9      A.  No, I don't.
10     Q.  -- right?
11     A.  I don't.
12     Q.  And do you recall that underneath the
13 cribbing where the base piece had been that
14 there was some sort of big depression from the
15 thing sinking in?
16     A.  I can't remember.
17     Q.  Okay. Do you know if there was ice in
18 the area where the cribbing was under the base
19 piece?
20     A.  Yeah, I believe there was.
21     Q.  Okay.
22         MR. TERRY: Well, Chris, hold on. I am
23 going to object to you misrepresenting the
24 photograph. There is ice 50 feet long in the
127

1  right?
2      A.  Yeah. Sometimes they are sitting for
3  quite a while.
4      Q.  Like what, a week, a month?
5      A.  Yeah, a week sometimes. Yeah, a couple
6  weeks.
7      Q.  And of course if you get heavy rain
8  after it's been set down the ground softens
9  underneath, right?
10     A.  It could, yes.
11     Q.  And that could create a depression
12 because of the shear weight of this thing,
13 right?
14     A.  Well, not that whole length because we
15 only have cribbing on the ends. I mean, like I
16 told you before, that piece itself since we only
17 crib up the ends of it, that piece itself wasn't
18 sitting on the ground.
19     Q.  Okay.
20     A.  It's suspended in the air because of
21 the cribbing on two ends.
22     Q.  And when you picked this --
23     A.  The depression would be underneath
24 where the cribbing would sit, not where the tube
126

1  photograph. He's already testified that it's in
2  the whole depressed area. Now you're trying to
3  misrepresent the photograph to make it seem
4  there's only ice under the cribbing.
5          MR. SULLIVAN: I am asking a different
6  question, counsel.
7          MR. TERRY: I think you're
8  misrepresenting the photograph on the record and
9  I -- I just want that to be clear because there
10 clearly shows like a sheet of ice, not just
11 underneath one area.
12         MR. SULLIVAN: Okay. Are you done
13 objecting, counsel?
14         MR. TERRY: Are you done testifying for
15 the witness?
16         MR. SULLIVAN: Are you kidding me?
17 Please. This is ridiculous.
18         MR. TERRY: I agree. Move on.
19         MR. SULLIVAN: No, no. You -- No.
20 Based on what the witness is testifying, I am
21 asking questions.
22         MR. TERRY: Okay.
23 BY MR. SULLIVAN:
24     Q.  Mr. Breyne, your testimony is that the
128

1  base and even the midsection was not touching
2  the ground on the whole length of the piece;
3  right?
4      A.  Yes, just sitting on the cribbing.
5      Q.  Okay.  And you don't know how far up
6  off the ground it was, do you?
7      A.  Well, we put eight-inch mat and then
8  four by sixes on the end, so you're looking at
9  what, 12 inches.
10     Q.  My question is do you recall that there
11  was a depression deeper where the cribbing was
12  after the base piece was lifted?
13     A.  I do not recall because once that's
14  picked up I usually follow it over to the base
15  and start putting the anchor bolts on.
16     Q.  Okay.
17     A.  Once it's picked up and in the air, you
18  know, a fork truck comes in and cleans up --
19  picks up the cribbing and -- and stuff like
20  that, and then we were -- I am over guiding the
21  base down on the anchor bolts.  So my attention
22  is not drawn to looking at the ground over
23  there.
24     Q.  Okay.

129

1      A.  Do you understand?
2      Q.  Yes, sir.
3          Do you have any recollection of how
4  long it takes to pick up the base piece and then
5  have it installed?
6      A.  About 30 minutes from being hooked up
7  to getting it up and moving it over and put it
8  down.  Probably an hour.
9      Q.  An hour total you're saying?
10     A.  Yeah.  From the time you pick it up to
11  put it down, get it bolted down, approximately
12  an hour.
13     Q.  And on this particular day it was
14  snowing that whole time, wasn't it?
15     A.  No.
16     Q.  What do you recall about that?
17     A.  I just remember just like a squall came
18  in there right before we started everything and
19  I believe it just stopped and -- just enough to
20  cover the ground with -- with snow.
21     Q.  Okay.  So you're saying it started
22  snowing right when you were doing the base,
23  picking it up?
24     A.  I can't remember if it was right then

130

1  or right before.  It was just like this squall
2  came in, just a real quick boom and covered
3  everything up.
4      Q.  Wasn't it Mortenson's job to remove
5  snow if it got too deep?
6          MR. TERRY:  Objection, calls for
7  speculation.
8          THE WITNESS:  I don't know whose job it
9  would be to remove the snow if it got too deep.
10  I mean, that's -- You know, never ran into it
11  where it got too deep where we couldn't do
12  anything, you know.
13  BY MR. SULLIVAN:
14     Q.  Do you recall anyone or -- Well, on
15  this project do you recall snow of that depth
16  that you would have to move it out of the way?
17     A.  Later on.  I mean, later on in
18  different sites, yeah, where they had -- It was
19  all cleared off by the time we got there.
20     Q.  And do you know who it was that removed
21  the snow and ice out of the way?
22     A.  I have no idea.  I would imagine it was
23  the excavating companies.
24     Q.  But you don't know?

131

1      A.  They are the ones with the dozers and
2  the equipment so...
3      Q.  You don't know who actually had that
4  task though --
5      A.  No.
6      Q.  -- is that fair to say?
7          Correct?  Is that correct?
8      A.  Yeah, I don't know who would have that
9  task.
10     Q.  You didn't know anyone at Borneke, did
11  you?
12     A.  No.
13     Q.  Do you remember ever speaking to anyone
14  at Borneke on this project?
15     A.  Not that I know of.
16         MR. SULLIVAN:  That's all I have, sir.
17  Thank you.  I appreciate it.
18         MR. TERRY:  Mr. Breyne, I just have two
19  minutes of follow-ups and then we will be done
20  and I mean that.
21             FURTHER EXAMINATION
22  BY MR. TERRY:
23     Q.  You were asked questions about whether
24  or not you're an excavating expert or whether or

132

1 not you have worked for an excavating company.
2 You would agree that you have worked on these
3 wind farm projects for the last 15, 20 years;
4 right?
5     A.    Yes.
6     Q.    And you have worked on at least
7 15 projects to your knowledge, right, give or
8 take?
9     A.    Yeah, give or take a few.  Yeah.  I am
10 pretty close to that.
11     Q.    And while you might not work for an
12 excavating company, it's safe to say that during
13 your time on these numerous projects you have
14 come to understand what is customary on these
15 projects; right?
16     A.    Yes.
17     Q.    Okay.  And when you're giving testimony
18 today about what you believe could have been
19 done or where you believe areas could have been
20 graded better, this is just based on your
21 general 15-plus years of experience as well as
22 your 15-plus projects just based on your general
23 construction knowledge; right?
24     A.    Yes, in and around it and seeing it and

133

1 been there.
2     Q.    Okay.  You were asked questions about
3 whether or not you believed there were mats
4 under the base section.  I believe you
5 testified -- I just want to be clear.  You
6 believed the base section only had mats and
7 cribbing at the end of it, right?
8     A.    I believe so.
9     Q.    Okay.  And you were one of the -- Go
10 ahead.
11     A.    I just believe there was just mats on
12 the ends.  I can't remember if there was
13 anything in the middle, but you usually don't
14 leave stuff laying in the middle of them.
15     Q.    Yeah.  And you were the person who
16 helped pick up the base section that morning,
17 right?
18     A.    Yes.
19     Q.    So you would have had an opportunity if
20 there were mats underneath the full thing to
21 pick those up and you don't remember doing that
22 as you sit here today, right?
23     A.    Yeah.  We usually have a fork truck on
24 the job, on the project.  That was their job is

134

1 to remove all the mats that are in the way.
2 Once that piece is picked up, they come over and
3 they remove the mats.
4     Q.    Okay.  And your knowledge is that there
5 were only mats and cribbing at the ends of the
6 base section which is where we see the depressed
7 area with the sheet of ice, right?
8     A.    I believe so.
9     Q.    Okay.
10     A.    To my knowledge, I think that's the
11 only places we had cribbing on that -- mats at.
12     Q.    And you further believe this because
13 when you look at the photograph there was one
14 large sheet of ice as opposed to scattered areas
15 that would have been broken up had you removed
16 the mats, right?
17     A.    Yeah.  If the fork truck would have ran
18 through there he would have broke up that ice.
19     Q.    Okay.
20     A.    You know, if he came down the ends and
21 picked up the mats from the ends he wouldn't
22 have broke up that ice underneath.
23     Q.    Yeah, exactly.
24         You were ask the questions about the

135

1 ground being able to soften up.  Again, based on
2 your understanding that this base only had
3 cribbing on the ends, this is also part of the
4 basis for your testimony that this area should
5 have been graded better from the beginning
6 because the depressed area would only be at the
7 ends of this section if it's set up how you say
8 it is, right?
9     A.    Yeah.  There shouldn't have been --
10 underneath it -- Nothing ever touches the ground
11 from end to end.  Say the piece was 65 feet
12 long.  You put a cribbing and they are four foot
13 wide and you put them on each end, so you're
14 looking at, what, 59 feet now, something like
15 that.  57 feet.  The rest of it does not touch
16 the ground when you're sitting on the ground to
17 make a depression like that.
18     Q.    Okay.  And that's what you believe to
19 be the case with the base section which exposed
20 the sheet of ice, right?
21     A.    Come back?
22     Q.    Yeah.  So you believe that the base
23 section which was removed from on top of the
24 sheet of ice only had cribbing at the ends to

136



1  state it simply, right?
2      A.   Yes.
3      Q.   And that's why you believe this area
4  wasn't properly graded or drained to begin with
5  because there was a large sheet of ice
6  throughout the whole area, not just underneath
7  the ends; right?
8      A.   Yeah.  I mean, yeah, it was from one
9  end to the other it was a sheet of ice.
10     Q.   Yeah.  And so that makes it look like
11  this one area just wasn't properly graded or
12  drained from the beginning as opposed to
13  something being formed later on, right?
14         MR. SULLIVAN:  Foundation.
15         Go ahead.
16         THE WITNESS:  Yeah.  I believe so.
17  Some kind of a -- Something created that
18  depression where that water pooled up.
19  BY MR. TERRY:
20     Q.   And had this been graded and drained
21  from day one, the water wouldn't have been able
22  to pool form and freeze, right?
23         MR. SULLIVAN:  Objection, foundation.
24         THE WITNESS:  Yeah.

137

1         MR. TERRY:  Okay.  That's all I have.
2  I appreciate it.
3         Chris, do you have anything further or
4  should I explain signature?
5         MR. SULLIVAN:  Go ahead.  Thanks.
6         MR. TERRY:  Sir, you have the
7  opportunity if you want to to read this
8  transcript to make sure that Ms. Barta took down
9  everything accurately.  You don't have to.  Most
10  witnesses waive their signature, meaning they
11  assume Ms. Barta took everything down
12  accurately.
13         If you want to read it you say reserve
14  and she will send you a copy.  If you trust that
15  she took everything down accurately, just say
16  waive and you're done.
17         THE WITNESS:  I will waive.
18         MR. TERRY:  Perfect.  Well, then that's
19  everything.  You can go ahead and hop off.  We
20  do appreciate your time and accommodation today.
21         THE WITNESS:  Okay.  Thank you.
22         MR. SULLIVAN:  Thank you.
23             (Whereupon, the proceedings
24              adjourned at 3:28 p.m.)

138

1    STATE OF ILLINOIS     )
2                          )  SS:
3    COUNTY OF C O O K     )
4         I, MICHELLE L. BARTA, a certified
5    shorthand reporter for the State of Illinois,
6    do hereby certify that heretofore, to-wit,
7    on the 23rd day of February 2022, personally
8    appeared before me via Zoom videoconference,
9    LEONARD BREYNE, in a cause now pending and
10   undetermined in the United States District Court
11   for the Northern District of Illinois, wherein
12   NICK GEORGEFF is the Plaintiff, and DON BORNEKE
13   CONSTRUCTION, INC., is the Defendant.
14        I further certify that the said
15   LEONARD BREYNE was first duly sworn to testify
16   the truth, the whole truth and nothing but the
17   truth in the cause aforesaid; that the testimony
18   then given by said witness was reported
19   stenographically by me and afterwards reduced to
20   typewriting by Computer-Aided Transcription, and
21   the foregoing is a true and correct transcript
22   of the testimony so given by said witness as
23   aforesaid.
24        I further certify that the signature to

139

1    the foregoing deposition was waived by the
2    deponent.
3         I further certify that I am not counsel
4    for nor in any way related to the parties to
5    this suit, nor am I in any way interested in the
6    outcome thereof.
7         IN TESTIMONY WHEREOF:  I have hereunto
8    set my verified digital signature this 10th day
9    of March, 2022.
10
11
12
13
14
15   MICHELLE L. BARTA, C.S.R., R.P.R.
16   LIC. NO. 084-004033
17
18
19
20
21
22
23
24

140



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

NICK GEORGEFF,                          )
                                        )
                 Plaintiff,             )
                                        )
          v.                            )          Case No. 3:20-cv-50313
                                        )
DON BORNEKE CONSTRUCTION, INC., )
                                        )
                 Defendant.             )

## DEFENDANT'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendant, DON BORNEKE CONSTRUCTION, INC., by and through its counsel, SWANSON, MARTIN & BELL, LLP, for its Amended Answer and Affirmative Defenses to Plaintiff's First Amended Complaint, states as follows:

## JURISDICTION AND VENUE

1.    This is a personal injury action involving an individual plaintiff and a corporate defendant.

**Answer:      Defendant admits the allegations contained in paragraph 1.**

2.    The plaintiff is a citizen of the State of Illinois, residing in Plainfield, IL.

**Answer:      Defendant lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 2 and therefore denies same.**

3.    The defendant is a citizen of the State of Minnesota with its principal place of business located in Eagle Lake, Minnesota.

**Answer:      Defendant admits only that it is a Minnesota corporation and its office address is 41537 50th Street in Janesville, Minnesota and denies the remaining allegations contained in paragraph 3.**

EXHIBIT

H

4.     The jurisdiction of this Court is invoked pursuant to 28 USC 1332 as the matter in controversy exceeds $75,000.00 and is between citizens of different states.

**Answer:     Defendant lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 4 and therefore denies same.**

5.     The events and omissions giving rise to this claim occurred in Lee County, Illinois, thus pursuant to 28 U.S.C. 1391(b), this Court is the appropriate venue for this action.

**Answer:     Defendant admits only that this Court is the appropriate venue and denies any remaining allegations contained in paragraph 5.**

## COUNT I – DIRECT NEGLIGENCE

6.     On and before November 15, 2018, the plaintiff was employed by M.A. Mortenson Company and engaged in a construction project on a wind farm in or near the Village of Compton, Lee County, Illinois.

**Answer:     Defendant lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 6 and therefore denies same.**

7.     Prior to said date, M.A. Mortenson Company hired the defendant to grade, maintain, repair and remove snow and ice from the dirt roadways used by persons, vehicles, and equipment on the construction.

**Answer:     Defendant admits only that it entered into a subcontract agreement with M.A. Mortenson Company on December 29, 2017, subject to its terms and conditions and denies the remaining allegations contained in paragraph 7.**

2

8.      On and before said date defendant was in charge of and responsible for grading, maintaining, repairing, and removing snow and ice from the dirt roadways used by persons, vehicles and equipment on the construction site.

**Answer:       Defendant admits only to those duties and responsibilities provided in its subcontract agreement with M. A. Mortenson Company dated December 29, 2017 and denies the remaining allegations contained in paragraph 8.**

9.      On and before said date defendant operated vehicles and equipment on the dirt roadways.

**Answer:       Defendant admits that it operated various vehicles and equipment on the subject windfarm site at various times; defendant lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 9 and therefore denies same.**

10.     On said date, the plaintiff was walking on a dirt roadway on the construction site in the performance of his work.

**Answer:       Defendant lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 10 and therefore denies same.**

11.     At all relevant times, the defendant had a duty to exercise reasonable care in the grading, maintaining, repairing and removal of snow and ice from said dirt roadway.

**Answer:       Defendant admits only to those duties imposed by law or contract, denies any breach of those duties and denies the remaining allegations contained in paragraph 11.**

12.     Notwithstanding and in violation of said duty, defendant, through its agents, servants, and employees, was then and there guilty of the following careless and negligent acts and/or omissions:

a)     Failed to properly grade, maintain and repair the dirt roadway;

b)     Failed to remove or to properly remove snow and ice from the dirt roadway;

c)     Failed to make a reasonable inspection of the dirt roadway when the defendant knew or should have known the such inspection was necessary to prevent injury to persons using the dirt roadway;

d)     Failed to use ordinary care to see that the dirt roadway was reasonable safe for the use of those lawfully on the property;

e)     Caused tracks and ruts to form on the dirt roadway creating a danger to persons using the dirt roadway;

f)     Allowed tracks and ruts to remain on the dirt roadway creating a danger to persons using the dirt roadway;

g)     Caused unnatural accumulations of ice to form in tracks and ruts on the dirt roadway creating a danger to persons using the dirt roadway;

h)     Allowed unnatural accumulations of ice to remain in tracks and ruts on the dirt roadway creating a danger to persons using the dirt roadway;

i)     Was otherwise careless and negligent.

**Answer:        Defendant denies the allegations contained in paragraph 12, including subparagraphs (a) through (i).**

13. As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions, at said time and place plaintiff slipped and feel on an unnatural accumulations of ice, causing him to suffer severe bodily injury and to sustain damages of a personal and pecuniary nature, including but not limited to pain, suffering, disability, loss of a normal life, loss of earnings and loss of earning potential, expenses for medical care and services, and other damages, all of which are continuing an permanent in nature.

**Answer:** **Defendant denies the allegations contained in paragraph 13.**

WHEREFORE, plaintiff respectfully requests judgment be entered in his favor and against the defendant in a dollar amount in excess of $75,000.00, plus costs of suit.

**Answer:** **Defendant denies that Plaintiff is entitled to judgment or relief in any amount whatsoever and specifically denies the relief sought in the *ad damnum* to Count I.**

## COUNT II – PREMISES LIABILITY

14. On and before November 15, 2018, the plaintiff was employed by M.A. Mortenson Company and engaged in a construction project on a wind farm in or near the Village of Compton, Lee County, Illinois.

**Answer:** **Defendant lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 14 and therefore denies same.**

15. Prior to said date, M.A. Mortenson Company hired the defendant to grade, maintain, repair and remove snow and ice from the dirt roadways used by persons, vehicles, and equipment on the construction site.

**Answer:** **Defendant admits only that it entered into a subcontract agreement with M.A. Mortenson Company on December 29, 2017 subject to its terms and conditions and denies the remaining allegations contained in paragraph 15.**

16.    On and before said date defendant possessed, operated, managed, maintained, designed, inspected, planned and/or controlled the dirt roadways used by persons, vehicles, and equipment on the construction site.

**Answer:** **Defendant admits only to those duties and responsibilities provided in its subcontract agreement with M.A. Mortenson Company dated December 29, 2017, denies violating those duties and denies the remaining allegations contained in paragraph 16.**

17.    On said date, the plaintiff was walking on a dirt roadway on the construction site in the performance of his work.

**Answer:** **Defendant lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 17 and therefore denies same.**

18.    On said date the defendant, well knowing its duty in this regard, carelessly and negligently caused and permitted said dirt roadway to become and remain in a dangerous condition for persons walking on the dirt roadway, in that the dirt roadway was in a state of disrepair with tracks, ruts, and unnatural accumulations of ice present, although the defendant knew or in the exercise of ordinary and reasonable care should have known of the dangerous condition.

**Answer:** **Defendant denies the allegations contained in paragraph 18.**

19.    At said time and place the defendant knew or could reasonably expect that persons on the property would not discover or realize the danger or would fail to protect against the danger in the performance of their work.

6

**Answer:** **Defendant denies the allegations contained in paragraph 19.**

20. As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions, at said time and place plaintiff slipped and fell on an unnatural accumulation of ice, causing him to suffer severe bodily injury and to sustain damages or a personal and pecuniary nature, including but not limited to pain, suffering, disability, loss of a normal life, loss of earnings and loss of earning potential, expenses for medical care and services, and other damages, all of which are continuing and permanent in nature.

**Answer:** **Defendant denies the allegations contained in paragraph 20.**

WHEREFORE, plaintiff respectfully request judgment be entered in his favor and against the defendant in a dollar amount in excess of $75,000.00, plus costs of suit.

**Answer:** **Defendant denies that Plaintiff is entitled to judgment or relief in any amount whatsoever and specifically denies the relief sought in the *ad damnum* to Count II.**

## DEFENDANT'S AFFIRMATIVE DEFENSES

Defendant, Don Borneke Construction, Inc. ("Borneke"), by and through its attorneys, Swanson, Martin & Bell, LLP, for its affirmative defenses, states as follows:

### I. Contributory Negligence

1. This incident arises from a slip and fall on ice on a windfarm construction project known as Mendota Hills in Lee County, Illinois. (Am. Compl., ¶ 13).

2. On or about November 15, 2018, Plaintiff slipped on ice that was allegedly unnaturally accumulated while walking on the windfarm turbine erection area of site T-11. (Am. Compl., ¶ 13).

7

3.    At the time and place of the incident, Plaintiff had a duty to exercise ordinary care and caution for his own safety and well-being.

4.    In violation of the aforementioned duty, Plaintiff was negligent in one or more of the following ways:

      a.    Failed to keep a proper look out while walking during a snow event at the site of T-11 on the Mendota Hills Windfarm site on or about November 15, 2018;

      b.    Failed to utilize personal protective equipment, such as ice cleats, which were available for his use;

      c.    Failed to maintain proper control of his body and objects on his person;

      d.    Was otherwise careless and negligent.

5.    The injuries sustained by Plaintiff, if any, were proximately caused by the aforesaid negligent acts or omissions on the part of Plaintiff, Nick Georgeff.

6.    In the event that this Court renders judgment in favor of Plaintiff, Defendant is entitled to a reduction of damages pursuant to 735 ILCS 5/2-1116, based upon the percentage of fault attributable to Plaintiff, and if that percent of fault is determined to be more than fifty percent (50%), then Defendant is entitled to judgment in its favor.

## II.    Open and Obvious

1.    Plaintiff seeks damages for injuries allegedly caused by Defendant, Borneke Construction.

2.    At all relevant times, Plaintiff had a duty to exercise ordinary care, perception, intelligence and judgement to avoid open and obvious risks that a reasonable person would have

taken in light of the open and obvious nature of the condition, said condition being ice and snow during a snow event.

3.    Notwithstanding Plaintiff's duty as aforesaid, at all times relevant hereto the Plaintiff was guilty of failing to take the necessary precautions that a reasonable person exercising ordinary perception and intelligence would have taken to avoid an open and obvious risk that could have been avoided without incident.

4.    Borneke is entitled to a reduction in any damages awarded to Plaintiff based on Plaintiff's failure to avoid open and obvious risk.

5.    Plaintiff is obligated to avoid open and obvious risk, and thus, these claims should be barred, or in the alternative, reduced if Plaintiff failed to avoid these open and obvious risks.

### III.    Third Party Conduct

1.    The Plaintiff's alleged injuries were proximately caused by third parties over whom Borneke has no control, namely Mortenson Construction.

2.    At the time and place of the incident, Borneke had no control over the allegedly defective premises.

3.    Therefore, Plaintiff cannot recover from Borneke, as alleged.

### IV.    Lack of Notice

1.    Despite the exercise of reasonable diligence, Borneke did not have actual or constructive notice of the alleged condition, which caused Plaintiff's injuries.

2.    Therefore, Plaintiff cannot establish that Borneke's conduct caused the hazardous condition alleged, or that Borneke had legally sufficient notice of the alleged condition such that liability can be established.

## V.    Natural Accumulation of Ice

1.    The allegations of liability against Borneke in this matter arise from the occurrence of a natural accumulation of ice.

2.    Plaintiff's injuries, occurred as a result of the natural accumulation of ice at the site T-11 of the Mendota hills Windfarm Project of the at the time and place at issue.

3.    Therefore, as a matter of law, Borneke had no duty to warn of such condition caused by the natural accumulation of ice and is not liable for any alleged injuries.

Wherefore, Defendant, Don Borneke Construction, Inc., prays for judgment in its favor and against Plaintiff, as Plaintiff's own negligence, or the negligence of third party, Mortenson Construction, was the sole proximate cause and/or greater than fifty percent (50%) of the proximate cause of his alleged injuries.  In the alternative, Defendant prays that this Court reduce the jury's verdict, if any, by Plaintiff's proportionate share of negligence that proximately caused his alleged injuries, plus costs and any further relief deemed just and equitable by the Court.

Respectfully submitted,

**SWANSON, MARTIN & BELL, LLP**

By:    /s/ Christian A. Sullivan
       One of its Attorneys

Christian A. Sullivan
**SWANSON, MARTIN & BELL, LLP**
2525 Cabot Drive, Suite 204
Lisle, IL 60532
(630) 799-6970
Attorney No. 6278557
csulliva@smbtrials.com

10

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF ILLINOIS
 3                  EASTERN DIVISION
 4   NICK GEORGEFF,                    )
 5      Plaintiff,                     )
 6      vs.                            ) Civil Action
 7   DON BORNEKE CONSTRUCTION, INC.,.) No. 3:20-CV-50313
 8            Defendant.              )
 9          The deposition of ANDREW KRUSE, called
10   for examination pursuant to the Rules of Civil
11   Procedure for the United States District Courts
12   pertaining to the taking of depositions, before
13   Margaret A. Ritacco, a certified shorthand
14   reporter in the State of Illinois, on the
15   15th day of March 2022, at 1:00 p.m., via
16   videoconference per Executive Order 2020-14
17   pursuant to notice.
18
19
20
21
22
23   Reported by:  MARGARET A. RITACCO, CSR
24   License No.:  084-002796
```

**Page 2**

```
 1   APPEARANCES:
 2       ANESI, OZMON, RODIN, NOVAK & KOHEN, by
         MR. CHARLES A. TERRY,
 3       161 North Clark Street, 21st Floor
         Chicago, Illinois· 60601
 4       (312) 372-3822
         cterry@anesilaw.com
 5            Representing the Plaintiff;
 6
         SWANSON, MARTIN and BELL, by
 7       MR. CHRISTIAN A. SULLIVAN,
         2525 Cabot Drive, Suite 204
 8       Lisle, Illinois· 60532
         (630) 799-6900
 9       csullivan@smbtrials.com
              Representing Defendant,
10            Borneke Construction;
11
         FAEGRE, DRINKER, BIDDLE & REATH LLP., by
12       MS. CYRI VAN HECKE,
         90 South Seventh St.
13       3300 Wells Fargo Center
         Minneapolis, Minnesota  55402
14       (612) 766-8140
         cyri.vanhecke@faegredrdinker.com
15            Representing Third-Party Defendant,
              Mortenson Construction.
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1                  I N D E X
 2   WITNESS                         EXAMINATION
 3   ANDREW KRUSE
 4     BY MR. TERRY                        5
 5     BY MR. SULLIVAN                    75
 6     BY MR. TERRY, FURTHER              87
 7
 8
 9
10                E X H I B I T S
11   NUMBER                        IDENTIFICATION
12         (NO EXHIBITS WERE MARKED.)
13
14
15   BENNETT Deposition
16     Exhibit No. 3 (Referred to)       39
17     Exhibit No. 4 (Referred to)       40
18     Exhibit No. 8 (Referred to)       56
19
20
21
22
23
24
```

**Page 4**

```
 1      THE REPORTER:  My name is Margaret Ritacco, CSR.
 2   This deposition is being taken pursuant to
 3   Governor Pritzker's Executive Order 2020-14.
 4   All parties to this proceeding, including the
 5   court reporter, are attending via videoconference.
 6          Will the parties please introduce
 7   yourselves, state who you represent, and that
 8   you are in agreement with these procedures,
 9   starting with plaintiff's counsel.
10      MR. TERRY:  Charles Terry for the plaintiff,
11   Nick Georgeff, we agree.
12      MR. SULLIVAN:  Chris Sullivan for defendant,
13   Borneke Construction, we also agree.
14      MS. VAN HECKE:  Cyri Van Hecke for
15   third-party, Mortenson Construction, we agree.
16          (Witness sworn.)
17      MR. TERRY:  Sir, can you please state and
18   spell your name for the record?
19      THE WITNESS:  Andrew Kruse, A-N-D-R-E-W, last
20   name, K-R-U-S-E.
21
22
23
24
```

EXHIBIT
I

1  ANDREW KRUSE,
2  called as a witness herein, having been first
3  duly sworn, was examined and testified as
4  follows:
5  EXAMINATION
6  BY MR. TERRY:
7  Q.  Let the record reflect this is the
8  deposition of Andrew Kruse taken pursuant to
9  notice and agreement of the parties.  Let the
10  record also reflect this deposition is being
11  taken via Zoom, but still pursuant to all
12  applicable rules.
13  Before I get into some of the ground
14  rules and stuff, sir, do you mind if I call you
15  by your first name?  Or what do you prefer that
16  I call you today?
17  A.  Yeah, Andrew works great.
18  Q.  Andrew?
19  A.  Uh-huh.
20  Q.  Got it.  Have you ever given a
21  deposition before, Andrew?
22  A.  No, sir.
23  Q.  I'm sure Ms. Van Hecke has gone over
24  some of the ground rules with you, but I'm just

5

1  asking questions, and we'll take as many as you
2  need.
3  The only caveat is if there's a
4  question pending, you must answer the question.
5  Okay?
6  A.  Okay.
7  Q.  If you answer a question, we're going
8  to assume you understood what it meant.  So if
9  you don't understand, please ask us to repeat,
10  rephrase, or ask it in a different way.  Does
11  that make sense?
12  A.  Yes, it does.
13  Q.  Then, just a couple of more.  I'm going
14  to start with some background questions.  Some
15  people wonder why we ask these.  It's just to
16  get a little bit of an insight as to who you
17  are, and the reason is if this matter goes to
18  trial, this deposition is the one time for us
19  prior to that to find out who you are, what you
20  know, and what you'll testify to.
21  So, I'll try to keep the background
22  questions to a minimum, but that's the purpose
23  of going through this process, what a deposition
24  actually is.

7

1  going to repeat a few.  I use this old adage at
2  every dep.  If you break some of the rules,
3  nothing bad is going to happen, but it just
4  helps the process go smoother.  So, please try
5  to do your best to follow them, and the biggest
6  one for today's purposes is try not to talk over
7  each other.  So if someone is asking a question,
8  even if it's long-winded or boring, do your best
9  just to wait for the full question to come out
10  prior to answering.
11  Does that make sense?
12  A.  Yes, sir.
13  Q.  And then try to keep all your answers
14  out loud, meaning, yes, no, or otherwise.
15  Uh-huh and uh-uh don't come over well on the
16  transcript.  Okay?
17  A.  Yes, sir.
18  Q.  Third rule, don't call me, sir.  I'm
19  kidding.  If you need a break at any time,
20  please let me know.  I don't expect this to be
21  awfully long.  Hopefully, we'll have you out of
22  here in a couple hours.  Nonetheless, this is
23  not an endurance test.  If you need a break,
24  just let myself or Mr. Sullivan know, whoever's

6

1  Then the last one, I know the incident
2  we're here to talk about happened a few years
3  ago now.  So if at any point you don't remember,
4  or you don't know, that is fine, just say so.
5  This is not a memory test.  This is not trying
6  to trip you up or anything like that.
7  Again, it's just finding out what you
8  know and what you don't know.  And if you don't
9  know something, that's fine, but I would ask you
10  if you could give your best estimates as to
11  something, based on your experience and
12  expertise, that you would do that.
13  Does that make sense?
14  A.  Yes, it does.
15  Q.  I'll just start with a little bit of
16  background.  Sir, what's your date of birth?
17  A.  July 27, 1992.
18  Q.  What is your current address?
19  A.  246 Schrum, that would be S-C-H-R-U-M,
20  Drive, in the city of Whitmore Lake, Michigan.
21  Q.  Who do you live at this address with?
22  A.  My spouse.
23  Q.  How long have you lived at this
24  address?

8



Andrew Kruse 03/15/2022

1    A.   Since 2016.
2    Q.   Do you have any plans to move in the
3  next year or so?
4    A.   No, I don't.
5    Q.   Who is your current employer?
6    A.   Mortenson Construction.
7    Q.   I just want to make sure in case,
8  again, this matter goes to trial, we need to
9  know where to issue subpoenas and stuff like
10 that.  And we'll get into all that in a second.
11        Sir, what's your highest level of
12 education?
13   A.   I have a bachelor's degree.
14   Q.   Where is that from and when?
15   A.   Northern Michigan University, and I
16 graduated in 2014.
17   Q.   What is that degree in?
18   A.   Construction management.
19   Q.   Do you have any other certifications,
20 degrees, trade school degrees, things like that?
21   A.   No.
22   Q.   Have you ever been a member of a union?
23   A.   No, I have not.
24   Q.   Have you ever taken any, like, OSHA

                                              9

1    A.   Or by project base, which can be either
2  less or more frequent, depending.
3    Q.   Can you walk me through what some of
4  these entail?  Are they like kind of
5  overarching, like OSHA-like classes, or are they
6  more project specific?  How do they work?
7    A.   Project specific.  And I -- I guess the
8  content would revolve around the task at hand,
9  or the scope of work to be performed, along the
10 lines of safety.
11   Q.   Okay, got it.  Just a little bit more
12 about your background, and we'll get into your
13 work with Mortenson.
14        Have you ever served in the military,
15 sir?
16   A.   No, I have not.
17   Q.   And don't take offense to this
18 question, we truly ask it of everybody.
19        Have you ever been convicted of a
20 felony or a crime involving fraud or dishonesty?
21   A.   No, I have not.
22   Q.   And the same thing for the next
23 question, have you ever been -- have you ever
24 declared bankruptcy?

                                             11

1  classes?  Are you OSHA certified, things like
2  that?
3    A.   I don't.
4    Q.   I'm sorry?
5    A.   I don't have a formal OSHA
6  certification.
7    Q.   Okay.  You said you do not have any
8  formal OSHA certifications?
9    A.   Correct.
10   Q.   Do you have any informal, like
11 on-the-job training, things like that, that
12 would kind of be like Mortenson's equivalent?
13        You kind of had like a guarded answer,
14 that's why I want to see what you have.
15   A.   That's exactly what I was alluding to.
16 Yes, exposure to and participated in Mortenson's
17 safety trainings, which closely align with some
18 OSHA training.  No -- no formal records to
19 share, though.
20   Q.   How often does Mortenson put on these
21 types of training that you would undergo, on
22 average?
23   A.   Yearly.
24   Q.   Okay.

                                             10

1    A.   No.
2    Q.   Where did you work after graduating
3  from NMU?
4    A.   Mortenson Construction.
5    Q.   Have you worked with them continually
6  since 2014?
7    A.   Yes.  In 2014, I was a part-time
8  employee, with my job title as an intern.  And
9  then in January of 2015, I joined full time, and
10 I have been employed to current date.
11   Q.   When you started in January of 2015,
12 what was your title?
13   A.   Field engineer.
14   Q.   Can you just walk me through the
15 different titles you've had between 2015 and
16 present?
17   A.   Sure.  In 2015, field engineer, then
18 project engineer I.  Somewhere between 2017-ish,
19 project engineer II to assistant superintendent
20 in 2018 time frame.  And then superintendent I
21 until about, oh, sometime in 2020, supt. II to
22 the current status of senior supt. I.
23   Q.   So, then, at the time of the incident
24 we're here to talk about in November of 2018,

                                             12

1  were you a superintendent I?
2      A.  No, I was an assistant superintendent.
3      Q.  Got it, okay.  So can you kind of walk
4  me through the difference between what a field
5  engineer and what a project engineer does?
6      A.  Sure.  A field engineer -- mostly what
7  the -- what the title would allude to, quality
8  control in the field.  Project engineer, a
9  little bit more inclusive of quality control
10  overall between kind of from a project level,
11  and more customer-focused roles, right, more of
12  a leader in that aspect.
13      Q.  And then what about like a project
14  engineer II?  What would be the difference with
15  that?
16      A.  It has some variance depending on what
17  team you're applied to.  At least for my
18  position, it was a lead engineer position, so
19  kind of managing the other field engineers, and
20  project engineers Is, and then leading that
21  quality control as well as taking on some other
22  site duties.
23      Q.  And then for these three, you know,
24  positions, the field engineer, project engineer
13

1  I and II, are these all on-site roles?
2      A.  Yes, they are.
3      Q.  And then in -- because we're here to
4  talk about an incident that happened in 2018,
5  can you walk us through some of your duties and
6  responsibilities as an assistant superintendent?
7      A.  Sure.  Depending on the phase of the
8  project, assistant superintendents plan and
9  execute work, notably foundation, scope, all the
10  way -- you know, starting with the civil
11  activities through foundations, not to be
12  confused that civil is you, you know, dirt work and
13  road building, and then foundations is more of
14  the concrete rebar scope.  And then up to the
15  erection phase, which has a little bit more
16  moving parts to it, like cranes, turbine
17  components, and kind of everything until the
18  close out, so.
19      Q.  Would your role as an assistant
20  superintendent -- I know you said up to -- would
21  it also include erection phase, or would it only
22  go up until that?
23      A.  It would include erection phase at the
24  project in question, in 2018.  My experience did
14

1  not transition into the erection phase as much.
2  That's kind of why I said that.
3      Q.  Got it.  So on the 2018 project -- and
4  when I say that, you under that as the Mendota
5  Hills project?
6      A.  I do, yes.
7      Q.  The Mendota Hills project, is it safe
8  to say you would have worked from the, no pun
9  intended, ground up, like beginning of the
10  project with excavation, clearing, grading,
11  things like that, up until erection?
12      A.  Yes, sir.
13      Q.  Then would this have also included --
14  well, let me ask you this.
15          How does your interaction work as an
16  assistant superintendent between Mortenson and
17  the various subcontractors?
18      A.  Directing work.
19      Q.  Then in this role as an assistant
20  superintendent, would you have to be familiar
21  with various subcontractors' contracts, and
22  scopes of work, and things like that?
23      A.  Definitely scopes of work.  Contracts,
24  a little less fluent.
15

1      Q.  So at least like the attachments to the
2  contract describes what work the various
3  subcontractors are going to be doing, things
4  like that?
5      A.  Yes.
6      Q.  And, then, not only that, but also
7  being in the field and making sure the
8  subcontractors are actually doing this work?
9      A.  Yeah.  Work -- execution of the work is
10  the main -- I guess the main role of that
11  superintendent.  So, what task is to be
12  performed, kind of the duration of said task,
13  and then the sequence of the work along the way.
14      Q.  Got it.  And then on these projects,
15  being the wind farm project, let me ask you, how
16  many of these have you worked on in your career?
17      A.  About a dozen, until current date.
18      Q.  Got it.  Okay.  Let's say from 2014
19  until 2018 time frame, approximately?
20      A.  Six or seven.
21      Q.  And in those six or seven, have you
22  worked with Don Borneke Construction prior to
23  the Mendota Hills project?
24      A.  I don't believe I had before.
16



1    Q.   Prior to this project, is it safe to
2  assume you worked with other excavation and
3  grounding companies, though?
4    A.   Yes.
5    Q.   And you worked with other excavation
6  and companies like that on wind farms, correct?
7    A.   Yes.
8    Q.   So is it safe to say that you, as
9  working for Mortenson in various roles prior to
10 and up until this project, had become familiar
11 with the various tasks of the various
12 subcontractors, including excavating companies?
13   A.   Yes.
14   Q.   And just from a general standpoint, you
15 were comfortable understanding what work the
16 subcontracts these excavating companies had to
17 perform and how they had to perform it?
18   A.   Yeah.  For the most part, I'm familiar
19 with their work.
20   Q.   Yeah.  And from a general standpoint,
21 you know, things change maybe in the minutia
22 details from project-to-project, and that's why
23 you have to brush up with the scopes of work and
24 things like that, right?

17

1    A.   Yes.
2    Q.   On these projects, including the
3  Mendota Hills one, is it safe to say that
4  Mortenson hires these excavating companies
5  because the excavating companies are the experts
6  in their field?
7    A.   Yeah, that's the -- the work they
8  perform.
9    Q.   Yeah.  And Mortenson relies on these
10 excavating companies to do this work properly,
11 reasonably, so that it can effectuate the
12 completion of the project, right?
13   A.   Yes.
14   Q.   Just from a general standpoint,
15 Mortenson understands that prior to these
16 excavating companies coming in, this is usually
17 untouched or reclaimed farmland that needs to be
18 converted into workable land, right?
19   A.   Yes.  Mendota Hills was a bit of a
20 different job site, though.  There were some
21 existing infrastructure already in place from a
22 previous wind farm, and also some new
23 infrastructure being built at that time.
24   Q.   So Mendota Hills was kind of an area

18

1  where some areas were previously farms, that had
2  been reclaimed, so-to-speak, to farmland, that
3  had to be reconverted to a workable area, and
4  then other areas just had to be created?
5    A.   Absolutely correct.
6    Q.   Okay.  And whether it's reclaimed
7  farmland -- do you know what I mean when I say
8  reclaimed farmland?
9    A.   Yes.
10   Q.   So whether it's reclaimed farmland or
11 just farmland that's never been touched before,
12 Mortenson understands that this land needed to
13 be converted into a workable area, and that's
14 why an excavator is hired in part, right?
15   A.   Yes.
16   Q.   And prior to any ironworkers, or
17 electricians, or even delivery trucks coming, on
18 this project, for example, Don Borneke comes in
19 and converts these areas into workable land?
20   A.   Correct, they follow the civil plans.
21   Q.   And some of the tasks include things
22 like grading, maintaining, providing drainage,
23 compacting the land, all of these things in
24 various areas?

19

1    A.   Yes.
2    Q.   On these projects, I understand, you
3  know, there are huge, vast farmlands, the vast
4  majority of which is never touched, but the work
5  on this project is specified to very small
6  locations, like access roads, and erection areas
7  that are all laid out in the plans prior to work
8  commencing, right?
9    A.   Yes.
10   Q.   And these areas, whether it be an
11 access rode, a laydown yard, a turbine erection
12 area, these are all things that the excavating
13 company would be directly responsible for
14 preparing and maintaining for the work that's
15 coming, right?
16   MS. VAN HECKE:  Objection to responsible.
17   THE WITNESS:  Preparing for, yes.  On the
18 maintaining side, there's maybe some more
19 influence there on what maintenance requirements
20 exist, just because once work starts, say
21 turbine components delivered or unloaded,
22 erection begins.  There's certain things that we
23 would direct Borneke to do in forms of
24 maintenance, or perform, or self-perform, I

20

Andrew Kruse 03/15/2022

1  guess, in that matter.
2  BY MR. TERRY:
3      Q.  So it kind of -- are you saying it's
4  like a combination of both?  Once works starts,
5  Mortenson may direct Borneke to some areas for
6  maintenance, but also if Borneke sees something
7  that needs to be maintained, they can maintain
8  that on their own as well?
9      MR. SULLIVAN:  Objection, that misstates
10  testimony.
11      Go ahead.
12  MR. TERRY:  You can answer.
13  MS. VAN HECKE:  Just so you know, Andrew,
14  I'll just take a pause and let him know.
15          Andrew, when somebody makes an
16  objection, unless I instruct you not to, you can
17  go ahead and answer.
18  THE WITNESS:  Okay.  Hey, Charlie, can you
19  repeat that?
20  BY MR. TERRY:
21      Q.  Sure.  I just want to make sure I
22  understand what you're saying.
23          I understand that once work starts, the
24  direction may come from Mortenson that certain

21

1  things need to be maintained or repaired, but
2  also there's an ongoing component, if Borneke
3  sees something, they also have to -- that needs
4  to be remedied, they have to do that as well as
5  long as it's in their scope of work, right?
6      A.  For the most part, yes.
7      Q.  All right.
8      A.  Without being able to talk specifics,
9  it's a little hard to just generally, you know,
10  go through all the differences that could exist.
11  But, yes, maintenance as directed, or, you know,
12  being brought back into, you know, within the
13  plans is Borneke's responsibility.
14      Q.  Got it.  Okay.  And then, you know, to
15  your point, let's talk a little more
16  specifically.
17          For erection areas, I'll try to direct
18  most of my attention to that and the access
19  roads, because I know there's some overlap
20  between access roads and the radii, the erection
21  areas, and that's where this incident occurred.
22          So for the erection area, Borneke is
23  hired to literally create or recreate and
24  reclaim farmland, an area where a turbine is

22

1  going to be erected, right?
2      A.  Correct.
3      Q.  In these areas, this land for a radius
4  out of each direction of the turbine needs to be
5  graded, compacted, and proper drainage needs to
6  be provided, right?
7      A.  Yeah, depending on the civil site plan.
8  You'll have a specified, you know, radius or
9  cleared area, a specified --
10      Q.  Yeah.
11      A.  -- a specified graded area, including a
12  crane pad, that has different requirements, and
13  then the road and road shoulders, that kind of
14  tie -- that from like a county road, or, you
15  know, a state highway in this case, or whatever
16  we may be talking about.
17      Q.  Yeah, of course, and we actually took
18  the deposition of Andy Black yesterday.
19          Are you familiar with Andy Black?
20      A.  I am, yes.
21      Q.  It's safe to say that you understand
22  he's a project manager for Mortenson who worked
23  on this project as well?
24      A.  Yes, we were coworkers at the time.

23

1      Q.  And he testified to this as well, and
2  he kind of said it as, you know, these erection
3  areas on this project had a radius of 175 feet
4  out from turbine.
5          Does that sound about accurate?
6      A.  Without knowing the exact distance,
7  that sounds right on.
8      Q.  Okay.
9      A.  What it should have been, yeah.
10      Q.  And then he said maybe at the outer
11  edges of this 175-foot radius, the
12  specifications aren't as stringent as they are
13  closer to the center where the work is going to
14  be performed, where delivery trucks are going to
15  be coming, or equipment is going to be staged.
16          Does that sound accurate?
17      A.  Yes.
18      Q.  So in this area, let's just say where
19  the actual work is going to be performed, where
20  delivery trucks are going to be coming in and
21  out, and where equipment is going to be staged,
22  this is the area that needs to be properly
23  graded and compacted so that it's prepared for
24  the work that's coming, right?

24

1    A.   Yes, sir.  And most notable would be
2  offload activities.  You can think of the
3  grading in terms of what would be suitable for
4  heavy haul trucks to be able to drive in,
5  unload, and then be able to, you know, drive out
6  the other side of the turbine.  So that's mainly
7  what the preparation is that takes place at
8  these sites.
9    Q.   Exactly.  And that's what most people
10  have testified to in this matter.
11       Essentially, and correct me if I'm
12  wrong, the areas where the trucks are actually
13  coming in, dropping off the equipment, and where
14  the equipment is being staged, needs to be
15  graded and compacted such that the ground -- and
16  the idea is it won't just simply sink in or cave
17  in underneath the trucks and the equipment,
18  right?
19    A.   Yeah.  Yep.
20    Q.   And, additionally, in these areas, you
21  want -- the excavating company is contracted to
22  provide drainage at least away from the turbine
23  erection area so that way water doesn't pool in
24  the erection area, right?

25

1  compacting, so that the ground can support the
2  weight of these trucks and the equipment that's
3  being staged, right?
4    A.   Yes, sir.
5    Q.   And they also have to provide the
6  drainage, whether it be front to back,
7  side-to-side, left to right, whatever it may be,
8  so that way the drainage, the idea is it doesn't
9  pool in the center where the crane is going to
10  be and where the turbine is going to be, right?
11    A.   Yes.
12    Q.   You agree some of the ideas behind
13  this, among, I'm sure, a plethora of other
14  things, are if the ground is properly prepared
15  and compacted in these areas where deliveries
16  are going to be made and equipment is going to
17  be staged, then the ground won't sink in
18  underneath these things, such that there's large
19  ruts or depressed areas where water can pool and
20  form, or that can simply cause tripping hazards.
21  You'd agree with that, right?
22    A.   I guess I have some hesitation to agree
23  with that.  I would just say the site can be
24  properly prepared, and then throughout work,

27

1    A.   Yes.  Generally, the turbine area is
2  graded -- grades away from the turbine in the
3  center, or the pedestal, and that would provide
4  drainage to the outside.  I would just make one,
5  you know, comment.
6    Q.   Okay.
7    A.   Not every turbine area is like a flat
8  ground site, so you might have terrain that
9  flows from one side of the site to the other, or
10  drains front to back.  Very dependent, based on
11  the site.
12    Q.   Exactly.  So each site is different
13  based on the site, and that's what, you know,
14  specific specifications are for each site,
15  right?
16    A.   Correct.
17    Q.   And at each site, depending on what the
18  certain specifications are, it's up to the
19  excavating company to perform their work up to
20  these specifications on each individual site,
21  right?
22    A.   Yes, to follow the civil plans.
23    Q.   Yeah.  And they have to follow these
24  civil plans with things such as grading and

26

1  tripping hazards, kind of to what your statement
2  there was, you know, tripping hazards can
3  present themselves with just any amount of work
4  that takes place on that site.  So it can be
5  prepared in such a way, yes, but that doesn't
6  mean it would necessarily stay in that state
7  while any work is performed.
8    Q.   Okay.  But, again, in the area, like
9  where the actual work is going to be performed,
10  the delivery, and the crane pad, things like
11  this, these are all areas with more stringent
12  standards that require more prep work, so that
13  in a perfect world, they would stay as prepared
14  as possible for the work that's coming, right?
15    A.   Yes, as prepared as possible.
16    Q.   And, again, things happen on a
17  construction site.  You know, it rains, trucks
18  come in and out.  But the idea is -- the idea
19  behind all of this is, if the excavation company
20  is doing their job and preparing the ground
21  properly, the ground will be able to support the
22  weight of these trucks, and support the weight
23  of the equipment being staged, and effectuate
24  the actual delivery and erection, right?

28

1    A.   Could you repeat that?
2    MR. TERRY:  Sure.
3         Margie, I hate to do it, but do you
4    mind reading it back?  I don't know if I can get
5    it back out again.
6         (Record read.)
7    THE WITNESS:  Thank you very much.
8         Surely, I -- it depends on the soil
9    type conditions and the existing conditions that
10   you have on the site.  Not to go too far down
11   this rabbit hole, but you can do the same prep
12   work on two different sites, one with sand or
13   one with clay, but due to a variety of different
14   factors, you'll have very different results.
15        So the only thing I would say to that
16   is, yes, the civil contractor to do -- to work
17   in accordance with the civil plans is the
18   expectation.  However, the results of the site
19   may vary drastically, based on outside controls.
20   BY MR. TERRY:
21   Q.   And these results may vary, but
22   nonetheless there are agreed upon specifications
23   for each site, and each site has these varying
24   ground conditions, and these conditions are
                                              29

1    erection to the best of the possible
2    circumstances, right?
3    A.   Yes, suitable for work.
4    Q.   One of the things that would make these
5    erection areas suitable for work would be so
6    that, for example, the crane pad doesn't sink
7    into the ground and the crane tips over.  That
8    would be catastrophic, right?
9    A.   That would be a catastrophic example,
10   yes.
11   Q.   And, obviously, you know, the crane pad
12   we already established a different
13   specification, but nonetheless, the crane pads
14   are made such that no matter what the ground
15   conditions are at the site, the crane is not
16   going to sink into the ground and tip over,
17   right?
18   A.   Yes, Charlie.  The crane pads are
19   actually a Mortenson specification that we give
20   to the civil contractor, whereas the civil plans
21   are, I believe on this project, was from
22   Westwood, which is a third-party civil engineer
23   that can design typical sites and typical
24   layouts.
                                              31

1    known when the specifications are made, and it's
2    expected that the civil contractor will comply
3    with these specifications so that the ground is
4    prepared for each various condition, right?
5    A.   The ground conditions are estimated,
6    based on a geotech of a single point, so maybe
7    not fully known until you open it up.  But I
8    would say they adjust to some of those site
9    conditions that presents themselves during the
10   work.
11   Q.   And this adjustment is on the civil
12   contractor, Borneke in this example, to make and
13   know what the best tasks and routes to take are
14   on each site, because they are the experts in
15   that field, right?
16   A.   Correct.  We would rely on Borneke to
17   basically give us the best product that's
18   possible at these locations.
19   Q.   And the best product at these
20   locations, whether it be mud, whether it be
21   clay, the idea is where the work is being
22   performed and where it's being erected and
23   delivered, the ground should be compacted and
24   graded so that it can effectuate delivery and
                                              30

1    Q.   But no matter who's giving Borneke the
2    specifications, whether it be Mortenson for the
3    crane pads or Westwood for the actual ground
4    conditions, it's still up to Borneke to
5    implement these plans and see to it that they're
6    complied with in the field, right?
7    A.   It is up -- it is up Borneke to install
8    them in the field.
9    Q.   Yeah.  Like Mortenson is not out there
10   building crane pads.  That's Borneke's job,
11   right?
12   A.   Right.
13   Q.   And the same thing for like grading and
14   compacting erection areas.  While it may be
15   someone else giving the specs, it's still
16   Borneke doing the task at each site, right?
17   A.   Yes.
18   Q.   And part of the idea behind it is, if
19   the ground is compacted and prepared where the
20   equipment is going to be staged, the hope is
21   that the equipment won't hopefully sink into the
22   ground or fall off the cribbing due to ground
23   conditions being depressed, right?
24   A.   Correct.
                                              32



1    Q.   So these are very important areas that
2  need to be properly prepared and compacted so
3  things like this don't happen or they're
4  prevented as much as possible, right?
5    A.   Yes, prevented as much as possible.
6    Q.   Let's talk about the -- you know, we've
7  been kind of talking about generalities using
8  Borneke.  Let's talk about this site in
9  particular.
10        Would you agree that on this Mendota
11 Hills wind farm project Don Borneke was the
12 contracted excavating company?
13   A.   Yes.
14   Q.   And your role on this project was
15 assistant superintendent, right?
16   A.   That's correct.
17   Q.   Would your role have intertwined kind
18 of with the work that Borneke was performing at
19 the various sites?
20   A.   Yes.
21   Q.   As the assistant super, it's important
22 for you to see -- not only see what they're
23 doing, but know what they're supposed to be
24 doing, so that way you can make sure it's being

33

1  implemented on this project specifically?
2    A.   Yes.
3    Q.   On this project, some of these
4  responsibilities for, you know, the various
5  erection sites, would be things such as
6  clearing, and grubbing, and grading the land?
7    A.   Yep.
8    Q.   And some of the other things would be
9  grading and maintaining the various erection
10 areas, maintaining, whether it be based on
11 Mortenson's direction or their own observations?
12   A.   Yes.
13   Q.   And you, as the super for Mortenson,
14 you would walk around and make sure these things
15 were being done by Borneke, right?
16   A.   Yes.
17   Q.   We've already talked about kind of what
18 an erection area is, but in layman's terms, it's
19 literally where the turbine is going to be
20 built, right?
21   A.   Correct.
22   Q.   And I can tell you with certainty that,
23 you know, the radius around each -- and I'll
24 show the contract in a little bit -- was for a

34

1  175-foot radius in each direction.  And that
2  whole area would make up the erection area,
3  right?
4    A.   Yeah, the erection area or the turbine
5  pad location, turbine pad site.
6    Q.   On this project, there were sites T1,
7  T2, all the way up to T29.  Does that sound
8  right?
9    A.   Yeah.
10   Q.   And each T site is a different location
11 of a turbine, right?
12   A.   Yes.
13   Q.   I'm still here.  I'm just looking at
14 some of the things we've already talked about to
15 see if I need to go over it.
16   A.   No worries.
17   Q.   In these erection areas, and I'm going
18 to use that word, because that's what the
19 contract refers to it as, is an erection area.
20        In these erection areas, at the center
21 is literally where the foundation of the turbine
22 is, right?
23   A.   Generally, yes.
24   Q.   I mean, it might be here or there,

35

1  depending on the actual site, but the idea is
2  the radius outside of the foundation is what
3  makes up that erection area, right?
4    A.   Yes.
5    Q.   And the foundation is literally what
6  the turbine is going to be sitting on?
7    A.   Yes, the concrete.
8    Q.   Then in this erection area on this
9  project, at each T site, 1 through 29, this, you
10 know, the area we talked about kind of closer to
11 the actual turbine, maybe not on the outer edges
12 of that 175-foot radius, but these closer
13 perimeters is what makes up like the working
14 area, and the delivery area, and the staging
15 area, things like that?
16   A.   Yes, the -- the erection area.
17   Q.   In this erection area, this is where
18 workers, like ironworkers, are going to be
19 coming later on?
20   A.   Yes.
21   Q.   This is where various semis are going
22 to be delivering bases, midsections, hubs,
23 things like that?
24   A.   Yep.

36



1  Q.  This is also where those things are
2  going to be staged for a week, maybe two weeks,
3  until they're actually erected?
4  A.  Yep.
5  Q.  And the ground in these areas, as to
6  T-1, T-2, all the way up to T-29, needs to be
7  prepared to the specifications so that these
8  erection areas can support the weight of these
9  various pieces of equipment and the trucks while
10  they're delivering and also staging the
11  equipment?
12  A.  Yes.
13  Q.  I'm going to add at each of these
14  specific sites on this project, again we talked
15  about it generally, but specifically, one of the
16  tasks was providing adequate grading -- grading
17  and drainage, right?
18  A.  Yes.
19  Q.  And you'd agree that one of the
20  benefits of providing adequate drainage was that
21  water -- or the idea is that hopefully water
22  won't pool in the center where people are going
23  to be working, or equipment is going to be
24  staged, because if water pools in the winter,

37

1  for example, it can freeze and cause more
2  hazards, right?
3  A.  Yes, that is one of the benefits of
4  adequate drainage.
5  Q.  And another one is it just simply
6  prevents standing water that can cause a whole
7  plethora of problems on these projects, right?
8  A.  Yes.
9  Q.  Andy Black testified yesterday that the
10  175-foot radius around the turbine, and I think
11  we talked about this a little bit, but that
12  whole area is what makes up the erection area.
13  And then, again, that tighter circle is where
14  the compacting, grading, and drainage really
15  matters more, because that's where all the
16  important work is going to be performed.
17  Does that sound right?
18  A.  Correct.  And it's also part of that --
19  when we backfill the foundation.  So before
20  erection and after backfill, there's a --
21  there's a 2 percent, I believe, you know, taper
22  to the site, so it kind of helps you setup for
23  drainage, as you -- post erection for
24  restoration activities that Borneke would also

38

1  be performing.
2  Q.  I appreciate that.
3  He also testified that in this tighter
4  circle, so-to-speak, that this is where the
5  equipment would be delivered and staged, so this
6  is further reason why this ground needs to be
7  compacted and graded, so that way it adequately
8  supports the weight of the trucks and equipment,
9  so that way, like depressed areas just don't
10  form underneath it, right?
11  A.  Correct.
12  Q.  I'm going to get to the contract in a
13  second, but I just want to show you a few
14  documents based on your work with this project.
15  This was previously marked as
16  Brad Bennett's Deposition Exhibit 3.
17  Can you see my screen, sir?
18  A.  I can.
19  Q.  Does this appear -- I zoomed in a
20  little bit.  Does this appear to be an accurate
21  copy of the site map for the Mendota Hills wind
22  farm project?
23  A.  Yes, it does.
24  Q.  As we were talking about, it shows the

39

1  sites T1, T2.  It kind of weaves around a little
2  bit, but all the way down to T29, somewhat at
3  the bottom by the laydown yard?
4  A.  Yes.
5  Q.  Then these various T sites are, again,
6  like we've established, showing on the map, are
7  literally where the turbines are going to
8  erected, and the surrounding area would be the
9  erection area, right?
10  A.  Yes.
11  Q.  Then I want to show you what was also
12  marked as Exhibit 4 during Brad Bennett's
13  deposition.
14  Can you see my screen?
15  A.  I can.
16  Q.  Do you see down at the bottom here, I
17  zoomed out, I'll zoom in.  We have Beemerville
18  Road?
19  A.  Yep.
20  Q.  Then we have Bingham, kind of in the
21  middle, and Fitch over to the left, right?
22  A.  Yep.
23  Q.  So just generally, does this appear to
24  be at least part of the wind farm project that

40



1  we're here to talk about?
2      A.  Yes, I believe it is.
3      Q.  Then we see these main roads, and we
4  see like all these little roads that branch off.
5  Would these kind of be a spur and access roads
6  for the various turbines?
7      A.  Yep.
8      Q.  Then if I go on to Page 2 of this
9  exhibit, this shows, I think it's T-11, or at
10  least close to it, but nonetheless, it's just
11  for illustrative purposes, this shows Bingham
12  Road and an access road that curves off it all
13  the way up until a turbine, right?
14      A.  Yeah.  I think that -- yeah, that's
15  what it looks like.
16      Q.  Then you have this dark green area to
17  the left and to the right, and kind of
18  underneath the turbine.  This would be like
19  untouched farmland that never really gets worked
20  on, for the most part, right?
21      A.  Yes.
22      Q.  Then these areas surrounding the
23  turbine that look a little more clear, this
24  would be like the erection area?

41

1      A.  The erection area would probably be a
2  little bit bigger, about -- yeah.  Tough to say
3  from this aerial, but it looks like some of that
4  has been restored.
5      Q.  So this would, at least, show part of
6  the erection area.  Whether or not more of it
7  was restored, it's just like the general sense
8  that that area surrounding it would be part of
9  erection area, right?
10      A.  Yes.
11      Q.  Then this road leads up and until the
12  erection area, and there's like a turnaround
13  area, and things like that in there as well?
14      A.  Yes.
15      Q.  And, again, I know it might not be
16  perfect, because some of the ground has been
17  reclaimed and restored to its prior condition,
18  but just from a general standpoint, you would
19  agree that that's kind of like the makeup of
20  these sites, right?
21      A.  Yes.
22      Q.  Then I want to show you the contract
23  for this project.  Then have you -- well, let me
24  ask you this.

42

1      Have you seen the contract for this
2  project prior to today, or are you unsure?
3      A.  I am unsure.
4      Q.  But you are for sure that you would
5  have seen the scope of work between Borneke and
6  Mortenson at some point?
7      A.  I'm not sure, but I --
8      Q.  Okay.
9      A.  -- I believe it was referenced plenty
10  of times.  I don't know if I, you know, would
11  have read it word-for-word, if that makes sense.
12      Q.  Okay.  Got it.  If you didn't read it
13  word-for-word, who would have relayed to you
14  what specifically Borneke needs to be doing in
15  the field so that way you can make sure it's
16  being implemented?  Would that be like a
17  combination of you and Andy Black?
18      A.  Yes, conversations with Andy Black, as
19  well as, you know, with reference to the
20  contract as well as the civil drawings.
21      Q.  Got it.  As it pertains to like
22  contract interpretation, or, you know, the scope
23  of work, from a contract standpoint
24  specifically, is it safe to say that you would

43

1  kind of defer to Andy Black, seeing that he was
2  the project manager on this site?
3      A.  Typically, yes.
4      Q.  So when you say you've seen the scope
5  of work, you may not know it as in detail or
6  as -- what's the word I'm looking for --
7  intimately as Mr. Black did, you would maybe
8  rely on it more from a general standpoint, and
9  also rely on things such as drawings, and things
10  like that?
11      A.  Yes, exactly.
12      Q.  All right.  Got it.  I'm just going to
13  scroll to the scope of work section, then, to
14  see maybe if it jogs your memory, and if you
15  kind of looked at it before, and ask you some
16  questions about it.  Okay?
17      A.  Sure.
18      Q.  So this is an 11-page exhibit to the
19  contract.  Can you still see my screen?
20      A.  I can.
21      Q.  And, again, you can see at the top,
22  this is the Mendota Hills Repowering Project.
23  It talks about Mortenson's project number, and
24  this would be the scope of work for Don Borneke,

44

1  the excavating company, right?
2      A.  Yes.
3      Q.  As I'm scrolling through it, it shows
4  things like the general requirements on Page 2,
5  clearing and grubbing, the trailer and laydown
6  yard.  If we keep going, things like access
7  roads, and if we keep going further, you know,
8  project maintenance, and foundation, and turbine
9  erection areas.
10      Does this appear to be something that
11 you would have looked at in the past to
12 understand the various scopes of work of Don
13 Borneke on this project?
14      A.  Yes.
15      Q.  Then we can kind of skip some of the
16 minutia of this.  But under turbine access
17 roads, do you see 2.6 right here?  I'll zoom in
18 to the specific section, but do you see that?
19      A.  Yes, I do.
20      Q.  If we go on to the next page,
21 Subsection N at the top, do you see that?
22      A.  Yes, I do.
23      Q.  And it says:  Subcontractor shall
24 construct temporary access roads/radii required

45

1  to facilitate delivery of turbines to each wind
2  turbine foundation location on site.  And then
3  temporary access roads/radii shall be aggregate
4  based.
5      Did I read that first -- about half of
6  that, correctly?
7      A.  Yes.
8      Q.  And when talking with Andy Black
9  yesterday, he said, you know, part of the
10 requirement was to, as it says here, create
11 these access roads and this radius that kind of
12 goes in through the erection areas that help
13 facilitate deliveries, staging, and turnaround
14 of the trucks, and that was to be performed by
15 Don Borneke.
16      Does that sound accurate to you?
17      A.  Yes, it does.
18      Q.  So this kind of -- this area, at least
19 of the erection -- this area, at least of the,
20 you know, access roads part of the scope of
21 work, would kind of also feed into the erection
22 area because there needs to be this radii or --
23 these radii that helps turn around the trucks,
24 and also help stage and deliver the equipment?

46

1      A.  Yes.
2      Q.  And then if we skip ahead a little bit,
3  and if we go into turbine erection areas on
4  Page 9, these -- this would be -- and, again, we
5  talked about this with multiple people,
6  including Mr. Black, but this would be, like,
7  part of the contract that would actually discuss
8  the responsibility of Don Borneke at these
9  erection areas, right?
10      A.  Yes.
11      Q.  Then, as we talked about earlier, the
12 radius for the erection area on this project
13 would be 175 feet?
14      A.  Yep.
15      Q.  Then there are certain things that need
16 to be done on these various sites.  And I think
17 this is what you were talking about for each
18 site, actual limits of clearing, and required
19 slope will be as per the contract documents, and
20 coordination with Mortenson's superintendents
21 for component location.
22      So, it kind of varies from
23 site-to-site.  Is this what you were talking
24 about?

47

1      A.  That's exactly it.  Yeah, different
2  sites deal with different work around, you know.
3      Q.  And during the deposition of
4  Mr. Black yesterday, he said, like, for example,
5  the last part, for component locations.  You
6  know, Mortenson and Borneke were kind of working
7  hand-in-hand, so-to-speak.  Like, Borneke would
8  know exactly where the crane pad was going to
9  be, exactly where the trucks would be driving,
10 exactly where the equipment would be staged.
11 And these are the areas that really need to be
12 focused on, because they're hyper-specific and
13 hyper-defined per each various erection site.
14      Does that make sense?
15      A.  Yes, probably.  Maybe not exact.  When
16 it comes to like a road, the 16-foot wide
17 roadway, or the radii, and the erection areas,
18 and the crane pads, you know, we would stake
19 those out for them, so there's definitely no
20 disparity there.  Would I say within a couple of
21 feet up to, you know -- some leeway each way of
22 where these components may have ended up, or
23 where equipment may have been driving, or being
24 transported.  Some of that is steel fitted.

48



Andrew Kruse 03/15/2022

1    Q.  Got it.  So when I said exact, I might
2 have been too much of a lawyer there, I should
3 say.  It's more like you, as Mortenson, would
4 stake out where the various things were going,
5 and then Borneke would come in, and at least
6 within a reasonable variation of that, prepare
7 the land for what's coming next?
8    A.  Very accurate, yes.
9    Q.  And in this area, things such as the
10 crane pad are going to be staked out, things
11 like the access road, as well as where various
12 pieces of equipment are going to be delivered
13 and staged, right?
14    A.  Yes.
15    Q.  In all of these staked out areas, and
16 we'll skip the crane pad because I know that's a
17 different specification, but like for the access
18 road that's staked out and in the erection areas
19 that are staked out, these are all things that
20 need to be properly prepared and compacted, so
21 that it can support the weight of the delivery
22 trucks as well as the staging of equipment,
23 right?
24    A.  Yes.

49

1    MR. TERRY:  Then, guys, I'm sorry.  Do you
2 guys mind if we just take a quick, like
3 five-minute break?  Can we go off the record for
4 a second?
5         (Recess was taken.)
6    MR. TERRY:  Back on the record.
7 BY MR. TERRY:
8    Q.  So, sir, I know you said that from
9 specific contractual interpretations you would
10 defer to Mr. Black, but nonetheless, as it
11 pertains to like actual work being performed on
12 these sites and in the field, you were one of
13 the Mortenson individuals who were overseeing
14 Borneke's work, and had to know what they were
15 contracted to perform, and help implement that
16 in the field, right?
17    A.  Yes.
18    Q.  And, again, I'll show you the scope of
19 work, because it's talking about the erection
20 areas.
21         In these erection areas, you would
22 agree -- you've already talked about the
23 175-foot radius, and in this area, if possible,
24 for each site, there needs to be, for example,

50

1 no more than a 5 percent grade across the
2 area?
3    A.  Right.
4    Q.  And, then, additionally, things such as
5 in subsections, bumps shall be leveled and holes
6 filled to accommodate equipment travel, right?
7    A.  Yes.
8    Q.  Then the same thing, the cleared areas
9 shall be maintained, compacted, and provide
10 positive drainage at all times to facilitate
11 turnaround area for turbine delivery and
12 components through the duration of the project,
13 right?
14    A.  Yes.
15    Q.  So, again, this is kind of what we were
16 talking about before, the bumps and the holes
17 shall be filled and leveled, and the compaction
18 and drainage need to be maintained, at least in
19 these areas where equipment is going to be
20 delivered or trucks are going to be turning
21 around and staging equipment.
22         Does that sound right?
23    A.  Yes, it does.
24    Q.  And in these areas you would expect --

51

1 again, this is in that tighter area where
2 actually work is being performed and deliveries
3 are being made, that's what I'm talking about
4 for the next question.
5         In these areas, this is where you would
6 expect the ground to be compacted on this
7 project such that it does not simply sink in
8 underneath a staged piece of equipment, like a
9 base or a midsection, right?
10    A.  Yes.
11    Q.  And the same thing, you would expect
12 the ground to be prepared in these areas to be
13 able to support the weights of the various semi
14 trucks delivering these pieces of equipment, so
15 that there's not these large depressed areas, or
16 trucks getting stuck, or things like that,
17 right?
18    A.  Yes.
19    Q.  Now, I just want to talk generally,
20 sir.  On this project, you would agree that you
21 were able to observe Borneke's work and the
22 types of equipment they had, the people they
23 had, things like this for the most part?
24    A.  Yes.

52



1    Q.   And you understand on this project,
2   they had pieces of equipment that were large,
3   and pieces of equipment that were small, right?
4    A.   Yes.
5    Q.   They had things like bulldozing on the
6   large end, and skid steers or Bobcat, I think
7   they're the same thing, but on the small end?
8    A.   Yes.
9    Q.   And, hypothetically, if an area was too
10  tight for a bulldozer to get into, something
11  smaller like a Bobcat or a skid steer, in
12  practice, could potentially be used, right?
13       MR. SULLIVAN:  Objection, foundation.
14       Go ahead.
15       MR. TERRY:  You can answer, sir.
16       THE WITNESS:  It could be, yes.
17  BY MR. TERRY:
18   Q.   And, again, you know, at the beginning
19  we talked about the various trades knowing what
20  each company is going to be doing.  You would
21  agree that on this project, ironworkers did the
22  ironwork, and the excavating company did the
23  excavating work, right?
24   A.   Yes.

53

1   thought needed to be done, right?
2    A.   Yes.
3    Q.   But the point of it is, just from a
4   general standpoint, if it was something
5   excavation, whether it be prep work, or whether
6   it be remedying work, it was Borneke that was
7   doing this type of excavation work, not
8   Mortenson?
9    A.   That's correct.
10   Q.   And just more so from a general
11  standpoint, we've already, I think, established
12  that if an area is properly graded with proper
13  drainage, one of the benefits on this project
14  and the hopes is that water will not pool in
15  these areas, right?
16   A.   Yes.
17   Q.   All right.  And if water does not pool,
18  there's hopefully not large lakes of water or
19  large areas of water that pool and freeze,
20  right?
21   A.   Yes.
22   Q.   And these are all tasks that Borneke
23  was contracted to prepare and try to prevent if
24  possible on this project, right?

55

1    Q.   Like Mortenson wasn't going around and
2   grading and compacting erection areas, right?
3    A.   That's correct.
4    Q.   If there was something that needed to
5   be performed, such as a reassessment, or a
6   re-compaction, or a regrading, or anything like
7   that, that's something that Borneke would bring
8   their equipment over to do, right?
9    A.   Yes, depending on -- depending on the
10  scope, you know, what the issue was or what they
11  were coming back for.  Yeah, any of like a
12  civil -- what I could loosely call a tune-up,
13  would be coming from Borneke.
14   Q.   Okay.  Got it.  So from a tune up
15  perspective, so-to-speak, like when it come to
16  actual civil work, like the ground -- let's just
17  use the excavating work, because that's the word
18  that's stuck in my head.  Is that okay by you?
19   A.   Sure.
20   Q.   For the excavating work, this is
21  something that, if there was excavation work,
22  this is something that Borneke would have to
23  come in and do, whether it was based on
24  Mortenson's request, or something that they just

54

1    A.   Yes.
2    Q.   I want to -- I thought I was still
3   sharing my screen, okay.
4        I want to move on to an exhibit that's
5   been used in various depositions.  I'll just
6   refer to it as Exhibit 8 for Mr. Bennett's
7   deposition.
8        Sir, are you familiar with what this
9   document on the screen is showing, the
10  Construction Incident Analysis?
11   A.   I'm not -- I'm familiar with the CIA.
12  Not this one specifically.
13   Q.   Have you seen this one before?
14   A.   Maybe a long -- you know, years ago.
15  Not -- not recently.
16   Q.   Got it.  As Mortenson's -- one of their
17  assistant superintendents on this project, you
18  would have been one of the individuals helping
19  oversee Mortenson's work -- I mean Borneke's
20  work on this project and knowing what they were
21  doing at various sites, right?
22   A.   Yes.
23   Q.   When I talk about the subject incident,
24  you know, are you familiar with the incident

56



1  we're here to talk about involving my client,
2  Nick Georgeff?
3      A.  Loosely.  I was -- you know, I only
4  heard from other individuals.
5      Q.  Would you have been involved in at
6  least the prep work with Borneke on these
7  various sites, like T-1 through T-29?
8      A.  Yes, on the foundation scope, as well
9  as, like, ahead of offload.
10     Q.  Okay.
11     A.  So road construction, radii
12  construction, and basically making sure, you
13  know, that the sites are built ready to take
14  parts.  To that point, I was involved.
15     Q.  Okay.  Got it.  So once they were
16  actually erected, you were not involved.  But up
17  until delivery and things like that, it was kind
18  of like the scope we were talking about earlier?
19     A.  Yeah, and, Charlie, I don't know if
20  you're aware of it, but I wasn't on the project
21  in November.
22     Q.  Okay.
23     A.  I was basically sent to another
24  project.  I took some personal time at the end

57

1  of October, and then for the month of November,
2  actually right around that like November 15th
3  date, I was on another project in Oregon.
4      Q.  Okay.
5      A.  So, when it comes to the specifics
6  about like this incident, or that site, I don't
7  have some of those clarifications.
8      Q.  So it's safe to say, then, that you did
9  not observe my client falling or anything like
10  that?
11     A.  No, I did not.
12     Q.  Did you ever talk with him after this
13  accident?
14     A.  No.
15     Q.  Did you ever talk with anyone about the
16  specifics about this accident that you remember,
17  that you can recall specific conversations
18  about?
19     A.  I do believe I checked in with the
20  team, and that individual would have been one of
21  the engineers at the time.  And I just said,
22  hey, how have things been going?  To which he
23  briefly described that we had an injury, and to
24  the specifics of what he told me was, other than

58

1  kind of resulting in a broken leg, I couldn't
2  tell you much more.  But that's how I would have
3  found out and known about this.
4      Q.  But as it pertains to specifics, like
5  if this sheet of ice looked like this on the day
6  of the occurrence, or any of the facts in the
7  incident report, you don't really know one way
8  or another because you weren't there; is that
9  fair to say?
10     A.  Yes, that's fair to say.
11     Q.  I do want to ask you one question about
12  it, nonetheless.
13     A.  Sure.
14     Q.  We've already established that -- well,
15  two questions.  One, on this site, and it says
16  right here, proper PPE.  Would you agree that
17  while ice cleats were available, they were not
18  required prior to this incident?
19     A.  That's correct.
20     Q.  And based on this document, and, again,
21  you've seen these before, you know how to
22  interpret them, right?
23     A.  Yes.
24     Q.  Okay.  It says that the team member,

59

1  meaning my client, Nick Georgeff, had all the
2  required PPE per site policies, right?
3      A.  Yes.
4      Q.  And, then, as we've already
5  established, on this project, any excavation
6  work that needed to be performed would have been
7  performed by Don Borneke, right?
8      A.  Yes.
9      Q.  So at the top of Page 2, where it says:
10  The site had previously been addressed with a
11  bulldozer to mitigate walking/working hazards;
12  however, the ice accumulation had occurred too
13  close to the WTG section for the dozer to
14  operate safely, leaving the ice unaddressed.
15  One, did I read that correctly?
16     A.  Yes.
17     Q.  Two, on this site, you know, the
18  pre-existing being addressed with a bulldozer,
19  this is one of the tasks that you would have
20  overseen Don Borneke performing on the various
21  sites, right?
22     A.  Correct.
23     Q.  And this work of the bulldozer was
24  something that would have been a task that only

60



Andrew Kruse 03/15/2022

1  Don Borneke was performing on these sites, to
2  prepare these sites, right?
3      A.   Wait.  Are you talking about in this
4  instance --
5      Q.   Yes.
6      A.   -- like when you say previously
7  addressed with a bulldozer?
8      Q.   Yeah, exactly.  So when it says
9  previously addressed, this is something that
10  would have been -- this site would have been
11  addressed and prepared with Don Borneke's
12  equipment prior to the delivery even, right?
13      A.   Correct.  And then, I guess, Charlie,
14  just for maybe some clarity, that's -- you know,
15  the sites were built --
16      Q.   Yes.
17      A.   -- the components were unloaded.
18  Pertaining specifically to the CIA, when I read
19  the site has been previously addressed with a
20  bulldozer to mitigate walking/working hazards,
21  that, to me, tells me that the bulldozer had
22  been since returned, knocked down any ruts, or,
23  you know, basically hazards that existed, that
24  were identified, and gave that site a tune-up,

61

1  as I would say.  Knock it down.
2      Q.   Exactly.
3      A.   And then, yes.
4      Q.   In this tune-up -- and Andy Black
5  testified to this yesterday as well -- based on
6  your reading of this document, this tune-up,
7  so-to-speak, is something that would have been
8  done -- Mortenson would have called Borneke out
9  to the site and said, hey, this site needs a,
10  quote, unquote, tune-up, right?
11      A.   Yep.
12      Q.   And this tune-up, again, is excavating
13  work, so it would have been performed by
14  Borneke, right?
15      A.   Yes.
16      Q.   So like Andy Black testified to
17  yesterday, I want to make sure you're on the
18  same page, you read this to say this site was
19  originally addressed, and then it was
20  readdressed by Don Borneke at some point later
21  on, right?
22      A.   Correct.
23      Q.   And when Don Borneke readdressed this,
24  there was a realization that there's ice, but

62

1  the dozer could not safely operate because it
2  was too close to the WTG section, right?
3      A.   Yep.
4      Q.   And when we look at this first page,
5  this thing in the front, would this be the WGT?
6      A.   More specifically, that is the hub.
7      Q.   Okay.
8      A.   But it is a turbine component part of
9  the tower, called the hub.
10      Q.   Got it.  So the WTG, that stands for
11  wind turbine generator, right?
12      A.   Correct.
13      Q.   So that's essentially the whole
14  turbine, where it's going to be erected and
15  things like that, right?
16      A.   Yep.
17      Q.   And then this, to the right, is -- I
18  think this is a mid -- this hub in front, these
19  are all components of the WTG?
20      A.   Yes.
21      Q.   So, again, when it says -- and in this
22  picture, because you were one of the assistant
23  superintendents, I'm going to zoom in for a
24  second, do you see this, what looks like a pad

63

1  of lumber on the left side of this photograph?
2      A.   Crane mats, yes.
3      Q.   There's been testimony in this case
4  that this was the crane pad on this site.  Does
5  that appear accurate to you, or at least
6  possible, based on what it looks like in the
7  corner?
8      A.   Yes, it appears possible.
9      Q.   And based on your work on the other
10  sites on this project, you know, the crane would
11  have to be somewhat close to these various
12  pieces, so that it can actually pick it up and
13  swing it to where it needs to go, right?
14      A.   Yes.
15      Q.   These cranes have a limited radius,
16  meaning they can't just swing out, you know,
17  200 feet, it will tip over, right?
18      A.   Depending on the type of crane, yes.
19      Q.   What about the cranes used on this
20  project?
21      A.   For the base mid-operation, as
22  specified here, yeah, limited radius when
23  handling these components.
24      Q.   So let me ask you one other question.

64

1  During the deposition of -- or two other ones on
2  this.
3          During the deposition of my client, as
4  well as one of his coworkers, they testified
5  that based on their understanding of the site
6  map, you know, and when various work was being
7  performed, they believed that site T1 here --
8  there's a typo, it should be T11 -- if they were
9  in the middle of November, would it be more
10 likely true than not that they were already
11 starting to erect site T11 as opposed to T1?
12     A.  I do not know.
13     Q.  You have no reason to disagree with
14 that, you just don't know because you were
15 already off the project?
16     A.  Correct.
17     Q.  Got it.  But nonetheless, again, on the
18 back page where it says the part about unable to
19 readdress the ice, you also read this as ice
20 occurred too close to the WGT section and all
21 the components here.  Borneke was called back
22 out to give the site a tune-up, but they were
23 unable to specifically tune-up this sheet of ice
24 due to its location, right?

65

1      A.  Yes.
2      Q.  So it was kind of one of those things,
3  they were called out to the site as a whole, but
4  they left this specific area unaddressed due to
5  its location?
6      A.  Yes.
7      Q.  Okay.  Got it.  I want to ask you a
8  question about -- before I forget, have you seen
9  plans of the day before on these projects?
10     A.  Like a pod?
11     Q.  Yeah.
12     A.  Yes.
13     Q.  And you know how to read them; is that
14 fair to say?
15     A.  Yes.
16     Q.  If we look at this pod, P-O-D, it says
17 Tuesday, October 30, 2018, right?
18     A.  Okay.
19     MS. VAN HECKE:  You're not sharing your
20 screen.
21     MR. TERRY:  Oh.  Unfortunately you have to
22 look at me another second.  Thank you, Cyri.
23 BY MR. TERRY:
24     Q.  If we go to the pod, do you see my

66

1  screen, Tuesday, October 23rd, 2018?
2      A.  Yes.
3      Q.  And this is the type of document, while
4  maybe you might not have been on this project
5  anymore, you're comfortable reading, from a
6  general standpoint, based on your time with
7  Mortenson and your continued employment with
8  them?
9      A.  Yes.
10     Q.  So if we go down to offload, and we see
11 the various, you know, base, mid, is it safe to
12 say that this is when -- if you look at the
13 first column, Monday, October 29th, the base
14 would have been offloaded at site T11 on
15 October 29th?
16     A.  Yes.
17     Q.  Okay.  And then if we go on to Page 2,
18 which is a pod from November 1st, 2018, right?
19     A.  Okay.
20     Q.  Does that appear accurate to you?
21     A.  Yes, it is.
22     Q.  Then if we go down to the third row,
23 Friday, November 18th, or the third column, can
24 you see that?

67

1      A.  Yes.
2      Q.  If we scroll down to offload, and we
3  see mid right here, it says that the mid was
4  offloaded at site T11 on November 2nd, 2018,
5  right?
6      A.  No, that would show that the mid is
7  planning to be offloaded on the next day.
8      Q.  Okay.  So this would show --
9      A.  So --
10     Q.  Go ahead.
11     A.  What you're showing is Thursday here,
12 and that would show as Friday, so the next day.
13     Q.  Okay.  So when this shows T11 mid
14 offload Friday, November 2nd, what are you
15 interpreting that to mean?
16     A.  Charlie, if you would, just scroll back
17 up to the headers.  I just want to make sure the
18 dates are lining up.
19     Q.  Yeah.  So the last column right here is
20 November 2nd.
21     A.  And what's the current date of this?
22 November 1st?
23     Q.  Yeah.
24     A.  Okay.  So this is distributing on the

68

Andrew Kruse 03/15/2022

1st. The center column would be the plan of
2 that date, and then Friday, November 2nd, would
3 be the plan of the next day.
4     Q.   Got it.  Okay.
5     A.   Looking at the offload column that you
6 referenced, specifically T11 as called out,
7 would be the plan for tomorrow, saying it was
8 November 1st after T15 and T16 were unloaded.
9     Q.   Got it.  So at least based on these
10 documents, the plan was -- or these two pages --
11 to offload the mid at site T11 on November 2nd,
12 right?
13     A.   Yep.
14     Q.   And then if we go back to the first
15 page, the plan was to offload the base at site
16 T15 and T11 on Monday, October 29th?
17     A.   Yes.
18     Q.   Okay.  And, again, this is just for
19 general -- I don't think we've established this
20 yet, but these plans of the day show the plans
21 literally of what work is going to be performed
22 on a day, as well as the plans for the next day
23 or two, right?
24     A.   Yes.  The scheduled work.  Yes.

69

1     Q.   So based on these documents, at least,
2 it appears the base of the mid section were
3 delivered to T11, or planned to be, at least, on
4 Monday, October 29, and Friday, November 2nd,
5 accordingly, right?
6     A.   Yes.
7     Q.   So if we just go off the plans of the
8 day, these pieces were delivered approximately
9 two weeks before the 15th of November, which is
10 the date of my client's accident, right?
11     A.   That would appear to be true.
12     Q.   So then based on the CIA, sometime in
13 that two week period, Borneke would have been
14 called out to the site T11 to do a tune-up.
15 Like, you know, the words you've used, they
16 would have tuned up the areas surrounding the
17 sheet of ice, saw the sheet of ice, but
18 determined they can't fix it due to its
19 location, right?
20     MR. SULLIVAN:  I'm going to object, that
21 calls for speculation and misstates his prior
22 testimony.  He said he wasn't even there in the
23 month of November.
24     MR. TERRY:  I'm just asking him to read a

70

1 document he's probably seen a hundred times in
2 his career.  The objection is noted, though,
3 Chris.  Thank you.
4     THE WITNESS:  Charlie, yeah, I would
5 expect that -- yeah, based on that offload time
6 frame, that post offload, whatever, you know,
7 site needed to be addressed, that's why the
8 bulldozer came back and would have done a
9 tune-up at the site before, you know, the next
10 scope of work.
11     MR. TERRY:  Okay.
12 BY MR. TERRY:
13     Q.   And while you might not have been here
14 on this project, you've seen these types of
15 tune-ups being requested and also performed on
16 these projects from time to time?
17     A.   Yes.
18     Q.   And this is commonplace.  You know that
19 as the Mortenson's assistant superintendent on
20 this project, that if a tune-up to a site needs
21 to be performed, it's going to be the excavating
22 company that performs it, right?
23     A.   Yes.
24     Q.   And based on your reading of the CIA

71

1 that I showed you, it shows that a tune-up was
2 performed, but in the specific area where the
3 ice is, it could not be performed due to the
4 location of the ice despite Borneke coming out
5 and fixing the surrounding areas?  That's your
6 reading of it, at least, right?
7     A.   Yes.
8     Q.   And this reading is based on your
9 almost a decade of experience with Mortenson and
10 your knowledge of this site specifically?
11     A.   Yeah.
12     Q.   Okay.  I promise I'm wrapping up now,
13 maybe just another five minutes and
14 Mr. Sullivan will have a few follow-ups for you.
15         Overall, sir, you would agree that on
16 this project Mortenson hired Borneke and it
17 relied on their expertise for the excavation
18 work that was going to be performed, right?
19     A.   Yes.
20     Q.   And Borneke has been hired by Mortenson
21 on numerous projects because they are the
22 experts in the excavation field for this area,
23 correct?
24     A.   Yes, they're one of our preferred

72



1 subcontractors for the civil scope of work.
2    Q.   Yeah.  And while there may be numerous
3 ones that you've used, you understand based on
4 your time with Mortenson that Borneke has been
5 used on prior projects as well?
6    A.   Absolutely.
7    Q.   And this work continues to be given to
8 Borneke on some projects, and also predated the
9 date of this accident, the project, right?
10   A.   Yes.
11   Q.   And the reason I'm asking this is, it's
12 safe to say that not only from the specific
13 contract and the scope of work on this project,
14 but just from a general business relationship
15 standpoint, Mortenson understood what they were
16 contracting Borneke to perform, and Borneke
17 understood what they were being contracted to
18 perform.  That's a safe assumption, right?
19   A.   Yes.
20   Q.   And on this project specifically,
21 Borneke and Mortenson coordinated such that
22 Borneke knew where the crane pad was going to be
23 staked out, knew where the erection areas were
24 going to be staked out, and knew where the

73

1 staging areas in the erection areas were going
2 to be staked out, right?
3    A.   Not all of them might have been staked.
4 But, yes, knew where the -- knew where those
5 locations were going to be.
6    Q.   Borneke and Mortenson, let me ask it
7 another way, coordinated where the actual more
8 stringent standards needed to be applied so that
9 the deliveries could be effectuated and the
10 materials could be staged, right?
11   A.   Yes.
12   Q.   Did you ever, after the date of this
13 incident, come back to work on this project?  Or
14 once you were off, you were off?
15   A.   I never returned to work.
16   Q.   Got it.  Okay.
17       I think I asked you this.  Just to be
18 safe.  Did you perform any role, whether it be
19 answering questions or otherwise, as it pertains
20 to the investigation or the drafting of the CIA?
21   A.   No, I was not involved in any of that.
22   MR. TERRY:  Chris, if you want to take over
23 we can -- now might be a good time.  I think I'm
24 pretty much wrapped up, and I'll check over my

74

1 notes.
2    MR. SULLIVAN:  Sure.
3    MR. TERRY:  Mr. Kruse, I appreciate your time
4 today.  Thank you very much.  I may have a few
5 follow-ups after Mr. Sullivan.
6    THE WITNESS:  Sure thing.  Thank you.
7    MR. SULLIVAN:  Mr. Kruse, good afternoon.
8    THE WITNESS:  Hello.
9    MR. SULLIVAN:  I represent Borneke
10 Construction.  I have a few follow-up questions
11 for you here.
12            EXAMINATION
13 BY MR. SULLIVAN:
14   Q.   What was your relationship to
15 James Langstson?
16   A.   Jamie was an erection supt, and I'd say
17 a close coworker at the time of the project.  So
18 coworker, officially, and we work similarly
19 side-by-side.  Him through more of the erection
20 side of things, primarily, and myself, coming
21 from, you know, inception of the project through
22 foundations, kind of up to that erection point,
23 to where I left.
24   Q.   So does that mean he basically takes

75

1 over for what you were doing at the point of the
2 erection?
3    A.   More specifically erection focused, so
4 those tasks and crews.
5    Q.   Meaning after delivery?
6    A.   Yes.
7    Q.   Was he considered your boss or not?
8    A.   No.
9    Q.   But he was a superintendent, right?
10   A.   Correct.
11   Q.   But Andy Black was your direct
12 supervisor; is that right?
13   A.   Yes, sir.
14   Q.   So he would have been Langston's
15 supervisor also?
16   A.   Yes.  And Christian, maybe to just kind
17 of show you, on these projects, like the
18 individual who approves your time card is the
19 project manager.  However, there is another kind
20 of relationship, I guess, a superior ranking.
21 Superintendents at Mortenson report to a FOM, a
22 field operations manager, when it comes to like
23 craft, craft hiring, kind of work flow, and
24 maybe some of the nuances or specifics of the

76

1  trade -- of the task to be performed.
2      Q.  Okay.  And --
3      A.  Whereas Andy Black stays more in the PM
4  contractual side of things.
5      Q.  Who would have been the FOM, as you
6  said?
7      A.  The FOM?
8      Q.  FOM.
9      A.  At the time it would have been Chandler
10  Thomas.
11      MR. TERRY:  I'm sorry, Chris, what word did
12  you use?  The who?
13      MR. SULLIVAN:  F-O-M, he said, right?
14      THE WITNESS:  F-O-M, field operations
15  manager.
16      MR. TERRY:  Got it.  Sorry about that.
17      THE WITNESS:  No worries.
18  BY MR. SULLIVAN:
19      Q.  And was this someone that was on site?
20      A.  No.
21      Q.  Was this someone in Minnesota?
22      A.  working kind of -- not a specific
23  location for that field operation managers.
24  Visits -- visits sites from time-to-time,

77

1  check-in kind of as project -- along with
2  projects as needed.  Spend some time at the
3  headquarters in Minnesota as well as remote.
4      Q.  Do you have any recollection of any
5  conversations with James Langston about this
6  incident?  This case?  Anything like that?  The
7  plaintiff?
8      A.  No.  Just to be more specific, we
9  talked about it, I guess, a little bit in
10  recent, in just saying do you remember this?
11  But no specifics to really share.
12      Q.  Okay.  And you don't have any
13  recollection of conversations with Andy Black
14  about it, do you?
15      A.  No.
16      Q.  Do you have any recollection of
17  interaction with Borneke on this project at all?
18      A.  Yes.
19      Q.  Did you have like one point of contact,
20  or someone you worked with at Borneke you
21  recall?
22      A.  Yeah, that was Brad Bennett.
23      Q.  Would you say you had a good working
24  relationship with Brad Bennett?

78

1      A.  Yes, I would.
2      Q.  Have you worked with him on any
3  projects since then, since this one?
4      A.  No, I haven't.
5      Q.  Was there any instance in which you
6  recall asking Brad Bennett to bring his
7  employees out to perform one of these tune-ups
8  that you mentioned?
9      A.  Not specifically at a pad site.  I do
10  remember some comments about maybe a -- to
11  rework a radius, or some of the, you know,
12  delivery pad for certain components.  It can
13  happen pretty often, just touching up things
14  here and there.
15      Q.  Would you say that each time you asked
16  or someone on your team asked Borneke to
17  readdress something for whatever reason, they
18  did that for you without any problem?
19      A.  Yes, I would say that's accurate.
20      Q.  You don't have any reason to assert
21  that Borneke failed to fulfill its contractual
22  obligations on this project, do you?
23      A.  No, I don't.
24      Q.  You are not aware of any incident in

79

1  which Mortenson alleged or asserted that Borneke
2  failed to do something it should have done, do
3  you?
4      A.  No.
5      Q.  And you would agree with me that --
6  well, strike that.
7          You don't have any specific
8  recollection of individual pad sites and their
9  condition at any point, do you?
10      A.  No.
11      Q.  Including T11, that I guess we're
12  talking about here?
13      A.  I don't have any specifics about T11.
14      Q.  Would you agree with me that if a pad
15  site, prior to delivery of components, is
16  graded, and compacted, and drained in accordance
17  with the contract, the ground, subsequent to
18  delivery and as time passes depending on weather
19  conditions, may get to a point where it's not
20  sufficient any longer, correct?
21      A.  That's correct.
22      Q.  And that doesn't mean that it was
23  improperly graded at the beginning, does it?
24      A.  No.  And an example of that would

80

1  have -- what's shown on that exhibit, that
2  showed a rainout day.  That would be a primary
3  example of what you're talking about, where work
4  couldn't be performed.
5      Q.   And rainout date, obviously, is you're
6  getting too much rain, and the ground softens up
7  and so forth, right?
8      A.   Yes.
9      Q.   It doesn't matter if it was graded
10 properly before the rain, does it?
11     A.   No, it does not.
12     Q.   With regard to the picture that you
13 were shown, you were only shown, I think, the
14 one picture with the ice, right?
15     A.   Yep.
16     Q.   You don't have any recollection of that
17 picture before today, do you?
18     A.   I don't.
19     Q.   And you don't have any recollection of
20 interacting with Borneke on that site, do you?
21     A.   No.
22     Q.   You don't know how long that ice had
23 been there as of the point of the injury in this
24 case, or the incident, do you?
81

1      A.   No.
2      Q.   And you don't know the cause of the ice
3  necessarily, do you?
4      A.   No, I don't.
5      Q.   Do you -- strike that.
6          You don't know what may have been done,
7  what may not have been done, to do a tune-up on
8  that site at all, do you?
9      A.   No.
10     Q.   And as you sit here, you don't know
11 what the weather conditions were on
12 November 15th at that site, do you?
13     A.   No, I don't.
14     Q.   Did you have any involvement in safety
15 meetings with the employees at Mortenson on this
16 site?
17     A.   Yes, if -- if like the morning
18 instructions and morning safety meetings, yes, I
19 was very involved.
20     Q.   And are those usually conducted by
21 Mortenson employees?
22     A.   Usually conducted by Mortenson, like
23 supervisory staff.
24     Q.   Okay.
82

1      A.   Superintendents in safety.
2      Q.   Would you be considered a supervisory
3  staff?
4      A.   Yes.
5      Q.   So you would have conducted some of
6  those meetings, you think?
7      A.   Yes.
8      Q.   And that was pre-task plan cards being
9  created?
10     A.   Not at that meeting, but we would have
11 talked about the creation and kind of, you know,
12 when those need to be used.
13     Q.   Those meetings took place every day,
14 right?
15     A.   Yes, every morning.
16     Q.   Just called morning meetings, is that
17 what they're called?
18     A.   Stretch and bend, more loosely.
19     Q.   But they took place every day, right?
20     A.   Yes.
21     Q.   And weather conditions, or changing
22 weather conditions, or upcoming weather
23 conditions for the day, those are things that
24 are supposed to be noted on pre-task plan cards
83

1  at each site, right?
2      A.   Yes.
3      Q.   And if a Mortenson employee shows up to
4  that site, he's supposed to sign the card that
5  he's aware of it, right?
6      A.   Yes.
7      Q.   And that would have included something
8  like it's snowing today, or it's going to snow
9  today, right?
10     A.   Yes.
11     Q.   In the order of operations on this
12 project, the grading and compaction was required
13 to be done by Borneke before the delivery of the
14 components, right?
15     A.   Correct.
16     Q.   Is it fair to say that Borneke's job
17 was done unless and until Mortenson called it
18 back out to correct something?
19     A.   Yes.  In a perfect world, Borneke
20 prepares the site for delivery.  It doesn't have
21 to touch it until the tower is erected, and then
22 comes back for restoration.
23     Q.   But there were times when Mortenson
24 identified or maybe even in the moving of
84



1  equipment or something, change in weather
2  conditions, anything like that, and you would
3  call Borneke back out to fix something?
4      A.  Right.  Might need to maintain
5  something or touch it up, yep.
6      Q.  You're not aware of any instance in
7  which Borneke failed to comply with any request
8  by Mortenson in that regard, are you?
9      A.  No.
10     Q.  Are you aware, with regard to the ice
11 that you see in that picture, if Borneke even
12 had notice of that particular ice?
13     A.  I don't know.
14     Q.  Do you know if ice melt salt was
15 available to the Mortenson employees?
16     A.  I don't know if it was.
17     Q.  Do you know who Lonnie Sears is?
18     A.  I do.
19     Q.  He was the direct foreman for George
20 Georgeff; is that right?
21     A.  I believe so.  Lonnie -- I believe
22 Lonnie's title at that project was ironworker
23 foreman or general foreman, which would have
24 been in some relationship to Nick Georgeff.

85

1      Q.  Did you know Nick Georgeff?
2      A.  I did not, personally.
3      Q.  Did you ever interact with Lonnie Sears
4  regarding this incident, or, I guess, anything
5  related to it?
6      A.  No.
7      Q.  And you never talked to him about this
8  case or anything, did you?
9      A.  No.  I guess the only caveat I would
10 say is we -- I worked with Lonnie the next year
11 at a project called Green River, where we talked
12 about an incident where somebody broke their leg
13 due to slips, slippery conditions, and that was
14 about the extent of those conversations.
15     Q.  And --
16     A.  More or less something to look out for.
17     Q.  Is Lonnie Sears still a Mortenson
18 employee, if you know?
19     A.  I don't believe Lonnie is, but I would
20 not know that for certain.
21     Q.  Do you know if James Langston is still
22 a Mortenson employee?
23     A.  Yes, he is.
24     Q.  Borneke was paid, as far as you know,

86

1  for this work on this contract -- for this
2  project, right?
3      MR. TERRY:  Objection to relevance.
4          You can obviously answer, sir.
5      THE WITNESS:  I don't know.  That's -- that's
6  not my wheelhouse.
7      MR. SULLIVAN:  Okay.  I think that's all I
8  have, sir.  I appreciate your time.
9      THE WITNESS:  No problem, thank you.
10     MR. TERRY:  I just have two follow-ups for
11 you, and I mean that, or at least two category
12 of follow-ups, which will be two minutes.
13     THE WITNESS:  Sure.
14          FURTHER EXAMINATION
15 BY MR. TERRY:
16     Q.  Based on the CIA, when you were asked
17 questions about the pre-task plan cards, based
18 on this CIA, it says on the second page, the
19 existing hazard was not properly delineated nor
20 was its location identified on the pre-task plan
21 card.  Additionally, snow had begun falling --
22 had begun to fall that morning covering the ice
23 with a thin layer of snow, which made its
24 identification difficult prior to stepping on

87

1  the ice, right?
2      A.  Yep.
3      Q.  So based on this document, not only did
4  the pre-task plan card not delineate the ice,
5  but it also documents that the ice was covered
6  with a thin layer of snow, right?
7      A.  Yeah.  The pre-task, in a more, you
8  know, general sense, Charlie.  The pre-task may
9  have specified something like watch out for
10 slippery conditions, or something more general
11 that that CIA points out, it wasn't directly
12 identified.
13     Q.  Exactly.  And then you were asked
14 questions about whether an area was properly
15 graded, or prepared and no longer was it
16 properly graded and prepared, and you said,
17 yeah, exactly, that's what tune-ups are for,
18 right?
19     A.  Yes.
20     Q.  And based on -- and you said yes?
21     A.  Yep.
22     Q.  Sorry.  I think I started talking over
23 you, and I just to want make sure the court
24 reporter got your answer.

88



**Page 89**

On the picture I showed you based on the CIA, this appears to be what exactly happened here. A tune-up was requested and Borneke came out to the area, but because of the size of the dozer, it could not properly readdress the area near the turbine ports, right?

A. Again, Charlie, I don't know that. That's what I infer from that CIA, the way it's written.

Q. And this is based on your -- one, your understanding of how the project was run, right?

A. Yes.

Q. You understand, based on your time on this project, that Borneke would have been the only subcontractor performing excavating work, right?

A. Yes.

Q. And then this is also based on your years with Mortenson, understanding how these documents are written, right?

A. Yes.

Q. So based on all of that, based on your experience, and based on your time on this

**Page 90**

project and understanding that Borneke was the only company who would perform this work anyway, you would read this document to say that a tune-up was performed, so-to-speak, but near the turbine components, this could not be addressed due to the location and size of the dozer, right?

A. Yeah.

Q. But we've already established, and hypothetically speaking, if a bulldozer was too big for an area, a smaller piece of equipment, or even manpower can potentially be used in a pinch, right?

A. I suppose.

MR. TERRY: Okay. I believe that's all I have.

MR. SULLIVAN: Nothing further for me. Thank you.

MR. TERRY: Ms. Van Hecke, would you like to reserve signature again?

MS. VAN HECKE: No.

MR. TERRY: Do you want to change your mind about yesterday? I can e-mail the court reporter.

**Page 91**

MS. VAN HECKE: I do. I do. When you send Andy Black's to me, I'll tell you that we don't need to sign it.

MR. TERRY: Can you do me a favor, Ms. Van Hecke. Can you just send me an e-mail stating that you waive signature on Mr. Black's, and then I'll forward it to the court reporter, or you could even do it. Either way.

MS. VAN HECKE: Do I have her -- I'll send it to you. You forward it to whoever you need to forward on to.

MR. TERRY: I was going to say, do you really want to read all this?

MS. VAN HECKE: I really don't want to.

MR. TERRY: Mr. Kruse, I appreciate your time. You can go ahead and hop off. I do have a question for Ms. Van Hecke.

Margie, while we're still on the record, I will take the original for this.

MR. SULLIVAN: I'll take a copy, please. Thank you.

(Proceedings concluded at 2:46 p.m.)

**Page 92**

STATE OF ILLINOIS.   )
                     )  SS:
COUNTY OF C O O K     )

I, MARGARET A. RITACCO, a notary public within and for the County of Cook and State of Illinois, do hereby certify that heretofore, to-wit, March 15th, 2022, personally appeared before me, via videoconference, ANDREW KRUSE, in a cause now pending and undetermined in the in the United States District Court Northern District of Illinois, Eastern Division, wherein NICK GEORGEFF is the Plaintiff, and DON BORNEKE CONSTRUCTION, INC., is the Defendant.

I further certify that the said ANDREW KRUSE was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

Andrew Kruse 03/15/2022

```
 1        I further certify that the signature to
 2   the foregoing deposition was waived by counsel
 3   for the respective parties.
 4        I further certify that the taking of this
 5   deposition was pursuant to notice and that there
 6   were present at the deposition the attorneys
 7   hereinbefore mentioned.
 8        I further certify that I am not counsel
 9   for nor in any way related to the parties to
10   this suit, nor am I in any way interested in the
11   outcome thereof.
12        IN TESTIMONY WHEREOF:  I have hereunto
13   set my hand and affixed my notarial seal this
14   1st day of April 2022.
15
16
17
18
19
20        NOTARY PUBLIC, COOK COUNTY, ILLINOIS
21        LIC. NO. 084-002796
22
23
24
```

                                                    93



**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF ILLINOIS
 3                   EASTERN DIVISION
 4  NICK GEORGEFF,              )
 5     Plaintiff,               )
 6     vs.                      ) Civil Action
 7  DON BORNEKE CONSTRUCTION, INC.,) No. 3:20-CV-50313
 8          Defendant.          )
 9          The deposition of MARK SIKEL, called
10  for examination pursuant to the Rules of Civil
11  Procedure for the United States District Courts
12  pertaining to the taking of depositions, before
13  Margaret A. Ritacco, a certified shorthand
14  reporter in the State of Illinois, on the
15  10th day of March 2022, at 1:03 p.m., via
16  videoconference per Executive Order 2020-14
17  pursuant to notice.
18
19
20
21
22
23  Reported by:  MARGARET A. RITACCO, CSR
24  License No.:  084-002796
```

**Page 2**

```
 1  APPEARANCES:
 2       ANESI, OZMON, RODIN, NOVAK & KOHEN, by
 3       MR. CHARLES A. TERRY
 4       161 North Clark Street, 21st Floor
 5       Chicago, Illinois· 60601
 6       (312) 372-3822
 7       cterry@anesilaw.com
 8          Representing the Plaintiff;
 9
10       SWANSON, MARTIN and BELL, by
11       MR. CHRISTIAN A. SULLIVAN
12       2525 Cabot Drive, Suite 204
13       Lisle, Illinois· 60532
14       (630) 799-6900
15       csullivan@smbtrials.com
16          Representing the Defendant.
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1                   I N D E X
 2  WITNESS                        EXAMINATION
 3  MARK SIKEL
 4    BY MR. TERRY                      5
 5    BY MR. SULLIVAN                  76
 6    BY MR. TERRY - FURTHER           81
 7
 8
 9
10              E X H I B I T S
11  NUMBER                      IDENTIFICATION
12  SIKEL Deposition
13    Exhibit No. 1                    49
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1       THE REPORTER:  My name is Margaret Ritacco, CSR.
 2  This deposition is being taken pursuant to
 3  Governor Pritzker's Executive Order 2020-14.
 4  All parties to this proceeding, including the
 5  court reporter, are attending via videoconference.
 6       Will the parties please introduce
 7  yourselves, state who you represent, and that
 8  you are in agreement with these procedures,
 9  starting with plaintiff's counsel.
10       MR. TERRY:  Charles Terry for the plaintiff,
11  we agree.
12       MR. SULLIVAN:  Chris Sullivan for Borneke
13  Construction, we agree.
14       THE WITNESS:  Mark Sikel for Borneke
15  Construction, I agree.
16          (Witness sworn.)
17       MR. TERRY:  Sir, would you mind stating your
18  first and last name, and spelling the last name
19  for the record?
20       THE WITNESS:   Mark Sikel, S-I-K-E-L.
21
22
23
24
```

EXHIBIT
J

1           MARK SIKEL,
2  called as a witness herein, having been first
3  duly sworn, was examined and testified as
4  follows:
5              EXAMINATION
6  BY MR. TERRY:
7     Q.   Let the record reflect this is the
8  discovery deposition of Mark Sikel taken
9  pursuant to notice and agreement of the parties.
10 Let the record also reflect this deposition is
11 being taken via Zoom, but still pursuant to all
12 applicable rules.
13          Have you ever given a deposition
14 before, sir?
15    A.   I have not.
16    Q.   I'm sure Mr. Sullivan has gone over a
17 few of the ground rules.  I'm just going to
18 remind of you a few.
19          The biggest one today is because we are
20 via Zoom, do your best to wait for the full
21 question to come out prior to answering.
22 Attorneys can be longwinded, boring, and
23 predictable in their questions.  But it really
24 make Ms. Ritacco's job harder to take everything

5

1  down if we're talking over each other.  So,
2  please, just do your best to not interrupt
3  anybody, and we will try to give you the same
4  courtesy.
5          Does that make sense?
6     A.   Yes.
7     Q.   If you are giving an answer to a
8  question, please try to keep your answers out
9  loud, meaning yes, no, or otherwise.  Uh-uhs and
10 uh-huhs don't come over well on the transcript.
11 We might remind you of this if it comes out, so
12 don't take offense to us reminding you of any of
13 the rules.  It's just trying to keep things
14 going smoothly.  Okay?
15    A.   Yes.
16    Q.   If you need a break at any time, by all
17 means, please, let me know.  I don't think we
18 will be awfully long today.  With that being
19 said, this is not an endurance test.  If you
20 need a break, just let me know, and we will go
21 ahead and take one.  Okay?
22    A.   Yes.
23    Q.   Then the last one that I'm going to go
24 over, I'm sure I'm forgetting a few, but if you

6

1  answer a question, we are going to assume you
2  understood what it meant.  So, please, only
3  answer questions you understand.  If you answer
4  one, again, the answer will stand, and we will
5  assume you understood what it meant.  So if you
6  have a question about it, please, just ask.  I'm
7  happy to rephrase, ask a similar but different
8  question, or have the court reporter read it
9  back.
10          Does that make sense?
11    A.   Yes.
12    Q.   We've already gotten your name.  What's
13 your date of birth, sir?
14    A.   2/7/1974.
15    Q.   What is your current address?
16    A.   2347 Abbywood Lane, North Mankato,
17 Minnesota.
18    Q.   What was the city, did you say?
19    A.   North Mankato.
20    Q.   How long have you lived at this
21 address?
22    A.   Fifteen years, give or take.
23    Q.   Do you have any plans to move in the
24 next year or so?

7

1     A.   No.
2     Q.   Who do you live there with?
3     A.   With my wife and kids.
4     Q.   I'm not going to get into much about
5  them.  One other thing I should have mentioned,
6  I'm sure Mr. Sullivan went over this with you,
7  but the point of the deposition is to find out
8  what you will testify to if this matter goes to
9  trial.
10          A lot of it, what we'll talk about
11 today, is relating to the actual things at
12 issue, but, also, we just like to get a little
13 bit of background about you.  So I promise I
14 will try to be brief in that regard and get to
15 the substance.
16          But that's why I'm asking some of these
17 questions.  Okay?
18    A.   Yes.
19    Q.   So that I don't have to do any math,
20 how old are you as you sit here today?
21    A.   Forty-eight.
22    Q.   What's your spouse's name?
23    A.   Tara Sikel.
24    Q.   How long have you been married?

8

1    A.   Twenty years.
2    Q.   Congratulations.
3    A.   Thanks.
4    Q.   Are your children, are they minors?
5    A.   Yeah, well -- well, one of them.
6    Q.   Okay.
7    A.   One of the three.
8    Q.   Got it.  I don't have to get personal
9    about them, but just out of curiosity, do they
10   live at the home with you?
11   A.   Yeah.  One is away at college, but,
12   yeah, the other two live.
13   Q.   Okay.  Got it.  So, what's your highest
14   level of education?
15   A.   BA.
16   Q.   Where is that from?
17   A.   Saint John's University --
18   Q.   Is that --
19   A.   -- Minnesota.
20   Q.   When did you get the degree and what is
21   it in?
22   A.   1996 in Biology.
23   Q.   After you graduated from college, did
24   you do anything with your biology degree?

9

1    A.   I did not.
2    Q.   What did you do after graduating?
3    A.   Worked in the construction industry,
4    residential homes, for 15 years.
5    Q.   What company was this with?
6    A.   John Sikel Construction for three
7    years, who is -- that's my dad.  And then
8    St. Peter Lumber for 12 years in sales.
9    Q.   When you worked with John Sikel
10   Construction, what was your role?
11   A.   Carpentry, estimating.
12   Q.   And you did that, is it fair to say,
13   between approximately '96 and '99?
14   A.   Yes.
15   Q.   All right.  And then you worked with
16   St. Peter Lumber until about what, 2011 or so?
17   A.   Actually, no.  Until about 2009.
18   Q.   All right.  What were you doing with
19   St. Peter Lumber?  You said sales?
20   A.   Estimating and sales.
21   Q.   Forgive me, because I don't know
22   St. Peter Lumber, is this like a hardware store?
23   Is it a lumber store?
24   A.   Yeah, just like -- it's a home building

10

1    center.
2    Q.   When you say estimating, would you guys
3    supply lumber for, like, general contractors, or
4    for at-home projects, or a combination of both?
5    A.   Combination.
6    Q.   And you worked with them from
7    approximately '99 until 2009.  Did you have,
8    like, the same general role throughout that
9    whole time?
10   A.   Can you repeat?  You cut out.
11   Q.   Yeah, sure.
12        Was your role between '99 to 2009 with
13   St. Peter Lumber generally the same for those
14   ten years?
15   A.   Yes, it was.
16   Q.   And then what did you do after St.
17   Peter Lumber?
18   A.   I came to Borneke Construction.
19   Q.   Do you know when you came to
20   Don Borneke Construction?
21   A.   2009.
22   Q.   What was your title when you came over?
23   A.   Estimator.
24   Q.   Have you been full time with

11

1    Don Borneke ever since?
2    A.   Yes.
3    Q.   What is your current title?
4    A.   Estimator/project manager.
5    Q.   In between 2009 and present, have you
6    had any other roles?
7    A.   No.
8    Q.   Can you walk me through -- obviously,
9    based on the word, we can kind get a sense of
10   what an estimator does.  But can you walk us
11   through the difference between an estimator and
12   a project manager?
13   A.   Estimating purposes, I just generate a
14   dollar value for bidding purposes.  And then if
15   we are selected by the prime contractor, then I
16   switch over to project managing mode, which go
17   through contracts, and then into the project
18   itself, pre-construction, and then manage the
19   project.
20   Q.   When you say manage the project, are
21   you typically on site or ae you offsite?
22   A.   Offsite.
23   Q.   So managing would be more of the back
24   of the scene stuff as opposed to like in the

12



1  field, right?
2      A.  That's correct.
3      Q.  So like ordering, change orders, price
4  adjustments, all that stuff?
5      A.  Correct.
6      Q.  How long have you acted as a project
7  manager at Don Borneke?  Like, when was first
8  the first time you started doing that,
9  approximately?
10     A.  2009, towards the end of the year.
11     Q.  So is it fair to say you started out as
12 an estimator, and then within the same year, you
13 started acting as somewhat of a project
14 manager/estimator, and you continue that until
15 present?
16     A.  That's correct.
17     Q.  Before we get more into that -- those
18 roles and your work with Don Borneke, just a few
19 more background questions.  We ask this of
20 everybody, so please don't take offense to them.
21         Have you ever been convicted of a
22 felony or a crime involving fraud or dishonesty?
23     A.  I have not, no.
24     Q.  Have you ever served in the military?
13

1      A.  No.
2      Q.  Have you ever filed bankruptcy?
3      A.  No.
4      Q.  As a project manager specifically, what
5  type of things -- can you just kind of walk me
6  through your day-to-day?  Let's say, like, after
7  you know you've gotten the bid and you've been
8  selected by the contractor.
9      A.  Lining up materials for the project,
10 lining up crews for the project.  Every phase in
11 a project is different, as you can probably
12 understand.  So, the day-to-day and the first
13 month of the project is substantially different
14 from day-to-day a month in.
15     Q.  Do you --
16     A.  Usually it's communications --
17     Q.  Go ahead.
18     A.  -- you know.  A couple of times a day
19 there's communication with the project team,
20 from the owner, which in this case was Mortenson.
21     Q.  And I know you said in this case it was
22 Mortenson, and so when we talk about the subject
23 project, or the subject wind farm, you
24 understand what I'm talking about, correct?
14

1      A.  Correct.
2      Q.  And that's the Mendota Hills Wind Farm
3  project?
4      A.  Yes.
5      Q.  As an estimator and project manager,
6  are you almost always working on various wind
7  farm projects?
8      A.  Yes.
9      Q.  Do you really do any other type of
10 projects, or is that the main crux of it?
11     A.  That's the main.
12     Q.  All right.
13     A.  Yeah.
14     Q.  In your role, is it important for
15 you -- and, again, some of these questions may
16 seem obvious, but we just have to ask them.
17         Is it important for you to be
18 intimately familiar with, like, contracts, the
19 attachments to the contracts?
20     A.  Yes.
21     Q.  And it's important for you to
22 understand, based on the contract, and, like,
23 the scope of work documents, what Borneke is
24 actually being contracted to perform; is that
15

1  fair?
2      A.  Yes.
3      Q.  Do you also work in terms of, like,
4  negotiating the contract, or anything like that?
5      A.  Yes.
6      Q.  Would this kind of be more in your,
7  like, estimating role, or does that come into
8  more of your project management role, or kind of
9  a hybrid of both?
10     A.  Yeah, it's a combination.  I have to
11 make sure that the contract meets up with what
12 we did, the two scopes workup.
13     Q.  And in terms of negotiating, like, for
14 example, let's use this subject project, would
15 this be, like, back and forth with Mortenson and
16 whatever suppliers you might need stuff from?
17     A.  Can you repeat that?
18     Q.  Sure.  Like, let's use this subject
19 project, for example.  When you say negotiate,
20 you know, a contract, is this something you
21 would do with, like, Mortenson, to go back and
22 forth about the various tasks and then try to
23 figure out pricing and stuff like that?
24     A.  Yeah, that's correct.
16



1    Q.   And in these negotiations, things like
2  inclusions and exclusions come up?
3    A.   Correct.
4    Q.   So it's fair to say that prior to work
5  even being performed, you, as a project manager
6  for Borneke, negotiates what's going to be
7  performed and what's not going to be performed,
8  and, like, a fair cost for all of that?
9    A.   That's correct.
10   Q.   Okay.  And then additionally, like
11 interacting with general contractors, like
12 Mortenson in this case, you guys are discussing
13 who is going to be responsible for what tasks,
14 right?
15   A.   That's correct.
16   Q.   Have you ever had any -- well, I should
17 have asked this before.
18        Are you a member of any union?
19   A.   No, I am not, personally.
20   Q.   Have you ever had any formal union
21 training or anything like that?
22   A.   No.
23   Q.   Have you ever had any formal education
24 as it pertains to construction management or

17

1  anything like that?
2    A.   No.
3    Q.   Do you have OSHA certifications?
4    A.   No.
5    Q.   But just from about a general
6  standpoint, you've been working with Borneke for
7  the last 13 years or so; is that fair?
8    A.   Yes.
9    Q.   And prior to this, you also worked in
10 similar fields doing estimating and sales?
11   A.   That's correct.
12   Q.   And from your last 13 years with
13 Don Borneke, is it fair to say you've become
14 pretty familiar with how things are ran on a
15 construction, and, like, the interactions
16 between the general contractor and
17 subcontractors like yourself?
18   A.   Yes.
19   Q.   And is it safe to say that in this
20 role, going into a project, both parties
21 typically know what is required of each other
22 and what is not required of each other, meaning
23 Mortenson knows what Mortenson is going to do,
24 and Borneke knows what Borneke is going to do?

18

1    A.   Yes, for the most part.
2    Q.   And there's some gray area in that some
3  things might not necessarily be talked about, or
4  you kind of come up with them on the fly, but
5  the general gist of what is going to be done,
6  that is usually agreed upon prior to commencing
7  work, because you need to know what you're
8  contracted for, right?
9    A.   That's correct, but with every job,
10 you're going to have a handful of change orders
11 and so forth.
12   Q.   Yeah, of course.  And, like, for
13 example, if there needs to be more gravel, or if
14 some other tasks needs to be performed, that
15 will be implemented through a change order, but
16 the general, you know, we're going to excavate,
17 grade, and compact this land, that's, like, part
18 of the initial bid, for the most part, right?
19   A.   Yes.
20   Q.   And you understand that, like, on these
21 construction sites, as the project manager who
22 helps bid and estimate these projects, you are
23 only bidding and estimating for the excavating
24 work, so-to-speak, right?

19

1    A.   Yes.
2    Q.   Like, you understand that other trades
3  stay in their own lane, so-to-speak?  Like
4  ironworkers do ironwork, and you're bidding for
5  the excavating work, right?
6    A.   Yes.
7    Q.   And then, you know, I saw -- and I'm
8  not going to share this because I shared this
9  with a couple of other Borneke employees
10 already, but just from the website, Don Borneke
11 has been performing these wind farm projects
12 since about 2000; does sound about right?
13   A.   Yes.
14   Q.   So they performed, would you say, close
15 to a hundred various wind farm projects?
16   A.   Probably more, just a few more.
17   Q.   And how many have you been a part of,
18 give or take?
19   A.   Thirty.
20   Q.   So you guys, do you work for a general
21 contractor more than another, like Mortenson, or
22 whoever else it may be, or is it kind of a whole
23 combination of contractors?
24   A.   There's a few.  Mortenson over the 20

20

1  years has probably been our biggest client, but.
2      Q.   Okay.  So it's safe to say that you
3  have at least somewhat of a history with
4  Mortenson; is that correct?
5      A.   That's correct.
6      Q.   And from this history, while things may
7  change from job-to-job, Mortenson has an
8  understanding of what Borneke does, and Borneke
9  has an understanding of what Mortenson does?
10     A.   That's correct.
11     Q.   We'll get into the specifics about this
12 project in a little bit, but just from a general
13 standpoint, Borneke is usually hired on these
14 wind farm projects as the excavating company,
15 right?
16     A.   That's correct.
17     Q.   And Borneke is hired because they've
18 done a whole number of these, and they're, like,
19 experts in this field, right?
20     A.   That's correct.
21     Q.   And Borneke knows what needs to be
22 done, what doesn't need to be done, and how to
23 do these things safely and reasonably, right?
24     A.   That's correct.

21

1      Q.   And, again, we'll get into the
2  specifics later, but some of the tasks, you
3  know, that kind of seem to carry over from
4  project-to-project are things like site
5  clearing, creating lay-down yards, creating
6  access roads, excavating, backfilling,
7  compacting, and the whole plethora of other
8  things.
9           Does this sound about right, though?
10     A.   Yes.
11     Q.   All right.  And just from a general
12 standpoint, when you are bidding on this work,
13 you understand that Borneke is taking
14 essentially untouched farmland and converting a
15 small portion of that into a workable area,
16 right?
17     A.   Yes.
18     Q.   And, like, for example, at the various
19 sites of the windmills, Borneke is hired to, in
20 the erection areas, for example, like, grade,
21 compact, maintain, and provide drainage?
22     A.   Yes.
23     Q.   And, again, a vast majority of these
24 farms, like 99, probably even more than that

22

1  percent, are never going to be touched.  But,
2  like, things such as the access road, or the
3  erection areas, or the lay-down yards, these are
4  all the main areas where Borneke has to ensure
5  its work is performed and performed well, right?
6      A.   Yes.
7      Q.   Like for the erection area, for
8  example, this is literally where the turbine is
9  going to be erected, right?
10     A.   Correct.
11     Q.   And in this erection area -- and we'll
12 get into the contract in a second -- but for a
13 radius going out in each direction of the
14 turbine, for this project it was a 175 feet.
15 But that whole radius in that area makes up the
16 erection area, right?
17     A.   Yes.
18     Q.   And in this erection area, the ground
19 needs to be prepared prior to ironworkers being
20 able to go in, right?
21     A.   Correct.
22     Q.   And this would include things such as
23 clearing and grubbing, if necessary?
24     A.   Yes.

23

1      Q.   The same thing for grading the land,
2  providing drainage, but also compacting the
3  land, right?
4      A.   Yes.
5      Q.   Then from time to time throughout the
6  project, typically these erection areas, there
7  is a portion of the contract that requires
8  Borneke to maintain these areas as well, right?
9      A.   Yes, up until a certain point.
10     Q.   And then the whole idea is -- let's
11 just talk about the prep work with, you know,
12 grading, compacting, drainage.  You want these
13 areas to be free and clear from ruts, or
14 standing water, and things like this, right?
15     A.   Yes, up until a certain point.
16     Q.   I think we can all agree that by
17 preparing the ground, the idea is you will do
18 your best to prepare it so that large areas of
19 standing water or large depressed areas don't
20 form, that's why Borneke is hire, right?
21     A.   Up until a certain point.
22     Q.   Well, what's that point?
23     A.   That point is when the turbine
24 components are actually delivered, that's the

24

1  end of our maintenance.  And then --
2      Q.  Okay.
3      A.  -- and then we'll come in afterwards.
4      Q.  Yeah, but you do agree that you have to
5  prepare the land for this delivery, right?
6      A.  Yes.
7      Q.  And you have to prepare the land so
8  that it's adequate for not only delivery, but
9  also work being performed in these erection
10 areas?
11     A.  Yes, but we can only control so much.
12 There's other contractors that are using this
13 area when we're not on site.  So we can't
14 control where they park machinery or how they
15 affect drainage on the erection area.
16     Q.  But, again, my question still remains,
17 part of the responsibility is to prepare the
18 land?  Even if you think that that ends at a
19 certain point, is to prepare the land for what
20 is coming next essentially --
21     A.  Correct.
22     Q.  -- because prior to you coming in --
23 I'm sorry, you said correct?
24     A.  Yes.

25

1      Q.  Then because prior to you coming in,
2  this is untouched farmland essentially, right?
3      A.  Correct.
4      Q.  And you agree from a general
5  standpoint, just generally speaking, if areas
6  are properly graded and compacted, one of the
7  ideas is this will help prevent depressed areas
8  or large ruts to form, right?
9      A.  Not necessarily, no.
10     Q.  So then why do you -- well, if that's
11 not the case, why are excavators even hired?
12     A.  Well, there's certain conditions where
13 you really can't even put grade -- if you have a
14 hundred percent flat farm field, sometimes you
15 can't produce drainage, the proper drainage.
16 Or, like I said, if another contractor
17 influences the grade, and we're not on site,
18 then you're not going to get the proper
19 drainage.
20     Q.  Okay.  But from a general standpoint,
21 you agree that part of the reasons why you are
22 hired is to grade and compact the land so that
23 it's able to effectuate delivery and erection of
24 the turbines, right?

26

1      A.  Yes.
2      Q.  And one of the ideas behind that is --
3  and I know a plethora of things go into this --
4  but if the land is properly prepared, the idea
5  is it might be less likely to have problems
6  later on, like ruts or depressed areas, and
7  obviously things can change, but if the land is
8  prepared, it is more likely to perform better?
9      A.  It's more likely, but it's not -- not a
10 necessity.  It's not guaranteed.
11     Q.  No, nothing is guaranteed in the
12 construction field, medical, or legal field, I
13 always say.  And there's always a whole slew of
14 things that can happen.
15         But in a perfect world, the idea is if
16 you prepare the ground properly, it will perform
17 properly for what comes next, right?
18     A.  Under the right conditions.
19     Q.  And you agree that if the areas are
20 properly graded, at least when they're graded
21 and compacted, there's not supposed to be large
22 ruts or depressed areas in these erection areas,
23 right?
24     A.  No, that's not correct.  It depends

27

1  upon the conditions.
2      Q.  Well, we will have a field day with the
3  scope of work when we get to it in a second,
4  then, if that's your testimony.
5          So you're telling me that you're not
6  supposed to prepare the grounds so there's no
7  depressed areas or ruts in erections sites?
8      A.  That's the intent, but if you have
9  three days of solid rain, you're going to have
10 issues if you drive heavy machinery or try to
11 put crane mats on that subgrade.
12     Q.  And, again, my question still remains,
13 things happen on a construction site, sometimes
14 it rains, right?
15     A.  Yes.
16     Q.  Sometimes it snows?
17     A.  Yes.
18     Q.  Sometimes it's dry?
19     A.  Correct.
20     Q.  Borneke has been doing this for over --
21 in your testimony, approximately a hundred wind
22 farm projects, and they've probably seen
23 everything from rain, snow, dryness, and
24 everything in between, right?

28



Mark Sikel 03/10/2022

1    A.   Correct.
2    Q.   And their job is, to the best of their
3  abilities, to prepare for these various
4  conditions?
5    A.   That's correct.
6    Q.   And to the best of their abilities,
7  prepare the ground for these various condition?
8    A.   That's correct.
9    Q.   Otherwise, you guys would be irrelevant
10 if you're -- if you're not needed, you're not
11 needed, but you are needed, right?
12   A.   Correct.
13   Q.   And, again, from a general standpoint,
14 when you go and prepare these erection areas,
15 some of the things you need to do is provide
16 proper drainage and grading, right?
17   A.   Correct, up to a certain point.
18   Q.   Sure.  Let's keep qualifying, that's
19 okay.  But, initially, you need to compact the
20 land so that it's prepared for things to come,
21 right?
22   A.   Correct.
23   Q.   And as an excavating company, you
24 understand that it's important to make sure the

29

1  ground conditions are safe for things that are
2  going to be coming later, right?
3    A.   Yeah, up until a certain point.
4    Q.   Well, again, before you come in --
5  fine, let's -- let's go that route.
6         So is it your testimony that when
7  you're done as the excavating company, you could
8  care less what happens to the ground after you
9  leave, as long as you give it a once over?
10   A.   Once -- once the area has been signed
11 off, we move on, unless we're called back to
12 that site to help out.  But, generally, once the
13 erection area is complete and it's signed off,
14 then the other contractors move in and do their
15 work.
16   Q.   Yes, of course.  But you'd still agree,
17 though, that as the excavating company, part of
18 your job is to prepare the land for what is
19 coming next, and that includes delivery and
20 erection, right?
21   A.   Up until delivery.  Once delivery
22 occurs, generally Mortenson will come in with
23 their cranes.  And they have their own dozers to
24 help with maintaining the site during that

30

1  process.
2    Q.   But as the excavating company who's
3  done this a hundred times, Borneke knows what is
4  going to come and be delivered to the various
5  sites, right?
6    A.   Yes.
7    Q.   Borneke knows that a crane is going to
8  come in these erection areas, right?
9    A.   Yes.
10   Q.   Borneke knows that various semi trucks
11 are going to come in and deliver heavy pieces of
12 equipment, right?
13   A.   Yes.
14   Q.   And to the best of Borneke's ability,
15 they're supposed to prepare the ground for this,
16 right?
17   A.   Yes.
18   Q.   And to the best of their ability, if
19 they prepare the ground properly, the idea is
20 the ground does not just simply cave in
21 underneath trucks or pieces of equipment, right?
22   A.   Well, that's the intent.
23   Q.   Of course.  So you'd agree with me,
24 then?

31

1    A.   Up until a certain point.  We can't
2  control when other contractors go on the site.
3  We can't stop them from entering the erection
4  area if we've had a three day rain or if the
5  ground is too saturated to maintain the
6  stability.
7    Q.   Well, would the same ring true for a
8  crane pad?  Are you saying at a certain point if
9  the crane tips over, who cares, we did our job?
10   A.   Yeah, I mean, we don't have any control
11 of that.
12   Q.   So you're telling me on a job site that
13 you, Borneke, performs, if a crane tips over,
14 it's not your problem?
15   A.   That's not our problem.  That's
16 engineering, geotech, and so forth to hit the --
17 hit the proper density of a subgrade.
18   Q.   Well, part of your responsibility as
19 the excavating company is to prepare the ground
20 and compact it so that this does not happen,
21 right?
22   A.   Yeah, we're not responsible for the
23 testing on these projects, and that -- that
24 falls under Mortenson's scope.  So if there's a

32



Mark Sikel 03/10/2022

1  specific density that the subgrade must meet,
2  that's -- that's on them.
3      Q.   But you're the company that prepares
4  the ground to specification, right?
5      A.   Correct.
6      Q.   So whatever specifications are, that's
7  fine, but it's still on Borneke to prepare it to
8  those specifications, right?
9      A.   Correct.
10     Q.   So, again, my question remains, then,
11 there are specifications for erection areas,
12 right?
13     A.   As far as levelness, yes.
14     Q.   And compaction, I saw it in the
15 contract?
16     A.   Yeah, but I'm not sure that it has to
17 meet a certain percentage of density.
18     Q.   What about for crane pads?
19     A.   Crane pads is a different story.
20     Q.   But you'd agree that -- you're kind of
21 saying two things here.  At one point you're
22 saying if the crane tips over, who cares.  But
23 now you're saying we're going to do it to spec.
24         So which one --

33

1  crane pad, Borneke had to do so to spec, and
2  part of the idea behind that is so the crane
3  does not tip over underneath the crane pad,
4  right?
5      A.   That's correct.
6      Q.   Then, additionally, while a whole
7  plethora of things can happen on these job
8  sites, you'd agree from a general standpoint
9  Borneke has to prepare the erection areas for
10 delivery?
11     A.   That's correct.
12     Q.   And part of this -- again, I know
13 you're going to qualify it -- but the idea
14 behind this is to prepare the ground so that it
15 simply does not cave in underneath the weight of
16 semi trucks or equipment, right?
17     A.   Yeah, under certain conditions.
18     Q.   Yeah, under certain conditions, and
19 those conditions are what's coming next?
20     A.   Is that a question?
21     Q.   Yes.
22     A.   Oh.  Yeah, we -- we prepare up until
23 turbine component delivery.
24     Q.   And by preparing it, you're preparing

35

1      MR. SULLIVAN:  I'm going to object.  It
2  mischaracterizes his testimony.  He never said
3  if a crane tips over, who cares.  That was your
4  words.
5      MR. TERRY:  I'll use his words.  He said it's
6  not his problem.
7      MR. SULLIVAN:  Go ahead.
8  BY MR. TERRY:
9      Q.   I'm just trying to figure out which one
10 is it?  Do you prepare the specs so the crane
11 doesn't tip over, or do you not?
12     A.   We follow the guidelines and build the
13 erection areas to spec.
14     Q.   Okay.  And part of that is ensuring
15 that the crane pad is built to spec, and the
16 idea behind it is so the crane does not tip
17 over, right?
18     A.   Are we talking about the crane pads or
19 the erection areas?
20     Q.   Well, the crane pad is in the erection
21 area, and right now, we're talking about the
22 crane pad specifically.  So the crane pad.
23     A.   Okay, and what's the question?
24     Q.   You would agree that by creating the

34

1  the ground so that it can hopefully support the
2  turbine delivery, right?
3      A.   Under -- under the right conditions.
4      Q.   And, sir, I get what you're trying to
5  do, and it's not helping this process move any
6  faster.  Just please answer the questions that
7  are asked.
8          I'm asking you -- you understand that
9  on these projects, if you don't prepare the
10 ground, no work can be done, right?
11     A.   That's correct.
12     Q.   And part of your job is to make sure
13 that when these pieces of equipment come, they
14 don't just sink into the ground and roll away,
15 right?
16     A.   I can't control the conditions.
17     Q.   So you're telling me -- the same thing
18 you said with the crane.  If it tips over, it's
19 not your problem.  The same thing with the
20 pieces of equipment that come in?
21     A.   I'm not responsible for the weather or
22 the conditions that -- that heavy rains or
23 winter-like conditions would bring to an
24 erection area site.

36



1    Q.   I'm not saying you're responsible for
2  making it rain or making it snow.  What I'm
3  saying is your job at Borneke is to help make
4  the ground able to support the weights of the
5  crane, the weights of the trucks, to the best of
6  your ability?
7    A.   To help --
8    Q.   Otherwise --
9    A.   -- to help to the best of our ability,
10 that's correct.
11   Q.   Otherwise, you'd agree there's no point
12 in having an excavating company if you're just
13 going to say, well, we can't do anything about
14 it anyway, so why do anything?
15   A.   Yes.
16   Q.   So you do agree that Borneke is
17 supposed to prepare the ground so that it does
18 not sink in underneath the weight of semi trucks
19 or equipment?  Again, certain things might
20 happen like rain or snow, but the idea is
21 Borneke prepares the ground to the best possible
22 standards, so that way these things don't happen
23 or they happen less, right?
24   A.   Yes, that's our intent.

37

1    Q.   That's your intent.  That's what you
2  are contracted to perform?
3    A.   Up to a certain point, yes.
4    Q.   Well, again, this is going to be fun
5  going through the scope of work, because a
6  certain point says throughout the duration of
7  the project?
8    A.   No, it says up until turbine component
9  delivery.
10   Q.   We will get into that in a second.
11        You agree that as the excavating
12 company and the project manager for the
13 excavating company, you understand that various
14 trades are going to be coming in after you
15 prepare the ground, and the ground needs to be
16 prepared in a way so that the work can be
17 performed, right?
18   A.   That's correct.
19   Q.   Okay.
20   A.   But it also requires maintenance to
21 maintain.
22   Q.   Of course.  And additionally, preparing
23 the ground, this compacting, this grading, it's
24 also important to provide drainage in these

38

1  areas, right?
2    A.   Correct, and --
3    Q.   And -- I'm sorry.
4    A.   And that's part of the maintenance.
5    Q.   It's also part of the prep?
6    A.   Yes, up until the components are
7  delivered, and then maintenance takes over.
8    Q.   And, sir, I'm going to ask you to
9  answer my questions in the way I ask them, and
10 Mr. Sullivan can ask you any follow-up that he
11 likes, so you can get any qualifications out
12 that you want.  But you're not answering my
13 questions in the way that I'm asking them.
14 You're answering a different question every
15 time.  Just please answer the questions that I
16 ask you.
17        MR. SULLIVAN:  I think he has answered those.
18 He's answered your question.
19        MR. TERRY:  He's not, and if we have to break
20 and have this done with someone supervising the
21 deposition, so be it.  But every questions,
22 there's a 30 second qualification for a yes or
23 no answer.
24        MR. SULLIVAN:  I happen to disagree, but go

39

1  ahead, that's fine.
2        MR. TERRY:  Okay.
3  BY MR. TERRY:
4    Q.   Let's get into this project
5  specifically.
6        You understand that on the Mendota
7  Hills project, Borneke was the excavating
8  company, right?
9        MR. SULLIVAN:  Mark, did you freeze on us?
10       MR. TERRY:  Chris, can you still hear me?
11       MR. SULLIVAN:  Yes.
12       MR. TERRY:  Okay.  Let's go off the record
13 for a second.
14          (Zoom technical difficulties.)
15            (Recess taken.)
16       MR. TERRY:  Back on the record.
17 BY MR. TERRY:
18   Q.   Mark, before get into the specific
19 project actually, both Mr. Brad Bennett and
20 Mr. Nick Borneke gave depositions in this
21 matter, and they both testified that part of the
22 responsibility of Borneke Construction is to
23 prepare the ground for the deliveries in the
24 work that is coming next.

40



Mark Sikel 03/10/2022

1        Do you disagree with this?
2    A.   No.
3    Q.   And both of them testified that in
4  preparing the ground, they're supposed to
5  compact it, and grade it, so that way, equipment
6  doesn't sink into the ground, to the best of
7  their ability.
8        Do you disagree with this?
9    A.   No.
10   Q.   And both of them also testified that in
11 compacting the ground, the idea is that the
12 ground will not sink underneath the weight of
13 semi trucks or pieces of equipment, such that
14 there's depressed areas where water can pool and
15 form.
16       Do you disagree with this?
17   A.   No.
18   Q.   Okay.
19   A.   But --
20   Q.   And both of them -- I'm sorry?
21   A.   As long as the conditions are adequate.
22   Q.   Okay.  And both of them also testified
23 that Borneke Construction has been doing this
24 for 20 plus years, and sometimes conditions on

41

1  sites are good, and sometimes conditions on
2  sites are bad, and Borneke Construction prepares
3  the ground in the best way they can for the
4  various conditions.
5        Do you disagree with this?
6    A.   No.
7    Q.   So you agree, then, to the best of
8  Borneke's abilities, based on the various
9  conditions that present itself on each job site,
10 part of the requirement in these erection areas,
11 like both Nick Borneke and Brad Bennett
12 testified, is to prepare the ground so that
13 equipment does not sink into it where depressed
14 areas can form.
15       You would agree, right?
16   A.   Yes.
17   Q.   And the same thing, you would agree,
18 like they have both testified, that they
19 understand semi trucks are going to drive down
20 access roads to these erection areas where
21 pieces of equipment are going to be offloaded,
22 and they both testified the idea is if the
23 ground is prepared properly, the ground will be
24 able to support the weight of the truck as well

42

1  as the equipment.
2        Do you disagree with this?
3    A.   No.
4    Q.   And they both testified that part of
5  Borneke's responsibility is to prepare, for
6  example, crane pads, and that the crane pads
7  should never, no matter what, tip over, because
8  this is prepared to specific specifications.
9        Do you disagree with this still?
10   A.   I don't understand the question.
11   Q.   Well, before you said if a crane pad or
12 if a crane tips over, it's not your problem
13 because you can't prepare for everything.  Both
14 Brad Bennett and Nick Borneke testified that
15 when you prepare a crane pad, you are preparing
16 the ground so that this never happens, because
17 that can't happen.
18       Do you disagree with this?
19   A.   Yeah, I guess I was just thrown back.
20 You said crane pad tip over, you kind of threw
21 me off.  Can you repeat the question?
22   Q.   Do you disagree that Borneke is
23 preparing the ground underneath the crane pad so
24 that the crane should never tip over?

43

1    A.   Yes, under the right conditions.
2    Q.   You do disagree?
3    A.   No, I -- I agree that the crane should
4  not tip over under the right conditions.
5    Q.   Okay.  And, again, you agree, like both
6  Mr. Borneke and Mr. Bennett testified, that if
7  the ground is sinking in underneath pieces of
8  equipment because it wasn't -- the ground was
9  not compacted or graded properly, this is
10 evidence that the ground was not prepared right;
11 would you agree?
12       MR. SULLIVAN:  Objection, it misstates
13 testimony.
14       Go ahead, if you understood the
15 question.
16       THE WITNESS:  I don't agree.
17 BY MR. TERRY:
18   Q.   So you think it's normal on job sites
19 for Borneke to give ground a once over, and then
20 just let pieces of equipment sink into the
21 ground?
22   A.   If the conditions allow that, yes.
23   Q.   Well, your job is to prepare for the
24 various conditions, you just testified to that.

44

1    A.   To a certain degree.
2    Q.   So to a certain degree, you agree
3  Borneke's role on these projects is to the best
4  of their abilities, preparing the ground so that
5  equipment and trucks don't sink into the ground,
6  to the best of Borneke's ability.  You would at
7  least agree with that, right?
8    A.   Correct.
9    Q.   Okay.  Now let's get into the specific
10 project as a whole.
11       Borneke's role on the Mendota Hills
12 project was the excavating company, right?
13   A.   Correct.
14   Q.   As the project manager, were you on
15 site, or no?
16   A.   No.
17   Q.   Did you ever go on site?
18   A.   No.
19   Q.   We're going to talk about erection
20 areas, because that's what's at issue here, and
21 I want to save some time.
22       You understand that on a various wind
23 farm, this one in particular, there are various
24 turbine sites.  And on this one, they were

45

1  numbered 1 through 29.  You understand that,
2  correct?
3    A.   Correct.
4    Q.   And these, on the site map, would be
5  like the letter T1, T2, all the way through 29,
6  right?
7    A.   Correct.
8    Q.   And at the T sites, this is literally
9  where the turbine is going to be erected, right?
10   A.   Correct.
11   Q.   Then the surrounding area for a radius
12 of 175 feet is the erection area, right?
13   A.   Correct.
14   Q.   Then the foundation is literally where
15 the turbine is going to be erected, right?
16   A.   That's correct.
17   Q.   And in the erection area, in addition
18 to having the crane be put up there, this is
19 literally where work is going to be performed
20 and deliveries are going to be made, right?
21   A.   That's correct.
22   Q.   And part of Borneke's job prior to this
23 happening is to grade and compact the erection
24 area?

46

1    A.   That's correct.
2    Q.   Additionally, things such as drainage,
3  grubbing, and clearing, all this is also part of
4  Borneke's job prior to work commencing at these
5  erection areas, right?
6    A.   That's correct.
7    Q.   And providing adequate drainage, you
8  would agree, is an important part of this
9  responsibility?
10   A.   Correct, when possible.
11   Q.   No, not when possible, because that's
12 not what the contract says, and we'll get to it
13 in a second.
14       You are supposed to provide drainage at
15 these erection areas, and that includes
16 sometimes adding or taking away land if
17 necessary, right?
18   A.   Yeah.  To a certain extent, yes.
19   Q.   Because if water pools near a turbine,
20 or if the drainage is not going away from where
21 the turbine is going to go, this could lead to a
22 whole plethora of problems, right?
23   A.   It can, yes.
24   Q.   For example, it can cause the ground to

47

1  soften up more easily?
2    A.   Yes.
3    Q.   And it can cause damage to various
4  pieces of equipment?
5    A.   Correct.
6    Q.   Or it can simply cause tripping and
7  slipping hazards for workers to come later on,
8  right?
9    A.   Yes.
10   Q.   And you agree that if there is proper
11 drainage, one of the benefits is that it is less
12 likely that water will pool and potentially
13 freeze, right?
14   A.   Yes.
15   Q.   And you also agree that if there is
16 proper drainage, and there is not standing
17 water, it is less likely that ruts will form
18 because the ground is less soft, right?
19   A.   Yes.
20   Q.   And in addition to this, and we'll get
21 to it in the contract in a second, but Borneke
22 has a responsibility for periodic maintenance of
23 the areas it has already worked on, right?
24   A.   Up until turbine component delivery,

48



1  yes.
2      Q.   So after turbine component delivery,
3  you don't care what happens, it's not your job?
4      A.   I care, but it's not our -- it's not in
5  our contract to maintain after the components
6  are delivered.
7      Q.   Well, I'm glad you said that, because
8  the contract says otherwise, and we'll get into
9  that.
10          I want to show you what's been marked
11  as exhibit -- or what will be marked as
12  Exhibit 1 for your deposition.  Sir, this is a
13  59-page document, and it says M.A. Mortenson
14  Company Subcontract Agreement.  It lists
15  Mortenson as the contractor, and a Don Borneke
16  as a subcontractor.  And under Section 1 it
17  discusses the Mendota Hills Repowering Project.
18          Does this appear to be the contract of
19  the subject project?
20      A.   Yes.
21              (Whereupon, SIKEL Deposition
22              Exhibit No. 1 was marked for
23              identification.)
24

49

1  BY MR. TERRY:
2      Q.   And does this appear to be a true and
3  accurate copy of that contract?
4      A.   It looks like it, yes.
5      Q.   And if we scroll through it, just for
6  sake of completeness, for example, on Page 3, we
7  have your signature as well as the electronic
8  signature of Andy Black from Mortenson?
9      A.   Yes.
10      Q.   And then if we scroll further, we have
11  various term and conditions, as well as the
12  scope of work, right?
13      A.   Yes.
14      Q.   And I'll keep scrolling just for a
15  second.  We have the purchase price, document
16  list, safety programs, quality assurance
17  programs, insurance requirements, and a whole
18  bunch of other things going all the way to the
19  application for payment.
20          So, now that we've scrolled this, does
21  this appear to be a true and accurate copy of
22  the contract?
23      A.   Yes.
24      Q.   And these contracts are agreements

50

1  between Mortenson and Borneke for the work
2  Borneke agrees to perform, right?
3      A.   Correct.
4      Q.   And it spells out what is negotiated
5  and agreed upon by the parties, right?
6      A.   Correct.
7      Q.   And any work that is stated in this
8  document, including the scope of work, is work
9  that Borneke bid for, contracted for, and
10  undertook the responsibility to perform, right?
11      A.   Correct.
12      Q.   And you'd agree that any work in this
13  project, any work in this contract, in the scope
14  of work, needs to be performed suitably,
15  reasonably, safely, and properly, right?
16      A.   Correct.
17      Q.   Now let's go on -- just look through
18  the document.  You agree that Page 1 discusses
19  the various documents that are part of this,
20  like we talked about, the scope of work, and
21  various other things, correct?
22      A.   Yes.
23      Q.   And then Part 2, if we literally go
24  down to scope of work, it says, in summarizing,

51

1  scope of work is attached in Exhibit A, right?
2      A.   Okay, yep.
3      Q.   Do you agree?
4      A.   Yes.
5      Q.   And then if we go on to Page 3, as we
6  talked about, this is your electronic signature
7  on this document, right?
8      A.   Yes.
9      Q.   Do you remember looking at, agreeing
10  to, and signing this contract on behalf of
11  Borneke?
12      A.   No, I don't remember it, but my
13  signature is there, so.
14      Q.   Do you remember your work on the -- for
15  the Mendota Hills Repowering Project?
16      A.   Specifically what work?
17      Q.   Your work.
18      A.   Yeah, I remember the project.
19      Q.   So you remember bidding for it,
20  negotiating, contracting for it?
21      A.   Yes, I remember parts of it, yeah.
22      Q.   And part of that would be signing the
23  contract when everything is agreed to?
24      A.   Yeah.  Yeah.  Okay.

52

1    Q.   And so you'd agree with that, that this
2  is your signature agreeing to the --
3    A.   I agree it's my signature.  I don't
4  remember signing this piece of paper
5  three-and-half years ago, so.
6    Q.   That's okay, but let me finish my
7  question.
8    A.   Okay.
9    Q.   Do you agree that this is your
10 signature on behalf of Borneke, agreeing to
11 comply with the terms of the contract by
12 Borneke's work on this project, right?
13   A.   Yes.
14   Q.   Okay.  I want to skip ahead a little
15 bit, just a couple of things I want to talk
16 about before we get into the scope of work.
17        You agree that this, on Page 10, would
18 be the insurance requirements for this project,
19 correct?
20   A.   Yes.
21   Q.   I want to just ask you the difference
22 here, employer's liability versus commercial
23 general liability.
24        Is employer's liability kind of like

53

1    Q.   And, then, again, if we continue
2  forward on to Page 14, this is, again, yours and
3  Andy Black's signature agreeing to these various
4  terms, correct?
5    A.   Correct.
6    Q.   And if we go on to Page 17, this is
7  under supplementary terms and conditions, you
8  can see that, correct?
9    A.   Correct.
10   Q.   If we go on to the third page of those
11 terms and conditions, can you see Subpart H?
12   A.   Yes.
13   Q.   Right where my mouse is.
14   A.   Yes.  Yes, sir.
15   Q.   You agree that it says:  Subcontractor
16 shall coordinate all deliveries with the
17 Mortenson on site superintendent, right?
18   A.   Yes.
19   Q.   You agree that coordinating with
20 Mortenson for deliveries from -- as the
21 excavating company, is a very important task to
22 do, right?
23   A.   Yes.
24   Q.   And part of this is you need to make

55

1  workmen's comp coverage?
2    A.   Yes.
3    Q.   And on this project, were you also
4  insuring the Mortenson workers under your policy
5  as well?
6    A.   I'm sure what is covered under the
7  umbrella, yes.
8    Q.   So if a Mortenson employee would be
9  injured, the workers' compensation would
10 typically be handled through your insurance,
11 then?
12   A.   I agree -- I believe so, yes.
13   Q.   So this first million up here for
14 employer's liability, that would be for things
15 like workmen's compensation, right?
16   A.   Correct.
17   Q.   And then underneath the commercial
18 general liability, it looks like there's a five
19 million underlying and a five million in excess.
20 Does that appear correct?
21   A.   Yes.
22   Q.   And these are all things that Borneke
23 agrees to provide for this project, correct?
24   A.   Correct.

54

1  sure the roads you prepared, the erection areas,
2  are able to support the various deliveries and
3  the components used to make the deliveries,
4  right?
5    A.   Yes.
6    Q.   Okay.  So Borneke knows when the
7  deliveries are going to be made, and they, in
8  fact, coordinate with Mortenson, right?
9    A.   Correct.
10   Q.   Now let's go on to Page 20.
11        You agree that this is the scope of
12 work, correct?
13   A.   Correct.
14   Q.   And this is an 11-page document, as you
15 can see at the bottom, right?
16   A.   Yes.
17   Q.   But it's all part of the contract.  For
18 ease, I didn't break them up.  You understand
19 that this is still the 11-page scope of work for
20 this Mendota Hills Repowering Project, correct?
21   A.   Correct.
22   Q.   Let's go under the general requirements
23 on Page 1, Section 2.1 general.  Do you see
24 that?

56



Mark Sikel 03/10/2022

1    A.   Yes.
2    Q.   Under D, you agree it says:
3  Subcontractor agrees to procure, provide, and
4  pay for all materials, equipment, tools,
5  consumables, labor, transportation, supervision,
6  temporary office requirements, administration,
7  and other costs required to complete the work.
8        Did I read that correctly?
9    A.   Yes.
10   Q.   So, this is kind of commonsense, but in
11 essence, this is saying that Borneke is
12 contracted to perform certain work, and they're
13 responsible to furnish the means to do that
14 work, right?
15   A.   Correct.
16   Q.   Now let's go under Page 2 of 11,
17 Section 2.3.  These are some of the tasks we
18 were talking about earlier, like clearing and
19 grubbing.  This is one of the things that is
20 common on these projects to have to do some of,
21 right?
22   A.   Correct.
23   Q.   The same thing with creating a
24 construction trailer/lay-down yard, right?

57

1  subgrade, placement and compaction of aggregate
2  material, right?
3    A.   Correct.
4    Q.   So this is what we were talking about
5  before.  Sometimes Borneke has to come in, strip
6  the ground, compact it, put more ground on top,
7  and compact it again, right?
8    A.   Correct.
9    Q.   So sometimes even if the ground may not
10 be level, or too level, whatever it is, Borneke
11 can come in, strip certain areas, prepare it,
12 and then put the aggregate back on top and
13 compact it again, right?
14   A.   Yes.
15   Q.   And then under I:  At a minimum,
16 subgrade shall be prepared in accordance with
17 and meet the compaction requirements set forth
18 in the design documents prior to installing
19 aggregate material, right?
20   A.   Yes.
21   Q.   And it says:  Subcontractor is aware
22 that some areas of the road subgrade may need to
23 be addressed with additional subgrade material
24 or corrected per the design documents, right?

59

1    A.   Yes.
2    Q.   If we go on to Page 3, turbine access
3  roads, let's start with Section A.  It says:
4  Subcontractor shall construct access roads to
5  each individual wind turbine as detailed in the
6  design documents, right?
7    A.   Correct.
8    Q.   And then it says under E, that the
9  roads shall have a maximum deviation of 9 inches
10 rise or fall within any 100 foot span, and shall
11 be level within one percent across the entire
12 width including the shoulders or as specified in
13 design documents, right?
14   A.   Yes.
15   Q.   So, again, these are contracts to
16 specifications.  Nowhere in here does it say
17 Borneke can do this where it thinks possible.
18 It just says this is what needs to be done,
19 right?
20   A.   Correct.
21   Q.   The same thing here, under G:  Access
22 road installation within a public right-of-way
23 shall include, but is not limited to, stripping
24 top soil, preparation of subgrade, compaction of

58

1    A.   Correct.
2    Q.   So, again, like what we were talking
3  about earlier, it's not just to whatever you
4  think is fit, it's to the specifications,
5  Borneke has to do its work, right?
6    A.   Yes.
7    Q.   And that includes sometimes compacting
8  the ground, adding aggregate, and a whole
9  plethora of other things, right?
10   A.   Correct.
11   Q.   Okay.  Under N:  Subcontractor shall
12 construct temporary access roads/radii required,
13 and that's R-A-D-I-I, required to facilitate the
14 delivery of turbines to each wind turbine
15 foundation location on site.  Temporary access
16 road/radii shall be aggregate base.
17 Subcontractor shall construct an entrance where
18 the main access or turbine string road meet the
19 public roads.  Subcontractor shall install
20 entrances per design document.  Right?
21   A.   Right.
22   Q.   So, again, not to whatever you see is
23 fit, or what you think is possible.  Borneke is
24 agreeing to construct temporary access roads,

60

Mark Sikel 03/10/2022

1  sometimes needing additional aggregate base, and
2  these access roads are to facilitate the
3  delivery of turbines to each wind turbine
4  foundation, right?
5      A.   Correct.
6      Q.   And additionally, subcontractor, under
7  P, shall install culverts and drainage features
8  for access roads, and it continues.
9           So you agree that part of your
10 responsibility, in access roads, for example, is
11 to prepare them and also provide drainage,
12 right?
13     A.   Correct.
14     Q.   Okay.  And I'll move on.  And then
15 under -- on Page 7, 2.14, project maintenance.
16 And, again, this section is discussing roads and
17 the lay-down yard, right?
18     A.   Yes.
19     Q.   But, again, for the roads and the
20 lay-down yards, Borneke is required to maintain
21 its work, correct?
22     A.   Correct.
23     Q.   So Borneke continues to have an on site
24 presence for the duration of the project, right?

61

1      A.   Yes.
2      Q.   And they have workers on site, and have
3  to address issues as they arise, right?
4      A.   Yes.
5      Q.   And they were supposed to maintain
6  their work in these areas?
7      A.   Correct.
8      Q.   Let's go on to Page 8, foundation,
9  excavation and backfills.  Again, for B, it
10 doesn't say Borneke can excavate and backfill as
11 they see fit.  It says they shall excavate and
12 backfill foundation in accordance with the
13 design documents, right?
14     A.   Correct.
15     Q.   And it says:  Subcontractor shall bench
16 or slope excavation back to OSHA standards,
17 right?
18     A.   Correct.
19     Q.   And then under I, for example -- again,
20 here under O, I meant:  Backfill shall be graded
21 away from the turbine to create adequate slope
22 away from the turbine as detailed in the design
23 documents, right?
24     A.   Correct.

62

1      Q.   And, again, the idea is despite you
2  saying where possible, Borneke is undertaking a
3  responsibility to provide grading and drainage
4  in these foundation areas, right?
5      A.   Yes.
6      Q.   And the idea is, you want water to pool
7  away from the turbine, away from the erection
8  area, right?
9      A.   Correct.
10     Q.   Lets go on to Page 9, turbine erection
11 areas.  Borneke understands this is literally
12 where the work is going to be performed, right?
13     A.   Correct.
14     Q.   Under Subsection A:  Subcontractor
15 shall clear grub and provide all necessary
16 grading for a 175-foot radius around the turbine
17 inclusive of cut and fill necessary to achieve
18 no more than a 5 percent grade across the area,
19 right?
20     A.   Yes.
21     Q.   And it continues:  Actual limits of
22 clearing and required slopes will be as per the
23 contract documents and coordination with
24 Mortenson's superintendents for component

63

1  locations, right?
2      A.   Correct.
3      Q.   So, again, here, the radius that we're
4  talking about in these erection areas is
5  175-feet in each direction around the turbine,
6  right?
7      A.   Yes.
8      Q.   And in these areas, subcontractor,
9  meaning Borneke, right?
10     A.   Yes.
11     Q.   Needs to clear and grub, correct?
12     A.   Yes.
13     Q.   They also need to provide all necessary
14 cut and fill so that it's graded properly, and
15 that's at no more than five percent, correct?
16     A.   Correct.
17     Q.   Okay.  So, again, when you said, where
18 feasible, or as able to, you agree there are
19 specifications in this contract, and those
20 specifications are by percent for erection
21 areas, right?
22     A.   Correct.
23     Q.   And all of this grading is necessary
24 and it's an important part of these projects;

64



Mark Sikel 03/10/2022

1  you'd agree with that, right?
2      A.   Yes.
3      Q.   This grading and these erection areas,
4  like both Mr. Bennett and Mr. Borneke talked
5  about, helps prevent water from pooling in these
6  erection areas, right?
7      A.   Yes.  That's the intent.
8      Q.   Okay.  And if water does not pool in
9  these erection areas, it will help prevent large
10  ruts from forming, or depressed areas where
11  water can pool, right?
12      A.   Yes.
13      Q.   And if there's no depressed areas where
14  water can pool, there's no areas where water can
15  pool and later freeze, then, right?
16      A.   Yes.
17      Q.   Okay.  And all of these are conditions
18  that Borneke is contracted to perform and try to
19  prevent by providing the necessary grading,
20  right?
21      A.   Yes.
22      Q.   Now under the subsection, there are
23  three of them.  Let's go down to Number 2 and 3.
24          Number 2 says:  Bumps shall be leveled

65

1  and holes filled to accommodate equipment
2  travel, right?
3      A.   Yes.
4      Q.   So, again, Borneke is undertaking a
5  contractual responsibility to level and fill
6  holes so that equipment can properly travel in
7  these erection areas, right?
8      A.   Yes.
9      Q.   This includes cranes, correct?
10      A.   Yes.
11      Q.   This includes various pieces of
12  equipment, right?
13      A.   Yes.
14      Q.   And this includes trucks making
15  deliveries, and everything else that is going to
16  be delivered to the erection areas, and whatever
17  work is going to be performed, right?
18      A.   Yes.
19      Q.   Under Subsection 3:  Cleared area shall
20  be maintained, compacted, and provide positive
21  drainage at all times to facilitate turnaround
22  area for turbine delivery components through the
23  duration of the project.
24          I read that correctly, right?

66

1      A.   Yes.
2      Q.   Okay.  So, again, for whatever the
3  purpose is, Borneke is required to maintain,
4  compact, and provide positive drainage at all
5  times in the erection areas, correct?
6      A.   Correct.
7      Q.   Okay.  And this responsibility is
8  through the duration of the project, as it
9  states in plain English, correct?
10      A.   Up until the point of the turbine
11  component deliveries.
12      Q.   No, it says to facilitate turnaround
13  area for turbine deliveries through the duration
14  of the project, correct?
15      A.   That's -- that's not how the
16  understanding is between Mortenson and Borneke.
17      Q.   Well, this is what Borneke contracted
18  to do in plain English, correct?
19      A.   Up until -- yeah, we maintain up until
20  the point of the component delivery.
21      Q.   Okay.  You agree that the contract says
22  through the duration of the project, correct?
23      A.   Yeah.  We can't have dozers sitting
24  out -- in the erection area when other

67

1  subcontractors are performing their work.
2      Q.   But that's not my question.
3          Do you agree that this section says:
4  Cleared areas shall be maintained, compacted,
5  and provide positive drainage at all times dot,
6  dot, dot, through the duration of the project,
7  correct?
8      A.   Up until the component delivery.
9      Q.   That's not what it says.  Answer my
10  simple question.
11          You agree that it says, the last six
12  words, through the duration of the project,
13  correct?
14      A.   No, I don't agree.
15      Q.   You're saying that's not the plain
16  words that are on this page?
17      A.   It says up until the component
18  delivery.
19      Q.   That's not what it says, and we'll read
20  it again.
21          Let's read it, and you tell me if I'm
22  reading it wrong, okay?  I'll start halfway
23  through:  Provide positive drainage at all times
24  to facilitate turnaround area for turbine

68

1  delivery components through the duration of the
2  project.
3      Did I read that section correctly?
4  A.  You read it correctly.
5  Q.  So those are the words that's on the
6  page, right?
7  A.  They are.
8  Q.  Okay.  Thank you.
9      So Borneke is contracted to maintain
10 these areas because they know what work is going
11 to be performed, right?
12 A.  Correct.
13 Q.  Okay.  Borneke -- and again, because
14 you're stating through delivery, let's talk
15 about the prep.  Because now we're on the same
16 page with the prep.
17      Borneke prepares these erection areas
18 so that it can accommodate deliveries from large
19 semis, right?
20 A.  Yes.
21 Q.  And they prepare these erection areas
22 so that they can accommodate huge pieces of
23 equipment that weigh tens of thousands of
24 pounds, right?

69

1  depressed areas form, right?
2  A.  Yes.
3  Q.  The idea is the erection area will be
4  able to support the weight of the pieces of
5  equipment while it is staged there, right?
6  A.  Yes, under the right conditions.
7  Q.  That's not what the contract says.
8  Again, you're qualifying.
9      The contract says Borneke prepares the
10 erection areas, and this includes grading and
11 compacting, correct?
12 A.  Yes.
13 Q.  And both Mr. Bennett and Mr. Borneke
14 testified that if the ground is prepared, the
15 idea is it will not sink in underneath pieces of
16 equipment.
17      You would agree with this, correct?
18 A.  Yes.
19 Q.  And they both testified, and you've
20 already agreed, that if the ground is properly
21 prepared, it won't sink in underneath pieces of
22 equipment, and there won't be depressed areas,
23 hopefully, right?
24 A.  Hopefully, right.

71

1  A.  Yes.
2  Q.  And, again, as both Mr. Bennett and
3  Mr. Borneke testified, and like you've testified
4  earlier, the idea is if these areas are properly
5  prepared, hopefully the ground won't cave in
6  underneath them or the equipment being used to
7  deliver them, right?
8  A.  Yes, hopefully.
9  Q.  Okay.  And this where grading and
10 compacting comes in, right?
11 A.  Yes.
12 Q.  And as this shows you, compacting needs
13 to be performed in the erection areas, correct?
14 A.  Yes.
15 Q.  And I'll stop sharing my screen now.
16 But compacting, we've already established.
17      The idea behind compacting, once the
18 ground is graded, is so that the ground is less
19 likely to sink in underneath pieces of equipment
20 and material, correct?
21 A.  Yes, that's the intent.
22 Q.  And the intent is if it's compacted
23 properly, the ground will hopefully not sink in
24 underneath pieces of equipment where large

70

1  Q.  Okay.  Part of the reason behind this
2  is if the ground sinks in underneath pieces of
3  equipment, this can damage equipment, right?
4  A.  Yes.
5  Q.  Or it can also cause catastrophic
6  injuries or death if pieces of equipment tip
7  over or materials roll around, right?
8  A.  Yes.
9  Q.  Okay.  Not only that, it can cause
10 depressed areas where water can pool or tripping
11 hazards can arise, right?
12 A.  Right.
13 Q.  All of these things are things that
14 Borneke's prep work is supposed to try and
15 prevent, correct?
16 A.  That's the intent.
17 Q.  That's the intent.  And that's what you
18 are contracted to perform, correct?
19 A.  Correct.
20 Q.  Okay.  And you'd agree that if Borneke
21 is not performing the tasks required of it under
22 the contract, then it is not performing the
23 obligations it affirmatively undertook when it
24 contracted to perform this work, correct?

72

1    A.   Correct.
2    Q.   Okay.  And then the same thing.  As we
3  talked about compaction, Borneke also had to
4  grade, compact, but provide drainage in these
5  erection areas, right?
6    A.   Correct.
7    Q.   And, again, the idea is if there's
8  proper drainage in these erection areas, water
9  will not pool in these erection areas, right?
10   A.   Correct.
11   Q.   And Borneke undertook this
12 responsibility and contracted to provide
13 drainage in these areas?
14   A.   Correct.
15   Q.   So you'd agree that the contract I just
16 showed you, including the scope of work, are
17 true and accurate copies of the contract and the
18 scope of work for this project, right?
19   A.   Right.
20   Q.   And these documents contain the
21 contracted to duties and responsibility on this
22 project for Borneke, right?
23   A.   Yes.
24   Q.   And by not complying with this

73

1  Exhibit A, the scope of work, or by not
2  completing the tasks in this document, you would
3  agree Borneke is not fulfilling their
4  contractual obligations, right?
5    A.   Right.
6    Q.   Okay.  Borneke, you understand, by
7  contracting to perform work, undertook the
8  contractual responsibility for these tasks,
9  right?
10   A.   Correct.
11   Q.   And Borneke was ultimately paid to
12 complete the tasks in this contract, right?
13   A.   Correct.
14   Q.   So in the erection areas, as we saw,
15 Borneke has to prepare the ground so that it
16 does not sink in underneath pieces of equipment
17 or material, correct?
18   A.   Correct, under the right conditions.
19   Q.   No, that's not what the contract says.
20 You would agree that now you're qualifying in
21 addition to what's in the contract.
22        The contract says you need to prepare
23 the erection area, and this includes grading and
24 compacting, correct?

74

1    A.   Correct.
2    Q.   And this also includes drainage, right?
3    A.   Yes.
4    Q.   Okay.  And like both Mr. Bennett and
5  Mr. Borneke said, if these areas are properly
6  prepared, and if there's adequate compaction and
7  drainage, the idea is pieces of equipment won't
8  sink into the ground, and there won't be
9  depressed areas where water would form and pool.
10 You agree with this, right?
11   A.   Yes, that's the idea.
12   Q.   Okay.  And that's the idea that Borneke
13 undertook the responsibility to perform and
14 contracted to perform, right?
15   A.   Right.
16   Q.   And by not doing this, they're not
17 fulfilling their contractual obligation, right?
18   A.   I guess, yes.
19   MR. TERRY:  Okay.  Chris, I'm sure you're
20 going to have a few follow-ups.  I think that's
21 all I have right now.  Let me just go through
22 and check my notes.
23   MR. SULLIVAN:  Yeah, let me just ask some
24 questions while you check your notes.  Whatever

75

1  you want to do.
2    MR. TERRY:  Sure.
3              EXAMINATION
4  BY MR. SULLIVAN:
5    Q.   Mark, Mortenson signed off on each of
6  these turbine sites for work performed by
7  Borneke when the compacting and grading work was
8  done, right?
9    A.   Correct.
10   Q.   And we're talking about 29 different
11 sites, right?
12   A.   Yes.
13   Q.   The site at issue in this case I think
14 is site T11.  Did you have any knowledge of
15 that?
16   A.   Yes, that's -- that's correct.
17   Q.   Okay.  So Mortenson would have signed
18 off and approved of the grading work and
19 compacting work that Borneke did on site T11
20 when the work was done, right?
21   A.   That's correct.
22   MR. TERRY:  Let me object.
23        Hey, Chris, so I don't interrupt
24 because we're doing this via Zoom, could I just

76

1  have a standing objection to relevance on this?
2  MR. SULLIVAN:  Okay.
3  MR. TERRY:  Thanks.
4  BY MR. SULLIVAN:
5  Q.  Do you have any knowledge, Mark, after
6  you -- after Borneke completed its grading and
7  compacting work on site T11 on this project,
8  that Mortenson notified you of any problem with
9  grading?
10  A.  No, not to my knowledge.
11  Q.  Did Mortenson ever complain about your
12  work on site T11?
13  A.  Not to my knowledge, no.
14  Q.  Do you have any knowledge that
15  Mortenson complained about the inadequacy of
16  Borneke's work at any point in this project?
17  A.  No.
18  Q.  No meaning what, they did not complain?
19  A.  Not to my knowledge, no.
20  Q.  Did Borneke comply with its contractual
21  obligations that you went through in this case?
22  A.  Yes.
23  Q.  And Mortenson paid Borneke the full
24  amount owed under the contract; is that right?

77

1  A.  Yes.
2  Q.  Did Mortenson withhold any money for
3  not performing the contract at any point?
4  A.  No.
5  Q.  Did Mortenson ever notify Borneke that
6  ice had formed at site T11 or anywhere else on
7  this project?
8  A.  No.
9  MR. TERRY:  Object to relevance.
10  BY MR. SULLIVAN:
11  Q.  Are you aware that Mortenson ever
12  notified you of any defect in the grading or
13  compacting at site T11 at any time?
14  A.  No.
15  Q.  The way this project worked, there were
16  phases, right?
17  A.  Correct.
18  Q.  And the grading and compacting of the
19  turbine erection sites was supposed to be
20  completed before the components were delivered,
21  right?
22  A.  That's correct.
23  Q.  And then when the grading and
24  compacting was completed, Mortenson had to

78

1  review it and approve it before the components
2  were then delivered, right?
3  A.  That's correct.
4  Q.  So that's what happened in each one of
5  these sites, 29 different ones?
6  A.  Yes.
7  Q.  And each one Mortenson approved?
8  A.  Yes, to my knowledge.  Yes.
9  Q.  Did Mortenson have a directive, as far
10  as you know, about where you were supposed to
11  be -- where Borneke employees were supposed to
12  be at each site, when the actual delivery was
13  taking place and where the erection was taking
14  place?
15  A.  No, I don't think so.
16  Q.  You had no role in delivery of any of
17  the components, correct?
18  A.  That's correct.
19  Q.  Meaning Borneke did not have a role?
20  A.  Borneke did not have a role.
21  Q.  Borneke did not have a role in erecting
22  the components either?
23  A.  That's correct.
24  Q.  And Mortenson did not want Borneke

79

1  around when the erecting was being completed in
2  terms of space.  Isn't there a spacial
3  limitation problem?
4  A.  That's correct.  There's only a limited
5  amount of room.
6  Q.  And what was your understanding of how
7  Mortenson conducted the erection process in that
8  regard?
9  A.  I guess that would be a question for my
10  on site superintendents on the procedures.
11  Q.  Okay.  And you were never on site on
12  this project, right?
13  A.  That's correct.
14  Q.  But if there were complaints by
15  Mortenson, you would have heard about it?
16  A.  Yes.
17  Q.  Okay.  And you're not aware that
18  Mortenson ever complained about Borneke's work?
19  A.  I'm not aware, no.
20  Q.  Did Mortenson ever tell you that at
21  site T11, or any other site, that the compacting
22  was incorrect?
23  A.  No.
24  Q.  Or that the grading was incorrect?

80

```
 1     A.   No.
 2     Q.   Or that the drainage was improper?
 3     A.   No.
 4     MR. SULLIVAN:  I think that's all I have.
 5   Thank you, sir.
 6     MR. TERRY:  Mr. Sikel, I do have two
 7   follow-ups.
 8           FURTHER EXAMINATION
 9   BY MR. TERRY:
10     Q.   You were asked about whether or not
11   Mortenson ever told you about defects in your
12   work.  Do you agree that Mortenson hires
13   Don Borneke Construction because they are the
14   experts in excavation, right?
15     A.   Yes.
16     Q.   And you, as Borneke, do not look for
17   Mortenson to tell you how to do your job
18   properly and safely, you are expected to know
19   that as the experts in excavation, right?
20     A.   Correct.
21     Q.   And, also, you were asked about whether
22   or not you prepared this ground first, and if
23   there are size constraints to the area, and you
24   said yes.  You'd agree that these are both
```
81

```
 1   further reasons why the work should be done
 2   right the first time, correct?
 3     A.   Correct.
 4     MR. TERRY:  Okay.  That's all I have.
 5     MR. SULLIVAN:  Okay, thanks.
 6           We'll waive signature.
 7     MR. TERRY:  Mr. Sikel, you can hop off.  I
 8   appreciate your time.
 9           Margie, I think I have your e-mail a
10   hundred times over, I'll e-mail you the exhibits
11   and I will take the original.
12           Thank you very much.
13     MR. SULLIVAN:  I'll take a copy.
14     (Proceedings concluded at 2:26 p.m.)
15
16
17
18
19
20
21
22
23
24
```
82

```
 1   STATE OF ILLINOIS    )
 2                        )   SS:
 3   COUNTY OF C O O K    )
 4       I, MARGARET A. RITACCO, a notary public
 5   within and for the County of Cook and State of
 6   Illinois, do hereby certify that heretofore, to-wit,
 7   March 10th, 2022, personally appeared before me,
 8   via videoconference, MARK SIKEL, in a cause now
 9   pending and undetermined in the In the United
10   States District Court Northern District of Illinois,
11   Eastern Division, wherein NICK GEORGEFF is the
12   Plaintiff, and DON BORNEKE CONSTRUCTION, INC.,
13   is the Defendant.
14       I further certify that the said
15   MARK SIKEL was first duly sworn to testify the
16   truth, the whole truth and nothing but the truth
17   in the cause aforesaid; that the testimony then
18   given by said witness was reported
19   stenographically by me in the presence of the
20   said witness, and afterwards reduced to
21   typewriting by Computer-Aided Transcription, and
22   the foregoing is a true and correct transcript
23   of the testimony so given by said witness as
24   aforesaid.
```
83

```
 1       I further certify that the signature to
 2   the foregoing deposition was waived by counsel
 3   for the respective parties.
 4       I further certify that the taking of this
 5   deposition was pursuant to notice and that there
 6   were present at the deposition the attorneys
 7   hereinbefore mentioned.
 8       I further certify that I am not counsel
 9   for nor in any way related to the parties to
10   this suit, nor am I in any way interested in the
11   outcome thereof.
12       IN TESTIMONY WHEREOF:  I have hereunto
13   set my hand and affixed my notarial seal this
14   25th day of March, 2022.
15
16
17
18
19   _____  _____
20   NOTARY PUBLIC, COOK COUNTY, ILLINOIS
21   LIC. NO. 084-002796
22
23
24
```
84

<u>Subcontract Number:18141002</u>
<u>Task/Cost Code:  502.0200000.00000 S</u>

# M. A. MORTENSON COMPANY
# SUBCONTRACT AGREEMENT

**THIS SUBCONTRACT AGREEMENT ("Agreement")** is entered into effective this 29th[th] day of December, 2017, by and between M. A. Mortenson Company ("**Mortenson**") and Don Borneke Construction, Inc., 41537 50th Street, Janesville, MN ("**Subcontractor**").  This Agreement includes the Subcontract Standard Terms and Conditions ("**Standard Terms and Conditions**"), the Indemnity Clause ("**Indemnity Clause**") and the Subcontract Supplementary Terms and Conditions ("**Supplementary Terms and Conditions**"), all attached hereto ("**Attachments**"), and the following Exhibits ("**Exhibits**"):

| | |
|---|---|
| Exhibit A - | **Scope of Work** |
| Exhibit B - | **Subcontract Price** |
| Exhibit C - | **Schedule** |
| Exhibit D - | **Contract Documents List** |
| Exhibit E - | **Safety Program Requirements** |
| Exhibit F - | **Quality Program Requirements** |
| Exhibit G - | **Insurance Requirements** |
| Exhibit H - | **Application for Payment** |
| Exhibit I - | **Lien Waivers** |



EXHIBIT

SIKEL-1

In consideration of their mutual promises herein, Subcontractor and Mortenson agree as follows:

1.    **PROJECT.**  Mortenson has entered into a contract dated [December 29, 2017] (the "**Contract**") with Mendota Hills, LLC ("**Owner**") to perform labor and furnish material for the construction of Mendota Hills Repowering, located at Lee County, IL ("**Project**"), pursuant to Drawings, Specifications, General Conditions, Supplementary General Conditions, Special Conditions, and Addenda prepared by Westwood Professional Services and Barr Engineering Co. ("**Engineer**"), and made a part of the Contract.  The Contract Documents ("**Contract Documents**") are this Agreement, the Contract and its exhibits, Drawings, Specifications, General Conditions, Supplementary General Conditions, Special Conditions, and Addenda, including the following:

[See EXHIBIT D - CONTRACT DOCUMENTS LIST]

2.    **SCOPE OF WORK.**    Subcontractor shall furnish and pay for all supervision, labor, materials, tools, equipment, services, scaffolds, appliances and all other items necessary to fully perform the Agreement, consistent with the provisions of the Contract Documents, including completion of all the following (the "Work"):

[See EXHIBIT A - SCOPE OF WORK]

3.    **SUBCONTRACT PRICE.**  The **Subcontract Price** is

[see EXHIBIT B - SUBCONTRACT PRICE]

4.    **TIME OF COMPLETION.**  Subcontractor shall prosecute and complete the Work in accordance with the following schedules and time limits:

[See EXHIBIT C - SCHEDULE]

5.      **RETAINAGE.**  Mortenson shall retain an amount from each application for payment such that __TEN__ percent (10%) of the total value of Work performed is withheld.  Retainage shall be held by Mortenson until released as provided in this Agreement.


6.      **SITE-SPECIFIC SAFETY PROGRAMS.**   Subcontractor agrees to provide all documents and conduct or participate in all site-specific safety programs related to elimination of accidents and injuries at the site, including but not limited to the following:

[See EXHIBIT E - SAFETY PROGRAM REQUIREMENTS]

7.      **PAYROLL MARKUPS.**   For Work performed on the basis of actual field cost pursuant to Paragraph 12.4.1.(a) of the Standard Terms and Conditions, the maximum allowable payroll mark-ups shall be 10% for field labor and 10% for fabrication shop labor.

8.      **INSURANCE:**
   a.  Commercial General Liability insurance limits shall be $5,000,000 unless otherwise indicated here _____$2,000,000

   b.  Professional Liability/Errors & Omissions coverage
       _____Is required
       __X__Is not required

   c.  Pollution Liability coverage
       _____Is required
       __X__Is not required

9.      **PAYMENT AND PERFORMANCE BONDS.**

_____ Performance and Payment Bonds are not required.

__X__ Performance and Payment Bonds are required, in full conformance with the requirements of Article 18 of the Terms and Conditions.


10.     **Entire Agreement.**    This Agreement constitutes the entire agreement between the parties hereto and is effective on the date set forth above.  No oral representations or other agreements have been made by Mortenson except as stated in this Agreement.  This Agreement may not be changed in any way except as herein provided, and no provision hereof may be waived by Mortenson except in writing signed by a duly authorized officer or agent.

IN WITNESS WHEREOF, Subcontractor and Mortenson herein execute this Agreement as set forth above.

| | |
|---|---|
| _____ | M. A. MORTENSON COMPANY |
| Don Borneke Construction, Inc., LLC | |
| By _*Mark Sikel*_____ | By _____ |
| Printed Name __Mark Sikel_____ | Printed Name <u>Andy Black</u> |
| Its _____Project Manager_____ | Its <u>Project Manager</u> |
| Subcontractor License No.____105C_____ | |
| Subcontractor state tax ID number __3730-5727_____ for _____Illinois |

# M. A. MORTENSON COMPANY
# SUBCONTRACT AGREEMENT
# STANDARD TERMS AND CONDITIONS

1.    **CONTRACT DOCUMENTS.**

1.1    The Contract Documents have been made available to Subcontractor for examination.

1.2    In the event of conflict between the Agreement and the other Contract Documents, the provisions of the Agreement shall govern.

1.3    Subcontractor binds itself to Mortenson under the Agreement with respect to its Work in the same manner as Mortenson is bound to Owner under the Contract Documents.

1.4    Subcontractor has carefully examined and understands the Contract Documents, has investigated the site of the Work and the conditions under which it is to be performed, and enters into the Agreement on the basis of its own examination, investigation and evaluation of such matters and not in reliance upon any opinions or representations of Mortenson, Owner, or any of their respective officers, agents, or employees.

2.    **SCOPE OF WORK.**  Subcontractor shall furnish and perform all of the Work required in the Agreement and the Contract Documents.

3.    **SUBCONTRACT PRICE.**  For the full and satisfactory performance of the Agreement, in compliance with the provisions of the Agreement, Mortenson shall pay Subcontractor the fixed Subcontract Price.  This sum may be changed only in accordance with the provisions of the Agreement.

4.    **TAXES AND CONTRIBUTIONS.**  The Subcontract Price includes, and Subcontractor hereby accepts exclusive liability for payment of, all federal, state, county, municipal and other taxes imposed by law or contract, and based upon labor, services, materials, equipment or other items acquired, performed, furnished or used in connection with the Work, including but not limited to (a) contributions, taxes or premiums (including interest and penalties) measured upon payroll or required to be withheld from employees; (b) sales, use, personal property and other taxes (including interest and penalties), whether stated separately, imposed by reason of performance of the Work, or any materials, equipment, labor, services or other items in connection with the Work; or (c) pension, welfare, vacation, annuity and other benefit contributions payable in connection with labor agreements or applicable law.

5.    **LAWS AND PERMITS.**  Unless otherwise required in the Agreement, Subcontractor shall not be required to obtain or pay for the primary building permit for the Project.  The Subcontract Price includes, and Subcontractor shall obtain and pay for all other permits, licenses, and fees necessary to complete the Work in accordance with the Contract Documents.  Subcontractor shall perform the Work in compliance with all applicable federal, state, municipal and local laws, codes, ordinances, rules, regulations, and requirements, including without limitation those relating to O.S.H.A., discrimination in employment, fair employment practices and equal employment opportunity, without additional expense to Mortenson, and shall correct, at its own cost and expense, any violations thereof. Subcontractor shall furnish such proof as Mortenson may request showing compliance and correction of violations.

6.    **TIME OF COMPLETION.**

6.1    Time being of the essence of the Agreement, Subcontractor shall begin the Work as soon as the Project is ready for the Work or, within three (3) calendar days after being notified in writing by Mortenson, and shall prosecute and complete the Work in accordance with the construction schedule, as such may be from time to time revised, and within the time limits stated in the Agreement.

6.2    Subcontractor shall promptly furnish all data requested by Mortenson for preparation and revision of construction schedules.

6.3    Should Subcontractor be delayed in the commencement, prosecution or completion of the Work by any unforeseeable cause beyond Subcontractor's control and not due to any fault, neglect, act or omission on its part, then Subcontractor shall be entitled to an extension of time.  Such extension shall be for a period equivalent to that granted to Mortenson by Owner under the Contract Documents for the same cause of delay, and shall release and discharge Mortenson from any and all claims by Subcontractor on account of the delay.  Subcontractor shall not be entitled to any extension of time unless a claim therefore is presented in writing to Mortenson within five (5) calendar days of the commencement of such claimed delay, or within such shorter time as may be required for Mortenson to comply with the Contact Documents.  Notwithstanding the foregoing, Subcontractor shall be entitled to compensation for delay if, and to the extent that, Mortenson secures compensation from Owner or others for delay on behalf of Subcontractor.

7.    **PAYMENTS.**

7.1    No payment shall be due or made to Subcontractor until receipt by Mortenson of (a) a fully executed Agreement; (b) evidence of insurance in conformance with Article 16 hereof; and (c) Bonds required under Article 18 hereof, if any.

7.2    Prior to submitting its first application for payment, Subcontractor shall submit a schedule of values allocating the Subcontract Price to the full Scope of Work, prepared in such form and supported by such data to substantiate its accuracy as Mortenson may require, which schedule shall be used as a basis for reviewing Subcontractor's applications for payment.  The schedule of values will be used for payment purposes only and shall not relieve Subcontractor from its obligation to perform all of the Work and

provide all labor and material required by the Agreement. When approved by Mortenson, the schedule of values may be modified by Subcontractor to incorporate executed change orders.

7.3     Not later than the 25th day of each month, Subcontractor shall submit its application for payment on forms provided by Mortenson. Each application for payment shall be calculated as the sum of (a) the value of Subcontractor's labor and materials incorporated into the Project as computed on the basis of the schedule of values, prices and allowable quantities of the Work performed, all as determined by Mortenson and either Owner or Architect; and (b) to the extent allowable by the Contract Documents, the value of materials not incorporated into the Project but delivered and stored at the Project site, minus (c) retainage, calculated from the sum of the amounts determined in preceding (a) and (b) as multiplied by the retainage percentage stated in the Agreement, and also minus (d) amounts previously paid. The application for payment shall not request payment for any portion of the Work which Subcontractor does not intend to pay to any subcontractor or material supplier that performed such Work. Subcontractor shall certify each application for payment, stating in writing that it accurately represents the value of the Work performed. Subcontractor agrees that, upon request by Mortenson, it shall furnish such information, supporting documents and consents of surety (on a form acceptable to Mortenson) as Mortenson may require to verify the value of the Work performed and confirm Subcontractor's entitlement to payment. When payment is based upon quantities at applicable unit prices, Subcontractor shall substantiate the quantities, and Mortenson and Owner shall have the right to examine, copy and audit relevant books and records of Subcontractor or any of its subcontractors in order to verify accuracy and completeness of the quantities. As a prerequisite to payment, Subcontractor shall provide, in a form satisfactory to Mortenson, partial lien and claim waivers and affidavits from Subcontractor, and its subcontractors and material suppliers, for the Work performed and the labor and material provided. Such waivers may be made conditional upon payment.

7.4     Monthly progress payments (less retainage) shall be made to Subcontractor within seven (7) days after Mortenson's receipt of payment from Owner, so long as Subcontractor is not in default or breach of the Agreement and is not subject to other reasons for withholding. Final payment to Subcontractor shall be due after completion and acceptance of the Work by Mortenson and either Owner or Architect and within seven (7) days of Mortenson's receipt from Owner of final payment for the Work, provided that: (a) Subcontractor shall have furnished evidence satisfactory to Mortenson that there are no claims, obligations, or liens for labor, services, materials, equipment, taxes or other items performed, furnished or incurred in connection with the Work; (b) Subcontractor shall have executed and delivered in a form satisfactory to Mortenson a general release in favor of Mortenson, Mortenson's surety, if any, and Owner; and (c) Subcontractor shall have delivered to Mortenson written consent of its surety, if any, to final payment. Final payment to Subcontractor shall constitute a release and waiver of any past, present and future claims by Subcontractor against Mortenson, its surety, if any, and Owner arising out of the Agreement and the Project or arising out of payment for the Work under the Agreement. Subcontractor acknowledges by its receipt of final payment that any and all of such claims are thereby released, waived and discharged.

7.5     Mortenson and Subcontractor expressly agree that payment to Mortenson on Subcontractor's account by Owner is an absolute condition precedent to Mortenson's obligations to pay Subcontractor under the Agreement. Subcontractor expressly agrees that it relies on the credit of Owner, not Mortenson, for payment for the Work. If Mortenson, in its sole discretion, pursues Owner or others for costs otherwise payable to Subcontractor, Subcontractor agrees that payment from Mortenson for Work shall not be due until Mortenson has exhausted all legal proceedings to recover such costs.

7.6     Subcontractor shall not be entitled to any payment to the extent there is: (a) any indebtedness owed by Subcontractor to Mortenson including for any matters unrelated to the Agreement; (b) defective Work not remedied or defective materials not removed and replaced; (c) third party claims; (d) claimed failure of Subcontractor to make payments to its subcontractors, material suppliers or laborers; (e) reasonable doubt that the Work can be completed for the unpaid balance of the Subcontract Price; (f) damage to Mortenson, Owner or another contractor or subcontractor; (g) unsatisfactory or untimely prosecution of the Work by Subcontractor; or (h) failure of Subcontractor to comply with the Contract Documents.

7.7     Subcontractor warrants and guarantees that title to all Work, materials and equipment included in an application for payment, whether incorporated into the Project or not, will pass to Owner upon receipt of such payment by Subcontractor, free and clear of all liens, claims, security interests or encumbrances. Subcontractor shall pay promptly for all materials, skills, labor and equipment used in performance of the Agreement, as bills or claims become due. Subcontractor shall protect the Project and defend, indemnify and hold harmless Owner and Mortenson and Mortenson's surety, if any, from and against all claims, bond claims, stop notices, equitable liens, mechanics' liens, damages, losses and expenses on account thereof, including without limitation legal fees and disbursements paid or incurred by Owner or Mortenson in connection therewith. Mortenson shall have the right at all times to contact Subcontractor's subcontractors and material suppliers to ensure that the same are being paid by Subcontractor for labor or materials furnished for use in performing the Work. Should Subcontractor: (a) fail to make timely payment to its material suppliers, subcontractors, laborers and fringe benefit funds; (b) fail to compensate Mortenson or another contractor or subcontractor for damage caused by Subcontractor; or (c) fail to perform its clean up obligations pursuant to Paragraph 8.5 hereof, Mortenson, in its sole discretion, may, in the instance of subsection (a) or (b), make direct payment to such individuals or entities and reduce the Subcontract Price accordingly or, in the instance of subsection (c), perform itself or hire others to perform such clean-up obligations and reduce the Subcontract Price accordingly.

7.8     Progress or final payments shall not be acceptance of improper, faulty, defective or non-conforming Work or material, shall not release Subcontractor of any of its obligations under the Agreement and shall not constitute a waiver of any rights or provisions hereof by Mortenson. Beneficial use or occupancy is not acceptance of the Work.

8.     **PROSECUTION OF WORK.**

8.1     Subcontractor shall perform the Work in a diligent, efficient and skillful manner, and in conformance with the Contract Documents using personnel competent to perform the Work, as the Work or any portion thereof becomes available, to allow Mortenson to promote the general progress of the entire construction and so that the Work shall not interfere with, hinder or delay other work.

8.2     Should Subcontractor delay the progress of the Work or of the Project, Subcontractor shall take necessary action as required to meet and maintain job progress, without additional compensation, and shall be liable to and reimburse Mortenson for damages resulting from such delay.

8.3     Subcontractor shall promptly secure delivery commitments, place orders for materials, equipment and services required in connection with the Work to avoid delays, and shall furnish copies of procurement documents and purchase orders upon request. Subcontractor shall furnish goods, materials, equipment and services in compliance with all applicable safety, certification and testing codes and laws. Subcontractor shall ship all goods, materials and equipment to the Project site, and all transportation, freight or delivery charges shall be prepaid by Subcontractor. Subcontractor shall be solely responsible for receiving and unloading shipments.

8.4     Mortenson shall have sole authority with respect to access and usage of the Project site. Subcontractor shall notify Mortenson prior to each delivery of goods, materials and equipment, and Mortenson, in its sole discretion, shall determine times and location for all such deliveries. Subcontractor shall establish temporary offices, storage facilities or other temporary facilities at the Project site only upon approval by and in locations designated by Mortenson. Subcontractor shall not post or display signs, banners or other announcements or advertising at the Project site without the express prior written approval of Mortenson.

8.5     Subcontractor shall clean up and remove from the site all debris caused by its operations no less than once each workday. Should Subcontractor fail to provide such cleanup and debris removal, Mortenson, upon Notice to Subcontractor, may arrange to have such work performed for the account of Subcontractor.

8.6     Subcontractor shall be solely responsible for protection of the Work and for loss or damage to materials, tools, equipment, or other personal property, owned or rented or used by Subcontractor in performance of the Work.

8.7     When as-built drawings are required by the Contract Documents, Subcontractor shall record as-built conditions on the Drawings and Detail Drawings in a form acceptable to Mortenson, on a weekly basis, during performance of the Work.

8.8     Mortenson will establish a limited number of initial control points, grid lines, benchmarks or other datum points for the use and reference of Subcontractor. Subcontractor shall be responsible for all subsequent layout, surveying and dimensional control required to perform the Work, and shall preserve or restore any initial layout disturbed or removed by Subcontractor. Notwithstanding dimensions given in the Drawings, Specifications and other Contract Documents, Subcontractor shall take all measurements and establish all dimensional controls necessary to insure proper matching and fitting of the Work.

8.9     Subcontractor shall promptly prepare and submit to Mortenson such shop drawings, details, design calculations, product data, submittals, samples and mockups as required by the Contract Documents and as necessary to describe completely the details of the Work and to ensure timely fabrication, delivery and installation of the Work. Shop drawings, details, design calculations, product data and other submittals shall be provided in the form, format and quantity requested by Mortenson. Approval of such items by Mortenson shall mean only that the submission conforms to the general concept of the Project, and shall not relieve Subcontractor of its obligation to perform the Work in compliance with the Contract Documents.

8.10    Should performance of the Work hereunder depend upon performance of other work, Subcontractor shall carefully examine all contiguous or dependent work, determine whether it is suitable for performance of the Work hereunder, report immediately any unsuitable conditions to Mortenson in writing, and allow Mortenson reasonable time to have such unsuitable conditions remedied. Unless Subcontractor reports such unsuitable conditions, Subcontractor shall be deemed to have accepted contiguous or dependent work as adequate for completion of the Work.

8.11    Subcontractor is responsible for intermeshing of various parts of the Work so that no part shall be left unfinished or incomplete owing to any disagreement between Subcontractor and its subcontractors or other subcontractors. Subcontractor shall be solely responsible to furnish and install sleeves, block-outs, piping, conduit, hangers, inserts, anchors, grounds and supports in concrete, masonry, structural steel or other preceding work, to provide for installation of the Work. Subcontractor shall provide all cutting, drilling and patching required to complete the Work and shall repair all damage by Subcontractor to existing conditions or to the work of others, including without limitation restoration of all fire-rated construction and fire-resistant coatings.

8.12    No substitutions of similar supplies, materials or equipment for items called for by the Contract Documents shall be made unless approved in writing by Mortenson and Owner or Architect, which approval shall not relieve Subcontractor from satisfactory and timely completion of the Work, or from conformance of the Work to the Contract Documents.

8.13    Subcontractor shall appoint a superintendent, who shall be responsible for the Work and shall have full authority to represent Subcontractor at the site. Subcontractor shall appoint a project manager who shall have full authority to represent Subcontractor in all matters related to the Project and the Agreement. Subcontractor's project manager and superintendent shall attend all meetings held by Mortenson relating to the Work, including weekly coordination meetings, unless excused by Mortenson.

8.14    Subcontractor shall maintain accurate and timely records relating to performance of the Work and shall provide daily reports and other records to Mortenson as required by the Contract Documents and as provided herein. Not later than 24 hours after the end of each work shift at the Project site, Subcontractor shall deliver to Mortenson a daily report. The daily report shall fully describe and record Work performed, including a) number of workers in each craft or category, b) weather conditions, c) visitors at the site, d) Work performed, including quantities and locations where applicable, e) summary of events, circumstances or conditions that could delay the Work or give cause for additional cost or time, and f) other information required to fully describe Work accomplished or as requested by Mortenson. Submission of the daily report shall not relieve Subcontractor of, or act in substitution for, notice requirements contained in the Agreement or in the Contract Documents.

9.     **LABOR.** Subcontractor shall not employ personnel, means, materials or equipment which may cause strikes, work stoppages or labor interferences. Subcontractor agrees to be bound by any applicable Project Labor Agreement. Subcontractor agrees to comply with and assist Mortenson in its compliance with, and to comply with, any subcontracting clause requirements of collective

bargaining agreements to which Mortenson is signatory and which are applicable to the Project.

10. **TOOLS AND EQUIPMENT.** Subcontractor shall provide all tools and equipment necessary to perform the Work, including but not limited to scaffolds, ladders, hoisting and specialty items. Mortenson's tools and equipment shall be available to Subcontractor only at Mortenson's discretion and on terms satisfactory to Mortenson. Subcontractor agrees to assume sole responsibility for all claims for loss or damage to all property, including its property, and Mortenson's property, arising out of Subcontractor's use of Mortenson's equipment, including without limitation hoisting of material. Subcontractor agrees that operators of Mortenson's equipment during the period of Subcontractor's use, either singly or with others, shall be deemed loaned servants of Subcontractor even though actually employed by Mortenson or others.

11. **SAFETY.**

11.1 Subcontractor shall perform the Work in a safe manner, shall comply with all safety measures initiated by Mortenson or required by the Contract Documents, and shall comply with all applicable laws, codes, ordinances, rules, regulations and orders of any public authority for the safety of persons or property, including such provisions as are more strict or more expensive than the safety measures initiated by Mortenson or required by the Contract Documents. Subcontractor shall be solely responsible for protection and safety of its employees, including employees of its subcontractors and suppliers of every tier, for final selection of safety methods and means, for required safety reports and records, for daily inspection of the Work area and its employees' safety equipment, and for instruction of its employees on health and safety, including weekly safety meetings. Subcontractor agrees to establish a goal of zero accidents and injuries for the Project, and to implement, maintain and enforce a safety program consistent with such goal. Subcontractor agrees to comply with the Mortenson Zero Injury Safety Training Manual and, if requested in writing, to prepare a written site-specific safety plan for the Project prior to commencing the Work. Subcontractor shall comply with all safety program requirements, as enumerated in Exhibit E - Safety Program Requirements.

11.2 Subcontractor shall reimburse Mortenson for all costs, including reasonable attorney fees, incurred by Mortenson arising out of or connected with a failure or alleged failure of Subcontractor to comply with this Article, including costs of investigation and fines and penalties imposed upon Mortenson for alleged safety violations by, or unsafe Work of, Subcontractor, regardless of whether Mortenson has or has not assisted or advised Subcontractor in fulfilling such responsibilities.

11.3 Subcontractor shall stop any part of the Work which either Mortenson or Subcontractor determines to be unsafe until corrective measures have been taken. Failure on the part of Mortenson to stop any part of the Work shall in no way relieve Subcontractor of its responsibility hereunder.

12. **CHANGES.**

12.1 Mortenson shall have the right by written directive to order changes, including additions and deletions to the Work and other revisions to the scope of the Work or the required time for completion of the Work, without notice to Subcontractor's surety, if any. Subcontractor shall promptly comply with all such written directives and shall diligently perform the changed Work in accordance with the Contract Documents. Should Subcontractor claim that the changes are of such a nature as to increase or decrease the cost of any part of the Work, then, unless such written directive includes an agreed upon adjustment in the Subcontract Price and/or time for completion of the Work, Subcontractor shall submit to Mortenson, in writing, within five (5) calendar days of receipt of the written directive, or within such shorter period as may be required for Mortenson to comply with the Contract Documents, all claims, if any, for adjustment of the Subcontract Price or of the time for the completion of the Work. Subcontractor shall not be entitled to a change in the Subcontract Price or in the time for completion of the Work unless so authorized by written change order by Mortenson and unless such notice of claims is provided by Subcontractor.

12.2 Should Mortenson issue a request for a proposal for a proposed change in the Work or in the time for completion of the Work, Subcontractor shall deliver to Mortenson a detailed and itemized proposal within twenty (20) calendar days of receipt of such request, or within such shorter period as may be required for Mortenson to comply with the Contract Documents, and prior to commencement of such change in the Work. The proposal shall contain quantities, rates, prices and other information as required or as requested by Mortenson, to fully describe the scope and price of the proposed change and scheduling detail and data to substantiate entitlement to any requested extension of time for completion of the Work. Subcontractor shall cooperate with Mortenson, and Owner and Architect at Mortenson's election, to review, modify the proposal if necessary, and negotiate in good faith to reach an agreement upon the terms of any change order. Subcontractor shall not be entitled to compensation for any costs and expenses relating to preparation of proposals for changes in the Work. Should the parties be unable to agree as to the value of the Work to be changed, Subcontractor shall promptly proceed with the changed Work upon written order of Mortenson and the value of the changed Work shall be determined and paid at actual field costs or other applicable method as determined by Mortenson.

12.3 Should Subcontractor claim that the issuance of any instruction, drawing or direction by Mortenson, Owner or Architect results in additional costs, Subcontractor shall immediately submit written notice of such claim to Mortenson and not later than five (5) calendar days after receipt thereof, or within such shorter period as may be required for Mortenson to comply with the Contract Documents, and in all events prior to commencing such Work. Subcontractor shall not be entitled to a change in the Subcontract Price resulting from such instructions, drawings or directions unless such written notice is provided by Subcontractor.

12.4 The total cost of any changes to the Work shall be determined by one or more of the following methods or combinations thereof as Mortenson may elect: (1) acceptance of a lump sum proposal with properly itemized costs; (2) unit prices stated in the Contract Documents, or in the Agreement, or subsequently agreed upon (unit prices shall be deemed to include an allowance for all of Subcontractor's direct and indirect costs, including, without limitation, office or shop expense, overhead, profit and bonds); or (3) actual field costs incurred in performance of the changed, added or deleted Work, plus allowance for overhead, supervision and profit, as provided in subparagraphs 12.4.1 and 12.4.2. No other costs arising out of or connected with the change to the Work or extra Work of any nature may be recovered by Subcontractor.

12.4.1 Actual field costs shall mean costs necessarily incurred in the proper performance of the changes to the Work or of

the extra Work, and paid by Subcontractor at rates not higher than the standard paid in the locality of the Project, except with the prior written consent of Mortenson for:

(a)     Wages paid for labor in the direct employ of Subcontractor or any of its subcontractors, plus a payroll mark-up on field labor and fabrication shop labor in amounts provided for in the Agreement, to cover all overhead items applicable to payroll, such as insurance, taxes, F.I.C.A., workers' compensation, unemployment taxes, and fringe benefits.

(b)     Net cost of all materials, supplies and equipment used in or incorporated in the changed or extra Work.

(c)     Third party rental charges for necessary machinery and equipment, exclusive of hand tools, for the period of time used in performing the changed or extra Work, including installation, minor repairs and replacements, dismantling, removal, transportation and delivery costs thereof at rental charges consistent with those prevailing in the locality of the Project. Total third party rental charges on machinery or equipment rented under an agreement containing a purchase option clause shall not exceed 75% of the option purchase price. Rental rates for machinery and equipment owned by Subcontractor shall be not more than 75% of published rental rates for like equipment in the locality of the Project, and the aggregate amount of rent for any single item of machinery or equipment shall not exceed 75% of the current fair market value.

(d)     The actual net increase in the cost to Subcontractor for performance and payment bonds resulting from the changed or extra Work.

12.4.2     The maximum percentage allowance added to itemized costs under a lump sum proposal or to actual field costs shall be 10% for changed or extra Work performed by Subcontractor's own forces and 5% for changed or extra Work performed by its subcontractors. Such allowance will be paid as full compensation to Subcontractor for profit, general superintendence, hand tools, capital and interest expense, insurance expense, field office expense, overhead, and all other elements of cost not defined herein as actual field costs. Notwithstanding the foregoing, the maximum aggregate allowance payable to Subcontractor and its subcontractors shall not exceed the lesser of (a) 15% or (b) the mark-up permitted in the Contract Documents for changed or extra Work less Mortenson's mark-up on such Work.

12.4.3     Mortenson shall have the right to inspect, copy and audit the books and records of Subcontractor and any of its subcontractors making claim for reimbursement for actual field costs and payment pursuant to allowances in order to verify the accuracy and allowability of all costs and allowances claimed. Subcontractor shall retain such books and records for a period not less than three years after final payment, or for such longer period as may be required by the Contract Documents.

12.5     Subcontractor shall not be entitled to a change in the Subcontract Price or the time for completion of the Work unless authorized in writing by Mortenson. Subcontractor shall have no right to maintain an action in court or, in the event arbitration is invoked by Mortenson, in arbitration to recover for changed or extra Work, unless Subcontractor has strictly complied with the requirements set forth herein.

12.6     All changes to the Work or extra Work ordered in writing by Mortenson shall be deemed to be a part of the Work hereunder and shall be performed in compliance with all provisions of the Contract Documents.

13.     **INSPECTION.**

13.1     Mortenson, Architect, Owner and their authorized representatives shall have the right to inspect and test the Work and the components thereof at all times and places to verify compliance with the Contract Documents and standards of good workmanship.

13.2     Subcontractor shall provide safe facilities for inspection of the Work by Mortenson, Architect, Owner and their authorized representatives in the field, at shops, or at any other place where materials or equipment for the Work are in preparation, testing, manufacture, treatment or storage.

13.3     All inspections and tests are for the benefit of Mortenson and Owner and shall not relieve Subcontractor of responsibility for providing its own quality control measures to assure that the Work complies with the Contract Documents. Inspection or testing by Mortenson, Architect or Owner, or any of their authorized representatives, shall not be construed as constituting acceptance and shall not relieve Subcontractor of responsibility for any non-compliance, damage to or loss of the Work, or in any way affect the continuing rights of Mortenson or Owner regarding the completed Work.

13.4     Within twenty-four (24) hours after receiving Notice from Mortenson that any portion of the Work has been rejected by Mortenson as defective or in any way failing to conform to the Contract Documents, Subcontractor, at its own expense and without an extension of time to complete the Work, shall proceed to remove all such portions of the Work from the Project or, at Mortenson's discretion, submit a schedule acceptable to Mortenson for removal of all such portions of the Work from the Project, and, in either instance, shall diligently proceed to replace the same with conforming Work and make good all work of others damaged or destroyed by or as a result of such defective, or non-conforming Work or by removal or replacement thereof.

14.     **TAKING OVER PERFORMANCE-TERMINATION FOR DEFAULT.**

14.1     An "Event of Default" shall mean any of the following: (a) failure to maintain the insurance coverages specified in Article 16 hereof; (b) failure to provide the Bonds required in Article 18 hereof; (c) failure to supply sufficient skilled workers, equipment or materials of proper quality and quantity; (d) failure to make timely payments including, without limitation, all payments required in Article 7.7; (e) failure to proceed with the Work within the time or in the sequence directed by Mortenson; (f) failure to prosecute the

Work with promptness and diligence; (g) causing stoppage, delay or interference to work of Mortenson or any other contractor or subcontractor; (h) failure to perform the Work in compliance with the Contract Documents; (i) failure to comply with any warranty applicable to the Work; (j) the filing by or against Subcontractor a petition in bankruptcy or for an arrangement or reorganization (Mortenson being unwilling to accept and hereby declines performance by any trustee in bankruptcy); (k) if Subcontractor becomes insolvent, goes into liquidation or dissolution, makes a general assignment for the benefit of creditors, consents to or appoints a receiver, custodian, trustee or liquidator or otherwise acknowledges insolvency; (l) if Subcontractor is dissolved, liquidated, wound up or fails to maintain existence as a going concern in good standing; or (m) any other material breach of the Agreement.  An Event of Default is a material breach of the Agreement.

14.2     Upon an Event of Default, Mortenson shall have the right, to the extent permitted by law, and in addition to any other rights and remedies provided by the Contract Documents or by law, after seventy-two (72) hours Notice to Subcontractor (except in the instance of Subsection 14.1(j), (k) or (l) in which case no such 72-hour Notice is required) to (i) perform (through itself or through others) any or all of the uncompleted part of the Work, or (ii) terminate the Agreement in whole or in part, for all or any portion of the Work, and in either case to enter the Subcontractor's premises, including any trailers, storage units or facilities owned or leased by Subcontractor and take possession of materials, equipment, scaffolds, tools, and other items necessary for the purpose of completing the Work, all of which Subcontractor hereby transfers, assigns and sets over to Mortenson; to employ persons as necessary to complete the Work; and to provide all labor, services, materials, equipment and other items required to complete the Work; and to deduct all resulting costs from any monies due or to become due to Subcontractor under the Agreement or, in the event such cost exceeds such moneys, recover the excess cost from Subcontractor.

14.3     In the case of such performance by Mortenson, whether by itself or through others, or in the event of such termination, Subcontractor shall not be entitled to receive any further payment under the Agreement until the Work shall be wholly completed to the satisfaction of Mortenson, at which time, if the unpaid balance of the Subcontract Price shall exceed the costs incurred by Mortenson in performing or completing the Work, such excess shall be paid by Mortenson to Subcontractor, but if such costs shall exceed such unpaid balance, then Subcontractor shall pay the difference to Mortenson, or any third party to whom Mortenson assigns its right of recovery.  Notwithstanding anything to the contrary contained herein, neither Mortenson nor its insurers waive any claims or rights of subrogation against Subcontractor relative to an Event of Default.  Such costs shall include the cost of performing, correcting and completing the Work in conformance with the Contract Documents and of furnishing all labor, services, materials, equipment, and other items required therefore, and shall also include all losses, damages, costs and expense, including attorneys' fees, legal expenses, and other disbursements, incurred by reason of or resulting from Subcontractor's default.

15.     **CONVENIENCE TERMINATION OR SUSPENSION**.

15.1     Mortenson may terminate the Agreement, in whole or in part, at any time by Notice to Subcontractor, whether or not Subcontractor is in default, in the event and to the extent that Owner has exercised its right, if any, to a convenience termination of the Contract.  Such termination shall be effective at the time and in the manner specified in said Notice and shall be without prejudice to any claims which Mortenson or Owner may have against Subcontractor.  Upon receipt of any such Notice, Subcontractor shall, unless the Notice directs otherwise:  (a) immediately discontinue the Work on the date and to the extent specified in the Notice; (b) place no further orders for materials, equipment or services, except as may be necessary for completion of such portion of the Work that is not terminated; (c) promptly make every reasonable effort to procure cancellations, upon terms satisfactory to Mortenson, of all material orders and subcontracts to the extent they relate to the performance of the Work terminated; and (d) thereafter execute only such portion of the Work that is not terminated, or in the event that all of the Work is terminated, execute only that portion of the Work as may be necessary to preserve and protect the Work already in progress and to protect materials and equipment at the Project site or in transit thereto.

15.2     Subcontractor waives any claims for damages, including loss of anticipated profits for uncompleted Work, on account of termination by Mortenson pursuant to Paragraph 15.1 and shall accept as its sole remedy payment of the amount recovered by Mortenson from Owner allocated as compensation for termination of the Work.

15.3     Mortenson may suspend the Agreement in whole or in part, at any time by Notice to Subcontractor whether or not Subcontractor is in default, in the event and to the extent that Owner has exercised its right, if any, to suspend the work required by the Contract.  Such suspension shall be effective at the time and in the manner specified in said Notice and shall be without prejudice to any claims which Mortenson or Owner may have against Subcontractor.  Upon receipt of any such Notice, Subcontractor shall, unless the Notice directs otherwise: (a) immediately suspend the Work on the date and to the extent specified in the Notice; (b) place no further orders for materials, equipment or services, except as may be necessary for completion of such portion of the Work as is not suspended; and (c) thereafter execute only such portion of the Work that is not suspended, or in the event that all of the Work is suspended, execute only that portion of the Work as may be necessary to preserve and protect the Work already in progress and to protect materials and equipment at the Project site or in transit thereto.

15.4     Subcontractor waives any claims for damages on account of suspension by Mortenson pursuant to Paragraph 15.3 and shall accept as its sole remedy payment of the amount recovered by Mortenson from Owner allocated as compensation for suspension of the Work.

16.     **INSURANCE**.

16.1     Prior to starting the Work, Subcontractor shall procure, maintain and pay for such insurance as will protect against claims for bodily injury or death, or for damage to property, including loss of use, which may arise out of operations by Subcontractor or by any of its subcontractors or by anyone employed by any of them, or by anyone for whose acts any of them may be liable.  Such insurance shall not be less than the greater of coverages and limits of liability specified in the Agreement, any coverages or limits of liability specified in the Contract Documents, or coverages and limits required by law.

16.2     Subcontractor shall procure and maintain the following minimum insurance coverages and limits of liability:

| | |
|---|---|
| Workers' Compensation | Statutory Limits |
| Employer's Liability | $1,000,000 each accident<br>$1,000,000 disease policy limit<br>$1,000,000 disease each employee |
| Commercial General Liability | $5,000,000 each occurrence<br>$5,000,000 general aggregate applicable<br>on a per project basis<br>$5,000,000 products/completed operations aggregate<br>or such other limits specified in the Agreement |
| Automobile Liability | $2,000,000 each accident |
| Professional Liability/Errors and<br>Omissions (if required by Paragraph<br>16.2.d or required per the Agreement) | $2,000,000 each claim<br>$2,000,000 annual aggregate |
| Pollution Liability (if required by<br>Paragraph 16.2.e or required per<br>the Agreement) | $2,000,000 each claim<br>$2,000,000 annual aggregate |
| Aircraft Liability (if required by<br>Paragraph 16.2.f or required per<br>the Agreement) | $5,000,000 per seat<br>$10,000,000 per occurrence |

a.   <u>Workers' Compensation and Employer's Liability</u> - For any employee, owner or principal of the Subcontractor who shall be at the Project site or at a specific off-site Project related location, workers' compensation coverage shall be provided whether or not required by statute.  If the Project is located and/or Subcontractor's principal place of business is in the state of Illinois, coverage must be adequate such that the Subcontractor and its insurer agree to waive any protection afforded under statute, law, ordinance or common law rights that cap the employer's liability to the amount of workers' compensation benefits it has paid or will pay on behalf of its employee.

b.   <u>Commercial General Liability</u> - Insurance required under this Paragraph shall provide coverage on an occurrence form no less broad than the ISO Form CG 00 01 2004 or 2007 edition and shall include coverage for Products/Completed Operations, all renewed and maintained for four (4) years after final acceptance of the Project by Owner or such longer period as the Contract Documents may require of Mortenson.  The general aggregate limit shall be per project.

c.   <u>Automobile Liability</u> - Insurance required under this Paragraph shall include coverage for all owned, hired and non-owned automobiles.

d.   <u>Professional Liability/Errors & Omissions</u> - If designated in the Agreement or if the Work includes architecture, design or engineering services, including that required to meet a performance specification, or other professional services including but not limited to surveying, Subcontractor shall procure, maintain, and pay for Professional Liability/Errors and Omissions insurance with limits of not less than $2,000,000 each claim and $2,000,000 annual aggregate including coverage for economic loss.  Subcontractor agrees to renew and maintain such coverage for four years after final acceptance of the Project by Owner or such longer period as the Contract Documents may require of Mortenson.

e.   <u>Pollution Liability</u> - If designated in the Agreement or if the Work includes any portion of i) building enclosure systems involving the watertight integrity of the building (including, without limitation, vapor or moisture barriers, roofing or flashing, exterior windows, curtainwall components or systems, plaster or stucco or exterior stone, masonry, waterproofing, or caulking), ii) plumbing, heating, fire suppression, ventilating or air conditioning systems, iii) drywall or insulation, or iv) building foundations, Subcontractor shall procure, maintain and pay for Pollution Liability insurance including contractual liability coverage.  Such insurance shall have limits of not less than $2,000,000 each claim and $2,000,000 annual aggregate, and shall include coverage for Completed Operations extending or renewed for four (4) years after final acceptance of the Project by Owner or such longer period as the Contract Documents may require of Mortenson.  The policy shall include coverage for bodily injury, property damage and clean-up costs.  The definition of Pollutant and/or Pollution Condition shall include any form of fungus, including mold.

f.   <u>Aircraft Liability</u> - If the Work involves the operation, maintenance or use of any aircraft, Subcontractor shall procure and maintain or cause to be procured and maintained Aircraft Liability insurance for loss or damage arising out of or related to the use of any aircraft used in the performance of the Work.  Such insurance shall have passenger liability limits of $5,000,000 per seat and provide coverage in a combined single limit of not less than $10,000,000 per occurrence, including bodily injury, property damage and passenger liability.  Such Aircraft Liability coverage shall be endorsed to include Mortenson and Owner and all others required by the Agreement to be additional insureds.

g.   For Work in those states where Workers' Compensation insurance is provided through a state fund and Employer's Liability coverage is not available, "stop gap" coverage shall be provided through either the Commercial General Liability policy or another state's Workers' Compensation policy.

16.3     To the extent allowed by law, all policies referenced in Article 16.2 shall include a waiver of subrogation in favor of Mortenson and Owner and others as required by the Contract Documents.

16.4     If the Professional or Pollution Liability insurance policies are required and written on a claims made basis, any retroactive date shall be prior to the start of Work and maintained on any subsequent renewals.

16.5     Employer's Liability, Commercial General Liability and Automobile Liability insurance may be arranged under single policies for full minimum limits required, or by a combination of underlying policies with the balance provided by an Excess or Umbrella Liability policy that is as materially broad as the underlying policy.

16.6     To the greatest extent allowed by law, Subcontractor shall endorse its Commercial General Liability (including Products/Completed Operations coverage and utilizing ISO endorsements CG 20 10 07 04 and CG 20 37 07 04 or equivalent) , Automobile Liability, Umbrella/Excess Liability, Contractors Pollution Liability and Aircraft Liability policies (if required herein)), to add Mortenson, Owner and such other parties as Mortenson is required under the Contract Documents to name as additional insureds on Mortenson's insurance, as "additional insureds", with respect to but not limited to liability arising out of (a) operations performed for Mortenson or Owner by or for Subcontractor, (b) Subcontractor's completed Work, (c) acts or omissions of Mortenson or Owner in connection with their general supervision of operations by or for Subcontractor, (d) Subcontractor's use of Mortenson's tools and equipment, and (e) claims for bodily injury or death brought against any of the additional insureds by Subcontractor's employees, or the employees of its subcontractors of any tier related to the performance of operations under the Contract Documents.  Such insurance afforded to Mortenson, Owner and others as additional insureds under Subcontractor's policies shall be primary insurance and not excess over, or contributing with, any insurance purchased or maintained by Mortenson or Owner or others required to be included as additional insureds.

16.7     Subcontractor shall maintain insurance with carriers authorized to do business in the state in which the Project is located and having a current A.M. Best rating of not less than A minus (A-), unless a different A.M. Best rating is accepted by Mortenson in writing.  In the event Subcontractor fails to procure or maintain any insurance required by this Article, Mortenson may, at its option, purchase such coverage and deduct the cost thereof from any monies due to Subcontractor, withhold funds from Subcontractor in an amount sufficient to protect Mortenson and other insured parties, or terminate the Agreement pursuant to its terms.

16.8     Certificates of Insurance including copies of the general liability additional insured endorsements shall be filed with Mortenson prior to commencing any Work hereunder.  Renewal certificates and endorsements shall be provided to Mortenson not less than ten (10) days prior to the expiration date of any of the required policies.  Mortenson shall not be obligated to review certificates or other evidence of insurance, or to advise Subcontractor of any deficiencies in such documents, and receipt thereof shall not relieve Subcontractor from, nor be deemed a waiver of Mortenson's right to enforce, the terms of Subcontractor's obligations hereunder. All insurance policies shall contain a provision that coverages and limits afforded thereunder shall not be canceled, or non-renewed, without thirty (30) days prior written notice to Mortenson or ten (10) days' notice for non-payment.  Subcontractor shall provide Mortenson written notice of material change to the required insurance thirty (30) days in advance of such change.  Mortenson shall have the right to examine any policy required under the Agreement.

16.9     To the extent of coverage afforded by any Builder's Risk, auto physical damage, any other property or equipment floater insurance applicable to the Work, vehicles, Project or equipment used in performance of the Work or the Project, regardless of whether such insurance is owned by or for the benefit of Subcontractor, Mortenson, Owner, or their respective agents and subcontractors, Mortenson and Subcontractor waive all rights against each other and Owner, and subcontractors, agents and employees each of the other, for loss or damage to the extent that the interests of Mortenson and Subcontractor are covered by such insurance, except such rights as they may have to the proceeds of such insurance. If policies of insurance provided by Mortenson or Subcontractor that are referred to in this Article require an endorsement to provide a waiver of subrogation, the owners of such policies will cause them to be so endorsed.

16.10     Mortenson and Owner neither represent nor assume responsibility for the adequacy of the Builder's Risk insurance to protect the interests of Subcontractor.  It shall be the obligation of Subcontractor to purchase and maintain any supplementary property insurance that it deems necessary to protect its interest in the Work.

16.11     Any deductible amount applied to any loss payable under the Builder's Risk insurance or any other project specific policy purchased by Mortenson or Owner and not reimbursable by Owner, shall be borne by the party or parties that are responsible for the resultant damage, as solely determined by Mortenson.  To the extent that no subcontractor or sub-subcontractor of a subcontractor is found responsible for such loss, the deductible amount shall be borne by Subcontractor, if the Subcontractor's Work is damaged, in direct proportion that its individual loss bears to the total loss.

17.     **INDEMNITY.**

See Indemnity Clause attached to the Agreement, which is incorporated herein.  In addition to the terms of the Indemnity Clause, Subcontractor binds itself to defend, indemnify, and hold harmless Mortenson in the same manner and to the same extent that Mortenson is bound to defend, indemnify, and hold harmless the Owner or any other party under the Contract Documents, and Subcontractor binds itself to defend, indemnify, and hold harmless the Owner and any other parties that Mortenson is obligated to defend, indemnify, or hold harmless under the Contract Documents in the same manner and to the same extent that Mortenson is obligated to defend, indemnify, and hold harmless the Owner or such other parties under the Contract Documents. Each obligation of Subcontractor to defend, indemnify, and hold harmless Mortenson or any other party is a separate and independent obligation, none of which shall in any way limit the scope or applicability of any other.

18.     **BONDS.**

18.1     If required in the Agreement, Subcontractor shall obtain and furnish to Mortenson performance and payment bonds (the "Bonds") covering the faithful performance of the Agreement and payment of all obligations arising thereunder.  The Bonds shall be

written on Mortenson's Subcontractor Performance Bond and Subcontractor Labor and Material Payment Bond forms, each in the full amount of the Subcontract Price. The penal sum of each of the Bonds, at all times, shall be equal to the Subcontract Price. For changes to the Subcontract Price that, in the aggregate, exceed twenty percent (20%) of the original Subcontract Price, Subcontractor shall obtain written consent of its surety for such changes on forms acceptable to Mortenson. The premium for such Bonds, including any additional premiums resulting from increases in the Subcontract Price, shall be included in the Subcontract Price and shall be paid by Subcontractor.

18.2     Subcontractor shall furnish all performance and payment Bonds required by the Agreement within ten (10) days of receipt of the Agreement, but in all events prior to commencement of the Work. Failure to furnish the required Bonds within the specified time is an Event of Default.

18.3     The surety or sureties executing the Bonds shall be authorized to conduct surety business in the state in which the Project is located and shall be listed in the current United States Department of the Treasury Circular No. 570, with an underwriting limitation equal to or greater than the penal sum of the Bonds to be furnished. The surety, or sureties, must have a current A.M. Best rating of A minus (A-) or higher. If the A.M. Best rating of the surety, or sureties, which execute(s) the Bonds subsequently falls below A minus (A-), then Subcontractor shall, within ten (10) days of such change in the published rating or upon receipt of Notice from Mortenson, and at Subcontractor's sole expense, obtain and furnish to Mortenson replacement Bonds executed by a surety, or sureties, in full compliance with the Agreement. The failure of Subcontractor to provide acceptable replacement Bonds within the referenced timeframe shall be a material breach and default of the Agreement.

19.     **INTELLECTUAL PROPERTY.** Subcontractor shall pay all royalties and license fees and shall defend, indemnify and hold harmless Mortenson and Owner, and their representatives, from all suits or claims and expenses, including attorneys' fees, arising from any claim that any concept, product, design, equipment, material, process, copyrighted material or confidential information furnished by Subcontractor constitutes an infringement of any patent rights or copyrighted material or is a theft of trade secrets or intellectual property, except to the extent such is expressly required by the Contract Documents.

20.     **WARRANTY.** Subcontractor warrants and guarantees that it shall perform all of the Work in a skillful manner, and shall furnish new materials and equipment of good quality, fit for the purpose intended and free from defects and in compliance with all requirements of the Contract Documents; that without cost to Mortenson or Owner it shall promptly correct improper or defective Work, materials or equipment and other work affected by such correction which may be discovered within one year from the date of final acceptance of the Project by Owner. Notwithstanding the foregoing, Subcontractor shall provide any broader guarantee or longer warranty period required by the Contract Documents. Required equipment and system warranty documents and as-built drawings shall be delivered to Mortenson within thirty (30) days of completion of the Work, or such earlier time as required by the Contract Documents. Nothing contained in this Article shall be construed to establish a period of limitation with respect to other obligations which Subcontractor has under the Contract Documents. Establishment of the one year time period herein (and any other period elsewhere in the Contract Documents) relates only to Subcontractor's specific obligations to correct the Work and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced.

21.     **DISPUTES.**

21.1     If arbitration of disputes is provided for in the Contract, and if Mortenson, in its sole discretion, elects to demand arbitration with Subcontractor as part of joint proceedings with Owner or others in accordance with the Contract, then any dispute between Mortenson and Subcontractor arising out of or relating to the Agreement or regarding any terms contained in the Agreement including, but not limited to, the arbitration provision, or the enforceability of the Agreement, shall be decided by arbitration in the manner provided for in the Contract. If Mortenson elects to so demand arbitration with Subcontractor, arbitration proceedings shall be held, at Mortenson's election, in Minneapolis, Minnesota, such place for arbitration as required by the Contract or as Mortenson may designate.

21.2     If the Contract does not provide for arbitration or if Mortenson elects to demand arbitration with Subcontractor individually, or as part of joint proceedings with others, then, at Mortenson's sole discretion, any dispute between Mortenson and Subcontractor arising out of or relating to the Agreement or any terms contained in the Agreement, including, but not limited to, the arbitration provision, or the enforceability of the Agreement, shall be decided by arbitration in accordance with the then current Construction Industry Arbitration Rules of the American Arbitration Association. Arbitration proceedings shall be held in Minneapolis, Minnesota, or such other place as Mortenson may designate, in its sole discretion.

21.3     Mortenson may enforce its rights to arbitration under Article 21 pursuant to the Federal Arbitration Act and shall be entitled to recover its costs and attorneys' fees incurred in enforcing its right to arbitrate or any other of its rights in Article 21.

21.4     If Mortenson demands arbitration against Subcontractor, Subcontractor agrees not to institute or assert (and to stay) any lawsuits against Mortenson arising out of or relating to the Project or the Agreement.

21.5     Mortenson shall not be required to arbitrate any dispute with Subcontractor unless and until Mortenson has consented and elected in writing to the arbitration of such dispute. The award rendered by the arbitrator(s) pursuant to Article 21 shall be final, and judgment may be entered upon it in accordance with the Federal Arbitration Act in any court having jurisdiction thereof.

21.6     If the Contract Documents provide administrative procedures for resolution of disputes (including, but not limited to, mediation or a meeting of executives), Subcontractor agrees to comply with such procedures and submit any claims or disputes to Mortenson in such manner and time as will permit Mortenson to comply with such administrative procedures. Subcontractor agrees not to institute or assert (and to stay) legal or other proceedings against Mortenson until such administrative procedures and remedies have been exhausted, and agrees to fully reimburse Mortenson for costs and expenses, including reasonable attorney's fees, incurred by Mortenson in the enforcement of this Paragraph.

21.7     Any claim by Subcontractor involving, in whole or in part, acts, errors or omissions of Owner or Architect, or other agents or representatives of Owner, as determined by Mortenson in its sole discretion, shall be subject to and governed by this

Paragraph. Such claim shall be submitted in writing to Mortenson in such time and manner as will permit Mortenson to comply with the Contract. Such claim shall contain a written entitlement narrative and an itemization of pricing for review and approval by Mortenson. If Mortenson, in its sole discretion, determines that the claim as submitted is inadequate or requires revision, Subcontractor shall revise and resubmit such claim. If Mortenson, in its sole discretion, decides not to proceed with such claim, Subcontractor, to the extent it determines to pursue such claim, shall be obligated to pursue such claim directly against Owner or others, and Subcontractor agrees not to institute or assert (and to stay) legal or other remedies against Mortenson until all legal proceedings against Owner or others with respect to such claim are final and complete. If Mortenson, in its sole discretion, decides to proceed with such claim, Subcontractor agrees not to institute or assert (and to stay) legal or other remedies against Mortenson until all legal proceedings against Owner with respect to such claim are final and complete. Subcontractor's right of recovery, arising from acts, errors or omissions of Owner or Architect, or other agents or representatives of Owner, shall be limited solely to that dollar amount and other relief, which is recovered from Owner and Mortenson shall not be liable to Subcontractor for any monies or other relief except those paid to Mortenson by Owner for the benefit of Subcontractor. Subcontractor hereby agrees to waive any right to further payment beyond the Subcontract Price arising out of the acts, errors, or omissions of Owner or Architect, or other agents or representatives of Owner, other than to the extent that Mortenson may receive funds from Owner on behalf of Subcontractor, which funds shall be paid by Mortenson to Subcontractor less costs and expenses incurred by Mortenson in prosecuting such claim.

21.8    Pending final resolution of any dispute or claim, and at all times, Subcontractor shall proceed diligently with performance of the Work.

22.    **ASSIGNMENT AND SUBLETTING.**

22.1    Neither the Agreement nor any monies due or to become due hereunder shall be assigned by Subcontractor without prior written consent of Mortenson. Any assignment without prior written consent of Mortenson shall be of no effect and shall vest no right in the assignee against Mortenson. Mortenson's consent to any assignment shall not relieve Subcontractor of any of its obligations under the Agreement and the Contract Documents, and Subcontractor shall remain as fully responsible for the defaults, acts and omissions of its assignee and all persons directly or indirectly employed by its assignee as it is for its own defaults, acts and omissions and those of its own officers, agents, and employees.

22.2    Subcontractor shall submit to Mortenson a listing of its subcontractors who will perform Work on the Project. Subcontractor shall bind each of its subcontractors to all of the provisions of the Agreement and the Contract Documents with respect to the Work. Mortenson's consent to any subcontracting shall not create any contractual relationship between Mortenson and any subcontractor of Subcontractor to whom the Work or any portion thereof is subcontracted and shall not relieve Subcontractor of its sole responsibility for the work of any such subcontractor.

23.    **EQUAL OPPORTUNITY; EMPLOYMENT AND SUBCONTRACTING.**

23.1    **Subcontractor shall abide by the requirements of 41 CFR 60-1.4(a). Subcontractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, age, national origin, sexual orientation, or gender identity, or any other reason prohibited by applicable law. Subcontractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin.**

23.2    **Mortenson and Subcontractor shall abide by the requirements of 41 CFR 60-300.5(a) and 41 CFR 60-741.5(a). These regulations prohibit discrimination against qualified protected veterans; and qualified individuals on the basis of disability. These regulations require affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans and qualified individuals with disabilities.**

23.3    Subcontractor shall comply with all applicable federal, state and local laws, ordinances, orders and regulations with respect to employment practices, including but not limited to requirements for: timekeeping and payment of wages (including overtime pay), meal and rest breaks, minimum and prevailing wages, restrictions on the employment of minors, classification of employees, and anti-harassment policies and training.

23.4    Subcontractor shall comply with any applicable subcontracting, targeted business (MBE, DBE, or WBE), or workforce requirements and goals specified in the Contract between Owner and Mortenson.

24.    **CONTINGENT ASSIGNMENT OF AGREEMENT.**  Subcontractor hereby consents to assignment of the Agreement by Mortenson to Owner (or Owner's Lender) provided that such assignment is effective only after Owner's termination of the Contract between Owner and Mortenson pursuant to the terms thereof. In such event, Subcontractor agrees to complete the Work for the benefit of Owner (or Owner's Lender), conditioned upon Owner's (or Owner's lender's) written agreement (1) to pay for all labor, material, and services furnished at Owner's request and (2) to pay for all labor, material, and services previously rendered to the extent such amounts are due and payable to Subcontractor under the terms of the Agreement.

25.    **MISCELLANEOUS.**

25.1    Mortenson's waiver of a breach of the provisions of the Agreement must be specifically set forth in writing signed by Mortenson and shall not extend to any other or future breaches. Mortenson's remedies herein are cumulative and in addition to other remedies in law or equity.

25.2    Subcontractor shall perform the Agreement as an independent contractor and is not, and shall not be deemed, an agent or employee of Mortenson.

25.3    If any term or provision of the Agreement is finally determined to be superseded, invalid, illegal or otherwise unenforceable, such determination shall not impair or otherwise affect the validity, legality or enforceability of the remaining terms or

provisions or parts of the provision of the Agreement, which shall remain in full force and effect as if the unenforceable term or provision or part were deleted.

     25.4     The term "Notice" in the Agreement shall mean a communication from Mortenson emailed to Subcontractor's email address in the Agreement, delivered personally by hand (with written confirmation of receipt) or sent to Subcontractor's last known address.

     IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge these Standard Terms and Conditions of the Agreement as set forth above.

<table>
<tr><td>__Don Borneke Construction, Inc__<br>Subcontractor</td><td>M. A. MORTENSON COMPANY</td></tr>
<tr><td>By    _Mark Sikel_</td><td>By _____</td></tr>
<tr><td>Printed Name _Mark Sikel_</td><td>Printed Name _____</td></tr>
<tr><td>Title   _Project Manager_</td><td>Title _____</td></tr>
</table>

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## Subcontract Supplementary Terms and Conditions

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of December 29, 2017

1. The Subcontract Standard Terms and Conditions are amended as follows:

   a. These Supplementary Terms and Conditions further define or clarify Standard Terms and Conditions previously listed.

   b. This agreement supersedes all other previous correspondence, but does not alter previously agreed to Supplementary Terms and Conditions.

   c. Work shall conform to all applicable local, state or national codes and guidelines, whichever is more stringent. Any and all costs associated with these requirements are included.

   d. As applies to the Work, Subcontractor shall provide specified warranties and guarantees to commence on the Project Substantial Completion date.

   e. As applies to the Work, Subcontractor shall review equipment and material delivery access.

   f. Within seven (7) days after award of Subcontract Agreement, Subcontractor shall submit each of the following:

      I. Contact person(s) assigned to the Project.

      II. A complete Submittal Register listing submittal identification number, type of submittal, description of item(s) and projected submittal date. The Submittal Register shall list each item for which the Subcontractor is responsible per the specifications, including shop drawings, descriptive data, test reports, samples, and warranties.

   g. No work shall be commenced until Insurance forms, Bonds (if applicable), etc. have been executed and approved.

   h. All Subcontractor warranties shall be assignable to the Owner upon Project Mechanical Completion.

   i. Supplier shall be responsible for repairs of public roads damaged as a result of his operations.

   j. Subcontractor acknowledges that they are required to assist in the design stages and ensure design documents support fixed lump sum price per Exhibit B without cost increase. No increases to the contract price will be allowed that arise due to the failure of the Subcontractor to identify and communicate cost impacts resulting from design changes. Subcontractor shall use all reasonable means to keep the civil

1

engineering consistent with their original pricing proposal and identify any changes not consistent with the original proposal within three days of receiving each set of design documents.  Failure to comply with this notification requirement shall result in Subcontractor performing work at no additional cost to the contract.

k.  Subcontractor shall be responsible for coordinating, to the mutual satisfaction of both the Subcontractor and Mortenson, all work included in this Agreement with the designated Mortenson Superintendent. Subcontractor, its sub-subcontractors and trades shall be required to fully cooperate with Mortenson Superintendent and other Contractors on the project.

l.  It shall be the responsibility of the Subcontractor, working with the trade representatives, to determine which of the trades is to perform any particular part of the work included in this agreement.  The inclusion of any scope of work item under any particular heading of this subcontract is not to be construed as assignment of jurisdictional boundaries. Subcontractor is required to perform a pre-job meeting with local trade unions and provide documentation.

m.  Subcontractor specifically agrees to pursue local participation (Lee County, IL)

n.  Subcontractor shall be responsible for those repairs and clean up of public roads damaged, arising from the sole negligence of the Subcontractor, during the performance of the work included in this agreement.

o.  Subcontractor's employees and any subcontracted employees or suppliers shall only use the allowable public roads for construction and deliveries as specified in the design documents.  All roads that are not approved for construction traffic shall not be used.  If roads are used the Counties and townships may impose a fee and a violation form.  Subcontractor shall be responsible for any fees associated with violating the road use agreement/ designated allowable construction traffic roads and correcting/ repairing any roads if damaged at Subcontractor's expense.

p.  Subcontract includes all utility locates as identified by Joint Utility Locating Information for Excavators (JULIE, Inc.), Public Record, the Owner, Mortenson and any other reasonable identification source, and associated costs as required for this scope of work.  Subcontractor acknowledges location of existing natural gas lines and overhead high voltage lines.  Subcontractor shall be responsible for ascertaining the location of and avoiding damage to all underground installations of utilities existing at the time of this subcontract, including without limitation, power, gas, water, sewer, telephone, data transmission, cable television and other underground installations.

q.  Mendota Hills Repowering, LLC as Third-Party Beneficiary; The parties hereto agree and acknowledge that the services/work/equipment to be provided hereunder by Subcontractor will be incorporated into the wind-powered electric generation facilities being developed by Owner.  As such, the parties expressly agree that Owner is a third-party beneficiary of this Agreement entitled, in its own name or in the name of Mortenson to enforce this Agreement against Subcontractor."

2.  Subcontractor agrees to comply with the following Project site work rules and working conditions:

a. Subcontractor shall not restrain access by adjoining property owners to any building or field.

b. Subcontractor is aware of the sensitivity of the adjoining property owners and shall maintain all of its activities to within the project limits. Subcontractor shall jointly review alleged property damage with Mortenson and the property owner.

c. Subcontractor shall repair any damage to land owner property or facilities caused by his/her work, excluding crop damage within established easements.

d. When traveling on the local road system, subcontractor shall always yield the right of way to area residents.

e. Subcontractor shall be responsible for any damage including crop damage caused by his/her work outside the established easements.

f. Mortenson onsite supervision is required to be present as long as Subcontractor is performing their work. Normal working hours shall be from 7:00 a.m. to 5:00 p.m., Monday through Friday unless otherwise directed by Mortenson. Subcontractor shall inform Mortenson within forty-eight (48) hours if Subcontractor will deviate from normal Project hours.

g. Overtime Operations – Subcontractor has included overtime costs as required to meet schedule requirement as required for the Milestone dates as identified in Exhibit C.

h. Subcontractor shall coordinate all deliveries with the Mortenson on site Superintendent.

i. Subcontractor shall provide representation at weekly/daily subcontractor coordination meetings.

j. Mortenson will oversee a Quality Management Program for this project under the direction of their Quality Manager. Subcontractor compliance with this program is mandatory. Copies of the Quality Management Program are available for review at the project site office. Subcontractor is responsible for their own quality management program, and Mortenson's program is supplemental to and not a replacement for Subcontractor's program unless blended and approved by Mortenson.

k. Subcontractor recognizes the goal of Zero Punchlists and will manage the work accordingly to achieve such goal.

l. Subcontractor specifically agrees to provide transportation for Subcontractor's employees, subcontractors, suppliers, vendors, and agents at work areas, and to abide by all established work hour, delivery, traffic control, site utilization, and traffic routing requirements for its work or the work of its employees, subcontractors, suppliers, vendors, and agents. Parking provisions for field and office personnel will be provided by Mortenson at the project office and laydown area. Employee personal vehicles will not be allowed at other project work areas.

m. Subcontractor acknowledges areas within or near the site where construction activity is not allowed.

n.  In the event that an employee of the Subcontractor incurs an injury while on the project, the employer will furnish Mortenson a copy of the "First Report of Injury Report" within twenty-four (24) hours after the occurrence.

o.  Subcontractor shall keep the Project Site, including storage areas used by this subcontract, free from accumulation of waste materials or rubbish arising out of the work, and prior to the completion of the work shall clean up, remove and properly dispose of any such waste materials or rubbish from and about the Project Site.

p.  Subcontractor shall not permit or allow the introduction of any firearm, illegal drugs, or intoxicating liquor upon the Project Site.

q.  Subcontractor recognizes smoking is prohibited on the Project except in designated areas. Designated areas would include onsite lay down area and inside closed cab vehicles/equipment.

r.  Subcontractor first day-first hour orientations will only be conducted in the morning following daily stretching on days designated by M. A. Mortenson Company.

s.  Subcontractor shall reduce emissions from construction vehicles and equipment exhaust by implementing the following mitigation measures:
    - Minimize idling time to five minutes when construction equipment is not in use, unless more time is required per engine manufacturer's specifications or for safety reasons;
    - Ensure equipment is maintained and properly tuned;

t.  On-site fueling activities will require a drip pan to catch any fuel overflows.

u.  Subcontractor will provide their own two-way communication radios


3.  The Subcontract Standard Terms and Conditions are further modified as follows:

None



IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge these Supplementary Terms and Conditions as set forth above.


<u>    Don Borneke Construction, Inc    </u>          M. A. MORTENSON COMPANY
Subcontractor

By    *Mark Sikel*                          By <u>Andy Black</u>


Its       Project Manager                   Its <u>Project Manager</u>



Subcontract Supplementary Terms and Conditions
10-26-04

4

## M. A. MORTENSON COMPANY
## SUBCONTRACT AGREEMENT

### INDEMNITY - Article 17 of the Standard Terms and Conditions

### <u>Illinois</u>

The following Article 17 is attached to and forms a part of the Standard Terms and Conditions of the Agreement between Subcontractor and Mortenson.

      17.1    To the fullest extent permitted by law, Subcontractor shall defend and indemnify Mortenson and all others whom Mortenson is obligated to defend and indemnify by the Contract Documents, (collectively "the indemnified parties") from and against any and all suits or claims alleging damages, losses and expenses, including attorneys' fees, attributable to injuries to persons or damage to property (including loss of use), arising out of or resulting from Subcontractor's Work, including all suits and claims for which any or all of the indemnified parties may be or may be claimed to be liable, and including all suits and claims that arise during and after construction of the Project, but only to the extent that such suits and claims also arise out of Subcontractor's negligence or other wrongful conduct. Subcontractor understands and agrees that this Paragraph obligates Subcontractor to defend the indemnified parties from all suits and claims that allege negligence or other wrongful conduct on the part of the indemnified parties, and to pay all costs of defense of the indemnified parties, including attorneys fees and ancillary costs and expenses incurred by the indemnified parties. Subcontractor understands and agrees that this Paragraph also obligates Subcontractor to pay any and all attorneys fees and expenses incurred by any of the indemnified parties in connection with enforcing the obligations of this Article 17.

      17.2    Subcontractor further agrees to obtain, maintain and pay for commercial general liability insurance which conforms to Article 16, including completed operations coverages, and such other insurance types and limits as are specifically required by Article 16, to secure the provisions of this Article 17.

      17.3    Subcontractor understands and agrees to undertake these obligations regardless of whether the injured person asserting a suit or claim is an employee of Subcontractor, its subcontractors, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable. Subcontractor's indemnity obligation under this Article 17 shall not be limited in any way by the operation of a workers' or workmen's compensation act, any disability act, or any other employee benefit act.

      17.4    Subcontractor and Mortenson agree that this Article 17 complies with the requirements of 740 ILL. COMP. STAT 35/1.

.IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Indemnity Clause as set forth above.

| | |
|---|---|
| <u>  Don Borneke Construction, Inc  </u><br>Subcontractor | M. A. MORTENSON COMPANY |
| By <u>  *Mark Sikel*  </u> | By _____ |
| Its <u>  Project Manager  </u> | Its _____ |

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

# **Exhibit A - Scope of Work**

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of December 29, 2017

The Scope of Work shall include the following, without limitation:

All Work required by the Contract Documents within the following specification sections:

1.1. All Contract Documents listed in Exhibit D. If the Scope of Work below contradicts any of the documents in Exhibit D, the more stringent requirement shall take precedence.

1.2. Subcontractor is required to assist in the civil design stages up to the issuance of IFC drawings to maintain lump sum price per Exhibit B. Civil IFC drawings will be amended to Exhibit D upon completion. Exhibit B quantities are based on documents listed in Exhibit D.

**The following material and other obligations are the responsibility of The Supplier and are Included in the Agreement:**

**2.1. General**

a. All equipment, materials, products, design and construction shall be new and in compliance with contract documents, design drawings and specifications and the requirements of this section.

b. Subcontractor shall provide all necessary submittals as required by the documents listed in Exhibit D of this contract.

c. Subcontractor has performed a detailed takeoff based on the drawings listed in Exhibit D of this contract, has visited the site and confirmed quantities and assumes all risk associated with potential quantity overruns.

d. Subcontractor agrees to procure, provide and pay for all materials, equipment, tools, consumables, labor, transportation, supervision, temporary office requirements, administration and other costs required to complete the work.

e. Subcontractor shall work within the project easements. Subcontractor shall be responsible for all costs associated with damage to property outside the project easements.

f. Subcontractor shall furnish loads to the project site in conformance with the contract documents listed in Exhibit D.

g. Subcontractor shall provide the necessary signage and personnel to assure a safe and proper traffic control during the construction of the scope of work. Signage shall comply with MUTCD standards and be coordinated with the local Authority Having Jurisdiction.

h. Subcontractor shall furnish and pay for all temporary water needs for the execution of this subcontract. This will include drinking water for all tradesmen employed by the Subcontractor. Subcontractor shall properly remove all bottles or cups used for drinking water.

i. Subcontractor acknowledges that Mortenson expects a fully comprehensive Quality Control Program to be implemented and managed by Subcontractor. Mortenson will support Subcontractor with review and

preparation of their plan, however, Subcontractor shall have a full time dedicated Quality Manager on site to monitor work and fill out, review and submit proper paper work to Mortenson on a daily basis. Documentation shall include the use of Procore for inspections.

## 2.2. Mobilization
a.  Subcontractor shall include all necessary hauling permits, packing, transportation and setup of all required equipment, personnel and support services needed to successfully execute this Scope of Work.

## 2.3. Clear and Grubbing
a.  Clear and grubbing shall include pushing of organic debris and all rocks to the side of the LOD (Limits of Disturbance) per Agreements and specifications.
b.  Rocks shall be removed from the site or used as riprap around culverts.
c.  Any soft organic debris such as grasses and or soft brush can remain onsite but any shrubs, trees or other debris shall be removed and disposed of if less than 6" in size with landowner instruction and local state regulations. Any shrubs, trees or other debris that exceeds 6" in size shall be piled at the perimeter of the LOD for landowner use. If landowner does not want material, upon written request by Mortenson, subcontractor shall remove all shrubs, trees, and debris for landowner.
d.  Subcontractor shall remove only those trees which are designated for removal. Subcontractor shall use care around trees to be saved. Prior to the removal of trees, Subcontractor to coordinate with Mortenson site team to ensure compliance with environmental regulations.
e.  Subcontractor shall be responsible for mowing of public road shoulders and ditches along the project routes as necessary to promote safe travel upon the public road system.

## 2.4. Construction Trailer, Laydown Yard
a.  Subcontractor shall construct an 7 acre area for trailers, laydown and contractor parking.
b.  Subcontractor shall strip and stockpile existing topsoil & organics. Stockpiled topsoil shall be stabilized in conformance with the project Storm Water Pollution Prevention Plan (SWPPP) for use at the end of the project for restoration.
c.  Subcontractor shall compact sub-grade per design documents.
d.  This area shall be sloped to drain and shall be maintained in a level state free of ruts and potholes throughout the duration of the project, inclusive of additional aggregate being placed as needed. Furnish and install required culverts to maintain drainage along adjacent public roadways and allow vehicle access to the area.
e.  Subcontractor shall place and compact aggregate base per project specifications.
f.  Construct two entrances connecting to the public road. The entrances shall be constructed 24' wide with two radius corners similar to the access road entrance inside radius to accommodate semi-truck traffic.
g.  The aggregate base material shall become the property of the project.

## 2.5. Road Surveying
a.  Subcontractor shall be responsible for all surveying in Subcontractor Scope of Work.

    b.    Roads shall be surveyed & staked for horizontal & vertical alignment.
    c.    Center line stakes shall be set at 100' intervals on tangent & 50' intervals on curves.
        i.    Subcontractor shall survey & stake offsets & limit to include but not limited to the following: main access roads, turbine string roads, foundations, spur roads, MET tower roads and substation road

## 2.6. Turbine Access Roads

    a.    Subcontractor shall construct access roads to each individual wind turbine as detailed in the design documents.
    b.    Subcontractor has included all surveying and staking required to construct the access roads.
    c.    Subcontractor shall provide the independent testing agency with samples of materials to be used to satisfy the testing requirements.
    d.    Anticipate installation of a minimum of 5,280 lf of turbine access road per day.
    e.    The roads shall have a maximum deviation of 9" rise or fall within any 100' span and be level within 1% across the entire width including the shoulders or as specified in design documents.
    f.    The roads shall not exceed a max gradient per design documents and subcontractor has included all necessary grading, including cuts and fills, to support this requirement.
    g.    Access road installation within a public right of way (ROW), shall include, but is not limited to, stripping topsoil, preparation of subgrade, compaction of subgrade, placement and compaction of aggregate material.
    h.    Subcontractor shall prepare 10' compacted shoulders on each side of all turbine access roads or as directed by Mortenson. Where road abuts fencing on one side, subcontractor shall provide compacted shoulder up to 20' on opposite side of road.
    i.    At a minimum, subgrade shall be prepared in accordance with and meet the compaction requirements set forth in the design documents prior to installing aggregate material. Subcontractor is aware that some areas of the road subgrade may need to be addressed with additional aggregate material or corrected per the Design Documents. Subcontractor agrees that payment for this work shall be time and materials as approved by the Contractor. Subcontractor is not required to upgrade entire road sections.
    j.    Subcontractor shall proof roll the entire length of roadway after completion of cement stabilization/aggregate placement per design documents, including: Main access roads, turbine string roads, including shoulders and radii.
    k.    Subcontractor shall coordinate testing, as required by the contract documents, with the independent testing agency. Subcontractor responsible for determining the optimal moisture percentage that is required for complete and effective cement hydration. Subcontractor acknowledges that this percentage may change as environmental and soil conditions change throughout the site, and will perform proctors as necessary to avoid the placement of unacceptable road sections. These provisions should be addressed in the contractors quality control plans and documentation.
    l.    Place & Compact aggregate base to a thickness per the contract documents over the prepared sub-grade.
    m.    The aggregate base shall meet the specification described in the design documents.

n.   Subcontractor shall construct temporary access roads / radii required to facilitate the delivery of turbines to each wind turbine foundation location on site. Temporary access roads / radii shall be aggregate base. Subcontractor shall construct an entrance where the main access or turbine string roads meet the public roads. The subcontractor shall install entrances per design documents

o.   Installation of turbine access roads shall not inhibit natural drainage. Finished elevation of the access roads shall be level with existing site grades.

p.   Subcontractor shall install culverts and drainage features for access roads, entrances, spur roads and stream crossings at the locations and sizes specified in the design documents or as natural conditions require.

   i.   Culvert inlets and outlets shall have aprons and be protected with riprap material if required by design document or by the County.

   ii.   Culverts shall be installed as required and at the proper elevation to facilitate existing site drainage conditions.

   iii.   Culverts shall be constructed with a temporary extension for the permanent section to the face of the temporary wide radius corner.

   iv.   Culverts shall be installed per Lee County requirements as well as design specifications.

   v.   Subcontractor acknowledges that certain drainage features including but not limited to: such as small check dams, v-notches and riprap may be required to address drainage and SWPPP requirements and has included costs for such work.

q.   Subcontractor shall install a shallow swale crossing at locations where culvert installation is not practical. Subcontractor shall work with designer and Mortenson on per location basis to address this type of drainage design. Subcontractor included cost to address swale crossings, if required.

r.   At project completion, scarify, spread topsoil, and remove any material installed for erosion control.

s.   Subcontractor shall notify Mortenson in writing proposed deviations to the contract documents and is not authorized to proceed with any deviations until written approval is given by Mortenson.

**2.7.  Turbine Spur Road**

a.   Upon removal of the crane pad subcontractor shall build a spur road connecting the existing turbine access road to the gravel beauty ring around the pedestal of the turbine.

b.   The turbine spur road shall be constructed per design documents with approved materials.

**2.8.  2" Road Cap at End of Project**

a.   An additional 2" of Aggregate cap shall be placed after all turbines on a particular string have been turned over and accepted by the Owner upon written direction from Mortenson.

b.   The aggregate base shall meet the specification described in the design documents.

*Project to receive spot repairs at project completion using suitable onsite material.*

**2.9   Entrances with Swing Gate & Removable**

a.   Any existing fencing disturbed by the Subcontractor's activities shall be repaired & if necessary replaced.

b.   Subcontractor shall install "H" frame bracing prior to cutting any existing fence, so existing fence does not lose its tension.
c.   Subcontractor shall Cut any barbed wire line fence and remove the Section of fence within the LOD.
d.   The existing fence shall be attached to "H" frame bracing and a temporary fence shall be installed closing the opened section of fence during construction. The temporary fence and gate shall be wide enough and positioned appropriately to allow for crane travel and support turbine delivery.
e.   Temporary barbed wire fence shall be extended from the "H" frames to the corner post of the swing gate and or the removable panel.
f.   Subcontractor shall Install one (1) 16' lockable swing gate and one (1) 20' removable 5-strand barbed wire panel allowing a 36' ROW opening for crane travel set back from the public road, and located to support radii installation and turbine delivery.
g.   At project completion the entrance shall be prepared for final construction. The swing gate will be relocated to the existing fence line and a new 5-strand barbed wire fence shall be installed to connect the corner post of the swing gate and "H" frames.
h.   Subcontractor acknowledges that certain fence lines along the road will need to be relocated to allow for radius installation and component delivery. Subcontractor shall install new fence as needed to maintain property boundaries, install gate as needed to facilitate construction, return fence to original location following radii removal, and install permanent gate in final location as designated in design documents or in accordance with local standards.

**2.10.    Fence Line Gate with a Swing Gate & Removable**
a.   Where roads and crane travel paths cross existing fence lines a 40' wide access will be cut in the existing line fence.
b.   Within fence openings one (1) 16' lockable swing gate and one (1) 20' removable 5-strand barbed wire panel will be installed along the fence line. A removable center post shall be installed to provide means of locking the swing gage and removable panel together and allowing access. The center post shall be set into a sleeve embedded in concrete.
c.   Subcontractor shall install 16' lockable swing gate and removable panel on all access road entrances.

**2.11.    Erosion and Sedimentation Control**
a.   Erosion and sedimentation control, both during & after construction, shall be provided as required to retain sediment onsite & to control erosion of embankments, temporary & final exposed slopes & temporary stockpiles in conformance with the Contract Documents and permit.  Subcontractor acknowledges that the Project area is sensitive to rain events and that erosion and drainage control is of the highest importance.
b.   Subcontractor shall supply, install & maintain erosion & sedimentation controls per the SWPPP & NPDES design and permit, and shall be subject to  weekly QC inspections of the installations by Mortenson. Inspections should be performed by Subcontractor  Maintenance of sediment controls shall include the controls "installed by others" as part of the owner's decommissioning scope. Subcontractor acknowledges that any noted deficiency or failure of these installations shall be corrected within 24 hours of written notice, or sooner if a rain event is eminent, and that failure to

correct will lead to potential fines or back charges. Mortenson shall have the right to perform corrections, or have corrections performed, if such corrections are not made within 24 hours of notice, at the expense of the Subcontractor.

c. Excess sediment behind silt fences will be removed and properly disposed when sediments reach 1/3 height of the structure, tracked sediments shall be removed from paved surfaces at the end of each day and construction entrances shall be maintained daily.

d. If construction activities are discontinued in areas of soil disturbance before final grading is complete, temporary grading shall be seeded and mulched. The areas shall be seeded with an appropriate perennial grass seed mix and shall be mulched with hay, straw, or other appropriate BMP within 7 days of the time it was temporarily discontinued. Mulch shall be maintained until a suitable vegetative cover is established.

e. Subcontractor shall provide additional periodic inspections and upkeep of erosion measures. Periodic can be defined as two inspections per every seven calendar days or after ½" rainfall in a 24 hour period is accumulated on the Mortenson rain gauges located at the office complex. Subcontractor shall report findings and an appropriate action plan to correct deficiencies to Mortenson within 24 hours of event.

f. Subcontractor shall maintain erosion control measures until the site has undergone final stabilization. Final stabilization shall be considered as when all soil disturbing activities have been completed and a uniform perennial vegetation cover has been applied and accepted by Mortenson. This maintenance program may extend into the next growing season.

g. All remaining temporary BMP's and accumulated sediments from silt fences shall be removed in accordance with the SWPPP.

h. Should any conflict arise between this Scope of Work and the SWPPP or NPDES Documents then the more stringent requirement shall govern.

## 2.12. Dust Control/Road Cleaning

a. Subcontractor shall provide the Project with full-time dust control operations. Nuisance dust will not be tolerated and must be mitigated during work activities and working hours.

b. Subcontractor shall be responsible for providing adequate quantity of water truck(s) to mitigate nuisance dust in a timely manner.

c. Subcontractor shall be responsible for locating and securing an approved and adequate water supply and all costs associated with the water supply. If a surge or storage tank is located onsite during construction, any permits and regulatory compliance shall be the responsibility of the Subcontractor.

d. Subcontractor shall place a chemical dust suppression agent in areas deemed extremely sensitive to nuisance dust. Subcontractor shall notify County and Mortenson 48 hours in advance when and where chemical application will be applied.

  i. Subcontractor shall place 1,000 lf of CaCl (28-32%) or Lignin in front of residential areas,

  ii. Subcontractor shall place 100 lf each way of CaCl (28-32%) or Lignin at road intersections

  iii. Chemical Applications are subject to local government approval.

e. Subcontractor shall respond to localized requests within thirty (30) minutes of notification of request.

f. Dust Control shall be provided by Subcontractor from the time the first piece of Subcontractor equipment arrives to site through completion of substantial completion punch list items.

g. Subcontractor shall supply a skid steer(s) or equivalent piece of equipment(s) with bucket, brush and scraper attachments to address tracking on the local roads. This equipment(s) shall be available from the time the first piece of Subcontractor equipment arrives to site through completion of substantial completion punch list items.

**2.13. Construction Water**

a. Subcontractor to provide and pay for all construction water necessary for completing the work of this agreement as well as supply of water to Mortenson for pressure washers and water storage vessels. Water supply is assumed to be supplied by the same water truck that is used for dust control operations.

b. No water withdrawals from streams or protected water reservoirs with respect to construction associated with the Project will be allowed. This includes water sources that may be on private land near the project site.

**2.14. Project Maintenance**

a. Subcontractor shall be responsible for maintaining or cleaning project access roads, project office laydown yard and public roads within the project limits of construction for the entire project duration.

b. Road maintenance shall include periodic blading to prevent potholes, ruts and washboard and the placement of additional aggregate as required to maintain road surface and crown. At no time will absence of a road crown be tolerated.

c. The subcontractor will be required to keep full time blade(s) onsite for road maintenance and crowning, as well as provide rolling and compaction equipment as necessary to maintain public and access roads.

**2.15. MET Towers**

a. Subcontractor shall install a MET tower roads the same as Access roads per design documents.
   i. MET tower roads will be 12' wide with minimal to no shoulders.
   ii. Aggregate base per design documents.
   iii. Prepare and compact the sub-grade as required by the contract documents.
   iv. Reseed the LOD & maintain the erosion control measures during the project duration.

b. Subcontractor shall clear & grub a 100' radius around the center of the Met Tower to a slope of no more than 5%.
   i. All cleared & grubbed debris shall be pushed to the edges of the cleared area.
   ii. Bumps shall be leveled & holes filled to accommodate construction equipment travel.

c. Subcontractor to provide excavation and backfill per Met Tower Design Documents.

d. After Met tower construction, the area shall be restored in the same manner as turbine areas.

e. Contract to provide fencing and met tower pad per design documents and specs

**2.16. Substation Pad Preparation and Entrance**

a. Subcontractor agrees to perform work at existing substation to correct drainage issues. This work shall be in compliance with the design documents.

### 2.17. Foundation Excavation and Backfill

a. Subcontractor shall strip & stockpile topsoil for later use in restoration work. Stockpiled topsoil shall be stabilized in conformance with the project Storm Water Pollution Prevention Plan (SWPPP) for use at the end of the project for restoration.
b. Subcontractor shall excavate & backfill foundations in accordance with the design documents.
c. Subcontractor shall excavate the foundation with a 4' extension on each side of the foundation.
d. Subcontractor shall provide an excavation bottom that is level within 1/10' from side to side and within 1/10 from front to back.
e. Subcontractor shall bench or slope excavation back to OSHA standards.
f. Subcontractor shall excavate two (2) pedestrian ramps 10' wide down to the bottom of the excavation.
g. Ramps shall have 30% maximum grade to allow for safe entry and exit for personnel.
h. Excavated material shall be neatly stockpiled separately from topsoil on only two sides of the foundation excavation at least 10' back from the edge of the excavation. Subcontractor shall be responsible to protect the stockpiled materials from excessive moisture. Subcontractor to provide and install barricade around excavation to allow for visual delineation of the open excavation. Excavation has warning barrier rope 6' away from the perimeter including ramps. Rope is held by T-posts with flags delineated and adhered every 6'.
i. Subcontractor shall dig 2 sump pits in the corners of the excavation to allow for dewatering.
j. Subcontractor shall excavate cut-off trenches around the perimeter of the foundation bottoms sloped to each sump to handle potential groundwater infiltration.
k. Stockpiled material shall not impede or restrict access to the foundation for concrete operations.
l. Backfill materials & compaction shall comply with design documents.
m. Subcontractor acknowledges that electrical conduits, vaults, grounding cables and rods, and electrical equipment are located in areas within their backfill operations. Subcontractor shall protect these items during backfill operations.
n. Subcontractor shall stop work and notify Mortenson supervision immediately if unsuitable material is encountered during foundation excavation. If it is determined that the unsuitable material must be removed, subcontractor will submit an estimate or work authorization prior to proceeding.
o. Backfill shall be graded away from the turbine to create adequate slope away from the turbine as detailed in design documents. Mortenson and subcontractor shall review each location prior to excavation to determine anticipated post foundation installation issues and any required adjustments necessary to support proper drainage at completion.
p. Topsoil shall be re-spread over the backfill material & blend to the existing grade.

q. Subcontractor shall use redundant off sets prior to removing center pin, and shall not remove this pin until an independent, third party, licensed surveyor, provided by subcontractor has verified that the pin is in the proper location. Subcontractor shall place intial center pin, establish offsets, and reestablish center pin after excavation is complete.

## 2.18. Dewatering
a. Subcontractor shall dewater each foundation as required to support foundation construction. Subcontractor is responsible for dewatering from the beginning of excavation through backfill.

## 2.19. Wetland Crossing
a. Subcontractor shall supply and install culverts at the wetland crossings per the design drawings. This shall include permanent and temporary installations.

## 2.20 Concrete Operations
a. Subcontractor shall construct concrete wash out pit at each foundation excavation, and dispose of waste material in excavation sump pit. Concrete must be processed in a way that complies with Construction Documents.

## 2.21. Turbine Erection Areas
a. Subcontractor shall clear, grub and provide all necessary grading for a 175' radius around the turbine inclusive of cut and fill necessary to achieve no more than a 5% grade across the area. Actual limits of clearing and required slopes will be as per the Contract Documents and coordination with Mortenson superintendents for component locations.
   i. All cleared & grubbed debris shall be pushed to the edges of the cleared area.
   ii. Bumps shall be leveled & holes filled to accommodate equipment travel.
   iii. Cleared area shall be maintained, compacted and provide positive drainage at all times to facilitate turnaround area for turbine delivery components through the duration of the project.
b. Topsoil shall be stripped & stockpiled prior to any cut/fill operation and re-spread around the erection area upon completion. Subcontractor agrees to coordinate with Mortenson superintendent on topsoil pile placement to avoid conflicts with other trades i.e. electrical collection, turbine offload, etc.
   i. De-compaction & restoration will be required at all erection areas.
c. Subcontractor acknowledges that turbine elevation is extremely sensitive for the Project and that this may cause the need for additional cut and fill at turbine locations to ensure tower heights do not exceed elevation limits.

## 2.22. Earthen Crane Hardstands
a. Subcontractor shall construct in conformance with the contract documents detailed in design documents and but not limited to the following:
   i. Subcontractor to construct all crane pads 60' x 80' built with earthen material. Subcontractor shall ensure proper sloping beyond this pad area to ensure no shifting or tilting of mats.
   ii. Crane Pads must be level within 1% from side to side & within 1% of level front to back.

       iii.    Subcontractor to maintain crane pads for the duration of the erection schedule.

       iv.    Crane pads will be tested to meet compaction requirements, and reworked as necessary shall tests reveal failing results.

b.    Topsoil shall be stripped & stockpiled prior to any cut/fill operation & re-spread around the crane pad and turbine upon completion.

c.    Crane pad locations shall be coordinated with Mortenson on-site personnel with respect to roadways and turbine locations.

d.    Any excavations that occur within crane pad area must be properly backfilled & compacted to meet load bearing & compaction requirements. Note that in some locations crane pad compaction will have a more stringent requirement than structural backfill.

e.    Crane pads shall be smooth drum rolled. No sheep's foot compaction will be allowed unless required to meet compaction, and then finished with a smooth drum roller to ensure no pockets are present.

**2.23.  Crushed Stone Around Turbines**

a.    Place a standard 6" thick x 15' wide compacted aggregate ring around each turbine pedestal and place additional material near the spur road in such a manner that a pickup truck can execute a 3-point turn without leaving the graveled surface. The aggregate base shall meet the specification described in the design documents.

**2.24.  Crane Travel Paths and Road Crossings**

a.    Subcontractor shall install culverts & fill drainage ditches as required for temporary crane path drainage ditch crossings

b.    Upon completion of the use of the road crossings they shall be removed, cleaned of debris, re-spread top soil & reseeded.

c.    Subcontractor shall clear and grub crane travel path LOD to a width of 36' and compact insitu soils. Unit price provided if 80' width is required.

d.    Compacted crane paths shall be de-compacted after the erection cranes finish traveling the compacted routes.

e.    Upon completion of the use of travel path the area shall be cleaned of debris and reseeded with native grasses.

f.    Removal of erection debris is not the responsibility of the Subcontractor.

g.    Subcontractor to notify Mortenson of identified areas of local failure within the crane path route.

**2.26.  Public Road Improvements**

a.    Subcontractor included all cost for public road maintenance and dust control for the entire duration of the project.

       I.    Subcontractor shall comply with County requirements as it relates to maintenance and dust control on County roads.

b.    Subcontractor shall install public road radii upgrade to facilitate turbine delivery on-site per County requirements and design documents.

**2.27.  Demobilization**

a.    Subcontractor shall include all necessary hauling permits, packing, transportation, and removal of all required equipment, personnel, and support services needed to successfully execute the scope of work.

The following is not the responsibility of The Subcontractor and is excluded from the Agreement:

None

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit A as set forth above.

Don Borneke Construction, Inc
Subcontractor

By _____*Mark Sikel*_____

Its ___Project Manager___

M. A. MORTENSON COMPANY

By _____

Andy Black

Its ____Project Manager___

EXHIBIT A – Scope of Work

Page 11 of 11

Mendota Hills Repowering
Lee County, Illinois
MORTENSON PROJECT NO. 18141002

## Exhibit B – Purchase Price

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of December 29th, 2017.

The Subcontract Price is Three Million Two Hundred Thirteen Thousand and Seventy Seven ($3,213,077) subject to adjustment only as provided in the Agreement.

Bonds

The execution of this contract is contingent upon the approval of the supplier through Mortenson's Pre-Qualification process, supported by Textura.

Sales and Use Tax

The Subcontract Price excludes the cost for all State Sales and Use Tax for the Work provided under this Agreement as required in the state of the location of the Project. Subcontractor to complete Building Material Exemption Certificate to comply with state legislature.


MJS
7/12/18

| Project Office Complex Area | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Project Office Complex Area (6" of 3" Minus & 2" of CA6 Aggregate Base) | 7 | ACRE | $ 50,000 | $ 350,000 | |
| SUBTOTAL | | | | $ 350,000 | |
| Applicable Taxes | | | 6.25% | Exempt | |
| TOTAL | | | | $ 350,000 | |
| Comments | | | | | |

| Existing Project Removal | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Mobilization | 1 | LS | $ 50,000 | $ 50,000 | |
| Removal & Haul off of Existing Access Roads | 34,550 | LF | $ 4.50 | $ 155,325 | Suitable material can be reused for access roads |
| Removal & Haul off of Existing Crane Pad and Crane Area Only | 63 | EA | $ 2,000 | $ 126,000 | Includes crane pad removal adjacent to |
| Removal and Haul off of Existing Substation Foundations | | LS | $ 30,000 | $ - | By Others |
| Restoration of WTG Foundation and Erection Area | | LS | $ 126,000 | $ - | By Others |
| Restoration of Removed Access Road Areas | 1 | LS | $ 40,000 | $ 40,000 | Match surrounding grade and restore to |
| SUBTOTAL | | | | $ 371,325 | |
| Applicable Taxes | | | 6.25% | Exempt | |
| TOTAL | | | | $ 371,325 | |
| Comments | | | | | |

No import included
MJS 7/12/18

| Public Road Improvements | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Asphalt Road Improvements (3" Asphalt Overlay w/ 3' Agg. Shoulders) | - | LF | $ - | $ - | Work to be performed on T&M |
| Gravel Road Improvements (2" Aggregate Base x 18' Road w/ 3' Agg. Shoulders) | - | LF | $ - | $ - | Work to be performed on T&M |
| SUBTOTAL | | | | $ - | |
| Applicable Taxes | | | 6.25% | Exempt | |
| TOTAL | | | | $ - | |
| Comments | | | | | |

1

| Roads | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Mobilization | 1 | LS | $ 150,000 | $ 150,000 | |
| Demobilization | 1 | LS | $ 50,000 | $ 50,000 | |
| Civil Surveying | 1 | LS | $ 40,000 | $ 40,000 | |
| Two (2) Year Warranty | 1 | LS | $ 35,000 | $ 35,000 | |
| Total Overhauls 16' Gravel Undercut 2" CA1 gravel overlay as required md) | 13,910 | LF | | $ 377,343 | |
| Refurbish Turbine String Roads - For Construction | 18,207 | LF | | $ - | Included in Maintenance Number |
| Refurbish Turbine String Roads - Post Construction | 18,207 | LF | $ 2.00 | $ 36,414 | 2" Aggregate Cap on existing roads |
| Turbine Spur Roads (6" CA6 x 16' Road no Shoulders) | 2,320 | LF | $ 18.75 | $ 43,500 | |
| Entrances (12' throat), corregate metal Culvert w/ Temp Radius | 17 | EA | $ 10,000 | $ 170,000 | 165' radii only -6" nofabic |
| Existing Entrances | 11 | EA | $ 7,500 | $ 82,500 | 165' radii only -6" nofabic |
| Low Water Crossings - Rip Rap on fabric w/ 6" Aggregate Cap | 4 | EA | $ 5,000 | $ 20,000 | Bernake to coordinate selection of LWC vs Culvert with Mortenson |
| Crane Travel Path | 41,750 | LF | $ 2.00 | $ 83,500 | |
| Crane Travel Path Ditch Crossing (1 EA = 1 Ditch) | 30 | EA | $ 2,500 | $ 75,000 | |
| Crane Travel Path Road Crossing (1' Sand Bedding) | 1 | EA | $ 5,000 | $ 5,000 | |
| Erosion & Sedimentation Control | 1 | LS | $ 50,000 | $ 50,000 | |
| Restoration and Reseeding | 1 | LS | $ 75,000 | $ 75,000 | |
| Dust Control - Water Trucks | 100 | DAYS | $ 1,250 | $ 125,000 | 1 water truck |
| Dust Control - Chemical Applications | 1 | LS | $ 20,000 | $ 20,000 | |
| Full Time Safety Professional | 1 | LS | NA | NA | NA |
| Project Maintenance | 1 | LS | $ 250,000 | $ 250,000 | Number includes turbine erection area maintenance |
| | | SUBTOTAL | | $ 1,588,263 | |
| | | Applicable Taxes | 6.25% | | |
| | | TOTAL | | $ 1,588,263 | |
| | | Comments | | | |

| Crane Pads and Erection Areas | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Turbine Erection Areas | 23 | EA | $ 2,500 | $ 72,500 | |
| Earthen Crane Hardstands - 60' x 80' | 23 | EA | $ 2,500 | $ 72,500 | |
| Crushed Stone Around Turbine - 19' Wide, 6" Thick | 23 | EA | $ 1,750 | $ 50,750 | Recycled CA6 |
| | | SUBTOTAL | | $ 135,750 | |
| | | Applicable Taxes | 6.25% | Except | |
| | | TOTAL | | $ 135,750 | |
| | | Comments | | | |

| Foundation Excavation & Backfill | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Foundation Excavation & Backfill - 63.5' Octagon, 9' Deep | 23 | EA | $ 9,000 | $ 261,000 | |
| Foundation Subcut & Soil Correction - 2' Over Ex | - | EA | $ 22,000 | Unit Price | |
| Foundation Dewatering | 23 | EA | $ 2,500 | $ 72,500 | |
| | | SUBTOTAL | | $ 333,500 | |
| | | Applicable Taxes | 6.25% | Except | |
| | | TOTAL | | $ 333,500 | |
| | | Comments | | | |

| Concrete Batch Plant Area | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Concrete Batch Plant Area (5' of 3" minus & 2" of CA6 Aggregate Base) | 2 | ACRE | $ 53,000 | Stationary | |
| | | SUBTOTAL | | $ - | |
| | | Applicable Taxes | 6.25% | Except | |
| | | TOTAL | | | |
| | | Comments | | | |

| Substation | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Substation Drainage Corrections | 1 | ACRE | $ 13,500 | $ 13,500 | Per 90% Civil Drawings |
| | | SUBTOTAL | | 13,500 | |
| | | Applicable Taxes | 6.25% | Except | |
| | | TOTAL | | 13,500 | |
| | | Comments | | | |

| MET Tower Site Preparation | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Met Tower Roads (Per Drawings) | 500 | LF | $ 21.50 | $ 10,750 | |
| Met Tower Site Preparation | 1 | EA | $ 1,500 | $ 1,500 | |
| Met Tower Excavation and Backfill | 1 | EA | $ 4,320 | $ 4,320 | |
| Met Tower Aggregate Base | 1 | EA | $ 1,385 | $ 1,385 | |
| Met Tower Fencing | 1 | EA | $ 5,384 | $ 5,384 | |
| | | | | $ - | |
| | | SUBTOTAL | | $ 23,339 | |
| | | Applicable Taxes | 6.25% | Except | |
| | | TOTAL | | $ 23,339 | |
| | | Comments | | | |

| Misc | Qty | UM | Unit Price | Total | Comments |
|---|---|---|---|---|---|
| Concrete Washout Pits | Included | | Included | Included | Use washout site to no less than one per day during backfill |
| Public Intersection Improvements | 11 | | $ 24,200 | $ 266,200 | Average Cost for 11 values - full disclosure on pre-bid day |
| | | | | $ 266,200 | |
| | | Applicable Taxes | | | |
| | | TOTAL | | $ 266,200 | |
| | | Comments | | | |

## Unit Price Provisions

Unit prices stated herein shall be applicable and available at Mortenson's sole discretion until the date of final payment or until such later date as provided in the Contract Documents. Except as otherwise described in the Contract Documents, unit prices shall include all miscellaneous and incidental material, labor, equipment, compensation, delivery, general conditions, benefits, overhead, profit, bonds, permits, shop drawings, small tools and taxes.

## Alternates

| Unit Prices | Qty | UM | Unit Price | | Total | | Comments |
|---|---|---|---|---|---|---|---|
| Fence modifications at public road radius improvements | - | EA | $ | 3,000 | $ | | Includes relocating fences to allow for radius installation, temporary gate, fence relocation and final gate at completion |
| Draintile Repair - 4" (Up To 20' Repair) | - | EA | $ | 535 | $ | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 6" (Up To 20' Repair) | - | EA | $ | 535 | $ | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 8" (Up To 20' Repair) | - | EA | $ | 577 | $ | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 10" (Up To 20' Repair) | - | EA | $ | 639 | $ | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 12" (Up To 20' Repair) | - | EA | $ | 728 | $ | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 4" (Over 20') | - | EA | $3.61' premium from under 20' | | | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 6" (Over 20') | - | EA | $10.25' premium from under 20' | | | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 8" (Over 20') | - | EA | $11.97' premium from under 20' | | | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 10" (Over 20') | - | EA | $14.00' premium from under 20' | | | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 12" (Over 20') | - | EA | $16.00' premium from under 20' | | | | Not per AIMA, foundation drain tile repair |
| Draintile Repair - 4" (Up To 20' Repair) | - | EA | $ | 4,464 | $ | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 6" (Up To 20' Repair) | - | EA | $ | 4,464 | $ | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 8" (Up To 20' Repair) | - | EA | $ | 4,585 | $ | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 10" (Up To 20' Repair) | - | EA | $ | 4,714 | $ | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 12" (Up To 20' Repair) | - | EA | $ | 4,839 | $ | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 4" (Over 20') | - | EA | $3.61' premium from under 20' | | | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 6" (Over 20') | - | EA | $10.25' premium from under 20' | | | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 8" (Over 20') | - | EA | $11.97' premium from under 20' | | | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 10" (Over 20') | - | EA | $14.00' premium from under 20' | | | | AIMA drain tile repair, foundation drain tile repair |
| Draintile Repair - 12" (Over 20') | - | EA | $16.00' premium from under 20' | | | | AIMA drain tile repair, foundation drain tile repair |
| Crane Travel Path - 60' Width | - | EA | $44' | | | | Includes clearing, cut and fill for full 60' corridor |

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit B as set forth above.

Don Borneke Construction, Inc
Subcontractor

M. A. MORTENSON COMPANY

By ___*Mark Sikel*___

By _____
       Andy Black

Its ___Project Manager___

Its ___Project Manager___

3

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## **Exhibit D - Contract Documents List**

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of this 29th day of December, 2017.

The Contract Documents includes but not limited to the following:

**Exhibits not limited to list below included in the BOP Agreement:**

| Civil | | | | |
|---|---|---|---|---|
| Drawing/ Spec No. | Rev. No. | Title | Drawing Date | Comment |
| | REV 1 | GAMESA, "REQUIREMENTS DOCUMENT WFL_LEEWARD-ENERGY-MENDOTA-HILLS". DOCUMENT CODE GD323608-EN | 09/13/17 | DESIGN REQUIREMENTS |
| | REV 1 | BARR ENGINEERING COMPANY, "GEOTECHINCAL REPORT, MENDOTA HILLS REPOWER PROJECT, LEE COUNTY, ILLINOIS, JANUARY 2017" | JAN 2017 | PRELIMINARY GEOTECH REPORT |
| Exhibit C-1 | | Schedule Mendota Hills Re-Power Schedule – 11-1-17 | | |
| | | Mortenson's Zero Injury Safety Program | | |
| Exhibit M | | Mortenson Wind Turbine Agreement WRW | 3/7/17 | |
| | | Mortenson Wind Turbine Agreement – Illinois Addendum | 3/7/17 | |
| Exhibit L | | Attachment 2 - New Project_AIMA 90816 Final | | |
| Exhibit L | | Attachment 3 Road Agreement_County FINAL_Redacted | | |
| | | Exhibit E-2 Meterological Tower Specifications | | |
| Exhibit A | | Scope of Work - BOP Agreement | | |
| | | | | |
| | | | | |
| | | | | |

Exhibit D Attachment I Civil Specifications
Exhibit F – Applicable Standards
Exhibit FF – Owner Furnished Equipment
Exhibit G – Project Site Description and Real Property Rights
Exhibit K – Contractor Provided Training
Exhibit L – Attachment 4 Interconnection Agreement Form
      -Attachment 5 Lee County SUP
Exhibit NN Geotechnical Studies Report
2018-05-25 Mendota Hills 90% Civil Plans
Exhibit E-2 Attachment 6 Met Tower Specifications
Mendota Hills Preliminary Foundation Design

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit D as set forth above.

Don Borneke Construction, Inc.
Subcontractor

M. A. MORTENSON COMPANY

By ___*Mark Sikel*___

By _____
    Andy Black

Its ___Project Manager___

Its ___Project Manager___

Supplier Exhibit D – Contract Documents List
10-28-04

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## Exhibit E – Safety Program Requirements

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of this 29th day of December, 2017.

At Subcontractor's cost, Subcontractor shall have a safety program for the Work that includes the safety requirements contained in the below published safety programs, all of which are incorporated herein by reference:

- Mortenson Zero Injury Training Program Manual (hereinafter the "Zero Injury Manual")
- Mortenson Mobile Crane Training Manual
- Mortenson Forklift Training Program Manual
- Mortenson Disruption Avoidance Training Manual

Subcontractor agrees to perform the safety obligations in the above referenced manuals and agrees to perform such obligations with respect to its Work in the same manner that the manual references safety steps to be taken by, or the safety obligations of, Mortenson. In addition, Subcontractor agrees to abide by any additional safety programs at the Project which are made available to Subcontractor. Subcontractor agrees that is shall obligate its subcontractors and suppliers to adhere to the requirements of Article 11 of the Subcontract Agreement Standard Terms and Conditions and this Exhibit E.

## I. Requirements On All Mortenson Projects

### A. Zero Injury Manual

To the extent the Zero Injury Manual imposes requirements and policies applicable to Mortenson employees, then Subcontractor agrees to require its employees to adhere the same requirements of such policies. Subcontractor's attention is drawn to the below listed requirements detailed in the Zero Injury Manual. Identification by Mortenson of these requirements shall in no way diminish or otherwise limit application of the above listed manuals to Subcontractor's Work or Article 1.3 of the Subcontract Agreement Standard Terms and Conditions.

- Subcontractor shall provide a written site-specific safety program related to the Work, as detailed in Section 1 of the Zero Injury Manual, before the start of Work which shall address each item contained in Section 1 of the Zero Injury Manual.

- Subcontractor shall provide a written job hazard analysis ("JHA"), as detailed in Section 12 of the Zero Injury Manual, for each portion of the Work.

- Subcontractor shall adhere to the Hazard Communication program at the Project, the requirements for which are detailed in Section 25 of the Zero Injury Manual.

- Subcontractor shall complete daily written pre-task plans for each item of Work, or more frequently as conditions at the Project change or require. The pre-task planning process is detailed in Section 12 of the Zero Injury Manual.

1

- Subcontractor shall ensure its employees adhere to the hand protection requirements detailed in Section 27B of the Zero Injury Manual while performing work at the Project.

- Subcontractor shall promptly conduct post-accident investigations for any accidents that occur during completion of the Work and investigations of near-miss incidents related to the Work. In this provision, an accident is any incident that results in any injury to an employee of Subcontractor or any property damage caused by actions performed during completion of the Work. A near-miss is any incident that has all the attributes of an accident but, by mere chance, injury to a Subcontractor employee or property damage was avoided. Subcontractor's investigations shall be consistent with the requirements of Section 4 of the Zero Injury Manual.

- All Subcontractor employees are required to wear eye protection, a high-visibility vest, long pants, a sturdy working boot and a hard hat at all times while at the Project. Section 27A and 27B of the Zero Injury Manual addresses additional requirements for Subcontractor's employees regarding personal protective equipment.

- Subcontractor acknowledges the requirement for positive fall restraint and fall protection for all fall hazards over six feet. Subcontractor acknowledges the requirement for positive fall restraint for its personnel in aerial lifts. Further details on fall protection that govern the Work are contained in Sections 10 and 11 of the Zero Injury Manual.

**B. Subcontractor On-Site Safety Professionals**

- Subcontractor shall provide on-site safety professionals at the Project if required pursuant to Section 3 of the Zero Injury Manual.

- Unless a more stringent requirement for use of an on-site safety professional is listed below in Section II (if applicable), Section 3 of the Zero Injury Manual requires that if Subcontractor, at any time, has 50 craft workers or more on the project site (including the craft workers of any of its subcontractors and suppliers of any tier), then Subcontractor must have a project-specific safety professional on site part-time when the workforce is below 50 craft workers and full-time when the workforce reaches or exceeds 50 workers. Additional Subcontractor safety personnel are also required on a proportional basis if the number of craft workers reaches or exceeds 60 craft workers.

- Refer to Section 3 of the Zero Injury Manual for additional details.

**C. Return to Work/Injury Case Management Plan**

- Subcontractor shall submit to Mortenson a written site-specific return to work/injury case management plan which shall detail Subcontractor's goals and policies on returning employees to work following an injury. Subcontractor's policy may include offering light duty or transitional work following an injury (if such work or duty is possible given the nature of the injury). Mortenson may object to the plan if, in its reasonable opinion, the plan does not establish reasonable actions or goals on returning employees to work or light duty following an injury. Submission of the plan to Mortenson by Subcontractor shall not be deemed to be agreement or assent by Mortenson to any portion or part of the plan.

2

D. **Written Silica Protection Policy**

- Subcontractor shall implement a silica protection plan for the Work which shall meet or exceed all laws and regulations (including applicable OSHA regulations) related to the protection of its employees against exposure to silica levels in excess of levels permitted by laws and regulations (including applicable OSHA regulations).

E. **Substance Abuse Screening**

- Definitions.  In this Section E:

  - Drug means: A controlled substance, as defined in Schedules I through V of Section 202 of the Controlled Substances Act, 21 U.S.C. § 812, including cocaine, opiates, marijuana, amphetamines, phencyclidine (PCP), barbiturates, benzodiazepines, propoxyphene, methadone and methaqualone.

  - Intoxicating substance means: Drug(s) or alcohol or any substance, the use of which, impairs work behavior or performance of work obligations at the Project in a manner to be unsafe.

  - Under the influence of alcohol or an intoxicating substance means: (1) the presence of alcohol in the individual's system that equals or exceeds a blood alcohol content of .04 percent; (2) the presence of any drug in the individual's system; or (3) the presence of an intoxicating substance in the individual's system.

  - Accident means: An incident at the Project that involves: 1) personal injury which necessitates treatment by a medical professional or that is reasonably expected to result in lost work time; or 2) damage to property at the Project.

  - Reasonably significant near miss means: An incident that has all the attributes of an accident but, by mere chance, significant injury or death did not occur or significant property damage was avoided.

  - Reasonable cause means: A basis for forming a belief based on specific facts and rational inferences drawn from those facts that lead a Subcontractor supervisor or manager, or a Mortenson employee, to reasonably suspect that a Subcontractor employee is under the influence of drugs, alcohol or an intoxicating substance while at the Project or while performing the Work.  Such specific facts or rational inferences may be drawn from an employee's behavior, performance, appearance, speech, or bodily odors while at the Project or while performing the Work.

- Drug and alcohol-free workplace.  In order to achieve a drug- and alcohol-free workplace, Subcontractor's employees shall not perform the Work or be present at the Project-site while under the influence of drugs, alcohol or an intoxicating substance. Subcontractor's employees shall not bring to the Project any drugs or alcohol.

3

- <u>Pre-Placement at Project.</u>  By assigning employees to work at the Project, Subcontractor represents that it has conducted substance abuse screening of such employees to screen for the presence of drugs or alcohol.

- <u>Post-Accident Testing.</u>  Subcontractor shall immediately (or as soon as reasonably practicable) perform a drug and alcohol screen on all of its employees who caused or contributed to an accident or a reasonably significant near-miss at the Project.

- <u>Reasonable Suspicion Testing.</u>  Subcontractor shall perform drug and alcohol screening on its employees upon reasonable cause.

- Subcontractor shall not permit any Subcontractor employee that tests positive following any of the above screening procedures to perform any portion of the Work or be present at the Project at any time through final completion of the Project.

- If the Project institutes a Project specific drug and alcohol screening plan, Mortenson shall inform Subcontractor of the project specific screening plan and Subcontractor agrees to follow such project specific screening plan.

F.  **Training**

- Subcontractor agrees that each of its employees at the Project or completing the Work shall attend three orientation training sessions provided by Mortenson (Orientation 1 [also known as first-day, first-hour which shall be completed before performing any work at the Project], Orientation 2 and Orientation 3).  Orientation 2 and Orientation 3 shall be completed as soon as reasonably practicable after Orientation 1 and as detailed in the Zero Injury Manual.

- Additionally, Subcontractor agrees that all its superintendents, foremen and Project supervisors, including members of its leadership that are overseeing any part of the Work, shall attend Mortenson's "Committed At The Top Zero Injury Program" training sessions.

- Subcontractor shall conduct daily safety meetings or daily toolbox safety talks at the Project for all Subcontractor's employees at the Project to discuss safely performing any specific items of Work anticipated during the day of the meeting and reminding employees to perform all Work in a safe manner.

G.  **Safety Teams**

- Subcontractor acknowledges that a project safety committee will be created at the Project.  Subcontractor's highest-level employee who regularly works at the Project-site shall be a member of the committee and attend committee meetings.

H.  **Safety Audits**

- Subcontractor shall conduct daily safety inspections and audits to determine if the Work is being performed in a safe manner and document, in writing, the results of such inspections and audits.

I. **Stretch-and-Bend**

- Subcontractor agrees and acknowledges that each of its employees at the Project (regardless as to position) shall participate in the daily Mortenson-led morning stretching program at the time established by Mortenson.

J. **Housekeeping**

- Subcontractor shall create and submit to Mortenson a housekeeping management plan that addresses adequate and sufficient daily clean-up, material storage and electrical cord management.

K. **Use of Equipment**

- Subcontractor shall permit only those of its employees qualified by training or experience to operate equipment and machinery. Subcontractor must train each of its affected employees in the manner required by applicable law and regulation.

## II. Additional Project Requirements

- Notwithstanding Section I(B) above, if Subcontractor, at any time, has **25** craft workers or more on the project site (including the craft workers of any of its subcontractors and suppliers of any tier), then Subcontractor must have a project-specific safety professional on site full-time. When the workforce exceeds **25** craft workers additional safety personnel are required on a proportional basis (25:1) ratio of craft to safety professionals. The subcontractor safety professional must coordinate the subcontractor's safety activities with Mortenson to ensure that the collective safety management resources are coordinated and utilized to the greatest extent for the benefit of the entire project. All other provisions of Section 3 of the Zero Injury Manual shall remain applicable.

  - The list below details the requirements on the number of onsite safety professionals needed based on the number of subcontractor's craft workers (including the craft workers of any of the subcontractor's subcontractors and suppliers, of any tier.

| Number of Workers Present | Subcontractor Safety Professional On site Presence |
|---|---|
| 1-9 | Equivalent of one work shift during the work week. |
| 10-24 | Equivalent of two work shifts during the work week. |
| 25-49 | One subcontractor Safety Professional On site full time. |

5

| 50-74 | Two subcontractor Safety Professionals On site full time. |
|---|---|
| 75-99 | Three subcontractor Safety Professional On site full time. |
| 100 or more workers | Four subcontractor Safety Professionals on site full time plus any additional safety supervision as agreed upon between Mortenson and Subcontractor. |

Mortenson may adjust the ratio in a more demanding manner as deemed necessary by Mortenson to adequately mitigate risks.

- <u>Random Drug and Alcohol Testing.</u>  If permitted by the law of the location of the Project and in compliance with such law, Subcontractor shall subject its employees at the Project to unannounced drug and alcohol screening on a random selection basis.  Such random testing shall be performed at intervals selected by Subcontractor to ensure that its employees are not using drugs or under the influence of alcohol or an intoxicating substance while at the Project or while performing the Work.  Random selection basis means a mechanism for selection of employees that: 1) results in an equal probability that any employee at the Project will be selected, and 2) does not give Subcontractor discretion to waive the selection of any Subcontractor employee selected under the mechanism.

- <u>Safety Incentive Program.</u>  Subcontractor shall create a written recognition and reward program which shall encourage reporting of safety issues and near misses. The program shall not be implemented in a manner to discourage any Subcontractor employee from reporting any injury.

- <u>Infection Control Requirements.</u>  If requested by Mortenson, Subcontractor shall adhere to the infection control procedures established for the Project by Mortenson or Owner as detailed in writing to the Subcontractor prior to the start of Work.

- <u>Safety Toe Boots.</u>  Subcontractor shall require employees to wear lace up, safety-toe boots that extend above the ankle.

- <u>Reports</u>.  Upon the start of each work week no later than 9 am, subcontractor shall submit a weekly report of all hazard recognitions, near misses, first aides, injuries, unplanned disruptions, environmental incidents, total craft workers on site including the craft workers of any of the subcontractor's subcontractors and suppliers, of any tier and total hours worked from the previous week to Mortenson.  On the 1st working day of each month no later than 9 am subcontractors shall submit a monthly report with the total hazard recognitions, near misses, first aides, injuries, unplanned disruptions, environmental incidents, total craft workers on site including the craft workers of any of the subcontractor's subcontractors and suppliers, of any tier and total hours worked from the previous month to Mortenson.

Exhibit E – Safety Program Requirements
6/21/2011

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit E as set forth above.

Don Borneke Construction, Inc.
Subcontractor

M. A. MORTENSON COMPANY

By _____*Mark Sikel*_____

By _____
                     Andy Black

Its ___Project Manager_____

Its _____Project Manager_____

7

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## **Exhibit F – Quality Program Requirements**

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of December 29, 2017

The Quality Program Requirements set forth in this Exhibit F are designed to further the goals of performing the Work correctly the first time, planning and coordinating the Work, eliminating errors, eliminating rework, maintaining efficient trade flow, and avoiding unnecessary delays. Accordingly, the Quality Program Requirements necessarily require close coordination with Mortenson.

1) Subcontractor shall designate a quality representative (the "Quality Representative") with responsibility to manage on behalf of Subcontractor all aspects of the quality process described in this Exhibit F.

2) Subcontractor shall participate in a preconstruction meeting with Mortenson at a time scheduled by Mortenson. The Quality Representative, among other Subcontractor personnel, shall attend the preconstruction meeting, as one of the purposes of the meeting will be to review the quality requirements for the Work under the Contract Documents.

3) A Definable Feature of the Work (sometimes referred to as a DFW) is defined as a task which is separate and distinct from other tasks, and has the same control requirements and work crews. For purposes of this Exhibit F, the Definable Features of the Work are:

| All Civil Infrastructure Work |
| --- |

4) Subcontractor shall, within 5 calendar days of execution of the Agreement (unless required earlier by the construction schedule), submit to Mortenson a site-specific Quality Management Plan covering all of the Work, including Work to be performed by subcontractors and suppliers at any tier to Subcontractor. The plan shall include the following:

   a) An organizational chart of Subcontractor personnel assigned to the Project with roles and responsibilities, including the identity of the Quality Representative.
   b) Identification of individuals responsible for performance of inspection of various aspects of the Work.
   c) The name, qualifications, duties and responsibilities of each person assigned to a quality control function.
   d) A description of subcontractor's procedure for ensuring that the most current drawing updates, specification updates, requests for information, changes to the Contract Documents, and requirements of approved shop drawings will be processed, tracked and communicated to both office and field team members and will be incorporated into the as-built documents.
   e) A log to identify and track all testing required by the Contract Documents and applicable codes.
   f) A complete list of closeout deliverables required under the Contract Documents, including operation and maintenance manuals, warranties, guarantees, and extra stock materials.

     g) Checklists for all inspections required by the Quality Management Plan. Checklists will be created by Mortenson in Procore and completed by Subcontractor in the field and submitted to Mortenson at the end of each working day.

If Mortenson provides comments on the Quality Management Plan, Subcontractor shall address Mortenson's comment and resubmit the Quality Management Plan to Mortenson.

5) Subcontractor shall participate in a phase planning meeting with Mortenson and other subcontractors for the purpose of determining appropriate trade flow and further development of schedule details.

6) In collaboration with Mortenson, Subcontractor shall develop an integrated work plan for each Definable Feature of the Work describing how the Work (including Work performed by its subcontractors and suppliers at any tier to Subcontractor) will be installed.   The integrated work plan  shall outline requirements for the following:

     a) Safety
     b) Quality
     c) Site utilization and access
     d) Schedule and work sequences (including where the work will start and what direction the work will proceed)
     e) Manpower and other resources
     f) Utilities needed for performance of the Work
     g) Equipment needed for performance of the Work
     h) Establishing conformity of materials with the Contract Documents and approved shop drawings
     i) Material handling
     j) Industry standards, references and best practices
     k) Installation processes.

The integrated work plan for each Definable Feature of the Work shall be submitted to Mortenson at least one week prior to the Preparatory Meeting.  If Mortenson provides comments on the integrated work plan, Subcontractor shall address Mortenson's comments and resubmit the integrated work plan to Mortenson.  Subcontractor shall train its installation crews on the content of the IWP and perform the Work in accordance with the IWP.  If any modifications to the IWP are required as a result of changed or unforeseen conditions, a revised IWP shall be submitted to and reviewed with Mortenson prior to commencement of the Work affected by the changed or unforeseen conditions, unless otherwise directed by Mortenson in writing.

For each Definable Feature of the Work, Subcontractor shall participate in a preparatory meeting (the "Preparatory Meeting") to be scheduled by Mortenson prior to commencement of the applicable Work.  The Quality Representative and the foreman or superintendent directly responsible for the installation of the applicable Work shall participate in the Preparatory Meeting.  The purpose of the Preparatory Meeting will be to review the following in order to determine whether the installation is ready to proceed:

a) requirements of the drawings and specifications;
b) verification that all submittals have been submitted and approved;
c) required inspections and testing;
d) the Integrated Work Plan;
e) status of completion of predecessor activities;
f) Delivery status of required materials and availability of required labor; and
g) other matters related to the installation of the Work.

7) Subcontractor shall schedule the preparation and submission of all submittals related to each Definable Feature of the Work to allow approval of such submittals prior to the Preparatory Meeting.

8) If during the Preparatory Meeting it is determined that Subcontractor is not ready to proceed with the installation of the DFW, Subcontractor shall participate in additional Preparatory Meetings until it is determined that Subcontractor is adequately prepared to commence with the applicable Work.

9) Subcontractor shall participate in and/or perform the following quality inspections of the Work (which may be at the Project site or at another location), at a minimum:

a) An inspection of each mock up that may be required by the Subcontract or Contract Documents.

b) For each Definable Feature of the Work, an initial inspection (the "Initial Inspection") shall be conducted jointly by Mortenson and Subcontractor upon the completion of the installation of the first portion of the Work. The purpose of the Initial Inspection is to verify that the installation process is consistent with the requirements of the integrated work plan and that the Work conforms to the Contract Documents. If the installation process is not consistent with the integrated work plan, Subcontractor shall modify its installation process to conform to the integrated work plan or appropriately modify its integrated work plan. If the Work does not conform to the requirements of the Contract Documents, Subcontractor shall correct the Work immediately and in all cases before performing any additional Work.

c) If any modifications are required to be made to the to the IWP as a result of the Initial Inspection, Subcontractor shall submit the modified plan to Mortenson for Mortenson's review and comment prior to continuing with the installation.

d) Follow up inspections, to be performed by Subcontractor for each Definable Feature of Work as follows:
   i) An inspection upon receipt of each delivery of equipment or materials that will be incorporated into the Work to ensure that the equipment or materials conform to the requirements of the Contract Documents.
   ii) On-going inspections shall be performed periodically as the Work progresses, at least in definable areas determined by Mortenson (for example, by room, area, elevation, or other) or at a frequency determined by Mortenson.
   iii) Cover-up inspections, before any work is covered up and made inaccessible by the successor trades. Cover-up Inspections shall be conducted and all work identified as deficient shall be corrected before the Work is made inaccessible.
   iv) A pre-final inspection, when Subcontractor believes that all Work is complete.

3

v) A final inspection, after all non-conforming work previously identified has been corrected and Subcontractor believes the Work is complete, in order to verify that the Work is complete and acceptable.

e) For each inspection described above, Subcontractor shall use checklists and other quality control documents that may be required in the integrated work plan or the Contract Documents or that are jointly developed by Subcontractor and Mortenson.

10) Nothing in this Exhibit F shall be deemed to diminish in any way Subcontractor's responsibility for its means and methods, the quality and safety of the Work, performance of the Work as required by the construction schedule, or Subcontractor's compliance in all respects with the Contract Documents. Subcontractor retains sole responsibility for all such matters.

11) Subcontractor shall maintain at the Project site and make available to Mortenson upon request any industry references, standards, best practices, or installation guidelines that are referenced by the Contract Documents or that directly pertain to the installation or acceptance of the Work.

12) Subcontractor shall ensure that all tools and devices used for measuring installed Work are in good and operable condition and are precise enough to accurately measure the Work within specified tolerances. Measuring devices that are required to be calibrated shall be properly marked and the date of their calibration shall be displayed. Upon request by Mortenson, Subcontractor shall furnish documentation of calibration.

13) Subcontractor shall maintain current as-built drawings (and building information models if such models are used by Subcontractor) as the Work progresses, and shall, at any time upon request, make them available for review by Mortenson or submit them to Mortenson.

14) In addition to the activities required above, the Quality Representative shall also:

**Report quality defects discovered and actions taken to mitigate issues to the Project Engineer on a weekly basis**

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this **Exhibit F** as set forth above.

Don Borneke Construction, Inc.
Subcontractor                                        M. A. MORTENSON COMPANY

By _Mark Sikel_____              By Andy Black_____

Its ___Project Manager_____       Its Project Manager_____

Exhibit F – Quality Program Requirements
8-30-12

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## **Exhibit G – Insurance Requirements**

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of this 29th day of December, 2017.

Subcontractor shall follow the attached insurance requirements form.

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit G as set forth above.

Don Borneke Construction, Inc
Subcontractor

By _____*Mark Sikel*_____

Its ___Project Manager_____

M. A. MORTENSON COMPANY

By _____
            Andy Black

Its ___Project Manager_____

Exhibit G – Insurance Requirement
10-29-04

Subcontractor:

Your firm has been issued a Notice to Proceed/issued a Letter of Intent/awarded a Subcontract for the above project.  Your insurance must comply with the terms and conditions of such Notice to Proceed/Letter of Intent/Subcontract. Please carefully follow the procedures outlined below in issuing the required Certificate of Insurance.

1.  Direct your insurance company or agent to use the ACORD Certificate of Insurance Form, or a form acceptable to Mortenson.

2.  The <u>certificate holder</u> shall read:
    M.A. Mortenson Company
    Attn:Andy Black
    700 Meadow Lane North
    Minneapolis, MN 55422

3.  The description of operations shall indicate the project name as follows:

    Project Name:  Mendota Hills Repowering
    Project No.:   18141002

4.  The attached <u>Sample</u> ACORD Certificate of Insurance form shows the <u>MINIMUM</u> coverages and limits to be certified as required by your subcontract agreement or the project specifications.  <u>MINIMUM</u> limit requirements may be satisfied by any combination of limits shown for primary liability coverages (i.e. General Liability, Automobile Liability, Employers' Liability) and Excess Liability, provided the sum of each combined limit equals or exceeds the <u>MINIMUM</u> limit shown on the attached Sample Certificate of Insurance form.

5.  The certificate must clearly state "Walnut Ridge Wind, LLC and M. A. Mortenson Company are named as "Additional Insureds" to the General Liability, Automobile Liability, and Excess Liability Policies.  Additional insureds have been named on the General Liability policy per the attached endorsements (CG 20 10 10 01 <u>**and**</u> CG 20 37 10 01 or equivalent).  Workers Compensation coverage includes a waiver of subrogation against M. A. Mortenson Company and the Owner."

6.  Return your completed Certificate of Insurance to the certificate holder above along with the <u>**required General Liability Additional Insured Endorsements issued by your insurance carrier.**</u>

No work will be authorized to proceed on the project until a Certificate of Insurance and copies of the required General Liability Additional Insured Endorsements (CG 20 10 10 01 and CG 20 37 10 01 or equivalent), properly completed by your insurance carrier, are received.

Thank you for your cooperation.

M. A. MORTENSON COMPANY

 ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
6/20/2018

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER<br>The MacKenzie Agency<br>P.O. Box 120<br>St. Peter MN 56082 | CONTACT NAME: Trent Nyhammer | |
|---|---|---|
| | PHONE (A/C, No, Ext): 507-931-4482 | FAX (A/C, No): 507-931-4544 |
| | E-MAIL ADDRESS: tnyhammer@mackenzieagency.net | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A : QBE North America | 24414 |
| INSURED<br>Don Borneke Construction Inc.<br>41537 50th St.<br>Janesville MN 56048 | INSURER B : | |
| BORNEKE | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES   CERTIFICATE NUMBER: 1583205006   REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>CLAIMS-MADE X OCCUR | Y | Y | CCI0169885 | 10/14/2017 | 10/14/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY X PRO-JECT LOC | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY**<br>X ANY AUTO<br>ALL OWNED AUTOS / SCHEDULED AUTOS<br>X HIRED AUTOS X NON-OWNED AUTOS | Y | Y | CBA0169885 | 10/14/2017 | 10/14/2018 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR<br>EXCESS LIAB CLAIMS-MADE<br>DED X RETENTION $ 10 000 | Y | Y | CCU0169885 | 10/14/2017 | 10/14/2018 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | Y | CWC1328078 | 10/14/2017 | 10/14/2018 | X WC STATU-TORY LIMITS / OTH-ER | |
| | | | | | | | E L EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E L DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E L DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Equipment Leased or Rented | | | CCI0169885 | 10/14/2017 | 10/14/2018 | Limit<br>Ded | 1,000,000<br>$1,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
MAM# 18141002   Project: Mendota Hills Repowering
As respects the named insured subcontractor's operations on this project, Mendota Hills Repowering and M.A.Mortenson Company are included as Additional Insureds under the General Liability, Automobile Liability and Umbrella Liability policies. Additional Insureds have been named on the General Liability policy per the attached endorsements (CG 20 10 10 01 and CG 20 37 10 01 or equivalent). Workers Compensation coverage includes a waiver of subrogation against M.A. Mortenson Company and the Owner.   Umbrella is follow form.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| M.A. Mortenson Company<br>Attn: Risk Management<br>700 Meadow Lane North<br>Minneapolis MN 55422 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)           The ACORD name and logo are registered marks of ACORD

POLICY NUMBER: CCI0169885

COMMERCIAL GENERAL LIABILITY
CG 20 10 10 01

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Name of Person or Organization:** |
| Mendota Hills Repowering |
| M.A. Mortenson Company |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** **Section II – Who Is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of your ongoing operations performed for that insured.

**B.** With respect to the insurance afforded to these additional insureds, the following exclusion is added:

**2. Exclusions**

This insurance does not apply to "bodily injury" or "property damage" occurring after:

**(1)** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed; or

**(2)** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

 © ISO Properties, Inc., 2000  ☐

POLICY NUMBER: | CCI0169885

**COMMERCIAL GENERAL LIABILITY**
**CG 20 37 10 01**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Name of Person or Organization:**<br>Mendota Hills Repowering<br>M.A. Mortenson Company |
| **Location And Description of Completed Operations:**<br>Project #18141002<br>Project: Mendota Hills Repowering |
| **Additional Premium:**<br>Included |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**Section II – Who Is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" at the location designated and described in the schedule of this endorsement performed for that insured and included in the "products-completed operations hazard".

Mendota Hills Repowering
Lee County, Illinois
MORTENSON PROJECT NO. 18141002

## **Exhibit H – Lien Waivers**

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of December 29, 2017.

With each request for payment the Subcontractor shall provide the applicable lien waiver enclosed within Exhibit H.  Upon receipt of final payment, the Subcontractor shall provide a completed final lien waiver.

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit I as set forth above.

Don Borneke Construction, Inc
Subcontractor

M. A. MORTENSON COMPANY

By _____*Mark Sikel*_____

By _____
                    Andy Black

Its ___Project Manager___

Its _____Project Manager_____

| **Exhibit AA-2** |
| --- |

### Subcontractor's Partial Lien Waiver and Release

THIS SUBCONTRACTOR CERTIFICATE FOR PARTIAL WAIVER OF LIENS is made this _____ of _____, 20__, by _____, a _____, having a business address at _____ (the "Releasor"), subcontractor to [Contractor's Name]. a [State] corporation, having a business address at [Contractor's Corporate Office address] ("Contractor"), for the performance or furnishing of certain Work in connection with the Mendota Hills Repowering project located in Lee County, Illinois (the "Project") owned by Mendota Hills, LLC, a Minnesota limited liability company ("Owner"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the BOP Contract.

Releasor, on behalf of itself and all Persons claiming any interest in or through Releasor and for Releasor's and their successors and assigns, and those acting by or through any of the foregoing, for and in consideration of the sum of _____No/100 U.S. DOLLARS (U.S. $_____) (the "Partial Payment") does hereby unconditionally and irrevocably waive, release, remise, relinquish and quit-claim any lien or other security interest, of any kind whatsoever, by or through the Releasor to the Contractor for the Project, which the Releasor ever had, or now has, against the Project, the property on which the Project is located, or against Owner, Contractor, their partners, parents, subsidiaries and affiliates, at all tiers, and their insurers, sureties, officers, directors, representatives, shareholders, agents, and all parties acting for any of them (collectively the "Releasee Entities"). This waiver and release shall only be effective as of the date the Partial Payment is made by Owner to Contractor, and only to the extent of the monies so paid on such date.

Releasor hereby certifies, represents and warrants that, to the extent of the Partial Payment: (a) the Releasor has not assigned or pledged any rights or claims in any amount due or to become due from the Contractor; (b) no claims from sub-subcontractors, vendors, mechanics or materialmen have been submitted to Releasor with respect to the Project or remain unsatisfied as of the date of this Subcontractor Certificate for Partial Waiver of Liens; (c) no mechanics or material or materialmen's liens have been filed with respect to the Project; and (d) payment has been made to all subcontractors, laborers and material suppliers, at all tiers, and all other entities, for all labor, services, materials and equipment furnished by or through the Releasor for the Project, including, without limitation, all payroll taxes and contributions required to be made and all wages, overtime pay, premium pay, holiday pay, sick pay, personal leave pay, severance pay, fees, fringe benefits, commissions and reimbursable expenses required to be paid and all deductions for dues, fees or contributions required to be made in connection with all collective bargaining agreements in existence, if any, which affect any worker(s) providing services for the Project.

Releasor will defend and indemnify the Owner of the Project, its lenders and title company, and Contractor and its sureties for all costs and expenses, including attorneys' fees, incurred as a result of claims that any of Releasor's subcontractors, suppliers or employees have not been paid or relating to the enforcement of this Partial Waiver of Liens.

The Releasor acknowledges and agrees that: (a) the Contractor and the Owner are relying upon the representations and warranties made herein as a material inducement for the Contractor to make payment to the Releasor; (b) this Subcontractor Certificate for Partial Waiver of Liens is freely and voluntarily given by the Releasor with full knowledge of its rights under the law and the Releasor has voluntarily accepted the terms of this Subcontractor Certificate for Partial Waiver of Liens for the Partial Payment recited above; and (c) the tendering of the Partial Payment by the Contractor and the receipt of the Partial Payment and the execution of this Subcontractor Certificate for Partial Waiver of Liens by the Releasor shall not, in any manner whatsoever, release the Releasor from: (i) its continuing obligations with respect to the completion of any work at the Project that remains incomplete, including, punch list work, warranty work or guaranty work, or the correction of defective or non-conforming work; (ii) any contractual, statutory or common law obligations of the Releasor with respect to any of the Releasee Entities; or (iii) any other obligations of the Releasor with respect to any of the Releasee Entities.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURES APPEAR ON FOLLOWING PAGE.]**

95761011.1 0057445-00005

Releasor hereby certifies, represents and warrants that the undersigned individual ("Signatory") is duly authorized, and the Signatory hereby represents that he/she has been duly authorized by and on behalf of the Releasor to execute this Subcontractor Certificate for Partial Waiver of Liens as of the date first above written.

[_____]

By:_____
Name:
Title:

STATE OF _____ )
                           )
COUNTY OF _____ )

This instrument was acknowledged before me on this _____ day of _____, by _____, _____ of _____, a _____, on behalf of said _____.


_____
[Notary Seal]                    Notary Public in and for the State of _____

_____
Printed Name of Notary Public

My Commission Expires:

95761011.1 0057445-00005

| Exhibit BB-2 |
| --- |

## Subcontractor's Final Lien Waiver and Release

THIS SUBCONTRACTOR CERTIFICATE FOR FINAL WAIVER OF LIENS is made this ____ of _____, 20__, by _____, a _____, having a business address at _____ (the "Releasor"), subcontractor to [Contractor's Name], a [State] corporation, having a business address at [Corporate Office Address] ("Contractor"), for the performance or furnishing of certain Work in connection with the Mendota Repowering project located in Lee County, Illinois (the "Project") owned by Mendota Hills, LLC, a Minnesota limited liability company("Owner"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the BOP Contract.

Releasor, on behalf of itself and all Persons claiming any interest in or through Releasor and for Releasor's and their successors and assigns, and those acting by or through any of the foregoing, for and in consideration of the sum of _____ and No/100 U.S. DOLLARS (U.S. ) (the "Final Payment") and other good and valuable consideration, in hand paid, the receipt and sufficiency of which are hereby acknowledged, as full and final payment on account of all labor, services, materials and equipment, furnished to Contractor for the Project, does hereby unconditionally and irrevocably waive, release, remise, relinquish and quit-claim any lien or other security interest, of any kind whatsoever, which the Releasor ever had, now has, or may have in the future, known or unknown, against the Project, the property on which the Project is located, or against Owner, Contractor, their partners, parents, subsidiaries and affiliates, at all tiers, and their insurers, sureties, officers, directors, representatives, shareholders, agents, and all parties acting for any of them (collectively the "Releasee Entities"). This Final Waiver of Liens shall be effective as of the date Final Payment referenced herein is paid by Owner to Contractor.

Releasor hereby certifies, represents and warrants that: (a) the Releasor has not assigned or pledged any rights or claims in any amount due or to become due from the Contractor; (b) no claims from sub-subcontractors, vendors, mechanics or materialmen have been submitted to Releasor with respect to the Project or remain unsatisfied as of the date of this Subcontractor Certificate for Final Waiver of Liens; (c) no mechanics or material or materialmen's liens have been filed with respect to the Project; and (d) payment has been made to all subcontractors, laborers and material suppliers, at all tiers, and all other entities, for all labor, services, materials and equipment furnished by or through the Releasor for the Project, including, without limitation, all payroll taxes and contributions required to be made and all wages, overtime pay, premium pay, holiday pay, sick pay, personal leave pay, severance pay, fees, fringe benefits, commissions and reimbursable expenses required to be paid and all deductions for dues, fees or contributions required to be made in connection with all collective bargaining agreements in existence, if any, which affect any worker(s) providing services for the Project.

Releasor will defend and indemnify the Owner of the Project, its lenders and title company, and Contractor and its sureties for all costs and expenses, including attorneys' fees, incurred as a result of claims that any of Releasor's subcontractors, suppliers or employees have not been paid or relating to the enforcement of this Final Waiver of Liens.The Releasor acknowledges and agrees that: (a) the Contractor and the Owner are relying upon the representations and warranties made herein as a material inducement for the Contractor to make payment to the Releasor; (b) this Subcontractor Certificate for Final Waiver of Liens is freely and voluntarily given by the Releasor with full knowledge of its rights under the law  and the Releasor has voluntarily accepted the terms of this Subcontractor Certificate for Final Waiver of Liens for the consideration recited above; and (c) the tendering of the Final Payment by the Contractor and the receipt of the Final Payment and the execution of this Subcontractor Certificate for Final Waiver of Liens by the Releasor shall not, in any manner whatsoever, release the Releasor from: (i) its continuing obligations with respect to warranty work or guaranty work, or the correction of defective or non-conforming work; (ii) any contractual, statutory or common law obligations of the Releasor with respect to any of the Releasee Entities; or (iii) any other obligations of the Releasor with respect to any of the Releasee Entities.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURES APPEAR ON FOLLOWING PAGE.]**

Releasor hereby certifies, represents and warrants to Releasee that the undersigned individual ("Signatory") is duly authorized, and the Signatory hereby represents that he/she has been duly authorized by and on behalf of the Releasor to execute this Subcontractor Certificate for Final Waiver of Liens as of the date first above written.

[_____]

By:_____
Name:
Title:

STATE OF _____ )
                            )
COUNTY OF _____ )

This instrument was acknowledged before me on this _____ day of _____, by _____, _____ of _____, a _____, on behalf of said _____.

_____

[Notary Seal]                   Notary Public in and for the State of _____

_____

                                Printed Name of Notary Public
My Commission Expires:

Mendota Hills Repowering Project
Lee County, IL
MORTENSON PROJECT NO. 18141002

## **Exhibit H - Application For Payment**

Attached to and forming a part of the Agreement between Subcontractor and Mortenson, effective as of this 29th day of December, 2017.

Subcontractor shall use the attached application for payment form.

IN WITNESS WHEREOF, Subcontractor and Mortenson herein acknowledge this Exhibit H as set forth above.

Don Borneke Construction, Inc.
Subcontractor.                                              M. A. MORTENSON COMPANY

By ___*Mark Sikel*___                                By _____
                                                                          Andy Black

Its ___Project Manager___                      Its _____Project Manager_____

1

Exhibit C – Schedule
10-29-04

**Page 1**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

NICK GEORGEFF,                    )

  Plaintiff,                     )

  vs.                            ) Civil Action

DON BORNEKE CONSTRUCTION, INC.,) No. 3:20-CV-50313

  Defendant.                     )

    The deposition of JAMES TINJUM, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, before Margaret A. Ritacco, a certified shorthand reporter in the State of Illinois, on the 4th day of April, 2023, at 10:02 a.m., via videoconference per Executive Order 2020-14 pursuant to notice.

Reported by:  MARGARET A. RITACCO, CSR

License No.:  084-002796

**Page 2**

APPEARANCES:

  ANESI, OZMON, RODIN, NOVAK & KOHEN, by

  MR. CHARLES A. TERRY

  161 North Clark Street, Suite 2100

  Chicago, Illinois  60601

  (312) 372-3822

  cterry@anesilaw.com

    Representing the Plaintiff;

  SWANSON, MARTIN and BELL, by

  MR. CHRISTIAN A. SULLIVAN

  2525 Cabot Drive, Suite 204

  Lisle, Illinois· 60532

  (630) 799-6900

  csullivan@smbtrials.com

    Representing Don Borneke

    Construction, Inc.

**Page 3**

       I N D E X

WITNESS                     EXAMINATION

JAMES TINJUM

  BY MR. TERRY                      6

  BY MR. SULLIVAN                 178

  BY MR. TERRY, FURTHER           200

  BY MR. SULLIVAN, FURTHER        202

      E X H I B I T S

NUMBER                      IDENTIFICATION

TINJUM Deposition

  Exhibit No. 1                    19

  Exhibit No. 2                    19

  Exhibit No. 3                    22

  Exhibit No. 4                    26

  Exhibit No. 5                    31

**Page 4**

THE REPORTER:  My name is Margaret Ritacco, CSR. This deposition is being taken pursuant to Executive Order 2020-14.  All parties to this proceeding, including the court reporter, are attending via videoconference.

    Will the parties please introduce yourselves, state who you represent, and that you are in agreement with these procedures, starting with Plaintiff's counsel.

  MR. TERRY:  Sure.  Charles Terry for the Plaintiff, we agree.

  MR. SULLIVAN:  Chris Sullivan for the Defendant, I agree.

  THE WITNESS:  James Tinjum, I agree.

    (Witness sworn.)

  MR. TERRY:  Sir, could you please state and spell your name for the record?

  THE WITNESS:  James Tinjum T, as in Tom, I N-J-U-M, as in Mary.

  MR. TERRY:  Perfect.  Let the record reflect this is the deposition of James Tinjum taken pursuant to notice and agreement of the parties. Let the record also reflect it's being taken via Zoom, but still pursuant to all applicable rules

EXHIBIT

K

James Tinjum 04/04/2023

---

**Page 5**

1  of the Federal Rules of Civil Procedure.
2      Before we get into it.
3  Margie, just to be clear, you went completely
4  black.
5      (Zoom technical difficulties.)
6  MR. TERRY: Mr. Tinjum, what do you prefer
7  that I call you for today? James? Mr. Tinjum?
8  Jim?
9  THE WITNESS: Dr. Tinjum is fine.
10  MR. TERRY: Okay. Well, let me ask you
11  this, have you given a deposition before?
12  THE WITNESS: Yes, I have.
13  MR. TERRY: Okay. Are you familiar with the
14  ground rules?
15  THE WITNESS: Yes, I am.
16  MR. TERRY: Okay. I'll just remind you of
17  two, given the medium that we're in.
18      The first one is the most important --
19  well, I guess they're both pretty important.
20      But, nonetheless, do your best to wait
21  for my full question to come out prior to
22  answering, and me and Mr. Sullivan will give you
23  the same courtesy.
24      Does that make sense?

---

**Page 6**

1  THE WITNESS: Yes, it does.
2  MR. TERRY: And then the other one. If for
3  any reason you don't understand a question,
4  please let me know. I'm happy to repeat, reask,
5  rephrase, or have it read back.
6      The only caveat is if you answer a
7  question, we're going to assume you understood
8  what I meant; is that fair?
9  THE WITNESS: Yes, I understand.
10  MR. TERRY: Okay. I'm just going to jump
11  right into it.
12      JAMES TINJUM,
13  called as a witness herein, having been first
14  duly sworn, was examined and testified as
15  follows:
16      EXAMINATION
17  BY MR. TERRY:
18  Q.  Do you have a copy of your CV and your
19  report in front of you?
20  A.  I have the copy of the report and CV
21  printed in front me.
22  Q.  Okay. Perfect. I'm just going to
23  share my screen for purposes of making sure
24  we're talking about the same thing, and I'll

---

**Page 7**

1  take it off as we're talking about it. Okay?
2      I separated this document. It is an
3  11-page document, and it looks like your CV.
4  I'm just going to scroll through it.
5      Does this look like a true and accurate
6  copy of your CV?
7  A.  Yes, it does.
8  Q.  Okay. I'll stop sharing, but we'll
9  talk through it real quick.
10      Just jumping all the way to the back
11  end first. I see that you are a licensed
12  professional engineer in the State of Wisconsin;
13  is that correct?
14  A.  That is correct.
15  Q.  When did you get this license?
16  A.  I do not remember the exact date,
17  approximately 1999.
18  Q.  Okay. And is that a license that has
19  to be renewed?
20  A.  Yes, it does.
21  Q.  How often and what goes into renewing
22  it?
23  A.  In Wisconsin, the renewal is a two-year
24  period. And there is a certain amount of

---

**Page 8**

1  continuing engineering education, professional
2  development hours, in addition to an ethics
3  requirement for every two-year renewal.
4  Q.  Okay. Chris and I are all too familiar
5  with that. It's the bane of our existence most
6  years I'm sure so...
7  MR. SULLIVAN: Mine's due two months.
8  MR. TERRY: Sorry, Chris?
9  MR. SULLIVAN: My CLEs are due in two months.
10  MR. TERRY: Mine too. Sorry, I digress.
11  BY MR. TERRY:
12  Q.  Mr. Tinjum, has your license ever been
13  suspended or revoked?
14  A.  It has not.
15  Q.  Okay. Has it ever lapsed?
16  A.  It probably has lapsed at one point or
17  another due to inattentiveness, but then I would
18  renew it.
19  Q.  Okay. So the most -- is it fair to say
20  that the most it would have lapsed would have
21  been, like, oh, shoot, moment in your head, I've
22  got to do my CLEs. Let's get that done in the
23  next week or so?
24  A.  No. Typically, if it lapsed, it was

---

Pages 5 to 8



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

**9**

1  because I just didn't see the email, or forgot
2  about it, and then paid the additional fee to
3  expedite the renewal.
4      **Q. Sounds good. Okay. So then, just**
5  **briefly, I want to go back and talk about your**
6  **education.**
7      **You received all of your higher**
8  **education from the University of Wisconsin**
9  **Madison, right?**
10      A. That is correct.
11      **Q. So you're a Badger?**
12      A. I am a Badger.
13      **Q. My cousin went there. It's an awesome**
14  **campus, awesome school.**
15      **So then you have a BS -- bachelor's of**
16  **science, a master's of science, and a Ph.D. all**
17  **in civil and environmental engineering; is that**
18  **correct?**
19      A. That is correct.
20      **Q. Okay. And then under the -- I just**
21  **want to go into Litigation Support next.**
22      **The only two people -- let me phrase it**
23  **this way. I only see two cases that pertain**
24  **directly to wind energy sites.**

**10**

1      **Would you agree with that? Other than**
2  **this one, which is not listed yet.**
3      A. I am flipping to that.
4      **Q. Sure. Take your time.**
5      **And the point of my question is to**
6  **also -- just so you know, I'm not going to try**
7  **and trip you up on anything in your CV. I'm**
8  **just asking, generally speaking, does it sound**
9  **accurate that you provided an expert opinion in**
10  **a litigation matter two times as it relates to a**
11  **wind farm other than this case?**
12      A. Yes, it has listed at least two cases
13  of wind energy projects.
14      **Q. Okay. What does the first one relate**
15  **to? Like, who were you retained by? What was**
16  **the issue? What were you talking about? Just**
17  **give me that about the first one. Generally**
18  **speaking, if it's confidential, that's fine too.**
19  **Just generally then.**
20      A. Well, per Page 13 of my expert report,
21  Mountain Air Wind is listed. I was engaged by
22  a foundation provider. It's called Earth
23  Systems Global. And in that particular case,
24  there was differential movement of the wind

**11**

1  turbine foundation, so I was engaged to see if I
2  agreed that standard of engineering practice was
3  performed in the design in that system.
4      **Q. Okay. And that was on behalf of the**
5  **company who installed it or designed it?**
6      A. That was on behalf of the company that
7  designed that foundation system.
8      **Q. Okay. And did you find that their**
9  **design was adequate?**
10      A. I believe I did. I -- it's been a
11  while ago. But, yes, generally speaking, I
12  agree with their system design.
13      **Q. So that was, like, a -- a similar issue**
14  **involving, like, soil, but also different at the**
15  **same time because it involved an actual foundation**
16  **of a wind turbine, fair?**
17      A. That is correct. It involved soil
18  conditions at a wind energy site.
19      **Q. Got it. And then you said Page 13 of**
20  **your report, so I might as well just go there**
21  **real quick.**
22      **What was the other one?**
23      A. The other one was Kawailoa Wind Farm.
24      MR. TERRY: And real quick, Margie, for the

**12**

1  record, that's K-A-W-A-I-L-O-A.
2      THE REPORTER: Got it.
3      MR. TERRY: Please proceed. Sorry, about
4  that Jim -- or Dr. Tinjum.
5      THE WITNESS: No worries.
6      So I was engaged by Alliant Energy
7  Corporation that was the owner of that wind
8  farm. And, again, it was related to soil
9  conditions and soil response to the foundation
10  and wind loading.
11      **Q. Okay. And, I'm sorry, I was looking at**
12  **something else.**
13      **Did you say that also related to the**
14  **foundation?**
15      A. That is correct.
16      **Q. Okay. Got it. And then -- since those**
17  **are, like, at least the two that I saw. You**
18  **know, that's just what I wanted to discuss.**
19      **When we move on to the next part of**
20  **your CV, the Representative Consulting Projects,**
21  **I see a lot about landfills and other similar**
22  **areas.**
23      **Would you agree that that would maybe**
24  **be, like, the -- one of the main focuses of the**



1  consulting projects you worked on, whether it
2  be, like, membranes to help protect the ground,
3  or whatever else it may be at a landfill?
4      A.  Yes.  I will characterize my 30-year
5  career as initiating primarily in environmental
6  related issues.  And then over this past decade
7  and a half, I've been working more on power
8  plants, renewable energy.  It's sustainability
9  related projects within the overall industry.
10     Q.  Got it.  Okay.  One of the representative
11  consulting projects I saw -- I don't know where
12  exactly it was -- but it said something, like,
13  about freeze-thaw foundation conditions and
14  remediation.
15          Are you familiar with what I'm -- oh,
16  that's your first one.
17          So what did this exactly relate to?  I
18  mean, it sounds very similar to what your
19  opinions are in this situation, at least in
20  terms of the freeze-thaw and the elasticity of
21  the ground.  Kind of walk me through what this
22  was.
23     A.  Yes.  So freeze-thaw, I have several
24  papers on that specific topic.  This particular

13

1  solution in that situation?
2      A.  Going from memory, primarily dewatering
3  of the area, so, basically, the primary means
4  was to limit the access of water to their
5  foundation and loading dock area.
6      Q.  Okay.  So pretty much -- and correct me
7  if I'm wrong, because I probably will be -- but
8  divert ground water to a further away location
9  away from their foundation area?
10     A.  Correct, in an attempt to limit what we
11  call is environmental cycling, where you go
12  wet/dry, wet/dry, wet/dry, and/or freeze/thaw.
13  That is one of the more cost effective
14  approaches to helping to mediate that situation.
15     Q.  Got it.  Hold on one second.
16          In all of these consulting projects, in
17  all of your experience, is it fair to say you
18  have never worked for a construction company
19  actually effectuating the work, like, on the
20  ground, like, excavating, moving the equipment,
21  moving the ground?  Is that safe to say?
22     A.  Yes.  My career has been as an engineer
23  consultant and/or in academics.
24     Q.  Okay.  So just to phrase it another

15

1  project was for the owner, which was Sargento
2  Foods, and they had a part of their building and
3  loading dock structure that was being impacted
4  by freeze-thaw conditions in which there was
5  undesirable movement in their structure.
6          And I was retained to investigate the
7  root cause and recommend remediation steps to
8  alleviate that situation.
9      Q.  Okay.  Was this already in the building
10  stage?  When I say -- that's bad.  Let me rephase
11  that.
12          Was this already when the building was
13  completed?  Or was this still in the construction
14  phase of that plant, or facility?
15     A.  No.  Unfortunately, for them, this was
16  post-construction.
17     Q.  It does not sound cheap or fun.
18     A.  It's -- it's not surprising given their
19  soil conditions.
20     Q.  Okay.  How did you -- so one of the
21  things you were retained to do in that matter
22  was figure out how to fix the problem, right?
23     A.  That is correct.
24     Q.  How did you come up -- what was the

14

1  way, you have never worked for a construction
2  company, whether it be a QA, quality assurance,
3  or quality control role, or as an actual laborer
4  or a construction worker, fair?
5      A.  I have not worked for a contractor;
6  however, I have done QA/QC resident engineering
7  on behalf of an owner.
8      Q.  Okay.  Have you ever worked for an
9  excavation company directly doing the work on
10  the site?
11     A.  I have not worked for an excavation
12  company directly.
13     Q.  One other one that I wanted to talk
14  about real quick on your CV.
15          Somewhere it says, confidential utility
16  owner geotechnical report.  I'm trying to find
17  exactly where that is.
18          Nevertheless, do you remember the
19  project that I'm discussing with the confidential
20  owner and geotechnical report for the utility
21  owner?
22     A.  I am -- you will have to point it to
23  me, because many of clients are of a confidential
24  nature --

16



1  Q.  Okay.  Got it.
2  A.  -- when I am engaged.
3  Q.  Got it.  Here we go.  About halfway
4  down the Representative Consulting, Wind Energy
5  Geotechnical Report and Foundation Design for
6  Confidential Owner -- Confidential Utility
7  Owner, Wisconsin's Third-Party Review.
8      Do you see that?
9  A.  Yes, I do.
10  Q.  What did that relate to?
11  A.  So that was for a large utility in
12  the Upper Midwest, and I was asked to do a
13  third-party review of the geotechnical report,
14  conduct it for their site.
15  Q.  Okay.  And did it relate to the issues
16  we're discussing today?  Or no?
17  A.  It was primarily standard of practice,
18  and if their approach was comprehensive and
19  appropriate for that particular site.
20  Q.  Okay.  So, generally, maybe touched on
21  some of the stuff we're talking about today --
22  or, specifically, I should say.  But, generally,
23  it was more so overarching, just, hey, does this
24  report touch on everything it needs to?

17

1  A.  Correct.
2  Q.  Okay.  For Peer-Reviewed Articles and
3  Invited Book Chapters, I did not see anything
4  specifically on point other than maybe, like,
5  freeze/thaw or, like, water/ground conditions
6  that would relate to the things we're going to
7  discuss today.
8      Would you agree with that?
9  A.  I have not published on freeze/thaw
10  specific to a wind farm.  I have published on
11  freeze/thaw in other applications, notably
12  transportation systems and pavement design.
13  Q.  Okay.  Same question for -- I guess we
14  can do it this way -- Items and Conferences and
15  Technical Reports and Publications by Students,
16  I didn't see anything of those sections either.
17      Just for sake of time, I'm combining
18  them together.
19  A.  Correct.
20  Q.  Okay.  Got it.  I'm going to show you
21  what's been -- what will be marked as Exhibit 2.
22  So 1 will be your CV, 2 will be Timesheets in
23  this matter, and -- bear with me one second.
24  A.  Now, for a point of clarification, just

18

1  as far as page numbering --
2  Q.  Sure.
3  A.  -- my CV was included as part of my
4  expert report as an exhibit.  And then I also
5  provided that similar CV separately as an
6  independent document, as you called for all
7  documents relevant to this.  So the page
8  numbering might be a little off, because the CV
9  was part of a document once, and it was an
10  independent document in the second.
11  Q.  That's fair.  Thank you.
12      (Whereupon, TINJUM Deposition
13      Exhibit Nos. 1 and 2 were
14      marked for identification.)
15  BY MR. TERRY:
16  Q.  Timesheet, do you see my screen?
17  A.  Yes, I do.
18  Q.  Okay.  It's a three-page document from
19  GLG.
20      Do you do your expert witness work
21  through a company by the name of GLG?
22  A.  In this case, yes.
23  Q.  Okay.  And then would this be a similar --
24  like a type of timesheet you would have provided

19

1  to them for the time periods -- just basically,
2  is this how it would look when you provided
3  them?
4  A.  Yes.  They have a computer-based
5  timesheet entry platform that I fill out.
6  Q.  Okay.  I calculated, when you add up
7  all the time worked in minutes, it's about 2,475
8  minutes, or approximately 41-and-a-quarter
9  hours.
10      Do you have any reason to dispute that?
11  Or would you agree that that's probably about
12  what you spent in this matter at least up until
13  February 2nd of 2023, when the last timesheet
14  ends?
15  A.  That would meet my expectations.
16  Q.  Have you spent any more time since
17  February 2nd of 2023?  And if so, can you give
18  me your best approximation of how much, including
19  your prep for today?
20  A.  Yes.  I -- this weekend I filled out a
21  timesheet related to time on Thursday and Friday
22  of last week, approximately eight hours.
23  Q.  Okay.
24  A.  Mostly for searching in my archive for

20



James Tinjum 04/04/2023

**Page 21**

1  materials that were requested for this deposition.
2     Q.  Sure.  So we're approximately -- you're
3  at 41-and-a-quarter plus 8, give or take, we're
4  just shy of 50 hours, 5-0, spent; is that fair?
5     A.  That is fair.
6     Q.  Okay.  And then I saw in your report --
7  I don't know if you were supposed to include
8  this or not, but you did -- you charge a rate of
9  350 per hour for all work, right?
10     A.  Three-fifty for engineering work, and I
11  believe I have a less -- a basis of approximately
12  half of that for any travel-related effort.
13     Q.  Okay.  And then I also received a bill
14  from GLG.
15     Are you aware that -- and I'll show you
16  this, and you can let me know if you've ever
17  seen this before or not.  This will be Exhibit 3
18  for your deposition.
19     Have you ever seen a document like this
20  before?
21     A.  I have not been provided this document.
22     Q.  Okay.
23
24

**Page 22**

1       (Whereupon, TINJUM Deposition
2       Exhibit No. 3 was marked for
3       identification.)
4  BY MR. TERRY:
5     Q.  Nonetheless, Gerson Lehrman Group, Inc.,
6  that's who you work for, or at least who's put
7  you in contact with Mr. Sullivan for the purposes
8  of this matter, correct?
9     A.  That is correct.
10     Q.  Are you aware that they bill your time
11  at $675 per hour?
12     A.  I am not aware of that until now.  I
13  know --
14     Q.  Okay.
15     A.  -- that they have a markup, but I do
16  not ask how much.
17     Q.  Sure.  Nonetheless, you agree, though,
18  that the amount that the defense is being charged
19  for your time, based on this invoice, is $675
20  per hour, fair?
21     A.  Based on this document, yes.
22     Q.  Okay.  So if we do 50 hours, which is
23  give or take how much you've worked in this
24  case, multiple it by $675, you're at $33,750 to

**Page 23**

1  date that was charged to the defense for your
2  time in this matter.
3     Do you have any reason to dispute that?
4     A.  I have no reason to dispute that.
5     Q.  Do you know why GLG is billing more
6  than $300 per hour more than what you are
7  actually saying you're billing yourself at?
8     A.  I'm not privy to their business
9  practice.
10     Q.  Okay.  I mean, that's a crazy markup.
11     Would you agree?
12     A.  Based on previous projects, where it's
13  closer to 150 per hour markup, that is more than
14  some other firms that I have worked for.
15     Q.  Okay.  Well, it doesn't -- this is just
16  a fun fact that I saw.  It was actually kind of
17  funny.
18     Did you know that they also bank with
19  Silicone Valley Bank?  That was just kind of a
20  fun fact I saw based on the invoice.  That was
21  kind of, like, an, uh-oh.  Luckily they were
22  bailed out.  But, nonetheless, I saw that, and I
23  was, like, huh, what are the odds.
24     A.  Not relevant to me.  As far as I know,

**Page 24**

1  I have been being paid on -- on schedule.
2     Q.  No, I know.  I just saw that.  I
3  thought it was funny.  I know it's not relevant
4  to you.
5     What's up, Chris?
6     MR. SULLIVAN:  Well, yeah.  I mean, that's
7  why we had -- I think they switched their
8  payment methods.
9     MR. TERRY:  I don't blame them.
10  BY MR. TERRY:
11     Q.  Anyway, so, again, sir, you have no
12  reason to dispute that, give or take, so far to
13  date, you've charged 33,000 -- or the defense
14  has been charged for your time, 50 hours times
15  675 per hour, which is approximately $33,750,
16  fair?
17     A.  That would be fair.
18     Q.  Plus however much time you spend in
19  today's deposition, let's say another three or
20  four hours, so another -- let's say, three
21  hours, another almost $2,100?
22     A.  Yes.
23     Q.  Okay.  How much -- let me ask you this.
24  How much of your professional practice pertains



25

1  to litigation work?
2      A.  So my limited liability company, Tinjum
3  Consulting, LLC, is a part-time business on the
4  side with my day job per se.  Off the top of my
5  head, I -- I would say that two-thirds of my
6  work over the last five years has been litigation
7  related.
8      Q.  Okay.  So two-thirds -- you would say
9  approximately two-thirds of your income would be
10  related to litigation and the other one-third
11  would be related to non-litigation work?
12      A.  Approximately, yes.
13      Q.  And, again, I'm not asking you for an
14  exact estimate.  I appreciate the approximation.
15      When did this become the norm in terms
16  of your percentage litigation versus non-litigation,
17  et cetera?
18      A.  Approximately seven or eight years.
19      Q.  Okay.  So it's been pretty consistent.
20  We can just stick with that then.
21      Breakdown of -- well, how many open
22  files, litigation-wise, do you currently have,
23  give or take?
24      A.  Including this file, I have three open

27

1  BY MR. TERRY:
2      Q.  That being said.  Can you see my screen
3  here, sir, the List of Cases in the Past Five
4  Years for Tinjum Consulting, LLC?
5      A.  Yes, I do.
6      Q.  And I think this also may be in your
7  reports.  That's fine.
8      That being said, I see one case on here
9  where you were retained by the plaintiff for
10  cases in the past five years.
11      Would you agree with that?
12      A.  Yes.
13      Q.  Okay.  Does this include all cases in
14  which you've provided expert opinions?  Or only
15  cases in which you've provided testimony,
16  whether it be at trial or deposition?
17      A.  This specific list was for litigation
18  related expert report and/or deposition.
19      Q.  Okay.  Got it.  So for the last five
20  years, I guess your historical estimate is
21  pretty accurate.  One out of five is about 80
22  percent for the defense, fair?
23      A.  That is fair.
24      Q.  What is -- I see Slope Stability.  I

26

1  litigation cases.
2      Q.  Okay.  Got it.  What is the breakdown
3  of current plaintiff versus defendant in open
4  files?  This one is obviously defendant.
5      A.  And these three open files, I have been
6  engaged by the defendant in all three.
7      Q.  Okay.  What about historically
8  speaking, what would you say your breakdown
9  has been, give or take?
10      A.  Historically, litigation related, I'd
11  say approximately, off the top of my head, 75 to
12  80 percent would be defendant.
13      Q.  Got it.  Okay.  I want to show you what
14  will be marked as Exhibit 4 for your deposition.
15      MR. TERRY:  And so, Margie, just so we're
16  clear.  Today I'll do -- I know the CV is
17  included in his report, but it will just be
18  easier this way.  CV is 1, Timesheets is 2, GLG
19  Bill is 3, and then Exhibit 4 will be the
20  Five-Year Litigation List, and then Exhibit 5, I
21  think, will be the report.
22      (Whereupon, TINJUM Deposition
23      Exhibit No. 4 was marked for
24      identification.)

28

1  can guesstimate what that means.
2      But it says Grandad Bluff Coalition,
3  expert opinion on slope stability.  That is the
4  only one I see for plaintiff.
5      What did that case relate to?  And what
6  did you do -- talk about, et cetera?
7      A.  That particular case, I was engaged by
8  a community organization that was concerned
9  about the development of a mountain bike trail
10  system on Grandad Bluff in LaCrosse, Wisconsin.
11  And I was retained to do an expert report on any
12  concerns related to construction induced stability
13  or erosion issues.
14      Q.  Okay.  Got it.  Before we go into your
15  report, which will be the next exhibit, I just
16  want to clear something up.
17      You are clearly an expert in civil and
18  environmental engineering, fair?
19      A.  Yes, I would consider myself in those
20  terms.
21      Q.  Okay.  You are not -- I just want to
22  clarify what you're not.
23      You are not a construction expert.  And
24  what I mean by that is an expert in how construction



29

1  companies, whether general contractor or
2  subcontractors, do their work, means and methods
3  on a day-to-day basis, fair?
4      A.  I have a solid understanding of what
5  contractors do for earthwork construction.
6      Q.  Sure.  But you have never actually
7  worked for a construction company doing the
8  work, fair?
9      A.  I have not worked for a construction
10 company doing said work.
11     Q.  You've never done any manual labor in
12 the construction field; is that fair?
13     A.  I have not been a manual laborer in the
14 construction field.
15     Q.  So when you say you have a general
16 understanding of the work that's being performed --
17 I don't mean this to be offensive -- but,
18 essentially, you're one of the examples of those
19 who don't do it, teach it, fair?
20     A.  I would not say that's fair.
21     Q.  Why not?
22     A.  Because the first half of my career was
23 in consulting --
24     Q.  Okay.

30

1      A.  -- in the field, once upon a time
2  taking construction density tests, QA/QC,
3  overseeing the quality of those means and
4  methods in meeting engineered standards for
5  specifications.
6      Q.  Okay.  But you never told a contractor,
7  hey, you're using that bulldozer wrong.  You
8  would tell them something along the lines of, my
9  scientific analysis of the soil says X, fair?
10     A.  So, in context, the standard of
11 practice is not to tell a contractor how to do
12 something, but to indicate when they are not
13 meeting performance standards.
14     Q.  All right.  And, again, performance
15 standards wouldn't be about how they're using
16 their tools or how they're doing their work, it
17 would be about behind-the-scenes scientific
18 analysis of soil or whatever else it may be,
19 fair?
20     A.  Yes, that is correct in the context
21 that you generally do not tell a contractor
22 their means and methods, because then you take
23 on responsibility for telling them how to do
24 something.

31

1      Q.  Well, not only that, contractors are
2  usually not going to take orders from somebody
3  not in the construction field, fair?
4      A.  They are responsible to meeting the
5  standards that are posed to them in contract
6  documents.
7      Q.  So, again, to say it another way, you
8  were more of a behind-the-scenes, I know quality
9  assurance and quality control -- but behind the
10 scenes in terms of specifications, analysis, as
11 opposed to front line telling contractors how to
12 work, how to do their work, fair?
13     A.  Correct.
14     Q.  Okay.  I want to go into your report.
15     You have a copy of that in front of
16 you, right?
17     A.  I do.
18     Q.  Okay.
19         (Whereupon, TINJUM Deposition
20         Exhibit No. 5 was marked for
21         identification.)
22 BY MR. TERRY:
23     Q.  I'll share it really quick.  But it's
24 21 pages without the exhibits, 31 with, fair?

32

1      A.  The -- I have my exhibits starting on
2  Page 15.
3      Q.  What -- okay.  Do you see at the top of
4  your report where it says Page 1 of 21?
5      A.  Yes.
6      Q.  Okay.  So that's what I'm referring to
7  at least.  I guess, when you look at -- so
8  Exhibit 1 does start on Page 15.  But -- so I
9  guess the exhibits start on Page 15, as you
10 said.
11     But the 21 total pages with exhibits,
12 and then -- well, 31 with your CV; 21 with just
13 the normal exhibits, 31 with your CV, fair?
14     A.  Yes.  The -- the CV was not in that
15 page numbering system.
16     Q.  Okay.  But if you look at the top of
17 your CV --
18     A.  Oh, yes.
19     Q.  Yeah.  If you look at the top of your
20 CV, it does say Page 22 of 31 here, right?
21     A.  Correct.
22     Q.  Okay.  So we already talked about your
23 CV.  Just for sake of not altering your report,
24 I'll leave it attached to this.  It can be

1 attached again, that's fine.
2     But you do have a copy of this report
3 in front of you, right?
4     A.  I do.
5     Q.  Okay.  So I won't share my screen
6 unless we're not on the same page, no pun
7 intended.
8     By the way, sometimes you get it where
9 a report is drafted for you in our field and
10 then you agree with the opinions, sometimes you
11 draft it yourself.
12     Safe to say that I thought this was
13 written for a baccalaureate, so I'm going to,
14 again, assume you wrote it yourself; is that
15 fair?
16     A.  I prepared an annotated outline and
17 then I wrote this report myself.
18     Q.  Where is your annotated outline?
19     A.  The annotated outline, I believe, was
20 provided by legal counsel.
21     MR. SULLIVAN:  It's a draft PowerPoint that
22 was in the materials, Charlie.
23     MR. TERRY:  Oh, okay.  You mean the draft
24 PowerPoint?

33

1     MR. SULLIVAN:  Yep.
2     MR. TERRY:  Is that what you were referring
3 to, Mr. Tinjum?
4     THE WITNESS:  That is correct.  I typically
5 do my outline work in PowerPoint form.
6     MR. TERRY:  Fair enough.  Okay.  Got it.
7 Okay.
8 BY MR. TERRY:
9     Q.  Was there any substantial edits
10 requested by -- or maybe not even substantial,
11 but -- what's the word I'm looking for --
12 purposeful or meaningful edits suggested or
13 requested to be made by the defense firm in this
14 matter, whether it be Chris, or someone else
15 from his firm?
16     A.  So the annotated outline was reviewed
17 by Chris Sullivan, and I had a conversation with
18 him.  There was no edits requested.  He just
19 asked have I provided all of the required things
20 in an expert report.
21     Q.  Fair.  Okay.  Got it.
22     A.  Yes.
23     Q.  Trust me, I didn't expect this.  But
24 sometimes you get some good answers to that, so

34

1 you just have to ask.
2     Basically, when you go into Page 1 of
3 your report, you'd agree that you start out by
4 giving a basic introduction of your -- basic
5 opinions in the areas of why you were asked to
6 address, and these are standard of care for an
7 earthwork subcontractor, soil conditions, root
8 cause for ice formation, and the relevance of
9 the information contained in my expert's report,
10 Joe Barnes, fair?
11     A.  Yes, that is the generality of why I
12 was retained to provide an opinion.
13     Q.  Okay.  And then if you go down, it's
14 broken down into sections.
15     Number one would be the Standard of
16 Care for Earthwork Subcontractor, meaning you believe DBC, Don Borneke, followed
17 Care for Earthwork Subcontractor,
18 the standard of care for an earthwork subcontractor,
19 right?
20     A.  That is my opinion, yes.
21     Q.  Okay.  And then you go on to say,
22 basically, that there was specifications
23 provided to them that were prepared by an
24 engineer of record, right?

35

1     A.  Correct.
2     Q.  And then, basically, your opinion is
3 they followed these specifications -- to the
4 specifications to the best of your knowledge
5 based on the information you were provided,
6 fair?
7     A.  My word would be to the standard of
8 care, yes.
9     Q.  Okay.  To the standard of care.
10     Let me ask you this.  There -- is it
11 your opinion that their job is to follow these
12 specifications provided no matter what, even if
13 they believe them to be unsafe?
14     A.  Well, I don't know if they believed
15 that they were unsafe, but the contractor
16 standard of care is to follow specifications.
17     Q.  That wasn't my question.  I appreciate
18 it.
19     My question was, specifically, is it
20 your opinion that they are contracted to perform
21 the contracted work based on the specifications
22 whether or not they believe them to be safe or
23 unsafe?  It's not up to them to question it,
24 it's just up to them to be good soldiers and

36



James Tinjum 04/04/2023

1  perform the work.
2       Is that your opinion?
3       A.  That was not my specific opinion in
4  this report.  I did not opine on the safety
5  aspect that I remember.
6       Q.  Sure.  Well, I'm asking you now.  If a
7  contractor looks at the specifications and
8  believes something may be missing or the
9  compaction might not be good enough or the soil
10 report is troublesome, is it your opinion that
11 they should disregard those concerns and just do
12 the work as specified, or they should address
13 those concerns?
14      A.  So if there is some gross -- some gross
15 safety violations, those things are typically
16 discussed openly in the morning, quote, unquote,
17 toolbox meetings, or similar.  So there is --
18 especially when you have a relationship between
19 a contractor and an engineer at multiple sites,
20 those discussions are more common and fruitful.
21      Q.  Okay.  So you would expect a qualified,
22 safe, competent excavation expert, if they
23 thought something was unsafe to specifications
24 or the contract, to address that either with the

37

1  engineer of record or the company that hired
2  them, fair?
3       A.  Yes, I would expect an earthwork
4  contractor to follow those specifications.
5       Q.  Well, not only follow the
6  specifications.  If they though something was
7  unsafe about them, to bring them up to the
8  contractor that hired them or the engineer of
9  record, if they had that ability, fair?
10      A.  If they had that ability, yes, that is
11 fair.
12      Q.  Okay.  Let me ask you this.  If -- would
13 you agree that on this job site specifically, it
14 would be up to both -- I'll be fair -- both
15 Mortenson and Borneke to ensure that the
16 excavation plans were safe and executed
17 properly?
18      A.  Well, I do have a question about the
19 excavation plan.
20      So as I've opined in this report,
21 earthwork construction, overall, can include
22 excavation, but I characterize this work as --
23 specific to this incident, as not excavation
24 related.

38

1       Q.  Okay.  Do you agree that Don Borneke is
2  an excavation contractor, or earthwork contractor,
3  and I'll use those words interchangeably throughout
4  this because --
5       Well, let me ask you this.  Don't you
6  agree that Don Borneke was digging and doing
7  earthwork that pertained to foundations and
8  other things that would fit -- be categorized as
9  excavation work?
10      A.  So earthwork contractor is more of a
11 global term, and it includes multiple practices
12 within that.  I agree that they were engaged as
13 an excavation service for the excavation for the
14 wind turbine foundations in particular.
15      Q.  So when you say excavation work was not
16 an issue, you just mean specifically as it
17 pertains to the access road in the erection
18 area, fair?
19      A.  Can you repeat that, please?
20      Q.  Sure.  When you say that the excavation
21 is not applicable, or is not excavation work,
22 whatever you just said, you're saying that only --
23 that statement only relates to the work that was
24 directly related to where Mr. Georgeff fell,

39

1  meaning the erection area and the turnaround
2  roads, fair?
3       A.  Yes, I consider the lay-down area for
4  the turbine area to be a non-OSHA qualified
5  excavation effort.
6       Q.  Jim, I get that.  And we're going to be
7  here for ten hours if you just like to hear
8  yourself talk after every answer.  It was a
9  simple yes or no.
10      The question was, do you agree that
11 part of the work was excavation related based on
12 your definition of it and part of it, specifically
13 the erection area in the lay-down yard and the
14 and turnaround area, would not be, fair?
15      A.  Yes.
16      Q.  Okay.  There we go.  So there was
17 excavation components to Don Borneke's work on
18 this project, just specifically not as it
19 relates to the exact location where the ice
20 formed, in your opinion, fair?
21      A.  That was my opinion, yes.
22      Q.  Okay.  So would you agree that
23 Don Borneke is not only an excavation expert
24 company, but also an earthwork general global

40

Pages 37 to 40



1  firm, whatever word you want to use, contractor
2  in this Midwest region?
3      A.  Excavation and earthwork, yes.
4      Q.  Okay.  And, in fact, you read the
5  depositions in this case, right?
6      A.  I have reviewed the depositions.
7      Q.  Okay.  You're aware that, even when you
8  go to their website, they talk about how many
9  dozens of wind farm projects they've worked on.
10  They pride themselves to be the experts in
11  excavation and earthwork, contract work
12  performed on these wind farms for the Midwest
13  region, fair?
14      A.  I saw some screenshots of their web
15  page as part of some of those deposition records.
16      Q.  Okay.  And on those screenshots, they
17  hold themselves out to be experts for wind farm
18  excavation and earthwork moving, fair?
19      A.  To my memory, yes.
20      Q.  Would you expect that a -- would you
21  expect that a company performing excavation work
22  on a project to be able to know how to read
23  plans, whether it be specifications for
24  compaction, whether it be specifications for

41

1      A.  Yes.
2      Q.  Okay.  Got it.
3      MR. TERRY:  You know what, guys, I'm sorry,
4  can we go off the record for a second?
5      MR. SULLIVAN:  Yes.
6          (Recess taken.)
7      MR. TERRY:  Back on the record.
8  BY MR. TERRY:
9      Q.  So, sir, you would expect that
10  Don Borneke, as we were talking about, to know
11  about soil responses in the area, and specifically
12  for the projects they're working on, because you
13  would expect them to be able to read the
14  specifications and do the work based on those,
15  fair?
16      A.  I would expect them to understand the
17  soil conditions.
18      Q.  Okay.  You would expect them to
19  understand the different specifications that are
20  required for pad versus an erection area, what
21  is safe and what is unsafe between those two
22  things based on the soil response and everything
23  kind of put together in that one big puzzle.
24  Based on everything they had, they should know

43

1  excavation, whether it be soil types, soil
2  categorizations, you always expect them to have
3  a general knowledge of all those things that go
4  into their work on a job site?
5      A.  Yes, I would expect that general
6  knowledge.
7      Q.  And if they don't have that general
8  knowledge, you would agree that they probably
9  shouldn't be doing this type of work, fair?
10      A.  It's that knowledge that allows them to
11  appropriately bid and receive jobs.
12      Q.  Okay.  So you would expect, at least
13  from a general standpoint, that Don Borneke
14  would be able to read and evaluate the contract
15  specifications, the geotechnical report, soil
16  classification reports, all that stuff; is that
17  fair?
18      A.  That is fair.
19      Q.  And you would expect them to be able
20  to, based on their experience in the area, come
21  to some, at least, general predictions or
22  conclusions about the type of soil, the weather,
23  stuff like that, based on their 60 plus wind
24  farm projects in the same region, fair?

42

1  what's safe, what's not safe, and how to do
2  their work based on a given area, fair?
3      A.  That's fair.
4      Q.  Okay.  So you would agree that they are
5  qualified to make assessments about the plans,
6  if they thought something about them was unsafe,
7  or improper, based on their experience in the
8  field?
9      A.  I would say that the standard of
10  practice is for, across the industry, would
11  be to allow the contractor to make those types
12  of -- initiate those types of discussions.
13      Q.  Especially if they're experts in this
14  field who have dozens of these types of projects
15  in the same geographic region, fair?
16      A.  Yes.
17      Q.  And you would agree -- and if I ask --
18  I might be asking you hypertechnical similar
19  questions, but they're different, I promise.
20          You'd agree that they're qualified to
21  look at weather reports to know what is likely
22  to come and how to respond to that with their
23  work coming up?
24      A.  I would expect a contractor to be in

44



James Tinjum 04/04/2023

1  tune and cognizant of the upcoming weather
2  conditions.
3      Q.  Because that can be highly important,
4  especially in the Midwest, when you're building
5  a wind farm, fair?
6      A.  Yes.  And across the seasons, weather
7  can present certain challenges.
8      Q.  And then the same questions as it
9  pertains to the soil reports and the
10  geotechnical reports.  And, again, if I asked
11  this, I apologize.
12      Do you agree that Don Borneke would be
13  qualified to not only look at these, but
14  qualified to provide opinions if they thought
15  something was lacking or dangerous or not
16  appropriate for the geographic region, fair?
17      A.  So I would expect them to develop means
18  and methods specific to the soil conditions.
19      I might need you to repeat that
20  question, so I got you correctly.
21      Q.  Sure.  Let me break it down a little
22  bit, because it is a multiple-point question.
23      You do agree that Don Borneke is
24  qualified and competent to look at the soil

45

1  ground and see how the soil is responding, see
2  what's going on underneath the surface, it might
3  necessitate different types of means or methods
4  based on what's going on in the sublayers, or
5  even in the top layer, just based on how it's
6  saturated or not saturated or whatever it may
7  be?
8      A.  So this answer does need some context.
9      Q.  Yes.
10      A.  Wind farms are very large projects over
11  large acreages, so, yes, soil conditions are
12  going to vary and potentially require different
13  considerations from one site to the next.
14      Q.  Okay.  And this is something that you
15  might not know until you actually get in there,
16  open up the ground and start moving earth
17  around, and say, uh-oh, this might be a little
18  different from the report.  Hey, let's have a
19  conversation about this and figure out the best
20  way to proceed, fair?
21      A.  That is fair.
22      Q.  Okay.  Let me just ask you a general
23  question.
24      You know, you're talking about the

47

1  reports, look at the geotechnical reports, know
2  what they mean, implement what they're
3  requesting of them in the field, fair?
4      A.  Yes.
5      Q.  And the same question, based on that,
6  because they're qualified and competent to look
7  at them and implement them in the field, you'd
8  expect them to have that same requirement you'd
9  expect of any contractor in the field, if they
10  see something that provides maybe pause or
11  concern or something that may not be appropriate,
12  you'd expect them to use the industry standard
13  and initiate a conversation, whether it be with
14  the general contractor and engineer of record,
15  whoever drafted these reports, fair?
16      A.  Yes, I agree with that.
17      Q.  Okay.  And would you also agree that
18  sometimes excavation companies, or the earthwork
19  contracting companies -- I'll use those
20  interchangeably for now.  When we get into
21  specific -- different work, that's -- we can
22  differentiate it.
23      Would you agree that sometimes these
24  contractors, when they actually open up the

46

1  standard of care for Don Borneke.  And I know
2  it's your opinion that they followed the
3  standard of care, because they followed the
4  specifications properly.
5      But hypothetically speaking, if an
6  excavation or earthwork contractor does not
7  properly perform the work on a job site, such as
8  they're not, you know, compacting to the correct
9  specifications or responding to the soil,
10  whatever it may be, would you agree that if
11  they're not doing their work properly, then they
12  would not be providing the standard of care
13  required of an earthwork contractor, just
14  hypothetically speaking?
15      A.  In that hypothetical, yes.
16      Q.  Okay.  And then I'm going to continue --
17  well, we'll go back to the report.
18      You said that Borneke has to use -- and
19  I'm just speaking generally.  If we need to get
20  specific quotes, we will.
21      But generally, you'd agree that they
22  need to use their means and methods to meet the
23  earthwork specifications, right?
24      A.  Correct.

48



James Tinjum 04/04/2023

1  Q.  So at the end of the day, it's up
2  to Borneke to perform the work up to the
3  specifications that are provided to them,
4  whether it be from geotech reports to contracts,
5  whatever it may be, all the specifications, it's
6  up to them to implement them in the field, fair?
7      A.  It is up to them to implement means and
8  methods.
9      Q.  Okay.  And they have to use, as we
10  talked about, their expertise to make sure these
11  specifications are appropriate not only from
12  project to project, but from site to site, fair?
13      A.  I'm sorry, just repeat that one more
14  time, please.
15      Q.  Sure.  You also agree that, based on
16  what we've just been talking about, Borneke
17  would not only have to, you know, come up with
18  the means and methods to implement these
19  specifications based on their expertise in this
20  field, you'd expect them to use this expertise
21  to make sure that the specifications are
22  appropriate, or at least safe, generally
23  speaking, from project to project, and even site
24  to site depending on how the ground conditions

49

1  may change on a large project, fair?
2      A.  Not necessarily.
3      Q.  So you -- so -- I'm just getting a
4  disconnect here.
5          A second ago you said an earthwork
6  contractor, including Don Borneke, would have to
7  use their expertise to make sure specifications
8  are safe and appropriate.  And if not, have the
9  conversations with the appropriate contractors
10  or engineers, right?
11      A.  Correct.  All --
12      Q.  So the --
13      A.  -- I'm saying is that there are
14  evolving relationships where there are
15  pre-construction activities to review the site.
16  If the contractor input into it more as a
17  partnership and -- you know, I'm not sure what
18  this particular relationship was on this site,
19  where this contractor was allowed to pre-bid or
20  pre-project.  Have those types of discussions.
21      Q.  Okay.  But my question for you, just
22  generally speaking, you'd agree that the
23  industry standard would be for Don Borneke to
24  use their expertise to look at these specifications

50

1  and just generally make sure that they're safe
2  and appropriate for the work they're going to be
3  performing in this area, fair?
4      A.  Yes.
5      Q.  Okay.  And then not only that, in
6  addition to doing those two things, the means
7  and methods and using their expertise, they also
8  have to execute their work properly, right?
9      A.  Correct.
10      Q.  And then in the last -- the first main
11  paragraph on Page 1, it says:  The quality
12  assurance control program was in effect and --
13  was in effect and enforced by others, primarily
14  Mortenson, right?
15      A.  Yes.
16      Q.  So Mortenson signed off on the work
17  that Don Borneke did on this project, based on
18  the testimony you've read, fair?
19      A.  That's my understanding, yes.
20      Q.  Okay.  But at the end of the day,
21  Mortenson is not an excavation company, and
22  that's why they hired Don Borneke, fair?
23      A.  Mortenson is an engineer, procure,
24  construct contractor --

51

1      Q.  Okay.  Who hired --
2      A.  -- not an earthwork contractor.
3      Q.  Exactly.  Again, it's a simple yes or
4  no.
5          So the answer would have been Mortenson
6  is not a specialized contractor, and that's why
7  they hired specialized contractors for this work,
8  fair?
9      A.  Yeah, subcontractors, correct.
10      Q.  Sure.  A subcontractor is a contractor.
11  That being said, so at the end of the day,
12  Borneke also had their own quality assurance and
13  quality control personnel on site, albeit, Nick
14  Borneke, fair?
15      A.  I am not specifically remembering a
16  specific QA/QC personnel.
17      Q.  Okay.  If Nick Borneke, obviously is a
18  member of the Borneke family, said that he was
19  on the site doing quality assurance and quality
20  control on a daily basis, would you have any
21  reason to dispute that?
22      A.  I would not have reason to dispute
23  that.
24      Q.  Okay.  So at the end of the day,

52

Pages 49 to 52



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1 although -- and would you have any reason to
2 dispute the testimony that Mortenson generally
3 signs off on the work, basically says, yeah,
4 we'll just go from the surface.
5     But at the end of the day it's up to
6 the specific contractor performing the work to
7 make sure they're doing it safely so that it's
8 ready to be signed off on?
9     A.  So in the industry it's typical for
10 a -- somebody separate from the contractor doing
11 the work to assess the quality of that work.
12     Q.  Sure.  But while the contractor -- and
13 we'll just use Borneke in this situation --
14 while they're doing their work, they should do
15 it up to the required specifications, if they
16 can, so that way when it comes time to sign off
17 on it they can get the checkmark and they can
18 move on, fair?
19     A.  Yes.
20     Q.  Okay.  So Mortenson's not out there
21 telling Borneke, hey, do your work in a
22 different way; or, hey, do this this way.  It's
23 still up to Borneke, like -- as you said, means
24 and methods, specifications, and execute the

53

1 work, fair?
2     A.  Yes.
3     Q.  And they also have their own quality
4 assurance person on the job site, Nick Borneke,
5 fair?
6     A.  Yes.
7     Q.  Okay.  So it's -- it's not just
8 Mortenson doing quality assurance.  Mortenson is
9 signing off on the work, but Borneke is the one
10 actually doing the work and actually has their
11 own quality assurance as well, fair?
12     A.  It's fair that Borneke or a contractor
13 would be assessing the level that their work is
14 performing to.
15     Q.  And you'd also expect that Borneke be
16 doing that as they're doing their work, fair?
17     A.  Repeat that one time, please.
18     Q.  Sure.  You'd also be expecting Borneke,
19 or any excavation earthwork contractor, to be
20 doing that as they're performing their work,
21 fair?
22     A.  Yes.  It's part of their understanding
23 that they are performing to specifications.
24     Q.  Okay.  You say that the standard of

54

1 care required Mortenson to notify Borneke of
2 problems, and then Borneke would fix them,
3 right?
4     A.  If you could point that out in my
5 report, so I can just get the context.
6     Q.  Sure.  The last full sentence on
7 Page 1:  As issues surface which would
8 necessitate repair and/or corrective action,
9 the standard of care is to notify the
10 subcontractor and allow time and access to
11 address the issue, right?
12     A.  Yes.
13     Q.  Are you -- do you remember the
14 testimony of Nick Borneke that said it was a
15 joint effort.  Mortenson would tell them about
16 certain things, but Borneke would also figure
17 out things on their own and address them as
18 needed.  That's why they had quality assurance
19 on the site?
20     A.  I do not specifically remember the
21 exact statement, but that would not surprise me
22 that that was stated.
23     Q.  Okay.  So it's not only Mortenson's job
24 to make sure the work is performed properly by

55

1 Borneke.
2     Would you agree, just generally
3 speaking and specifically for this project, it's
4 a joint effort between the hiring contractor and
5 the subcontractor doing the work.  If the
6 subcontractor realizes something is unsafe, they
7 can say something, if the general contractor
8 realizes something is unsafe, they could say
9 something, right?  It's a joint effort?
10     A.  It is a joint effort in those terms,
11 yes.
12     Q.  Okay.  Got it.  And you agree that
13 there are some projects where the earthwork
14 contractor does their work and then they leave
15 the project until they're called back, if needed,
16 fair?
17     A.  Yes.
18     Q.  On this project, Borneke was on the
19 site every single day; and, specifically, Nick
20 Borneke also testified that he was on the site
21 doing quality assurance every day or most days,
22 fair?
23     A.  To my memory, yes.
24     Q.  Okay.  And then you also agree that

56

Pages 53 to 56



James Tinjum 04/04/2023

1  Borneke, if they saw a problem, they had -- and
2  they said this in their testimony -- they could
3  go ahead and fix it if it's their work, fair?
4      A.  Yes.
5      Q.  Okay.  And then whether or not you like
6  the word tune-up, I get it, but, nonetheless,
7  you agree that Borneke, including Nick Borneke,
8  said that they were, in fact, doing tune-ups
9  from time to time on this project, meaning going
10 around, seeing if some of their work needed to
11 be resmoothed or releveled or whatever it may
12 be, and doing that, right?
13     A.  Yes.
14     Q.  So you agree that it's -- on this
15 project specifically it was a team effort
16 between Mortenson and Borneke, not all on one,
17 not all on the other.  It's a team effort to
18 make sure the work is not only being performed
19 properly, but also making sure that it's being
20 maintained properly, fair?
21     A.  Yes.
22     Q.  Okay.  If we go on to Page 2, on the
23 top -- well, it starts on the bottom of Page 1.
24 But it says:  An Engineer-Procure-Construct

57

1  contractor, so EPC, such as Mortenson understands
2  and plans for some level of project variability
3  understanding that when an earthwork subcontractor
4  is hired, they are purchasing a defined service
5  and not insurance, right?
6      A.  Correct.
7      Q.  Okay.  So you agree that despite this,
8  Borneke still has an obligation to perform the
9  work as a reasonably safe contractor would,
10 right?
11     A.  Yes.
12     Q.  And this would include having the
13 general knowledge of the plans and the
14 specifications to make sure, one, they are safe;
15 but two, so that way they can implement them in
16 the field by their own means and methods, fair?
17     A.  Yes.
18     Q.  Okay.  So they're not supposed to be
19 perfect, but they are supposed to do the work
20 properly, fair, and be knowledgeable experts in
21 their field doing the work, fair?
22     A.  Yes.
23     Q.  Okay.  And then you continue that
24 Borneke employed reasonable care and competence

58

1  given unknown and uncontrollable factors, right?
2      A.  Yes.
3      Q.  Okay.  And in your opinion the unknown
4  factors are things like weather, environmental
5  conditions, and soil heterogeneity, right?
6      A.  Yes.
7      Q.  Okay.  How is -- let me ask you this.
8  How is environmental conditions different from
9  weather, just generally speaking?
10     A.  So weather is things like temperature,
11 precipitation.
12     Q.  Sure.
13     A.  Environmental conditions are the result
14 of that weather, such as that freeze/thaw cycles
15 or wet/dry cycles.  Those are environmental cycles.
16     Q.  Okay.  So they go hand in hand, but
17 essentially weather is the temperature, the
18 rain, the sun; and the environmental would be
19 how the earth is responding to that?
20     A.  Yes.  That is my technical approach.
21     Q.  Okay.  What is soil heterogeneity?  Or
22 if I'm even pronouncing that correctly.
23     A.  It just means, in simplest terms, that
24 Mother Nature gives us a mix of soil conditions

59

1  at a site.
2      Q.  And is it heterogeneity or heterogeneity?
3      A.  Heterogeneity.
4      Q.  Heterogeneity.  Okay.  All right.  And
5  you say that all of these things are unknown to
6  Borneke, and that's why you think they employ
7  reasonable care and competence given these
8  unknown factors, right?
9      A.  Yes.
10     Q.  Okay.  My question for you is, how do
11 you reconcile this, when later in your report
12 you say that the soil response was predictable
13 and this was a predictable outcome based on the
14 site conditions, soil conditions, et cetera?
15     A.  So, specific to that location, what I'm
16 saying is is that, in general, silty, subgrade
17 conditions were expected at the site, just not
18 knowing where specifically they were expected.
19     Q.  So, generally speaking, this potential
20 outcome was predictable, but maybe not
21 specifically at site T11.
22         Is that what you're saying?
23     A.  Yeah, that's a fair characterization of
24 my statement.

60

Pages 57 to 60



James Tinjum 04/04/2023

1    Q.  Okay.  So as an excavation expert, even
2  before the work starts, anyone who's looking at
3  these reports and knows anything about anything
4  about soil heterogeneity, soil types, geotechnical
5  reports, they should know that a response like
6  this might happen depending on environmental
7  conditions, and to kind of be aware for things
8  that change on the project given the various
9  sites, fair?
10    A.  That's a fair statement at multiple
11  levels, including the geotechnical report rider --
12    Q.  Sure.
13    A.  -- the EPC contractor, and the
14  subcontractors.
15    Q.  Oh, okay.  So it's a fair statement
16  that this was a -- whether it be at site T11, or
17  somewhere else, that this response was a
18  predictable response based on the type of soil,
19  not only for Borneke, but -- we'll do it this
20  way -- for Borneke, for Mortenson, and for the
21  geotech rider, fair?
22    A.  The elastic settlement would be expected
23  and was expected in the geotechnical report.
24    Q.  Okay.  Got it.  And this is something

61

1  you would expect a competent contractor, like
2  Borneke, to know what that is; to know that,
3  hey, this might occur on various sites; be on
4  the lookout for it and make sure we're just
5  doing the work properly based on how the soil
6  responds from site to site, fair?
7    A.  I'm just going to have to characterize
8  my responses.  They may not understand the
9  mechanics of it.  They'll understand that
10  they've seen that before, so would expect things
11  to happen without necessarily knowing the
12  engineering mechanics of it.
13    Q.  So they might not know the engineering,
14  like, they might not be a professional engineer
15  or a civil engineer with a doctorate in this
16  question, but they -- you know, in this area,
17  but based on their experience, you still expect
18  them to be able to look at this report and
19  understand, generally, what it means and how the
20  soil might respond --
21    A.  Yes.
22    Q.  -- in this area, fair?
23    A.  Yes.
24    Q.  Okay.  And based on that, when they go

62

1  from site to site, they have, like you said,
2  conditions might change from T1 to T -- however
3  many there were, 30 or whatever it was.
4    On each individual turbine site, there
5  might be different soil conditions, fair?
6    A.  At each turbine site and then across
7  the location soil conditions may be different.
8    Q.  Okay.  So I'll go -- and I understand
9  that you're going to say Mortenson, in the
10  rider, purports to know this.
11    But Borneke would also know that, hey,
12  be on the lookout, there might be this silty
13  type of soil on various sites, right?
14    A.  They should be aware of that, yes.
15    Q.  Okay.  And you agree that, from site to
16  site, turbine site to turbine site, work may
17  need to be altered for the means and methods and
18  the specifications.
19    Once you actually open up the soil and
20  say, oh, site T10 didn't have a silty soil, but
21  site T11 does.  Let's make sure we're addressing
22  this with either the engineer or Mortenson and
23  figure out a plan that's safe, fair?
24    A.  A plan that's executable, yes.

63

1    Q.  Okay.  Not only executable, also that
2  would be -- lead to safe work conditions on the
3  project, fair?
4    A.  Yes.
5    Q.  Okay.  So when you say this is an
6  unknown factor, just to be clear, you're only
7  saying, specifically, no one could have
8  predicted exactly that site T11 would have this
9  response, but generally on the project, this
10  response could be expected somewhere, fair?
11    A.  Yes.
12    Q.  Okay.  On the next -- maybe it's the
13  next page.  Oh, yeah, this is what I wanted to
14  talk about.  And this is exactly what we're
15  getting into on the next page.  We'll get there
16  in a second.  We don't have to go there.
17    When you actually say that Barr Engineering
18  geotechnical report was -- predicted -- like, it
19  predicted this type of response in various areas
20  of the project, fair?
21    A.  It stated that there were elastic silts
22  and it predicted that there was elastic settlement
23  specific to the wind turbine foundations.
24    Q.  Okay.  So this is something that you

64

Pages 61 to 64



1 would -- again, the geotech report is something
2 that you'd at least expect Don Borneke to have a
3 working knowledge of and understand what it's
4 saying, specifically what silty soil might do,
5 fair?
6    A. It is fair that the geotechnical report
7 is typically part of the construction documents.
8    Q. And part of what you'd expect a competent
9 contractor, like Borneke, to understand and
10 implement in the field based on their own means
11 and methods, fair?
12    A. They would be expected to understand
13 the soil conditions, yes.
14    Q. Okay. So you would expect Borneke not
15 only to have read this document, but to have
16 known about it and implemented it in their work
17 on the project from site to site if they see a
18 different response from a site -- the previous
19 site, fair?
20    A. It's fair that they would be expected
21 to be knowledgeable of all construction documents.
22    Q. Okay. You go on to number two, the
23 main next heading on Page 2 -- well, 15 to 21.
24 It says that, generally, the root cause of an

65

1 settlement caused that slightly depressed area
2 where then precipitation could collect and
3 freeze.
4    Q. So when you say elastic -- I just want
5 to make sure I'm understanding you correctly --
6 it's kind of a combination of two things. One,
7 it's a combination of the freeze/thaw, but then
8 also combined with the weight of the equipment
9 that's staged in this area, fair?
10    A. So if -- if you allow me to define what
11 elastic settlement is, maybe that will help.
12    Q. Sure.
13    A. So elastic settlement, or compression,
14 is a near immediate response to a loading. So
15 think of a sponge, you have a sponge that's
16 filled with water and you put your hand on top
17 of it and you push it down, the sponge moves, it
18 compresses.
19    Q. Sure. Sure.
20    A. That is an elastic response.
21    Q. Got it. So if we think of it this way --
22 I just want to make sure I'm -- so it's -- when
23 you have a new sponge that's dry, it doesn't
24 have that elastic response, as easily at least;

67

1 exposed, thin layer of ice at turbine erection
2 site T11 was elastic compression of compacted,
3 fine-grained silt that was -- what is it --
4 surficially loaded by placement of a heavy tower
5 section at the location of the slip/fall
6 incident, right?
7    A. Correct.
8    Q. Okay. That is very hypertechnical, so
9 I want to break that down. Because I've been
10 dealing with this for the last four years, and I
11 barely know what that means. And I want to make
12 sure that we're all on the same page when this
13 goes in front of a jury.
14    A. Sure.
15    Q. You are basically saying that because
16 of the freeze/thaw cycle, the soil was caused to
17 retain precipitation and/or melted water, fair?
18 Simply put, I know I'm oversimplifying it, but
19 that's the general statement?
20    A. Yes, it retains water.
21    Q. And this is what you believe caused the
22 sheet of ice to rise -- or the water to rise and
23 the sheet of ice to form, fair?
24    A. My statement was is that elastic

66

1 but when you have it wet, it does have it, fair?
2    A. So it's a very fair follow up. When it
3 is dry, it will not have as much compression as
4 when it was wet.
5    Q. Okay.
6    A. It's stiffer when it's dry, it is not
7 as stiff when it's wet.
8    Q. Okay. So this is why you say it's not
9 just like a sheer pressure causing this. It's
10 kind of the elasticity caused by the ground
11 condition, but also the weight of the equipment
12 on top. So it's not just the sheer force, it's
13 the freeze/thaw that caused this when the
14 equipment was placed there, fair?
15    A. Yes. Multiple factors go into that
16 mechanism.
17    Q. Okay. And this elasticity of the soil
18 was, as you said in the engineering report, a
19 predictable response in certain areas, just not
20 exactly where it would happen, fair?
21    A. It's fair, but let me provide context.
22 The geotechnical report specifically calculated
23 elastic settlement for the wind turbine foundations
24 and not necessarily for these prep areas.

68

Pages 65 to 68



1    Q.  Okay.  You agree that the wind turbine
2  foundations are in the same area, generally
3  speaking, as the erection area, because you have
4  to have the turbine in the erection area, fair?
5    A.  Correct.
6    Q.  Okay.  And so in the same general
7  location there is this elasticity noted at each
8  turbine site, fair?
9    A.  Yes.
10    Q.  Okay.  So at each turbine site,
11  Borneke, Mortenson, and the geotech person, but
12  specifically Borneke, would have known the soil
13  is going to have an elastic response based on
14  the geotechnical report, based on the soil,
15  based on everything.
16    They should have at least known that,
17  hey, these foundation sites, the erection sites
18  might have this type of elastic response, fair?
19    A.  I would expect them to be cognizant of
20  that, not just because of this site, but because
21  of their previous work.
22    Q.  Okay.  And if they had any qualms or
23  problems or concerns, it would not only be up to
24  Mortenson and the geotech writer to bring them

69

1  came from, it could be melted precipitation or
2  it could be water that is expelled from the soil
3  when it is loaded.
4    Q.  I got --
5    A.  I cannot tell you definitively if it
6  was melt water or if it was water that came out
7  of that wet sponge.
8    Q.  So for all you -- exactly.  For all you
9  know, it could have come out of the wet sponge,
10  it could have come from rain, it could have come
11  from somebody hosing off equipment.  But it just
12  pooled in that area due to it being depressed,
13  due to the response of the soil, due to its
14  elastic qualities, fair?
15    A.  That is fair.
16    Q.  Okay.  You say that the soil has a
17  lower elastic moduli, I think.
18    What does that mean?
19    A.  So that is the stiffness that I'm
20  referring to.
21    Q.  Got it.
22    A.  So stronger soil has higher modulus and
23  is stiffer; soil that's wetter, weaker has a
24  lower moduli, it's less stiff.

71

1  up, Borneke could also address it; hey, we're
2  about to bring in a 50,000-pound piece of
3  equipment, or however heavy it was, I'm
4  concerned that the elasticity in the soil might
5  not be able to support it properly.
6    They could have done that, and that
7  would be industry standard if they had those
8  concerns, fair?
9    A.  Anybody at a site could provide to that
10  discussion.
11    Q.  Okay.  Got it.  When you're saying that
12  the elastic part of the soil, I just want to
13  make sure, are you saying that -- well, this is
14  going to sound like a stupid question, but I
15  have to ask it.
16    The frozen sheet of ice came from water
17  that eventually froze.
18    We can agree on that, right?
19    A.  Yes, I would agree.
20    Q.  Are you opining where the water came
21  from?  Or are you just saying that the depressed
22  area was formed due to the elastic response?
23    A.  Both.  I can opine that the loading
24  caused the elastic response.  Where the water

70

1    Q.  Okay.  And, again, this is also
2  something that Borneke, not only given their
3  expert -- not only given their review of the
4  documents for this project and their knowledge
5  of them, but based on their general experience
6  in the area, you'd expect them to know how
7  certain soil with, maybe not these terms, but a
8  lower elastic moduli will respond, fair?
9    A.  I think it's fair to especially soft,
10  wet soils, they would expect to have -- expected
11  to understand that there's more potential.
12    Q.  Okay.  And then you do -- that's fair.
13  Then you do go on to say that contractors find
14  it hard or impossible to compact the soil if the
15  solar radiation is low.
16    So pretty much, when the solar -- like,
17  when the radiation from sun is lower, the
18  soil -- the sponge won't dry out, and it's hard
19  to get the soil compacted to a level that's
20  appropriate; is that fair?
21    A.  That's a very fair understanding.
22    Q.  Okay.  And, again, this is something
23  that Borneke, given their expertise and given
24  their review of the documents, would know, and

72



1  given just the general, hey, it's August to
2  November in the Midwest, fair?
3      A.  It's fair that, as I indicated in
4  Part II, that the spring and late fall, early
5  winter are more problematic with regards to
6  drying otherwise wet soil.
7      Q.  Okay.  And the point is that this is
8  something that would be not only -- I'm just
9  focusing specifically on Borneke.
10      This is something that would be well
11  known among earthwork excavation contractors,
12  right?
13      A.  Earthwork contractors will understand
14  that soil will compress when loaded.
15      Q.  Okay.  And this is something, specifically,
16  when an earthwork contractor opens up the soil
17  at a specific site, like T11, for example, when
18  they were moving it around and doing the compaction,
19  creating this erection area, this is something
20  that they can see that might change from site to
21  site and they have to respond to those changes
22  from site to site, fair?
23      A.  Respond in what manner?
24      Q.  Sure.  If the elastic moduli or the

73

1  changes in the soil, changes from site to site,
2  this is something that, just generally speaking,
3  earthwork contractors should know of.  And if
4  there's changes from site to site, like you say
5  there might be, they have to respond to that
6  appropriately and come up with the proper means
7  and methods to effectuate the work, fair?
8      A.  Yes.
9      Q.  Okay.  Then you go on to say there
10  were no in-force specifications of contract
11  conditions, which would have mitigated this
12  condition, right?
13      A.  There were no quantitative specs like
14  there was for the wind turbine foundation itself
15  or the crane itself.
16      Q.  Okay.  So, basically, the -- we talked
17  about this a lot in the depositions of all
18  Mortenson people and all Borneke.
19      The pad -- the crane pad and the
20  turbine, like, the actual foundation, has,
21  like -- I think the word that was used, like,
22  astronomical specifications, because you don't
23  want anything to happen there, and catastrophic
24  failures can happen, fair?

74

1      A.  That is correct.  The most critical
2  components of the site are the wind turbine
3  foundation and the crane pad.
4      Q.  Okay.  But you also do agree that
5  Borneke, just simply put, based on the contract,
6  had an obligation to not only -- it was their
7  obligation to create erection areas, fair?
8      A.  Sorry, one last --
9      Q.  Sure.
10      A.  -- the last part of that?
11      Q.  Yeah.  They had an obligation to
12  create, like, erection areas, right?
13      A.  Yes, they created the erection areas.
14      Q.  And the erection area was approximately
15  a 175-foot radius area that would -- I'm sorry,
16  it was a -- it's a large area.  But the
17  turnaround area was, like, 175-foot radius that
18  allowed for the delivery of components and the
19  turnaround of the trucks, fair?
20      A.  Yes.
21      Q.  And this was at each specific site,
22  right?
23      A.  Yes.
24      Q.  And you remember reading the testimony

75

1  where it said, Borneke would have access to,
2  like, the plans of the day, and they would know
3  which site was getting deliveries when?
4      A.  Yes.
5      Q.  Okay.  And you also read the testimony
6  that said not only that, but these erection
7  sites, granted, they had the 175-foot turnaround
8  area, the 175-foot radius, they specifically
9  knew, at least down to a pretty close degree of
10  accuracy, where the trucks would come in and
11  turn around and where the equipment would be
12  staged, fair?
13      A.  I would assume so, yes.
14      Q.  Do you have any reason to dispute the
15  testimony that says that?  Or no?
16      A.  No.
17      Q.  And, in fact, you assume it, right?
18      A.  Yes.
19      Q.  Okay.  So -- and would you have any
20  reason to dispute the testimony, though,
21  although the specifications between the
22  foundation and the crane pad differ from the
23  erection area and the turnaround area, the
24  turnaround area still needs to be more stringent

76

Pages 73 to 76



1   in terms of its preparation so that it can
2   effectuate the delivery of these trucks and the
3   staging of the equipment?
4       A.   That erection area has a defined standard.
5       Q.   Okay.  And it's probably not -- it's
6   obviously not as high as the foundation, but
7   it's obviously not the lowest standard on the
8   project either.
9           It's somewhere in the middle, right?
10      A.   No, I would disagree with that.  I
11  would say that the access roads and haul roads
12  have higher standards, the crane pad and the
13  wind turbine generator foundation have the
14  highest standards, and the laydown area would
15  have the lowest standards at the site.
16      Q.   Okay.  So if Borneke's own employee
17  said that this turnaround area would have higher
18  specifications than the access road, would you
19  disagree with them in that regard?
20      A.   I would, yes.
21      Q.   Okay.  Fair enough.  Nonetheless, would
22  you agree that the point of these erection areas
23  is to make sure the ground is able to support
24  the weight of the trucks delivering the

77

1   equipment and the equipment being staged?
2       A.   Yes.
3       Q.   Okay.
4       A.   In addition to that egress for delivery
5   of equipment and similar.
6       Q.   Sure.  And, generally speaking, these
7   excavation companies know how much these pieces
8   of staged equipment weigh, because they've done
9   this work on dozens of other projects and they
10  also have the contract specifications, fair?
11      A.   They should have a general fill -- feel.
12  but I believe there's typically a separate
13  erection contractor at the site that's lifting
14  that equipment and offloading.  It's the general
15  standard of practice.
16      Q.   Let me ask you this.  An excavation
17  contractor, like Borneke, who's done this, I
18  think, 60 times in the Midwest, they would know
19  that these pieces of equipment and the trucks
20  delivering the pieces of equipment are beyond
21  heavy, fair?
22      A.   Yes.
23      Q.   Okay.  And they would have to know
24  that, hey, certain areas are going to have this

78

1   silty soil.  We need to make sure that the areas
2   with silty soil are properly prepared, or an
3   alternate plan is implemented, if needed, so
4   that way the equipment can be delivered and
5   staged, right?
6       A.   Yes and no.  I agree that -- that it
7   can be delivered, but the alternate plan, I don't
8   know if that would be Borneke's responsibility.
9       Q.   Sure.  Maybe not creating the plan, but
10  at least starting the conversation, like, hey,
11  we opened up the soil on this site and it's
12  pretty wet, it's pretty soggy.  I think the soil
13  might fail underneath it.
14          That's something that an excavation
15  contractor, when they open up the soil, should
16  be able to see, right?
17      A.   Not necessarily fail, but that this
18  area has soil conditions that are worthy of
19  consideration.
20      Q.   Okay.  So when they open it up, and a
21  contractor who is already aware that, hey, this
22  project will have silty, wet, sponge-like soil,
23  if they get to a specific site and they see this
24  when they're doing the earthwork, they should at

79

1   least have a conversation, hey, there might be
2   some unfavorable results of the soil at this
3   site, how do we address this, if at all, fair?
4       A.   They could do that if they have, you
5   know, a productive partnership on the site.
6       Q.   Okay.  So you agree that had -- so
7   Borneke had the availability, or the option, to
8   do that at each individual site if they thought
9   something needed to have that conversation,
10  fair?
11      A.   I think they could do that.  I do not
12  specifically remember being that a requirement
13  in the contract documents of Borneke.
14      Q.   Well, you do remember that the contract
15  documents at Borneke said that they have to not
16  only do the means and methods of the, you know,
17  specifications, but do the work so that way it
18  can properly and, like, safely effectuate
19  delivery and staging of equipment in the
20  turnaround areas, fair?
21      A.   That sounds like typical language of a
22  contract document, but I -- I don't remember the
23  specific language.
24      Q.   Sure.  We'll get there.  But, nonetheless,

80



1 the point is, if they thought something might be
2 potentially unsafe and their job is to effectuate
3 safe work, or work that allows the work to be
4 performed in a safe manner, they would have an
5 obligation, if they thought it might be unsafe,
6 to bring that up to somebody, fair?
7     A.   Unsafe work, yes, generally should be
8 brought up to somebody.
9     Q.   Okay.  So when you say there's no
10 specific specification or contract condition
11 which sort of mitigated this condition, this is
12 something that, hypothetically, if Borneke, when
13 they opened up the soil, saw this silty soil
14 response, they could have brought this to
15 Mortenson's attention, and said, hey, I think we
16 should address this before anything even gets
17 delivered.
18         That was a possibility, fair?
19     A.   It's a possibility, but with context.
20 I think, generally, with these types of soil
21 conditions, it's the operational constraints
22 that are discussed.  What that means is running
23 of delivery vehicles, pulling out the delivery
24 vehicles that get stuck.

81

1         Usually in the context of these types
2 of soil conditions, it's not necessarily a
3 safety issue, but they're looking at the
4 operational things, are vehicles potentially
5 getting stuck.  Are they able to deliver the
6 components, I think, is the primary thought
7 process for those soil conditions.
8     Q.   And then a secondary one would be
9 safety.
10         Because, like you said, safety should
11 be at the forefront of everyone's mind, fair?
12     A.   Fair.  Yes.
13     Q.   And a depressed area on a job site
14 where water can pool and freeze can potentially
15 be unsafe, fair?
16     A.   It could potentially be unsafe, yes.
17     Q.   So Borneke had the knowledge and
18 expertise that silty soil would compress
19 possibly causing a depressed area.
20         If they saw this when they opened up
21 the soil, they knew about it, you agree one of
22 the potential remedies would be to tell
23 Mortenson, hey, at this specific site, soil is
24 more silty than the previous sites, maybe we

82

1 should address this in a different way.
2         That was a possibility, fair?
3     A.   It's a possibility if they had data
4 that would allow for that possibility, such as
5 compaction tests, roof rolling --
6     Q.   Okay.
7     A.   -- main size distributions and similar.
8     Q.   Let me ask you this.  We've already
9 established this.
10         They would have had at least a general
11 predictably of this response on the project as a
12 whole based on the engineering reports, fair?
13     A.   Yes.
14     Q.   And when they open up the soil at a
15 specific site, they're able to make determinations
16 about the soil at that specific site, fair?
17     A.   On a gross level.  But, again, I don't
18 believe that there was specific QA/QC data for
19 this site.
20     Q.   That wasn't my question.  My question
21 was specifically earthwork contractors, when
22 they're doing this work.
23         You agree that it changed from site to
24 site.  You've already established this.

83

1         And that if soil conditions did change
2 from site to site, they should address this and
3 alternate their means and methods, if needed, to
4 effectuate the work based on the changing soil
5 conditions from site to site, fair?
6     A.   I actually do not know what they would
7 have done differently other than preparing the
8 material to spec, which is basically a grading
9 and light compaction to grade specification.
10     Q.   Well, we'll get there in a second.
11 But, nonetheless, my question is this.
12         They -- when they are going from site
13 to site, a qualified knowledgeable subcontractor
14 in excavation and earthwork, they can see the
15 soil response changing from site to site, if
16 there are such changes, fair?
17     A.   Yes, they are generally observant of
18 those types of conditions.
19     Q.   Okay.  Got it.  Would you agree that --
20 you know, you say something in this section
21 about a reinforcement layer followed by a clean
22 granular spill.  I can't talk, apparently.
23         That would have been a possible way to
24 address the soft silty soil on this site, right?

84



1    A.  That would be the extreme engineering
2  solution, yes.
3    Q.  Okay.  But this is also, like I said, a
4  predictable response to the soil.  So this would
5  be, if it was of concern to the excavation
6  contractor, the -- the best way to mitigate any
7  possible concerns about the silty soil, fair?
8    A.  Sorry.  Say that one more time.
9    Q.  Sure.  Since the soil response was
10  predictable on this site on the project as a
11  whole, this type of mitigation would have been
12  the most predictable or easily, like accessible --
13  maybe not easily accessible in terms of
14  practicability, but easily, like, suggestible by
15  the excavation contractor if there was a concern
16  about the silty soil, fair?
17    A.  I would have to answer this with
18  context.
19    Q.  Go ahead.
20    A.  I think it's predictable by somebody,
21  such as myself, a professional engineer, the
22  engineer of record, the engineers at the site on
23  a quantifiable manner, and earthwork contractors
24  see it in play.  So they have seen similar types

85

1  of soils at other sites --
2    Q.  Got you.
3    A.  -- and this soil is going to be harder
4  to work.
5    Q.  Okay.  So although the engineer might
6  have the scientific analysis of it, the
7  earthwork contractors have the knowledge of the
8  geotechnical reports plus the in-the-field, oh,
9  shoot, this soil responds differently than
10  others, fair?
11    A.  Yes.
12    Q.  And if they had a suggested mitigation,
13  the earthwork contractor could say, hey, we
14  could strip this down, put in some fill in a
15  layer, and then put it back up, and that should
16  mitigate any possible risk of the silty soil,
17  right?
18    A.  That would be proposing contract
19  modifications and additional work, but they
20  could do that, yes.
21    Q.  Okay.  Got it.  The next section, OSHA
22  1926 Subpart P, as in Peter, Excavation, is not
23  applicable to this case.
24    You see that, right?

86

1    A.  Yes.
2    Q.  Okay.  And, again, I just want to be
3  clear.
4    So part of Borneke's work on this
5  project as a whole, OSHA Subpart -- OSHA 1926
6  Subpart P, Excavation, would be applicable.
7    You just don't think it was applicable
8  for the creation of the erection in the lay-down
9  yard, fair?
10    A.  Yes.
11    Q.  Okay.  Then on the bottom of this page
12  you discuss the low hydraulic conductivity,
13  meaning expeditious infiltration of precipitation
14  and/or snowmelt cannot be reasonably expected.
15    You say that, right?
16    A.  Yes.
17    Q.  And, again, I'm not trying to be cute.
18  This is very, very complicated jargon.
19    To say it simply, because of this type
20  of soil, you do not think water, or precipitation,
21  will exit it, or leave it, quickly, right?
22    A.  Yes.
23    Q.  Okay.  On the top of Page 3, you say
24  that the turbine erection area is designed to

87

1  ensure adequate bearing support for temporary
2  staging of heavy pieces of the wind turbine
3  generator system and unload transportation
4  vehicles, not to protect employees from
5  cave-ins, right?
6    A.  Yes.
7    Q.  So I guess that what you're saying,
8  basically, 1926 is not applicable to this very
9  specific work, fair?
10    A.  Yes.
11    Q.  Okay.  But, nonetheless, you do agree
12  that the erection area and the staging area, the
13  compaction in the ground needs to be adequate,
14  such that it can, one, support the weight of the
15  trucks coming in with the equipment; two, support
16  the turnaround; and three, support the staging
17  of that equipment, fair?
18    A.  Yes.
19    Q.  Okay.  Let me -- you also say something
20  along the lines of this soil is C -- Type C, as
21  in Charlie, not B, as in boy, right?
22    A.  No, the reverse.
23    Q.  Oh, okay.
24    A.  I say that the geotechnical report

88



James Tinjum 04/04/2023

1    classifies the site soil as Type B, but the
2    Barnes report classifies it as Type C.
3        Q.  Sorry, it was long day yesterday
4    preparing for this.
5        Yeah.  So it's B type soil based on
6    your analysis, not C, fair?
7        A.  No.  The geotechnical investigation
8    report classified it as OSHA B.
9        Q.  Yes.
10       A.  That was a stamped PE report.  So then
11   I would expect the soil to be Type B, generally.
12   Whereas as the Barnes report classified it as
13   Type C.
14       Q.  Okay.  And, again, I get the -- my
15   question is just simply then.
16       How do you respond to the fact that
17   OSHA said that any soil submerged or seeping is
18   a Type C soil?
19       A.  That would be fine.
20       Q.  Okay.  So you do agree --
21       A.  I understand that statement, yes.
22       Q.  Okay.  So let me -- I know this -- so
23   any soil that is submerged or seeping is Type C,
24   fair?

89

1        A.  Yes.
2        Q.  And you, again, say the Barr
3    Engineering report was predictive of this type
4    of soil response, right?
5        A.  Yes.
6        Q.  So then are you critical of the
7    engineers or of Mortenson for not doing
8    different specifications in this area?
9        A.  No.
10       Q.  Okay.  So you don't think that it was
11   a problem, you just think that this was a
12   predictable response, essentially, based on the
13   silty soil, right?
14       A.  It's a predictable response, yes.
15       Q.  And anyone -- as we've already established,
16   anyone who is qualified or knowledgeable in this
17   field reading these reports will know this, right?
18       A.  The geotechnical engineers would know
19   this, yes.
20       Q.  Not only the geotechnical engineers.
21   We already talked about it.
22       You'd expect Borneke to get a copy of
23   this report and at least have a general knowledge
24   of the type of soil response and predictability

91

1        A.  As classified by OSHA, yes.
2        Q.  Yes.  So as classified by OSHA then,
3    would you agree that the soil under the sheet of
4    ice -- let's just talk about that, okay.  The
5    soil under the sheet of ice, when it was water
6    or when it was seeping water, since it's
7    submerged and/or seeping, that specific area
8    could be categorized as Type C soil by OSHA?
9        A.  It could be categorized, yes.  My
10   statement was that site soil, in general, was
11   Type B.  But as you indicate --
12       Q.  Okay.
13       A.  -- there -- as I indicate, there's
14   heterogeneity and there's potential for other
15   classifications.
16       Q.  Okay.  And the potential would be that
17   the soil in or around or underneath the ice
18   would be Type C because of its submerged or
19   seeping qualities, right?
20       A.  In that classification system, yes.
21       Q.  Okay.  And then we get into what I want
22   to talk about next.  Barr Engineering report
23   Page 3, but number four on your report.
24       You see that, right?

90

1    of it, fair?
2        A.  Yes.
3        Q.  Okay.  So then, based on that, this
4    predictable response would have been predictable
5    not only to the geotechnical engineer, not only
6    to Mortenson, but also to Borneke, fair?
7        A.  Yes.  Borneke would have an understanding
8    based on their other work that this type of soil
9    could have this response.
10       Q.  Sure.  The last sentence of this
11   section -- maybe this -- this paragraph, I
12   apologize.  It starts groundwater is very
13   shallow.
14       Do you see that?
15       A.  Yes.
16       Q.  It says:  Groundwater is very shallow
17   at the site, 0.8 to 10 feet below ground
18   surface, which indicates that water retention
19   and availability can be problematic, right?
20       A.  Yes.
21       Q.  So this is, again, further evidence of
22   this predictability that would be known to
23   anyone reading this report, fair?
24       A.  Correct.  I am summarizing context

92

Pages 89 to 92



1 within that report.
2 Q. Sure. So you're basically saying why
3 it's predictable here, right?
4 A. Yes.
5 Q. Okay. Got it. And then you say, lower
6 on -- and, I'm sorry, apparently I have
7 something in my throat, but nonetheless -- in
8 conclusion, for this section, you say: The
9 freeze/thaw cycles damage the structural
10 integrity of the compacted soil. Even with
11 compaction quality assurance, you still believe
12 it was prone to degrade regardless, fair?
13 A. That is fair. And that is based on
14 research in publications that I have done on
15 soil response to freeze/thaw?
16 Q. Sure. And I'm not going to question
17 your qualifications, Mr. Tinjum. What I'm
18 saying is, this is just further -- based on this
19 type of predictable soil response, anyone reading
20 the report would know that the compaction might
21 degrade, including the excavator contractor
22 hired to do the compaction at the site, fair?
23 A. Yes and no. An engineer, and an
24 engineer like myself, with this type of

93

1 experience would understand this better, but --
2 academically, but contractors would understand
3 this because of practice.
4 Q. So let me put it to you this way. You,
5 obviously, have dedicated your life to this
6 field and studying it, and you know from a --
7 both in the field, but also more of a book-smart
8 way, fair?
9 A. From a mechanism based way, yes.
10 Q. Sure. And then Borneke would know it
11 from both the scientific aspect, but more so
12 from an in-the-field working way. They had more
13 in the field working knowledge, but you'd also
14 expect them to know the general know-how to
15 understand and comprehend these reports, fair?
16 A. They have practice based experience,
17 yes.
18 Q. Got it. And then you get into your
19 rebuttal opinions about Joe Barnes, right?
20 A. Correct. That is item five in my
21 report.
22 Q. Yep. All right. So number five,
23 Rebuttal to August 12, '22 Barnes Report.
24 You have a qualm with his use of the

94

1 work sink, S-I-N-K, right?
2 A. That is correct. It's not a geotechnical
3 engineering term.
4 Q. Sure. Let me ask you this. Would you
5 agree with me that underneath the sheet of ice
6 was a depressed area, the extent of which we
7 don't know because it wasn't measured; but we
8 can agree on the term depressed area?
9 A. Yes, I have stated that it appeared to
10 be a depressed area.
11 Q. Okay. So you don't like the term
12 sinking, but you will agree with me that it was
13 a depressed area, right?
14 A. Yes.
15 Q. And depressed area caused by a
16 predictable response of soil in which the
17 saturated sponge was compressed with a heavy
18 piece of a mid-section turbine, fair?
19 A. Yes.
20 Q. Okay. So I'm not trying to be cute,
21 I'm just asking.
22 So this is more so of a semantics or
23 vernacular rebuttal as opposed to, like, a --
24 methodology here.

95

1 You just don't think that that's a
2 recognizable term in the industry, sinking,
3 fair?
4 A. Correct.
5 Q. Okay. And then you continue that,
6 ruts, holes, sagging, and weeping surfaces are
7 not symptoms of improper site preparation.
8 Ruts are the visible result of shallow bearing
9 capacity failures caused by wet or supersaturated
10 soil; soil type with ruts more prone; and
11 damaged surface layers from freeze/thaw cycling,
12 right?
13 A. Yes.
14 Q. Okay. But, again, what -- I'll assume --
15 for the purposes of these next questions, I'm
16 assuming that what you say is true and Barnes
17 isn't. I'm not saying that I agree with that,
18 but let's just take your points here and go with
19 that.
20 Based on your point, all of this was
21 still a predictable soil response, fair?
22 A. Yes. It's not surprising.
23 Q. Okay. And then, in your opinion, even
24 if Borneke worked as they were contracted to do,

96



James Tinjum 04/04/2023

1  things such as ruts, sagging, weeping surfaces
2  are not symptoms they were doing their job
3  improperly, but rather a soil response that was
4  predictable, fair?
5      A.  Yes.
6      Q.  Okay.  We'll come back to that in
7  second.
8      MR. TERRY:  We've been going for about
9  another hour.  Let's just take a quick, like,
10  three-minute break, and come back at 11:50, and
11  then I'll continue on.
12      Does that work for everybody?
13      THE WITNESS:  That works.
14      MR. TERRY:  Perfect.  Thanks, everyone.
15          (Recess taken.)
16  BY MR. TERRY:
17      Q.  Sir, I have a question for you.  So we
18  just -- and I'm just going to repeat my last
19  question so we're back on the same page.
20      In your opinion, even if Borneke
21  performed the work they were contracted to do,
22  wet saturated soil with ruts and depressed areas
23  and sagging, et cetera, would not be an indication
24  they were doing their work improperly, fair?

97

1  That's your opinion?
2      A.  Yes.
3      Q.  Okay.  So let me ask you this.  I'm
4  going to go through a few people's testimonies,
5  and I just want to make sure we're on the same
6  page.
7      Do you remember reading the testimony
8  of Leonard Breyne, B-R-E-Y-N-E?
9      A.  Let me -- I am just looking at my
10  transcripts.  B-R-E-Y-N-E?
11      Q.  Yep.
12      A.  Yes, I reviewed it.  And just in
13  advance, there's a lot of different people, so
14  sometimes you've just got to remind me and what
15  they said and who they said.
16      Q.  Sure.  Let me tell you this, okay.  I'm
17  only going to ask you about people that I
18  know -- actually, there might be one you
19  haven't.  But most of them -- the majority of
20  the testimony I'm going to ask you about, I'm
21  certain you've reviewed.  Okay?
22      A.  Okay.
23      Q.  So let me -- Leonard Breyne, who's an
24  ironworker, said:  Although other areas of the

98

1  site were prepared properly, it's his opinion,
2  based on the fact that there was a large
3  depressed area with a sheet of ice, that this
4  area was not prepared properly with Borneke.
5      You would disagree with that, fair?
6      A.  Disagree with that statement or that
7  that statement was made?
8      Q.  Disagree with the statement.
9      A.  Yes.
10      Q.  Okay.  And so for all of these, I'm
11  just going to ask you whether or not you agreed
12  with the statement and its proposition, not
13  whether or not they made it, because I know they
14  made it.  Okay?
15      A.  Okay.
16      Q.  The same thing that Leonard Breyne
17  testified, if Borneke performed their job
18  properly, this accident could have been
19  prevented.
20      You would disagree with this too then,
21  right?
22      A.  Again, I'm going under the premise that
23  these were statements, and, yes, I would disagree
24  with that.

99

1      Q.  For all of these, let's go under that
2  premise.  Okay?
3      Also, if he said that Borneke graded
4  properly and provided proper drainage from day
5  one, the water would never have been able to
6  pool there.
7      You disagree with this as well then,
8  fair?
9      A.  Yes.
10      Q.  You also looked at the deposition
11  testimony of Andrew Kruse, K-R-U-S-E, who's the
12  Mortenson superintendent.
13      If he testified -- and, again, assuming
14  all these are true.  If he testified that the
15  ground needed to be compacted so that it can
16  support the weight of trucks driving and
17  unloading equipment in such that it does not
18  sink underneath staged pieces of equipment,
19  would you agree or disagree with this?
20      A.  I agree that that should be in the
21  specifications.
22      Q.  Okay.  And you would agree then that
23  the contractor performing this work would be
24  required to perform this work to those

100

Pages 97 to 100



1  specifications such that the areas do not sink
2  underneath the staged equipment or the trucks,
3  fair?
4      A.  No, not fair with context.  Again, as I
5  have previously stated, that you can grade and
6  compact an area and it can go -- undergo
7  environmental cycles, thus leading towards
8  rutting and similar regardless of whether it was
9  compacted properly or not.
10     Q.  Okay.  So you agree that that was the
11  contracted to specifications of Borneke on this
12  project, fair?
13     A.  Yes.
14     Q.  You just think other environmental
15  weather conditions changed the ground such that
16  it was near impossible to perform these contracted
17  to specifications, fair?
18     A.  No.  What I'm stating is is that if you
19  properly compact and grade an area, environmental
20  conditions can change it post-earthwork.
21     Q.  Okay.  If -- so you agree that Borneke
22  has the obligation to perform the work as Andrew
23  Kruse testified -- and we'll address the
24  changing conditions later -- but simply put,

101

1  Borneke had the contractual obligation to
2  compact the ground such that it can support the
3  weight of driving trucks, unloading, and staging
4  of equipment without sinking underneath them,
5  fair?
6      MR. SULLIVAN:  I'm going to object to the --
7      THE WITNESS:  Fair.
8      MR. SULLIVAN:  -- to the question, the
9  contract speaks for itself.
10     Go ahead.
11  BY MR. TERRY:
12     Q.  You said, fair?
13     A.  Yes.
14     Q.  Okay.  Now, if there are changing
15  ground conditions on the project, you would also
16  agree that Borneke had an obligation to maintain
17  the turnaround and erection areas on this
18  project such that it can effectuate not only
19  deliver, but also erection of the turbine
20  components, fair?
21     A.  Yes.
22     Q.  Okay.  So if there are changing ground
23  conditions -- we'll get to practicability or
24  changing of the specifications in a second.

102

1      But, nonetheless, based on your
2  understanding, they were contracted to perform
3  work that would require them to address changing
4  ground conditions and maintain the site due to
5  specifications of the contract, fair?
6      A.  Yes.
7      Q.  I mean, if they're not doing this,
8  simply put, they're not fulfilling their
9  obligations of the earthwork contract on this
10  project, fair?
11     A.  Yes.
12     Q.  Okay.  So would you agree that when the
13  ground conditions changed then, such that the
14  silty soil became hypersaturated by its freeze/thaw
15  cycle, Borneke still had the contractual obligation
16  to maintain this erection area to effectuate
17  delivery and transport and staging?
18     A.  Yes.
19     Q.  And by not doing that and by allowing a
20  depressed area to form, simply stated, based on
21  this obligation, they would not be complying
22  with the contractual responsibilities of the
23  earthwork excavation contractor on this project,
24  fair?

103

1      A.  I -- you're going to have to repeat
2  that and just go a little slower.
3      Q.  Sure.  I can rephrase it.
4      So simply put, sir, if Borneke is --
5  they have the obligation to maintain the ground
6  conditions even with the changing of the season,
7  the changing of the environmental conditions,
8  whatever it may be.
9      If they are not doing this, and
10  depressed areas are forming, whether or not you
11  believe they would have required different
12  specifications or removal of subgrade and
13  putting stuff in, simply put, by not maintaining
14  this area without depressed areas and without
15  areas that cannot support the weight of the
16  trucks, they would not be fulfilling their
17  contractual obligation of an excavation
18  contractor on this site, fair?
19     A.  No.  Again, I believe they were
20  performing their contractual obligations, which
21  means that you have to be given notice and
22  opportunity to perform maintenance and said
23  events.
24     Q.  Okay.  So let me ask you --

104



1    A.   What I'm saying is I don't recall
2  them ever not performing maintenance when asked
3  to do said maintenance.
4        Q.   Let me ask you this.  In this
5  hypersaturated soil, okay --
6        A.   I assume that it is super saturated,
7  yes.
8        Q.   Sure.  In your assumption, in your
9  model, whatever you want to call it, this
10 loading of this heavy piece of equipment, how
11 long would it take for it to sag, in your
12 opinion?  Give or take, a couple hours?
13       A.   Hours to days.
14       Q.   Okay.  But not weeks, fair?
15       A.   It would initiate that process
16 relatively rapidly.
17       Q.   Okay.  And more likely true than not,
18 within hours, right?
19       A.   It would initiate within hours, yes.
20       Q.   Okay.  So this turbine component was
21 delivered weeks before this incident.
22            Were you aware of that?
23       A.   I do not remember the exact sequence of
24 delivery and staging on the site.

105

1    A.   After the mats were removed, yes, it
2  would have been evident.
3        Q.   Well, not only after the mats were
4  removed.  It's pretty easy to see if mats are no
5  longer 3 inches above the ground and they're now
6  below the ground, fair?
7        A.   I disagree with that characterization.
8            Elastic movement, I don't know if it
9  was a centimeter, I don't know if it was an
10 inch, I don't know if it was three inches.  That
11 can be hard to see when it's obscured with the
12 equipment that's on it.
13       Q.   Nonetheless, you do think this is
14 something that would have been prevalent -- it
15 would have started at least -- pretty soon
16 thereafter the equipment was delivered, right?
17       A.   Yes, that is elastic compression.  It's
18 fairly --
19       Q.   Sure.
20       A.   -- instantaneous.
21       Q.   Okay.  And then my question for you
22 is -- again, we've already established Borneke
23 was on this project on a daily basis, right?
24       A.   Yes.

107

1        Q.   Nonetheless, if this equipment was
2  delivered even, let's say, ten days earlier,
3  approximately, the symptoms would have presented
4  themselves, more likely true than not, relatively
5  soon thereafter delivery, fair?
6        A.   I don't think that you can see
7  underneath a section of tower such as this to
8  actually see that it's compressing.  It's not
9  easily visible.
10       Q.   Sure.  Let me ask you this.  On this
11 tower, it was staged on top of, like, mats,
12 fair?
13       A.   I did not see a picture of that.  But
14 the resulting pattern of the formation appears
15 that there were mats placed.
16       Q.   Okay.  And while there was testimony
17 that the mats were removed, thus revealing the
18 ice, so the mats were present, based on the
19 evidence we have.
20            That being said, the mats, if they were
21 underneath the staged equipment, the symptoms of
22 them sinking would have been pretty evident
23 fairly soon thereafter in the hours after this
24 equipment was placed, fair?

106

1        Q.   And Nick Borneke, among others, was
2  going from site to site in a pickup truck making
3  sure that their work was still maintained as
4  they were contractually required to, fair?
5        A.   I believe that was stated in the
6  various depositions, yes.
7        Q.   So it wasn't just Mortenson telling
8  them, hey, something is wrong.  It's already
9  what we established, it was both, Borneke could
10 see something was wrong or Mortenson can tell
11 them something was wrong, right?
12       A.   Yes, in general.
13       Q.   Okay.  So this staged piece of equipment
14 was placed down days, maybe even weeks before
15 this subject incident.  Borneke would have had
16 that same amount of time, from the time the
17 equipment was staged, to go back to this area to
18 make sure that the staging of the equipment,
19 that the ground conditions that they prepared
20 were still adequate.
21            They would have had that window to do
22 that, fair?
23       A.   I don't know what they could have done,
24 because the equipment was there.

108



James Tinjum 04/04/2023

---

1    Q.   What equipment was there?
2    A.   The tower section.
3    Q.   Sure.  That's not my question.  My
4  question is, from the time this tower section
5  was put down, right?
6    A.   Yeah.  I --
7    Q.   To the time it was lifted up, that time
8  period.  I'm forgetting what the exact days
9  were, but I know it was approximately ten days
10 or more.  During that window, whenever it was,
11 was it a minute -- not a minute.  It was days.
12      During that time window, Borneke, being
13 on the site every day going from site to site,
14 doing observations to making sure work was
15 performed adequately, even if it's your opinion
16 they wouldn't have been able to see it, they had
17 the opportunity to go to that site and make sure
18 that the ground conditions, generally, at that
19 site were still adequate, fair?
20   A.   They had access to the site in general,
21 yes.
22   Q.   So, hypothetically speaking, if the
23 mats were depressed enough such that it caused a
24 deviation or a large sheet of ice to form, if

109

---

1    Q.   Okay.  How thick are they, give or
2  take?
3    A.   They're timber.  Just going off of
4  memory, maybe 12-inch by 12-inch.
5    Q.   Okay.  Well, then underneath the
6  timber, there's actually like mats that would be
7  placed as well, fair?
8    MR. SULLIVAN:  Tell him again.
9    THE WITNESS:  No.  I guess maybe I'm
10 misunderstanding.
11      The timber is the mat, typically.
12   MR. TERRY:  I think that we're understanding
13 two other things.
14 BY MR. TERRY:
15   Q.   So on this project -- and, you know
16 what, let me do this.  I'll show you your report
17 real quick, because the photo kind of shows it.
18 Okay?
19   A.   Sure.
20   Q.   Can you see my screen?
21   A.   Yes, I can.
22   Q.   Do you see these timbers over here
23 underneath the section next to the sheet of ice?
24   A.   Correct.  Okay.  I understand now.

111

---

1  it's sitting next to another piece of staged
2  equipment that's not depressed, you agree that
3  that's something that could be differentiated
4  between, hey, this piece of equipment is lower
5  than that one and the mats we're seeing are
6  lower than the other mats, fair?
7    MR. SULLIVAN:  Objection, speculation.  It
8  assumes that you can even tell by looking.
9    MR. TERRY:  You can answer.
10   MR. SULLIVAN:  Go ahead.
11   THE WITNESS:  My answer is, as I previously
12 testified, that I think that it could be quite
13 difficult to discern settlement with --
14   MR. TERRY:  I -- go ahead.  I didn't mean to
15 cut you off, I apologize.  Go ahead.
16   THE WITNESS:  By eyesight, my technical
17 opinion is that it would be difficult to discern
18 settlement underneath that power section on
19 mats.
20   MR. TERRY:  Okay.
21 BY MR. TERRY:
22   Q.   Let me ask you this.  Have you ever
23 seen those mats used on a construction site?
24   A.   Yes.

110

---

1    Q.   Do you see these mats?
2    A.   Correct.
3    Q.   Okay.  So what was testified is that
4  these mats that were underneath this section,
5  there was another set of mats where this sheet
6  of ice was.  And that underneath these mats that
7  are still here, they were not depressed, but
8  underneath this area they were.
9        So my question for you is, you see
10 these mats, how they may be a few inches thick?
11   A.   Yes.
12   Q.   Okay.  If these -- that's what I'm
13 talking about when I say mat, not the timbers.
14 Okay?
15   A.   Okay.
16   Q.   So these mats, if these are depressed
17 into the ground such that the mats next to them
18 are not, you'd agree that this would be a
19 phenomenon that would be observable on a job
20 site.  You can visibly see some mats are
21 depressed into the ground, some are not.  Fair?
22   MR. SULLIVAN:  Objection --
23   THE WITNESS:  It's possible --
24   MR. SULLIVAN:  -- assume facts not in

112

---

Pages 109 to 112



James Tinjum 04/04/2023

1  evidence.
2      But go ahead.
3      THE WITNESS: It's possible, but it's
4  hypothetical that you can see it.
5      MR. TERRY: Sure.
6  BY MR. TERRY:
7      Q. But it is possible that this could be
8  seen, right?
9      A. It is possible, yes.
10     Q. And this could be seen by anybody,
11  whether it be Mortenson or whether it be
12  Borneke, fair?
13     A. Yes.
14     Q. Okay. So during that time window in
15  this hypothetical situation -- well, let's just
16  say this.
17     Assuming that the hypothetical
18  situation I just gave you is true during that
19  time window of delivery and erection, Borneke
20  could have gone to this site and seen that
21  depression albeit the mats, fair?
22     A. It is possible.
23     Q. Okay. Got it. So let's move back on
24  to the testimony you agree with and disagree

113

1  with.
2      You'd agree with this actually, I
3  think, based on your testimony today, that Andy
4  Kruse testified, no matter who provided the
5  specifications to Borneke, it was up to them to
6  implement them in the field, fair?
7      A. Yes.
8      Q. You would also agree that Borneke was
9  provided information about the erection sites,
10  and pretty close to where the equipment was
11  going to be staged by stakes, fair?
12     A. Yes, that would be fair.
13     Q. Okay. And then going to Andy Black,
14  who is the project manager for Mortenson. I
15  don't know if I saw that you reviewed his
16  testimony. I'm assuming you did, but I don't
17  think it's listed in your report.
18     Do you remember if you reviewed the
19  project manager's testimony from Mortenson,
20  Andrew Black, or Andy Black he went by?
21     A. I do not specifically remember. I
22  would --
23     Q. Sure.
24     A. -- have to go to my computer and see if

114

1  I have that document, and for whatever reason,
2  left it out of the transcripts.
3      Q. That's okay. I'm just going to ask you
4  a -- I have your OneDrive, so if it's in there,
5  it's in there, if it's not, it's not. I just
6  have a general question for you.
7      My question for you is, Andy Black
8  testified the ground needed to be prepared such
9  that it could support both the weight of trucks
10  and equipment being staged and delivered.
11     You'd agree with this, actually, right?
12     A. Yes. It needs to be designed for that
13  condition -- those conditions.
14     Q. Well, not designed, but prepared for
15  those conditions, right?
16     He testified that the ground -- we're
17  not talking about the specifications here, we're
18  talking about the implementation of the
19  specifications.
20     He testified that the ground would need
21  to be prepared in such a way that it could
22  support both the weight of the trucks and the
23  delivered staged equipment.
24     You'd agree with that, generally

115

1  speaking, right?
2      A. Yes.
3      Q. Okay. You would also agree -- well,
4  let me ask you. You would disagree then if he
5  testified that large ruts and depressed areas
6  were evidence the ground was not prepared
7  properly.
8      You would disagree with Andy Black in
9  this regard?
10     A. I mean, yes and no. I mean, ruts could
11  be a sign of improper compaction, but they also
12  could be a sign of changed conditions and
13  environmental cycling.
14     Q. Okay. And the change in conditions and
15  environmental cycling are things that are still
16  contractual obligations of Borneke to maintain
17  on this project in these erection areas,
18  specifically in the turnaround areas, fair?
19     MR. SULLIVAN: Objection.
20     THE WITNESS: The maintenance was part of
21  their contract, I believe.
22     MR. TERRY: Okay.
23  BY MR. TERRY:
24     Q. So then based on that, the contractual

116



James Tinjum 04/04/2023

1 obligations and just based on what you know
2 about their work in this erection area -- and
3 you even have it in your report later, that they
4 had to maintain the erection area to facilitate
5 the delivery of the turbine equipment, et cetera.
6     You'd agree that Borneke had this
7 obligation to maintain, and that includes the
8 obligation to maintain changing ground and
9 environmental conditions, just generally
10 speaking, that they had that obligation, fair?
11     A.  Yes.
12     Q.  Okay.  Would you agree or disagree that
13 Borneke was -- well, actually, we've already
14 established this.
15     You think that Mortenson was the
16 quality control person.  But also you agreed
17 with me today that Borneke was going from site
18 to site doing their own quality control on this
19 site.
20     It was a team effort between Mortenson
21 and Borneke in this regard, fair?
22     A.  It's fair that everybody on site is
23 doing some form of quality control of their
24 progress.

117

1     Q.  Okay.  And would you agree that Borneke
2 was responsible for levelling and filing bumps
3 and holes as well as maintaining and compacting
4 the clean -- the cleared area while providing
5 adequate drainage at all times?
6     It's in your report, so I'm assuming
7 you agree with it.
8     A.  It's in my report because I believe
9 that is in the contract documents.
10     Q.  And that would be something that they
11 were required to do then, right?
12     A.  Correct.
13     Q.  Okay.  And would you agree that if
14 Borneke is not going around and repairing,
15 maintaining the ground conditions, and filling
16 bumps and holes, as well as providing adequate
17 drainage at all times, then they were not
18 fulfilling their contractual obligations
19 required of them, fair?
20     A.  If they were asked to do it, and did
21 not do it, yes, they are not following their
22 obligations.
23     Q.  But not only that.  Your own report
24 says that they had an obligation to maintain.

118

1     And we've seen in the testimony that
2 the maintaining of these ground conditions were
3 not only what Mortenson told them, but also if
4 they saw something, fair?
5     A.  Can you just point to my report,
6 wherever you're characterizing this, so I can
7 just get the context.
8     Q.  Well, it's later on.  I don't want to
9 jump around too much.  But Page 8 of 21 at the
10 top.  It's on bullet point -- I'll just read it
11 to you, because we'll get there in a second.
12     But cleared area to be maintained,
13 compacted, and provide positive drainage at all
14 times to facilitate turnaround area for turbine
15 delivery components throughout the duration of
16 the project, right?
17     A.  Yes.  Thank you.
18     Q.  Okay.  No, of course.  So Borneke has
19 this contractual obligation on this project, and
20 this would include the changing ground or
21 environmental conditions, fair?
22     A.  Yes.
23     Q.  And you would agree that if Borneke is
24 not going around and repairing the bumps and

119

1 filling the holes and maintaining and compacting
2 the cleared area while providing adequate
3 drainage at all times, that they were not doing
4 these things, they would not be complying with
5 their contractual obligations, fair?
6     A.  Correct.  There's a timeliness to it
7 that impacts that response, but yes.
8     Q.  Sure.  And this timelessness is both,
9 if Mortenson tells them or if they see it, fair?
10     A.  Yes.  And they're provided an opportunity
11 to do said maintenance.
12     Q.  Sure.  But also, again, if they see
13 something, they can request at that time to do
14 that maintenance, right?
15     A.  Yes, they could.
16     Q.  Okay.  Would you agree that, generally
17 speaking -- I think I skipped one.
18     Would you agree that, based on what I'm
19 telling you and based on just general construction
20 knowledge, Borneke knew -- I think we already
21 agreed on this, but Andy Black testified about
22 it.
23     Based on Borneke's review of the daily
24 reports and timesheets, et cetera, they would

120

Pages 117 to 120



1  know not only exactly when pieces of equipment
2  were scheduled to be delivered, but pretty much
3  exactly where they were going to be delivered
4  because they were also staked out on the project,
5  fair?
6      A.  That's a fair assessment.
7      Q.  And then Andy Black, project manager
8  for Mortenson, testified that in these areas,
9  because Mortenson -- or Borneke knows exactly
10 where and exactly when these pieces are going to
11 be delivered, that they need to prepare the
12 ground in these areas even more stringently than
13 the surrounding areas in the general vicinity,
14 so that way the prepared ground can support
15 delivery, turnaround, and staging.
16     And I don't mean in comparison to the
17 crane or the access roads, I just mean maybe the
18 5 feet next to the -- you know, the area where
19 it's staked out.
20     You would agree with that then, fair?
21     A.  No, I would not necessarily agree with
22 that.  I don't recall having that condition in
23 the contract documents.
24     Q.  Okay.  So if Andy Black testified that

121

1  that's his understanding, you would disagree
2  with that then, simply put, fair?
3      A.  It's fair that I do not recall seeing
4  special preparation in specific areas in the
5  contract documents in the lay-down area overall.
6      Q.  If he specifically said this -- if he's
7  just testifying -- he may have said it
8  hypothetically, because I don't know.  He's just
9  testifying from general industry knowledge,
10 that, hey, as an excavation contractor knows, in
11 this specific area, if a piece of equipment is
12 going to be delivered, they should maybe pay a
13 little bit more attention to that area than the
14 area 5 feet to the left.
15     Would you generally agree with that
16 proposition?
17     A.  Not -- no.
18     Q.  Okay.  Fair enough.  Would you agree or
19 disagree with him if he testified that even if a
20 depressed area forms, the drainage should be
21 proper such that the water does not pool and
22 allowed in an area where the water could pool
23 and freeze?
24     A.  Please repeat that.

122

1      Q.  Sure.
2      A.  I think I'm going to disagree, but I
3  need to make sure I understand the question.
4      Q.  Sure.  The project manager for
5  Mortenson testified that even if a depressed
6  area formed, he believes the drainage should be
7  adequate enough such that the water runs away
8  from the depressed area and does not pool.
9      Would you agree or disagree with this?
10     A.  I disagree.
11     Q.  Okay.  Nick Borneke is the next person
12 whose deposition you read that I want to talk
13 about.  He was the quality control person from
14 Borneke on the site, and he testified that
15 Borneke was responsible for maintaining the
16 erection area.
17     You actually agree with this, fair?
18     A.  Yes.
19     Q.  If he also testified that repairing and
20 maintaining required Borneke to provide adequate
21 drainage such that water did not pool and
22 freeze, would you agree or disagree with this?
23     A.  Can you repeat the context of his
24 statement?

123

1      Q.  Sure.  He testified, generally speaking,
2  that Borneke was required to provide adequate
3  drainage such that water did not pool and
4  freeze.
5      Would you agree or disagree with this?
6      A.  Pool, yes.  I don't think -- I would
7  disagree with the freezing statement.  That is
8  not a part of the contract documents.
9      Q.  Okay.  You would agree that --
10 generally speaking, if Borneke is providing
11 adequate drainage on this site, would you agree
12 with him that the water should not be pooling
13 even in depressed areas?
14     A.  No, I disagree.
15     Q.  Okay.  Would you agree or disagree with
16 Nick Borneke that Borneke was responsible for
17 going from site to site on a weekly basis and
18 doing quality control of the work and was
19 repairing what needed to be repaired?
20     A.  That sounds accurate, yes.
21     Q.  Okay.  So, again, Borneke is, in fact,
22 doing their own quality control on a weekly
23 basis and going from site to site and looking at
24 what needs to be repaired and just doing it,

124

Pages 121 to 124



1  right?
2      A.  Yes, they're inspecting the site.
3      Q.  Would you agree or disagree that
4  Borneke was responsible for leveling?  And when
5  he testified to this, leveling and filling all
6  ruts and holes as well as maintaining the
7  compacted area and providing adequate drainage.
8      I know you agree with that in regard to
9  other testimony.  Do you also agree with it in
10 terms of Nick Borneke's testimony, fair?
11     A.  Yes, I agree with that overall, as it
12 was part of the contract documents.
13     Q.  Sure.  Would you -- and then when
14 Nick Borneke testified that they're not going
15 around doing this, then they would not be
16 fulfilling the obligations of their contract,
17 fair?
18     A.  They would not be providing that
19 maintenance component.
20     Q.  Okay.  Would you agree or disagree with
21 Nick Borneke when he testified that Borneke was
22 required to properly grade an area such that
23 standing water will not form in the erection
24 area?

125

1      A.  Yes.
2      Q.  Okay.  Would you agree or disagree
3  that -- well, yes, you agree?
4      A.  I agree with your premise that you do
5  not allow for ponding water.
6      Q.  Okay.  Would you agree --
7      A.  I think that's -- you'd have to read
8  that back to me to make sure --
9      Q.  Sure.
10     A.  -- I understood your question.
11     Q.  Would you -- and all of this is
12 Nick Borneke's testimony right now.
13     Would you agree or disagree with
14 Nick Borneke when he testified that Borneke
15 was required to provide adequate grading and
16 drainage such that standing water does not pool
17 in the erection area?
18     A.  No.  Adequate grading so that generally
19 does not occur; but then if that occurs, that
20 there's maintenance to address the issue.
21     Q.  Okay.  So it's kind of you disagree
22 with him that adequate drainage and grading
23 would do this overall; but if it does start to
24 happen, you would think that the maintenance

126

1  requirement, or aspect of the contract, would
2  require them to address it?
3      A.  Yes.
4      Q.  Okay.  And you agree with Nick Borneke,
5  when he testified that, generally speaking,
6  Borneke knows when and where its equipment is
7  going to be delivered and how heavy it is, right?
8      A.  I would expect that, yes.
9      Q.  Okay.  And would you agree or disagree
10 with Nick Borneke when he, himself, testified
11 that if Borneke is doing their work properly
12 there should not be large depressed areas or
13 large ruts?
14     A.  No, I disagree.
15     Q.  So you disagree with Nick Borneke when
16 he also says that if there are large depressed
17 areas, or large ruts, that means Borneke was not
18 performing their work properly?
19     A.  Again, the -- my previous premise is is
20 that rutting, and similar deflections, could be
21 caused by inadequate compaction, or they could
22 be caused by environmental factors, and other
23 things, regardless of how the material was
24 compacted.

127

1      Q.  Regardless, they would have an
2  obligation to maintain this such that those
3  areas are addressed, right?
4      A.  The maintenance is part of the
5  contract, yes.
6      Q.  Okay.  So then would you agree or
7  disagree with Nick Borneke, just simply put, if
8  there are large ruts and depressed areas, this
9  is evidence that Borneke was not doing their
10 work properly.
11     Would you agree or disagree with this?
12     A.  Not necessarily.
13     Q.  So you don't necessarily agree, you
14 don't necessarily -- which one is it?  Do you
15 agree or disagree with it?  That was my
16 question.
17     A.  Again, I'm saying that ruts could
18 happen by multiple reasons, so I can't answer
19 directly that it was caused by X or Y.  It could
20 be one or the other or a combination.
21     Q.  Sure.  Would you agree or disagree with
22 Nick Borneke, when he testified, that if Borneke
23 is doing their job properly, accidents like this
24 should never happen?

128



James Tinjum 04/04/2023

1    A.  I disagree.
2    Q.  Okay.  Let's keep going through your
3    report.
4        Lower on on the same page of your
5    report, you go into the testimony about the
6    tune-ups, right?
7    A.  Yes.  If you could point me to the
8    area?
9    Q.  I'm trying to find this right now too.
10   Okay.  Here we go.  Page 4, C.
11   A.  Page 4, C.  Okay.
12   Q.  So you say that you don't -- you never
13   heard of this term, essentially, on the job site,
14   right?
15   A.  I haven't heard of it in my interactions
16   with any personnel in the industry.
17   Q.  Okay.  Are you denying that Borneke
18   performed what they referred to as tune-ups on
19   this project?
20       And when I'm saying that, they refer to
21   tune-ups as they're going to the various job
22   sites -- or the sites they've already prepared
23   and maintaining and repairing them.  That's how
24   they refer to a tune-up.

                                          129

1        So would you just -- this whole point
2    in your report --
3        Well, let me ask this.  Do you agree or
4    disagree that they were performing those things?
5    A.  Yes, I understand that they were doing
6    those, maintaining and repairing, as necessary --
7    Q.  Okay.
8    A.  -- based on the fact witnesses.
9    Q.  Okay.  Your opinion is just that you
10   never heard of this term before, fair?
11   A.  Yes, that is correct.  It's not, in my
12   opinion, an industry standard turn -- term that
13   I have heard.
14   Q.  Sure.  That's fair.  When you go on to
15   number -- or letter D then, you say:  Full-depth
16   penetration of surface and deep sagging are not
17   symptoms of improper drainage, right?
18   A.  Yes.
19   Q.  So if you -- if all of the following
20   people:  Nick Borneke, Joe Barnes, Andy Black,
21   Leonard Breyne, and Andrew Kruse all say that
22   these are symptoms of improper drainage, you
23   would disagree with them?
24   A.  Yes.  It's not necessarily the root

                                          130

1    cause.
2    Q.  Not necessarily the root cause, but you
3    agree it could be a cause, fair?
4    A.  It could be a cause, yes.
5    Q.  Okay.  Fair.  So -- and another cause
6    could be improper draining or compaction.  It
7    could be.
8        Maybe not the root cause, but it could
9    be a cause, fair?
10   A.  Yes.
11   Q.  Okay.  When you go into E, you say the
12   area was not caused by load, but rather elastic
13   strain of a heavy element.  And you're -- yada,
14   yada, yada.  So we've already talked about this.
15       This goes back to the sponge analogy
16   you gave, and this was a predictable type of
17   response for this type of soil when you put
18   something heavy on saturated soil, fair?
19   A.  Yes.
20   Q.  Okay.  F, elastic-based settlement
21   versus shear failure.  Again, we talked about
22   that a lot.  We've got the sponge analogy, which
23   I appreciate because that makes a lot of sense.
24       This was all predictable, though, of

                                          131

1    this type of soil response even in the engineering
2    report, right?
3    A.  Yes, I could predict this.
4    Q.  Okay.  If you were on this job -- well,
5    let me ask you this.  Do you agree that this
6    type of soil response, when these heavy pieces
7    of equipment are being staged, do you agree that
8    this is something that should have been planned
9    for and contracted around?
10   A.  No, I do not believe that.
11   Q.  Okay.
12   A.  It is, or should be, standard of
13   practice.
14   Q.  Fair enough.  But then your next bullet
15   point under F, you say that it's heavily ero --
16   the root cause of the elastic-based settlement
17   caused by a heavily loaded area.  We've already
18   established that.
19       And then you say:  The allowable
20   bearing capacity is, in part, due to quality of
21   the soil and degree of compaction, right?
22   A.  Yes.
23   Q.  So it's a combination of both.  Not
24   only is it the quality of the soil, but it's

                                          132



1 also due to the level of compaction that was
2 either done on not done on this site, fair?
3     A.  Yes.
4     Q.  Okay.  And then G, you say, DBC had the
5 responsibility to provide the means and methods
6 to prepare the tower erection areas, whereas
7 standard of care is for the engineer of record
8 to provide the specifications and plan for the
9 construction of tower erection areas, right?
10    A.  Correct.
11    Q.  Okay.  So, again, we've already talked
12 about this a lot.  At the end of the day, though,
13 you still expect Borneke to be knowledgeable and
14 be able to read all the plans and reports and be
15 able to come up within their head potential
16 problems or safety issues, if they see them,
17 fair?
18    A.  Yes.
19    Q.  Okay.  So they're the ones who are
20 responsible for implementing the plans is
21 basically what this section says.  Like, as long
22 as they think the plans are safe, they have an
23 obligation to go out there and implement them.
24    That's pretty much what this section is

133

1 referring to, right?
2     A.  They provide the means and methods,
3 correct.
4     Q.  Okay.  You say one of the many
5 technical considerations missing from Joe Barnes'
6 report is the freeze/thaw.  You agree you could
7 have listed more, but you did not.
8     This is just the one you decided to
9 pick on, fair?
10    A.  I guess you need to give me context of
11 what you mean of me picking on.
12    Q.  Well, say you say one of the many
13 geotechnical considerations that is missing from
14 Joe Barnes' report.
15    As opposed to listing them out, you
16 just list the freeze/thaw as the lack of the
17 consideration now, fair?
18    A.  Yes -- no, I also indicate that
19 the settlement was characterized by consolidation,
20 I disagreed with that.  And I just put the
21 context of what bearing capacity is.
22    Q.  Got it.  So, hypothetically speaking,
23 if he did consider this and just came to another
24 opinion that wasn't what he thought was the root

134

1 cause, you would just be too professional when
2 it came to differing opinions based on the
3 evidence provided, fair?
4     A.  No.  In context, I believe that he is
5 an expert in one area, not necessarily geotechnical
6 engineering.
7     Q.  Okay.  Let me ask you this.  You go on
8 to say that Borneke was not the creating
9 employer, under H.
10    Because the condition came to be as a
11 result of the freeze/thaw compared to what they
12 did/did not do, right?
13    A.  Sorry.  Repeat that.  I was reading at
14 the same time.
15    Q.  Sure.  Basically, Borneke, in your
16 opinion, is not the creating employer because
17 the condition was caused by an environment --
18 environmental factors as opposed to something
19 they did directly or did not do, fair?
20    A.  Yes.
21    Q.  So assuming -- let's just assume.
22 Hypothetically, if Borneke's work, or the lack
23 thereof in terms of maintenance, whatever it
24 was, did, in fact, cause this depressed area,

135

1 then they would be the creating employer in that
2 situation, fair?
3     A.  I am not positive.  I am -- I took the
4 context of creating employer as I thought it
5 was from the Barnes' report, but that's not
6 found in Lexion when I do that, creating
7 employer, so I'd have to go back further for
8 that definition.
9     Q.  Sure.  Let me ask you this.  Just
10 generally speaking, are you familiar with the
11 term exposing and creating employer under OSHA?
12    A.  Limited.
13    Q.  Okay.  Would you agree that Joe Barnes
14 is more qualified, as an OSHA instructor, to
15 give opinions about OSHA characterization of
16 creating and exposing employers than you are?
17    A.  Of that aspect of OSHA, yes.
18    Q.  Okay.  So, in fact, on that aspect of
19 OSHA, Joe Barnes would be more qualified than
20 you are, fair?
21    A.  In the terminology, yes.  But I'm
22 saying that geotechnical aspects and the root
23 cause is what I'm opining on here.
24    Q.  But you don't even know what creating

136



1  employer means, do you?
2      A.  I indicated I'm using the definition
3  per the terms in the Barnes' report.
4      Q.  Okay.  So per the terms in the Barnes'
5  report, hypothetically assuming that what
6  Don Borneke did directly to cause this
7  condition, you would agree then that in that
8  hypothetical based on the definition in the
9  Barnes' report, they would be a creating
10  employer, fair?
11      A.  No, I don't believe I was stating that.
12      Q.  Okay.  I'm asking you, do you agree or
13  disagree that if somebody creates a dangerous
14  condition on a job site, they are the creating
15  employer?  Or do you not know?
16      A.  I would have to research that further.
17      Q.  Okay.  Well, this is my one time to ask
18  you, and, you know, if you don't know, you don't
19  know.  That's fine.  It's outside of your area
20  of expertise.
21          Is this your area of expertise?  Or no?
22  Do you know or don't you know, at this point, as
23  we sit here today?
24      A.  I know what the root cause is in my

137

1  technical opinion, and that root cause was
2  caused by the loading of that soil and then
3  however you define that creating employer for
4  that loading.
5      Q.  So you know, again, when you said it's
6  the root cause of the depression, but you don't
7  know who or what is a creating or exposing
8  employer just based on your knowledge, taking
9  the Barnes report out of it, fair?
10      A.  Yes.
11      Q.  Okay.  Under J, I was curious about
12  this.  You say -- you go into this long
13  paragraph, I won't read it.  But then at the
14  bottom you say, is technically incorrect.
15          So is he partially correct?  Or what?
16          Because usually when you say technically
17  incorrect that's a qualification.  I'm just
18  trying to figure out what you mean.  It's at the
19  bottom of Page 5, J.
20      A.  Yes.
21      Q.  And then it goes onto the top of Page 6
22  as well as a few bullets so...
23      A.  Yes.  So when I say it's not technically
24  correct, and then I follow with the bullets of

138

1  what my technical opinion would be.
2      Q.  So how was -- so, basically, what I'm
3  getting at is -- okay.  So I see what you're
4  saying.
5          So you're saying you pretty much take
6  all the environmental -- let me ask you this.
7  You take all the environmental aspects out of
8  it, and you just look at the pure language of
9  the contract and the requirements for Borneke to
10  maintain the work, Joe Barnes would be correct.
11          But when you put in the environmental
12  aspects and the changing ground conditions and
13  you look at what you believe to be the root
14  cause, then he's incorrect based on all of that?
15      A.  My opinion is the root cause is
16  different than what Joe Barnes -- similar
17  language on what cause was.
18      Q.  Okay.  So his belief is that the ground
19  was just not prepared properly, and then, if
20  that is true, then he would be correct.
21          But based on the root cause, in your
22  opinion being the environmental factors, based
23  on that, he's technically incorrect, fair?
24      A.  Joe Barnes indicated that this was a

139

1  consolidation based phenomenon.  I disagree.
2  It's geotechnically incorrect.  That's why I
3  introduced the term elastic settlement and
4  explain that.
5          So that part of my disagreement is
6  the mechanisms of this depression, I am in
7  disagreement with Mr. Barnes.
8      Q.  Okay.  Let's go on to the next page.
9  K, you say you disagree with Barnes when he
10  says, water accumulation that turned into an ice
11  field and became hidden by snow is foreseeable
12  and preventable, right?
13      A.  Correct.
14      Q.  Okay.  So you agree that the potential
15  for a depressed area, based on the soil response,
16  was predictable.  It's just, again, your opinion
17  in this specific area it was not.
18          It's just generally predictable, not
19  specifically, fair?
20      A.  Not specifically.  But may I add to
21  that, is for this to happen a multitude of
22  factors have to come together at the same time.
23      Q.  Sure.  Well, let me ask again.  That's
24  my question.

140



James Tinjum 04/04/2023

141

1     In the Midwest it's common that it
2  rains and snows, fair?
3     A.  Yes.
4     Q.  And it's common that it gets cold later
5  in the year such that temperatures go below
6  freezing and standing water can freeze, right?
7     A.  Yes.
8     Q.  And that's not, like, some novel idea.
9  I mean, it's the Midwest.  Look outside today,
10  the weather sucks, right?
11     A.  Yes.  It's -- it's the Midwest, if you
12  look out across any field out there now, a
13  farmer's field, you're probably going to see low
14  areas and ice and accumulations, et cetera.
15     Q.  And that's what I'm getting at.
16     So you say that the general idea that
17  the soil will fail is predictable based on its
18  response, or that a depressed area may form due
19  to the sponge analogy, right?
20     A.  Yes.
21     Q.  But you just don't think that the next
22  logical corollary is that in a depressed area
23  water might pool and freeze?  You don't think
24  that's a possibility, on a job site, when there's

142

1  a depressed area in the Midwest?
2     A.  No.  I previously testified is that a
3  ponded area could be water from snowmelt or --
4  and it could be water expelled from that sponge.
5     Q.  Okay.
6     A.  I'm trying to be consistent with where
7  that water might come from.
8     Q.  So it's a predictable response,
9  you just don't know if the exact outcome is
10  predictable?
11     A.  I apologize, I'm not following.
12     Q.  Sure.  What I'm getting at is, you keep
13  saying that this is a predictable response.  The
14  predictable response is that a depressed area
15  forms due to the heavy loading on saturated --
16     A.  Yes.  That is -- I apologize for
17  cutting you off, your question.
18     Yes, it's a predictable response, in my
19  expertise, that that sponge would depress with
20  loading.
21     Q.  And would you agree that in this
22  depressed area it's predictable that, if it
23  rains, water might pool in it, just generally
24  speaking?

143

1     A.  Water might pool, yes.
2     Q.  And then if water pools, if it gets
3  cold, the water might freeze, right?
4     A.  That is correct.
5     Q.  Okay.  All of this is somewhat
6  predictable, fair?
7     A.  Yes, that series could be predicted.
8     Q.  There's a logical corollary if you have
9  those weather events, fair?
10     A.  Corollary, so --
11     Q.  Sure.  Maybe I'm using the wrong words.
12  There's a logical next step.
13     If it's depressed, likely then it
14  rains, if it rains, it's likely that it freezes
15  if it gets cold.  It's all very possible given
16  the type of soil and given the predictability of
17  this type of situation, fair?
18     A.  That is very possible, yes.
19     Q.  Okay.  Let's go on to number six,
20  Standard of Care for Earth Wind Compaction at
21  the Site was Followed, right?
22     A.  Yes.
23     Q.  You say:  Frozen soil does not compact.
24     You agree that frozen soil does

144

1  compact, it's just significantly harder to
2  compact.
3     Would you agree with that?
4     A.  No.  The standard of practice in the
5  industry is not to compact frozen soil.  It will
6  not adequately compact.
7     Q.  Okay.  Would you agree, though, that
8  this soil was prepared prior to the ground
9  freezing at the site?
10     A.  Yes.  My understanding is that the area
11  was prepared.
12     Q.  Okay.  So it could have been compacted
13  more, hypothetically speaking, before it was
14  frozen, fair?
15     A.  Yes.
16     Q.  Okay.  And then you say, again,
17  exposed, fine-grained layers subjected to
18  environmental cycles deteriorate in strength and
19  modulus.
20     This is predictable in strength and
21  modulus, right?
22     A.  Yes.
23     Q.  Okay.  And, again, this is predictable
24  and known, fair?



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1    A.  In engineering practice, yes.
2    Q.  Not only that.  Based on an excavation
3  company's knowledge and the general knowledge of
4  science behind it plus their experience in the
5  field, this would be known to them as well,
6  fair?
7    A.  They would know that it could have a
8  response, they would not know the terms of
9  modulus and strength like I do.  But, yes, they
10  would see, practice based, the evidence of --
11    Q.  Sure.  And Like I said --
12    A.  -- to keep --
13    Q.  Sure.  And like I said at the
14  beginning, I think you're writing this for a
15  Nobel laureate, and I applaud you.  But, I mean,
16  it's going over my head.  How do you think it's
17  going to go over with a jury?  I mean, that's
18  neither here nor there.
19    A.  That's a hypothetical.  I --
20    Q.  Sure.  I'll withdraw the question.
21    A.  -- when I write --
22    Q.  I'll withdraw the question.  I'll
23  withdraw the question.  I apologize.
24        You go on to say, Contract sections,

145

1  you know, those say what it say.  Then you say
2  the solution would be to scarify -- or scarify
3  the top 2 inches to establish an acceptable
4  interface to the engineer.
5        This is what could have been done, in
6  your opinion, fair?
7    A.  Yes.  That is what the contract
8  specifications would allow for.
9    Q.  Okay.  Scarify, I mean, that doesn't
10  mean to go up and sneak up on the soil.  It
11  means till it, essentially, to get the water
12  out, fair?
13    A.  That is correct.
14    Q.  So simply --
15    A.  So -- so -- sorry.  They -- they disc
16  it to prepare it for compaction, not necessarily
17  to remove water immediately.
18    Q.  Okay.  So, nonetheless, the way to
19  address this is to till it or to disc it and
20  then compact it, fair?
21    A.  Yes.  I think that would be standard
22  of -- good standard practice.
23    Q.  And this would be good standard
24  practice for an excavation company who notices

146

1  these conditions, fair?
2    A.  Yes, they would be expected to
3  understand how to do this.
4    Q.  So if Borneke saw and wanted to remedy
5  this, this would be their obligation to do the
6  scarifying procedure on this area, fair?
7    A.  That would be an appropriate path
8  forward.
9    Q.  Okay.  Would you agree by not
10  scarifying the soil, technically, they're not
11  complying with their contractual obligation to
12  maintain the areas?
13    MR. SULLIVAN:  Objection, it assumes they
14  ever saw it.
15        Go ahead.
16    THE WITNESS:  No.  What I'm saying is is you
17  can't scarify and compact frozen soil.  So if
18  the frozen soil is there, you can't just add
19  soil to the top of it and compact that new soil.
20    MR. TERRY:  Sure.
21    THE WITNESS:  That goes against the
22  specification and standard practice.
23    MR. TERRY:  That's what I'm getting at.
24

147

1  BY MR. TERRY:
2    Q.  When we talked about it earlier.  And,
3  again, I'm not saying that you just put soil on
4  top and compact it.
5        You're saying this is the solution if
6  you realize there's a problem and it needs to be
7  compacted further, right?
8    A.  Yes.  But --
9    Q.  Okay.  Go ahead.
10    A.  But the basis is that you cannot put
11  soil on top of previously frozen soil.  That
12  would not be appropriate for standard practice
13  and these specifications.
14    Q.  But you could move the obstruction,
15  scarify the soil, and then compact it, fair?
16    A.  Yes.
17    Q.  Okay.  So, again, during that window we
18  talked about earlier, assuming that window
19  existed, assuming Borneke knew about this, or
20  should have known about this, they could have
21  gone out there, asked for this obstruction to be
22  moved, and then the proper course of action
23  would be for them to scarify the soil, fair?
24    A.  Hypothetically, yes, they could have

148

1  done that.
2      Q.  Okay.  Fair.  We talked about D, but
3  you say something along the lines of fine-grained
4  soil is very sensitive as to compacted moisture
5  condition.
6          Is this just what we were talking about
7  earlier, the sponge is going compress and let go
8  of water essentially?
9      A.  No.  This is slightly different.  It
10  means that saturated, or super saturated, soil,
11  you cannot compact it without first drawing the
12  soil back.  So it's like driving in mud, it
13  doesn't matter how many times you put a vehicle
14  over the top of it, it stays mud.
15      Q.  Okay.
16      A.  So you would have to remove water
17  first.  It doesn't matter how many times you put
18  a compacter over top of it, it's not going to
19  compact.
20      Q.  So this goes back to the scarification
21  process essentially?
22      A.  Of soil, yes.
23      Q.  And then you say signs of problems
24  would be pumping in silty soil, rolling and

149

1  deflection in silty and clayey soil, and then
2  water wicking to the surface, right?
3      A.  Yes.
4      Q.  And these would all be signs of
5  problems that a qualified excavation company
6  would be able to realize on a site given their
7  expertise in the area, fair?
8      A.  A qualified resident engineer or QA/QC
9  personnel.
10      Q.  Well, you'd expect that a qualified
11  engineer -- well, let me ask you this.  Would
12  you expect that Borneke, given their experience,
13  would know that silty soil -- I mean, we've
14  already established that you'd expect them to
15  know some of these things.
16          Would you expect them to know these
17  problems based on their experience in the field?
18  Maybe not in these exact terms, but knowing what
19  the soil looks like and how they respond?
20      A.  Yes.
21      Q.  Okay.  And the on F you say, if
22  fine-grained soil is near saturation, no amount
23  of compaction will adequately densify, right?
24      A.  Yes.

150

1      Q.  And this goes, again, back to the, you
2  know, let's scarify and then compact it down,
3  right?
4      A.  Scarify it, dry it back, compact it,
5  yes.
6      Q.  Okay.  All right.  And then you move on
7  to Standard of Care, the bullet point, for a
8  Wind Industry for Turbine Erection Laydown Areas
9  is for a smooth surface with less than 5 percent
10  grades to facilitate equipment loadout and
11  transport vehicle entrance/egress, right?
12      A.  Yes.
13      Q.  And you mention on the next page, the
14  contract did, in fact, called for this, right?
15      A.  Yes.
16      Q.  Okay.  And then you say that the very
17  capacity and foundation stiffness are not
18  primary design consideration for turbine
19  erection areas, right?
20      A.  Correct.
21      Q.  You agree that this is kind of
22  misleading, though, because each individual
23  area has their own specifications, fair?
24      A.  I don't characterize it as misleading.

151

1      Q.  Well, no one said that the erection
2  site had to be to the same specifications as the
3  foundation.  That's why I'm saying it's
4  misleading, because no one ever said that.
5          You agree that they're supposed have
6  different specifications, right?
7      A.  Yes, they have different specifications.
8      Q.  And the specifications of the
9  foundation -- or of the erection area is
10  supposed to be able to facilitate deliveries,
11  support the weight of the trucks, and the staged
12  equipment such that depressed areas do not form.
13          That's the contractual requirements for
14  this work, fair?
15      A.  Yes.
16      Q.  Okay.  And then, again, you discuss why
17  you should not place fill over frozen and
18  deteriorated soil.
19          And this, again, goes back to the
20  scarifying of the soil, right?
21      A.  Yes.
22      Q.  And this, again, goes back to the
23  hypothetical, which Borneke could have
24  potentially done this before this incident

152



James Tinjum 04/04/2023

1   happened, if they were going from site to site
2   and saw a deteriorating condition, fair?
3       A.  Yes.
4       Q.  Okay.  And then you say, compaction
5   tests could confirm if appropriate means and
6   methods were employed, right?
7       A.  Yes.
8       Q.  Who would be responsible for checking
9   Borneke's compaction?  Borneke seems to think it
10  would be them.
11      A.  You would have to explain why Borneke
12  thinks it's them.
13      Q.  Well, just based on my understanding,
14  when you look at it.  Borneke said, yeah, it was
15  up to us to make sure we were compacting
16  everything to specifications.
17          Would you agree or disagree with that?
18      MR. SULLIVAN:  Well, I'm going to object to
19  it misstates testimony.  It was signed off by
20  Mortenson.  That's a generalized statement that
21  misstates prior testimony.
22      Go ahead.
23      MR. TERRY:  You can answer without the
24  testifying objection.

                                        153

1       Go ahead.
2       THE WITNESS:  So my sub-bullet point is is
3   that there were not quantitative compaction
4   limits.  So when there are not quantitative
5   compaction limits, this is a subjective term.
6       MR. TERRY:  Okay.
7   BY MR. TERRY:
8       Q.  So this is subjective.  So, basically,
9   Borneke should compact to a standard they think
10  appropriate, and then see if Mortenson signs off
11  on it?
12      A.  No, not necessarily.  It's saying two
13  things.  Is -- first, these turbine erection
14  areas are designed and constructed to a lower
15  standard of care than those other areas that
16  typically have quantitative specifications.
17      Q.  Well, we've already established that.
18  That doesn't change the fact that compaction
19  needs to be adequate enough such that it
20  facilitates delivery and staging of equipment
21  and that depressed areas do not form, fair?
22      MR. SULLIVAN:  Objection, the contract does
23  not say anything about depressed areas.
24      Go ahead.

                                        154

1       MR. TERRY:  You can answer, sir.
2       THE WITNESS:  Yes, per the contract language
3   that I previously pointed out.
4       MR. TERRY:  Okay.
5   BY MR. TERRY:
6       Q.  Would you agree that although you think
7   the root cause of this freeze/thaw cycle,
8   there's also a possibility that Borneke simply
9   did not compact and prepare the ground enough?
10  That's a possibility and a possible cause in
11  addition to your root cause, fair?
12      A.  It's a theoretical partial cause.
13      Q.  Okay.  Fair enough.  We're going to
14  move on to number seven quickly.  I'm almost
15  done, I promise.
16      MR. TERRY:  Let's just take one more quick
17  break, and we'll come back and finish up.
18      THE WITNESS:  All right.
19      MR. SULLIVAN:  How long?
20      MR. TERRY:  We can come back in 4 minutes,
21  12:55.  Does that work?
22      MR. SULLIVAN:  Yep.
23      MR. TERRY:  Perfect.
24          (Recess taken.)

                                        155

1   BY MR. TERRY:
2       Q.  Moving on to number seven.  You say
3   that DBC completed the work in accordance with
4   the contract documents, right?
5       A.  That is my technical opinion, yes.
6       Q.  Your technical opinion is that they
7   were required to clear, grub, and provide all
8   necessary grading for a 175-ft radius around the
9   turbine inclusive of cut and fill to achieve no
10  more than 5 percent grade, right?
11      A.  Yes.
12      Q.  And it also said that they had to clear
13  the area debris to the edges and that bumps
14  shall be leveled and holes filled to accommodate
15  equipment travel, right?
16      A.  Correct.
17      Q.  And then it also says that you think
18  relevant testimony of fact witnesses indicated
19  that DBC followed the standard, right?
20      A.  Yes.
21      Q.  And then your report says, cleared area
22  to be maintained, compacted, and provide positive
23  drainage at all times to facilitate turnaround area
24  for turbine delivery components throughout the

                                        156

                                Pages 153 to 156



James Tinjum 04/04/2023

1 duration of the project, right?
2     A.  Yes.
3     Q.  And you say that it appears that they
4 were compacted and maintained with positive
5 drainage when the turbine erection areas were
6 turned over to the erection team, right?
7     A.  Correct.
8     Q.  But, again, there's this window, this
9 hypothetical window that we've been talking --
10 it's not even a hypothetical window.
11     The window that was between delivery
12 and the erection is the time period where
13 Borneke still had a contractual obligation to
14 maintain these areas, fair?
15     A.  Yes.
16     Q.  And if they were not doing this, then
17 they would not be complying with the contractual
18 obligation even if it was, quote, unquote,
19 turned over, because they had the opportunity to
20 go back and look at this, potentially, fair?
21     A.  If they were given that opportunity,
22 that's fair.
23     Q.  Okay.  And you don't have any testimony
24 to dispute the fact that they were given this

157

1     Q.  Okay.  Fair.  And then you agree that
2 you say that the compacted and maintained area
3 was maintained up until the time it was turned
4 over to the erection team.
5     That's what your report says, right?
6     A.  Yes.  And --
7     Q.  Okay.
8     A.  -- in context, I believe that's not
9 from me, a fact witness, but from reading of
10 fact witness testimony.
11     Q.  Sure.  But they had an obligation to
12 maintain it throughout the duration of the
13 project, not just after it was delivered, fair?
14     A.  The specifications call for that
15 throughout maintenance.
16     Q.  Throughout the duration, not just
17 through delivery, right?
18     A.  Yes.
19     Q.  Okay.  Let me ask you this.  There was
20 testimony -- you get into this later -- but you
21 get into the CIA, the construction incident
22 analysis, right?
23     A.  Correct.
24     Q.  And you address the fact that this

159

1 ability or possibility, fair?
2     A.  Not to my recollection.
3     Q.  Okay.  And then underneath you say,
4 Indications -- do you see that long paragraph?
5 It says, the deformity existed for a short
6 period of time.  The DBC was not allowed access
7 to perform maintenance, et cetera, et cetera?
8     A.  Yes.
9     Q.  You do agree, though, that this is
10 something that you said would probably present
11 itself near immediately given the elastic type
12 of soil and the heaviness of the load being put
13 down, right?
14     A.  Yes.
15     Q.  And we also talked about the hypothetical
16 situation in which, if a contractor saw the mats
17 being depressed lower than the ground, or other
18 mats, if they saw this, this would have given
19 them the potential situation in which they could
20 have remedied this by having the equipment moved
21 and scarifying the soil and then compacting it,
22 right?
23     A.  Hypothetically, yes, that would have
24 kicked in a series of remedial activities.

158

1 ice occurred too close to the wind turbines,
2 et cetera, et cetera.
3     You remember reading that, right?
4     A.  I remember reading those statements.
5     Q.  There was testimony from the Mortenson
6 employee who put together this report, who,
7 based on his experience filling out these
8 reports, that it's his understanding that it
9 says something along the lines of, the
10 excavation team was called back out to the site,
11 and due to the location of the ice and a
12 bulldozer not being able to fit, this condition
13 was not remedied.
14     Do you remember reading that in the
15 testimony?
16     MR. SULLIVAN:  Objection, that misstates the
17 report.
18     Go ahead.
19     MR. TERRY:  I didn't say the report, I said
20 the testimony, Chris.
21     THE WITNESS:  That sounds familiar, yes.
22     MR. TERRY:  Okay.
23 BY MR. TERRY:
24     Q.  So if this is, in fact, true, okay, and

160



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

James Tinjum 04/04/2023

1  we assume that the incident analysis, when it
2  says, you know, the ice was noticed and it was
3  too close to the site and a bulldozer couldn't
4  do it, then you would agree that, based on that,
5  Borneke would have notice of this condition.
6  And as the contractor providing excavation
7  services, they would have an obligation to
8  remedy this in combination with Mortenson, fair?
9      MR. SULLIVAN:  Objection, misstates testimony.
10     Go ahead.
11     THE WITNESS:  They could remedy this situation
12  with time, access, and other contractor relocating
13  equipment immediately next to the depressed area.
14     MR. TERRY:  Okay.
15  BY MR. TERRY:
16     Q.  So it wouldn't just be on -- well, in
17  fact, this would be their contractual obligation
18  because they had an obligation to maintain and
19  fill bumps, ruts, et cetera.  They have an
20  obligation to create a smooth surface free of
21  standing water, right?
22     A.  They have that obligation, yes.
23     Q.  So their contractual obligation, if
24  they did have notice of this, would be to repair

161

1  moving this so we can get back in here and fix
2  this.
3      They could have done that, right?
4      MR. SULLIVAN:  Objection, assuming they even
5  had notice of it.
6      Go ahead.
7      THE WITNESS:  Hypothetically, yes, they could
8  have asked for that sequence of activities to be
9  done.
10     MR. TERRY:  Okay.
11  BY MR. TERRY:
12     Q.  And, hypothetically speaking, that
13  would have been fulfilling their contractual
14  obligations, because they were contracted to
15  maintain the areas, right?
16     A.  They were contracted to meet those
17  specifications.
18     Q.  Okay.  So would you agree then that,
19  just based on the pure language of the contract,
20  by not addressing this area, if they had notice
21  of it, they would not be fulfilling their
22  contractual obligations to maintain the area?
23     A.  I agree with your premise that with
24  notice, they would have that obligation.

163

1  it in some way, shape, or form, in combination
2  with Mortenson or other contractor on the site,
3  fair?
4      A.  Yes, in time --
5      Q.  And if they had --
6      A.  -- with access.
7      THE REPORTER:  I'm sorry, I couldn't --
8      MR. TERRY:  I'm sorry.
9  BY MR. TERRY:
10     Q.  Did you say with time and with access?
11     A.  Yes.
12     Q.  Okay.  So, yes, with time and with
13  access.
14     A.  And you have -- this is not an
15  immediate item to rectify, and I also previously
16  testified and wrote that you cannot just place
17  fill on top of frozen soil.  There's other
18  remedial measures.
19     So this takes time --
20     Q.  Sure.
21     A.  -- and access.
22     Q.  Let me ask you this.  They could have
23  said, hey, this piece of turbine equipment is
24  still down here.  Mortenson, when do you plan on

162

1  Q.  Okay.  You also mentioned in this
2  report that the, excuse me, the Barr Engineering
3  geotechnical report did not recommend specific,
4  quantitative compaction and proof-rolling
5  requirements for the turbine erection areas;
6  thus, DBC was not contracted to compact the
7  turbine erection areas to a quantitative
8  relative compaction specification, right?
9      A.  Yes.
10     Q.  Nonetheless, Borneke was the hired
11  expert excavation earth moving contractor who
12  was required to compact and prepare the ground
13  to specifications adequate enough to perform the
14  work, and/or, if unable to, maintain it
15  throughout the duration of the project, fair?
16     A.  Yes.
17     Q.  Okay.  And then under the CIA, you
18  basically agree with the findings of the CIA,
19  right?
20     A.  Yes.  And my point eight, I largely am
21  quoting the CIA.
22     Q.  Okay.  But, again, you would agree
23  that, hypothetically, if this condition was
24  remedied or -- yeah, if this condition was

164

Pages 161 to 164



1 remedied before they even encountered it, then
2 we'd never even get to this point, fair?
3     A.  With time and access, yes, this could
4 have been remediated -- remediated, excuse me.
5     Q.  Okay.  Then we can skip ahead a little
6 bit, because you get into your background again.
7 We already talked a lot about this.
8        You say that your geotechnical
9 engineering program, you're a professor in that
10 program -- I'm sorry, you're the director of the
11 geological engineering program at the University
12 of Wisconsin Madison, right?
13     A.  Correct.
14     Q.  And, again, you have a lot of
15 experience in terms of lab experience, lab
16 reports, quality assurance, quality control, but
17 you never actually performed the work of an
18 excavation contractor, fair?
19     A.  Yes.
20     Q.  And then you go into what you teach,
21 the articles you wrote.  But, again, nothing
22 about your on-the-job experience as an excavator
23 actually implementing the specifications in the
24 field, fair?

165

1 the math that we went over earlier, you know,
2 30,000 and change, is what you've been -- what
3 your time has been billed at to Don Borneke in
4 this construction, plus whatever you bill today,
5 fair?
6     A.  Provided the information today, yes,
7 fair.
8     Q.  And then, lastly, in your report you
9 get into your conclusion, right?
10     A.  Yes.
11     Q.  And, again, you kind of go over what we
12 went over.  But you think Borneke followed the
13 standard of care of an excavation contractor on
14 this project, right -- or an earth moving
15 contractor?
16     A.  Correct.  Yes.
17     Q.  And you think that it is more of a
18 thaw/freeze elasticity issue as opposed to
19 simply the ground caving or sinking in, right?
20     A.  Yes.
21     Q.  Okay.  And you disagree with the
22 testimony of the people we've discussed,
23 Nick Borneke, Andy Kruse, Andrew Black, and Joe
24 Barnes, in the specific areas which we've

167

1     A.  I have not worked for a contractor,
2 fair.
3     Q.  And then we go into what you reviewed,
4 current and relevant cases, right?
5     A.  Yes.
6     Q.  And then, again, you list -- if we
7 continue on, you list everything you've
8 reviewed, right?
9     A.  Yes.
10     Q.  And then, in addition, you talk about
11 the articles and references in the cited
12 opinions, right?
13     A.  Yes.
14     Q.  And then you get into how much you
15 charge per hour, and we've already established
16 that.  No matter what you charge per hour, the
17 invoice being charged to Don Borneke Construction
18 by your expert finding service, whatever you
19 want to call it, $675 per hour, fair?
20     A.  As presented to me today, yes.
21     Q.  And you have no reason to dispute that,
22 do you?
23     A.  I have no reason to dispute that.
24     Q.  So based on what I'm showing you today,

166

1 already discussed, fair?
2     A.  And specific technical areas, yes.
3     Q.  Okay.  You also agree that although
4 this is a freeze/thaw elasticity issue, this is
5 something that was predictable and known even by
6 Nick -- or even by Don Borneke, based on their
7 review of the geotechnical reports, the soil
8 reports, and everything provided to them.
9        Even before the work started, this was
10 a predictable response for this type of soil,
11 fair?
12     A.  In my opinion, yes, I would have
13 predicted this.
14     Q.  And you would expect Don Borneke to
15 have knowledge that this type of soil might have
16 this type of response, fair?
17     A.  Based on their practice-based
18 experience, yes, I would expect them to
19 understand difficult soil conditions.
20     Q.  And based on this, based on the
21 information they were provided prior to work
22 performing, you would expect them to understand,
23 hey, this is this type of soil, it might have
24 this type of response, just be on the lookout

168



1   for this, fair?
2       A.  They could have a general understanding
3   that this type of response could be possible,
4   yes.
5       Q.  Well, not could have.  You said earlier
6   you would expect them to.  As a qualified
7   excavation earth moving contractor, you would
8   expect them to have this type of general
9   knowledge.
10      Maybe not the same level you do, but,
11  generally speaking, enough to know what the
12  expected predictable response is, fair?
13      A.  General knowledge, yes.
14      Q.  Okay.  I want to go over, just briefly,
15  speaking of the exhibits.
16      Exhibit 1, this one is just basically
17  the silty and the clayey, C-L-A-Y-E-Y, soil at
18  Mendota Hills with a low hydraulic conductivity
19  and thus expected low drainage ability, right?
20      A.  Yes.
21      Q.  So this is a chart that would have been
22  provided and available to Borneke prior to the
23  work being performed, fair?
24      A.  This is a publically available chart.

169

1       Q.  And this is something that you would
2   expect a qualified excavation earth moving
3   contractor to look at in preparation for the
4   their work and at least understand on a general
5   level, fair?
6       A.  I would not expect them to look at this
7   level of graph prior to a project.
8       Q.  But this would probably have been
9   provided to them in materials, fair?
10      A.  This type of graph would not be
11  provided to them in the materials.
12      Q.  Okay.  Fair enough.  But, nonetheless,
13  the report that gave the type of soil and the
14  predictable response, that would have been
15  provided to them, and that's something you would
16  have expected them to understand on a general
17  level, fair?
18      A.  The general level, yes, silty, clayey
19  soil was presented to them.
20      Q.  Okay.  What about Exhibit 2A or 2B,
21  would you expect either of these to be provided
22  to them?
23      A.  No.
24      Q.  Okay.  What about Exhibit -- well,

170

1   Exhibit 3 is just your own example.
2       What about Exhibit 4?
3       A.  Exhibit 4 was from the geotechnical
4   report.
5       Q.  And this is where we talked about --
6   you see in your highlighted section, you
7   highlight the clay of low plasticity, silt of
8   high plasticity, and silt.  So these are the
9   types of things that you would expect, based on
10  this and other things in the report, to be
11  predictable, right?
12      A.  Yes.
13      Q.  So this is also something that you
14  would expect a qualified excavation contractor
15  to have a knowledge of as to the predictability
16  of this outcome, fair?
17      A.  General knowledge, yes.
18      Q.  Okay.  What about Exhibit 5?
19      A.  What about it?
20      Q.  Was that provided to you?  Or aware of?
21      A.  No, that would not typically be
22  provided.
23      Q.  Would this be something that would be
24  generally available?

171

1       A.  It is a publically available document.
2       Q.  So had Borneke chosen to look for
3   something like this, or had they, based on their
4   experience, known, hey, this area freezes and
5   thaws, freezes and thaws, they could have looked
6   this up too and got further predictable
7   knowledge of what was going to happen, fair?
8       A.  It's potential.
9       Q.  Okay.
10      A.  I will characterize that in that this
11  is the type of material that I teach in my wind
12  energy courses so...
13      Q.  Sure.
14      A.  Even the engineers don't routinely know
15  this.  It's part of the learning process.
16      Q.  And even if they don't routinely know
17  this specifically, it doesn't negate the fact
18  that they were provided reports, the soil and
19  response report that would have predicted some
20  similar response to what happened on this job
21  site prior to the work even being performed,
22  fair?
23      A.  Yes.
24      Q.  Would you agree that on this job site,

172

Pages 169 to 172



James Tinjum 04/04/2023

1 just generally speaking -- well, we'll get to
2 that in a second. Hold on.
3     All right. So, hypothetically speaking,
4 if there was this knowledge of this condition to
5 Borneke, this would be a condition, we've
6 already established, would be remedied in some
7 way, shape, or form through a combination of
8 effort between Borneke and Mortenson, whereas
9 Borneke would actually perform the excavation
10 work, fair?
11     A. Yes, with time and access.
12     Q. Okay. So Mortenson would have some
13 responsibility and so would Borneke, fair?
14     A. It is a contractual relationship out
15 there, yes.
16     Q. So Mortenson would not be the sole
17 proximate cause of this issue, in your opinion,
18 fair?
19     MR. SULLIVAN: Objection, calls for a legal
20 conclusion.
21     MR. TERRY: You can answer.
22     THE WITNESS: I did not assess a blame, I
23 provided a root cause.
24

173

1 BY MR. TERRY:
2     Q. I'm asking you, based on that, and just
3 based on everything, it would not be -- Mortenson
4 would not be the sole proximate cause in the
5 situation that we're to talk about today.
6     It's a combination effort, fair?
7     MR. SULLIVAN: Objection, calls for a legal
8 conclusion. There's no foundation for any such
9 testimony, and move to strike if he answers.
10     MR. TERRY: Go and answer.
11     THE WITNESS: I -- I, personally, don't think
12 there's an entity to be causatively blamed for
13 this issue.
14     MR. TERRY: Okay.
15 BY MR. TERRY:
16     Q. Despite Borneke being the excavation or
17 earthwork contractor who had this predictable
18 type of response known before they even started
19 the work, and based on them having the obligation
20 to maintain the areas, you still don't believe
21 this was anybody's fault?
22     A. If anything, I concur with the
23 conclusions in the incident report on some of
24 the mechanisms that could have been in play.

174

1     Q. Okay. And the incident report, based
2 on the testimony that you said you remember --
3 or recall, I think was the word you used --
4 based on the testimony that you recall in
5 combination with the incident report, the likely
6 scenario is that Borneke was called back out to
7 the site, and nothing was done about it due to
8 the location of the ice and close proximity to
9 the turbine, fair?
10     MR. SULLIVAN: Objection, misstates testimony.
11     Go ahead.
12     THE WITNESS: I recall testimony about the
13 accessibility to the site because of the staged
14 equipment -- or staged material that was still
15 there.
16     MR. TERRY: Okay.
17 BY MR. TERRY:
18     Q. Just overall, you agree that Borneke is
19 a knowledgeable excavation earth moving contractor
20 who's well-qualified to perform the work in this
21 area, fair?
22     A. Yes.
23     Q. You agree that they are well-qualified
24 from a general standpoint to read and understand

175

1 the documents about and come up with their own
2 conclusions about the predictability of this
3 type of soil response, fair?
4     A. That's more of a gray area depending on
5 how you define soil predictability.
6     Q. Based on their 60 plus projects in the
7 area and based on the information they provided
8 to them, you would agree that this predictable
9 response should have also been predictable to
10 them in a general sense, fair?
11     A. I would indicate that it would not be
12 surprising.
13     Q. And, in fact, it would probably be
14 predictable, because they've probably
15 encountered this on other projects, fair?
16     A. I would assume that this has been
17 encountered at other projects.
18     Q. So this type of soil response would
19 have been predictable and known to Borneke prior
20 to the work even being performed based on the
21 geotechnical report provided to them as well as
22 their knowledge in the field and industry and
23 the geographic region, fair?
24     A. This type of response would not be

176

Pages 173 to 176



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

James Tinjum 04/04/2023

1 unexpected.
2     **Q. Answer my question, it's a yes or no.**
3 **Without the qualification, yes or no?**
4     A. Please repeat the question then.
5     **Q. Sure. Do you agree that this type of**
6 **response from Borneke -- scratch that.**
7     **Do you agree that the predictability of**
8 **this type of response to the soil would be**
9 **something that would be known by Borneke in a**
10 **general sense given their knowledge and**
11 **experience in the industry and the geographic**
12 **region plus the documents provided to them prior**
13 **to their work being started, fair?**
14     A. Yes.
15     **Q. So essentially stating this was**
16 **predictable to everybody, including Borneke?**
17     A. This type of response could be
18 predicted.
19     **Q. So to state it another way, this type**
20 **of soil response was predictable to everyone**
21 **before the work even began, including Borneke,**
22 **fair?**
23     MR. SULLIVAN: Misstates prior testimony
24 about location.

177

1     THE WITNESS: I don't know if it's
2 predictable to everybody.
3     MR. TERRY: Sure.
4 BY MR. TERRY:
5     **Q. This type of soil response was**
6 **predictable to the engineer, to Mortenson, and**
7 **to Borneke, fair?**
8     A. I think you could take it to that
9 level, fair.
10     MR. TERRY: Okay. I don't believe I have
11 anything further at this point.
12     Chris?
13     MR. SULLIVAN: Dr. Tinjum, let me ask you
14 some questions about --
15     MR. TERRY: Oh, sorry, Dr. Tinjum, I do
16 appreciate your time today. I don't want to be
17 rude. Thank you.
18     THE WITNESS: Thank you.
19         EXAMINATION
20 BY MR. SULLIVAN:
21     **Q. Starting with what counsel just**
22 **mentioned to you about predictable response.**
23     **Your testimony and your opinion in this**
24 **case is that the geotechnical report, generally**

178

1 **speaking, for the whole area means that there**
2 **are areas of this soil that could have this type**
3 **of response in terms of environmental changes,**
4 **correct?**
5     A. Correct.
6     **Q. Not this specific area where the**
7 **incident took place?**
8     A. This specific area is not predictable
9 across the site. This could have predictably
10 happened somewhere.
11     **Q. And your opinion is that Borneke did**
12 **comply with the standard care of a reasonably**
13 **competent excavation contractor?**
14     A. Yes. That was stated in my report.
15     **Q. And your opinion is that Borneke did**
16 **properly comply with the contract documents,**
17 **meaning compaction and grading and so forth,**
18 **correct?**
19     A. Yes.
20     **Q. And a reasonably competent excavation**
21 **contractor can comply with the requirements of**
22 **the contract and do all those things, and it**
23 **can, nonetheless, be, basically, undone by**
24 **environmental conditions that later take place,**

179

1 **correct?**
2     A. That is correct.
3     **Q. And is that the essence of your**
4 **testimony and your opinions this case?**
5     MR. TERRY: I'm going to object to
6 speculation.
7     You can answer.
8     THE WITNESS: Yes.
9 BY MR. SULLIVAN:
10     **Q. Borneke, obviously, is not a**
11 **geotechnical engineering firm, is it?**
12     A. They are not.
13     **Q. And they're not expected to meet the**
14 **standard of care of an engineer, are they?**
15     A. No.
16     **Q. You saw the testimony -- you reviewed**
17 **the testimony of Brad Bennett in this case,**
18 **right?**
19     A. Yes.
20     **Q. And you saw that he testified he had no**
21 **knowledge of any issue with site T11, or**
22 **anywhere else, regarding sinking soil, but in**
23 **particular T11, correct?**
24     A. I do not recall that exact language,

180

Pages 177 to 180



James Tinjum 04/04/2023

1  but that sounds familiar.
2      Q.  And, you know, Borneke in this case
3  disputes they received any notice of a problem
4  with site T11 before this incident, right?
5      A.  To my understanding of the fact of what
6  this is, yes.
7      Q.  And counsel asked you about, you know,
8  the -- once the equipment is laid down, the
9  process with regard to the soil conditions
10  affected by the environmental changes begins
11  soon after the components are laid down.
12      Do you recall that line --
13  A.  Yes.
14  Q.  -- line of questioning?
15  A.  Yes.
16      Q.  Once the component is laid down and
17  then the mat is on top of it, you can't see.
18  There's no evidence that anyone saw anything
19  until that was removed, correct?
20  A.  I did not see any evidence that
21  was observed.
22  Q.  So if Borneke -- strike that.
23      Let me go back.  You agree with me,
24  Borneke completed the compaction, drainage, and

181

1  grubbing requirements in the contract, and
2  Mortenson had to inspect and then approve that
3  before they moved on, right?
4  A.  That is my understanding based on the
5  fact witnesses.
6      Q.  And then you agree with me that
7  Mortenson controlled when the equipment was
8  going to be actually delivered and then erected,
9  right?
10  A.  That would be under their control as
11  the EPC.
12      Q.  And with regard to maintenance,
13  Borneke's on site.  If they are reviewing each
14  of these sites after they've completed their
15  excavation work, and they see no evidence of
16  anything amiss before the components are
17  delivered, there would be nothing for them to do
18  with regard to maintenance, would there?
19  A.  That is correct.
20      Q.  And you agree with me there's no
21  evidence that Mortenson ever complained about
22  anything with regard to site T11 to Borneke that
23  Borneke had done incorrectly?
24  MR. TERRY:  Relevance.

182

1      THE WITNESS:  To my knowledge, I did not see
2  that communication or correspondence.
3  BY MR. SULLIVAN:
4      Q.  You recall the testimony of Leonard
5  Breyne, right?  We talked about how you
6  reviewed, that's one of the transcripts you
7  looked at, right?
8  A.  That is correct.
9      Q.  And even he says, they were performing
10  the erection on the day of the incident, and no
11  one saw this icy area until half hour, maybe an
12  hour, he says, before this incident took place.
13  MR. TERRY:  Objection, mischaracterizes his
14  testimony, and relevance, and contractual
15  obligation.
16      You can answer.
17  THE WITNESS:  To my recollection, yes, I do
18  recall something of that -- similar to that
19  statement.
20  BY MR. SULLIVAN:
21      Q.  And an excavation contractor can't fix
22  something unless it has been noticed of a
23  problem, can it?
24  MR. TERRY:  Assuming -- objection, incomplete

183

1  hypothetical.
2  THE WITNESS:  I would agree with that
3  statement.
4  BY MR. SULLIVAN:
5      Q.  There's no evidence that even after --
6  well, strike that.
7      While -- I mean, you understand that
8  this incident took place when Nick Georgeff
9  arrived on the site after the Mortenson crew was
10  already erecting the components, right?
11  MR. TERRY:  Again, relevance.
12      You can answer.
13  THE WITNESS:  That is my understanding.
14  BY MR. SULLIVAN:
15      Q.  And Lonnie Sears is one of the people
16  that you reviewed in terms of testimony, right?
17  A.  That is correct.
18      Q.  He was the Mortenson foreman on the
19  site.
20      And you agree with me that Borneke did
21  not control the actual -- had no involvement in
22  the erection on the day of the incident, right?
23  A.  My understanding is is that was a
24  separate erection contractor.

184

Pages 181 to 184



1  Q.  And Mortenson controlled -- it was
2  Mortenson employees actually doing that work,
3  right?
4  A.  I do not remember, specifically, who's
5  employees they were.
6  Q.  But they weren't Borneke's, were they?
7  A.  Not that I recall.
8  Q.  So Lonnie Sears testified he was the
9  superintendent for Mortenson in control -- or in
10  charge of the erection at the time of the
11  incident, and he observed this icy area after
12  they lifted up the piece that had covered it up.
13  You agree with me and part of your
14  opinions are that you agree with the incident
15  analysis report, right?
16  MR. TERRY:  I'm going to object.  That's,
17  like, a ten-part question.
18  If you understand, you can answer.
19  MR. SULLIVAN:  Why don't you answer it.
20  THE WITNESS:  I -- yeah.  I testified that I
21  agreed with -- largely with the incident report.
22  MR. SULLIVAN:  Right.
23  BY MR. SULLIVAN:
24  Q.  So the Mortenson foreman that was doing

185

1  component that was covering it up before this
2  happened, is there?
3  A.  That is correct.
4  Q.  The fact that environmental conditions
5  alter previous excavation work does not mean the
6  excavation work originally done was not sufficient,
7  does it?
8  A.  Well, I characterize it as earthwork
9  construction, not excavation construction.  But
10  with --
11  Q.  Go ahead.
12  A.  -- that caveat, yes.
13  Q.  The earthwork contractor -- I'm sorry,
14  I mix them up.  The earthwork contractor had no
15  control over Mortenson employees.
16  You agree with that, right?
17  A.  I agree.
18  Q.  And the earthwork contractor had no
19  control over lifting and moving pieces around
20  either, the components of the wind turbine?
21  A.  They did not control that equipment or
22  operations.
23  Q.  Your opinions about complying with the
24  contract comes directly from the language of the

187

1  the work, if he saw a hazard, your opinion is
2  that he has the obligation to cordon it off such
3  that this incident doesn't take place?
4  MR. TERRY:  Objection, outside this expert's
5  area of expertise.  He's talking about soil, not
6  about construction standards.
7  You can answer, sir.
8  THE WITNESS:  Based on my review of the
9  construction documents, including deliverable
10  for Mortenson on their health and safety
11  protocol, that -- yes, that was standard of
12  practice and was indicated in the incident
13  report.
14  BY MR. SULLIVAN:
15  Q.  Are you aware of any evidence, having
16  reviewed what you -- the materials in this case
17  that anyone saw this icy area where he fell
18  prior to lifting up the component and the mats
19  underneath it?
20  A.  There was no indication of this icy
21  area anywhere that I reviewed.
22  Q.  And there's no evidence that anyone, be
23  it a Mortenson employee or Borneke, ever saw
24  that there was some problem underneath the

186

1  contract itself, right?
2  A.  Yes.  I reviewed the contract documents
3  themselves.
4  Q.  I just want to share this with you real
5  fast.  This is the actual contract.
6  MR. TERRY:  Are you withdrawing your prior
7  objection that he's not qualified to provide
8  legal opinions about the contract?
9  MR. SULLIVAN:  I don't know what you're
10  talking about.  Forgive me.
11  I'm showing the contract here.
12  BY MR. SULLIVAN:
13  Q.  You reviewed the contract as part of
14  your opinion and your report in this case,
15  right, sir?
16  A.  I did.
17  Q.  And this is what you reviewed, where it
18  says turbine erection areas, correct?
19  A.  Yes, I reviewed this component.
20  Q.  And this is what defines their --
21  Borneke's obligation with regard to turbine
22  erection areas, right?
23  MR. TERRY:  Objection, legal conclusion.
24  THE WITNESS:  Yes.

188



1  BY MR. SULLIVAN:
2      Q.  You are familiar with what the standard
3  of care is for a contractor like Borneke in
4  following contracts on wind turbines, right?
5      MR. TERRY:  Outside of his area of expertise.
6      You can answer.
7      THE WITNESS:  I am aware of that, and I
8  actually teach that in my continuing engineering
9  education short courses and related courses on
10 wind energy.
11 BY MR. SULLIVAN:
12     Q.  And you have particularized knowledge
13 with regard to wind farms just like this, right?
14     A.  I do.
15     Q.  And the -- well, strike that.
16        Let me just -- looking at Section 2.21,
17 it doesn't say anything here about depressed
18 areas, does it?
19     MR. TERRY:  Objection to relevance.
20     THE WITNESS:  Correct, there's no language on
21 depressed areas.
22 BY MR. SULLIVAN:
23     Q.  It doesn't say anything about ensuring
24 that pooling water doesn't form, anything like

189

1  that, does it, in this contract?
2      MR. TERRY:  It literally talks about
3  drainage, Chris.  Don't mis -- objection,
4  mischaracterizes the contract.
5      THE WITNESS:  There is no specific language
6  on ponding in this area.
7  BY MR. SULLIVAN:
8      Q.  You reviewed this as part of your
9  preparation for your report, right?
10     A.  I did.
11     Q.  And your opinion is that Borneke
12 complied with these requirements as identified
13 on this contract?
14     A.  That is my technical opinion, yes.
15     Q.  You have particularized experience with
16 regard to wind farms as you've expressed in your
17 report, right?
18     A.  Yes.
19     Q.  And the earthwork for wind farms is
20 unique and different than ordinary excavation
21 work; is that right?
22     A.  The wind energy industry is unique in
23 many aspects of earthwork construction.
24     Q.  The excavation required for wind farms

190

1  is much different than excavation that would be
2  required for, say, a building or even a house,
3  right?
4      MR. TERRY:  I'm going to object to relevance.
5      You can answer.
6      THE WITNESS:  Significantly different, yes.
7  BY MR. SULLIVAN:
8      Q.  And knowing that this -- Borneke was
9  hired to do earth moving work for a wind farm
10 specifically, and reviewing all the evidence you
11 have in this case, you believe they performed
12 their obligations correctly?
13     A.  Yes, that is number one in my expert
14 opinion.
15     Q.  Borneke had no control over the
16 engineering or design plans on the site, did
17 they?
18     A.  They did not.
19     Q.  Did you see anything in your materials
20 how much Borneke was paid for the work they did
21 on this job?
22     MR. TERRY:  I'm going to object to relevance.
23     THE WITNESS:  I did see some pricing
24 information, but I forget where it was.

191

1  BY MR. SULLIVAN:
2      Q.  Do you recall what it was?  How much it
3  was?
4      A.  I do not recall, but I know that each
5  turbine erection area was a lump sum dollar
6  value.
7      Q.  Do you recall the language of the
8  contract that required all clear and -- debris
9  to be pushed to the edges of the cleared area?
10     A.  Yes.
11     Q.  You wouldn't fault Borneke for doing
12 just that, would you?
13     A.  I would not.
14     Q.  Obviously, Borneke has no control
15 over the weather or the changing environmental
16 conditions given the time frame this project
17 took place.
18        Do you agree with that?
19     A.  I would.
20     Q.  And you agree with it, having reviewed
21 everything you have in this case that you
22 mention in your report, there's no evidence that
23 Borneke noted any difficulty with the specific
24 area where this injury took place while they

192

Pages 189 to 192



James Tinjum 04/04/2023

1  were doing their work and up until this incident
2  took place?
3      A.  I do not recall any instances of a
4  problem.
5      Q.  There's no evident that it was not
6  properly drained, sloped, compacted, and so
7  forth, with the contract from the time Borneke
8  finished its work all the way up until this
9  accident, is there?
10     A.  Correct, there is no evidence of
11  improper adherence to contract specifications.
12     Q.  And no -- you don't know any evidence
13  that Borneke was asked to come back because
14  anyone from Mortenson, or anyone else, found an
15  issue that needed to be addressed, do you?
16     A.  I'm not aware of any, quote, unquote,
17  call-backs.
18     Q.  You would agree with me that a
19  reasonably prudent contractor has to observe
20  an issue before they can fix an issue?
21     A.  Correct.
22     Q.  Even if Borneke was familiar with the
23  geotechnical report, it wouldn't have told them
24  specific areas where there could be more

193

1  difficulty grading and compacting?
2      MR. TERRY:  Wait.  Hold on.  I'm sorry.
3          Chris, do you mind repeating that?  Or
4  having it read back.
5          (Record read as requested.)
6      THE WITNESS:  Correct, but I need to give
7  context, is the geotechnical investigation
8  report, to my recall, did not identify any
9  particular turbine areas for special concern.
10  BY MR. SULLIVAN:
11     Q.  Right.  So looking at it, they would
12  have had no idea that there's more of an issue,
13  potentially, in site T11?
14     A.  That is correct.  So, again, with
15  context, other wind energy sites that have
16  problematic areas, the geotechnical report often
17  will call them out for specific remediation or
18  care.
19     Q.  But this particular report did not do
20  that?
21     A.  It did not.
22     Q.  And the whole project area was many
23  acres, dozens of acres at least.  They had 29
24  sites, right?

194

1      A.  These turbine areas cover hundreds, if
2  not thousands, of acres over an area.  They
3  don't impact thousands of acres, but they're
4  constructed over thousands of acres.
5      Q.  So when counsel was asking you, they
6  should have been familiar -- that Borneke should
7  have been familiar with the geotechnical report
8  that would have told them there was potential
9  for unsettling of soil, it would have alerted
10  them to no specific area on this project, would
11  it?
12     MR. TERRY:  Well, I'm going to object,
13  because I never said unsettling of soil, and I
14  never said on a specific site.  I said generally
15  speaking.  I think you're referring to elasticity,
16  but that was nowhere near my question or the
17  specificity of it.
18         Subject to that objection, obviously,
19  you can answer.
20     THE WITNESS:  I need it repeated to me,
21  please.
22     MR. SULLIVAN:  Let me just -- I'll withdraw
23  that.
24

195

1  BY MR. SULLIVAN:
2      Q.  The point is looking at that report
3  would not have alerted them to any specific
4  area, whether it could have been an issue?
5      A.  I agree.
6      Q.  Obviously, Borneke has no control over
7  the freeze/thaw cycles after their work is done.
8      A.  That is correct.
9      Q.  Did you see any evidence that Mortenson
10  ever stopped work and notified Borneke that they
11  needed corrective action on site T11 where this
12  happened?
13     MR. TERRY:  Objection, relevance.  That's not
14  required for Borneke to do their work.
15         You can answer.
16     THE WITNESS:  Not that was presented to me.
17  BY MR. SULLIVAN:
18     Q.  You understood that Mortenson was the
19  general contractor on the site, right?
20     MR. TERRY:  Objection, relevance.  Objection,
21  move to strike.
22         Chris, this will be subject to a motion
23  in limine.  You could have sued Mortenson.  You
24  chose not to for contractual and relationship

196

Pages 193 to 196



1 reasons, so that way Borneke keeps getting work
2 from them.
3          That being said, you would not be able
4 to admit these arguments at trial, and I'm
5 moving to strike and bar this.
6          You can answer, sir.
7      THE WITNESS:  General contractor, or my
8 terminology was engineer-procure-construct.
9      MR. SULLIVAN:  Okay.
10 BY MR. SULLIVAN:
11      Q.   But what does that mean?
12      MR. TERRY:  Same objections.
13      THE WITNESS:  That --
14      MR. TERRY:  He's not even using the same
15 terms.  He's not even using contract terms.
16 He's using engineering contract procure, or
17 whatever it is, and you're asking him to talk
18 about general contractor.
19          Objection, same one as before, objection,
20 outside his area of expertise.  He's not an
21 expert in construction.  He's already said that.
22      MR. SULLIVAN:  Go ahead.
23      THE WITNESS:  So a general contractor, such
24 as Mortenson, is generally responsible for the

197

1 design engineering procurement, instead about
2 being bid out and conducted by separate
3 entities.  In this project, that was Mortenson.
4 BY MR. SULLIVAN:
5      Q.   And that's your experience with wind
6 farms, generally, in your experience and research.
7          That's part of your job, right?
8      A.   That is correct.  These are typically
9 designed, managed, and implemented by a single
10 contractor that is then responsible for
11 sub-engineers and subcontractors.
12      Q.   So, in this case then, Mortenson would
13 have been in charge of not only Borneke, but
14 then the -- whoever is contracted to load the
15 equipment and then erect it?
16      MR. TERRY:  Objection, speculation.  This is
17 assuming he's seen the contract between the
18 owner and Mortenson.  He has no idea.  This is
19 completely outside his area of expertise.  And
20 the same objections as before.
21      THE WITNESS:  So sorry, repeat the question.
22      MR. SULLIVAN:  I'll just repeat the question.
23      MR. TERRY:  Hey, Chris, about how much longer
24 do you have do you think?

198

1      MR. SULLIVAN:  I don't know.  I mean, not
2 long, five minutes.
3      MR. TERRY:  Okay.  Thanks.
4 BY MR. SULLIVAN:
5      Q.   As you've explained your understanding
6 of these projects, Mortenson is the entity that
7 would be in charge of all the subcontractors,
8 including Borneke, right?
9      MR. TERRY:  Same objections.
10      THE WITNESS:  Correct.
11 BY MR. SULLIVAN:
12      Q.   You can see in the picture, the only
13 picture in this case that shows that ice.
14          Do you recall that?
15      A.   Yes, I do.
16      Q.   Obviously, where there's ice, the
17 ground is frozen; is that right?
18      A.   No, not obviously.
19      Q.   Never --
20      A.   It means that the water on top of the
21 ground is frozen.
22      Q.   Okay.
23      A.   The ground could be frozen or it may
24 not be.

199

1      Q.   Frozen ground cannot be compacted, can it?
2      A.   Not compacted appropriately, correct.
3      Q.   You agree with me, there's no picture
4 that you saw that shows the component that was
5 in place over the ice along with the mats prior
6 to this incident, is there?
7      A.   That is correct.  I have not observed any
8 predecessor to this photo on what was staged there.
9      MR. TERRY:  And I'm going to object to
10 relevance.
11 BY MR. SULLIVAN:
12      Q.   Does your report adequately state your
13 opinions in this case?
14      A.   Yes, it does.
15      MR. SULLIVAN:  I think that's all I have.
16 Thank you, sir.
17      MR. TERRY:  I just have a few follow-ups, and
18 I really mean that.  I'll be very brief.
19          FURTHER EXAMINATION
20 BY MR. TERRY:
21      Q.   You were shown the contract documents
22 and asked about depressed areas and the specific
23 language of pooling.
24          Do you agree the contract called for

200



James Tinjum 04/04/2023

1  maintenance of the compacted area and adequate
2  drainage provided throughout the entire project
3  including the turnaround area and the requirement
4  to fill and level out bumps and holes and rocks,
5  fair?
6      A.  That is a fair assessment, yes.
7      Q.  Okay.  You agree that despite Borneke
8  having no control over the freeze/thaw, it was
9  still their requirement to maintain the ground
10  condition even with changing ground conditions
11  such as freeze/thaw.
12      That was their contractual requirement,
13  fair?
14      A.  The contractual agreement was for
15  maintenance, yes.
16      Q.  You were asked questions about the GC
17  and who controls the project.
18      At the end of the day, Borneke is the
19  one who's responsible for doing their work in a
20  safe and proper manner in accordance with not
21  only the contract documents, but also industry
22  standard and safety, fair?
23      A.  Yes.
24      MR. TERRY:  I don't think I have anything

201

1  usually asked to review the transcript for
2  accuracy to that level.
3      MR. SULLIVAN:  Okay.  So if you'd like to do
4  that, you can just say, I reserve my right to --
5      THE WITNESS:  I reserve my right to review
6  and correct the transcript.
7      MR. TERRY:  Hold on.  Just for the record,
8  you cannot correct the transcript.  You can
9  correct spelling errors, or if you said yes and
10  she typed no, that's the only difference.  You
11  cannot actually change anything.
12      MR. SULLIVAN:  Right.  That's true.
13      THE WITNESS:  I understand.
14      MR. TERRY:  Okay.
15      MR. SULLIVAN:  With that, show reserved.
16      MR. TERRY:  Margie, I'll order the original
17  and I will email you the exhibits.
18      THE REPORTER:  Chris, will you handle
19  signature?
20      MR. SULLIVAN:  Yes.
21      (Proceedings concluded at 1:49 p.m.)
22
23
24

203

1  further.
2      MR. SULLIVAN:  Just one last question,
3  follow-up.
4          FURTHER EXAMINATION
5  BY MR. SULLIVAN:
6      Q.  The last question that counsel asked you.
7      You believe they did comply with that
8  standard, right, Mr. Tinjum?
9      A.  I believe --
10      MR. TERRY:  Asked and answered 14,372 times
11  today, Chris.
12      THE WITNESS:  I believe that Don Borneke
13  Construction followed standard of care for this
14  project.
15      MR. SULLIVAN:  Okay.  That's it.  Thank you.
16      You know, in terms of signature, you
17  have the opportunity to review it.  I think --
18  actually, in federal court, I don't remember if
19  you get signature or not, frankly.
20      MR. TERRY:  I don't know if you do, to be
21  honest.
22      Let's go off the record.
23      (Discussion off the record.)
24      THE WITNESS:  On my typical projects, I'm

202

1      IN THE UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF ILLINOIS
3          EASTERN DIVISION
4
5  NICK GEORGEFF,             )
6      Plaintiff,            )
7  vs.                  ) Civil Action
8  DON BORNEKE CONSTRUCTION, INC.,) No. 3:20-CV-50313
       Defendant.         )
9
10
11      I, JAMES TINJUM, being first duly sworn,
12  on oath say that I am the deponent in the
13  aforesaid deposition taken on the 4th day of
14  April, 2023; that I have read the foregoing
15  transcript of my deposition and affix my
16  signature to same.
17      _____
            JAMES TINJUM
18
19
20  Subscribed and sworn to
21  before me this      day
22  of            , 2023
23
24  Notary Public

204

Pages 201 to 204



1   STATE OF ILLINOIS   )
2               ) SS:
3   COUNTY OF C O O K   )
4     I, MARGARET A. RITACCO, a notary public
5   within and for the County of Cook and State of
6   Illinois, do hereby certify that heretofore, to-wit,
7   April 4th, 2023, personally appeared before me,
8   via videoconference, JAMES TINJUM, in a cause
9   now pending and undetermined In the United States
10  District Court, Northern District of Illinois,
11  Eastern Division, wherein NICK GEORGEFF is the
12  Plaintiff, and DON BORNEKE CONSTRUCTION, INC.,
13  is the Defendant.
14     I further certify that the said JAMES TINJUM
15  was first duly sworn to testify the truth, the
16  whole truth and nothing but the truth in the
17  cause aforesaid; that the testimony then given
18  by said witness was reported stenographically by
19  me in the presence of the said witness, and
20  afterwards reduced to typewriting by Computer-Aided
21  Transcription, and the foregoing is a true and
22  correct transcript of the testimony so given by
23  said witness as aforesaid.
24     I further certify that the signature to

205

1     McCorkle Litigation Services, Inc.
2      200 N. LaSalle Street, Suite 770
3       Chicago, Illinois 60601-1014
    April 18, 2023
4   SWANSON, MARTIN and BELL
    MR. CHRISTIAN A. SULLIVAN
5   2525 Cabot Drive, Suite 204
    Lisle, Illinois 60532
6
7   IN RE:  NICK GEORGEFF vs. DON BORNEKE
         CONSTRUCTION, INC.
8   COURT NUMBER: 3:20-CV-50313
    DATE TAKEN:  April 4, 2023
9   DEPONENT:  JAMES TINJUM
10  Dear Mr. Sullivan:
11  Enclosed is the deposition transcript for the
    aforementioned deponent in the above-entitled
12  cause.  Also enclosed are additional signature
    pages, if applicable, and errata sheets.
13
    Per your agreement to secure signature, please
14  submit the transcript to the deponent for review
    and signature.  All changes or corrections must
15  be made on the errata sheets, not on the
    transcript itself.  All errata sheets should be
16  signed and all signature pages need to be signed
    and notarized.
17
    After the deponent has completed the above,
18  please return all signature pages and errata
    sheets to me at the above address, and I will
19  handle distribution to the respective parties.
20  If you have any questions, please call me at the
    phone number below.
21
    Sincerely,
22  Cindy Alicea        MARGARET A. RITACCO
    Signature Department     Court Reporter
23         (312)263-0052
24  cc:  ALL COUNSEL ORDERING THE TRANSCRIPT

207

---

1   the foregoing deposition was reserved by counsel
2   for the respective parties.
3     I further certify that the taking of this
4   deposition was pursuant to notice and that there
5   were present at the deposition the attorneys
6   hereinbefore mentioned.
7     I further certify that I am not counsel
8   for nor in any way related to the parties to
9   this suit, nor am I in any way interested in the
10  outcome thereof.
11    IN TESTIMONY WHEREOF:  I have hereunto
12  set my hand and affixed my notarial seal this
13  17th day of April 2023.
14
15
16
17
18  _____
19  NOTARY PUBLIC, COOK COUNTY, ILLINOIS
20  LIC. NO. 084-002796
21
22
23
24

206



**JAMES M. TINJUM, PhD, PE**
Tinjum Consulting, LLC
10 Arboredge Way
Fitchburg, WI 53711
Phone: 608.609.8424 – jmtinjum@tinjumconsultingllc.com



## PROFESSIONAL PREPARATION

University of Wisconsin-Madison, Civil and Environmental Engineering, BS 1993

University of Wisconsin-Madison, Civil and Environmental Engineering, MS 1995

University of Wisconsin-Madison, Civil and Environmental Engineering, PhD 2006

## APPOINTMENTS

| | |
|---|---|
| *Owner*, Tinjum Consulting LLC (EIN 45-1853470) | 2003 – current |
| *Director*, Geological Engineering Program University of Wisconsin-Madison (jmtinjum@wisc.edu) | 2019 – current |
| *Associate Professor*, Department of Civil and Environmental Engineering | 2019 – current |
| *Associate Chair*, Department of Engineering Professional Development | 2017 – 2019 |
| *Faculty Director of Online Credit Engineering Programs* | 2016 – 2018 |
| *Associate Professor*, University of Wisconsin-Madison | 2014 – current |
| *Assistant Professor*, University of Wisconsin-Madison | 2008 – 2014 |
| *Associate Geotechnical Engineer*, CH2M HILL, Inc. (Philadelphia, PA) | 2005 – 2008 |
| *Dwight D. Eisenhower Research Fellow*, University of Wisconsin-Madison | 2002 – 2005 |
| *Project Geotechnical Engineer and Project Manager*, RMT, Inc. (Madison, WI) | 1998 – 2002 |
| *Staff Geoenvironmental Engineer*, CH2M HILL, Inc. (Denver, CO) | 1995 – 1998 |
| *Research and Teaching Assistant*, University of Wisconsin-Madison | 1993 – 1995 |
| *Engineering Intern*, Caterpillar, Inc. (Peoria, IL) | 1990 – 1992 |

## PROJECTS

### *Litigation Support / Expert Witness*

Hazardous Waste Disposal and TCLP Analysis. Confidential Waste Management Company (North America). *Expert Witness*. 2022 – current.

Hazardous Waste Material Assessment. Confidential Industrial Company (Wisconsin). Expert Witness. 2022 – current.

Landfill Liner Performance Modeling. Confidential Waste Management Company (North America). *Standard-of-Care Expert*. 2018 – current.

Nature and Extent of PFAS Contamination. City of Rhinelander (Wisconsin). *Third-Party Review*. 2019 – current.

Bluff Slope Stability Analysis. Grandad Bluff, La Crosse (Wisconsin). *Expert Witness.* 2020

Bluff Slope Stability Failure Analysis. Confidential Client (Wisconsin). *Standard-of-Care Expert*. 2018 – 2019.

Excavation Stability Analysis. Confidential Client (Wisconsin). *Expert Witness*. 2019.

Landfill Liner Performance Modeling. Confidential Waste Management Company (North America). *Standard-of-Care Expert*. 2018 – current.

Coal Combustion Residuals Landfill. Confidential Client (North America). *Standard-of-Care Expert*. 2017 – 2019.

Wind Energy Site, Litigation of Foundation Performance. Confidential Client (North America). *Standard-of-Care Expert*. 2014 – 2017.

Wind Energy Site, Litigation of Foundation Performance. Confidential Client (North America). *Standard-of-Care Expert*. 2016 – current.

Brownfield Remediation, Litigation of Responsible Parties. CNH America LLC (Racine, WI). *Expert Witness*. 2010 – 2013.

Soft Ground Foundation Analysis, Litigation of Foundation Suitability. Gekas Law LTD (Chicago, IL). *Expert Witness*. 2009 – 2010.

Remedial Investigation, Chromium-Impacted Site. Honeywell International (Baltimore, MD). *Principal Investigator*. 2006 – 2017.

***Representative Consulting Projects (Energy, Environment, Geotechnical)***

Freeze-Thaw Foundation Conditions and Remediation. Sargento Foods Incorporated (WI). Third-Party Review.

Coal Combustion Residual Impoundment Closure. Confidential Utility Owner (MO). Third-Party Geotechnical Review.

Coal Combustion Residual Landfill Remediation. Confidential Utility Owner (WI). Third-Party Geotechnical Review.

Landfill Slope Reconstruction and Lagoon Closure.  City of Clovis (NM).  Design Coordinator.

Cooling Pond Slope Reconstruction and Armoring. Rohm and Haas Company (TX). Geotechnical Design Engineer.

Geotechnical Design of Sediment Excavation. Rohm and Haas Company (Mozanica, Italy). Senior Geotechnical Engineer.

Sludge Lagoon Closure.  Chevron (TX).  Geotechnical Engineer.

Bridge Armoring.  Burlington Northern Santa Fe Railroad (MT).  Resident Engineer.

Landfill Construction.  Waste Management, Countryside Landfill (IL).  Design Engineer.

Wind Energy Geotechnical Report and Foundation Design. Confidential Utility Owner (WI). Third-Party Review.

Wood-Ridge Feasibility Study. Rohm and Haas Company (NJ). Technical Manager.

Coal-fired Power Plant Siting. Unnamed Client (IA). Project Manager.

Feasibility Study, Former Chlorine Plant. Weyerhaeuser (NC). Study Coordinator.

Natural Gas-fired Power Plant Siting.  Mirant Corporation (WI).  Project Coordinator.

Natural Gas Power Generating Facilities Construction.  Southern Energy Inc., Zeeland (MI) and Neenah (WI).  Project Geotechnical Engineer.

Superfund Remedial Design and Remedial Action.  Waste Management, H.O.D. Landfill (IL). Engineering Coordinator.

Foundry Sand Landfill Siting and Construction.  Waupaca Foundry (TN).  Lead Engineer.

Geotechnical and Leaching Properties of Cement Kiln Dust.  National Lime Association (DC). Project Coordinator.

Treatment Plant Design. Various Clients (CO, NE, OK, WY). Lead Geotechnical Engineer.

Remedial Design and Construction. Hill Air Force Base (UT).  Design Engineer.

Highway Reconstruction.  Federal Highway Administration (WY).  Design Engineer.

**PUBLICATIONS**

**Peer Reviewed, Archived Papers**

1. Yilmaz, M., Tinjum, J.M., Acker, C., and Marten, B. 2021. "Transport Mechanisms and Emission of Landfill Gas through Various Configurations in an MSW Landfill Using a Static Flux Chamber Technique. *Journal of Engineering Management*. 280, 111677.

2. Yilmaz, M., Eun, J., Tinjum, J.M., and Fratta, D. 2021. "In-service Response of Shallow On-shore Wind Turbine Generator Foundation." *Geotechnical and Geological Engineering*. 1–18.

3. Chen, J., Eun, J., Feng, Y., and Tinjum, J.M. 2021. "Long-term Leaching Behavior of Chromite Ore Processing Residue as Backfill Material and the Propagation of Chromium in the Surrounding Soil." *Journal of Hazardous, Toxic, and Radioactive Waste*. 25(3), 04021017.

4. Oh, H. and Tinjum, J.M. 2020. "Effect of Initial Moisture Content on Critical Temperature of Three Sandy Soils." Proceedings of ASCE Geo-Congress. *ASCE Geotechnical Special Publication 316*. 21–30.

5. Thomas, L.K., Tinjum, J.M., and Holcomb, F.H. 2020. "Environmental Life Cycle Assessment of a Deep Direct-Use Geothermal System in Champaign, Illinois." Proceedings, 45th Workshop on Geothermal Reservoir Engineering. Stanford University, Stanford, California, February 10-12, 2020, SGP-TR-216.

6. Mostafa Afzalian, Jongwan Eun, James M Tinjum. 2019. "Evaluation of Bimodal Water Retention Characteristics for Hydrating Chromium Ore Processing Residue (COPR)." Geo-Congress 2019: Geotechnical Materials, Modeling, and Testing. 754-764.

7. Alsabhan, A.H., Fratta, D., Warren, B., Tinjum, J.M., and Edil, T.B. 2019. "Using Time Domain Reflectometry to Determine Depth of Fouling and Fouling Type in Railway Track Substructure." ASTM *Geotechnical Testing Journal*. 42(1), 156–179. DOI: 10.1520/GTJ20170305.

8. McDaniel, A., Tinjum, J.M., Lin, Y.-F., Stumpf, A.J., Thomas, L., and Hart, D.J. 2018. "Distributed Thermal Response Test to Analyze Thermal Properties in Heterogeneous Lithology." *Geothermics*. 76, 116–124.

9. Stumpf, A., Damico, J., Okwen, R., Stark, T., Elrick, S., Nelson, W.J, Lu, Y., Holcomb, F., Tinjum, J., Yang, F., Frailey, S., and Lin, Y.-F. 2018. "Feasibility of a Deep Direct-Use Geothermal System at the University of Illinois Urbana-Champaign." *GRC Transactions*. 42.

10. Alsabhan, A.H., Fratta, D., Warren, B., Tinjum, J.M., and Edil, T.B. 2018. "Using Time Domain Reflectometry to Determine Depth of Fouling and Fouling Type in Railway Track Substructure." ASTM *Geotechnical Testing Journal*. 42(1).

11. McDaniel, A., Tinjum, J.M., Hart, D.J., and Fratta, D. 2018. "Dynamic Calibration for Permanent Distributed Temperature Sensing Networks." IEEE *Sensors Journal*. 18(6), 2342–2352. DOI: 10.1109/JSEN.2018.2795240.

12. Alsabhan, A.H., Tinjum, J.M., Fratta, D., and Edil, T.B. 2018. "Field Validation of Polyurethane Technology in Remediating Rail Substructure and Enhancing Rail Freight Capacity." In: Railroad Ballast Testing and Properties. DOI 10.1520/STP160520170142.

13. Eun, J, Tinjum, J.M., Benson, C.H., and Edil, T.B. 2018. "Methane Transport through Simulated Interim Landfill Covers with a PE Geofilm or Ethylene-Vinyl Alcohol, LLDPE, or PVC Geomembrane." ASCE *Journal of Environmental Engineering*. 144(2). DOI: 10.1061/(ASCE)EE.1943-7870.0001298.

14. Eun, J, Tinjum, J.M., Benson, C.H., and Edil, T.B. 2018. "Equivalent Transport Parameters for Volatile Organic Compounds (VOCs) in Co-Extruded Geomembrane Containing Ethylene-Vinyl Alcohol (EVOH)." *Journal of Geotechnical and Geoenvironmental Engineering*. 144(7).

15. McDaniel, A., Fratta, D., Tinjum, J.M., and Hart, D.J. 2018. "Long-term District-Scale Geothermal Exchange Borefield Monitoring with Fiber Optic Distributed Temperature Sensing." Geothermics. 72, 193–204. DOI: 10.1016/j.geothermics.2017.11.008.

16. Enos, C., Yilmaz, M., Wu, Z., Tinjum, J.M., and Fratta, D. 2018. "Field and Lab Characterization of the Operational Response of Wind Turbine Generator Foundation Soil." International Foundations Congress and Equipment Expo. IFCEE 243–253.

17. Herrera, C., Nellis, G., Reindl, D.T., Klein, S., Tinjum, J.M., and McDaniel, A. 2017. "Use of a Fiber Optic Distributed Temperature Sensing System for Thermal Response Testing of Ground-coupled Heat Exchangers." *Geothermics*. 71, 331–338. DOI: 10.1016/j.geothermics. 2017.10.002.

18. Mandal, T., Tinjum, J., and Edil, T. 2017. "Study on Flexural Strength, Modulus, and Fatigue Cracking of Cementitiously Stabilized Materials." *Road Materials and Pavement Design*. DOI: 10.1080/14680629.2017.1325772.

19. Florea, L.J., Hart, D., Tinjum, J., and Choi, C. 2017. "Potential Impacts to Groundwater from Ground-Coupled Geothermal Heat Pumps in District Scale." Groundwater. 55(1). 8–9.

20. Ozdogan-Dolcek, A., Atkins, I., Harper, M.K., Tinjum, J.M., and Choi, C.Y. 2017. "Performance and Sustainability of District-Scale Ground Coupled Heat Pump Systems." *Geotechnical and Geological Engineering*. DOI 10.1007/s10706-016-0147-y.

21. Tian, K., Benson, C.H., and Tinjum, J.M. 2017. "Chemical Characteristics of Leachate in Low-Level Radioactive Waste Disposal Facilities." *Journal of Hazardous, Toxic, and Radioactive Waste*. 21(4). DOI: 10.1061/(ASCE)HZ.2153-5515.0000361.

22. Eun, J, Tinjum, J.M., Benson, C.H., and Edil, T.B. 2017. "Comparison of Volatile Organic Compound Transport in Composite Liners with HDPE and Ethylene–Vinyl Alcohol Coextruded Geomembranes." ASCE *Journal of Geotechnical and Geoenvironmental Engineering*. 143(6). DOI: 10.1061/(ASCE)GT.1943-5606.0001484.

23. Tian, K., Benson, C.H., Tinjum, J.M., and Edil, T.B. 2017. "Antioxidant Depletion and Service Life Prediction for HDPE Geomembranes Exposed to Low-Level Radioactive Waste Leachate." ASCE *Journal of Geotechnical and Geoenvironmental Engineering*. DOI 10.1061/(ASCE)GT.1943-5606.0001643.

24. Oh, H. and Tinjum, J.M. 2017. "Comparison of Two Laboratory Methods for Measuring the Critical Temperature of Sandy Soils." Proceedings of ASCE Geotechnical Frontiers 2017. *ASCE Geotechnical Special Publication 280*. 809–817.

25. Mandal, T., Tinjum, J.M., Gokce, A., and Edil, T.B. 2016. "Protocol for Testing Flexural Strength, Flexural Modulus, and Fatigue Failure of Cementitiously Stabilized Materials Using Third-Point Flexural Beam Tests. *ASTM Geotechnical Testing Journal*. 39(1). 1–15.

26. Mandal, T., Tinjum, J.M., and Edil, T.B. 2016. "Non-Destructive Testing of Cementitiously Stabilized Materials using Ultrasonic Pulse Velocity Test." *Transportation Geotechnics*. 6(2016). 97–107.

27. Rhoades, K., Tinjum, J., and Eun, J. 2016. "Transport of Hexavalent Chromium in the Vadose Zone by Capillary and Evaporative Transport from Chromium Ore Processing Residue." *Canadian Geotechnical Journal*. 53(4). 619–633. DOI: 10.1139/cgj-2015-0010.

28. Bloom, E. and Tinjum, J.M. 2016. "Fully Instrumented Life-Cycle Analyses for Residential Geo-Exchange System." Proceedings of ASCE Geo-Chicago. *ASCE Geotechnical Special Publication 270*. 114–124.

29. McDaniel, A., Harper, M., Fratta, D., Tinjum, J.M., Choi, C., and Hart, D. 2016. "Dynamic Calibration of a Fiber-Optic Distributed Temperature Sensing Network at a District-Scale Geothermal Exchange Borefield." Proceedings of ASCE Geo-Chicago. *ASCE Geotechnical Special Publication 270*. 1–11.

30. Eun, J., Yilmaz, M., Tinjum, J.M., and Benson, C.H. 2016. "Hydrogen Sulfide (H2S) Transport through Simulated Interim Covers with Conventional and Co-Extruded Ethylene-Vinyl Alcohol (EVOH) Geomembranes." Proceedings of ASCE Geo-Chicago. *ASCE Geotechnical Special Publication 271*. 411–420.

31. Eun, J., Chen, J., and Tinjum, J.M. 2016. "Long-Term Leaching Characteristics of Chromite Ore Processing Residue Using Synthetic Groundwater." Proceedings of ASCE Geo-Chicago. *ASCE Geotechnical Special Publication 270*. 1–11.

32. Walker, M., Meyer, L., Tinjum, J.M., Hart, D. 2015. "Thermal Property Measurements of Stratigraphic Units with Modeled Implications for Performance of Vertical Ground Source Heat Pumps." *Geotechnical and Geological Engineering*. DOI 10.1007/s/10706-015-9847-y.

33. Yilmaz, M., Eun, J., Tinjum, J.M., and Fratta, D. 2015. "In-Service Behavior of Soil Underlying Shallow Wind Turbine Generator Foundation." *Proceedings of the 15th Pan-American Conference on Soil Mechanics and Geotechnical Engineering*, 1965–1972. Buenos Aires, Argentina. IOS Press BV. ISBN 978-1-61499-602-6.

34. Ebrahimi, A., Tinjum, J.M., and Edil, T.B. 2015. "Deformational Behavior of Fouled Railway Ballast." *Canadian Geotechnical Journal*. 52(2015). 344–355.

35. Soleimanbeigi, A., Shedivy, R.F., Tinjum, J.M., and Edil T.B. 2015. "Climatic Effect on Resilient Modulus of Recycled Unbound Aggregates." *Road Materials and Pavement Design*. 16(4). 836–853.

36. Ba, M., Tinjum, J.M., and Fall, M. 2015. "Prediction of Permanent Deformation Model Parameters of Unbound Base Course Aggregates Under Repeated Loading." *Road Materials and Pavement Design.* 16(4). 1–16.

37. Diagne, M., Tinjum, J.M., and Nokkaew, N. 2015. "The Effects of Recycled Clay Brick Content on the Engineering Properties, Weathering Durability, and Resilient Modulus of Recycled Concrete Aggregate." *Transportation Geotechnics*. 3(2015). 15–23.

38. Hesse, D.E., Tinjum, J.M., and Warren, B.J. 2014. "Impact of Increasing Freight Loads on Rail Substructure from Fracking Sand Transport." *Transportation Geotechnics*. 1(4). 241–256.

39. Nokkaew, K., Tinjum, J.M., Likos, W.J., and Edil, T.B. 2014. "Effect of Matric Suction on Resilient Modulus for Compacted Recycled Asphalt Base Course in Postcompaction State." *Transportation Research Record, Journal of the Transportation Research Board*. No. 2433. 241–256. DOI 10.3141/2433-08.

40. Wu, R., Tinjum, J.M., and Likos, W. 2014. "Finite-Element Modeling of Coupled Heat and Moisture Transfer in Unsaturated Soils for Shallow Horizontal Geothermal Ground Loops." *Geotechnical and Geological Engineering*. DOI 10.1007/s10706-014-9811-2.

41. Yao, J., Oh, H., Likos, W., and Tinjum, J.M. 2014. "Three Laboratory Methods for Measuring Thermal Resistivity Dryout Curves of Coarse-Grained Soils." ASTM *Geotechnical Testing Journal*. 37(6), 1056–1067.

42. Keene, A., Tinjum, J.M., and Edil, T.B. 2014. "Mechanical Properties of Polyurethane-Stabilized Ballast and Infrastructure Materials." *Geotechnical Engineering Journal of the SEAGS and AGSSEA*. 45(1). 67–73.

43. Ebrahimi, A., Tinjum, J.M., and Edil, T.B. 2014. "Mechanistic-Based Maintenance Planning of Railway Substructure." Geotechnical Engineering Journal of the SEAGS and AGSSEA. 45(1). 48–55.

44. Eun, J., Tinjum, J.M., Benson, C.H., and Edil, T.B. "Volatile Organic Compound (VOC) Transport through Composite Liner with Co-Extruded Geomembrane Containing Ethylene Vinyl-Alcohol (EVOH)." ASCE Geo-Congress 2014.

45. Hunter, E.L., Tinjum, J.M., and Benson, C.H. "Radionuclide Behavior in Low-Level Radioactive Waste (LLW) Disposal Barrier Materials: Impacts of Sorption." ASCE Geo-

Congress 2014.

46. Oh, H., Yao, J., Tinjum, J.M., and Likos, W.J. 2014. "Thermal Resistivity Dryout Curves for Three Sandy Soils." ASCE Geo-Congress 2014.

47. Ozdogan-Dolcek, A., Tinjum, J.M., and Hart, D. 2014. "Numerical Modeling of Ground Temperature Response in a Ground Source Heat Pump System (GSHP)." *Geotechnical Special Publication No. 234, Proceedings Geo-Congress 2014*. 2755–2766.

48. Rajaei, M., and Tinjum, J.M. "Case Study of Wind Plant Life Cycle Energy, Emissions, and Water Footprint." *ASCE Geo-Congress 2014*.

49. Tian, K., Tinjum, J.M., Benson, C.H., and Edil, T.B. 2014. "Antioxidant Depletion in HDPE Geomembranes Exposed to Low-Level Radioactive Waste Leachate." ASCE Geo-Congress 2014.

50. Wu, R., Tinjum, J.M., and Likos, W. 2014. "Coupling Thermal Conductivity Dryout Curves with Unsaturated Modeling of Shallow Horizontal Geothermal Exchange Loops." *Geotechnical Special Publication No. 234, Proceedings Geo-Congress 2014*. 4015–4026.

51. Yilmaz, M., Schubert, S., Tinjum, J.M., and Fratta, D. "Foundation Soil Response to Wind Turbine Generator Loading." *ASCE Geo-Congress 2014*.

52. Woodward, N.R., Tinjum, J.M., and Wu, R. 2013. "Water Migration Impacts on Thermal Resistivity Testing." ASTM *Geotechnical Testing Journal*. 36(3). 948–955.

53. Rajaei, M., and Tinjum, J.M. 2013. "Life Cycle Assessment of Energy Balance and Emissions of a Wind Energy Plant." *Journal of Geotechnical and Geological Engineering*. 31(6). 1663–1670.

54. Ba, M., Fall, M., Tinjum, J.M., and Nokkaew, K. 2013. "Effect of Soil Suction on Resilient Modulus of Compacted Aggregate Base Courses." *Journal of Geotechnical and Geological Engineering*. 31(5). 1497–1510.

55. Chen, J., Tinjum, J.M., and Edil, T.B. 2013. "Leaching of Alkaline Substances and Heavy Metals from Recycled Concrete Aggregate Used as Unbound Base Course." *Transportation Research Record, Journal of the Transportation Research Board*.

56. Soleimanbeigi, A., Edil, T.B. and Tinjum, J.M. 2013. "Effect of Temperature on Shear Strength of Recycled Asphalt Shingles." *Transportation Research Record, Journal of the Transportation Research Board*.

57. Lee, J., Edil, T.B., Benson, C.H., and Tinjum, J.M. 2013. "Building Environmentally and Economically Sustainable Transportation Infrastructure-Highways: A Green Highway Rating System." *ASCE Journal of Construction Engineering and Management*.

58. Keene, A., Edil, T.B., Fratta, D., and Tinjum, J.M. 2013. "Modeling Effect of Polyurethane Stabilization on Track Response." *ASCE Geotechnical Special Publication No. 231, Proceedings Geo-Congress 2013*. 1410–1418.

59. Bozyurt, O., Keene, A.K., Tinjum, J.M., Edil, T.B., and Fratta, D. 2013. "Freeze-thaw Effects on Stiffness of Unbound Recycled Base Course.**"** ASTM *International Symposium on Mechanical Properties of Frozen Soils*, STP1568. Jacksonville, FL.

60. Boecher, T.A., Tinjum, J.M., and Xu, H. 2012. "Mineralogical and Amorphous Species in Chromium Ore Processing Residue." *Journal of Residuals Science and Technology*. 9(4). 131–141.

61. Ebrahimi, A., Tinjum, J.M., and Edil, T.B. 2012. "Protocol for Testing Fouled Railway Ballast in Large-Scale Cyclic Triaxial Equipment." *ASTM Geotechnical Testing Journal*. 35(5). 796–804.

62. Tinjum, J.M., and Lang, P. 2012. "Wind Geotechnics." *ASCE Geo-Strata*. 16(1). 18–26.

63. Bozyurt, O., Tinjum, J.M., Son, Y.H., Edil, T.B., and Benson, C.H. 2012. "Resilient Modulus of Recycled Asphalt Pavement and Recycled Concrete Aggregate." ASCE *Geotechnical Special Publication No. 225, Proceedings Geo-Congress 2012*. 3901–3910.

64. Nokkaew, K., Tinjum, J.M., and Benson, C.H. 2012. "Hydraulic Properties of Recycled Asphalt Pavement and Recycled Concrete Aggregate." ASCE *Geotechnical Special Publication No. 225, Proceedings Geo-Congress 2012*. 1476–1485.

65. Chen, J., Bradshaw, S., Benson, C.H., Tinjum, J.M., and Edil, T.B. 2012. "pH-dependent Leaching of Trace Elements from Recycled Concrete Aggregate." ASCE *Geotechnical Special Publication No. 225, Proceedings Geo-Congress 2012*. 3729–3737.

66. Woodward, N.R., and Tinjum, J.M. 2012. "Impact of Moisture Migration on Thermal Resistivity Testing in Unsaturated Soil." *ASCE Geotechnical Special Publication No. 225, Proceedings Geo-Congress 2012*. 4426–4435.

67. Leaching of Trace Elements from Recycled Concrete Aggregate." ASCE Geotechnical Special Publication No. 225, Proceedings Geo-Congress 2012. 3729–3737.

68. Bozyurt, O., Tinjum, J.M., Son, Y.H., Edil, T.B., and Benson, C.H. 2012. "Resilient Modulus of Recycled Asphalt Pavement and Recycled Concrete Aggregate." ASCE Geotechnical Special Publication No. 225, Proceedings Geo-Congress 2012. 3901–3910.

69. Eun, J., and Tinjum, J.M. 2012. "Unsaturated Transport of Ebullition Gas through Sediment Capping Geotextiles and Sand." *5th Asia-Pacific Conference on Unsaturated Soils*. 481–486.

70. Eun, J., and Tinjum, J.M. 2012. "Variation in Air Entry Suction of Nonwoven Geotextiles with Pore Size Distribution." *5th Asia-Pacific Conference on Unsaturated Soils*. 475–480.

71. Lee, J.C., Edil, T.B., Benson, C.H., and Tinjum, J.M. 2011. "Evaluation of Variables Affecting Sustainable Highway Design with BE2ST-in-Highways System." *Transportation Research Record, Journal of the Transportation Research Board*. 2233. 178–186.

72. S., Scalia, J., Schlicht, P., and Wang, X. 2011. "Engineered Covers for Waste Containment: Changes in Engineering Properties & Implications for Long-Term Performance Assessment." NUREG/CR-7028, Office of Research, U.S. Nuclear Regulatory Commission, Washington, DC.

73. Lee, J.C., Edil, T.B., Tinjum, J.M., and Benson, C.H. 2010. "Quantitative Assessment of Environmental and Economic Benefits of Using Recycled Construction Materials in Highway Construction." Transportation Research Record, *Journal of the Transportation Research Board*. 2158. 138–142.

74. Millspaugh, A.M., Tinjum, J.M., and Boecher, T.A. 2010. "Specific Gravity of Expansive Chromium Ore Processing Residue with Complex Microstructure." *ASTM Geotechnical Testing Journal*. 33(4). 322–328.

75. Schlicht, P., Benson, C., Tinjum, J.M., and Albright, W. 2010. "In-Service Hydraulic Properties of Two Landfill Final Covers in Northern California." ASCE *Geotechnical Special Publication No. 199, Proceedings Geo-Congress 2010*. 2867–2877.

76. Dixon, N., Langer, U., Reddy, K., Maugeri, M., Tinjum, J., Mahler, C., and Cho, Y. 2009. "Waste Characterization." ASCE *Geotechnical Special Publication No. 209. Proceedings of the 2008 International Symposium on Waste Mechanics*. 135–152.

77. Tinjum, J.M., Benson, C.H., and Edil, T.B. 2008. "Mobilization of Cr(VI) from Chromite Ore Processing Residue through Acid Treatment." *Science of the Total Environment*. 391(1). 13–25.

78. Tinjum, J.M., Benson, C.H., and Edil, T.B. 2008. "Treatment of Cr(VI) in Chromium Ore Processing Residue Using Ferrous Sulfate-Sulfuric Acid or Cationic Polysulfides." *ASCE Journal of Geotechnical & Geoenvironmental Engineering*. 132(12). 1791–1803.

79. Schlicht, P.D., Benson, C.H., Tinjum, J.M., and Albright, W.H. 2010. "In-Service Hydraulic Properties of Two Landfill Final Covers in Northern California." *ASCE Geotechnical Special*

*Publication No. 199*, Proceedings Geo-Congress 2010. 2867–2877.

80. Tinjum, J.M., Houck, C.J., and French, C. 2008. "Field Investigation Techniques for Characterizing and Delineating COPR." ASCE Geotechnical Special Publication No. 178, Proceedings Geo-Congress 2008. 407–414.

81. Dixon, N., Langer, U., Reddy, K., Maugeri, M., Tinjum, J.M., Mahler, C., and Cho, Y. 2009. "Waste Characterization." ASCE Geotechnical Special Publication No. 209. Proceedings of the 2008 International Symposium on Waste Mechanics. 135–152.

82. Tinjum, J.M., Benson, C.H., Edil, T.B., and Chowdhury, A. 2005. "An Innovative Method to Treat Chromium Ore Processing Residue." 8th International In Situ and On-Site Bioremediation Symposium, Baltimore, MD.

83. Tinjum, J.M., Krantz, B.J., Ditto, W.L., and Aldern, J.L. 2003. "Investigation and Remediation of Karst Features at Foundry Landfill Site." Sinkholes and the Engineering and Environmental Impacts of Karst: Proceedings of the 9th Multidisciplinary Conference. ASCE Geotechnical Special Publication No. 122. 349–360.

84. Tinjum, J.M., and Schittone, J.V. 2001. "Landfill Construction through Peat and Organic Silt." Soft Ground Technology. ASCE Geotechnical Special Publication No. 112. 388–398.

85. Tinjum, J.M., Benson, C.H., and Blotz, L.R. 1997. "Soil Water Characteristic Curves for Compacted Clays." ASCE Journal of Geotechnical & Geoenvironmental Engineering. 123(11). 1060–1069.

86. Benson, C.H., Tinjum, J.M., and Hussin, C.J. 1995. "Leakage Rates from Geomembrane Liners Containing Holes." Geosynthetics '95 Conference Proceedings. 745–758.

## Invited Book Chapters

87. Tinjum, J.M. 2017. "Energy Geotechnics: Towards a Sustainable Energy Future." In: *Geoenvironmental Practices and Sustainability: Linkages and Directions.* Springer.

88. Tinjum, J.M., and Christensen, R.W. 2010. "Site Characterisation, Design, and Construction Considerations." In Wind Energy Systems: Optimising Design and Construction for Safe and Reliable Operation. 28–45. Eds. J.D. Sørensen and J.N. Sørensen. Woodhead Pub. Cambridge, UK.

## Items at Conferences

89. Ba, M., Fall, M., and Tinjum, J.M. 2015. Comparison of Laboratory Resilient Modulus with Elastic Moduli Measured with Soil Stiffness Gauge and Back-Calculated from Large Scale Model Experiment of Unbound Base Course. *International Conference on Innovations in Construction.* May 11–12, Paris.

90. Mandal, T., Tinjum, J.M., and Edil, T.B. "Non-Destructive Testing of Cementitiously Stabilized Materials Using Ultrasonic Pulse Velocity Test." Transportation Research Record, Journal of the Transportation Research Board. Washington, D.C. Role: Presented (poster) by Tinjum.

91. Bozyurt, O., Keene, A.K., Tinjum, J.M., Edil, T.B., and Fratta, D. 2013. "Freeze-thaw Effects on Stiffness of Unbound Recycled Base Course." ASTM International Symposium on Mechanical Properties of Frozen Soils, STP1568. Jacksonville, FL.

92. Eun, J., and Tinjum, J.M. 2012. "Unsaturated Transport of Ebullition Gas through Sediment Capping Geotextiles and Sand." 5th Asia-Pacific Conference on Unsaturated Soils. 481–486.

93. Eun, J., and Tinjum, J.M. 2012. "Variation in Air Entry Suction of Nonwoven Geotextiles with Pore Size Distribution." 5th Asia-Pacific Conference on Unsaturated Soils. 475–480.

94. Rajaei, M. and Tinjum, J.M. 2012. "Life Cycle Assessment of Energy Balance and Emissions of a Wind Energy Plant." 17th Annual Great Lakes Geotechnical/Geoenvironmental Conference. Cleveland, OH.

95. Ebrahimi, A., Fratta, D., and Tinjum, J.M. 2010. "Detection of Fouling in Ballast by Electromagnetic Surveying." AREMA 2010 Annual Conference & Exposition. Orlando, FL.

96. Ebrahimi, A., Tinjum, J.M., and Edil, T.B. 2010. "Large-scale, Cyclic Triaxial Testing of Rail Ballast." AREMA 2010 Annual Conference & Exposition. Orlando, FL.

97. "Use of BE2ST in-Highways for Green Highway Construction Rating in Wisconsin." Proceedings of 1st T&DI Green Streets & Highway Conference. 480–494.

98. Keene, A.K., Edil, T.B., Tinjum, J.M., and Brown, B.W. 2012. "Mechanical Properties of Polyurethane-stabilized Ballast." International Symposium on Geotechnical Engineering for High-speed Transportation Infrastructure. Hangzhou, China.

99. Keene, A.K., Edil, T.B., Tinjum, J.M., and Brown, B.W., 2012. "Engineering Design of Polyurethane-stabilized Ballast." 3rd International Conference. on New Developments in Soil Mechanics and Geotechnical Engineering. Near East Univ., Nicosia, Cyprus.

**Technical Reports**

100. Yu-Feng Lin, Andrew Stumpf, Scott Frailey, Roland Okwen, Yongqi Lu, Franklin Holcomb, James Tinjum, Timothy Stark, Scott Elrick, Kevin Fisher, Wenfeng Fu, Damon Garner, Chuck Hammock, James Kirksey, Chris Korose, Jiale Lin, Zhaowang Lin, Ray McKaskle, J Nelson, Hafiz Salih, Lauren Thomas, Jeff Urlaub, Austyn Vance, and Fang Yang. 2020. "Geothermal Heat Recovery Complex: Large-Scale, Deep Direct-Use System in a Low-Temperature Sedimentary Basin." Illinois State Geological Survey, Prarie Research Institute.

101. Wen, H., Muhunthan, B., Wang, J., Li, X., Edil, T., and Tinjum, J.M. 2014. "Characterization of Cementiously Stabilized Layers for Use in Pavement Design." National Academy of Sciences. *National Cooperative Highway Research Program (NCHRP)* Report 789. ISBN 978-0-309-30813-7.

102. CH2M HILL. 2009. "COPR Investigation, Dundalk Marine Terminal, Baltimore, Maryland." Technical Report to Honeywell Inc. and Maryland Port Administration.

103. Geosyntec Consultants. 2009. "COPR Heave Investigation Report, Dundalk Marine Terminal, Baltimore, Maryland." Technical Report to Honeywell Inc. and Maryland Port Administration.

104. Tinjum, J.M., Liu, X., and Klett, N. 2008. "Characterization and Stabilization Mechanisms of Secondary Aluminum Processing Waste." UW–Madison GeoEngineering Technical Report 08-5.

**Publications by Students Without Co-Author Credit**

105. Ebrahimi, A. and Keene, A.K. 2011. "Maintenance Planning of Railway Ballast." Proceedings of the AREMA Annual Conference, Minneapolis, MN. Reviewed paper and presentation material, which was presented key Keene.

106. Ebrahimi, A. 2011. "Behavior of Fouled Ballast." Railway Track & Structures, August.

## SYNERGISTIC ACTIVITIES

- ASCE Fellow (elected 2018)
- Chair, College of Engineering Academic Planning Committee (2016 – 2017)
- Wisconsin Professional Engineer, License No. 33972-006

- Southwest Branch (ASCE Wisconsin Section) – President (2002 – 2003)
- Junior Engineers Tomorrow's Scientists, Denver – Civil Engineering Director (1996 – 1998)
- ASCE Zone III Practitioner Advisor of the Year (2003)
- ASCE Wisconsin Section Outstanding Young Engineer (2002)

**AFFILIATIONS**

*Graduate Advisor*: Professor Craig Benson**,** Dean of the College of Engineering (emeritus), University of Virginia

*Thesis Advisor and Postgraduate-Scholar Sponsor:* Connor Acker (UW-Madison), Timothy Boecher (Braun Intertec), Jeff Casmer (Braun Intertec), Jin Cheol Lee (1st ROK Marine Division), Ali Ebrahimi (Geosyntec), Chris Enos (Westwood Engineering), Jongwan Eun (U. of Nebraska), Ahmet Gokce (TUBITAK), Damien Hesse (Terracon), Sam Jorgensen (Westwood Engineering), Andrew Keene (UT-Austin), Emre Kucukkirca (Shannon & Wilson), Xiaoming Liu (U. Sci. & Tech., Beijing), Adam McDaniel (Westwood Engineering), Lauren Meyer (Engineering Analytics), Andrew Millspaugh (Natural Resource Technology), Kongrat Nokkaew (Katsaert U.), Hyunjun Oh (UW-Madison), Ayşe Özdoğan-Dölçek (Balıkesir U.), Katrina Rhoades (CH2M HILL), Paul Schlicht (Golder), Stephen Schubert (Patrick Engineering), Ryan Shedivy (Golder), Zhipeng Su (Shenyuan Geotechnical Engineering), Lauren Thomas (UW-Madison), Matthew Walker (Barr Engineering), Benjamin Warren (Shannon & Wilson), Nikki Woodward (Kleinfelder), Ray Wu (FTI Consulting), Mehmet Yilmaz (Turkish Education Ministry), Wei-hao Zen (Hong Kong).

**LEGAL REFERENCES (EXPERT WITNESS)**

Matthew J. Frank
MURPHY DESMOND S.C.
33 East Main Street, Suite 500
Madison, WI 53703
(608) 268-5616
(608) 257-2508 (fax)
mfrank@murphydesmond.com

Chris Gekas
GEKAS LAW LTD.
33 N. LaSalle St., Suite 2220
Chicago IL 60602
(312) 726-4501
(312) 726-4505 (fax)
CJG@gekaslaw.com

Jeffrey Leavell
JEFFREY LEAVELL, S.C.
723 S. Main Street
Racine, WI  53403-1211
(262) 633-7322
(262) 633-7323 (fax)
Jeff@jeffreyleavell.com

Mica Simpson
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
(206) 359-6023
(206) 359-7023 (fax)
MSimpson@perkinscoie.com

Case: 3:20-cv-50313 Document #: 80 Filed: 06/23/23 Page 444 of 480 PageID #:645

**GLG (//glg.it)** / Timesheets



**EXHIBIT**

**2**

**Project Name:** Nick Georgeff vs. Don Borneke Construction, INC. (Windfarm Excavation Expert)

**Client Name:** Swanson Martin & Bell LLP

**Invoice Period:** November 7th 2022 - December 3rd 2022

| Task Date | Task Type | Task Description | Time Worked (minutes) |
|-----------|-----------|------------------|------------------------|
| 11/10/2022 | 23918 | Reviewed Plaintiff's Disclosure | 30 |
| 11/10/2022 | 23918 | Reviewed Barnes Report | 100 |
| 11/11/2022 | 23918 | Reviewed Borneke Contract | 100 |
| 11/11/2022 | 23918 | Reviewed Mortenson COR | 20 |
| 11/11/2022 | 23918 | Reviewed Nick Borneke Transcript | 40 |
| 11/12/2022 | 23918 | Reviewed Brad Bennett Transcript and Exhibits | 105 |
| 11/12/2022 | 23918 | Reviewed Hogan Transcript | 25 |
| 11/12/2022 | 23918 | Reviewed Barnes Transcript | 95 |
| 11/7/2022 | 23918 | Reviewed OSHA Excavation Standards | 45 |
| 11/16/2022 | 23918 | Prep for and Participate in Legal Update Call w/ C | 90 |
| 11/17/2022 | 23918 | Reviewed Kruse, Sears, Langston Transcripts | 100 |

SAVE

**GLG (//glg.it)** / Timesheets

**Project Name:** Nick Georgeff vs. Don Borneke Construction, INC. (Windfarm Excavation Expert)

**Client Name:** Swanson Martin & Bell LLP

**Invoice Period:** December 3rd 2022 - January 1st 2023

| Task Date | Task Type | Task Description | Time Worked (minutes) |
|---|---|---|---|
| 12/22/2022 | 23918 | Annotated Outline, Previous Cases, Qualifications | 270 |
| 12/25/2022 | 23918 | Opinion 1, Standard of Care | 60 |
| 12/25/2022 | 23918 | Opinion 2, Root Cause | 70 |
| 12/25/2022 | 23918 | Opinion 3, OSHA 1926 Subpart P | 50 |
| 12/25/2022 | 23918 | Opinion 4, Geotechnical Engineering Report | 50 |
| 12/25/2022 | 23918 | Rebuttal to Barnes Report | 120 |
| 12/26/2022 | 23918 | Opinion 6, Earthwork Compaction Standard of Pra | 50 |
| 12/26/2022 | 23918 | Opinion 7, Contract Documents | 65 |
| 12/26/2022 | 23918 | Opinion 8, Construction Incident Report | 45 |
| 12/27/2022 | 23918 | Prepare Figures 1-6 for Expert Report | 150 |
| 12/29/2022 | 23918 | Prep for and Legal Call | 45 |
| 12/30/2022 | 23918 | Begin writing Expert Report | 95 |

SAVE

**GLG (//glg.it)** / Timesheets

---

**Project Name:** Nick Georgeff vs. Don Borneke Construction, INC. (Windfarm Excavation Expert)

**Client Name:** Swanson Martin & Bell LLP

**Invoice Period:** January 1st 2023 - February 2nd 2023

| Task Date | Task Type | Task Description | Time Worked (minutes) |
|---|---|---|---|
| 01/4/2023 | 23918 | Prepare Expert Report | 100 |
| 01/8/2023 | 23918 | Prepare Expert Report | 175 |
| 01/9/2023 | 23918 | Prepare Expert Report | 335 |
| 01/10/2023 | 23918 | Legal Call to Finalize Expert Report | 45 |

SAVE



**EXHIBIT**

**3**

**Gerson Lehrman Group, Inc.**
60 E42nd St
3rd Floor
New York, NY 10165
(212) 984-8500

**Bill To:**

Swanson Martin & Bell LLP
Attn: Christian Sullivan
330 N. Wabash, Suite 3300
Chicago, IL 60611
United States

| Invoice | US-RET27437 |
|---|---|
| Date | 01/04/2023 |
| Payment Terms | Net 30 |
| PO Number | |

| Description | Amount |
|---|---|
| Nick Georgeff vs. Don Borneke Construction, INC. (Windfarm Excavation Expert)<br>Jim Tinjum: 12.90 hours at $675.00 per hour = $8,707.50 | $8,707.50 |

Please remember your use of Gerson Lehrman Group services is subject
to our Usage Policies available at www.glgroup.com/usage_policies.html

| | |
|---|---|
| Subtotal: | $8,707.50 |
| Misc: | $0.00 |
| Tax: | $0.00 |
| Total: | $8,707.50 |

***ACH/Wiring Instructions***
Silicon Valley Bank
3003 Tasman Drive
Santa Clara, CA 95054
ABA: 121140399 / Swift Code: SVBKUS6S
Acct Name: Gerson Lehrman Group, Inc.
Acct No: 3300426119

***Remittance Address:***
Box 200589
Pittsburgh, PA 15251-0589



**Gerson Lehrman Group, Inc.**
60 E42nd St
3rd Floor
New York, NY 10165
(212) 984-8500

**Bill To:**

Swanson Martin & Bell LLP
Attn: Christian Sullivan
330 N. Wabash, Suite 3300
Chicago, IL 60611
United States

| Invoice | US-RET27692 |
|---|---|
| Date | 01/30/2023 |
| Payment Terms | Net 30 |
| PO Number | |

| Description | Amount |
|---|---|
| Nick Georgeff vs. Don Borneke Construction, INC. (Windfarm Excavation Expert)<br>Jim Tinjum: 18.20 hours at $675.00 per hour = $12,285.00 | $12,285.00 |

| | |
|---|---|
| Subtotal: | $12,285.00 |
| Misc: | $0.00 |
| Tax: | $0.00 |
| Total: | $12,285.00 |

Please remember your use of Gerson Lehrman Group services is subject
to our Usage Policies available at www.glgroup.com/usage_policies.html

**ACH/Wiring Instructions**

Silicon Valley Bank
3003 Tasman Drive
Santa Clara, CA 95054
ABA: 121140399 / Swift Code: SVBKUS6S
Acct Name: Gerson Lehrman Group, Inc.
Acct No: 3300426119

**Remittance Address:**

Box 200589
Pittsburgh, PA 15251-0589

**List of Cases in past Five Years, Tinjum Consulting LLC**
**Page 1 of 1**



- New York State v. Covanta Hempstead
  - Current
  - Expert Opinion submitted October 03, 2022
  - Deposition January 2023
  - Engaged by Defendant
  - Attorney: Elizabeth A. Edmondson, Jenner & Block LLP

- 11200 West Heather Ave.
  - Current
  - Expert Opinion submitted May 16, 2022
  - Engaged by Defendant
  - Attorney: Edward Keating, Duane Morris LLP

- Grandad Bluff Coalition
  - Expert Opinion on slope stability submitted April 30, 2020
  - Engaged by Plaintiff
  - Attorney: Christine Clair

- William N. Yoss v. American Transmission Company LLC
  - Slope Stability Analysis and Opinion of Extractable Aggregate Resource
  - Expert Opinion submitted February 15, 2019
  - Engaged by Defendant
  - Attorney: Bryan Cahill, Godfrey & Kahn, S.C.

**EXHIBIT**

**5**

exhibitsticker.com

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

10 Arboredge Way, Fitchburg, WI  53711    (608) 609-8424

January 10, 2023

**RE: Evaluation of Geotechnical Conditions and Earthwork Standard-of-Care for Mendota Hills Repower Project Site**

<u>**Introduction and Scope**</u>

Based on my background and specialized expertise, I have been retained to provide independent and professional judgment with respect to geotechnical soil conditions and earthwork construction at the Mendota Hills Repower Project site.  Regarding the geotechnical soil conditions and standard-of-care for earthwork subcontractors at wind energy sites, I have been asked to provide my expert opinion specific to the area of the temporary staging area for Turbine 11, T11.  I have been asked to opine on the following subjects:

- Standard-of-Care for an earthwork subcontractor during the balance-of-plant construction of a wind energy site in the Upper Midwest; specifically, for the 175-foot area around a turbine location that is defined, grossly, as the *Turbine Erection Area*;

- Geotechnical basis for soil conditions at the Mendota Hills Repower Site;

- Root-cause analysis of ice formation beneath temporary staging area for tower mid-section for Turbine 11 (T11); and

- Relevance and technical accuracy of findings and conclusions contained in the Barnes Report (August 12, 2022).

<u>**Expert Opinion – Basis and Reasons**</u>

**1.  Standard-of-Care for Earthwork Subcontractor Followed**

Don Borneke Construction (DBC) provided a level or quality of service that would ordinarily be provided by normally competent earthwork contractors in the field of wind energy site balance-of-plant construction that contemporaneously provide similar service in the same region (that is, the Upper Midwest of the United States) and under the same circumstances and environmental conditions. Earthwork specifications were prepared by the engineer-of-record based on a professionally prepared and professional stamped geotechnical engineering investigation.  In this standard-of-care scenario, an earthwork contractor is hired to execute, using their means and methods, and meet earthwork specifications.  A quality assurance/quality control (QA/QC) program was in effect and enforced by others (primarily Mortenson).  As issues surface which would necessitate repair and/or corrective action, the standard-of-care is to notify the subcontractor and allow time and access to address the issue.  When contracting earthwork services and through judgment gained from experience and applied practice, an Engineer-

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____2_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI 53711    (608) 609-8424

Procure-Construct (EPC) contractor such as Mortenson understands and plans for some level of project variability understanding that when an earthwork subcontractor is hired, they are purchasing a defined service and not insurance. Reasonable care and competence was employed by DBC and, given unknown and uncontrollable factors such as weather, environmental conditions, and soil heterogeneity at the site, perfection and infallibility in earthwork construction cannot be expected or justified.

**2. The Root Cause of an Exposed, Thin Layer of Ice at Turbine Erection Area T11 was Elastic Compression of Compacted, Fine-grained Silt that was Surficially Loaded by Placement of a Heavy Tower Section at the Location of the Slip/Fall Incident.**

The shallow soil at the site was prone to deleterious freeze-thaw behavior. Even if this soil was compacted and inspected to specifications, environmental cycles (primarily freeze-thaw cycling) caused the soil to retain precipitation and/or meltwater. Wet and/or saturated fine-grained soil have lower elastic moduli, thus leading to greater amounts of plastic strain accumulation when loaded, especially by heavy elements such as tower sections. Earthwork contractors find it very difficult, if not impossible, to compact fine-grained, wet soil to a high level of relative compaction in the spring or late fall when solar radiation is low (thus not offering the ability for the soil to dry) and/or when the soil has been subjected to wet/dry and/or freeze/thaw cycles. This was **NOT** an excavation stability issue under the purview of OSHA 1926 Part P (as further detailed in Opinion 3). This was **NOT** a bearing capacity failure, which is a shear stress failure (see Exhibit 3). Given the environmental conditions at the site and soil profile, a certain amount of unknown or uncontrollable factors are to be expected. There were no in-force specifications or contract conditions which would have mitigated this root-cause mechanism. In my expert technical opinion, the only way to have potentially avoided the formation of ice at the location of incident would have been to place a geotextile reinforcement layer on compacted subgrade followed by placement of imported, 'clean' granular fill—this is NOT standard-of-care for Turbine Erection Areas nor was this scenario called for in the Contract Documents.

**3. OSHA 1926 Subpart P, Excavations, is Not Applicable to this Case.**

With respect to scope and application, OSHA 1926.650(a) states that Subpart P applies to all **open excavations** made in the earth's surface; however, clearing, grubbing, grading, and compaction is work unrelated to creating open excavations as "Excavation" means any man-made cut, cavity, trench, or depression in an earth surface, formed by **earth removal** per 1926.650(b). The shallow depression leading to the thin veneer of ice was caused by elastic compression of fine-grained site soil upon loading by others (see Opinion 2), **not** by earth removal. Compacted, fine-grained soils have low hydraulic conductivity (see Exhibit 1); thus, expeditious infiltration of precipitation and/or snowmelt cannot be reasonably expected. As stated in 1926 Subpart P, App A, Soil

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____3_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI 53711    (608) 609-8424

Classification (2) Application: "This appendix applies when a sloping or benching system is designed in accordance with the requirements set forth in 1926.652(b)(2) as a method of protection for employees from cave-ins." The Turbine Erection Area is designed to ensure adequate bearing support for temporary staging of heavy pieces of the wind turbine generator system and unload access for transportation vehicles, not to protect employees from cave-ins.

The Geotechnical Investigation Report (Barr Engineering, 2017), which was stamped by a professional engineer, classifies site soil as OSHA Type B (Section 4.2.3), not Type C as presented in the Barnes Report (Barnes, 2022). Irrespective, **OSHA soil classes** are indicators of slope and/or trench stability and **are wholly inappropriate for use in calculating bearing capacity, elastic settlement and/or consolidation of soil** (see Exhibit 2). The appropriate soil classification system for this scenario is the Unified Soil Classification System (ASTM D2487). Correlations to strength, bearing capacity, consolidation, and permeability are all appropriately made from USCS soil classifications, not OSHA soil classes (see Exhibit 3)

### 4. Barr Engineering Geotechnical Report was Predictive of this Type of Soil Response

The Geotechnical Engineering Report for Mendota Hills Repower was stamped by a Professional Engineer, William W. Kossmann. Per this report (Barr Engineering, 2017), the subsurface at the site at foundation level is predominantly silty clay to sandy lean clay (glacial till). Overlying this glacial till is a thin (2–9 ft) layer of loess (i.e., wind-blown silt and clay), elastic silt in locations (see Exhibit 4). Clearing and grubbing of the upper 6 to 18 inches of soil/topsoil at the site was recommended in the Geotechnical Report. Groundwater is very shallow at the site, 0.8 to 10 ft below ground surface, which indicates that water retention and availability can be problematic.

Key Geotechnical Report Findings, and relation to geotechnical soil response, included:

- Fine sands, silts, and certain clays at the site (see Exhibit 4) are **very frost prone** (see Exhibit 5);
- California bearing ratio, CBR, of 1.5 to 3.8 – this is emblematic of soils prone to rutting (see Exhibit 2);
- Compacted, fine-grained soil has low hydraulic conductivity (see Exhibit 2), meaning that precipitation and snowmelt will very slowly infiltrate, thus water would tend to be retained at the surface;
- Section 4.4.4 predicted levels of elastic settlement.

In conclusion, freeze-thaw cycles damage the structural integrity of compacted soil. Thus, an exposed (to environmental conditions such as freeze-thaw) surface layer compacted to specifications and inspected/approved by independent QA/QC procedures is highly likely to

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____4_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI  53711    (608) 609-8424

degrade with freeze-thaw cycles at a site with soil conditions/properties described in the Barr Engineering Geotechnical Report (Barr Engineering, 2017).

5. **Rebuttal to August 12, 2022, Barnes Report**

   a) The Turbine Erection Site (called the Pad Site by Barnes), did not 'sink'

   - Sinking is not a recognized or appropriate geotechnical engineering term.

   - The temporary tower staging area experienced *plastic strain accumulation* that was caused by loading from the tower section (see Opinion 3).

   - The water accumulation was likely caused by either melted snow or by expelled porewater from the loading of a wet, compacted silty layer that was likely impacted by freeze-thaw cycling.

   b) Ruts, holes, sagging, and weeping surfaces are not "symptoms" of improper site preparation.  Ruts are the visible result of shallow bearing capacity failures that are commonly caused by:

   - Wet or supersaturated soil;

   - Soil type, with ruts more prone in silty and elastic soil; and

   - Damaged surface layers from wet/dry cycling and/or freeze/thaw cycling.

   c) Through my twelve years of specialization in wind energy, my overall 30-plus years in geotechnical engineering, and my connections across the industry, I had never heard of the term "Tune-up," particularly in connection to a safe walking or working surface

   - The term and use in this case are not industry standard-of-practice, in my opinion.

   d) Full-depth penetration of a surface and deep sagging are not symptoms of improper drainage; instead, penetrations are the end result of wet or supersaturated silty or elastic soils that are damaged by wet/dry and/or freeze/thaw cycling.

   e) That the area of ice was the length and width of a tower section is clear and compelling evidence that accumulated plastic strain caused by a heavy element was the root cause

   - The root cause was not consolidation-based settlement as described in the Barnes Report, consolidation is a time-dependent process whereas elastic strain accumulation is a relatively rapid phenomena.

   f) The root cause is not related to Allowable Bearing Capacities, which is a shear failure mechanism

   - The root cause is elastic-based settlement caused by a heavily loaded area.

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____5_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI 53711    (608) 609-8424

- I agree that allowable bearing capacity is in part due to quality of the soil and degree of compaction.

  One of the many geotechnical considerations that is missing in the Barnes Report (2022) is environmental degradation caused by wet/dry and/or freeze/thaw cycling.

g)  DBC had the responsibility to provide the ***means and methods*** to prepare the Tower Erection Areas; whereas, standard-of-care is for the Engineer of Record to provide the ***specifications and plans*** for the construction of Tower Erection Areas

  - Specifications and plans control, ***not*** the experience of the subcontractor

    – The earthwork contractor is ***not*** the expert on geotechnical engineering required for wind energy balance-of-plant construction, that is the responsibility of the Engineer of Record.

    – The earthwork contractor provides expertise, equipment, and labor (i.e., means and methods) to achieve earthwork specifications.

h)  DBC was ***not*** the "creating employer" using the terms in the Barnes Report

  - The root cause was the accumulation of **plastic settlement directly caused by placement of a heavy tower section on prepared soil** that was likely experiencing degradation due to freeze/thaw.

  - The secondary root cause was that compacted, loaded, fine-grain soil has very low permeability; thus, precipitation and/or snowmelt does not rapidly infiltrate or drain and water also routinely wicks to the surface thus freezing given the environmental conditions.

i)  There are no "known weight capacities" for OSHA soil types

  - OSHA soil types are solely used for the determination of protective controls for excavations, such as for excavations for the construction of wind turbine foundations and trenches for the electrical collectors (see Exhibit 3).

  - The Unified Soil Classification System, USCS, is the appropriate soil classification system used world-wide by geotechnical engineers to estimate the necessary soil properties for site design.

j)  The Barnes (2022) conclusion that the frozen slip hazard "…was a result of DBC not properly preparing the ground conditions such that a depressed area without adequate drainage was created, thus allowing water to pool and the sheet of ice to be created resulting in the injury" is, technically, incorrect.

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____6_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI  53711    (608) 609-8424

- In my technical opinion, the depression was plastic strain accumulation directly caused by temporary but heavy loading of a tower section on frost-prone soil that was degraded by environmental conditions preceding the event in question; specifically, freeze-thaw cycling of the prepared surface.

- If this potential outcome was of serious concern for the standard-of-care for earthwork construction at wind energy sites, then the specifications for Turbine Erection Areas would have specifically called for more rigorous compaction and/or material control in this area.

k) "The area of water accumulation that turned to an ice field and became hidden by snow was foreseeable and preventable."

- The water accumulation at that specific area was not foreseeable nor was it preventable given the soil conditions at the site, the in-play environmental weather conditions, and the in-force specifications and contract terms.

- A certain amount of unknown or uncontrollable factors are common, thus some level of product variability is anticipated and allowed by the EPC in the execution of standard-of-care.

## 6. Standard-of-Care for Earth Compaction at Wind Energy Site was Followed

Based on my 30-plus years of earthwork-specific experience including interactions with practitioners from around the United States, the following would be expected at the Mendota Hills Wind Repower site:

a) Frozen soil does not compact

- Section 3.5.2 (General Fill) of the Civil Specifications thus states "Do not place fill over porous, wet, frozen, or soft subgrade surfaces."

b) Exposed, fine-grained layers subjected to environmental cycles (wet/dry and/or freeze thaw) deteriorate in strength and modulus.

c) Section 3.4.3.4 of the Civil Specifications states "If subgrade material or previously placed subsoil fill has deteriorated due to weather exposure, scarify the top 2 inches of material to establish an interface acceptable to the Engineer prior to placing any additional fill."

d) Fine-grained soil is very sensitive to as-compacted moisture condition.

e) Signs of Problems

- Pumping in silty soil

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____7_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI  53711    (608) 609-8424

- Rolling and deflection in silty and clayey soil

- Water wicking to the surface

f) If fine-grained soil is near saturation, no amount of compaction will adequately densify

Based on my experience and review of relevant documents, my conclusion related to earthwork standard-of-care include the following:

- Standard-of-Care in the Wind Industry for Turbine Erection Laydown Areas is for a smooth surface with <5% grades to facilitate equipment loadout and transport vehicle entrance/egress.

- Bearing capacity and foundation stiffness are **not** primary design considerations for Turbine Erection Areas, unlike that for crane pads, haul roads, and wind turbine generator foundations; thus, fill selection and quantitative earthwork standards were not incorporated by the Engineer of Record.

- Per the specifications, fill should **NOT** be placed over frozen soil or deteriorated soil; thus, the depressed area of question should have been coned/taped off to alert personnel of the hazard until proper soil scarification, discing, and fill placement was initiated (and this corrective action could only occur after the adjacent tower section had been removed from the vicinity).

- Compaction tests (nuclear density gauge, dynamic cone) would confirm if appropriate means and methods were employed

  – Relative compaction limits were **NOT** included in the Specifications or Plan Set for the Turbine Erection Laydown Areas.

  – Per my review of available documents, relative compaction testing by an independent QA/QC agent were not conducted.

  – Atterbergs, grain-size distribution, and compaction curves, per my review of available documents, were not prepared/available for the Turbine Erection Laydown Areas.

  – If proof rolling was conducted, these results were not available for my review.

**7. DBC Completed the Work in Accordance with the Contract Documents**

The Scope of Work for the Turbine Erection Areas (Section 2.21) indicated that the

- Subcontractor shall clear, grub, and provide all necessary grading for a 175-ft radius around the turbine inclusive of cut and fill necessary to achieve no more than 5% grade

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____8_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI  53711    (608) 609-8424

across the area including clearing debris to edges and that bumps shall be leveled and holes filled to accommodate equipment travel.

⇒ Relevant testimony of fact witnesses indicated that DBC followed this standard.

- Cleared area to be maintained, compacted, and provide positive drainage at all times to facilitate turnaround area for turbine delivery components throughout duration of project.

    ⇒ Relevant testimony of fact witnesses indicated that the cleared areas were compacted and maintained, with positive drainage, when the Turbine Erection Areas were turned over to the erection team.

    ⇒ Indications were that the elastically deformed area under the mid tower section at T11 was exposed for a very short time period; thus, DBC was not allowed time or safe access to perform maintenance.  Further, as the Contract Documents specifically state that fill shall not be placed on frozen or deteriorated soil, DBC had no course of action, even if they had been informed of the frozen ground situation.  Remediation of the situation would first require removal of the adjacent tower section (see Exhibit 6) such that DBC had a safe working area to scrape off the frozen area, scarify, and compact fill to return the prepared ground to a positive drainage situation.

        ▪ Standard-of-practice for an earthwork contractor at a Wind Energy Site from the Manufacturer's perspective (in this case, Gamesa) is to have limited operations in the Turbine Erection Area due to potential damage to turbine equipment and components.

Finally, the Barr Engineering Geotechnical Report (2017) did not recommend specific, quantitative compaction and proof-rolling requirements for the Turbine Erection Areas; thus, DBC was not contracted to compact the Turbine Erection Areas to a quantitative relative compaction specification.

**8.  The Mortenson Construction Incident Report Specifies the Correct Protocol.**

II.  Investigation Findings

    b.  Contributing Factors (5 Whys)

        i.  Site Preparation- ***Due to the location of the ice, a dozer could not refinish the area because it was too close to the tube section and crane pad***

          ⇒ Thus, fully supporting Opinion No. 7

        ii.  Hazard Identification- The pre-task card for that site highlighted the presence of icy conditions, but did not identify specific locations on the pad

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

10 Arboredge Way, Fitchburg, WI 53711    (608) 609-8424

    c.  Root Cause(s) (5 Whys)

        i.  ***Adverse ground conditions***- The site received enough snow that morning to cover the ground with a few inches. This layer of snow concealed some hazards that existed on site, specifically the ice adjacent to the mid section

III.    Lessons Learned

      i.  Site Preparation: ***It is the foreman responsibility to ensure the crew walks the site prior to commencing work. Any area that cannot be refinished by a dozer and contains adverse ground conditions needs to be delineated by identification on the pre-task plan card and by standard cones.***

     ii.  Adverse ground conditions: ***The project team needs to ensure that any potential for adverse ground conditions are discussed at the site wide level. In addition, foreman need to be trained on the proper process for pre-task planning to ensure all changed conditions are planned and the risk mitigated. Lastly, the project team is identifying select tasks that will require ice cleats for 100% of the crew when icy conditions are present.***

IV.    Corrective Actions / Preventative Measures

    6.  Provide each foreman with ice melt salt and cones to address adverse conditions in frequently traveled areas on the site.

**Background and Qualifications**

I am an Associate Professor in the Department of Civil and Environmental Engineering and Director of the Geological Engineering Program at the University of Wisconsin-Madison (UW–Madison). I have additional responsibilities in the Office Interdisciplinary Professional Programs (InterPro), from which I conduct outreach activities and professional development training in energy geotechnics and geotechnical engineering. Prior to joining UW–Madison in 2008 as a tenure-track professor, I worked in private industry for 13 years including positions with Caterpillar (Peoria, IL), RMT, Inc. (Madison, WI), and CH2M HILL (Denver, CO and Philadelphia, PA). I am the recipient and co-recipient of numerous awards from the American Society of Civil Engineers (ASCE), the Federal Highway Administration (FHWA), and other organizations, including a Dwight D. Eisenhower Research Fellowship, the ASCE Zone III Practitioner Advisor of the Year, and the ASCE Wisconsin Section Outstanding Young Engineer. Over the past dozen years, I specialized in the geotechnical development and balance-of-plant (BOP) design and construction of wind energy facilities. I have conducted multiple projects with an emphasis on evaluating the dynamic forces and foundation soil response at wind energy facilities. This includes field monitoring, laboratory experiments, and finite element analysis. My CV is attached as **Exhibit 7**.

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____10_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI  53711   (608) 609-8424

Overall, my responsibilities at UW–Madison are for applied research, teaching, and continuing engineering education in the areas of geotechnical engineering, energy geotechnics, and sustainable/clean energy infrastructure.  I do note that I have been retained as an independent expert and will testify in my capacity as a professional engineer, not on behalf of UW–Madison.  The information about his affiliation with, and roles and responsibilities at, UW–Madison is provided for informational purposes only.   As a professor at UW–Madison, I have advised/directed over 100 undergraduate, graduate, post-doctoral, and visiting scholars in Geotechnical and Geological Engineering.  The majority of my matriculated advised students over this past decade work in Energy Geotechnics including at prominent firms in the wind energy sector.

At UW–Madison, I teach several geotechnical engineering and energy/sustainability-related courses, including:

- Wind Energy Development and Balance-of-Plant Design (CEE535)
- Sustainable Systems Engineering Capstone Design (EPD669)
- Distributed Sustainable Energy Resource Design (EPD690)
- Remediation Geotechnics (CEE635)
- Foundations (CEE532)
- Introduction to Foundations (GLE432)
- Soil Mechanics (CEE330)

I teach and direct nationally and internationally attended engineering short courses involving geotechnical engineering, civil and environmental engineering, and sustainable energy.  These courses are accredited for engineering professional development in all 50 states.  Over the past 14 years, nearly 3,000 engineering and technical professionals have attended my two–four day engineering courses, including attendees from all 50 states, several territories, and 28 different countries.  Examples of these courses include:

- *Foundation Engineering and Design*
- *Wind Turbine Foundation and Tower System Design*
- *Wind Energy Civil Balance-of-Plant Design*
- *Wind Energy Electrical Balance-of-Plant Design*
- *Unsaturated Soil Engineering and Energy Geotechnics*
- *Soil Engineering for Non-Soils Engineers and Technicians*

I have authored over 100 peer-reviewed, archived publications (see full list in Appendix 1) including publications in the preeminent outlets in my profession.  Some of my notable publications in wind energy geotechnics and related soil properties include:

- Yilmaz, M., Enos, C.A., Tinjum, J.M., and Fratta, D. 2022. "Moment-Based Analysis of On-shore Wind Turbine Generator Foundation Soil Response." *International Journal of Geomechanics*. In Review.

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

10 Arboredge Way, Fitchburg, WI  53711    (608) 609-8424

- Tinjum, J.M. 2017. "Energy Geotechnics: Towards a Sustainable Energy Future." In: *Geoenvironmental Practices and Sustainability: Linkages and Directions.* Springer.

- Yilmaz, M., Eun, J., Tinjum, J.M., and Fratta, D. 2015. "In-Service Behavior of Soil Underlying Shallow Wind Turbine Generator Foundation." *Proceedings of the 15th Pan-American Conference on Soil Mechanics and Geotechnical Engineering*, 1965–1972. Buenos Aires, Argentina.

- Rajaei, M., and Tinjum, J.M. "Case Study of Wind Plant Life Cycle Energy, Emissions, and Water Footprint." *ASCE Geo-Congress 2014.*

- Yilmaz, M., Schubert, S., Tinjum, J.M., and Fratta, D. "Foundation Soil Response to Wind Turbine Generator Loading." *ASCE Geo-Congress 2014*.

- Rajaei, M., and Tinjum, J.M. 2013. "Life Cycle Assessment of Energy Balance and Emissions of a Wind Energy Plant." *Journal of Geotechnical and Geological Engineering.*

- Ba, M., Fall, M., Tinjum, J.M., and Nokkaew, K. 2013. "Effect of Soil Suction on Resilient Modulus of Compacted Aggregate Base Courses." *Journal of Geotechnical and Geological Engineering*.

- Tinjum, J.M., and Lang, P. 2012. "Wind Geotechnics." *ASCE Geo-Strata*.

In addition to my published work in energy geotechnics, I have lectured extensively on energy geotechnics and wind-turbine foundation response around the world including international seminars or invited lectures in Bangalore, Mumbai, and Buenos Aires; seminars for engineering consulting firms (Bechtel, Terracon, RES Americas, BT Squared, and SEECO Consultants, Inc.), various universities (University of Colorado, University of Iowa, University of Illinois at Chicago and at Urbana-Champaign), and multiple community organizations.

**<u>Facts and Data Considered in Developing Opinion</u>**

In performing this analysis, I reviewed the following primary project-specific documents:

- Nick Georgeff v. Don Borneke Construction, Plaintiff's Disclosure.

- Barnes, J. 2022. "Preliminary Barnes Report." Nick Georgeff v. Don Borneke Construction, Inc. Dated August 12, 2022.

- Borneke Contract for Mendota Hills Repowering, dated December 29, 2017

- Barr Engineering. 2017. Geotechnical Engineering Report, Mendota Hills Repower Project.

- Mortenson Civil Construction Plans. 2018. Wind Turbine Pads, Access Roads, Drainage and Erosion Control.

- Mortenson Quality Manual dated September 27, 2017.

- Mortenson Wind Energy Group Safety Program dated March 15, 2013.

- Mortenson Zero Injury Program Training Manual with various dates depending on Section.

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____12_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI  53711    (608) 609-8424

- OSHA 1926 Subpart P
- Balance of Plant Agreement by and between Mendota Hills, LLC and M.A. Mortenson Company. Dated December 19, 2017.
  - Exhibit A, Scope of Work
  - Exhibit D Attachment 1, Civil Specification
  - Exhibit K, Contractor-Provided Training
- Transcripts
  - Nick Borneke Transcript
  - Brad Bennett Transcript
  - Hogan Transcript
  - Barnes Transcript
  - Andrew Kruse Transcript
  - Lonnie Sears Transcript
  - Testimony of Jamie Langston
  - Georgeff Transcript
  - Breyne Transcript
  - Joe Barnes Transcript

In addition, the following technical references have been cited in my opinions and/or support my analysis:

American Society for Testing and Materials. 1985. "Classification of Soils for Engineering Purposes." Annual Book of ASTM Standards, D 2487-83, vol. 04, pp. 395–408.

Luettich, S.M., Giroud, J.P., and Bachus, R.C. 1992. Geotextile Filter Design Guide. Geotextiles and Geomembranes. 11(4–6), pp. 355–370.

M. Carter and S.P. Bentley. 1991. Correlations of Soil Properties. Pentech Press, London, pp. 52-103.

Casagrande, A. and Fadum, R.E. 1940. Soil Mechanics Series. Cambridge, MA.

George B. Sowers. 1970. Introductory Soil Mechanics and Foundation, The Macmillan Company, Landon, pp. 214-215

U.S. Department of Army. 1997. "Military Soils Engineering", FM 5-410.

United States Army Corps of Engineers. 1984. Pavement Criteria for Seasonal Frost Conditions. Department of the Army Corps of Engineers, Office of the Chief of Engineers.

Kaplar, C.W. 1974. Freezing Test for Evaluating Relative Frost Susceptibility of Various Soils. Cold Regions Research and Engineering Laboratory, Hanover, New Hampshire.

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____13_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI  53711    (608) 609-8424

## Current, Relevant, and Recent Cases

- New York State v. Covanta Hempstead
    - Current
    - Expert Opinion submitted October 03, 2022
    - Deposition scheduled for January, 2023
    - Engaged by Defendant

- 11200 West Heather Ave.
    - Current
    - Expert Opinion submitted May 16, 2022
    - Engaged by Defendant

- Grandad Bluff Coalition
    - Expert Opinion on slope stability submitted April 30, 2020
    - Engaged by Plaintiff

- William N. Yoss v. American Transmission Company LLC
    - Slope Stability Analysis and Opinion of Extractable Aggregate Resource
    - Expert Opinion submitted February 15, 2019
    - Engaged by Defendant

- BlackRock Engineers v. Duke Energy
    - Expert Opinion submitted September 29, 2017
    - Case Dismissed in 2019
    - Engaged by Defendant

- Kaiwailoa Wind Farm Arbitration
    - Case settled in 2017
    - Expert Opinion submitted March 1, 2017
    - Engaged by Defendant, Alliant Energy Corp.

- Mountain Air Wind
    - Standard-of-Care Third-Party Review
    - Engaged by Earth Systems Global

For this engagement, I am compensated at the rate of $350 per hour for all work, and $175 per hour for all non-working travel (portal to portal).

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____14_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI 53711   (608) 609-8424

## Summary Conclusions

In my expert opinion, Don Borneke Construction followed standard-of-care as an earthwork subcontractor at a wind energy site in the Upper Midwest of the United States in relation to the Mendota Hills Repower Project.  The root cause of an exposed, thin layer of ice at Turbine Erection Area T11 was elastic compression of compacted, fine-grained silt that was surficially loaded by placement of a heavy tower section at the location of the slip/fall incident.  This type of soil and its susceptibility to freeze-thaw degradation was likely based on the site's geotechnical engineering report (Barr Engineering, 2017).  Given the governing earthwork specifications at the site, DBC would not be allowed to place fill over frozen and/or degraded soil in the vicinity of the temporary staging areas for the tower section in Turbine Erection Area T11, even if they were provided notice and opportunity.  Further, due to the location of another tower section immediately adjacent to the area of the slip/fall (see Exhibit 6), safety protocols and standard-of-care should not have allowed DBC personnel and equipment into this area; thus, the only reasonable course of action would have been to identify and cordon off this area until the adjacent tower section was removed from the area.

Sincerely

James M. Tinjum, PE, PhD, F.ASCE
jmtinjum@tinjumconsultingllc.com

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____15_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI 53711   (608) 609-8424



**Exhibit 1. Silty/Clayey soil at Mendota Hills Repower with very low hydraulic conductivity and thus expected low drainage ability.  Source:  Luettich et al. 1992.**

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____16_____ OF _____21

10 Arboredge Way, Fitchburg, WI  53711    (608) 609-8424

| Soil Classification | | Rating and Magnitude of Soil Engineering properties | | | | | | | | | |
| USCS Divisions [1] | Symbols [2] | Optimum Water Content (%) [3] | Max. Dry Unit weight (pcf) [4] | Cohesion (psf) [5] | Friction Angle (deg) [6] | Hydraulic Conductivity (cm/s) [7] | Drainage Characteristics [8] | CBR [9] | Compressibility and Expansion [10] | Potential Frost Action [11] | Compaction Characteristics [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gravel and Gravelly Soil** | GW | 8-11[a] | 125-135[a] | 124.2[b] | 0 | 33-41 | >10$^{-2}$ | good (pervious)[c] | 40-80 | almost none | none to very slight[d] | good |
| | GP | 11-14 | 115-125 | 121.7 | 0 | 35-41 | >10$^{-2}$ | good (pervious) | 30-60 | almost none | none to very slight | good |
| | GM | 8-12 | 120-135 | 113.3 | 0 | 32-38 | 10$^{-3}$ - 10$^{-6}$ | poor (semipervious) | 20-60 | slight | slight to medium | good |
| | GC | 9-14 | 115-130 | 116.6 | 0 | 29-33 | 10$^{-6}$ - 10$^{-8}$ | poor (impervious) | 20-40 | slight | slight to medium | good |
| **Sand and Sandy Soil** | SW | 9-16 | 110-130 | 126.1 | 0 | 35-41 | >10$^{-3}$ | good (pervious) | 20-40 | almost none | none to very slight | good |
| | SP | 12-21 | 100-120 | 115.6 | 0 | 31-39 | >10$^{-4}$ | good (pervious) | 10-40 | almost none | none to very slight | good |
| | SM | 11-16 | 110-125 | 116.6 | 0 | 33-35 | 10$^{-3}$ - 10$^{-6}$ | poor (impervious) | 10-40 | slight | slight to high | good |
| | SC | 11-19 | 105-125 | 118.9 | 0 | 30-36 | 10$^{-6}$ - 10$^{-8}$ | poor (impervious) | 5-20 | slight to medium | slight to high | fair to good |
| **Silt and Clay (LL<50)** | ML | 12-24 | 95-120 | 103.3 | 0 | 29-37 | 10$^{-3}$ - 10$^{-6}$ | poor (impervious) | <= 15 | slight to medium | medium to very high | poor to good |
| | CL | 12-24 | 95-120 | 109.3 | 210-625 | 26-32 | 10$^{-6}$ - 10$^{-8}$ | no drainage (impervious) | <= 15 | medium | medium to high | fair to good |
| | OL | 21-33 | 80-100 | NA | 105-315 | 22-32 | 10$^{-4}$ - 10$^{-6}$ | poor (impervious) | <= 5 | medium to high | medium to high | poor to fair |
| **Silt and Clay (LL>50)** | MH | 24-40 | 70-95 | 85.1 | 0-210 | 24-30 | 10$^{-4}$ - 10$^{-8}$ | poor (impervious) | <= 10 | high | medium to very high | poor to fair |
| | CH | 19-36 | 80-105 | 95.3 | 315-730 | 17-27 | 10$^{-6}$ - 10$^{-8}$ | no drainage (impervious) | <= 15 | very high | medium | poor to fair |
| | OH | 21-45 | 65-100 | NA | 105-315 | 17-35 | 10$^{-6}$ - 10$^{-8}$ | no drainage (impervious) | <= 5 | high | medium | poor to fair |

Notes:

1. If LL<25 and PI, SM value as subbase ranged from fair to good. Otherwise, SM's value as subbase ranged from poor to fair.
2. If LL<25 and PI, GM's value as base ranged from fair to good. Otherwise, GM's value as subbase ranged from poor to unsuitable.

[a] geotechdata.info

[b] Average values of compacted soils from western United States (USBR)

[c] According to USBR, k less than 1 ft/year as impervious (no drainage), k between 1 and 100 ft/year as semipervious (poor); k greater than 100 ft/year as pervious (good)

[d] American Concrete Pavement Association (ACPA)

Columns 1 and 2 show the USCS soil classification including major divisions and specific group symbols.
Columns 3 and 4 give typical ranges of optimum water content and corresponding maximum dry unit weight based on standard proctor, AASHTO T99 (after Carter and Bentley, 1991)
Columns 5 and 6 indicate typical ranges of cohesions and friction angles of different soil groups (www.geotechdata.info and USBR).
Column 7 shows the typical ranges of hydraulic conductivity of different soil groups (after Casagrande and Fadum 1940).
Column 8 evaluates drainage characteristics based on permittivity of soils (Sowers et al. 1970)
Column 9 shows the typical ranges of CBR value of soils (after Liu, 1967)
Column 10 evaluates the compressibility and expansion characteristics of soils (FM5-410, Military Soil Engineering)
Column 11 evaluates the potential frost action of soils (FM5-410, Military Soil Engineering)
Column 12 evaluates the compaction characteristics of soils (Sowers et al. 1970)

**Exhibit 2a. Soft, Silty/Clayey soil at Mendota Hills Repower would be rated poor (impervious) to drainage with medium to very high compressibility and expansion properties..**

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____17_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI 53711   (608) 609-8424

| Soil Classification | | Soil Value as Transportation Sectors | | | | |
|---|---|---|---|---|---|---|
| USCS Divisions | Symbols | Embankment (1) | Subgrade (2) | Subbase (3) | Base (4) | Backfill in MSE Wall (5) |
| Gravel and Gravelly Soil | GW | Excellent | excellent | excellent | good | good to excellent |
| | GP | fair to good | excellent to good | good | good to fair | excellent |
| | GM | fair to good | excellent to good | good to fair | good to unsuitable[2] | good to fair |
| | GC | fair to good | good | fair | poor to unsuitable | fair |
| Sand and Sandy Soil | SW | excellent | good | good to fair | poor | good |
| | SP | fair to good | good to fair | fair | poor to unsuitable | good |
| | SM | fair to good | good to fair | good to poor[1] | poor to unsuitable | fair |
| | SC | fair to good | good to fair | poor | unsuitable | poor |
| | ML | poor | fair to poor | unsuitable | unsuitable | very poor to unsuitable |
| Silt and Clay (LL<50) | CL | Good | fair to poor | unsuitable | unsuitable | unsuitable |
| | OL | unsuitable | poor | unsuitable | unsuitable | unsuitable |
| | MH | unsuitable | poor | unsuitable | unsuitable | unsuitable |
| Silt and Clay (LL>50) | CH | Fair | poor | unsuitable | unsuitable | unsuitable |
| | OH | unsuitable | poor to very poor | unsuitable | unsuitable | unsuitable |

Column 1 evaluates soils value as embankment based on material suitability
Column 2 evaluates soils value as subgrade materials (FM5-410, Military Soil Engineering)
Column 3 evaluates soils value as subbase courses (FM5-410, Military Soil Engineering)
Column 4 evaluates soils value as base courses (FM5-410, Military Soil Engineering)
Column 5 evaluates soils value as backfills in MSE wall (the evaluation is based on WisDOT MSE wall standards)

**Exhibit 2b. Soft, Silty/Clayey soil at Mendota Hills Repower would be rated as unsuitable to poor with respect to subgrade or subbase properties, thus indicating that these soil types would provide a suitable working surface for a short time period only, only when dry, and only when not exposed to environmental wet/dry and/or freeze/thaw cycling.**

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____18_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI 53711    (608) 609-8424



**Exhibit 3. Examples of where various soil classification systems are used in geotechnical engineering practice.**

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____19_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI  53711    (608) 609-8424



**Exhibit 4. Silty/Clayey soils at Mendota Hills Repower are predominately CL (clay of low plasticity), MH (silt of high plasticity), and ML (silt) per the Barr Engineering Geotechnical Report as presented in USCS soil types.**

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____20_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI 53711    (608) 609-8424



**Frost Design Soil Classification (USACOE, 1984)**

| Frost Group | Soil Type | <0.02 mm (%) | Typical USCS Classes |
|---|---|---|---|
| NFS | (a) Gravels, crushed stone, crushed rock | 0–1.5 | GW, GP |
| | (b) Sands | 0–3 | SW, SP |
| PFS | (a) Gravels, crushed stone, crushed rock | 1.5–3 | GW, GP |
| | (b) Sands | 3–10 | SW, SP |
| S1 | Gravelly soils | 3–6 | GW, GP, GW-GM, GP-GM |
| S2 | Sandy soils | 3–6 | SW, SP, SW-SM, SP-SM |
| F1 | Gravelly soils | 6–10 | GM, GW-GM, GP-GM |
| F2 | (a) Gravelly soils | 10–20 | GM, GW-GM, GP-GM |
| | (b) Sands | 6–15 | SM, SW-SM, SP-SM |
| F3 | (a) Gravelly soils | >20 | GM, GC |
| | (b) Sands, except very fine silty sands | >15 | SM, SC |
| | (c) Clays, PI > 12 | – | CL, CH |
| F4 | (a) All Silts | – | ML, MH |
| | (b) Very fine silty sands | >15 | SM |
| | (c) Clays, PI > 12 | – | CL, CL-ML |
| | (d) Varved clays and other fine-grained, banded sediments | – | CL, ML, SM, CH, SM |

*Frost Susceptible*

Source: Scanned from USACOE (1984) but originates in Kaplar (1974)

**Exhibit 5. Silty/Clayey Soils at Mendota Hills Repower classify as F4 in the USACOE Frost Design Soil Classification System, or with "Very High" frost susceptibility.**

**TINJUM CONSULTING, LLC (EIN 45-1853470)**
**James M. Tinjum, PhD, Professional Engineer**

PAGE _____21_____ OF _____21_____

10 Arboredge Way, Fitchburg, WI  53711    (608) 609-8424



**Exhibit 6. Photograph of Tower Storage "Pad" for T11 Turbine Erection Area.**

**Exhibit 7. James M. Tinjum CV**
**Page 22 of 31**

**JAMES M. TINJUM, PhD, PE**
Tinjum Consulting, LLC
10 Arboredge Way
Fitchburg, WI  53711
Phone:  608.609.8424 – jmtinjum@tinjumconsultingllc.com

## PROFESSIONAL PREPARATION

University of Wisconsin-Madison, Civil and Environmental Engineering, BS 1993

University of Wisconsin-Madison, Civil and Environmental Engineering, MS 1995

University of Wisconsin-Madison, Civil and Environmental Engineering, PhD 2006

## APPOINTMENTS

| | |
|---|---|
| *Owner*, Tinjum Consulting LLC (EIN 45-1853470) | 2003 – current |
| *Director*, Geological Engineering Program University of Wisconsin-Madison (jmtinjum@wisc.edu) | 2019 – current |
| *Associate Professor*, Department of Civil and Environmental Engineering | 2019 – current |
| *Associate Chair*, Department of Engineering Professional Development | 2017 – 2019 |
| *Faculty Director of Online Credit Engineering Programs* | 2016 – 2018 |
| *Associate Professor*, University of Wisconsin-Madison | 2014 – current |
| *Assistant Professor*, University of Wisconsin-Madison | 2008 – 2014 |
| *Associate Geotechnical Engineer*, CH2M HILL, Inc. (Philadelphia, PA) | 2005 – 2008 |
| *Dwight D. Eisenhower Research Fellow*, University of Wisconsin-Madison | 2002 – 2005 |
| *Project Geotechnical Engineer and Project Manager*, RMT, Inc. (Madison, WI) | 1998 – 2002 |
| *Staff Geoenvironmental Engineer*, CH2M HILL, Inc. (Denver, CO) | 1995 – 1998 |
| *Research and Teaching Assistant*, University of Wisconsin-Madison | 1993 – 1995 |
| *Engineering Intern*, Caterpillar, Inc. (Peoria, IL) | 1990 – 1992 |

## PROJECTS

### *Litigation Support / Expert Witness*

Environmental Management of Residuals from Energy Recovery Facility. Confidential Legal Firm (North America). *Expert Witness.* 2022 – current.

Environmental Management of Residuals from Metal-plating Facility. Confidential Legal Firm (North America). *Expert Witness.* 2022 – current.

Landfill Liner Performance Modeling. Confidential Waste Management Company (North America). *Standard-of-Care Expert*. 2018 – current.

Nature and Extent of PFAS Contamination. City of Rhinelander (Wisconsin). *Third-Party Review*. 2019 – 2022.

Bluff Slope Stability Analysis. Grandad Bluff, La Crosse (Wisconsin). *Expert Witness.* 2020.

Bluff Slope Stability Failure Analysis. Confidential Client (Wisconsin). *Standard-of-Care Expert*. 2018 – 2019.

Excavation Stability Analysis. Confidential Client (Wisconsin). *Expert Witness*. 2019.

Exhibit 7. James M. Tinjum CV
Page 23 of 31

Landfill Liner Performance Modeling. Confidential Waste Management Company (North America). *Standard-of-Care Expert*. 2018 – current.

Coal Combustion Residuals Landfill. Confidential Client (North America). *Standard-of-Care Expert*. 2017 – 2019.

Wind Energy Site, Litigation of Foundation Performance. Confidential Client (North America). *Standard-of-Care Expert*. 2014 – 2017.

Wind Energy Site, Litigation of Foundation Performance. Confidential Client (North America). *Standard-of-Care Expert*. 2016 – current.

Brownfield Remediation, Litigation of Responsible Parties. CNH America LLC (Racine, WI). *Expert Witness*. 2010 – 2013.

Soft Ground Foundation Analysis, Litigation of Foundation Suitability. Gekas Law LTD (Chicago, IL). *Expert Witness*. 2009 – 2010.

Remedial Investigation, Chromium-Impacted Site. Honeywell International (Baltimore, MD). *Principal Investigator*. 2006 – 2017.

### Representative Consulting Projects (Energy, Environment, Geotechnical)

Freeze-Thaw Foundation Conditions and Remediation. Sargento Foods Incorporated (WI). Third-Party Review.

Coal Combustion Residual Impoundment Closure. Confidential Utility Owner (MO). Third-Party Geotechnical Review.

Coal Combustion Residual Landfill Remediation. Confidential Utility Owner (WI). Third-Party Geotechnical Review.

Landfill Slope Reconstruction and Lagoon Closure.  City of Clovis (NM).  Design Coordinator.

Cooling Pond Slope Reconstruction and Armoring. Rohm and Haas Company (TX). Geotechnical Design Engineer.

Geotechnical Design of Sediment Excavation. Rohm and Haas Company (Mozanica, Italy). Senior Geotechnical Engineer.

Sludge Lagoon Closure.  Chevron (TX).  Geotechnical Engineer.

Bridge Armoring.  Burlington Northern Santa Fe Railroad (MT).  Resident Engineer.

Landfill Construction.  Waste Management, Countryside Landfill (IL).  Design Engineer.

Wind Energy Geotechnical Report and Foundation Design. Confidential Utility Owner (WI). Third-Party Review.

Wood-Ridge Feasibility Study. Rohm and Haas Company (NJ). Technical Manager.

Coal-fired Power Plant Siting. Unnamed Client (IA). Project Manager.

Feasibility Study, Former Chlorine Plant. Weyerhaeuser (NC). Study Coordinator.

Natural Gas-fired Power Plant Siting.  Mirant Corporation (WI).  Project Coordinator.

Natural Gas Power Generating Facilities Construction.  Southern Energy Inc., Zeeland (MI) and Neenah (WI).  Project Geotechnical Engineer.

Superfund Remedial Design and Remedial Action.  Waste Management, H.O.D. Landfill (IL). Engineering Coordinator.

Foundry Sand Landfill Siting and Construction.  Waupaca Foundry (TN).  Lead Engineer.

Geotechnical and Leaching Properties of Cement Kiln Dust.  National Lime Association (DC). Project Coordinator.

Treatment Plant Design. Various Clients (CO, NE, OK, WY). Lead Geotechnical Engineer.

Remedial Design and Construction. Hill Air Force Base (UT). Design Engineer.

Highway Reconstruction. Federal Highway Administration (WY). Design Engineer.

## PUBLICATIONS

### Peer Reviewed, Archived Papers

1. Yilmaz, M., Tinjum, J.M., Acker, C., and Marten, B. 2021. "Transport Mechanisms and Emission of Landfill Gas through Various Configurations in an MSW Landfill Using a Static Flux Chamber Technique. *Journal of Engineering Management*. 280, 111677.

2. Yilmaz, M., Eun, J., Tinjum, J.M., and Fratta, D. 2021. "In-service Response of Shallow On-shore Wind Turbine Generator Foundation." *Geotechnical and Geological Engineering*. 1–18.

3. Chen, J., Eun, J., Feng, Y., and Tinjum, J.M. 2021. "Long-term Leaching Behavior of Chromite Ore Processing Residue as Backfill Material and the Propagation of Chromium in the Surrounding Soil." *Journal of Hazardous, Toxic, and Radioactive Waste*. 25(3), 04021017.

4. Oh, H. and Tinjum, J.M. 2020. "Effect of Initial Moisture Content on Critical Temperature of Three Sandy Soils." Proceedings of ASCE Geo-Congress. *ASCE Geotechnical Special Publication 316*. 21–30.

5. Thomas, L.K., Tinjum, J.M., and Holcomb, F.H. 2020. "Environmental Life Cycle Assessment of a Deep Direct-Use Geothermal System in Champaign, Illinois." Proceedings, 45th Workshop on Geothermal Reservoir Engineering. Stanford University, Stanford, California, February 10-12, 2020, SGP-TR-216.

6. Mostafa Afzalian, Jongwan Eun, James M Tinjum. 2019. "Evaluation of Bimodal Water Retention Characteristics for Hydrating Chromium Ore Processing Residue (COPR)." Geo-Congress 2019: Geotechnical Materials, Modeling, and Testing. 754-764.

7. Alsabhan, A.H., Fratta, D., Warren, B., Tinjum, J.M., and Edil, T.B. 2019. "Using Time Domain Reflectometry to Determine Depth of Fouling and Fouling Type in Railway Track Substructure." ASTM *Geotechnical Testing Journal*. 42(1), 156–179. DOI: 10.1520/GTJ20170305.

8. McDaniel, A., Tinjum, J.M., Lin, Y-F., Stumpf, A.J., Thomas, L., and Hart, D.J. 2018. "Distributed Thermal Response Test to Analyze Thermal Properties in Heterogeneous Lithology." *Geothermics*. 76, 116–124.

9. Stumpf, A., Damico, J., Okwen, R., Stark, T., Elrick, S., Nelson, W.J, Lu, Y., Holcomb, F., Tinjum, J., Yang, F., Frailey, S., and Lin, Y-F. 2018. "Feasibility of a Deep Direct-Use Geothermal System at the University of Illinois Urbana-Champaign." *GRC Transactions*. 42.

10. Alsabhan, A.H., Fratta, D., Warren, B., Tinjum, J.M., and Edil, T.B. 2018. "Using Time Domain Reflectometry to Determine Depth of Fouling and Fouling Type in Railway Track Substructure." ASTM *Geotechnical Testing Journal*. 42(1).

11. McDaniel, A., Tinjum, J.M., Hart, D.J., and Fratta, D. 2018. "Dynamic Calibration for Permanent Distributed Temperature Sensing Networks." IEEE *Sensors Journal*. 18(6), 2342–2352. DOI: 10.1109/JSEN.2018.2795240.

12. Alsabhan, A.H., Tinjum, J.M., Fratta, D., and Edil, T.B. 2018. "Field Validation of Polyurethane Technology in Remediating Rail Substructure and Enhancing Rail Freight Capacity." In: Railroad Ballast Testing and Properties. DOI 10.1520/STP160520170142.

13. Eun, J, Tinjum, J.M., Benson, C.H., and Edil, T.B. 2018. "Methane Transport through Simulated Interim Landfill Covers with a PE Geofilm or Ethylene-Vinyl Alcohol, LLDPE, or

PVC Geomembrane." ASCE *Journal of Environmental Engineering*. 144(2). DOI: 10.1061/(ASCE)EE.1943-7870.0001298.

14. Eun, J, Tinjum, J.M., Benson, C.H., and Edil, T.B. 2018. "Equivalent Transport Parameters for Volatile Organic Compounds (VOCs) in Co-Extruded Geomembrane Containing Ethylene-Vinyl Alcohol (EVOH)." *Journal of Geotechnical and Geoenvironmental Engineering*. 144(7).

15. McDaniel, A., Fratta, D., Tinjum, J.M., and Hart, D.J. 2018. "Long-term District-Scale Geothermal Exchange Borefield Monitoring with Fiber Optic Distributed Temperature Sensing." Geothermics. 72, 193–204. DOI: 10.1016/j.geothermics.2017.11.008.

16. Enos, C., Yilmaz, M., Wu, Z., Tinjum, J.M., and Fratta, D. 2018. "Field and Lab Characterization of the Operational Response of Wind Turbine Generator Foundation Soil." International Foundations Congress and Equipment Expo. IFCEE 243–253.

17. Herrera, C., Nellis, G., Reindl, D.T., Klein, S., Tinjum, J.M., and McDaniel, A. 2017. "Use of a Fiber Optic Distributed Temperature Sensing System for Thermal Response Testing of Ground-coupled Heat Exchangers." *Geothermics*. 71, 331–338. DOI: 10.1016/j.geothermics. 2017.10.002.

18. Mandal, T., Tinjum, J., and Edil, T. 2017. "Study on Flexural Strength, Modulus, and Fatigue Cracking of Cementitiously Stabilized Materials." *Road Materials and Pavement Design*. DOI: 10.1080/14680629.2017.1325772.

19. Florea, L.J., Hart, D., Tinjum, J., and Choi, C. 2017. "Potential Impacts to Groundwater from Ground-Coupled Geothermal Heat Pumps in District Scale." Groundwater. 55(1). 8–9.

20. Ozdogan-Dolcek, A., Atkins, I., Harper, M.K., Tinjum, J.M., and Choi, C.Y. 2017. "Performance and Sustainability of District-Scale Ground Coupled Heat Pump Systems." *Geotechnical and Geological Engineering*. DOI 10.1007/s10706-016-0147-y.

21. Tian, K., Benson, C.H., and Tinjum, J.M. 2017. "Chemical Characteristics of Leachate in Low-Level Radioactive Waste Disposal Facilities." *Journal of Hazardous, Toxic, and Radioactive Waste*. 21(4). DOI: 10.1061/(ASCE)HZ.2153-5515.0000361.

22. Eun, J, Tinjum, J.M., Benson, C.H., and Edil, T.B. 2017. "Comparison of Volatile Organic Compound Transport in Composite Liners with HDPE and Ethylene–Vinyl Alcohol Coextruded Geomembranes." ASCE *Journal of Geotechnical and Geoenvironmental Engineering*. 143(6). DOI: 10.1061/(ASCE)GT.1943-5606.0001484.

23. Tian, K., Benson, C.H., Tinjum, J.M., and Edil, T.B. 2017. "Antioxidant Depletion and Service Life Prediction for HDPE Geomembranes Exposed to Low-Level Radioactive Waste Leachate." ASCE *Journal of Geotechnical and Geoenvironmental Engineering*. DOI 10.1061/(ASCE)GT.1943-5606.0001643.

24. Oh, H. and Tinjum, J.M. 2017. "Comparison of Two Laboratory Methods for Measuring the Critical Temperature of Sandy Soils." Proceedings of ASCE Geotechnical Frontiers 2017. *ASCE Geotechnical Special Publication 280*. 809–817.

25. Mandal, T., Tinjum, J.M., Gokce, A., and Edil, T.B. 2016. "Protocol for Testing Flexural Strength, Flexural Modulus, and Fatigue Failure of Cementitiously Stabilized Materials Using Third-Point Flexural Beam Tests. *ASTM Geotechnical Testing Journal*. 39(1). 1–15.

26. Mandal, T., Tinjum, J.M., and Edil, T.B. 2016. "Non-Destructive Testing of Cementitiously Stabilized Materials using Ultrasonic Pulse Velocity Test." *Transportation Geotechnics*. 6(2016). 97–107.

27. Rhoades, K., Tinjum, J., and Eun, J. 2016. "Transport of Hexavalent Chromium in the Vadose Zone by Capillary and Evaporative Transport from Chromium Ore Processing Residue." *Canadian Geotechnical Journal*. 53(4). 619–633. DOI: 10.1139/cgj-2015-0010.

28. Bloom, E. and Tinjum, J.M. 2016. "Fully Instrumented Life-Cycle Analyses for Residential

Geo-Exchange System." Proceedings of ASCE Geo-Chicago. *ASCE Geotechnical Special Publication 270*. 114–124.

29. McDaniel, A., Harper, M., Fratta, D., Tinjum, J.M., Choi, C., and Hart, D. 2016. "Dynamic Calibration of a Fiber-Optic Distributed Temperature Sensing Network at a District-Scale Geothermal Exchange Borefield." Proceedings of ASCE Geo-Chicago. *ASCE Geotechnical Special Publication 270*. 1–11.

30. Eun, J., Yilmaz, M., Tinjum, J.M., and Benson, C.H. 2016. "Hydrogen Sulfide (H2S) Transport through Simulated Interim Covers with Conventional and Co-Extruded Ethylene-Vinyl Alcohol (EVOH) Geomembranes." Proceedings of ASCE Geo-Chicago. *ASCE Geotechnical Special Publication 271*. 411–420.

31. Eun, J., Chen, J., and Tinjum, J.M. 2016. "Long-Term Leaching Characteristics of Chromite Ore Processing Residue Using Synthetic Groundwater." Proceedings of ASCE Geo-Chicago. *ASCE Geotechnical Special Publication 270*. 1–11.

32. Walker, M., Meyer, L., Tinjum, J.M., Hart, D. 2015. "Thermal Property Measurements of Stratigraphic Units with Modeled Implications for Performance of Vertical Ground Source Heat Pumps." *Geotechnical and Geological Engineering*. DOI 10.1007/s/10706-015-9847-y.

33. Yilmaz, M., Eun, J., Tinjum, J.M., and Fratta, D. 2015. "In-Service Behavior of Soil Underlying Shallow Wind Turbine Generator Foundation." *Proceedings of the 15th Pan-American Conference on Soil Mechanics and Geotechnical Engineering*, 1965–1972. Buenos Aires, Argentina. IOS Press BV. ISBN 978-1-61499-602-6.

34. Ebrahimi, A., Tinjum, J.M., and Edil, T.B. 2015. "Deformational Behavior of Fouled Railway Ballast." *Canadian Geotechnical Journal*. 52(2015). 344–355.

35. Soleimanbeigi, A., Shedivy, R.F., Tinjum, J.M., and Edil T.B. 2015. "Climatic Effect on Resilient Modulus of Recycled Unbound Aggregates." *Road Materials and Pavement Design*. 16(4). 836–853.

36. Ba, M., Tinjum, J.M., and Fall, M. 2015. "Prediction of Permanent Deformation Model Parameters of Unbound Base Course Aggregates Under Repeated Loading." *Road Materials and Pavement Design.* 16(4). 1–16.

37. Diagne, M., Tinjum, J.M., and Nokkaew, N. 2015. "The Effects of Recycled Clay Brick Content on the Engineering Properties, Weathering Durability, and Resilient Modulus of Recycled Concrete Aggregate." *Transportation Geotechnics*. 3(2015). 15–23.

38. Hesse, D.E., Tinjum, J.M., and Warren, B.J. 2014. "Impact of Increasing Freight Loads on Rail Substructure from Fracking Sand Transport." *Transportation Geotechnics*. 1(4). 241–256.

39. Nokkaew, K., Tinjum, J.M., Likos, W.J., and Edil, T.B. 2014. "Effect of Matric Suction on Resilient Modulus for Compacted Recycled Asphalt Base Course in Postcompaction State." *Transportation Research Record, Journal of the Transportation Research Board*. No. 2433. 241–256. DOI 10.3141/2433-08.

40. Wu, R., Tinjum, J.M., and Likos, W. 2014. "Finite-Element Modeling of Coupled Heat and Moisture Transfer in Unsaturated Soils for Shallow Horizontal Geothermal Ground Loops." *Geotechnical and Geological Engineering*. DOI 10.1007/s10706-014-9811-2.

41. Yao, J., Oh, H., Likos, W., and Tinjum, J.M. 2014. "Three Laboratory Methods for Measuring Thermal Resistivity Dryout Curves of Coarse-Grained Soils." ASTM *Geotechnical Testing Journal*. 37(6), 1056–1067.

42. Keene, A., Tinjum, J.M., and Edil, T.B. 2014. "Mechanical Properties of Polyurethane-Stabilized Ballast and Infrastructure Materials." *Geotechnical Engineering Journal of the SEAGS and AGSSEA*. 45(1). 67–73.

43. Ebrahimi, A., Tinjum, J.M., and Edil, T.B. 2014. "Mechanistic-Based Maintenance Planning of Railway Substructure." Geotechnical Engineering Journal of the SEAGS and AGSSEA. 45(1). 48–55.

44. Eun, J., Tinjum, J.M., Benson, C.H., and Edil, T.B. "Volatile Organic Compound (VOC) Transport through Composite Liner with Co-Extruded Geomembrane Containing Ethylene Vinyl-Alcohol (EVOH)." ASCE Geo-Congress 2014.

45. Hunter, E.L., Tinjum, J.M., and Benson, C.H. "Radionuclide Behavior in Low-Level Radioactive Waste (LLW) Disposal Barrier Materials: Impacts of Sorption." ASCE Geo-Congress 2014.

46. Oh, H., Yao, J., Tinjum, J.M., and Likos, W.J. 2014. "Thermal Resistivity Dryout Curves for Three Sandy Soils." ASCE Geo-Congress 2014.

47. Ozdogan-Dolcek, A., Tinjum, J.M., and Hart, D. 2014. "Numerical Modeling of Ground Temperature Response in a Ground Source Heat Pump System (GSHP)." *Geotechnical Special Publication No. 234, Proceedings Geo-Congress 2014.* 2755–2766.

48. Rajaei, M., and Tinjum, J.M. "Case Study of Wind Plant Life Cycle Energy, Emissions, and Water Footprint." *ASCE Geo-Congress 2014.*

49. Tian, K., Tinjum, J.M., Benson, C.H., and Edil, T.B. 2014. "Antioxidant Depletion in HDPE Geomembranes Exposed to Low-Level Radioactive Waste Leachate." ASCE Geo-Congress 2014.

50. Wu, R., Tinjum, J.M., and Likos, W. 2014. "Coupling Thermal Conductivity Dryout Curves with Unsaturated Modeling of Shallow Horizontal Geothermal Exchange Loops." *Geotechnical Special Publication No. 234, Proceedings Geo-Congress 2014.* 4015–4026.

51. Yilmaz, M., Schubert, S., Tinjum, J.M., and Fratta, D. "Foundation Soil Response to Wind Turbine Generator Loading." *ASCE Geo-Congress 2014.*

52. Woodward, N.R., Tinjum, J.M., and Wu, R. 2013. "Water Migration Impacts on Thermal Resistivity Testing." ASTM *Geotechnical Testing Journal.* 36(3). 948–955.

53. Rajaei, M., and Tinjum, J.M. 2013. "Life Cycle Assessment of Energy Balance and Emissions of a Wind Energy Plant." *Journal of Geotechnical and Geological Engineering.* 31(6). 1663–1670.

54. Ba, M., Fall, M., Tinjum, J.M., and Nokkaew, K. 2013. "Effect of Soil Suction on Resilient Modulus of Compacted Aggregate Base Courses." *Journal of Geotechnical and Geological Engineering.* 31(5). 1497–1510.

55. Chen, J., Tinjum, J.M., and Edil, T.B. 2013. "Leaching of Alkaline Substances and Heavy Metals from Recycled Concrete Aggregate Used as Unbound Base Course." *Transportation Research Record, Journal of the Transportation Research Board.*

56. Soleimanbeigi, A., Edil, T.B. and Tinjum, J.M. 2013. "Effect of Temperature on Shear Strength of Recycled Asphalt Shingles." *Transportation Research Record, Journal of the Transportation Research Board.*

57. Lee, J., Edil, T.B., Benson, C.H., and Tinjum, J.M. 2013. "Building Environmentally and Economically Sustainable Transportation Infrastructure-Highways: A Green Highway Rating System." *ASCE Journal of Construction Engineering and Management.*

58. Keene, A., Edil, T.B., Fratta, D., and Tinjum, J.M. 2013. "Modeling Effect of Polyurethane Stabilization on Track Response." *ASCE Geotechnical Special Publication No. 231, Proceedings Geo-Congress 2013.* 1410–1418.

59. **Bozyurt, O., Keene, A.K., Tinjum, J.M., Edil, T.B., and Fratta, D. 2013. "Freeze-thaw Effects on Stiffness of Unbound Recycled Base Course."** ASTM *International Symposium on Mechanical Properties of Frozen Soils*, STP1568. Jacksonville, FL.

60. Boecher, T.A., Tinjum, J.M., and Xu, H. 2012. "Mineralogical and Amorphous Species in Chromium Ore Processing Residue." *Journal of Residuals Science and Technology*. 9(4). 131–141.

61. Ebrahimi, A., Tinjum, J.M., and Edil, T.B. 2012. "Protocol for Testing Fouled Railway Ballast in Large-Scale Cyclic Triaxial Equipment." *ASTM Geotechnical Testing Journal*. 35(5). 796–804.

62. Tinjum, J.M., and Lang, P. 2012. "Wind Geotechnics." *ASCE Geo-Strata*. 16(1). 18–26.

63. Bozyurt, O., Tinjum, J.M., Son, Y.H., Edil, T.B., and Benson, C.H. 2012. "Resilient Modulus of Recycled Asphalt Pavement and Recycled Concrete Aggregate." ASCE *Geotechnical Special Publication No. 225, Proceedings Geo-Congress 2012*. 3901–3910.

64. Nokkaew, K., Tinjum, J.M., and Benson, C.H. 2012. "Hydraulic Properties of Recycled Asphalt Pavement and Recycled Concrete Aggregate." ASCE *Geotechnical Special Publication No. 225, Proceedings Geo-Congress 2012*. 1476–1485.

65. Chen, J., Bradshaw, S., Benson, C.H., Tinjum, J.M., and Edil, T.B. 2012. "pH-dependent Leaching of Trace Elements from Recycled Concrete Aggregate." ASCE *Geotechnical Special Publication No. 225, Proceedings Geo-Congress 2012*. 3729–3737.

66. Woodward, N.R., and Tinjum, J.M. 2012. "Impact of Moisture Migration on Thermal Resistivity Testing in Unsaturated Soil." *ASCE Geotechnical Special Publication No. 225, Proceedings Geo-Congress 2012*. 4426–4435.

67. Leaching of Trace Elements from Recycled Concrete Aggregate." ASCE Geotechnical Special Publication No. 225, Proceedings Geo-Congress 2012. 3729–3737.

68. Bozyurt, O., Tinjum, J.M., Son, Y.H., Edil, T.B., and Benson, C.H. 2012. "Resilient Modulus of Recycled Asphalt Pavement and Recycled Concrete Aggregate." ASCE Geotechnical Special Publication No. 225, Proceedings Geo-Congress 2012. 3901–3910.

69. Eun, J., and Tinjum, J.M. 2012. "Unsaturated Transport of Ebullition Gas through Sediment Capping Geotextiles and Sand." *5th Asia-Pacific Conference on Unsaturated Soils*. 481–486.

70. Eun, J., and Tinjum, J.M. 2012. "Variation in Air Entry Suction of Nonwoven Geotextiles with Pore Size Distribution." *5th Asia-Pacific Conference on Unsaturated Soils*. 475–480.

71. Lee, J.C., Edil, T.B., Benson, C.H., and Tinjum, J.M. 2011. "Evaluation of Variables Affecting Sustainable Highway Design with BE2ST-in-Highways System." *Transportation Research Record, Journal of the Transportation Research Board*. 2233. 178–186.

72. S., Scalia, J., Schlicht, P., and Wang, X. 2011. "Engineered Covers for Waste Containment: Changes in Engineering Properties & Implications for Long-Term Performance Assessment." NUREG/CR-7028, Office of Research, U.S. Nuclear Regulatory Commission, Washington, DC.

73. Lee, J.C., Edil, T.B., Tinjum, J.M., and Benson, C.H. 2010. "Quantitative Assessment of Environmental and Economic Benefits of Using Recycled Construction Materials in Highway Construction." Transportation Research Record, *Journal of the Transportation Research Board*. 2158. 138–142.

74. Millspaugh, A.M., Tinjum, J.M., and Boecher, T.A. 2010. "Specific Gravity of Expansive Chromium Ore Processing Residue with Complex Microstructure." *ASTM Geotechnical Testing Journal*. 33(4). 322–328.

75. Schlicht, P., Benson, C., Tinjum, J.M., and Albright, W. 2010. "In-Service Hydraulic Properties of Two Landfill Final Covers in Northern California." ASCE *Geotechnical Special Publication No. 199, Proceedings Geo-Congress 2010*. 2867–2877.

76. Dixon, N., Langer, U., Reddy, K., Maugeri, M., Tinjum, J., Mahler, C., and Cho, Y. 2009. "Waste Characterization." ASCE *Geotechnical Special Publication No. 209*. *Proceedings of the 2008 International Symposium on Waste Mechanics*. 135–152.

77. Tinjum, J.M., Benson, C.H., and Edil, T.B. 2008. "Mobilization of Cr(VI) from Chromite Ore Processing Residue through Acid Treatment." *Science of the Total Environment*. 391(1). 13–25.

78. Tinjum, J.M., Benson, C.H., and Edil, T.B. 2008. "Treatment of Cr(VI) in Chromium Ore Processing Residue Using Ferrous Sulfate-Sulfuric Acid or Cationic Polysulfides." *ASCE Journal of Geotechnical & Geoenvironmental Engineering*. 132(12). 1791–1803.

79. Schlicht, P.D., Benson, C.H., Tinjum, J.M., and Albright, W.H. 2010. "In-Service Hydraulic Properties of Two Landfill Final Covers in Northern California." *ASCE Geotechnical Special Publication No. 199*, Proceedings Geo-Congress 2010. 2867–2877.

80. Tinjum, J.M., Houck, C.J., and French, C. 2008. "Field Investigation Techniques for Characterizing and Delineating COPR." ASCE Geotechnical Special Publication No. 178, Proceedings Geo-Congress 2008. 407–414.

81. Dixon, N., Langer, U., Reddy, K., Maugeri, M., Tinjum, J.M., Mahler, C., and Cho, Y. 2009. "Waste Characterization." ASCE Geotechnical Special Publication No. 209. Proceedings of the 2008 International Symposium on Waste Mechanics. 135–152.

82. Tinjum, J.M., Benson, C.H., Edil, T.B., and Chowdhury, A. 2005. "An Innovative Method to Treat Chromium Ore Processing Residue." 8th International In Situ and On-Site Bioremediation Symposium, Baltimore, MD.

83. Tinjum, J.M., Krantz, B.J., Ditto, W.L., and Aldern, J.L. 2003. "Investigation and Remediation of Karst Features at Foundry Landfill Site." Sinkholes and the Engineering and Environmental Impacts of Karst: Proceedings of the 9th Multidisciplinary Conference. ASCE Geotechnical Special Publication No. 122. 349–360.

84. Tinjum, J.M., and Schittone, J.V. 2001. "Landfill Construction through Peat and Organic Silt." Soft Ground Technology. ASCE Geotechnical Special Publication No. 112. 388–398.

85. Tinjum, J.M., Benson, C.H., and Blotz, L.R. 1997. "Soil Water Characteristic Curves for Compacted Clays." ASCE Journal of Geotechnical & Geoenvironmental Engineering. 123(11). 1060–1069.

86. Benson, C.H., Tinjum, J.M., and Hussin, C.J. 1995. "Leakage Rates from Geomembrane Liners Containing Holes." Geosynthetics '95 Conference Proceedings. 745–758.

## Invited Book Chapters

87. Tinjum, J.M. 2017. "Energy Geotechnics: Towards a Sustainable Energy Future." In: *Geoenvironmental Practices and Sustainability: Linkages and Directions*. Springer.

88. Tinjum, J.M., and Christensen, R.W. 2010. "Site Characterisation, Design, and Construction Considerations." In Wind Energy Systems: Optimising Design and Construction for Safe and Reliable Operation. 28–45. Eds. J.D. Sørensen and J.N. Sørensen. Woodhead Pub. Cambridge, UK.

## Items at Conferences

89. Ba, M., Fall, M., and Tinjum, J.M. 2015. Comparison of Laboratory Resilient Modulus with Elastic Moduli Measured with Soil Stiffness Gauge and Back-Calculated from Large Scale

Model Experiment of Unbound Base Course. *International Conference on Innovations in Construction*. May 11–12, Paris.

90. Mandal, T., Tinjum, J.M., and Edil, T.B. "Non-Destructive Testing of Cementitiously Stabilized Materials Using Ultrasonic Pulse Velocity Test." Transportation Research Record, Journal of the Transportation Research Board. Washington, D.C. Role: Presented (poster) by Tinjum.

91. Bozyurt, O., Keene, A.K., Tinjum, J.M., Edil, T.B., and Fratta, D. 2013. "Freeze-thaw Effects on Stiffness of Unbound Recycled Base Course." ASTM International Symposium on Mechanical Properties of Frozen Soils, STP1568. Jacksonville, FL.

92. Eun, J., and Tinjum, J.M. 2012. "Unsaturated Transport of Ebullition Gas through Sediment Capping Geotextiles and Sand." 5th Asia-Pacific Conference on Unsaturated Soils. 481–486.

93. Eun, J., and Tinjum, J.M. 2012. "Variation in Air Entry Suction of Nonwoven Geotextiles with Pore Size Distribution." 5th Asia-Pacific Conference on Unsaturated Soils. 475–480.

94. Rajaei, M. and Tinjum, J.M. 2012. "Life Cycle Assessment of Energy Balance and Emissions of a Wind Energy Plant." 17th Annual Great Lakes Geotechnical/Geoenvironmental Conference. Cleveland, OH.

95. Ebrahimi, A., Fratta, D., and Tinjum, J.M. 2010. "Detection of Fouling in Ballast by Electromagnetic Surveying." AREMA 2010 Annual Conference & Exposition. Orlando, FL.

96. Ebrahimi, A., Tinjum, J.M., and Edil, T.B. 2010. "Large-scale, Cyclic Triaxial Testing of Rail Ballast." AREMA 2010 Annual Conference & Exposition. Orlando, FL.

97. "Use of BE2ST in-Highways for Green Highway Construction Rating in Wisconsin." Proceedings of 1st T&DI Green Streets & Highway Conference. 480–494.

98. Keene, A.K., Edil, T.B., Tinjum, J.M., and Brown, B.W. 2012. "Mechanical Properties of Polyurethane-stabilized Ballast." International Symposium on Geotechnical Engineering for High-speed Transportation Infrastructure. Hangzhou, China.

99. Keene, A.K., Edil, T.B., Tinjum, J.M., and Brown, B.W., 2012. "Engineering Design of Polyurethane-stabilized Ballast." 3rd International Conference. on New Developments in Soil Mechanics and Geotechnical Engineering. Near East Univ., Nicosia, Cyprus.

**Technical Reports**

100. Yu-Feng Lin, Andrew Stumpf, Scott Frailey, Roland Okwen, Yongqi Lu, Franklin Holcomb, James Tinjum, Timothy Stark, James Damico, Scott Elrick, Kevin Fisher, Wenfeng Fu, Damon Garner, Chuck Hammock, James Kirksey, Chris Korose, Jiale Lin, Zhaowang Lin, Ray McKaskle, J Nelson, Hafiz Salih, Lauren Thomas, Jeff Urlaub, Austyn Vance, and Fang Yang. 2020. "Geothermal Heat Recovery Complex: Large-Scale, Deep Direct-Use System in a Low-Temperature Sedimentary Basin." Illinois State Geological Survey, Prarie Research Institute.

101. Wen, H., Muhunthan, B., Wang, J., Li, X., Edil, T., and Tinjum, J.M. 2014. "Characterization of Cementiously Stabilized Layers for Use in Pavement Design." National Academy of Sciences. *National Cooperative Highway Research Program (NCHRP)* Report 789. ISBN 978-0-309-30813-7.

102. CH2M HILL. 2009. "COPR Investigation, Dundalk Marine Terminal, Baltimore, Maryland." Technical Report to Honeywell Inc. and Maryland Port Administration.

103. Geosyntec Consultants. 2009. "COPR Heave Investigation Report, Dundalk Marine Terminal, Baltimore, Maryland." Technical Report to Honeywell Inc. and Maryland Port Administration.

104. Tinjum, J.M., Liu, X., and Klett, N. 2008. "Characterization and Stabilization Mechanisms of Secondary Aluminum Processing Waste." UW–Madison GeoEngineering Technical Report 08-5.

**Publications by Students Without Co-Author Credit**

105.    Ebrahimi, A. and Keene, A.K. 2011. "Maintenance Planning of Railway Ballast." Proceedings of the AREMA Annual Conference, Minneapolis, MN. Reviewed paper and presentation material, which was presented by Keene.

106.    Ebrahimi, A. 2011. "Behavior of Fouled Ballast." Railway Track & Structures, August.

## SYNERGISTIC ACTIVITIES

- ASCE Fellow (elected 2018)
- Chair, College of Engineering Academic Planning Committee (2016 – 2017)
- Wisconsin Professional Engineer, License No. 33972-006
- Southwest Branch (ASCE Wisconsin Section) – President (2002 – 2003)
- Junior Engineers Tomorrow's Scientists, Denver – Civil Engineering Director (1996 – 1998)
- ASCE Zone III Practitioner Advisor of the Year (2003)
- ASCE Wisconsin Section Outstanding Young Engineer (2002)

## AFFILIATIONS

***Graduate Advisor***: Professor Craig Benson**,** Dean of the College of Engineering (emeritus), University of Virginia

***Thesis Advisor and Postgraduate-Scholar Sponsor:***  Connor Acker (UW-Madison), Timothy Boecher (Braun Intertec), Jeff Casmer (Braun Intertec), Jin Cheol Lee (1st ROK Marine Division), Ali Ebrahimi (Geosyntec), Chris Enos (Westwood Engineering), Jongwan Eun (U. of Nebraska), Ahmet Gokce (TUBITAK), Damien Hesse (Terracon), Sam Jorgensen (Westwood Engineering), Andrew Keene (UT-Austin), Emre Kucukkirca (Shannon & Wilson), Xiaoming Liu (U. Sci. & Tech., Beijing), Adam McDaniel (Westwood Engineering), Lauren Meyer (Engineering Analytics), Andrew Millspaugh (Natural Resource Technology), Kongrat Nokkaew (Katsaert U.), Hyunjun Oh (UW-Madison), Ayşe Özdoğan-Dölçek (Balıkesir U.), Katrina Rhoades (CH2M HILL), Paul Schlicht (Golder), Stephen Schubert (Patrick Engineering), Ryan Shedivy (Golder), Zhipeng Su (Shenyuan Geotechnical Engineering), Lauren Thomas (UW-Madison), Matthew Walker (Barr Engineering), Benjamin Warren (Shannon & Wilson), Nikki Woodward (Kleinfelder), Ray Wu (FTI Consulting), Mehmet Yilmaz (Turkish Education Ministry), Wei-hao Zen (Hong Kong).